# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*,

*Plaintiffs,*

v.

UNITED AIRLINES, INC.,

*Defendant*.

Civil Action No.: 4:21- 01074-P

# MEMORANDUM IN SUPPORT OF MOTION FOR
# TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

BACKGROUND ................................................................................................ 2

STANDARD OF REVIEW ............................................................................... 6

ARGUMENT .................................................................................................... 6

I.      EEOC Review is No Obstacle Here to Preliminary Injunctive Relief ............................... 6

II.     Preliminary Injunctive Relief is Appropriate and Necessary to Remedy United's
        Ongoing Violation of Federal Law. ................................................................................ 9

        A.      Plaintiffs are likely to succeed on the merits of their Title VII claims. ................. 9

        B.      Plaintiffs are likely to succeed on the merits of their ADA claims. .................... 16

        C.      Without preliminary injunctive relief, Plaintiffs will suffer irreparable injury. ... 18

        D.      Plaintiffs' injury outweighs any potential hardship to United. ............................ 21

        E.      Granting the injunction will serve the public interest. ......................................... 22

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*ADT v. Capital Connect,*
    145 F. Supp. 3d 671 (N.D. Tex. 2015) ............................................................ 18, 20

*Am. Postal Workers Union v. Postmaster Gen.,*
    781 F.2d 772 (9th Cir. 1986) ........................................................................... 9

*Ansonia Bd. of Educ. v. Philbrook,*
    479 U.S. 60 (1986) ........................................................................................ 13

*Bailey v. Delta Air Lines,*
    722 F.2d 942 (1st Cir. 1983) ........................................................................... 7

*Baily v. Dallas Cnty. Sch.,*
    No. 3:16-cv-1642-M, 2016 WL 7638146 (N.D. Tex. Dec. 9, 2016) ........................ 7

*Baker v. Am. Airlines,*
    430 F.3d 750 (5th Cir. 2005) ........................................................................... 14

*Bolden v. Caravan,*
    112 F. Supp.3d 785 (N.D. Ind. 2015) ............................................................... 9

*Brener v. Diagnostic Ctr. Hosp.,*
    671 F.2d 141 (5th Cir. 1982) ........................................................................... 10

*Bultemeyer v. Fort Wayne Cmty. Schs.,*
    100 F.3d 1281 (7th Cir. 1996) ......................................................................... 12

*Burlington N. & Santa Fe Ry. Co. v. White,*
    548 U.S. 53 (2006) ................................................................................ 11, 15, 20

*Clark Cnty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001)............................................................................................ 15, 18

*Cooper v. AT&T Corp./Lucent Tech.*,
    No. 97-CA-0628, 1998 WL 1784223 (W.D. Tex. Oct. 22, 1998),
    *report & recommendation adopted sub nom.*, No. 97-CA-0628,
    1998 WL 1978660 (W.D. Tex. Dec. 8, 1998) ........................................................ 14

*Davis v. Dallas Area Rapid Transit*,
    383 F.3d 309 (5th Cir. 2004) ............................................................................... 14

*Davis v. Fort Bend Cnty.*,
    765 F.3d 480 (5th Cir. 2014) ............................................................................... 10

*Dickerson v. United Parcel Serv.*,
    No. 3:95-CV-2143, 1999 WL 966430 (N.D. Tex. Oct. 21, 1999)............................ 18

*Dr. A. v. Hochul*,
    No. 21-cv-1009 (N.D.N.Y. Sept. 14, 2021)...................................................... 19, 23

*Drew v. Liberty Mut. Ins.*,
    480 F.2d 69, 72, 74 (5th Cir. 1973) ......................................................... 2, 6, 7, 8

*EEOC v. AutoNation USA Corp.*,
    52 F. App'x 327 (9th Cir. 2002) ............................................................................ 9

*EEOC v. Chevron Phillips Chem. Co.*,
    570 F.3d 606 (5th Cir. 2009) ..................................................................... 10, 11, 16

*EEOC v. Jetstream*,
    No. 13-cv-02340, 2016 WL 879625 (D. Colo. Mar. 8, 2016) ................................ 9

*EEOC v. Universal Mfg. Corp.*,
    914 F.2d 71 (5th Cir. 1990) ................................................................................. 13

*Enyart v. Nat'l Conf. of Bar Exam'rs*,
    630 F.3d 1153 (9th Cir. 2011) .............................................................................. 24

*Feist v. Louisiana*,
    730 F.3d 450 (5th Cir. 2013) ............................................................................... 16

*Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*,
    601 F.2d 199 (5th Cir. 1979) ................................................................................. 6

*FTC v. Dean Foods Co.*,
    384 U.S. 597 (1966)............................................................................................. 8

*Harvest Rock Church, Inc. v. Newsom*,
    141 S. Ct. 889 (2020).......................................................................................... 23

*Hilliard v. BellSouth Med. Assistance Plan*,
    918 F. Supp. 1016 (S.D. Miss. 1995).................................................................... 7

*Kathleen S. v. Dep't of Pub. Welfare of Pa.*,
    10 F. Supp. 2d 476 (E.D. Pa. 1998) .................................................................... 24

*Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*,
   578 F.2d 1122 (5th Cir. 1978) .................................................................. 6

*Ladd v. Livingston*,
   777 F.3d 286 (5th Cir. 2015) .................................................................. 6

*Love v. City of Dallas*,
   No. 3:96-CV-0532-R, 1997 WL 278126 (N.D. Tex. May 14, 1997) ..................... 11, 12, 15, 18

*Lyon v. Illinois High Sch. Ass'n*,
   No. 13-CV-00173, 2013 WL 140926 (N.D. Ill. Jan. 10, 2013), *as amended* (Jan. 11, 2013).. 24

*Martin v. Metro. Atlanta Rapid Transit Auth.*,
   225 F. Supp. 2d 1362 (N.D. Ga. 2002) ...................................................... 24

*McCoy v. City of Shreveport*,
   492 F.3d 551 (5th Cir. 2007) .................................................................. 14

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)............................................................................ 10

*Miller v. Port Auth. of N.Y. & N.J.*,
   351 F. Supp. 3d 762 (D.N.J. 2018) ........................................................... 9

*Moss v. Harris Cnty. Constable Precinct One*,
   851 F.3d 413 (5th Cir. 2017) .................................................................. 16

*Myers v. Hose*,
   50 F.3d 278 (4th Cir. 1995) .................................................................. 13

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*,
   389 F.3d 973 (10th Cir. 2004) ................................................................ 22

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
   No. 19-CV-2002, 2019 WL 7372508 (E.D. Pa. Dec. 31, 2019), *aff'd*, 968 F.3d 251 (3d Cir.
   2020), *cert. denied*, 141 S. Ct. 1517 (2021)............................................... 24

*Roberts v. Neace*,
   958 F.3d 409 (6th Cir. 2020) .................................................................. 23

*Rogers v. Commonwealth of Pa.*,
   No. 2:97-cv-6627, 1997 WL 793585 (E.D. Pa. Dec. 9, 1997) .............................. 7

*Rogers v. Int'l Marine Terminals*,
   87 F.3d 755 (5th Cir. 1996) .................................................................. 13

