**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| | § | Civil Action No. 4:21-01074-P |
| v. | § § | |
| UNITED AIRLINES, INC., | § § | |
| Defendant. | § § | |
| | § § | |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 3

    A. The COVID-19 Pandemic ......................................................................................... 3

    B. United's Vaccine Policy ............................................................................................ 4

 C. ACCOMMODATIONS UNDER THE POLICY ............................................................ 4

ARGUMENT ...................................................................................................................... 6

I      PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF ANY
       OF THEIR CLAIMS .................................................................................................... 7

    A. The Title VII Claims .................................................................................................. 7

    B. The Americans with Disabilities Act Claims ........................................................... 12

    C. The Retaliation Claims ............................................................................................ 17

    D. Plaintiffs Cannot Excuse Their Failure to Exhaust Administrative Remedies .......... 18

II.    PLAINTIFFS CANNOT SHOW IMMINENT IRREPARABLE INJURY ................... 19

III.   HARDSHIP TO UNITED OUTWEIGHS ANY POTENTIAL INJURY TO
       PLAINTIFFS .............................................................................................................. 23

IV.   THE PUBLIC INTEREST DOES NOT SUPPORT AN INJUNCTION ....................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*2013 Travis Oak Creek GP, LLC v. PNC Bank, N.A.*,
   No. 1:17–cv–560–RP, 2017 WL 8774231 (W.D. Tex. June 19, 2017)...................................22

*Albertson's Inc. v. Kirkingburg*,
   527 U.S. 555 (1999)........................................................................................................13

*Ansonia Bd. of Educ. v. Philbrook*,
   479 U.S. 60 (1986)..........................................................................................................11

*Anyadike v. Vernon College*,
   2016 WL 107901 (N.D. Tex. 2016)................................................................................20

*Austgen v. Allied Barton Sec. Servs., L.L.C.*,
   815 F. App'x 772 (5th Cir. 2020) .....................................................................12, 14, 15

*Bluefield Water Ass'n v. City of Starkville*,
   577 F.3d 250 (5th Cir. 2009) .............................................................................................7

*Brener v. Diagnostic Ctr. Hospital*,
   671 F.2d 141 (5th Cir. 1982) .............................................................................................8

*Bridges v. Houston Methodist Hosp.*,
   4:21-cv-01744, ECF No. 10 (S.D. Tex. June 4, 2021) (Ex. 1) ...................................21, 24, 25

*Bruff v. N. Miss. Health Servs., Inc.*,
   244 F.3d 495 (5th Cir. 2001) .........................................................................................8, 12

*Burwell v. Hobby Lobby Stores, Inc.*,
   134 S.Ct. 2751 (2014).........................................................................................................7

*Campbell v. Sonat Offshore Drilling, Inc.*,
   979 F.2d 1115 (5th Cir. 1992) .........................................................................................19

*Chacon v. Granata*,
   515 F.2d 922 (5th Cir. 1975)............................................................................................20

*City of Meridian, Miss. v. Algernon Blair, Inc.*,
   721 F.2d 525 (5th Cir. 1983) ..........................................................................................20

*Collins v. Southwestern Bell Tel. Co.*,
　　376 F. Supp. 979 (E.D. Okla. 1974) ...............................................................18, 19

*Conlay v. Baylor Coll. of Med.*,
　　2010 WL 774162 (S.D. Tex. Mar. 3, 2010)...........................................................20

*Davis v. Fort Bend Cnty.*,
　　893 F.3d 300 (5th Cir. 2018) ...................................................................................18

*Davoll v. Webb*,
　　194 F.3d 1116 (10th Cir. 1999) ...............................................................................13

*Dr. A. v. Hochul*,
　　No. 21-cv-1009 (N.D.N.Y. Sept. 14, 2021), ECF No. 7......................................22, 24

*Drew v. Liberty Mutual Insurance Company*,
　　480 F.2d 69 (5th Cir. 1973) ...............................................................................18, 19

*E.E.O.C. v. Agro Distrib.*,
　　555 F.3d 462 (5th Cir. 2009) ...................................................................................14

*E.E.O.C. v. N. Mem'l Health Care*,
　　908 F.3d 1098 (8th Cir. 2018) .................................................................................17

*E.E.O.C. v. U.S. Steel Corp.*,
　　2013 WL 625316 (W.D. Pa. Feb. 20, 2013) ...........................................................16

*Fallon v. Mercy Catholic Medical Ctr. Of S.E. Penn.*,
　　877 F.3d 487 (3d. Cir. 2017)................................................................................7, 13

*Feist v. La. Dep't of Justice*,
　　730 F.3d 450 (5th Cir. 2013) ...................................................................................12

*Fort Bend Cty., Tex. v. Davis*,
　　139 S. Ct. 1843 (2019)...............................................................................................19

*Google Inc. v. Hood*,
　　822 F.3d 212 (5th Cir. 2016) ...................................................................................22

*Gradillas v. Hughes Aircraft Co.*,
　　407 F. Supp. 865 (D. Ariz. 1975) ...........................................................................18

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs.*,
　　2009 WL 1766095 (N.D. Tex. June 23, 2009) .......................................................20

*Hernandez v. Metro. Transit Auth.*,
  673 Fed. App'x 414 (5th Cir. 2016) ...........................................................................1

*Hohider v. United Parcel Serv., Inc.*,
  574 F.3d 169 (3d Cir. 2009).............................................................................12, 13

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) ...................................................................................20

*Horvath v. City of Leaner, Tex.*,
  2018 WL 10771965 (W.D. Tex. 2018), *aff'd* 946 F.3d 787 (5th Cir. 2020) ...........12

*Jenkins v. Cleco Power, LLC*,
  487 F.3d 309 (5th Cir. 2007) ...................................................................................17

*Klaassen v. Trs. of Ind. Univ.*,
  No. 1:21-CV-00238, ECF No. 34 (N.D. Ill. July 18, 2021) (Ex. 2), *aff'd* 2021
  WL 3281209 (*pet. for review denied*).......................................................................24

*Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
  414 F.3d 700 (7th Cir. 2005) ...................................................................................20

*McGee v. Purolator Courier Corp.*,
  430 F. Supp. 1285 (N.D. Ala. 1977).........................................................................18

*Morgan v. Fletcher*,
  518 F.2d 236 (5th Cir. 1975) ...................................................................................20

*Moss v. Harris Cty. Constable Precinct One*,
  851 F.3d 413 (5th Cir. 2017) ...................................................................................14

