**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>*Defendant.* | Civil Action No.: 4:21-01074-P |

**PLAINTIFFS' TRIAL BRIEF
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

ARGUMENT ................................................................................................................ 1

I.  Preliminary Injunctive Relief is Appropriate and Necessary to Remedy United's
    Ongoing Violation of Federal Civil Rights Laws. ............................................... 1

    A.  Plaintiffs are likely to succeed on the merits of their Title VII claims. ................ 2

    B.  Plaintiffs are likely to succeed on the merits of their ADA claims. ..................... 12

    C.  Without preliminary injunctive relief, Plaintiffs will suffer irreparable injury. ... 16

    D.  Plaintiffs' injury outweighs any potential hardship to United. ............................ 20

    E.  Granting the injunction will serve the public interest. ......................................... 22

II. Plaintiffs Have Properly Complied with Their EEOC Filing Requirements,
    and That Compliance Poses no Obstacle to Preliminary Injunctive Relief. ..................... 23

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*ADT v. Capital Connect*,
    145 F. Supp. 3d 671 (N.D. Tex. 2015) ............................................................. 16, 18

*Ansonia Bd. of Educ. v. Philbrook*,
    479 U.S. 60 (1986) .............................................................................................. 6

*Austgen v. Allied Barton Sec. Servs.*,
    815 F. App'x 772 (5th Cir. 2020) ....................................................................... 14

*Bailey v. Dallas Cty. Sch.*,
    No. 3:16-cv-1642-M, 2016 WL 7638146 (N.D. Tex. Dec. 9, 2016) ........................ 24

*Baker v. Am. Airlines*,
    430 F.3d 750 (5th Cir. 2005) .............................................................................. 10

*Brener v. Diagnostic Ctr. Hosp.*,
    671 F.2d 141 (5th Cir. 1982) ............................................................................. 2, 5

*Bultemeyer v. Fort Wayne Cmty. Schs.*,
    100 F.3d 1281 (7th Cir. 1996) ............................................................................ 5

*Burlington N. & Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006) ...................................................................................... 4, 11, 18

*Clark Cty. Sch. Dist. v. Breeden*,
    532 U.S. 268 (2001) .................................................................................... 11, 16

*Cooper v. AT&T Corp./Lucent Tech.*,
No. 97-CA-0628, 1998 WL 1784223 (W.D. Tex. Oct. 22, 1998) .......................................... 11

*Davis v. Dallas Area Rapid Transit*,
383 F.3d 309 (5th Cir. 2004) ................................................................................................ 10

*Davis v. Fort Bend Cty.*,
765 F.3d 480 (5th Cir. 2014) .................................................................................................. 3

*Dickerson v. United Parcel Serv.*,
No. 3:95-CV-2143, 1999 WL 966430 (N.D. Tex. Oct. 21, 1999) ......................................... 15

*Dr. A. v. Hochul*,
No. 21-cv-1009 (N.D.N.Y. Sept. 14, 2021) ........................................................................... 17

*Drew v. Liberty Mut. Ins.*,
480 F.2d 69 (5th Cir. 1973) ............................................................................................ 24, 25

*EEOC v. Chevron Phillips Chem. Co.*,
570 F.3d 606 (5th Cir. 2009) ........................................................................................ 2, 5, 13

*EEOC v. Mission Hosp.*,
No. 1:16-cv-00118, 2017 WL 3392783 (W.D.N.C. Aug. 7, 2017) .......................................... 4

*EEOC v. Universal Mfg. Corp.*,
914 F.2d 71 (5th Cir. 1990) ................................................................................................... 6

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................................................ 20

*Feist v. Louisiana*,
730 F.3d 450 (5th Cir. 2013) ................................................................................................ 12

*Fort Bend County v. Davis*,
139 S. Ct. 1843 (2019) ........................................................................................................ 24

*Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*,
578 F.2d 1122 (5th Cir. 1978) ............................................................................................... 2

*Ladd v. Livingston*,
777 F.3d 286 (5th Cir. 2015) ................................................................................................. 2

*Lawson v. State of Wash.*,
319 F.3d 498 (9th Cir. 2003) ............................................................................................... 20

*Love v. City of Dallas*,
No. 3:96-CV-0532-R, 1997 WL 278126 (N.D. Tex. May 14, 1997) ........................ 4, 6, 11, 16

*Martin v. Metro. Atlanta Rapid Transit Auth.*,
225 F. Supp. 2d 1362 (N.D. Ga. 2002) ................................................................................. 23

*McCoy v. City of Shreveport*,
492 F.3d 551 (5th Cir. 2007) ............................................................................................... 10

*Moss v. Harris Cty. Constable Precinct One*,
851 F.3d 413 (5th Cir. 2017) .......................................................................................... 12, 14

*Myers v. Hose*,
  50 F.3d 278 (4th Cir. 1995) ........................................................................... 6

*Norman v. NYU Langone Health Sys.*,
  492 F. Supp. 3d 154 (S.D.N.Y. 2020)......................................................... 13, 14

*Quiles Rodriguez v. Calderon*,
  172 F. Supp. 2d 334 (D.P.R. 2001)................................................................ 19

*Rogers v. Int'l Marine Terminals*,
  87 F.3d 755 (5th Cir. 1996) ........................................................................... 6

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)................................................................................. 20, 22

*Ruggiero v. Mount Nittany Med. Ctr.*,
  736 F. App'x 35 (3d Cir. 2018) ..................................................................... 14

*Sampson v. Murray*,
  415 U.S. 61 (1974)......................................................................................... 19

*Sherr v. Northport-E. Northport Union Free Sch. Dist.*,
  672 F. Supp. 81 (E.D.N.Y. 1987) ................................................................... 4

*Strong v. Univ. Healthcare Sys.*,
  482 F.3d 802 (5th Cir. 2007) ......................................................................... 11

*Tabatchnik v. Cont'l Airlines*,
  262 F. App'x 674 (5th Cir. 2008) ................................................................... 16

*Tandon v. Newsom*,
  141 S. Ct. 1294 (2021)................................................................................... 22

*Turpen v. Missouri-Kansas-Texas R.R. Co.*,
  736 F.2d 1022 (5th Cir. 1984) ........................................................................ 5

*TWA v. Hardison*,
  432 U.S. 63 (1977)........................................................................................... 9

*Union Pac. Ry. Co. v. Botsford*,
  141 U.S. 250 (1891)....................................................................................... 22

*United States v. Seeger*,
  380 U.S. 163 (1965)......................................................................................... 3

*Vaughn v. Waffle House*,
  263 F. Supp. 2d 1075 (N.D. Tex. 2003) .......................................................... 5