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020)............................................................................ 23

*S. Bay United Pentecostal Church v. Newsom*,
   141 S. Ct. 716 (2021)........................................................................... 23

*Sheehan v. Purolator Courier Corp.*,
   676 F.2d 877 (2d Cir. 1981)................................................................... 7

*Strong v. Univ. Healthcare Sys.*,
   482 F.3d 802 (5th Cir. 2007) ................................................................. 15

*Sughrim v. New York*,
   503 F. Supp. 3d 68 (S.D.N.Y. 2020)..................................................................... 7

*Tabatchnik v. Cont'l Airlines*,
   262 F. App'x 674 (5th Cir. 2008) .......................................................................... 18

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021) ........................................................................................... 23

*Thomas v. Nat'l Ass'n of Letter Carriers*,
   225 F.3d 1149 (10th Cir. 2000) ............................................................................... 9

*Turpen v. Missouri-Kansas-Texas R.R. Co.*,
   736 F.2d 1022 (5th Cir. 1984) ............................................................................... 11

*TWA v. Hardison*,
   432 U.S. 63 (1977).................................................................................................. 13

*Union Pac. Ry. Co. v. Botsford*,
   141 U.S. 250 (1891)................................................................................................ 23

*Vaughn v. Waffle House*,
   263 F. Supp. 2d 1075 (N.D. Tex. 2003) .............................................................. 11

*Ward v. Walsh*,
   1 F.3d 873 (9th Cir. 1993) ..................................................................................... 22

*Weber v. Roadway Express*,
   199 F.3d 270 (5th Cir. 2000) ................................................................................... 9

*Winston v. Lee*,
   470 U.S. 753 (1985)................................................................................................ 23

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)................................................................................................ 22

## Statutes

42 U.S.C. § 12111.......................................................................................................... 17

42 U.S.C. § 12112.................................................................................................... 16, 17

42 U.S.C. § 12203.......................................................................................................... 18

42 U.S.C. § 2000e............................................................................................................. 9

42 U.S.C. § 2000e-2.......................................................................................................... 9

42 U.S.C. § 2000e-5........................................................................................................ 7, 8

## Other Authorities

*Comirnaty and Pfizer-BioNTech COVID-19 Vaccine*, U.S. FOOD & DRUG. ADMIN.,
   https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-
   2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine.............................. 3

David Koenig, *United Airlines will require US employees to be vaccinated*, AP NEWS (Aug. 6, 2021) ................................................................................................ 4

*EU Digital COVID Certificate*, EUROPEAN COMM'N ............................................. 14

*Johnson & Johnson COVID-19 Vaccine Authorized by U.S. FDA For Emergency Use – First Single-Shot Vaccine in Fight Against Global Pandemic*, JOHNSON & JOHNSON (Feb. 27, 2021) ...................................................................... 2

*Jumpseat Committee Update*, UNITED MASTER EXECUTIVE COUNCIL (Sept. 16, 2021)................. 4

Leslie Josephs, *United will require its U.S. employees to be vaccinated, a first for country's major airlines*, CNBC (Aug. 6, 2021) ........................................... 3, 4

Michael Erman, *U.S. FDA authorizes Pfizer COVID-19 vaccine for emergency use*, REUTERS (Dec. 11, 2020) .................................................................................. 2

*Moderna COVID-19 Vaccine*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine.................................................................................................. 2

*Path out of the Pandemic, President Biden's COVID-19 Action Plan*, THE WHITE HOUSE ........ 13

Zach Griff, *United's ditching 2 major COVID-19 modifications, including electrostatic spraying*, THE POINTS GUY (July 12, 2021) ......................................... 4

United Airlines ("United") recently announced that its employees must receive a COVID-19 vaccine by September 27, 2021, or face termination.  Plaintiffs represent a class of United employees with religious and medical objections to receiving that vaccine.  Each Plaintiff requested a religious or medical accommodation, but United responded by offering—at best—the false accommodation of indefinite leave without pay.  In doing so, United violated its obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA") to provide reasonable accommodations.  United also violated federal law by retaliating against Plaintiffs for participating in the protected activity of requesting accommodations, essentially penalizing employees for exercising their rights.

Each Plaintiff has filed administrative claims with the Equal Employment Opportunity Commission ("EEOC") challenging United's discriminatory practices.  Those claims remain pending, and this Motion asks only that the Court suspend the timeline of United's vaccine mandate temporarily for those who request religious or medical accommodations to allow the EEOC sufficient time to complete its review of Plaintiffs' claims.  To be clear: Plaintiffs do not challenge the vaccine mandate itself through this action.  They merely ask the Court to require United to follow federal law and grant reasonable accommodations to the vaccine mandate.

Unless the Court temporarily enjoins United's mandate for all employees with religious or medical reasons for seeking an accommodation, Plaintiffs and thousands of others similarly situated will suffer harms that neither the EEOC nor this Court can remedy.  Facing the risk of lost income, many United employees may opt to receive the vaccine, despite their religious beliefs or health concerns.  Other employees may suffer such significant harms that monetary damages will be insufficient as a remedy.  These injuries include homelessness, the inability to continue paying for life-saving medical care, and the disruption of a dependent's college education.  The Court

should exercise its equity jurisdiction to temporarily enjoin United's vaccine mandate for those with religious or medical reasons for seeking an accommodation "to preserve the court's ability to later order meaningful relief." *Drew v. Liberty Mut. Ins.*, 480 F.2d 69, 72, 74 (5th Cir. 1973).

## BACKGROUND

By Spring 2020, COVID-19 was spreading rapidly around the world.  At that time, United began implementing certain mitigation procedures for its workforce, including requiring employees to wear masks and maintain distance from others.  *See* Sambrano Aff. ¶ 8 (App.3); Hamilton Aff. ¶ 5 (App.7).  Since then, at least three separate COVID-19 vaccines have been developed and authorized for use in the United States.

The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine in December 2020.  *See* Michael Erman, *U.S. FDA authorizes Pfizer COVID-19 vaccine for emergency use*, REUTERS (Dec. 11, 2020), https://www.reuters.com/article/us-health-coronavirus-fda-pfizer/u-s-fda-authorizes-pfizer-covid-19-vaccine-for-emergency-use-idUSKBN28L1IG.  A week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine.  *See Moderna COVID-19 Vaccine*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine.  Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.  *See Johnson & Johnson COVID-19 Vaccine Authorized by U.S. FDA For Emergency Use – First Single-Shot Vaccine in Fight Against Global Pandemic*, JOHNSON & JOHNSON (Feb. 27, 2021), https://www.jnj.com/johnson-johnson-covid-19-vaccine-authorized-by-u-s-fda-for-emergency-usefirst-single-shot-vaccine-in-fight-against-global-pandemic.  On August 23, 2021, the FDA issued full approval for the Pfizer vaccine Comirnaty for individuals 16 years of age and older.  *See Comirnaty and Pfizer-BioNTech COVID-19*

*Vaccine*, U.S. FOOD & DRUG. ADMIN., https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine.