*Munaf v. Geren*,
  553 U.S. 674 (2008)...................................................................................................23

*Nottelson v. A.O. Smith Corp.*,
  397 F. Supp. 928 (E.D. Wis. 1975)...........................................................................18

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
  600 F.3d 562 (5th Cir. 2010) .....................................................................................6

*Powers v. USF Holland, Inc.*,
  667 F.3d 815 (7th Cir. 2011) ...................................................................................12

*Quintana v. McCombs Ford W.*,
    2014 WL 2946671 (W.D. Tex. June 30, 2014) ........................................................20

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941).............................................................................................24

*Sampson v. Murray*,
    415 U.S. 61 (1974)..............................................................................................20

*Silva v. City of Hidalgo, Tex.*,
    575 F. App'x 419 (5th Cir. 2014) .........................................................................15

*Small v. Memphis Light, Gas & Water*,
    141 S. Ct. 1227 (2021)........................................................................................11

*Tagore v. United States*,
    735 F.3d 324 (5th Cir. 2013) ......................................................................7, 8, 9, 10

*Taylor v. Books A Million, Inc.*,
    296 F.3d 376 (5th Cir. 2002) ...............................................................................18

*Trans World Airlines, Inc. v. Hardison*,
    432 U.S. 63 (1977)..........................................................................................10, 11

*Troy v. Shell Oil Co.*,
    378 F. Supp. 1042 (E.D. Mich. 1974)...................................................................18

*United States v. Short*,
    181 F.3d 620 (5th Cir. 1999) ...............................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2010)..............................................................................................8

*Weber v. Roadway Exp., Inc.*,
    199 F.3d 270 (5th Cir. 2000) .........................................................................9, 10, 11

*Weinberger v Romero-Barcelo*,
    456 U.S. 305 (1982)............................................................................................24

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008)..............................................................................6, 19, 20, 21

*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*,
    2006 WL 1540587 (N.D. Tex. June 6, 2006) (Fitzwater, J.)....................................23

**STATUTES**

42 U.S.C. § 2000e(j) ........................................................................................11

42 U.S.C. § 12102 .......................................................................................12, 13

42 U.S.C. § 12111 ...........................................................................................16

42 U.S.C. § 12112 .......................................................................................13, 15

42 U.S.C. § 12113 ...........................................................................................16

INTRODUCTION

In their motion for emergency injunctive relief, the Plaintiffs are demanding—without any fact development, class certification review, or other normal litigation process—a broad, unprecedented, nationwide injunction that would prohibit United Airlines, Inc. ("United") from applying a health and safety-related employment policy to essentially any employee who does not wish to comply with the policy for any asserted religious or "medical" (not just disability) reasons. Although Plaintiffs deny that they are challenging United's "vaccine mandate itself," Plaintiffs' Memorandum ("Pl. Mem.") at 1, that is exactly what they are doing. As a practical matter, Plaintiffs are asking this Court to sit as a "super-personnel department," reviewing the wisdom or fairness of United's business decisions about how best to enhance workplace health and safety. *See Hernandez v. Metro. Transit Auth.*, 673 Fed. App'x 414, 419 n.5 (5th Cir. 2016) (noting that federal courts "regularly decline" invitations to second-guess employment policies under the guise of federal anti-discrimination law).

No other court in the country has granted such relief with respect to a private employer's vaccine policies. In this case, the Plaintiffs' request for emergency action should be denied and this matter should proceed in the normal course (including development of what will undoubtedly be a hotly contested factual record). There are several reasons this is so.

*First*, Plaintiffs are not likely to prevail on the merits. As discussed in detail below, the relief is inappropriate under Title VII because (1) Plaintiffs cannot demonstrate eligibility for protection and (2) their proposed accommodations would impose more than de minimis costs on United and would adversely impact plaintiffs' co-workers. With respect to the Americans with Disabilities Act ("ADA"), plaintiffs ask for injunctive relief beyond what the ADA authorizes, without establishing a qualifying "disability," and without addressing the "direct threat" that unvaccinated employees pose to United's other workers and the traveling public.

*Second*, Plaintiffs have failed to allege any plausible irreparable harm. All of the harms asserted are based on loss of employment income, which as a matter of law is not "irreparable" because such losses could be addressed through monetary damages if Plaintiffs are ultimately able to prove any intentional discrimination.

*Third,* Plaintiffs ignore the substantial hardships that would be imposed on United if an injunction were granted. Like most other airlines, United's business has been significantly damaged by the pandemic. Further loss of business due to diminished public confidence in the safety of unvaccinated employees is an injury for which there is no remedy (unlike the monetary harms alleged by the Plaintiffs).

*Fourth*, the public interest does not favor an emergency injunction here. There is, of course, a strong public interest in the safety of commercial air travel. *See generally* 49 U.S.C. Chapt. 447. By forcing United to allow unvaccinated employees to continue to work during a surge in COVID-19, an injunction would diminish, to at least some degree, the health and safety of United's employees and the traveling public.

*     *     *     *

United is making a good faith effort to manage workplace safety and provide reasonable accommodations in the face of unprecedented and rapidly evolving circumstances. To the extent Plaintiffs assert such policies are discriminatory, such allegations can and should be addressed like any other claims under Title VII or the ADA. Plaintiffs' approach – waiting until just days before the policy becomes effective and then insisting on a *de facto* class-wide injunction under an extremely expedited procedure – is the wrong way to proceed. The Court should deny the motion for a TRO and direct the parties to negotiate a proposed schedule for further proceedings in this case.

- 2 -

**STATEMENT OF FACTS**

**A.      The COVID-19 Pandemic**

COVID-19 is a highly contagious, dangerous disease that has already caused hundreds of thousands of deaths in the United States alone. *Basics of COVID-19*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 24, 2021), https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html. By Spring 2020, COVID-19 was spreading rapidly around the world. *Id.*; Compl. ¶ 15. At that time, United began implementing various mitigation procedures for its workforce, requiring employees to wear masks, maintain distance from others, and participate in temperature checks. *Id.* ¶ 16.