*Weber v. Roadway Express*,
  199 F.3d 270 (5th Cir. 2000) ........................................................................... 2

*Winston v. Lee*,
  470 U.S. 753 (1985)....................................................................................... 22

**Statutes**

42 U.S.C. § 12112.................................................................................. 12, 14, 15

42 U.S.C. § 12203 ................................................................................................ 15

42 U.S.C. § 2000e ............................................................................................ 2, 5

42 U.S.C. § 2000e-2 ............................................................................................ 2

**Other Authorities**

*What to expect when you fly*, United Airlines, https://www.united.com/ual/en/us/fly/travel/what-to-expect.html ................................................................................................ 8

**Regulations**

29 C.F.R. § 1630.2 ............................................................................................ 13

Plaintiffs, on behalf of themselves and similarly situated United Airlines ("United") employees, do *not* challenge United's general policy of requiring employees to receive COVID-19 vaccines. Instead, they challenge United's unlawful refusal to grant reasonable religious and medical *accommodations* to that mandate. Rather than offering such accommodations, United has offered—at best—the false accommodation of indefinite leave without pay. In doing so, United violated its obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA") to provide reasonable accommodations. United also violated federal civil rights laws by retaliating against employees for participating in the protected activity of requesting such accommodations. A more thorough background of this dispute is included in Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, which Plaintiffs incorporate here. *See* ECF Nos. 5–7.

Until recently, United planned to place accommodation-seeking employees on unpaid leave beginning October 2, 2021, and to terminate any employee whose accommodation request was denied. After Plaintiffs' Motion for a Temporary Restraining Order, however, United delayed its plans to effectively terminate all such employees until October 15, 2021. A preliminary injunction is necessary to preserve the status quo for United's employees who are in the process of challenging United's discriminatory and retaliatory actions.

## ARGUMENT

### I. Preliminary Injunctive Relief is Appropriate and Necessary to Remedy United's Ongoing Violation of Federal Civil Rights Laws.

To obtain a preliminary injunction, Plaintiffs must establish: "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v. Livingston*, 777 F.3d 286,

288 (5th Cir. 2015).  "Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others."  *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

### A.   Plaintiffs are likely to succeed on the merits of their Title VII claims.

United has twice violated Title VII.  First, it discriminated against Plaintiffs by failing both to engage in the interactive process and to provide reasonable religious accommodations—unpaid leave is facially unreasonable.   Second, United retaliated against Plaintiffs for seeking accommodation—United has made clear that it disfavors religious accommodation requests.

1.  Title VII prohibits an employer from discriminating against an employee "because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  This "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  *Id.* § 2000e(j).  After receiving an accommodation request, an employer should "engage in an interactive process—a meaningful dialogue with the employee[.]"  *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (cleaned up).[1]  The employer must act in "good faith," *id.*, and the employee must "make a good faith attempt to satisfy his needs through means offered by the employer," *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).  United failed to engage in a good-faith interactive process and failed to provide any reasonable religious accommodations.  Accordingly,

---

[1] As Plaintiffs noted, courts "have not been consistent" about whether Title VII provides an independent cause of action for failure to engage in an interactive process.  TRO Mot. 9 n.2. But Contrary to United's argument (TRO Opp. 11), some courts recognize an obligation under Title VII to engage in such a process. TRO Mot. at 9 n.2. The argument is academic here as Plaintiffs will succeed on their Title VII discrimination claim either way. United's failure to engage in an interactive accommodation process underscores the unreasonableness of the so-called accommodation; United never intended to meaningfully accommodate them.

Plaintiffs are likely to succeed in showing that United violated Title VII.

Under Title VII, Plaintiffs "must first establish a *prima facie* case of religious discrimination" by showing: (1) that they have *bona fide* religious beliefs that conflict with an employment requirement; (2) about which they informed United; and (3) that they suffered an adverse employment action for failing to comply with the conflicting employment requirement. *Davis v. Fort Bend Cty.*, 765 F.3d 480, 485 (5th Cir. 2014).  For this, "a court's inquiry" does *not* review the merits of the religious beliefs; "whether the belief is a true religious tenet[ ] is not open to question." *Id.* at 485 (citation and quotation marks omitted).  Rather, a court asks only "whether [the individual's beliefs] are, in his own scheme of things, religious." *Id.*  As the Supreme Court put it, religious beliefs are those that involve an individual's "ultimate concern[.]" *United States v. Seeger*, 380 U.S. 163, 187 (1965).  One "touchstone of a religio[us]" belief is the showing that a believer will "categorical[ly] disregard elementary self-interest" rather than "transgressing [religious] tenets." *United States v. Allen*, 760 F.2d 447, 450 (2d Cir. 1985).

Plaintiffs easily satisfy the first two prongs of the *prima facie* case requirement.  At the outset, by purporting to grant religious accommodation requests, United has already determined that Plaintiffs hold religious beliefs that merit accommodation.  *See, e.g.*, Sambrano Aff. ¶ 12 (App.3) (ECF No. 7).  This Court should not revisit that determination.  But even if the Court were to analyze this issue further, each Plaintiff who requested a religious accommodation holds a sincere religious belief that prevents him or her from receiving the COVID-19 vaccine.  Most hold religious beliefs that prevent them from engaging in activity connected in any way to abortion. *See* Sambrano Aff. ¶ 5 (App.2); Hamilton Aff. ¶ 7 (App.7–8); Castillo Aff. ¶ 9 (App. 19); Kincannon Aff. ¶ 6 (App.28–29).  As Plaintiffs will demonstrate at the upcoming hearing, the COVID-19 vaccines all used fetal cell lines in testing—cell lines that derived from aborted fetuses.

And some Plaintiffs' religious beliefs conflict with taking toxic or foreign substances. *See, e.g.*, Jonas Aff. ¶ 8 (App.24); Hamilton Aff. ¶ 7 (App.7–8) (she "believe[s] that [her] body is God's temple" and that she cannot "inject that substance" into her body).

Other courts have held that such beliefs are sufficient to show a sincerely held religious belief under Title VII. *See Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 93 (E.D.N.Y. 1987) (holding that the plaintiffs' beliefs opposed to receiving "a foreign element outside the normal processes of the body" were religious beliefs "rooted in matters of 'ultimate concern,'" as evidenced by the fact that the refusal to receive the vaccine "and ensuing legal battle with the school district . . . manifests a dedication to their principles"); *EEOC v. Mission Hosp.*, No. 1:16-cv-00118, 2017 WL 3392783, at *2–3 (W.D.N.C. Aug. 7, 2017) (holding that Plaintiffs established a *prima facie* case of religious discrimination where hospital denied request for a religious accommodation to flu vaccine requirement based on belief that receiving vaccine was contrary to belief that "our bodies are a temple and that God gave us dominion over our bodies").