On August 6, 2021, United announced that all employees—even those who already had the disease and are still immune—would be required to receive a COVID-19 vaccine within five weeks of the FDA granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first.  *See* Hamilton Aff. ¶ 4 (App.7).  Because the FDA approved a form of Pfizer's COVID-19 vaccine on August 23, 2021, United employees must receive a COVID-19 vaccine by September 27, 2021, or be terminated.  *See id.*  United's mandate is absolute; there is no alternative for periodic testing, mask wearing, or social distancing—even for employees who have recovered from COVID-19 and possess antibodies.  Employees must choose vaccination or termination—or, for "accommodated" employees, the potential of years without pay.

When United announced the vaccine mandate, it stated that employees could request accommodations for religious or health reasons.  But United's Chief Executive Officer Scott Kirby then threatened United employees "to be very careful about" requesting such accommodations.  Mr. Kirby stated that there would be very "few people that get through the medical and religious exemption process"—describing such employees derisively as "all [of a] sudden decid[ing] 'I'm really religious.'"  *Id.* ¶ 15 (App. 9).  Mr. Kirby threatened those employees by stating that they are "putting [their] job[s] on the line" if they request such accommodations.  *Id.*

According to United, this vaccination mandate will increase employee safety.  *See* Leslie Josephs, *United will require its U.S. employees to be vaccinated, a first for country's major airlines*, CNBC (Aug. 6, 2021), https://www.cnbc.com/2021/08/06/united-airlines-vaccine-mandate-employees.html.  But United does not require any passenger flying on its planes, or interacting with its staff, to be vaccinated.  *See* David Koenig, *United Airlines will require US*

*employees to be vaccinated*, AP NEWS (Aug. 6, 2021), https://apnews.com/article/united-airlines-vaccine-mandate-employees-frontier-e8eef8e8f11d4924b81768484e5401a1.  Nor does it require its employees from other countries to be vaccinated, even though those employees work and come into contact with United crews from the United States.  *Id*.  And pilots from other airlines allowed to ride in the "jumpseat" of the aircraft (in the cockpit) are not subject to United's vaccine mandate, although they may be asked to wear a mask during the flight at the discretion of the United pilot.  *See Jumpseat Committee Update*, UNITED MASTER EXECUTIVE COUNCIL (Sept. 16, 2021) https://contentsharing.net/actions/email_mobile_web_version.cfm?recipient_id=2940366754&message_id=20802705&user_id=ALPA&jobid=53070823.  At the same time, United has relaxed requirements for flight attendants wearing gloves and eye protection, and the company no longer ensures the "deep" cleaning of aircraft after each flight as it did at the outset of the pandemic.  *See, e.g.,* Zach Griff, *United's ditching 2 major COVID-19 modifications, including electrostatic spraying*, THE POINTS GUY (July 12, 2021), https://thepointsguy.com/news/united-ends-electrostatic-spraying-deplaning-process/.  Moreover, United does not require the regional airline crews that fly for them to be vaccinated.  *See* Josephs, *supra*.

Plaintiffs are six United employees in varying positions and working environments.  Plaintiffs Sambrano and Turnbough are pilots.  *See* Sambrano Aff. ¶ 2 (App.2); Turnbough Aff. ¶ 2 (App.13).  Plaintiff Castillo is an Aircraft Technician.  *See* Castillo Aff. ¶ 2 (App.18).  Plaintiff Hamilton is a Station Operations Representative who works in an office setting.  *See* Hamilton Aff. ¶ 2 (App.7).  Plaintiff Jonas is a United Club Representative at DFW, where she works in the United Club lounge.  *See* Jonas Aff. ¶ 2 (App.23).  And Plaintiff Kincannon is a Flight Attendant.  *See* Kincannon Aff. ¶ 2 (App.28).  Each Plaintiff requested a reasonable accommodation from United's vaccine mandate for religious or medical reasons, or both.  *See, e.g.*, Sambrano Aff. ¶ 11

4

(App.3); Castillo Aff. ¶ 5 (App.18); Turnbough Aff. ¶ 6 (App.14); Jonas Aff. ¶ 16 (App.25).

Despite each Plaintiff working in a different environment—aircraft, offices, or large open spaces—United failed to contact them to discuss possible accommodations, responding only with a uniform "accommodation" of indefinite unpaid leave.  *See* Sambrano Aff. ¶ 12 (App.3); Turnbough Aff. ¶ 9 (App.14).  While on unpaid leave, the Plaintiffs, like all other "accommodated" United employees across the country, may not use accrued vacation or sick leave, may not accrue vacation or sick leave, and must pay all medical insurance premiums, including United's portion. *See* Sambrano Aff. ¶ 13 (App.3); Castillo Aff. ¶ 8; Turnbough Aff. ¶ 10 (App.14).  While requests were nominally "granted," the result was termination.[1]

As discussed in the accompanying declarations, United's discriminatory and retaliatory actions impose significant personal and professional harms on each Plaintiff.  Each Plaintiff will suffer immediate financial hardship if they lose their regular income stream.  *See*, *e.g.*, Sambrano Aff. ¶ 17 (App.4); Castillo Aff. ¶ 14 (App.19).  Several will be unable to pay necessary medical expenses, and the specter of losing health insurance is presently impacting healthcare decisions regarding treatment options.  *See, e.g.*, Castillo Aff. ¶ 14 (App.19); Hamilton Aff. ¶¶ 12–15 (App.8–9); Jonas Aff. ¶ 11 (App.24).  Extended unpaid leave will also affect certain Plaintiffs' ability to afford housing, transportation, and education.  *See* Castillo Aff. ¶ 13 (App.19); Sambrano Aff. ¶ 17 (App.4); Jonas Aff. ¶¶ 12-13 (App.24).  Moreover, United's actions have brought significant stress into Plaintiffs' lives and are disrupting family relationships.  *See, e.g.*, Hamilton Aff. ¶ 9 (App.8); Jonas Aff. ¶ 14 (App.24).

---

[1] United will now allow individuals granted medical accommodations to first use their earned sick pay while out of work, even though there is no sickness preventing the employees from working. Once that brief amount of pay is used, however, the employee will be on regular unpaid leave.

5

## STANDARD OF REVIEW

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must establish: "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015). "[F]inding a substantial likelihood that movant will ultimately prevail on the merits does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979) (citation and quotation marks omitted). "Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others." *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

## ARGUMENT

### I.    EEOC Review is No Obstacle Here to Preliminary Injunctive Relief.

Each Plaintiff has a pending charge with the EEOC complaining of United's discriminatory and retaliatory actions. *See* Sambrano Aff. ¶ 19 (App.4); Castillo Aff. ¶ 16 (App.20); Hamilton Aff. ¶ 19 (App.9); Jonas Aff. ¶ 16 (App.25); Kincannon Aff. ¶ 15 (App.30); Turnbough Aff. ¶ 18 (App.16).  This does not prevent an injunction against United's current course of actions.  While individuals asserting claims under Title VII or the ADA must complete the EEOC's administrative process before seeking "final relief" through a civil action, courts in this Circuit may grant preliminary injunctive relief on those claims where "irreparable injury is shown and likelihood of ultimate success has been established[.]" *Drew*, 480 F.2d at 71, 72.  In such cases, an "individual

employee may bring her own suit to maintain the status quo pending the action of the [EEOC] on the basic charge of discrimination." *Id.* at 72; *see also id.* at 74 (preliminary injunctive relief is necessary "to preserve the court's ability to later order meaningful relief."); *Hilliard v. BellSouth Med. Assistance Plan*, 918 F. Supp. 1016, 1026 (S.D. Miss. 1995) (holding that a plaintiff may "proceed [on an ADA claim] without first exhausting the EEOC's administrative process" where there is a showing of irreparable injury); *Baily v. Dallas Cnty. Sch.*, No. 3:16-cv-1642-M, 2016 WL 7638146, at *2 n.4 (N.D. Tex. Dec. 9, 2016) ("Exhaustion of administrative remedies in the ADA context is similarly a condition precedent rather than a jurisdictional prerequisite to suit.").