Since the end of 2020, at least three separate COVID-19 vaccines have been developed and authorized for use in the United States. Pl. Mem. at 2. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine in December 2020, a second EUA for the Moderna COVID-19 vaccine a week later, and a third EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. *Id.* On August 23, 2021, the FDA issued full approval for the Pfizer vaccine for individuals 16 years of age and older. *Id.* These vaccines are highly effective at preventing severe disease and death from COVID-19. *See, e.g., Delta Variant: What We Know About the Science*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

The Delta variant of the COVID-19 virus is currently the predominant strain in the United States. *Id.* In July 2021, new data showed that the Delta variant was more infectious and was leading to increased transmissibility when compared with other variants of the virus. *See id.* Further, unvaccinated people are much more likely to get infected, transmit the virus, and face more serious consequences from the infection. *Id.* Indeed, according to one study released by the

CDC, unvaccinated individuals are nearly five times more likely to be infected with COVID-19 than vaccinated individuals. *SARS-CoV-2 Infections and Hospitalizations Among Persons Aged ≥16 Years, by Vaccination Status — Los Angeles County, California, May 1–July 25, 2021*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 27, 2021), at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e5.htm. Even among those who previously contracted COVID-19, reinfection is 2.34 times more likely in unvaccinated individuals. *Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 13, 2021), at https://www.cdc.gov/mmwr/volumes/70/wr/mm7032e1.htm. The CDC released updated guidance on the need for urgently increasing COVID-19 vaccination coverage on July 27, 2021. *Id.*

## B.      United's Vaccine Policy

On August 6, 2021, United announced its COVID-19 Vaccination Policy (the "Policy"). Compl. ¶ 20. The Policy requires all US-based employees who enter United facilities to receive a COVID-19 vaccine by September 27, 2021 or obtain an approved exemption as an accommodation. Limacher Decl., Ex. 1, App. 122. Nothing in the Policy suggests that employees will be terminated for requesting or receiving an exemption.

The Policy was adopted in response to the COVID-19 pandemic and is intended to help safeguard the health and wellbeing of United's employees, customers, and others who spend time in United facilities or interact with United employees. Variations in the virus and advances in science and medicine require United to regularly revise its policies and procedures to better protect its workforce and customers against an ever-evolving threat.

## C.      Accommodations Under the Policy

The Policy recognizes two bases for an approved exemption. Limacher Decl., Ex. 1, App. 122. The first category involves employees who cannot get vaccinated due to medical reasons,

including due to a disability or a documented medical condition that contraindicates the vaccination. App. 122-123. The second category involves employees who object to being vaccinated on the basis of sincerely held religious beliefs and practices that prevent them from being vaccinated. App. 123.

United engaged in an interactive process with employees requesting religious and medical exemptions to determine whether a reasonable accommodation could be provided. Employees requesting an exemption were directed to fill out an intake form on United's online system for reasonable accommodation, HelpHub, and could attach supporting documentation. Limacher Decl., App. 119, ¶¶ 14-15. United then reviewed the accommodation request, requested documentation or follow-up documentation if necessary, and ultimately rendered a decision to the employee. App. 119-120, ¶ 16.

For those who qualified for an accommodation, United then made an individualized determination regarding what type of accommodation was appropriate. United has allowed some employees who do not need to be present at a United facility to do their jobs to work fully remotely, without a vaccination, until COVID-19 conditions improve. App. 120, ¶ 17. For employees whose positions make remote work impossible, United granted temporary leave until such time as the airline can determine whether, when or how each individual can safely return. *See* App. 121, ¶ 22. Customer-facing employees (including pilots, flight attendants, and customer service agents) can safely return to work once the pandemic meaningfully recedes. *Id.* Operational employees who are not customer-facing (such as ramp servicemen and mechanics) will be allowed to return to work once United has a testing program in place. *Id.*

For those granted a religious exemption, leave is unpaid. *Id.* Those granted a medical exemption are permitted to use paid sick leave. App. 120, ¶ 18. Some employees also have the

ability to go on long-term disability. *Id.* United's current policy of providing unpaid leave to unvaccinated employees as an initial accommodation is therefore neither universal nor permanent. App. 121, ¶ 22.

Requiring mask mandates, testing, or social distancing as the only accommodations for customer-facing employees and operational employees who work alongside other United employees would create an undue hardship for United and pose a direct threat to the health or safety of others and to the unvaccinated employee. *See* App. 117-118, ¶¶ 5-8. For example, masks are neither feasible nor safe in cockpits or cargo holds. *See* App. 117, ¶ 5. Further, there is a significant shortage of testing supplies, there are no centralized locations for testing due to United's decentralized workforce, and testing would require United to hire or train additional employees to administer and read the tests. App. 117-118, ¶ 6. For these reasons, and to protect the health and safety of both its employees and the public, United determined that many of the employees who are granted an exemption should remain on leave until it is safe for them to return to the workplace. *See* App. 121, ¶¶ 21-22.

### ARGUMENT

It is well-settled that emergency injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). A temporary restraining order or preliminary injunction is appropriate only if (1) there is a substantial likelihood that the moving party will prevail on the merits, (2) there is a substantial threat of irreparable injury, (3) the balance of harms tips in the movant's favor, and (4) the public interest supports an injunction. *See, e.g.*, *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 568-69 (5th Cir. 2010). The Fifth Circuit has "cautioned repeatedly" that such relief "should not be granted unless the party seeking

it has clearly carried the burden of persuasion on all four elements." *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009). Plaintiffs have not satisfied any element.[1]

## I.   PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS OF ANY OF THEIR CLAIMS.

### A.   The Title VII Claims.

#### 1.   *Plaintiffs Do Not Qualify for a Class-Wide Injunction.*

Religious discrimination is inherently an individualized inquiry. "The sincerity of a plaintiff's belief in a *particular religious practice* is an essential part of the plaintiff's prima facie case under [ ] Title VII." *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) (emphasis added). To be sure, a court cannot inquire into the reasonableness of a plaintiff's belief. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2779 (2014) (explaining that courts cannot second guess if a believer's "religious beliefs are mistaken or insubstantial"). However, to qualify for protection, each plaintiff must show that his or her belief is "religious" in nature. *See, e.g.*, *Fallon v. Mercy Catholic Medical Ctr. Of S.E. Penn.*, 877 F.3d 487 (3d. Cir. 2017) (holding that a particular employee's opposition to a vaccination did not qualify as a protected religious belief under Title VII). Each plaintiff must also show the "sincerity" of that religious belief, that is, it is genuinely felt, and "the plaintiff's 'sincerity' in espousing [a] practice is largely a matter of individual credibility." *Tagore*, 735 F.3d at 328.