Plaintiffs will also be able to show that they suffered adverse employment actions. United's "accommodation" is indefinite unpaid leave, which "differs very little from termination." *Love v. City of Dallas*, No. 3:96-CV-0532-R, 1997 WL 278126, at *6 (N.D. Tex. May 14, 1997). Just because an employee is "not completely severed" from his employment "does not mean that cutting off [his] paycheck was not an adverse employment action." *Id.* The Supreme Court agrees—a period of just 37 days of unpaid leave, even when later reimbursed, constitutes an adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72 (2006). Despite the employee subsequently receiving backpay, the Court noted that "White and her family had to live for 37 days without income" and "[t]hey did not know during that time whether or when White could return to work." *Id.* "Many reasonable employees would find a

4

month without a paycheck to be a serious hardship." *Id.* Yet United is forcing employees who requested a religious accommodation, even employees with pre-existing immunity to COVID-19, to forgo their paychecks due to their religious beliefs—and likely for much longer than 37 days. Plaintiffs are thus likely to satisfy the "adverse employment action" requirement.

The burden then shifts to United to demonstrate that it cannot "reasonably accommodate" Plaintiffs' needs without undue hardship. *Turpen v. Missouri-Kansas-Texas R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984); 42 U.S.C. § 2000e(j). United cannot sustain that burden. One touchstone for this analysis is the "reasonable[ness]" of the proposed accommodation. *See Vaughn v. Waffle House*, 263 F. Supp. 2d 1075, 1082–83 (N.D. Tex. 2003). By failing to engage each requester in "a meaningful dialogue" about the accommodation request, United has no way to know whether an acceptable accommodation would impose an undue hardship. *Chevron*, 570 F.3d at 621. Announcing only a one-size-fits-all accommodation deprived both United and Plaintiffs of the dialogue necessary to identify accommodations that would not be unduly burdensome. Here, the only interaction between United and its employees requesting religious accommodations was a series of improper questions designed to coerce individuals into taking the vaccine contrary to their religious beliefs. *See* Kincannon Aff. ¶ 7 (App.29). This is unsurprising given the hostility toward employees with religious beliefs that CEO Scott Kirby exhibited. Hamilton Aff. ¶ 15 (App.9). And United's approach to the accommodation requests was certainly not made in "good faith." *Brener*, 671 F.2d at 146; *see also Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary" and "[a] party that fails to communicate . . . may also be acting in bad faith"). Indeed, the only reason not to engage in the interactive process here was that United never actually

intended to allow employees whose requests were "approved" to continue working.

United also cannot show that it provided requesters with reasonable accommodations. Forcing employees into an indefinite amount of unpaid leave—potentially lasting several years—is effectively termination. *See Love*, 1997 WL 278126, at *6. But a "*[r]easonable* accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 759–60 (5th Cir. 1996) (emphasis added) (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)). Here, Plaintiffs can perform the essential functions of their jobs with or without an accommodation, as their vaccination status does not affect their abilities to perform their job functions. United took no steps to "presently, or in the immediate future" allow Plaintiffs to "perform the essential functions of [their] job[s.]" *Id.* Instead, United apparently identified only the most unreasonable option—short of *formal* termination—and put it in place for all requesters. But employers are not "free to choose an unreasonable form of accommodation over a reasonable one." *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 74 (5th Cir. 1990) (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986)).

There were a host of alternative accommodations United should have considered, each of which is more reasonable than indefinite unpaid leave. One obvious example, as Plaintiffs will demonstrate at the upcoming hearing, is to grant automatic exemptions from the vaccination requirement to employees who have already had COVID—and who are therefore even less of a risk to passengers and other United employees than those who have been fully vaccinated. Such an accommodation would be sufficient for Plaintiffs Sambrano, Castillo, and Jonas, all of whom have had COVID and are therefore unlikely to transfer or acquire the disease.

As another alternative, United could require mask wearing and periodic testing for

COVID-19 and/or antibodies—like President Biden suggested in his proposed nationwide vaccination program.  As Plaintiffs will demonstrate at the upcoming hearing, this practice would satisfy United's purported goal of protecting its workforce and customers at least as well as a uniform vaccination requirement—and likely better.  At the same time, United already has a centralized system that it uses for employees to upload copies of their vaccination records and to submit accommodation requests.  Limacher Decl. ¶ 14 (Def.'s App.119) (ECF No. 25).  United also already has a system in place that allows employees who have missed three days of work to upload information from their doctors so that United can clear those employees to return to work. There is no reason to believe that those same systems cannot be used to upload periodic test results.

As Plaintiffs will further show, United could also re-implement its system of daily symptom screening and temperature checks for those seeking an accommodation—a system that would be effective at preventing transmission of COVID-19 to employees and customers alike. This is something United did previously and is similar to what United requires of its passengers and non-U.S.-based employees.  Other options abound, which is why an arbitrary, across-the-board "accommodation" of indefinite unpaid leave cannot be reasonable. Indeed, as Plaintiffs already showed, the forthcoming federal order regarding vaccine mandates for private employers contemplates testing in lieu of vaccination; likewise, the European Union's digital COVID-19 certificate considers vaccination equivalent to a negative COVID-19 test *or* having previously recovered from COVID-19.  *See* TRO Mot. 12-13 (ECF No. 6) (collecting cases).[2]

Rather than explain its resistance to other options, United makes the bald assertion that it

---

[2] In discussing these potential accommodations, Plaintiffs do not attempt to carry United's burden. Rather, United has the burden to demonstrate the reasonableness of the accommodations, and the burden of establishing that any accommodation would impose an undue hardship on United.  *See Turpen*, 736 F.2d at 1026; 42 U.S.C. § 2000e(j).  The discussion of other potential accommodations merely highlights the unreasonableness of the "accommodation" United selected.

"engage[d] in a cost benefit analysis concerning alternatives to vaccines." TRO Opp. 11. But the absence of any reasonable accommodation shows that United's statement is either inaccurate or that its unspecified "analysis" was riddled with errors. Moreover, United's protestations that a "periodic testing protocol" would "impose a substantial cost on United," Limacher Decl. ¶ 6 (Def.'s App.118), is undercut by United's acknowledgement that it is currently developing "new testing and safety protocols" for certain United employees, *id.* ¶ 22 (Def.'s App.121).