Other courts outside this Circuit agree.  The Second Circuit explained that where, as here, "the court eventually will have jurisdiction of the substantive claim and an administrative tribunal has preliminary jurisdiction, the court has incidental equity jurisdiction to grant temporary relief to preserve the status quo pending the ripening of the claim for judicial action on its merits." *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981).  The First Circuit and several district courts have also held that plaintiffs may obtain injunctive relief during the EEOC process.  *See Bailey v. Delta Air Lines*, 722 F.2d 942, 944 (1st Cir. 1983); *Sughrim v. New York*, 503 F. Supp. 3d 68, 96 (S.D.N.Y. 2020) ("[T]emporary injunctive relief is available on Title VII claims before a plaintiff receives a right to sue letter from the EEOC[.]"); *Rogers v. Commonwealth of Pa.*, No. 2:97-cv-6627, 1997 WL 793585, at *3 (E.D. Pa. Dec. 9, 1997) ("42 U.S.C. § 2000e-5(f)(2) does not divest an individual plaintiff of the right to seek injunctive relief during an EEOC investigation.").

This conclusion is consistent with the history of Title VII.  *See Sheehan*, 676 F.2d at 881. Before Title VII was amended in 1972, "the sole right to enforce Title VII in the courts was given to the person aggrieved[,]" including seeking preliminary injunctive relief.  *Id.* at 882–86.  In 1972,

Congress amended Title VII to "explicitly authorize[ ] the EEOC to 'bring an action for appropriate temporary or preliminary relief' at any time, regardless of the status of any informal negotiation[.]" *Id.* at 881 (quoting 42 U.S.C. § 2000e-5(f)(2)).   While Congress did not add a "comparable provision with respect to individuals," the history of the provision shows there was no need for it: "[R]eading the statute as a whole, and having due regard for Congress's intent in enacting Title VII, . . . courts [are] entitled to use [their] inherent equity power to award temporary injunctive relief, in appropriate circumstances, in order to maintain the status quo prior to the EEOC's issuance of a right to sue letter."   *Id.*; *see also Drew*, 480 F.2d at 74 (concluding that Congress's silence should not be interpreted as "impliedly destroy[ing] an existing right of action").   As the Supreme Court has explained elsewhere, there is "a limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels. . . . Such power has been deemed merely incidental to the court's jurisdiction to review final agency action[.]"   *FTC v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (quotation marks omitted).

Preliminary injunctive relief is imperative to maintain the status quo here.   Without such relief, the Plaintiffs face an impossible choice—one for which the EEOC and this Court will have no remedy.   Plaintiffs must decide by September 27, 2021, whether to receive the COVID-19 vaccine or face termination—literally or functionally.   It is understandable that United employees may be considering acquiescing to the mandate, as many have already been coerced into doing, thereby risking their health and/or their conscience in favor of their livelihood.   If the Court does not enter preliminary relief for those employees with religious or medical reasons for seeking an injunction and those employees determine that they must forsake their consciences or health to maintain their income, that decision cannot be reversed or remedied by a subsequent EEOC

8

decision.  Moreover, Plaintiffs face many other immediate harms for which the Court will not be

able to fashion a remedy later.  "[T]o preserve [this] court's ability to later order meaningful relief,"

it must enter preliminary injunctive relief now.  *Drew*, 480 F.2d at 74.

## II.    Preliminary Injunctive Relief is Appropriate and Necessary to Remedy United's Ongoing Violation of Federal Law.

### A.    Plaintiffs are likely to succeed on the merits of their Title VII claims.

United has violated Title VII in multiple ways.  First, the company discriminated against

Plaintiffs by failing to engage in the interactive process and by not providing reasonable religious

accommodations.  Second, United retaliated against Plaintiffs for engaging in protected activity.

Any of these actions will give rise to liability for United.[2]

1. Title VII prohibits an employer from discriminating against an employee "because of

such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  This "includes all aspects of religious

observance and practice, as well as belief, unless an employer demonstrates that he is unable to

reasonably accommodate an employee's . . . religious observance or practice without undue

hardship on the conduct of the employer's business."  *Id.* § 2000e(j); *see Weber v. Roadway

Express*, 199 F.3d 270, 273 (5th Cir. 2000).  After receiving an accommodation request, "the

employer is obligated by law to engage in an interactive process—a meaningful dialogue with the

---

[2] Plaintiffs recognize that courts "have not been consistent" about whether Title VII provides an independent cause of action for failure to engage in the interactive process.  *Miller v. Port Auth. of N.Y. & N.J.*, 351 F. Supp. 3d 762, 787 (D.N.J. 2018).  Some courts recognize an obligation under Title VII to engage in the interactive process.  *See, e.g.*, *EEOC v. AutoNation USA Corp.*, 52 F. App'x 327, 329 (9th Cir. 2002); *Am. Postal Workers Union v. Postmaster Gen.*, 781 F.2d 772, 777 (9th Cir. 1986); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000).  Others do not.  *See EEOC v. Jetstream*, No. 13-cv-02340, 2016 WL 879625, at *4 (D. Colo. Mar. 8, 2016); *Bolden v. Caravan*, 112 F. Supp.3d 785, 791 (N.D. Ind. 2015).  The argument is academic here, though. as Plaintiffs will succeed on their Title VII discrimination claim either way.  United's failure to engage in the interactive process merely underscores the unreasonableness of the so-called accommodation.  United did not bother to engage with the requesters because it never had any intention of accommodating the requests.

employee[.]"  *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (cleaned up).  The employer must act in "good faith," *id.*, and the employee must "make a good faith attempt to satisfy his needs through means offered by the employer," *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).  United failed to engage in the interactive process and failed to provide any reasonable religious accommodations.  As such, Plaintiffs are likely to succeed in showing that United violated Title VII.

Under Title VII, Plaintiffs "must first establish a *prima facie* case of religious discrimination."  *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  In order to establish a *prima facie* case of religious discrimination based on a failure to accommodate, Plaintiffs must show that: (1) they have *bona fide* religious beliefs that conflict with an employment requirement; (2) about which they informed United; and (3) they suffered an adverse employment action for failing to comply with the conflicting employment requirement.  *Id.*  Plaintiffs are likely to succeed on each prong.