These determinations cannot be doled out in gross. For present purposes, and without prejudice to developing a contrary factual record at a later stage, it may be that some of all of the named plaintiffs in this action has a "religious belief" that is "sincerely" held. That does not mean, however, that Plaintiffs have shown a likelihood of success on their prima facie Title VII case to

---

[1]   United expressly preserves, and does not waive, any and all objections to venue and jurisdiction.

support injunctive relief across United's entire domestic workforce. Thus, any relief at this early procedural stage must be limited to relief vis-à-vis the six affiants before the Court. This is especially true because plaintiffs' class action allegations have not yet gone through the crucible of Rule 23.[2]

Moreover, plaintiffs are wrong to suggest that United's willingness to reasonably accommodate qualifying employees means that the company has waived the ability to contest the elements of their prima facie claim of religious discrimination under Title VII in this litigation. Were this the law, it would have the perverse effect of stifling religious exercise, by demanding that employers adopt a wooden and hostile posture toward employees' claims—or else waive their defenses in litigation—instead of the flexible approach United followed, consistent with its policy of religious accommodation.

2.      *Plaintiffs Seek Accommodations That Are More Than De Minimis.*

It is well-established that a "reasonable accommodation need not be on the employee's terms." *Brener v. Diagnostic Ctr. Hospital*, 671 F.2d 141, 146 (5th Cir. 1982); *see Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001) ("Title VII does not restrict an employer to only those means of accommodation that are preferred by the employee"). Accordingly, a Title VII religious accommodation claim will fail if the accommodation sought by plaintiff *either* **(i)** imposes a more than de minimis cost on an employer *or* **(ii)** if it would adversely impact co-workers who would not receive the accommodation. *See Tagore*, 735 F.3d at 330 (5th Cir.

---

[2]      The inadequacy of Plaintiffs' request for relief beyond the individual employees before the Court is highlighted by their putative class action allegation: "Plaintiffs seek to represent a class of all United employees who have requested or will request accommodations from United's vaccine mandate and who have had those accommodated requests either formally or effectively denied . . . ." (Compl. ¶ 118). This proposed class is not even tethered to those individuals who have a sincere religious belief or to any of the other specific elements of their claims (nor could it be given the highly individualized nature of such claims). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2010).

2013) ("Title VII does not require religious accommodations that impose more than 'de minimis' costs on an employer." (*citing Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 272-73 (5th Cir. 2000) (under Title VII, "'[u]ndue hardship' exists, as a matter of law, when an employer is required to bear more than a de minimis cost."). Plaintiffs' claim fails each of these prongs—either of which is fatal to their religious accommodation claims' likelihood of success on the merits.

  ***More than De Minimis Cost.*** Plaintiffs seek accommodations here of "mask wearing, periodic testing for COVID-19 antibodies, or periodic COVID-19 testing." Pl Mem. 13. There can be no denying these proposed accommodations would impose extraordinary—not just de minimis—costs on United and the public. *See* App. 117-118, ¶¶ 5-9. Plaintiffs seek a nationwide injunction across United's entire domestic workforce. This would mean implementing an elaborate and impracticable testing protocol across numerous employees, located in over 100 domestic airports, its corporate headquarters and all its offices. *Id.,* ¶ 6. These costs would be exacerbated, given the large proportion of United's workforce that is customer-facing and thus on a daily, if not hourly, basis risk exposure to COVID-19. The frequency of testing that would be required would be staggering.

  Cases from the Fifth Circuit demonstrate how the alternatives suggested by the plaintiffs would exceed Title VII's de minimis standard. For example, in *Tagore*, the Fifth Circuit explained that when a proposed accommodation is "time-consuming, impractical" for the employer, or "detrimental" to safety, it fails to qualify as a "de minimus [sic] measure." 735 F.3d at 330 (rejecting alternatives such as "working from [ ] home" as too burdensome).

  ***Imposition on Co-Workers.*** Moreover, the accommodations that Plaintiffs propose would create the "possibility of an adverse impact on coworkers," which the Fifth Circuit holds,

independently, establishes that a proposed accommodation fails the "de minimis" test. *See Weber*, 199 F.3d at 274 (holding "*mere possibility* of an *adverse impact on co-workers . . . is sufficient* to constitute an undue hardship" (emphasis added)). "In part, this is because costly accommodations would place the religious practitioner in a more favorable position, at the employer's expense, than her coworkers" or "require coworkers unfairly to perform extra work to accommodate the plaintiff." *Tagore*, 735 F.3d at 330. Here, the testing protocol would need to be implemented by United's Corporate Safety and Human Resources employees (among others), causing them a heavier workload. App. 117-118, ¶ 6. This would unduly burden Plaintiffs' co-workers and, thus, be more than de minimis. *See Weber*, 199 F.3d at 272-73 (plaintiff's proposed accommodation "constitutes more than a *de minimis* expense because [it] unduly burdens his co-workers"). Plaintiffs' proposed accommodation also jeopardizes the lives and health of their co-workers. "[C]ertain United employees work in extreme environments (including, but not limited to, inside fuel tanks or cargo holds) where the temperature may reach up to 120 degrees" and "heat stroke" can result if masks are worn. App. 117, ¶ 5. Additionally, the unvaccinated employees could expose co-workers to heightened risk of COVID-19 such as through "break-through" cases of COVID-19. *See, e.g., Delta Variant: What We Know About the Science*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

  ***None of Plaintiffs' Arguments Alter This Analysis.*** Instead of addressing the cost of their proposals or their impact on co-workers, Plaintiffs argue *Hardison* should be limited to its facts. *See* Pl. Mem. at 11 (claiming *Hardison* applies only when the religious accommodation sought "would have required the employer to breach a collective-bargaining agreement or pay other employees overtime to cover the shifts."). That is not correct. *First*, as shown by subsequent case

law, *Hardison* announced the governing legal standard for Title VII, not a narrow fact-bound proposition.[3] *Second*, the facts of *Hardison* are directly applicable here. Indeed, the Fifth Circuit has explained that, in *Hardison*, "the Supreme Court frowned upon a proposed accommodation that affected the possible job preferences of other employees." *Weber*, 199 F.3d at 274. *Third*, Plaintiffs claim that "United did not attempt to determine the cost of accommodating its employees." Factually, that is false. In developing its religious accommodation policy, United did engage in a cost benefit analysis concerning alternatives to vaccines. App. 118, ¶ 8. But, even if United had not done so, "hardship need not be quantifiable in economic terms." *Weber*, 199 F.3d at 274 (citing *Cook v. Chrysler Corp.*, 981 F.2d 336, 338 (8th Cir. 1992)).