Similarly, United suggests that other potential accommodations would unreasonably "jeopardize[ ] the lives and health of [Plaintiffs'] co-workers." TRO Opp. 10 (ECF No. 24). But that is demonstrably false, as each of the accommodations described above would allow United to ensure that employees who forgo the vaccine pose no greater risk to passengers or other employees than those who have been vaccinated. And United's alleged safety concern rings hollow, given United's other policies—*e.g.*, passengers do not need to be vaccinated, employees of regional partners do not need to be vaccinated, United employees outside the United States do not need to be vaccinated even when they fly with U.S.-based crews, and unvaccinated employees of other airlines are allowed to ride in the cockpit jumpseat. *See* Compl. ¶ 32. Moreover, according to United, "COVID-19 exposure on board our planes *is almost zero* thanks to advanced air filtration systems, required mask-wearing and diligent cleaning protocols." *What to expect when you fly*, United Airlines, https://www.united.com/ual/en/us/fly/travel/what-to-expect.html (emphasis added). Thus, even without United's mandate, the risk on board planes is "almost zero"—even for the unvaccinated passengers. It follows that an accommodation for flight attendants, for example, involving testing—combined with the "advanced air filtration systems, required mask-wearing and diligent cleaning protocols"—would eliminate United's claim that anyone was in jeopardy from the accommodated employee.

United further claims that any accommodation other than indefinite leave would have "more than [a] de minimis cost." TRO Opp. 9 (cleaned up). For instance, United states that a testing alternative "would mean implementing an elaborate and impracticable testing protocol." *Id.* United further asserts that the "frequency of testing that would be required would be staggering." *Id.* While the Supreme Court has held that requiring an employer "to bear more than a *de minimis* cost" in order to accommodate an employee "is an undue hardship," *TWA v. Hardison*, 432 U.S. 63, 84 (1977), that concern is not present here. As Plaintiffs will demonstrate at the upcoming hearing, each of the alternatives discussed above can be implemented at minimal cost, at most. Indeed, given United's existing employee reporting infrastructure for vaccinations as well as other health and training data, it would be simple and cost little or nothing for United to allow employees to also report testing results, symptom checks, or prior COVID infections. *See*, *e.g.*, Hamilton Aff. ¶ 6 (App.7); Turnbough Aff. ¶ 5 (App.13).

This case thus differs substantially from *Hardison*. Unlike *Hardison*, United did not attempt to determine the cost of meaningfully accommodating its employees. Also, unlike here, the employee in *Hardison* sought a religious accommodation that would have required the employer to breach a collective-bargaining agreement or pay other employees overtime to cover the shifts. *Hardison*, 432 U.S. at 76-77. In that context, such burdens exceeded a "*de minimis* cost" and thus (according to the standard adopted by the Court) constituted an "undue hardship." *Id.* at 84.[3] Plaintiffs do not attempt to limit *Hardison* to its facts, as United suggests. TRO Opp. 10. Rather, *Hardison* offers United no support because Plaintiffs are not asking United to undertake

---

[3] It has been noted that *Hardison* cannot be squared with Title VII's text and should be overruled. *Patterson v. Walgreen Co.*, 140 S. Ct. 685, 685 (2020) (Alito, J., concurring in the denial of certiorari). As this Court cannot overrule precedent, Plaintiffs mention that here only to preserve it for later review.

similar financial or operational costs.  Plaintiffs wish to continue working their jobs, on the same schedules, for the same salary.  And they are willing to do so with mitigation measures in place.

Finally, United attempts to sidestep this issue by arguing that "[r]eligious discrimination is inherently an individualized inquiry," and that "Plaintiffs do not qualify for a class-wide injunction."  TRO Opp. 7 (cleaned up).  But United created a class-wide issue when it decided to treat all requesters the same and place all "accommodated" employees on indefinite unpaid leave.  Thus, while United certainly should have engaged in an "individualized" review of each request, it did not do so, opting instead to treat all requesters the same.  Accordingly, class-wide relief is warranted and the Court should enter preliminary injunctive relief because Plaintiffs are likely to succeed on their Title VII failure to accommodate claim.

2.  United also violated Title VII by retaliating against Plaintiffs for engaging in activity protected by Title VII.  *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  For this claim, Plaintiffs must establish a *prima facie* case by showing that: (1) they participated in a protected activity; (2) their employer took an adverse employment action against them; and (3) a causal connection exists between the protected activity and the adverse employment action.  *See McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007).  Once Plaintiffs establish a *prima facie* case, the burden shifts to United to articulate a legitimate, nonretaliatory reason for its employment action.  *See id.*  "[A] plaintiff need only make a low showing to shift the burden[.]" *Baker v. Am. Airlines*, 430 F.3d 750, 754 (5th Cir. 2005).  If the employer identifies a legitimate, nonretaliatory reason for its employment action, the plaintiff must show that the employer's proffered reason is "a pretext for the . . . retaliatory purpose."  *McCoy*, 492 F.3d at 557.

Plaintiffs can establish each *prima facie* case requirement.  Plaintiffs engaged in protected activity as "persons requesting religious accommodations under Title VII are protected under

Title VII for making such requests." *Cooper v. AT&T Corp./Lucent Tech.*, No. 97-CA-0628, 1998 WL 1784223, at *7 n.104 (W.D. Tex. Oct. 22, 1998), *R. & R. adopted sub nom.*, No. 97-CA-0628, 1998 WL 1978660 (W.D. Tex. Dec. 8, 1998).   United is thus mistaken when it states that requesting accommodations is not a protected activity.  TRO Opp. 17.  United responded to each request either by stating that it would place the employee who requested a religious accommodation on indefinite unpaid leave, with benefits stripped away, or by denying the request, based solely on requesters failing to notify United of their request by an arbitrary date imposed by the company, and preparing to terminate the employee.  *See Love*, 1997 WL 278126, at *6; *Burlington N.*, 548 U.S. at 72.  This clearly demonstrates that Plaintiffs engaged in protected activity and suffered adverse employment actions.

Plaintiffs can also establish that their protected activity caused the adverse action.  Indeed, United's well-documented antipathy toward employees with religious beliefs shows that United threatened indefinite leave *because* of those beliefs. United's CEO is on record impugning the integrity of any employee requesting a religious accommodation—derisively referring to such employees as "sudden[ly] decid[ing], 'I'm really religious.'"   Hamilton Aff. ¶ 15 (App.9). Similarly, other United employees responded negatively to religious accommodation requests, including asking derisive questions about religious beliefs.  *See* Kincannon Aff. ¶ 7 (App.29).

Further, temporal proximity shows a causal connection.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *Strong v. Univ. Healthcare Sys.*, 482 F.3d 802, 808 (5th Cir. 2007).  Here, Plaintiffs submitted religious accommodation requests by August 31, 2021, and United stated just days later, on September 9, 2021, that all requesting employees would be "granted" the accommodation of indefinite unpaid leave and lost benefits.  The events were not separated by months, *see Breeden*, 532 U.S. at 273, but mere days.