On the first prong, "a court's inquiry" does not analyze the merits of the religious beliefs; "whether the belief is a true religious tenet[ ] is not open to question."  *Davis*, 765 F.3d at 485 (citation and quotation marks omitted).  Rather, a court asks only "whether [the individual's beliefs] are, *in his own scheme of things*, religious."  *Id.* (alteration in original).  United has already conceded this issue, accepting Plaintiffs' religious beliefs when it purported to grant such requesters an "accommodation."  *See, e.g.*, Sambrano Aff. ¶ 12 (App.3); Hamilton Aff. ¶ 11 (App.8).  United cannot argue now that those employees lack religious bases for requesting an accommodation.  Plaintiffs are thus likely to succeed in satisfying the first two prongs of the *prima facie* case requirement.

Plaintiffs will also be able to show that they suffered an adverse employment action.  The

only accommodation United offered was indefinite unpaid leave, and "leave without pay differs very little from termination." *Love v. City of Dallas*, No. 3:96-CV-0532-R, 1997 WL 278126, at *6 (N.D. Tex. May 14, 1997). Just because an employee is "not completely severed" from his employment "does not mean that cutting off [his] paycheck was not an adverse action." *Id.* The Supreme Court agrees, holding that a period of just 37 days of unpaid leave, even when later reimbursed, constitutes an adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72 (2006). Despite the employee subsequently receiving backpay, the Supreme Court noted that "White and her family had to live for 37 days without income" and "[t]hey did not know during that time whether or when White could return to work." *Id.* "Many reasonable employees would find a month without a paycheck to be a serious hardship." *Id.* Yet United is forcing employees who requested a religious accommodation, even employees with pre-existing immunity to COVID-19, to forgo their paychecks due to their religious beliefs—and likely for much longer than 37 days. Plaintiffs are thus likely to satisfy the "adverse employment action" requirement.

The burden then shifts to United to demonstrate that it cannot "reasonably accommodate" Plaintiffs' needs without suffering undue hardship. *Turpen v. Missouri-Kansas-Texas R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984); *see also* 42 U.S.C. § 2000e(j). United cannot do so. The touchstone for this analysis is the "reasonable[ness]" of the proposed accommodation. *See Vaughn v. Waffle House*, 263 F. Supp. 2d 1075, 1082–83 (N.D. Tex. 2003). By failing to engage each requester in "a meaningful dialogue" about the accommodation request, United has no way to know whether an acceptable accommodation would impose an undue hardship. *Chevron*, 570 F.3d at 621. Announcing only a one-size-fits-all accommodation deprived both United and Plaintiffs of the dialogue necessary to identify accommodations that would not be unduly burdensome. And

11

United's approach to the accommodation requests was certainly not made in "good faith." *Id.*; *see also Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary" and "[a] party that fails to communicate . . . may also be acting in bad faith"). Indeed, the only reason not to engage in the interactive process here was that United never intended to provide an accommodation that would keep employees whose requests were "approved" actually working.

In determining whether a company has engaged in an adequate search for a reasonable accommodation, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Bultemeyer*, 100 F.3d at 1285. The only breakdown here occurred when United refused to engage with its employees and instead announced a single accommodation for everyone. United will not be able to show that it engaged in the interactive process, which is made clear by the fact that United did not offer any requester an accommodation tailored to their request or circumstances. In fact, the only interaction between United and its employees requesting religious accommodations was a series of improper questions designed to coerce individuals into taking the vaccine contrary to their consciences. *See* Kincannon Aff. ¶ 7 (App.29).

United also failed to offer reasonable accommodations. Forcing employees into an indefinite amount of time on unpaid leave—potentially lasting several years—is effectively termination. *See Love*, 1997 WL 278126, at *6.[3] But this cannot be reasonable because a "[r]easonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in

---

[3] To be sure, there are cases holding that unpaid leave "can be a reasonable accommodation." *Delaval v. PTech Drilling Tubulars*, 824 F.3d 476, 481 (5th Cir. 2016). In contrast, Plaintiffs have not requested unpaid leave.

question." *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 759–60 (5th Cir. 1996) (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)).  United took no steps to "presently, or in the immediate future" allow Plaintiffs to "perform the essential functions of [their] job[s.]"  *Id.*  Instead, United apparently identified only the most unreasonable option—short of *formal* termination—and put it in place for all requesters.  Employers are not "free to choose an unreasonable form of accommodation over a reasonable one."  *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 74 (5th Cir. 1990) (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986)).

United may seek to rely on the Supreme Court's decision in *TWA v. Hardison*, 432 U.S. 63 (1977), where the Court held that requiring an employer "to bear more than a *de minimis* cost" in order to accommodate an employee "is an undue hardship."  *Id.* at 84.  But *Hardison* differs substantially from this case.  First, unlike *Hardison*, United did not attempt to determine the cost of accommodating its employees.   Second, the employee in *Hardison* sought a religious accommodation that would have required the employer to breach a collective-bargaining agreement or pay other employees overtime to cover the shifts.  *Id.* at 76-77.  In that context, such burdens exceeded a "*de minimis* cost" and constituted an "undue hardship."  *Id.* at 84.

In contrast, Plaintiffs here wish to continue working their jobs without being required to violate their conscience.  They are not asking for any accommodation that places a hardship on United.  Indeed, there are a host of reasonable accommodations that are not unduly burdensome, including: mask wearing, periodic testing for COVID-19 antibodies, or periodic COVID-19 testing.   Even the recent federal order regarding vaccine mandates for private employers contemplates testing as a viable option.  *See Path out of the Pandemic, President Biden's COVID-19 Action Plan*, THE WHITE HOUSE, https://www.whitehouse.gov/covidplan/.   Along those lines, the European Union's digital COVID-19 certificate considers vaccination equivalent

to a negative COVID-19 test *or* having previously recovered from COVID-19. *See EU Digital COVID Certificate*, EUROPEAN COMM'N, https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en. Other options abound, which is why an arbitrary, across-the-board "accommodation" of indefinite unpaid leave finds no support in *Hardison*—United cannot identify a hardship associated with other accommodation possibilities it did not consider.

2.    Title VII also makes it unlawful for an employer to retaliate against an employee who engaged in activity protected by Title VII. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). For this claim, Plaintiffs must establish a *prima facie* case by showing that: (1) they participated in a protected activity; (2) their employer took an adverse employment action against them; and (3) a causal connection exists between the protected activity and the adverse employment action. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007). Once Plaintiffs establish a *prima facie* case, the burden shifts to United to articulate a legitimate, nonretaliatory reason for its employment action. *See id.* "[A] plaintiff need only make a low showing to shift the burden[.]" *Baker v. Am. Airlines*, 430 F.3d 750, 754 (5th Cir. 2005). If the employer identifies a legitimate, nonretaliatory reason for its employment action, "the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead a pretext for the . . . retaliatory purpose." *McCoy*, 492 F.3d at 557.