Plaintiffs also complain about a supposed failure of United "to engage in the interactive process." Pl. Mem. at 10. Title VII's religious accommodation provision, however, does not impose any such interactive process requirement. *See* 42 U.S.C. § 2000e(j) (calling only for the "reasonabl[e] accomodat[ion] to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business"); *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (rejecting as in "conflict[] with both the language of the statute" of § 2000e(j) and legislative history a requirement of "bilateral cooperation" under Title VII's religious accommodation provision). Nonetheless, as, discussed below, Plaintiffs' narrative is incorrect: United did engage in an interactive dialogue with each of the six employees bringing suit. App. 119-120, ¶ 16.

Finally, the fact that United's accommodation to Plaintiffs "would have resulted in a loss

---

[3]  Presented with multiple recent opportunities to revisit it, the Supreme Court has left the *Hardison* standard in force, and has been explicit its de minimis burden standard continues to govern Title VII religious accommodation claims. *See, e.g.*, *Small v. Memphis Light, Gas & Water*, 141 S. Ct. 1227, 1228 (2021) (Gorsuch, dissenting from the denial of certiorari) (agreeing that *Hardison* binds lower courts and under that decision the "company had no obligation to provide [plaintiff] his requested accommodation because doing so would have cost the company something (anything) more than a trivial amount.").

in income[,] does not make [its] proposed accommodation unreasonable." *Horvath v. City of Leaner, Tex.*, 2018 WL 10771965, at *5 (W.D. Tex. 2018), *aff'd* 946 F.3d 787 (5th Cir. 2020); *accord Bruff*, 244 F.3d at 502 n.23 (rejecting religious accommodation claim despite the fact that it entailed a 'significant reduction in salary').

### B.   The Americans with Disabilities Act Claims.

To show a likelihood of success on a failure to accommodate claim, plaintiffs must demonstrate (1) they are qualified individuals with disabilities; (2) that their disabilities and its limitations were known to the employer; and (3) that the employer failed to make reasonable accommodations for those known restrictions. *See Feist v. La. Dep't of Justice*, 730 F.3d 450, 452 (5th Cir. 2013); *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 775 (5th Cir. 2020). They have not done so.

#### 1.   *Plaintiffs Have Not Shown an Entitlement to the ADA Relief Sought.*

Plaintiffs' ADA claim is wholly without merit because it asks this Court to issue an injunction on behalf of "all employees with . . . *medical reasons* for seeking an accommodation." Pl. Mem. at 1 (emphasis added). The ADA, however, does not require accommodation for employees' "medical reasons." Rather, the statute's reasonable accommodation protections extend only to employees who seek an accommodation for an actual disability. 42 U.S.C. § 12102(1); *see also Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) (explaining that the ADA's reasonable accommodations protections extend only to those workers who are actually disabled); *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 188 n.17 (3d Cir. 2009) (same). Plaintiffs are asking this Court to order United to comply with a standard that the ADA does not require.

Plaintiffs' ADA claim is without merit for the additional reason that determining who has an actual disability requires a highly individualized assessment. The ADA only protects "qualified

individual[s]" from "discriminat[ion] . . . on the basis of disability" in employment. 42 U.S.C. § 12112(a). The Supreme Court has admonished courts to pay "heed to the statutory obligation to determine the existence of a disability *on a case-by-case basis*." *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999) (emphasis added). *Accord Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999) (individualized nature of whether class members satisfied ADA definition of qualified individuals with a disability precluded class certification); *Hohider*, 574 F.3d at 182 (same). As relevant here, "[t]he term 'disability' means, with respect to an individual - a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

None of the plaintiffs has shown they have a "disability" and therefore cannot state a claim for any discrimination "on the basis of disability." 42 U.S.C. § 12112(a). More specifically, three of the six affiants (Sambrano ¶ 10; Jonas ¶ 5; Turnbough ¶ 6) raise *medical* issues, yet none has shown a qualifying *disability* under the ADA at this stage. For example, Ms. Jonas asserts having "severe reactions to various allergens, including eggs and pencillin" and reports once having "had an Emergency Room episode due to an allergy." Jonas ¶ 5. She has not connected this to impairment of any major life activities. The same is true for Mr. Turnbough's multiple sclerosis, which according to his own testimony is in remission. His affidavit says nothing about any limitation on any major life activity. *See Albertson's Inc.*, 527 U.S. 566 (noting in a parenthetical that "[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on

the life of the individual."). Indeed, "Mr. Turnbough is responsible for commanding and flying an aircraft," (Compl. ¶ 112) and does not report receiving any accommodations to do so, suggesting he does not currently lack the ability to perform major life activities. Even if any of the Plaintiffs could cure this infirmity, as with their Title VII claims, each putative class member must also satisfy a threshold qualification (here, a disability). There is no evidence about any such class member and, besides, the claim here would require a wholly impractical "case-by-case" determination of a qualifying disability and, such a determination is an impenetrable obstacle to the sweeping nationwide injunctive relief sought.

2. *Plaintiffs Cannot Establish United Failed to Provide a Reasonable Accommodation.*

"The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009). Unpaid leave has been found to a reasonable accommodation. "Time off, whether paid or unpaid, can be a reasonable accommodation . . . ." *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) . "Placing [the employee] on temporary leave of only a few weeks while awaiting his doctor's recommendations on his ability to work was a reasonable accommodation." *Austgen*, 815 F. App'x at 775. By not permitting unvaccinated employees to come in contact with their co-workers or members of the public as part of their work until the risks discussed above subside, unpaid leave is a reasonable accommodation. Because unpaid leave is a reasonable accommodation, there is no need to consider other potential accommodations.

Nonetheless, all other mitigating measures discussed by Plaintiff are less efficacious in combatting the life-and-death threat to United's employees and customers presented by unvaccinated employees in the workplace. Given the severity of the threat, mitigating measures are inappropriate until such time as United is confident those measures can significantly reduce

the risk at play. Given that nearly all of United's employees are vaccinated, such measures are under consideration, and unpaid leaves will only last until such measures can be implemented. App. 121, ¶ 21.

        3.     *Failure to Engage In the Interactive Process Is Not An Actionable Claim.*

In this Circuit, an employer's failure to engage in the interactive process is not actionable unless it leads to a failure to provide a reasonable accommodation, which did not occur here. *See Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 424 (5th Cir. 2014) ("[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."). This is because the ADA's text only prohibits "not making reasonable accommodations," 42 U.S.C § 12112(b)(5)(A), and says nothing about the "interactive process."  Regulations calling for "an interactive process is not an end in itself—it is a means to the end of forging reasonable accommodations." *Austgen*, 815 Fed App'x at 776 (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)).