11

United's approach is clear: if an employee sought a religious accommodation by August 31, 2021, the request may have been "approved," but the employee will still be heavily penalized. And if the request was not made by August 31, United brushed it aside and administratively denied the request—without consideration of its merits—based on the company's own arbitrary deadline, further evidencing United's hostility toward requests for religious exemptions. *See* Castillo Aff. ¶ 7 (App.18). Any suggestion that United's indefinite unpaid leave decision was legitimate and nonretaliatory is undercut by the obvious disdain United has shown for its employees who have religion-based objections to receiving the vaccine. *See* Hamilton Aff. ¶ 15 (App.9).

**B.     Plaintiffs are likely to succeed on the merits of their ADA claims.**

United also violated the ADA in two ways: United failed to engage in any interactive process or to provide employees with reasonable medical accommodations. And United retaliated against Plaintiffs seeking medical accommodations for engaging in protected activity.

1. Under the ADA, an employer discriminates against an employee by "fail[ing] to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . the accommodation would impose an undue hardship.'" *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on a failure to accommodate claim under the ADA, Plaintiffs must show that: (1) they are qualified individuals with a disability; (2) the disability and its limitations were known by the employer; and (3) the employer failed to make reasonable accommodations for such limitations. *See Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017).

Plaintiffs are likely to satisfy each of these requirements. United mistakenly contends that "[n]one of the Plaintiffs has shown they have a 'disability[.]'" TRO Opp. 13. At the outset, by purporting to grant medical accommodations, United has already determined that some Plaintiffs

have a disability that merits accommodation.  *See, e.g.*, Jonas Aff. ¶ 10 (App.24).  This Court should not revisit that determination.  But even if the Court analyzes this issue further, Plaintiffs satisfy the ADA's requirements.  Under the ADA, a "qualified individual with a disability" is anyone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]"  *Chevron*, 570 F.3d at 614.  This is to "be construed broadly in favor of expansive coverage[.]"  29 C.F.R. § 1630.2(j)(1)(i).  This definition thus includes impairments that are "episodic or in remission[,]" like "epilepsy, multiple sclerosis, cancer, hypertension, [and] asthma."  *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 16–-65 (S.D.N.Y. 2020) (citing 29 C.F.R. § 1630.2(j)(1)(vii)).  Further, "disability" can "[d]oubtless" include certain "reactions to vaccines [that are] severe enough . . . to rise to the level of a disability under the ADA."  *Id.* at 165.

Under this definition, some named Plaintiffs suffer from *bona fide* disabilities.  For instance, Plaintiff Turnbough has "relapsing/remitting [multiple sclerosis]."  Turnbough Aff. ¶ 5 (App.13).  Turnbough's neurologist recommended against receiving the vaccine due to the risk that it "might precipitate a 'cytokine storm'—a condition wherein an individual's immune system is over-stimulated and begins attacking healthy tissue and organs."  *Id.*  Additionally, Plaintiff Jonas suffers from extreme allergies and relies on multiple medications every day to manage them. Supp. Jonas Aff. ¶ 4 (S.App.2).[4]  And even then, she still suffers chronic breathing and sinus issues, and is susceptible to significant allergic reactions on a daily basis, including skin rashes and anaphylaxis.  *Id.* ¶¶ 5–6 (S.App.2).  If she were not to take medication any day, Ms. Jonas would risk severe results.  *See id.* ¶ 4 (S.App.2).  Accordingly, Ms. Jonas' doctor advised that she not receive the vaccine.  Jonas Aff. ¶ 9 (App.24).  Both Plaintiffs Turnbough and Jonas satisfy the

---

[4] Citations to "S.App." refer to Plaintiffs' Supplemental Appendix, which accompanies this Brief.

threshold requirement as they live with daily impairments from illnesses that are episodic or in remission. *See Norman*, 492 F. Supp. 3d at 164-65; *see also Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 40-41 (3d Cir. 2018) (noting that, at the "early pleading stage," a plaintiff is "not required . . . to go into particulars about the life activity affected by her alleged disability").

For the third prong, the ADA requires United to engage in an interactive process—a "meaningful dialogue" to discuss possible accommodations. *Chevron*, 570 F.3d at 621. As seen in the religious accommodation context, United failed to engage in such an interactive process with any requester. *See supra* Part I.A. United announced its one-size-fits-all accommodation without any attempt to identify the most reasonable accommodation for any specific requester, including those who are already immune through a prior infection.

But any accommodation under the ADA must be reasonable. *See* 42 U.S.C. § 12112(b)(5)(A). As already noted, indefinite unpaid leave is not a reasonable accommodation. *See supra* Part I.A. Seemingly conceding this issue, United relies on a case stating that "temporary leave *of only a few weeks* . . . was a reasonable accommodation." TRO Opp. 14 (quoting *Austgen v. Allied Barton Sec. Servs.*, 815 F. App'x 772, 775 (5th Cir. 2020)) (emphasis added). Yet the United employees here face potentially *years* of *unpaid* leave. But more importantly, United is misguided in relying on cases stating that unpaid leave "can be a reasonable accommodation." *Id.* (quoting *Moss*, 851 F.3d at 418). As Plaintiffs already showed (TRO Mot. 12 n.3), such cases address employees *requesting* unpaid leave as an accommodation, rather than an employer foisting unpaid leave on an employee. Plaintiffs have not requested such accommodations here. Further, the option for those on medical leave to use their "sick pay" prior to going on unpaid leave is of no moment. That option is temporary (lasting only until the sick leave runs out) and it unfairly takes away hours that employees have earned and may need later. In essence, United is demanding

that those "accommodated" employees pay themselves with their own money while on leave.

At the same time, United cannot show any burden sufficient to justify its unreasonable accommodation.   Under the ADA, "the term 'undue hardship' means an action requiring significant difficulty or expense."   42 U.S.C. § 12111(10)(A).   United cannot identify any "significant difficulty or expense" associated with granting accommodations to allow employees who requested medical accommodations to continue working with mitigation measures in place like mask wearing, periodic antibody testing, or periodic COVID-19 testing.   As Plaintiffs demonstrated above, there were a host of alternative, reasonable accommodations United could have considered. Given the availability of alternatives, United cannot explain why indefinite unpaid leave is the *only* available accommodation—particularly, as Plaintiffs will show, where such an accommodation system will be little or no more expensive—and perhaps more expensive—than merely granting accommodation requests and instituting mitigation measures.   In fact, United has already conceded that it can institute mitigation measures—it is currently developing a periodic-testing regime for employees.  *See* Limacher Decl. ¶ 22 (Def.'s App.121).[5]

2.  Plaintiffs are also likely to succeed on their ADA retaliation claims.  The ADA makes it unlawful to retaliate against employees seeking an accommodation. 42 U.S.C. § 12203(a).  ADA retaliation claims are "analyzed similarly to cases under" Title VII.  *Dickerson v. United Parcel Serv.*, No. 3:95-CV-2143, 1999 WL 966430, at \*7 (N.D. Tex. Oct. 21, 1999) (citing cases).