Plaintiffs can establish each *prima facie* case requirement. Plaintiffs engaged in protected activity as "persons requesting religious accommodations under Title VII are protected under Title VII for making such requests." *Cooper v. AT&T Corp./Lucent Tech.*, No. 97-CA-0628, 1998 WL 1784223, at *7 n.104 (W.D. Tex. Oct. 22, 1998), *report & recommendation adopted sub nom.*, No. 97-CA-0628, 1998 WL 1978660 (W.D. Tex. Dec. 8, 1998). United responded by taking

14

adverse employment actions—determining that it is placing each employee who requested a religious accommodation on indefinite unpaid leave (with benefits stripped away), or denying the request, based solely on requesters failing to notify United of their request by an arbitrary date imposed by the company, and then preparing to terminate the employee.  *See Love*, 1997 WL 278126, at *6; *Burlington N.*, 548 U.S. at 72.  And United's antipathy toward employees with religious beliefs shows that United threatened indefinite leave *because* of the employees' religious beliefs.  Indeed, United's CEO is on record impugning the integrity of any employee requesting a religious accommodation—derisively referring to such employees as "sudden[ly] decid[ing] 'I'm really religious.'"  Hamilton Aff. ¶ 15 (App.9).

Further, temporal proximity shows a causal connection.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Strong v. Univ. Healthcare Sys.*, 482 F.3d 802, 808 (5th Cir. 2007).  Here, Plaintiffs submitted religious accommodation requests by August 31, 2021, and United stated just days later on September 9, 2021, that all requesting employees would be "granted" the accommodation of indefinite unpaid leave and lost benefits.  The events were not separated by months, *see Breeden*, 532 U.S. at 273, but mere days.

United's approach is clear: if an employee sought a religious accommodation by August 31, 2021, the request will be "approved," but the employee will be heavily penalized.  And if the request was not made by August 31, United brushes it aside and administratively denies the request—without consideration of its merits—based on the company's own arbitrary deadline, further evidencing United's antipathy toward requests for religious exemptions.  *See* Castillo Aff. ¶ 7 (App.18).  To the extent United suggests now that its indefinite unpaid leave decision was legitimate and nonretaliatory, that argument is undercut by the obvious disdain United has shown for its employees with religious beliefs.  *See* Hamilton Aff. ¶ 15 (App.9).

**B.      Plaintiffs are likely to succeed on the merits of their ADA claims.**

United also violated the ADA in multiple ways.  United failed to engage in the interactive process or to provide employees with reasonable medical accommodations.  And United retaliated against Plaintiffs seeking medical accommodations for engaging in protected activity.

1.   Under the ADA, an employer discriminates against an employee by "fail[ing] to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . the accommodation would impose an undue hardship.'" *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)).  To prevail on a failure to accommodate claim under the ADA, Plaintiffs must show that (1) they are qualified individuals with a disability; (2) the disability and its limitations were known by the employer; and (3) the employer failed to make reasonable accommodations for such limitations. *See Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017).

The Plaintiffs are likely to satisfy each of these requirements.  A "qualified individual with a disability" is anyone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]" *Chevron*, 570 F.3d at 614.  As the Plaintiffs seeking a medical exemption explained to United, they face a risk of severe impairment by receiving the COVID-19 vaccine.  *See, e.g.*, Turnbough Aff. ¶ 6 (App.14).  But they are still able to perform the essential functions of their jobs.  *See id.*  Plaintiffs are thus likely to satisfy the first two *prima facie* case requirements.

For the third prong, the ADA requires United to engage in an interactive process—a "meaningful dialogue" to discuss possible accommodations and to grant those that are reasonable. *Chevron*, 570 F.3d at 621.  For the reasons already shown, United failed to engage in such an interactive process with any requester.  *See supra* Part II.A.  United announced its one-size-fits-all accommodation without any attempt to identify the most reasonable accommodation for any

specific requester, including those who were already immune through a prior infection.

Moreover, any accommodation under the ADA must be reasonable. *See* 42 U.S.C. § 12112(b)(5)(A). As noted, indefinite unpaid leave is not a reasonable accommodation. *See supra* Part II.A. And the option for those on medical leave to use their "sick pay" prior to going on unpaid leave is of no moment. That option is temporary (lasting only until the sick pay runs out) and it unfairly takes away hours that employees have earned and may need later. At the same time, United cannot show any burden sufficient to justify its unreasonable accommodation. United will again be unable to rely on *Hardison*, as the ADA sets forth a more stringent "undue hardship" standard. *See* 42 U.S.C. § 12111(10)(A) ("[Under the ADA], the term 'undue hardship' means an action requiring significant difficulty or expense."). United cannot identify any "significant difficulty or expense" associated with granting accommodations to allow employees who requested medical accommodations to continue working with mitigation measures in place like mask wearing, periodic antibody testing, or periodic COVID-19 testing. Accordingly, Plaintiffs are likely to succeed in showing that United violated the ADA by failing to engage in the interactive process and by failing to provide reasonable accommodations.

Confirming that United is actively violating the ADA, it conceded that there are mitigation measures available to accommodate employees. United is willing to consider mitigation measures for one group (the arbitrarily defined "non-customer facing") but not others. *See* Compl. ¶ 53. Of course, such consideration is exactly what the interactive process requires. Moreover, the promise of a potential return at an indeterminate point in the future does little to ameliorate Plaintiffs' harms. And to the extent United attempts to provide accommodations to medical requesters rather than religious requesters, it simply reinforces its antipathy toward sincerely held religious beliefs.

2. The ADA also makes it unlawful to retaliate against an employee for seeking an

accommodation.  *See* 42 U.S.C. § 12203(a).  "Retaliation claims under the ADA are analyzed similarly to cases under . . . Title VII[.]"  *Dickerson v. United Parcel Serv.*, No. 3:95-CV-2143, 1999 WL 966430, at *7 (N.D. Tex. Oct. 21, 1999) (citing cases).  "[M]aking a request for a reasonable accommodation under the ADA may constitute engaging in protected activity."  *Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008).  And there can be no dispute that United responded with adverse employment actions—threatening each "accommodated" employee with indefinite unpaid leave and lost benefits.  *See Love*, 1997 WL 278126, at *6.

Finally, Plaintiffs are likely able to show that their decision to identify a disability and request an accommodation was the reason United subjected them to adverse employment actions. Not only are the adverse actions close in time to the protected activity, thereby suggesting a causal connection, *see Breeden*, 532 U.S. at 273, but Mr. Kirby made not-so-veiled threats against anyone who dared request a medical accommodation, stating that "very few people" would receive such accommodations and that individuals requesting such an accommodation were "putting [their] job[s] on the line."  Hamilton Aff. ¶ 15 (App.9).  This antipathy will certainly overcome any attempt by United to identify a legitimate, nonretaliatory reason for its actions.  Thus, Plaintiffs are likely to succeed on their ADA retaliation claims.

### C.    Without preliminary injunctive relief, Plaintiffs will suffer irreparable injury.

United has put its religious and disabled workers in an impossible position—take the COVID-19 vaccine, at the expense of their conscience and health, or face a lengthy period of unpaid leave.  Unless the Court enjoins United's actions, Plaintiffs will be irreparably harmed.