Moreover, United was not required to engage in the interactive process here in any event because it would not have made determining a reasonable accommodation more or less likely. Once an employee has made a request for an accommodation, the ADA's regulations state that "it *may be* necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation" in order to craft a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3) (emphasis added). Here, the interactive process was not needed to craft a reasonable accommodation. In nearly all workplace accommodation situations, the issue is how to accommodate an employee's particular limitations or restrictions (based on a disability or religion) in light of a specific work rule or policy. In these situations, the interactive process is nearly always useful in illuminating the employee's limitations/restrictions and the

- 15 -

potential accommodations that would permit the employee to continue performing the essential functions of the job. By contrast, here what matters is not each Plaintiff's individual disability or religious restriction, but only that those restrictions cause each Plaintiff to be unvaccinated.

4. *The "Direct Threat" Defense Applies Here.*

Plaintiffs' motion for a TRO also ignores a relevant defense that bears on any reasonable accommodation analysis: United is permitted to enforce its neutral workplace rule, as relevant here, preventing unvaccinated individuals in customer-facing roles and unvaccinated operational employees from entering the workplace because of the "direct threat" they pose to themselves and others. Indeed, the ADA explicitly accounts for the kind of health and safety issues presented by the COVID-19 pandemic: "[t]he term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). And the ADA permits employers to implement "qualification standards" that both "screen out . . . an individual with a disability" and "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a) & (b); *see also* 29 C.F.R. § 1630.2(r)  ("Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."). Such an "assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.* This "direct threat" standard should be applied flexibly in a manner tailored to the threat and, accordingly, such that it can rest on well-grounded, but generalized, conclusions about a populations risk. *Cf. E.E.O.C. v. U.S. Steel Corp.*, 2013 WL 625316, at *21 (W.D. Pa. Feb. 20, 2013). Notably, United takes a different approach for those workers who can work remotely or do not interact with customers or other team members. App. 120, ¶ 17. Here, the EEOC itself has

- 16 -

determined that "COVID-19 at this time poses a direct threat both to individuals with the disease and those with [whom] they come into contact"[4] and United, thus, can rely on medical evidence discussed above demonstrating that unvaccinated individuals pose a direct threat to members of the traveling public, other United employees, and themselves.

### C.      The Retaliation Claims.

Plaintiffs' Title VII and ADA retaliation claims fail (Pl. Mem. at 14, 17-18), as they improperly seek to repackage their underlying substantive claims without satisfying multiple essential elements of this cause of action. *See Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 317 n.3 (5th Cir. 2007) ("To establish a prima facie case of retaliation, [a plaintiff] must prove that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the first two elements."). *First*, by making a request for accommodation, Plaintiffs did not engage in protected activity: they neither made "a charge of discrimination or participated in any proceeding," nor did they engage in protected "oppositional" activity. *E.E.O.C. v. N. Mem'l Health Care*, 908 F.3d 1098, 1102 (8th Cir. 2018) (affirming dismissal of claim for "unlawful retaliation because 'merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation.'"). *Second*, they fail to show the proper "causal link" because United's decision to place them on unpaid leave was not retaliation for submitting a request for accommodation, it was the accommodation itself—granted in response to their professed inability to become vaccinated. *Jenkins*, 487 F.3d at 317. Nor is Plaintiffs' charge founded that the questions United employees posed about religious accommodations sought, were "to coerce individuals into taking the vaccine contrary to their

---

[4] https://www.eeoc.gov/transcript-march-27-2020-outreach-webinar#q1

consciences." Pl. Mem. at 12. As explained above, Title VII only protects those employees with a sincerely held religious belief and United is entitled to probe whether that element is satisfied.

### D.     Plaintiffs Cannot Excuse Their Failure to Exhaust Administrative Remedies.

As plaintiffs admit, they have a statutory obligation to exhaust all administrative remedies before filing a lawsuit. *See* Pl. Mem. at 6; *see also, e.g., Davis v. Fort Bend Cnty.*, 893 F.3d 300, 303 (5th Cir. 2018) ("Before seeking judicial relief . . . Title VII plaintiffs are required to exhaust their administrative remedies by filing a charge of discrimination with the Equal Employment Opportunity Commission within 180 days of the alleged discrimination." (citing 42 U.S.C. § 2000e–5(e)(1))). These obligations are not merely suggestive; if raised, they are mandatory claims-processing rules. *See Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002).

It is undisputed that Plaintiffs have not met the exhaustion requirement by obtaining an EEOC right to sue letter on any of their claims. In an effort to excuse that failure, plaintiffs rely heavily on *Drew v. Liberty Mutual Insurance Company*, 480 F.2d 69 (5th Cir. 1973), claiming it holds that a plaintiff can seek injunction relief without exhausting administrative remedies. *See* Pl. Mem. at 6. This Court is not bound to apply *Drew* as Plaintiffs urge. *First,* not only has *Drew* been roundly criticized by other courts, but the facts of that case are entirely distinguishable from those presented here, meaning that even if it remains good law, *Drew* does not compel the conclusion that plaintiffs' failure to exhaust in this case should be overlooked.[5] In *Drew*, the plaintiff sought

---

[5]     *See Troy v. Shell Oil Co.*, 378 F. Supp. 1042, 1047 (E.D. Mich. 1974) (criticizing the logic of *Drew* and calling the decision an "obvious extension of Title VII by judicial action"); *see also Gradillas v. Hughes Aircraft Co.*, 407 F. Supp. 865, 869 (D. Ariz. 1975) ("*Drew* is the only decided case that establishes that the private employee is not prevented from seeking immediate relief in spite of the potential remedies that might be sought through the Equal Employment Opportunities Commission. It appears that the view adopted in the *Drew* case is contrary to the intent and direction of Congress."); *McGee v. Purolator Courier Corp.*, 430 F. Supp. 1285, 1286–87 (N.D. Ala. 1977) (distinguishing *Drew*); *Nottelson v. A.O. Smith Corp.*, 397 F. Supp. 928, 931–32 (E.D. Wis. 1975); *Collins v. Southwestern Bell Tel. Co.*, 376 F. Supp. 979, 983 (E.D. Okla. 1974).