---

[5] United's failure to consider such accommodations also undercuts its reliance on the direct threat defense.  TRO Opp. 16-17.  United states that, because "COVID . . . poses a direct threat," it may place all unvaccinated employees who request an accommodation on unpaid leave.  *Id.* at 17. United fails to provide authority for such a sweeping interpretation of the direct threat defense and, moreover, United fails to acknowledge that there are other mitigation measures that decrease the "direct threat" COVID poses. Further, United fails to acknowledge any risks posed by unvaccinated passengers, unvaccinated United employees from other countries flying with U.S.-based crews, or unvaccinated pilots of other airlines flying for free in United cockpit jumpseats or in the cabin.

Requesting a "reasonable accommodation under the ADA may constitute . . . protected activity." *Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008).  There can be no dispute that United responded with adverse employment actions—threatening each "accommodated" employee with indefinite unpaid leave and lost benefits.  *See Love*, 1997 WL 278126, at *6.

Finally, Plaintiffs will show that their ADA-accommodation request led United to subject them to adverse employment actions.  Not only are the adverse actions close in time to the protected activity, thereby suggesting a causal connection, *see Breeden*, 532 U.S. at 273, but Mr. Kirby made not-so-veiled threats against anyone who dared request a medical accommodation, stating that "very few people" would receive accommodations and that individuals requesting such an accommodation were "putting [their] job[s] on the line."  Hamilton Aff. ¶ 15 (App.9).  This antipathy will certainly overcome any attempt by United to identify a legitimate, nonretaliatory reason for its actions.  Thus, Plaintiffs' ADA-retaliation claims are likely to succeed.

### C.     Without preliminary injunctive relief, Plaintiffs will suffer irreparable injury.

Plaintiffs will also show that they will suffer irreparable injury absent a preliminary injunction.  United has put its religious and disabled workers in an impossible position—take the COVID-19 vaccine, at the expense of their religious beliefs and health, or face a lengthy period of unpaid leave.  Unless the Court enjoins United's actions, Plaintiffs will be irreparably harmed.

An irreparable harm is one that "cannot be undone," and an injunction is appropriate if the "anticipated injury is imminent and irreparable."  *ADT v. Capital Connect*, 145 F. Supp. 3d 671, 694 (N.D. Tex. 2015).  In this case, Plaintiffs face many harms that warrant preliminary injunctive relief.  Most significantly, United is using a short deadline, coupled with the threat of a draconian "accommodation," to compel its employees to violate their religious beliefs or put their health at risk.  Without vaccination, United employees face formal or effective termination within days.

One Fort Worth-area man's story proves the immediate harm.  David Lockwood—who works at DFW—requested a religious accommodation.  *See* Lockwood Aff. ¶¶ 1, 3 (App.33). Because he could not afford to be without income for an extended period, he ultimately decided to violate his religious beliefs and acquiesce to United's coercion.  *See id.* ¶ 6 (App.33).  Mr. Lockwood is likely not alone as the threat of immediate loss of income may force many United employees to forgo their religious beliefs and their health.  Considering such significant and immediate harms facing Plaintiffs and other United employees, it is unsurprising that employees may consider violating their beliefs or compromising their health to receive the vaccine.  *See* Lockwood Aff. ¶¶ 6, 8 (App.33–34).  If they do so, the harm will be permanent—the breach of religious belief will already have occurred—and the Court cannot later fashion a remedy to undo that harm.  Understanding the irreparable nature of such harms, the United States District Court for the Northern District of New York recently issued a temporary restraining order enjoining the New York Department of Health from enforcing a mandate (lacking any accommodation provisions) that all health care workers receive the COVID-19 vaccine by September 27, 2021. *See* Order, *Dr. A. v. Hochul*, No. 21-cv-1009 (N.D.N.Y. Sept. 14, 2021), ECF No. 7.

Employees who, despite United's coercive actions, refuse to receive the vaccine for religious or medical reasons also face additional irreparable harms. While it is true that United may be able to compensate its employees for lost wages later, that is cold comfort for employees and their families who will face a host of serious and irreparable injuries resulting from their loss of salary.  Ms. Hamilton will lose the income and medical insurance that she currently uses to pay for her husband's cancer treatment.  *See* Hamilton Aff. ¶¶ 11-14 (App.8).  Indeed, Ms. Hamilton's current treatment decisions for her husband are dependent upon whether she will have a *paying* job after October 15, 2021.  *See id.*  Mr. Castillo will be homeless at the end of October if United

places him on unpaid leave.  *See* Castillo Aff. ¶ 13 (App.19).  Mr. Sambrano will need to determine how he can continue paying for his child's college education and whether his family will need to consider alternative education options.  *See* Sambrano Aff. ¶ 17 (App.4).  Similarly, Ms. Jonas' husband is disabled, and his care requires her salary and medical insurance.  *See* Jonas Aff. ¶ 11 (App.24).  Placement onto extended unpaid leave will prevent Ms. Jonas from providing her husband the care he needs.  *See id.*  Additionally, the threat of unpaid leave has caused Mr. Turnbough significant stress, substantially increasing the risk that his multiple sclerosis will relapse.  *See* Turnbough Aff. ¶¶ 14–15 (App.15).  Surprisingly, United calls these harms "speculative."  TRO Opp. 19-20.  These harms are both likely and imminent.

While the irreparable injury analysis does not typically consider harms that can be "undone through monetary relief," *ADT*, 145 F. Supp. 3d at 694, it is equally true, as the Supreme Court has held, that even "a month without a paycheck [is] a serious hardship," *Burlington N.*, 548 U.S. at 72.  Many aspects of these financial harms are not easily redressed by damages—serious physical and psychological consequences of impending homelessness, loss of life-saving medical treatment, and changes in education decisions due to lost income.  Further, employees placed on unpaid leave will lose seniority within United's seniority-based system beginning on the 91st day of unpaid leave, which cannot be undone.  That is why the Supreme Court could find "no reason to believe that a court could not have issued an injunction where an employer suspended an employee for retaliatory purposes, even if that employer later provided backpay."  *Id.*

Moreover, United's employees will face irreparable deterioration of their job skills if they are placed on unpaid leave. For example, pilots must remain up to date on current technology and fly frequently in order to maintain their skills. As Plaintiffs will demonstrate, being forced onto leave will cause those perishable skills to deteriorate, and no amount of financial compensation on

the backend can return to employees the time they lost—potentially years—during which they could have further developed the skills necessary for their careers, and skills that would increase their value to United and, potentially, other carriers.  The same is true of other positions.