An irreparable harm is one that "cannot be undone," and an injunction is appropriate if the "anticipated injury is imminent and irreparable."  *ADT v. Capital Connect*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015).  In this case, Plaintiffs face many harms that warrant preliminary injunctive relief.  Most significantly, United is using a short deadline, coupled with the threat of a draconian

"accommodation," to compel its employees to violate their conscience or put their health at risk. Without vaccination in a matter of days, United employees face formal or effective termination.

One Ft. Worth-area man's story proves the immediate harm at issue. David Lockwood— a Station Operations Representative at DFW—had requested a religious accommodation. *See* Lockwood Aff. ¶¶ 1, 3 (App.33). But because he could not afford to be without income for an extended period, he ultimately decided to violate his religious beliefs and acquiesce to United's coercion. *See id.* ¶ 6 (App.33). Mr. Lockwood is likely not alone in that decision as the threat of immediate loss of income may be enough to force many United employees to forgo their religious beliefs and their health. Understanding the irreparable nature of such harms, the United States District Court for the Northern District of New York recently issued a temporary restraining order enjoining the New York Department of Health from enforcing a mandate that health care workers receive the COVID-19 vaccine by September 27, 2021. *See* Order, *Dr. A. v. Hochul*, No. 21-cv-1009 (N.D.N.Y. Sept. 14, 2021), ECF No. 7.

A survey of the accompanying declarations further demonstrates the immediate harm United is about to inflict on its employees. For example, if he is placed on unpaid leave, Mr. Castillo will be homeless in October when his current apartment lease expires. *See* Castillo Aff. ¶ 13 (App.19). Ms. Hamilton will lose the income and medical insurance that she currently uses to pay for her husband's cancer treatment. *See* Hamilton Aff. ¶¶ 11-14 (App.8). Indeed, Ms. Hamilton's current treatment decisions for her husband are dependent upon whether she will have a *paying* job on October 2, 2021. *See id.* Mr. Sambrano will need to determine how he can continue paying for his child's college education, or whether the family will need to consider alternative education options. *See* Sambrano Aff. ¶ 17 (App.4). Similarly, Ms. Jonas' husband is disabled, and his care requires her salary and medical insurance. *See* Jonas Aff. ¶ 11 (App.24).

Placement onto extended unpaid leave will prevent Ms. Jonas from providing her husband the care he needs. *See id.* Additionally, the threat of unpaid leave has caused Mr. Turnbough significant stress, which substantially increases a risk that his multiple sclerosis will relapse. *See* Turnbough Aff. ¶¶ 14–15 (App.15).

Considering such significant and immediate harms facing Plaintiffs and other United employees, it is unsurprising that employees may consider violating their beliefs or compromising their health to receive the vaccine. *See* Lockwood Aff. ¶¶ 6, 8 (App.33–34). If they do so, the Court cannot fashion a remedy for that at a later date. Moreover, the financial harms themselves warrant preliminary injunctive relief. While the irreparable injury analysis does not typically consider harms that can be "undone through monetary relief," *ADT*, 145 F. Supp. 3d at 694, it is equally true that "a month without a paycheck [is] a serious hardship," *Burlington N.*, 548 U.S. at 72. Many aspects of these financial harms are not easily redressed by damages—serious physical and psychological consequences of impending homelessness, loss of life-saving medical treatment, and changes in education decisions due to lost income. That says nothing about the myriad non-financial harms that accompany the loss of a paycheck, such as: the risk of a stress-induced MS relapse (Turnbough Aff. ¶ 15 (App.15)); marital strain (Kincannon Aff. ¶ 12 (App.29)); family stress (Sambrano Aff. ¶ 17 (App.4)); stress-induced high blood pressure (Jonas Aff. ¶ 14 (App.24)).

The Court may prevent each of these harms by granting preliminary injunctive relief. Again, Plaintiffs do not challenge United's ability to institute a COVID-19 vaccine mandate generally. They merely ask that United comply with federal law by engaging in an interactive process with individuals needing religious or medical accommodations, and by granting reasonable accommodations for those individuals. By enjoining United's vaccine mandate for

those employees with religious or medical bases for requesting accommodations, the Court will ensure that it is able to fashion an appropriate remedy at a later date.  If the Court does not do so, several Plaintiffs (and likely numerous other United employees) will suffer irreparable harms.

        **D.**      **Plaintiffs' injury outweighs any potential hardship to United.**

The harms discussed above are serious and irreparable.  The risk of United forcing employees to forsake their religious beliefs and health far outweighs any harm that the injunction may cause.  Any claim that the vaccine mandate *must* go into effect by September 27 rings hollow; United has operated since spring 2020 without such a mandate and there is no compelling reason why it cannot continue doing so for enough time to engage in the interactive process required by federal law.  Had United engaged in this process, it would have likely identified countless other ways to accommodate Plaintiffs while also protecting public health—mask wearing, periodic antibody testing, and periodic COVID testing are just a few options.  Plaintiffs do not claim that United must allow them to work without any mitigation measures.  Rather, Plaintiffs merely ask the Court to require United to follow federal law, engage in the interactive process, and develop reasonable accommodations that consider Plaintiffs' religious beliefs and health concerns on the one hand, and the public's health interests on the other hand.  Requiring United to comply with federal law does not impose a harm that outweighs Plaintiffs' irreparable injury.

While United will likely argue that safety concerns over COVID-19 create a harm for the airline in the case of an injunction, this argument fails.  Setting aside the fact that United's COVID-19 safety precautions have lessened over time, not increased, United: (1) does not require all of its employees to be vaccinated—only those living in the United States—even though United employees from all around the world travel and work with one another; (2) allegedly plans to allow *some* "accommodated" U.S. employees to return to work in the future with mitigation measures in place; (3) does not require pilots from other airlines flying in the cockpit of United aircraft to be

vaccinated; and (4) does not require any passengers to be vaccinated or even show proof of a negative COVID-19 test.  *See* Compl. ¶ 32.  Moreover, United's vaccine mandate does not apply to regional airline partners that fly United customers on shorter routes.  *Id*.  Thus, even assuming it is appropriate for United to require vaccinations, there is no safety justification that can support a blanket policy that fails to take individual situations into account.  Perhaps that is why federal law requires United to engage in the interactive process with the requesters in the first place.

      **E.**     **Granting the injunction will serve the public interest.**

An injunction preserving the status quo while the EEOC considers Plaintiffs' claims will also serve the public interest.  For example, allowing employees to exercise religious freedom by making decisions in accordance with their sincerely held religious beliefs is a public interest of the highest order.  "Religion is the first of our rights under the First Amendment and the Bill of Rights.  The right to the free exercise of religion is a precious American invention . . . to be jealously guarded.  It is the right of a human being to respond to what that person's conscience says is the dictate of God."  *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993).  The value of religious freedom has been "zealously protected, sometimes even at the expense of other interests of admittedly high social importance."  *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).  To be sure, there is also an important public interest in fighting the spread of COVID-19.  "But there is an equally strong public interest in a citizen's free exercise of religion" in being able to maintain his employment without compromising his religious beliefs.  *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc) (Seymour, J., concurring in part and dissenting in part)*, aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006).