a preliminary injunction against her employer prior to exhausting her administrative remedies at the EEOC. *Drew*, 480 F.2d at 70. By the time the injunction was issued, a Right-to-Sue Notice was issued, and the EEOC was pursuing relief on behalf of the plaintiff. *Id.* By contrast, in this case, Plaintiffs submitted their charges of discrimination merely days before initiating this action. United has yet to even be served with the charges made to the EEOC, much less has the EEOC been able to conduct any investigation of the allegations. And of course, unlike *Drew*, the EEOC has not pursued any relief on behalf of Plaintiffs. As such, *Drew* is inapplicable here.[6] *Cf. Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992) (it is "*legally indistinguishable* decision[s]" of the Fifth Circuit that "must be followed by" district courts) (emphasis added). *Second*, intervening Supreme Court precedent should be understood to have abrogated *Drew*. *See United States v. Short*, 181 F.3d 620, 624 (5th Cir. 1999) (explaining that a Fifth Circuit panel opinion can be overruled by "an intervening Supreme Court case explicitly or implicitly overruling that prior precedent"); *see also, e.g.*, *supra* n. 5; *Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1851 (2019).

## II.   PLAINTIFFS CANNOT SHOW IMMINENT IRREPARABLE INJURY.

To show irreparable harm sufficient to justify entry of preliminary injunctive relief, a moving party must prove that such injury is both "likely" and "imminent." *Winter*, 555 U.S. at 22;

---

[6]         Moreover, in *Drew*, the Fifth Circuit highlighted the point that the plaintiff's action was instigated for the sole purpose of maintaining the status quo "*pending the actions of the Commission*." *Id.* (emphasis in original). The Fifth Circuit found this fact particularly important because plaintiff "normally would not be permitted to file a suit on the merits unless the Commission had been unable for a period of 180 days to effect conciliation[.]" *Id.* According to the Fifth Circuit, it was because the plaintiff was seeking temporary relief that the 180-day provision was waived. *See id.* In this case, Plaintiffs' Complaint is clearly an action brought for "final adjudication" of Plaintiffs' rights "to be protected against the alleged discriminatory conduct of" Defendant. *Id.* at 73 n.5. Specifically, Plaintiffs seek class certification; declarations that Defendant has violated Title VII and the ADA in at least three ways; injunctive relief; monetary damages; reasonable attorneys' fees and costs; and any other relief deemed appropriate by the Court. *See* Comp. at 29–30. It therefore cannot be justified as an effort to merely preserve the status quo pending action by the EEOC.

*Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury

is not sufficient."). Moreover, to be "irreparable," there must be "no other adequate legal remedy."

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs.*, 2009 WL 1766095, at *3 (N.D. Tex. June 23, 2009);

*Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). An irreparable harm is an extraordinary

harm—one that cannot be fully compensated by money damages. *See Winter*, 555 U.S. at 22.

In this case, the plaintiffs allege that they will be irreparably harmed by the offered

accommodation of unpaid leave because they will "suffer immediate financial hardship if they lose

their regular income stream." Pl. Mem. at 5. They allege that this loss of earnings will, in turn,

affect their ability to afford health care, transportation, housing, and the like, and will cause

"significant stress." *Id.* This alleged harm is insufficient for several reasons.

*First*, Courts have consistently held that a party cannot show irreparable harm based on

lost earnings. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90-92 (1974) (loss of earnings does not

constitute irreparable harm).[7] Such losses are not "irreparable" because if plaintiffs were to prevail

on the merits, they would be entitled to reinstatement, back pay, back benefits, and reimbursement

of other proven economic damages. *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525,

529 (5th Cir. 1983) (holding that an injury is not irreparable if it can be addressed through monetary

---

[7]       *See also, e.g., Morgan v. Fletcher*, 518 F.2d 236 (5th Cir. 1975) (even where loss of income
will allegedly lead to foreclosure of home and loss of health care insurance, it is not irreparable injury
because employee would be entitled to full back pay should her discharge later prove wrongful); *Louis
Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("[a] permanent
loss of employment, standing alone, does not equate to irreparable harm."); *Anyadike v. Vernon College*,
2016 WL 107901 (N.D. Tex. 2016) (alleged harm of future lost earnings is not irreparable because it can
be addressed through money damages); *Quintana v. McCombs Ford W.*, 2014 WL 2946671, at *2 (W.D.
Tex. June 30, 2014) (finding that, even where plaintiff alleged that he would not be able to pay his family's
living expenses if not reinstated at his job, lost wages were not sufficient to establish irreparable harm);
*Conlay v. Baylor Coll. of Med.*, 2010 WL 774162, at *5 (S.D. Tex. Mar. 3, 2010) ("Irreparable harm is not
establish in employment cases by financial distress or inability to find other employment, unless truly
extraordinary circumstances exist. The plaintiff's insufficient of savings or difficulties in obtaining other
income generally will not support a finding of irreparable injury, regardless of how severely they may affect
a particular individual.").

remedy). That is true here. As the court in *Bridges* held, anyone who is terminated for refusing a vaccine can sue for money damages. *Bridges v. Houston Methodist Hosp.*, 4:21-cv-01744, ECF No. 10 at 1 (S.D. Tex. June 4, 2021) (Ex. 1). Because plaintiffs can be compensated by monetary damages if they prevail, they cannot show irreparable harm.

*Second*, the plaintiffs' asserted harm is not "certain" or "actual," but rather is "theoretical." *Winter*, 555 U.S. at 22. All of the alleged secondary harms – loss of ability to pay for medical care, loss of housing and so on – presuppose an extended period of time out of work on unpaid leave. But there is no basis for assuming that will occur:

- United's policy is predicated on the current surge in COVID-19 cases attributable to the Delta variant, which has caused a spike in hospitalizations and death, especially among unvaccinated employees. App. 121, ¶ 21. If the surge subsides, the length of any leave for affected employees may be too short to cause the sort of secondary financial consequences that the plaintiffs allege.

- United's current policy of providing unpaid leave to unvaccinated employees as an initial accommodation is neither universal nor permanent. The airline will continue to evaluate whether, when and under what circumstances unvaccinated individuals can return to work. App. 121, ¶ 22. In fact, with respect to the small number of United employees whose jobs can be done remotely, United has allowed those individuals to continue working remotely. App. 120, ¶ 17.

- There are a variety of other reasons why it would be imprudent to just assume that the period of unpaid leave will last for "years," as plaintiffs assert. For example, the U.S. government recently announced that the Department of Labor will be promulgating an emergency temporary standard ("ETS") that will require a mandatory vaccine policy for

- 21 -

all employers with more than 100 employees. It is unclear exactly what the ETS will say or how it might apply to United, but it will purportedly require that unvaccinated employees be allowed to return to work subject to a strict testing regimen.