United's employees also face irreparable dignitary, psychological, and reputational harms from being effectively terminated for discriminatory reasons. "If Defendants deprive [plaintiffs] of [their] employment . . . they will also deprive [them] of [their] title and dignity. . . . These are intangibles not aptly measured or compensable by any monetary amount." *Quiles Rodriguez v. Calderon*, 172 F. Supp. 2d 334, 344 (D.P.R. 2001).  And there are many psychological harms that accompany the loss of a paycheck, such as: the risk of a stress-induced multiple sclerosis relapse (Turnbough Aff. ¶ 15 (App.15)); marital strain (Kincannon Aff. ¶ 12 (App.29)); family stress (Sambrano Aff. ¶ 17 (App.4)); and stress-induced high blood pressure (Jonas Aff. ¶ 14 (App.24)). Additionally, effectively terminating Plaintiffs stigmatizes them, harms their reputations, and makes transfer to another airline for employment difficult—all because of their religious beliefs and disabilities.  Although some courts have found that plaintiffs did not show a risk of reputational harm sufficient to constitute irreparable injury, *see, e.g.*, *Sampson v. Murray,* 415 U.S. 61 (1974), the Supreme Court has explicitly "recognize[d] that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found," *id.* at 92 n.68.  This is such a case.  United has discriminated against its employees on the basis of their religious beliefs and disabilities.  That discrimination, coupled with the reputational and psychological harms it will cause, is the kind of "extraordinary" case the Supreme Court anticipated in *Sampson. Id.*

In addition, regardless of whether employees accept effective termination or receive the vaccine despite their religious and health concerns, United has caused them irreparable injury by

simply forcing them to choose between their livelihood and their right to live out their faith absent undue hardship from their employer.  In another COVID-19 case, the Supreme Court held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).  So too with statutory anti-discrimination and religious-freedom rights.  Title VII promises people of faith that their religious beliefs will be reasonably accommodated, and the ADA promises the same for disabled individuals.  "The short of the matter is that under Title VII"—and the ADA—employees do not have to choose between their religious beliefs and employment." *Lawson v. State of Wash.*, 319 F.3d 498, 502 (9th Cir. 2003) (dissenting op.).  Yet United's "accommodations" subject its employees to that forbidden discrimination by forcing employees to choose daily between their beliefs and their livelihood.  Whichever they choose, they lose.

The Court may prevent these harms by granting the preliminary injunction.  Again, United may institute a COVID-19 vaccine mandate generally.  Plaintiffs merely ask that United comply with federal civil rights laws by engaging with individuals seeking religious or medical accommodations, and by granting reasonable accommodations for those individuals after a good-faith interactive process.  By enjoining United's mandate for those employees with religious or medical bases for requesting accommodations, the Court will ensure that it is able to fashion an appropriate remedy later.  If the Court does not, Plaintiffs (and other United employees) will be irreparably harmed.

### D.  Plaintiffs' injury outweighs any potential hardship to United.

The harms discussed above are serious and irreparable and they outweigh any hypothetical harm the injunction may cause.  Moreover, any claim that the broad mandate *must* go into effect

immediately is false; United has operated since spring 2020 without such a mandate and there is no compelling reason why it cannot continue doing while engaging in the interactive process required by federal law.  Had United engaged in this process, it would have already identified countless other ways to accommodate Plaintiffs while also protecting public health—mask wearing, periodic antibody testing, and periodic COVID testing are just a few options.  Plaintiffs do not claim that United must allow them to work without any mitigation measures.  Rather, Plaintiffs merely ask the Court to require United to follow federal civil rights laws, engage in the interactive process, and develop reasonable accommodations that consider Plaintiffs' religious beliefs and health concerns on the one hand, and the public's health interests on the other hand. Requiring United to comply with the law does not impose a harm outweighing Plaintiffs' injury.

While United argues that safety concerns over COVID-19 create a harm for the airline in the case of an injunction, this argument is belied by United's own conduct.  Setting aside the fact that United's COVID-19 safety precautions have lessened over time, not increased, United: (1) does not require all of its employees to be vaccinated—only those living in the United States— even though United employees from around the world travel and work with one another; (2) allegedly plans to allow *some* "accommodated" U.S. employees to return to work in the future with mitigation measures in place; (3) does not require pilots from other airlines flying in the cockpit or cabin of United aircraft to be vaccinated; and (4) does not require any passengers to be vaccinated or even show proof of a negative COVID-19 test. *See* Compl. ¶ 32.  Moreover, United's vaccine mandate does not apply to regional airline partners that fly United customers on shorter routes. *Id*.  It likewise does not apply to the vendors who work alongside United employees every day.  Thus, no matter the reason United decided to require vaccinations for its employees, there is no safety justification that can support a blanket policy that fails to account for individual

situations.  Perhaps that is why federal civil rights laws require United to engage in an interactive process with requesters in the first place.

      **E.**      **Granting the injunction will serve the public interest.**

An injunction preserving the status quo while the EEOC considers Plaintiffs' claims will serve the public interest.  For example, as Plaintiffs have already demonstrated, allowing employees to exercise religious freedom by making decisions in accordance with their sincerely held religious beliefs is a public interest of the highest order.  TRO Mot. 22–23 (citing cases).

Recognizing religious freedom's centrality to the public interest, the Supreme Court has protected religious exercise even when faced with competing public health considerations.  *See*, *e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1296–98 (2021) (per curiam) (collecting cases and granting a preliminary injunction against COVID-19 public health order restricting religious exercise).  "Even in a pandemic," religious freedom "cannot be put away and forgotten."  *Roman Cath. Diocese*, 141 S. Ct. at 68.

The same is true of allowing individuals to make medical choices—in consultation with their doctors—to protect their health.  "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."  *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251 (1891).  No law permits United to interfere with that right—indeed, the ADA exists to ensure it cannot do so.  The Supreme Court has recognized the right to medical decision-making even in the face of countervailing societal interests.  *See Winston v. Lee*, 470 U.S. 753, 766 (1985) (recognizing a right to medical decision-making and holding that a court could not force a defendant, for evidentiary purposes, to have surgery to remove a bullet fired by a victim).  As Plaintiffs already demonstrated, the public interest

in allowing individuals to determine their need for a medical accommodation is particularly strong as the countervailing interest in stopping the spread of COVID-19 can be achieved through other means such as mask wearing and testing.  TRO Mot. 24–25 (citing cases).