Recognizing the centrality of religious freedom to the public interest, other courts— including the Supreme Court—have protected religious exercise even in the face of competing

public health considerations. *See*, *e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (ordering preliminary injunctive relief against COVID-19 public health order restricting religious exercise); *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (same); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (same); *Harvest Rock Church, Inc. v. Newsom*, 141 S. Ct. 889 (2020) (same); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (same); Order, *Dr. A.*, No. 21-cv-10009 (N.D.N.Y. Sept. 13, 2021).  The Supreme Court has admonished lower courts that "[e]ven in a pandemic," religious freedom "cannot be put away and forgotten."  *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 68.  Protecting that guarantee through injunctive relief serves a vital public interest.

The same is true of allowing individuals to make medical choices—in consultation with their doctors—to protect their health.  As early as 1891, the Supreme Court recognized, in holding that a court could not force a plaintiff to submit to a surgical examination as to the extent of the injury sued for, that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."  *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251 (1891).  No law permits United to interfere with that right—indeed, the ADA exists to ensure it cannot do so.  The Supreme Court has recognized the right to medical decision-making even in the face of countervailing societal interests.  *See Winston v. Lee*, 470 U.S. 753, 766 (1985) (recognizing a right to medical decision-making and holding that a court could not force a defendant, for evidentiary purposes, to have surgery to remove a bullet fired by a victim). The public interest in allowing individuals to determine their need for a medical accommodation is particularly strong as the countervailing interest in stopping the spread of COVID-19 can be achieved through other means such as mask wearing and testing.

23

Indeed, the ADA protects such decision-making by requiring an employer to provide reasonable accommodations.  As another Circuit recognized, "[i]n enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities." *Enyart v. Nat'l Conf. of Bar Exam'rs,* 630 F.3d 1153, 1167 (9th Cir. 2011).  Many district courts have recognized a public interest in enforcing the ADA.  *See, e.g.*, *Ramsay v. Nat'l Bd. of Med. Exam'rs*, No. 19-CV-2002, 2019 WL 7372508, at *19 (E.D. Pa. Dec. 31, 2019), *aff'd*, 968 F.3d 251 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1517 (2021) ("It is obviously in the public interest that the dictates of the ADA . . . be followed—Congress so decreed by passing [the] statute[]."); *Lyon v. Illinois High Sch. Ass'n*, No. 13-CV-00173, 2013 WL 140926, at *5 (N.D. Ill. Jan. 10, 2013), *as amended* (Jan. 11, 2013) ("The general public has a clear interest in protecting the rights of the disabled; and by providing this disabled individual with the reasonable accommodations to which he is entitled under the law, the interests of the public are furthered."). This Court should hold, consistent with other courts, that there is a public interest in enforcing the ADA to protect the rights of disabled individuals.  *See, e.g.*, *Enyart*, 630 F.3d at 1167 (noting "the public's interest in enforcement of the ADA and in elimination of discrimination on the basis of disability"); *Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F. Supp. 2d 476, 481 (E.D. Pa. 1998) ("It is clearly in the interest of the public to enforce the mandate of Congress under the [ADA].").

The public also has an interest in United's disabled employees retaining both their employment and their right to make their own medical decisions because "[t]he public has an interest in the full participation of the disabled in the economic, social and recreational life of the community." *Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1383 (N.D. Ga. 2002) (citation omitted).  United's discriminatory policy runs contrary to that interest by forcing its disabled employees out of the workforce—potentially for years.  This decision will have

devastating economic consequences for Plaintiffs and those similarly situated, and those economic impacts affect the community at large.[4]

To be sure, United will likely argue that an important public interest in eradicating COVID-19 outweighs Plaintiffs' religious beliefs and medical concerns. Plaintiffs do not dispute the important goal of stopping COVID-19's spread, but it does not override United's obligations under federal law. And it certainly does not allow United to effectively terminate all employees who requested an accommodation. By United's own admission, nearly 90 percent of pilots and 80 percent of flight attendants have received a COVID-19 vaccine. *See* Josephs, *supra.* Moreover, a large portion of the public likely possesses antibodies against COVID-19 due to previous infection. This Motion thus asks the Court to enjoin United's mandate for employees seeking accommodations for religious or medical reasons, and the public interest is not to the contrary.

## CONCLUSION

Plaintiffs ask this Court to preserve the status quo by allowing the EEOC to continue reviewing Plaintiffs' administrative charges regarding United's unlawful conduct. Specifically, to prevent irreparable harm, the Court should enjoin United from terminating or placing on indefinite leave any employee who has a religious or medical basis for seeking an accommodation. The Court should also enjoin United from denying as untimely any request for a religious or medical accommodation. By granting temporary preliminary relief, the Court will ensure that the EEOC and this Court will be able to order meaningful relief later.

September 22, 2021                                     Respectfully submitted,

---

[4] United may argue that the public interest favors its vaccine mandate because the spread of COVID-19 negatively affects the economy. United could have furthered that interest through mask wearing, antibody testing, or COVID-19 testing. Additionally, the public is well-served by uninterrupted flow of air traffic. United's "accommodation" policy will likely cost it at least 5% of its workforce, which will have consequences for the public.

/s/ John C. Sullivan
John C. Sullivan
Texas Bar No. 24083920
john.sullivan@the-sl-lawfirm.com
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891

/s/ Robert C. Wiegand
Robert C. Wiegand
Texas Bar No. 00791924
bob.wiegand@swolegal.com
Melissa J. Swindle
Texas Bar No. 24013600
Melissa.swindle@swolegal.com
Stewart Wiegand & Owens PC
325 N. St. Paul Street, Suite 3750
Dallas, TX 75201
Telephone: (469) 899-9800
Facsimile: (469) 899-9810

/s/ Mark R. Paoletta
Mark R. Paoletta*
D.C. Bar No. 422746
mpaoletta@schaerr-jaffe.com
Gene C. Schaerr*
D.C. Bar No. 416368
Brian J. Field*
D.C. Bar No. 985577
Kenneth A. Klukowski*
D.C. Bar No. 1046093
Annika M. Boone*
Utah Bar No. 17176
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136

* *Pro hac vice* motions forthcoming

*Counsel for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

On September 22, 2021, I filed the foregoing document with the clerk of court for the United States District Court, Northern District of Texas.  I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rule of Civil Procedure 5(b)(2).

Additionally, I communicated both by telephone and email with Ada W. Dolph, Seyfarth Shaw LLP, who informed me that she was counsel for Defendant, and that the following attorneys would be representing Defendant in this matter:

Ada W. Dolph
Seyfarth Shaw LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
312.460.5977
adolph@seyfarth.com

Steve Shardonofsky
Seyfarth Shaw LLP
700 Milam St., Suite 1400
Houston, Texas 77002
713.225.1001
sshardonofsky@seyfarth.com

Vanessa Rogers
Seyfarth Shaw LLP
700 Milam St., Suite 1400
Houston, Texas 77002
713.860.0054
vrogers@seyfarth.com

Notice and a copy of the foregoing has been provided to these attorneys via the Court's ECF system and via email.

*/s/ Robert C. Wiegand*
Robert C. Wiegand, Attorney for Plaintiffs