- As plaintiffs acknowledge, employees who are on medical exemption-based leave are entitled to use their sick leave. Pl. Mem. at 5 n.1. This further undermines the notion that any of the plaintiffs granted a medical accommodation are likely to suffer irreparable harm – they may very well be able to stay on paid leave until recalled to work.

- To the extent that plaintiffs claim that the harm they will suffer is being forced to forego their religious beliefs, *see* Pl. Mem. at 19, that is also insufficient. As they admit, United granted exemptions to almost every employee who filed a timely request. No one was forced to surrender their legitimate beliefs – by definition, they all had the option of taking the offered accommodation. In this regard, the case at hand is entirely distinguishable from the case that plaintiffs cite, *Dr. A. v. Hochul*, No. 21-cv-1009 (N.D.N.Y. Sept. 14, 2021), ECF No. 7. The state mandate in that case was enjoined because it lacked any religious accommodation at all, not because the accommodation offered was supposedly inadequate.

*Third*, none of the asserted harms are sufficiently "imminent" to justify emergency temporary injunctive relief. [8] Plaintiffs speculate that they will suffer various harms at some point in the future, such as a potential "need to consider alternative education options" or a "potential" relapse of disease symptoms. Pl. Mem. at 19-20. These are, at most, potential harms that could

---

[8]     Courts routinely reject applications for temporary restraining orders when the harm is not truly immediate. *See, e.g.*, *Google Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016) (vacating injunction prohibiting state attorney general from bringing civil or criminal action against Google because the "prospect of [an enforcement action] is not sufficiently imminent or defined to justify an injunction"); *2013 Travis Oak Creek GP, LLC v. PNC Bank, N.A.*, No. 1:17–cv–560–RP, 2017 WL 8774231, at *5 (W.D. Tex. June 19, 2017) (noting that the relevant question "is whether immediate injunctive relief is necessary to avoid imminent irreparable injury" and finding that threatened foreclosure that would not occur for another two months was not "so imminent as to require immediate relief" (emphasis in original)).

occur at some point in the future, not certain harms that are about to occur in the next few days. There is more than adequate time to consider the issues in this case on a less expedited timeline.

That is especially so given that the supposed urgency here is largely a product of plaintiffs' own lack of diligence. The law is well-established that "delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Wireless Agents, L.L.C. v. T-Mobile USA, Inc*., 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006) (Fitzwater, J.). In this case, plaintiffs acknowledge that they were aware of United's policy as early as August 6, 2021. Pl. Mem. at 3. But they waited six weeks, until just a few days before the policy deadline, to file this action.

## III.   HARDSHIP TO UNITED OUTWEIGHS ANY POTENTIAL INJURY TO PLAINTIFFS.

A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008). In each case, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod.*, 480 U.S. 531, 542 (1987).

In this case, plaintiffs argue that United would not be harmed by an injunction, but that is untrue. The vaccine requirement is a key element of United's overall strategy for operating through the pandemic. App. 118, ¶ 9. The airline's business has been badly hurt by the massive decline in air travel. Restoring and maintaining public confidence in the safety of air travel is critical to United's long-term success (and perhaps even survival). *Id.* A decision to require vaccines for customer-facing employees in order to achieve that goal is exactly the sort of discretionary business decision that United has every right to make without governmental interference or second-guessing. Moreover, there is no remedy if United loses business due to an injunction.

- 23 -

Hence, the harm of an injunction to United clearly outweighs any (easily remediable) harm to the plaintiffs.[9]

## IV.   THE PUBLIC INTEREST DOES NOT SUPPORT AN INJUNCTION.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).

In this case, the policy at issue states that it "intended to help safeguard the health and wellbeing of our employees, customers, and others who spend time in our facilities or interact with our employees." While plaintiffs may dismiss such safety concerns, Pl. Mem. at 21-22, the public interest clearly favors measures designed to enhance health and safety in air travel, both for airline employees and United's customers.

None of the courts that have examined similar challenges to private (*i.e.* non-governmental) vaccine requirements have found that the public interest supports an injunction. *Klaassen v. Trs. of Ind. Univ.*, No. 1:21-CV-00238, ECF No. 34 (N.D. Ill. July 18, 2021) (Ex. 2), *aff'd* 2021 WL 3281209 (*pet. for review denied)*; *Norris v. Stanley*, No. 1:32-CV-00756, ECF No. 7 (W.D. Mich. Aug. 31, 2021) (denying employee's request to enjoin employer's vaccine requirement for all Michigan State University employees) (Ex. 3); *see also Bridges*, 4:21-CV-01774, ECF No. 10 (order denying TRO and dismissing 117 employees lawsuit against its employer over the employees' termination for failing to comply with employer's vaccine requirement). To the

---

[9]    While plaintiffs argue that there is no magic to the current deadline of September 27, the fact is that plaintiffs would not accept *any* deadline for submitting accommodation requests. Their own request for relief asks that the Court allow unvaccinated employees to continue to work indefinitely. Complaint (ECF No. 1) at 30.

contrary, to the extent that courts that made any finding on this point, they have concluded that public health weighs heavily against an injunction. *See Bridges*, 4:21-cv-01774, ECF No. 10 at 2.

CONCLUSION

For the reasons stated herein, Plaintiffs' motion for a temporary restraining order or preliminary injunction should be denied.

Dated: September 23, 2021                              Respectfully submitted,

                                        */s/ Jordan M. Matthews*
                                        Jordan M. Matthews
                                        IL Bar No. 6300503
                                        JONES DAY
                                        77 W. Wacker Drive, Suite 3500
                                        Chicago, Illinois 60601
                                        Telephone: (312) 782-3939
                                        Facsimile: (312) 782-8585
                                        Email: jmatthews@jonesday.com

                                        Donald J. Munro
                                        D.C. Bar No. 453600
                                        JONES DAY
                                        51 Louisiana Avenue, NW
                                        Washington, DC 20001
                                        Telephone: (202) 879-3939
                                        Facsimile: (202) 626-1700
                                        Email: dmunro@jonesday.com

**CERTIFICATE OF SERVICE**

I certify that on September 23, 2021, the foregoing was filed using the U.S. District Court

for the Northern District of Texas's CM/ECF system, which will send a notice of electronic filing

to all participating counsel of record.


*/s/ Jordan M. Matthews*
Jordan M. Matthews