The public also has an interest in United's disabled employees retaining their employment and their right to make their own medical decisions. *See Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1383 (N.D. Ga. 2002).  United's discriminatory policy runs contrary to that interest by forcing its disabled employees out of the workforce—potentially for years.  This decision will have devastating economic consequences for Plaintiffs and those similarly situated, and those economic impacts affect the community at large.

To be sure, United will likely argue that an important public interest in eradicating COVID-19 outweighs Plaintiffs' religious beliefs and medical concerns.  Plaintiffs do not dispute the important goal of stopping COVID-19's spread, but it does not override United's obligations under federal civil rights law.  And it certainly does not allow United to effectively terminate all employees who request an accommodation.  By United's own admission, nearly all of its workforce has now received a COVID-19 vaccine.  TRO Mot. 25.  Moreover, a large portion of the public likely possesses antibodies against COVID-19 because of previous infection.  Accordingly, there is no pressing public interest permitting United to deny religious and medical accommodation requests for this relatively small number of employees.  Plaintiffs' request for a narrow injunction is thus supported by the public interest.

## II.    Plaintiffs Have Properly Complied with Their EEOC Filing Requirements, and That Compliance Poses no Obstacle to Preliminary Injunctive Relief.

Finally, United is wrong to argue (TRO Opp. 18–19) that Plaintiffs' compliance with EEOC filing requirements forecloses preliminary injunctive relief.  To be sure, each Plaintiff has a pending charge with the EEOC complaining of United's discriminatory and retaliatory actions.

*See* Sambrano Aff. ¶ 19 (App.4); Hamilton Aff. ¶ 19 (App.9); Turnbough Aff. ¶ 18 (App.16); Castillo Aff. ¶ 16 (App.20); Jonas Aff. ¶ 16 (App.25); Kincannon Aff. ¶ 15 (App.30). But this does not prevent the Court from issuing an injunction against United's treatment of employees with religious or medical objections to the vaccine mandate. While individuals asserting claims under Title VII or the ADA must complete the EEOC's administrative process before seeking "final relief" through a civil action, courts in this Circuit may grant preliminary injunctive relief on those claims where "irreparable injury is shown and likelihood of ultimate success has been established[.]" *Drew v. Liberty Mut. Ins.*, 480 F.2d 69, 71, 72 (5th Cir. 1973).

In such cases, an "individual employee may bring her own suit to maintain the status quo pending the action of the [EEOC] on the basic charge of discrimination." *Id.* at 72; *Bailey v. Dallas Cty. Sch.*, No. 3:16-cv-1642-M, 2016 WL 7638146, at *2 n.4 (N.D. Tex. Dec. 9, 2016) ("Exhaustion of administrative remedies in the ADA context is similarly a condition precedent rather than a jurisdictional prerequisite to suit."). Courts outside this Circuit agree. TRO Mot. 7. And this conclusion is entirely consistent with the history of Title VII. *See id.* at 7-8.

United's attempt to distinguish *Drew* fails. TRO Opp. 18–19. First, the smattering of district court cases United cites—all decades old and from outside this Circuit—are, unlike *Drew*, nonbinding. *See id.* at 18 n.5. Nor was *Drew* abrogated in *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1851 (2019). TRO Opp. 19. Instead, *Fort Bend* confirms *Drew*'s status as good law; the Supreme Court merely held that Title VII's exhaustion requirement is not jurisdictional. 139 S. Ct. at 1846. That holding neither implicates nor abrogates *Drew*'s holding on the availability of preliminary injunctive relief before the completion of the administrative process.

Preliminary injunctive relief is imperative here to maintain the status quo of Plaintiffs' employment at the time they filed their Complaint. Without it, Plaintiffs face an impossible choice.

Plaintiffs must decide whether to receive the COVID-19 vaccine or face termination—literally or functionally. It is understandable that United employees may consider acquiescing to the mandate, as many have already been coerced into doing, thereby risking their health and/or religious beliefs in favor of their livelihood. Lockwood Aff. ¶ 6 (App.33). Without preliminary relief, others will likely do so as United continues to withhold paychecks, and that decision—with the resulting breach of religious scruples or subjection to health risks— cannot be reversed by a subsequent decision from the EEOC or this Court. Thus, this case should not merely "proceed in the normal course" (TRO Opp. 1); the impossible choice facing Plaintiffs is of United's own making and United should not be permitted to use lengthy litigation schedules to continue coercing employees to violate their religious beliefs or health. "[T]o preserve [this] court's ability to later order meaningful relief," it must enter preliminary injunctive relief now. *Drew*, 480 F.2d at 74.

## CONCLUSION

Plaintiffs ask this Court to preserve the status quo to allow the EEOC to continue reviewing Plaintiffs' administrative charges regarding United's unlawful conduct. Specifically, to prevent irreparable harm, the Court should enjoin United from: (1) terminating or placing on indefinite leave any employee who asserts a religious or medical basis for seeking an accommodation; (2) reducing in any manner those employees' benefits or taking any other adverse employment actions against them; (3) taking further retaliatory actions toward those who requested accommodations; and (4) denying as untimely any request for an accommodation. By granting a preliminary injunction now, the Court will ensure that the EEOC and this Court will be able to order meaningful relief later.

October 1, 2021

Respectfully submitted,

*/s/ John C. Sullivan*
John C. Sullivan
Texas Bar No. 24083920
john.sullivan@the-sl-lawfirm.com
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891

*/s/ Robert c. Wiegand*
Robert C. Wiegand
Texas Bar No. 00791924
bob.wiegand@swolegal.com
Melissa J. Swindle
Texas Bar No. 24013600
Melissa.swindle@swolegal.com
Stewart Wiegand & Owens PC
325 N. St. Paul Street, Suite 3750
Dallas, TX 75201
Telephone: (469) 899-9800
Facsimile: (469) 899-9810

*/s/ Mark R. Paoletta*
Mark R. Paoletta*
D.C. Bar No. 422746
mpaoletta@schaerr-jaffe.com
Gene C. Schaerr*
D.C. Bar No. 416368
Brian J. Field*
D.C. Bar No. 985577
Kenneth A. Klukowski*
D.C. Bar No. 1046093
Joshua J. Prince*
D.C. Bar No. 1685532
Annika M. Boone*
Utah Bar No. 17176
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136

* Admitted *pro hac vice*

26

*Counsel for Plaintiffs and the*
*Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

On October 1, 2021, I filed the foregoing document with the clerk of court for the United States District Court, Northern District of Texas.  Notice and a copy of the foregoing has been provided to these attorneys via the Court's ECF system and via email.


*/s/ Robert C. Wiegand*
Robert C. Wiegand, Attorney for Plaintiffs