**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| DAVID SAMBRANO, individually, and on behalf of all others similarly situated, | § § § § | |
| Plaintiffs, | § § | Civil Action No. |
| v. | § § | 4:21-CV-01074-P |
| UNITED AIRLINES, INC., | § § § | |
| Defendant. | § § | |

**DEFENDANT UNITED AIRLINE INC.'S POST-HEARING BRIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND FACTS ................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I.      Applicable Legal Principles ................................................................................. 2

II.     Application to Plaintiffs' Proposed Accommodations ...................................... 3

    A.      Testing at Home .......................................................................................... 4

    B.      Expansion of Pre-Departure Testing ......................................................... 7

    C.      Symptom Checks & Expanded Sick Leave .............................................. 10

    D.      Reliance on Natural Immunity .................................................................. 11

III.    Plaintiffs Cannot Waive Contractual or Regulatory Burdens on United ........ 12

    A.      Rights of the Putative Class Members Cannot Be Waived ...................... 12

    B.      Collective Bargaining Agreements Cannot Be Waived ........................... 12

    C. Federal and State Laws Cannot Be Waived ............................................... 14

IV.     The Collective Bargaining Agreements Are Also Germane to United's
    Accommodations and the Issue of Irreparable Harm ...................................... 14

    A.      Alternate CSR Positions .......................................................................... 14

    B.      Loss of Seniority as Alleged Irreparable Harm ...................................... 15

CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

Page

CASES

*Anderson v. United Airlines*,
  No 21-1050, Dkt. 1 (M.D. Fla. Oct. 18, 2021) .......................................................................7

*Baker v. F.A.A.*,
  917 F.2d 318 (7th Cir. 1990) ................................................................................................14

*Barrington v. United Airlines, Inc.*,
  No. 1:21-cv-02602-RMR-STV, ECF No. 23 (D. Colo. Oct. 14, 2021) (App.
  Ex. E) ...................................................................................................................................10

*Bodle v. TXL Mortg. Corp.*,
  788 F.3d 159 (5th Cir. 2015) ................................................................................................14

*Brener v. Diagnostic Ctr. Hosp.*,
  671 F.2d 141 (5th Cir. 1982) ............................................................................................2, 11

*Bruff v. N. Miss. Health Servs., Inc.*,
  244 F.3d 495 (5th Cir. 2001) ..................................................................................................2

*Claiborne v. Ill. Cent. R.R.*,
  583 F.2d 143 (5th Cir. 1978) ................................................................................................15

*Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*,
  88 F. App'x 813 (6th Cir. 2003) .............................................................................................3

*Forby v. One Techs., LP*,
  No. 3:16-CV-856-L, 2020 WL 4201604 (N.D. Tex. July 22, 2020) .....................................12

*Holmes v. Helms*,
  705 F.2d 343 (9th Cir. 1983) ................................................................................................14

*Moseley v. Goodyear*,
  612 F.2d 187 (5th Cir. 1980) ................................................................................................15

*Mungin v. Fl. E. Coast Ry. Co.*,
  416 F.2d 1169 (5th Cir. 1969) ..............................................................................................13

*Sims v. City of Dallas*,
  No. CIV.A.3:95-CV-177-X, 1996 WL 722052 (N.D. Tex. Dec. 5, 1996) ............................15

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011) ................................................................................................12

*Tagore v. United States*,
  735 F.3d 324 (5th Cir. 2013) ............................................................................2, 3, 7

*Trans World Airlines, Inc. v. Hardison*,
  432 U.S. 63 (1977) .................................................................................................2, 3

*Turpen v. Missouri-Kansas-Texas R.R. Co.*,
  573 F. Supp. 820 (N.D. Tex. 1983), *aff'd* 736 F.2d 1022 (5th Cir. 1984) ................................3

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
  300 U.S. 515 (1937) ................................................................................................12

*Weber v. Roadway Exp., Inc.*,
  199 F.3d 270 (5th Cir. 2000) .....................................................................................2

*Zipes v. Trans World Airline, Inc.*,
  455 U.S. 385 (1982) ................................................................................................15

**STATUTES**

42 U.S.C. § 12111 ........................................................................................................2

45 U.S.C. § 152 ..................................................................................................12, 13

49 U.S.C. § 44701 ....................................................................................................14

## INTRODUCTION

One of the central issues in this case is whether and how plaintiffs' proposed alternative accommodations would impose an "undue hardship" on United Airlines ("United"). As demonstrated below, the various collective bargaining agreements ("CBAs") and regulatory regimes that bind United – especially with respect to flight crew – are one of many factors that support the conclusion that implementing any of plaintiffs' preferred accommodations would be a logistical and operational nightmare, as well as a significant financial burden. And while plaintiffs have suggested that they could just "waive" those requirements, the unions that represent the employees at issue have confirmed in writing that they will *not* agree to do so. *See infra* at 13. Hence, United cannot reconcile its collectively-bargained and regulatory obligations with plaintiffs' demands for alternative accommodations.

## BACKGROUND FACTS

The airline industry is one of the most heavily regulated and heavily unionized industries in the United States. *See* https://www.airlines.org/our-priorities/. As a result, when implementing any change in operations, United must – in addition to accounting for its own internal business needs and limitations – navigate a complex web of externally-imposed obligations, including both collective bargaining agreements and federal regulations.

The vast majority of United's customer-facing employees are unionized, including (1) pilots, (2) flight attendants, and (3) customer service representatives ("CSRs"), which include gate agents and other airport operations personnel.[1] App. 1 ¶ 3, 445 ¶ 3, 1035 ¶ 5. Pilots are represented by the Air Line Pilots Association International ("ALPA"); flight attendants are

---

[1] This brief focuses on customer-facing employees because, as discussed both in prior briefing and during the hearing, United is in the process of implementing new accommodations for non-customer facing employees, and plaintiffs appear to agree that those new accommodations are reasonable.

represented by the Association of Flight Attendants ("AFA"); and CSRs are represented by the International Association of Machinists ("IAM"). *Id.* United has a separate CBA with each union: the United Pilot Agreement ("UPA"), the Flight Attendant Agreement ("JCBA"), and the Passenger Service Agreement ("PSA"), respectively. *See id.* Ex. A-1, B-1, C-1.

United is also subject to Federal Aviation Regulations ("FARs") governing both the airline and its pilots. *See* 14 C.F.R. Parts 1-199. The FARs cover a wide range of topics, including preflight duties, duty periods and rest requirements, and flight operations. App. 1171 ¶ 2. In addition, various state wage and hour laws purport to require employers, including airlines, to pay for any form of required testing. *Id.* 2 ¶ 6, 446 ¶ 8.

ARGUMENT

## I.     Applicable Legal Principles.

As discussed at the evidentiary hearing, United can prevail on the merits by showing that its accommodation is reasonable *or* that the alternatives proposed by plaintiffs would impose an undue hardship. *See, e.g.*, 29 C.F.R. § 1605.2(b)(2). Moreover, it is quite clear that, under *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), and its progeny, an employer may establish undue hardship by demonstrating that an alternative proposed accommodation implicates a "more than de minimis" burden by pointing to any one of several different factors, including increased operational costs, burdens on co-workers, impracticality, or decreased effectiveness. *E.g. Tagore v. United States*, 735 F.3d 324, 329-30 (5th Cir. 2013); *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 272-73 (5th Cir. 2000).[2] Similar rules apply under the Americans with Disabilities Act ("ADA"). *See* 42 U.S.C. § 12111(10).

---

[2]     *See also, e.g., Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982) (more than de minimis cost can be "imposition upon co-workers."); *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001) (additional workload and travel for co-workers was more than de minimis burden on employer).

In addition, as in *Hardison* itself, an employer can show "more than de minimis" burdens from the proposed accommodation by pointing to external constraints, including legal or collective bargaining obligations. 432 U.S. at 79-81; *accord* 29 C.F.R. App. 1630.15(d) (under ADA, "[t]he terms of a collective bargaining agreement may be relevant to [the undue-hardship] determination"). Such obligations can be relevant in one of two different ways. First, if the proposed accommodation would require the employer to violate a CBA or legal obligation, that is necessarily an undue hardship. *Hardison*, 432 U.S. at 77, 80-81; *Tagore*, 735 F.3d at 329-330.

Second, even if the proposed accommodation would not violate a CBA or the law, it can still be an undue hardship if, as a result of complying with such obligations, the employer would incur more than de minimis burdens. *See, e.g., Turpen v. Missouri-Kansas-Texas R.R. Co.*, 573 F. Supp. 820, 826 (N.D. Tex. 1983) (finding undue hardship where proposed accommodation would require employer to keep extensive records and complex billing procedures to ensure compliance with the CBA), *aff'd* 736 F.2d 1022 (5th Cir. 1984).[3]

## II.     Application to Plaintiffs' Proposed Accommodations

As this case has progressed, plaintiffs have proposed an evolving set of various accommodations that, they claim, can be implemented at "little to no cost" to United.[4] In the sections below, we review each of the plaintiffs' current proposals and show how they (1) are either inconsistent with or would impose additional cost as a result of United's CBAs and regulatory obligations, and (2) implicate other practical or operational concerns.

---

[3]     *Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 88 F. App'x 813, 819 (6th Cir. 2003) (where CBA would require payment of "premium overtime wage," proposed accommodation of Sunday work constitutes undue hardship).

[4]     As an example of how plaintiffs' proposals have changed, in their Complaint, they discuss mask-wearing as one of the alternatives. Compl. (ECF No. 1) at ¶ 119 and p. 30. At the evidentiary hearing, however, plaintiffs' counsel expressly stated that masking is *not* one of the alternative accommodations that plaintiffs are demanding. Likewise, while they emphasized "symptom checks" at the hearing, there is no mention of that in the Complaint.

### A.    Testing at Home

During the hearing, plaintiffs argued that, in lieu of vaccination, flight crew could conduct COVID screening tests on their "own time" and at their own expense (using test kits that they buy themselves). Notably, this proposal is absent from plaintiffs' complaint and any of their briefing. Plaintiffs also proposed that – for individuals who have had COVID – they could submit their own antibody tests. There are multiple problems with any version of self-regulated, at-home testing.

1.    As a threshold matter, plaintiffs' proposal cannot be reconciled with CBA and FAR provisions regarding duty time and rest.[5] Both pilots and flight attendants are required to have uninterrupted periods of rest between any periods when they perform work-related functions. *See* App. Ex. A-1 §§ 6(V), (W); *id.* Ex. B-1 §§ 5-E-3, 5-F-3; 14 C.F.R. § 117.25(e). The required duration of these rest periods vary greatly depending on where an individual is flying from, what time the flight was, and various other factors. *Id.* Work-related duties, including even relatively minor interruptions, are often considered an interruption of rest. App. 3 ¶ 9, 447 ¶¶ 10, 11. Hence, any form of medical testing – even if supposedly on the employee's "own" time – would, under the CBAs and FARs, count as duty time. *See id.*

As a result, if an off-duty testing program were put in place for these employees, United would be in the impossible position of either violating rest/duty rules or re-starting each employee's rest period after each test. If United violated the rest/duty time provisions it would be subject to grievances by ALPA and AFA, as well as sanctions or fines from the FAA. *See id.* 3-4 ¶ 12, 446 ¶ 6, 1174 ¶ 13. And if United re-started the clock related to rest periods, it would cause serious operational problems. For example, if a flight attendant finished a trip at midnight, and

---

[5]    Many of these issues regarding the CBA rules and regulatory or state law obligations are hotly contested in other contexts, and United's description of those obligations herein are without prejudice to any interpretation of such provisions or other defenses that United may assert in separate proceedings.

needed to report back at 10 AM for the next leg of the trip, it would be impossible to add testing to that schedule without running the risk of infringing on the minimum rest required under the JCBA. *Id.* 3 ¶ 9. In this same scenario, if United were to re-start the clock, the flight attendant would be unable to fly his or her 10 AM trip and would need to be replaced. The same is true for pilots. *Id.* 447 ¶ 10; 14 C.F.R. § 117.25(e).

Nor is it an answer to say that flight crew can test outside their rest period. That would require adding time onto existing duty periods. *See* App. Ex. A-1 § 6(R); *id.* Ex. B-1 § 5-E-2-a-(4). This additional duty time will limit the amount of time that flight crews can fly planes because duty time is subject to various hourly limitations. *See id.* Ex. A-1 §§ 6(S), (T), (U); *id.* Ex. B-1 §§ 5-B, 5-F. These time restrictions are particularly problematic on long-haul flights where the flight crew is often running up on its duty limits even under the best conditions. *Id.* 5 ¶ 17, 449 ¶ 21.

Moreover, flight crew are not assigned traditional daily schedules, but rather work "trip pairings" that span multiple days and cities. *Id.* 6 ¶ 21, 447-48 ¶ 14. For example, a three-day trip pairing could consist of the following segments: Day 1: SFO to DEN, DEN to ORD; Day 2: ORD to DCA, DCA to ORD; Day 3: ORD to LAX, LAX to SFO. *Id.* 447-48 ¶ 14. Pilots and flight attendants would inevitably need to be tested in the middle of these multiday trips, which means testing could not be limited to plaintiffs' "own time" in light of these multiday trips.

2.      Under the CBAs, pilots and flight attendants are also entitled to receive a certain number of off-duty days. *See id.* Ex. A-1 § 6(Q); *id.* Ex. B-1 §§ 5-E-4, 5-E-5, 5-F-4, 5-F-5, 20-D-5. Similar to the rest time problem, if a pilot or flight attendant had to test for COVID-19 on these days, that would constitute a job function, and so the day would not count as "off." *Id.* 6 ¶ 22, 450 ¶ 28. This problem would be especially acute if, as plaintiffs suggested, they test every day. United would either have to provide alternative days off or it risks violating the CBAs.

3.     Beyond the duty/rest problems, the CBAs would also require United to pay for time spent doing any form of at-home testing. In order to implement the limited pre-departure testing scheme that is currently in place, United had to negotiate new agreements that require pay for testing time. App. 4 ¶ 13. Per those agreements, flight attendants receive $15 for each additional 5 minutes, up to a maximum of $135 for 45 minutes. *Id.* Likewise, United extended pilots' duty days by thirty minutes for the testing. *Id.* 448 ¶ 16. Pilots are compensated at their usual rate for this additional duty time. *Id.* United would either need to apply these rules or negotiate new agreements with ALPA and AFA. *Id.* 4 ¶ 13, 450 ¶ 27.

4.     Additionally, many state laws – including some laws specifically enacted to address the issue of COVID-19 testing – purport to require employers to pay for time spent testing or otherwise prohibit employers from passing along the cost of employer-required medical examinations, including COVID-19 testing. *See id.* 2 ¶ 6 ("In eight states where United has flight attendants based, those states have laws that could be interpreted as requiring the employer to pay for COVID-19 testing."). Thus, in at least some jurisdictions, United would risk incurring substantial costs for COVID-19 testing.

5.     In addition, United would, at least in some circumstances, be threatened with paying for the cost of the COVID-19 tests themselves, even if the employees initially acquired the tests on their own without United's involvement. As Sasha Johnson discussed during her testimony, if a United employee uses his or her insurance to obtain a COVID-19 test, United ultimately pays a fee. In recent months, United has paid an average of $97 for each COVID-19 test that an employee obtains using their health insurance benefits. *See* ECF No. 76-1, Exhibit 6 (detailing United's expenditures associated with COVID-19 testing; in August 2021 United paid $6,167,138 in insurance costs for COVID-19 tests).

6.     Aside from all of the issues that arise from the application of the CBAs and the FAR, there are also various practical or logistical problems associated with at-home testing:

- Employees who are left to perform their own tests (without any medical professional assistance or oversight) may experience testing error, and United has no way to validate that a test was properly conducted. App. 451 ¶ 30.

- As a lawsuit filed yesterday shows, a number of employees in the putative class are opposed to testing.  *See Anderson v. United Airlines*, No 21-1050, Dkt. 1, at 158 (M.D. Fla. Oct. 18, 2021) (App. Ex. G).  United cannot be expected to simply trust that employees will perform their own testing when they have stated that they see no value in such precautions.

- As with the current pre-departure testing regime, a manager would have to review each test result to ensure that it is at least facially accurate and does not reflect a positive test. That is not a function that can be performed by using the automated "fit to fly" protocol. App. 451 ¶ 31. That sort of increased obligation on other employees is, standing alone, an undue hardship.  *Tagore*, 735 F.3d at 329-330.

- As United's expert indicated, there is substantial variation in the type and quality of test kits. ECF No. 76-1, Ex. 16 ¶ 36-37. There is no existing mechanism by which United can confirm that employees are using the proper type of test. And in light of supply chain issues, there is no guarantee that sufficient quantities of high quality tests will be available. *See* ECF No. 25, App. 117-118, ¶ 6.

**B.     Expansion of Pre-Departure Testing**

Plaintiffs also raised the prospect of testing at the airport, pointing to the fact that United is already doing so for a limited number of flights. However, expanding airport programs would also implicate numerous CBA provisions and FARs.

First, pilots and flight crew would need to arrive at the airport at least 30 minutes early to undergo testing. Pilots' time is already filled with numerous pre-flight duties with significant safety implications that are required by FAA regulations.[6] The arrival time for the flight crew is set precisely so that they have enough time to complete all of these required pre-flight checks and other related duties. App. 5 ¶ 18, 448-49 ¶ 20. Those pre-flight arrival times do not have room to accommodate a COVID-19 testing program, even one that takes 15-20 minutes. *Id.*

Second, early arrival for testing would have further complications for flight attendants. Pursuant to JCBA § 6(R)(4), United cannot change the home base or layover scheduled check-in times for flights on certain aircraft. Although the CBA allows for an extension of report times for certain aircraft, that is done at the pairing level, which means that everyone on the pairing must be given the same extension. *Id.* 4-5 ¶ 16. Thus, under the JCBA, United would not have the ability to extend report flight times for an individual flight attendant. *Id.*

Third, just as with at-home testing, United would be required under the CBAs to pay for the time spent for flight crews to be tested, under either existing contract language or under new terms demanded by ALPA and AFA. *Id.* 4 ¶ 13, 448 ¶ 17. As United's witness Sasha Johnson testified, expanding the program to cover all accommodated flight crew would cost tens of thousands of dollars per month.

---

[6]     *See, e.g.*, 14 C.F.R. § 91.7 (pilot is "responsible for determining whether that aircraft is in condition for safe flight"); 14 C.F.R. § 91.103 (pilot shall "become familiar with all available information concerning that flight" including information relating to "weather reports and forecasts, fuel requirements, alternatives available if the planned flight cannot be completed, and any known traffic delays" and "runway lengths at airports of intended use" as well as takeoff and landing distance information); 14 C.F.R. § 121.315 (flight crew must follow FAA-approved cockpit check procedures that "include each item necessary for flight crewmembers to check for safety before starting engines [and] taking off . . . and in engine and systems emergencies"); 14 C.F.R. § 121.533(b) (the pilot in command is "jointly responsible" with the aircraft dispatcher for "preflight planning, delay, and dispatch release of a flight in compliance with" the regulations); 14 C.F.R. § 121.663 (the airline must prepare a dispatch release for each flight between specified points. The pilots, along with the dispatcher, "shall sign the release only if they both believe that the flight can be made with safety"); and 14 C.F.R. § 117.5 (As part of the dispatch or flight release, "each flight crew member must affirmatively state he or she is fit for duty prior to commencing flight").

Fourth, scheduling arrangements under both the UPA and the JCBA present further operational difficulties with testing requirements for certain unvaccinated employees. The JCBA and UPA allow pilots and flight attendants virtually unlimited flexibility in arranging their schedules: both sets of employees may trade trips however they so choose (with the small exception that pilots must trade for flights on the same type of aircraft they fly). *Id.* 5-6 ¶ 19, 449 ¶ 23. Because of this, there is a high amount of unpredictability as to where a given flight attendant or pilot will travel at any given date or time. *Id.* For example, a flight attendant scheduled to travel to Newark on a given day could end up, on little to no notice, traveling to Guam instead. *Id.* This makes expanding proctored testing (which is currently in place for those limited destinations that require testing) for those unvaccinated flight attendants and pilots nearly impossible from a logistical standpoint. *Id.* In order to implement such a testing program, United would need to implement a program that is available at every airport to which it flies. *Id.*

Fifth, if a flight attendant or pilot tested positive at a remote location where United does not have additional flight attendants or pilots, United would likely have to cancel the flight that the flight attendant or pilot was scheduled to work. *Id.* 6 ¶ 20, 449 ¶ 24; *see also id.* 449-50 ¶ 25 ("When pilots call out sick, especially on short notice or in high volumes, delays and cancellations inevitably increase because United must take the time to rearrange flight crew to adequately staff flights, or, if insufficient crew members are available, it must cancel flights."). Moreover, "[b]ecause trip pairings span multiple days and cities across the nation, the impact of a delayed or cancelled flight is rarely limited to that one flight. Rather, a single delay or cancellation often causes multiple cascading delays and cancellations throughout United's system." *Id.* 450 ¶ 26. The only reason United's current testing scheme works is because it covers a limited number of locations where a reserve crew is always available should someone test positive.

### C.       Symptom Checks & Expanded Sick Leave

Plaintiffs have also proposed self-regulated "symptom checks," whereby flight crew and other employees would determine, on their own and with no management oversight, whether they feel well enough to come to work (even if they are symptomatic). This would be tantamount to allowing employees to simply choose to work whenever they wish, leading to unexpected absences and, at least potentially, disruptions to operations. *See id.* 451-52 ¶¶ 34-35.

More importantly, plaintiffs' proposal of a self-administered COVID-19 symptom check is not a reasonable accommodation because it cannot prevent the pre-symptomatic spread of COVID-19, which often occurs prior to a positive COVID-19 test. *See* ECF No. 76-1, Exhibit 16 ¶ 24; Ex. 3 ¶¶ 30-32. As Dr. Crotty explained, "Testing identifies infections that have occurred and help limit the spread—limit the damage—after infection happens," but does not prevent infection. *Id.* ¶ 23. Likewise, a symptom check only works once a person is feeling sick. However, prior to that, a flight crew member could have spread COVID-19 to coworkers or the public. By contrast, COVID-19 vaccines have been proven to reduce transmission of the disease regardless of when symptoms occur. *See id.* Ex. 3 ¶¶ 35-36.

Accordingly, forcing United to adopt this alternative would require it to knowingly put its workforce at greater risk of COVID-19 infection, hospitalization and death by enabling infected individuals to work for days before they ever developed symptoms. *See, e.g.*, *Barrington v. United Airlines, Inc.*, No. 1:21-cv-02602-RMR-STV, ECF No. 23, at 9 (D. Colo. Oct. 14, 2021) (App. Ex. E) (explaining that United had presented "facts suggesting that its other employees may be placed at greater risk of contracting COVID-19 if they are required to come in contact with unvaccinated coworkers. This, alone, would appear to constitute an undue burden . . . .").[7]

---

[7]       This also implicates the burden on plaintiffs' co-workers who need to shoulder added health and safety risks, as well as an additional emotional and psychological toll. *See* S. Lukasik Hr'g Testimony; B. Quigley Hr'g Testimony.

### D.      Reliance on Natural Immunity

Finally, plaintiffs have argued that United should accept evidence of past COVID-19 infection, arguing that it should constitute proof of "immunity" equivalent to vaccination. Compl. ¶ 27. This option depends on antibody testing, which implicates all of the CBA and FAR duty/rest time concerns outlined above, as well as the potential that United would have to pay for testing time and the tests themselves. Moreover, as Dr. Crotty explained, there is no commercially available test that can "quantify antibodies at a defined level that demonstrates protection in people with previous infection." ECF No. 76-1, Exhibit 16 ¶¶ 36-37.[8]

Moreover, as Dr. Del Rio explained, not all individuals with prior COVID-19 generate antibodies. ECF No. 76-1, Exhibit 16, Ex. 3 ¶ 36. In other words, at least some people with a prior COVID-19 infection have *little or no* protection against reinfection (or hospitalization and death). In other words, forcing United to adopt this alternative requires it to rely on the hope that a previously-infected person has developed immunity, whereas vaccination presents a far more reliable approach to protecting United's workforce and its business operations. *See, e.g.*, *Brener*, 671 F.2d at 146 (affirming the denial of Title VII religious accommodation claim where the proposed alternative "resulted in decreased efficiency, economic loss, and increased [safety] risk," as well as "a detrimental impact on the [business'] function").

---

It also could impose an operational toll on United's business, including the likelihood of flight schedule disruptions and delays, substantial out-of-pocket costs, and the harder-to-quantify, but equally important, business losses from not having the levels of safety that United deems appropriate to appeal to its customers and promote employee satisfaction. *See* S. Johnson Hr'g Testimony.

[8]      Evidence also established that those plaintiffs who have a religious objection to the COVID-19 vaccine would also be unable to submit to antibody testing, since the unrebutted and uncontested evidence submitted by Dr. Crotty in this case is that both were developed and tested using stem cell lines procured from abortions. ECF No. 76-1, Exhibit 16 ¶ 38. Setting aside any implications for "sincerity," this shows that even plaintiffs' proposed alternative will be untenable for many (if not most) class members with Title VII religious accommodation claims.

### III.    Plaintiffs Cannot Waive Contractual or Regulatory Burdens on United.

At the evidentiary hearing, plaintiffs tacitly acknowledged that federal regulations, collectively-bargained limitations, and other constraints would apply to any sort of testing regime or other potential accommodation (such as expanded sick leave). Their proposed solution is that they could just "waive" those requirements, both with respect to the individual named plaintiffs as well as the entire putative class.

#### A.    Rights of the Putative Class Members Cannot Be Waived

As a threshold matter, neither the named plaintiffs nor their counsel have any authority to "waive" collectively-bargained rights of the absent class members. As the Supreme Court has held, "[n]either a proposed class action nor a rejected class action may bind nonparties." *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011). Binding non-parties requires "a class action approved under Rule 23." *Id.*; *cf. Forby v. One Techs., LP*, No. 3:16-CV-856-L, 2020 WL 4201604 (N.D. Tex. July 22, 2020) (declining to make finding of waiver against absent class members "prior to class certification, as the class members are not yet parties to the litigation."). And depending on the type of class certified, absent class members would have opt-out rights, which would further undermine any notion that the named plaintiffs can "waive" away their CBA rights. *See* 3 Newberg on Class Actions § 7:12 (5th ed.).

#### B.    Collective Bargaining Agreements Cannot Be Waived

Neither the named plaintiffs nor their counsel can "waive" collective bargaining agreements. The Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, provides that a carrier must "treat with" the certified representative of a craft or class of employees. 45 U.S.C. § 152 Ninth. This means that ***only*** the authorized union representative can agree to alter or waive provisions in existing agreements. *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 548 (1937) (holding that the RLA "imposes the affirmative duty to treat only with the true representative, and hence

12

the negative duty to treat with no other.").[9] Hence, when there is a certified union, "no member of the craft has any right or power to alter the specified working conditions. *Neither the employee nor a group of employees may alter or waive prescribed provisions* until the agreement is changed by processes under the Act." *Mungin v. Fl. E. Coast Ry. Co.*, 416 F.2d 1169, 1178 (5th Cir. 1969) (emphasis added). That is so even if an individual employee would prefer different terms than those provided in the CBA. In *Order of R.R. Telegraphers v. Ry. Express Agency*, the Supreme Court held that a carrier may not enter into agreements with individual employees that supersede a CBA unless the CBA specifically authorizes such individual agreements. 321 U.S. 342, 347 (1944).

In this case, as noted above, the authorized representatives of the employees at issue are the various unions that represent different groups of customer-facing employees. *See* App. 1 ¶ 3, 445 ¶ 3. None of those unions have indicated a willingness to "waive" any of the CBA provisions discussed above. *Id.* 7 ¶ 25, 446 ¶ 7. Indeed, ALPA has expressly stated that it will *not* "agree to waive [CBA] provisions as to accommodations that would adversely [] affect the contractual rights of other United pilots." *Id.* 446 ¶ 7; *id.* Ex. B-2 (Letter from ALPA to D. Munro and R. Wiegand). AFA has said the same. *Id.* 7 ¶ 25; *id.* Ex. A-2 (Letter from AFA to D. Munro and R. Wiegand). Nor is there any provision in any of the extant CBAs that allows United, "either completely or within prescribed limits," to reach agreements with individual employees. *Telegraphers*, 321 U.S. at 347; App. 7 ¶ 25, 446 ¶ 4. Accordingly, neither United nor the named plaintiffs can just "waive" the CBAs, either with respect to the six individual plaintiffs or with respect to the putative class as a whole.

---

[9]     The RLA also provides that a carrier may not change agreements "except in the manner prescribed in such agreements or in [the RLA]." 45 U.S.C. § 152 Seventh. There are criminal penalties for willful violations of this provision. 45 U.S.C. § 152 Tenth.

### C. Federal and State Laws Cannot Be Waived

Plaintiffs and their counsel also cannot waive the application of the FARs and other relevant state and federal laws. Only the Administrator of the FAA may grant an exemption to FARs promoting safety and prescribing minimum safety standards, such as the minimum rest requirements implicated here. 49 U.S.C. § 44701(f).[10] Along the same lines, "[e]mployees' rights under state wage and hour laws are generally not subject to waiver." 51B. C.J.S. Labor Relations § 1353 (Oct. 2021 update). Similarly, even "[c]ontracts cannot waive employee rights under the FLSA" consistent with public policy." *Id.*; *see also Bodle v. TXL Mortg. Corp.*, 788 F.3d 159, 164 (5th Cir. 2015).

## IV. The Collective Bargaining Agreements Are Also Germane to United's Accommodations and the Issue of Irreparable Harm.

In addition to the question of undue hardship, there are at least two other respects in which the CBAs are germane to the Court's analysis**.**

### A. Alternate CSR Positions

As discussed at the hearing, United has offered a number of CSRs – including named Plaintiff D.J. Jonas – the option of moving to a non-customer facing position called "Agent on Demand." *See* ECF 41 at 18. Plaintiffs claim that this accommodation is unreasonable because an individual can remain in the position for only 59 days. However, that limitation is imposed by the PSA (the CBA that governs CSRs), which creates an exception to seniority rules for temporary vacancies, allowing United to "create and fill vacancies of less than 60 days for any position within a classification with active employees for any reason." *See* App. Ex. C-1 §§ 1(C)(3), 1(E).

---

[10] *Cf. Baker v. F.A.A.*, 917 F.2d 318 (7th Cir. 1990) (upholding FAA denial of exemption to pilots who failed to satisfy certain required medical standards); *Holmes v. Helms*, 705 F.2d 343, 347 (9th Cir. 1983) (affirming FAA denial of exemption to pilots seeking exception to regulation prohibiting pilots over sixty from flying certain flights).

In any event, the "Agent on Demand" program is not the only alternative available to the accommodated CSRs. Under the PSA, any CSR may transfer to another position represented by IAM "on a competitive basis," meaning that they are eligible to apply and be selected for any of those positions. *Id.* § 1(C)(3). Positions represented by IAM include ramp services employees and storekeepers, both of which are non-customer facing and have been offered the testing and masking accommodation announced on October 12, 2021. App. 1035-36 ¶ 9.[11]

### B.      Loss of Seniority as Alleged Irreparable Harm

The CBAs also contain terms that govern seniority, including how long employees continue to accrue seniority while on leave. App. 6-7 ¶ 23, 451 ¶ 32. At the hearing, plaintiffs tied their irreparable harm argument to the notion that employees would cease to accrue seniority while on personal leave. However, "class-based seniority relief for identifiable victims of illegal discrimination is a form of relief generally appropriate under [42 US.C. § 2000e-5(g)]." *Zipes v. Trans World Airline, Inc.*, 455 U.S. 385, 386 (1982).[12] Nothing in the CBAs would preclude restoration of seniority for any individual who was deemed to have lost such seniority as a result of a violation of law or contract. To the contrary, if an employee is terminated and then later returned to work by an arbitrator, the relief often includes restoration of seniority. App. Ex. F.

### CONCLUSION

For the foregoing reasons, as well as those stated in previous briefing, plaintiffs' motion for a preliminary injunction should be denied.

---

[11]      United has openings in many of these positions. App. 1036 ¶ 10. In addition, if a CSR transferred to another position, the PSA would entitle the CSR to "retain and continue to accrue seniority in their former classification, location, and work status for 2 years" and the CSR could "return to their former basic classification within 2 years without a vacancy." App. Ex. C-1 § 7(F). Thus, while "Agent on Demand" accommodations lasting longer than 59 days may run afoul of the PSA, the PSA allows for other accommodations that the CSRs could pursue.

[12]      *See also, e.g.*, *Moseley v. Goodyear*, 612 F.2d 187, 192 (5th Cir. 1980); *Claiborne v. Ill. Cent. R.R.*, 583 F.2d 143, 149 (5th Cir. 1978); *Sims v. City of Dallas*, No. CIV.A.3:95-CV-177-X, 1996 WL 722052 at *2 (N.D. Tex. Dec. 5, 1996).

Dated: October 19, 2021                    Respectfully submitted,

                                           _____/s/ Jordan M. Matthews_____
                                           Jordan M. Matthews
                                           IL Bar No. 6300503
                                           JONES DAY
                                           77 W. Wacker Drive, Suite 3500
                                           Chicago, Illinois 60601
                                           Telephone: (312) 782-3939
                                           Facsimile: (312) 782-8585
                                           Email: jmatthews@jonesday.com

                                           Donald J. Munro
                                           D.C. Bar No. 453600
                                           JONES DAY
                                           51 Louisiana Avenue, NW
                                           Washington, DC 20001
                                           Telephone: (202) 879-3939
                                           Facsimile: (202) 626-1700
                                           Email: dmunro@jonesday.com

                                           Alexander V. Maugeri
                                           NY Bar No. 5062666
                                           JONES DAY
                                           250 Vesey Street
                                           New York, NY 10281-1047
                                           Telephone: (212) 326-3880
                                           Facsimile: (212) 755-7306
                                           Email: amaugeri@jonesday.com

                                           Russell D. Cawyer
                                           State Bar No. 00793482
                                           **KELLY HART & HALLMAN LLP**
                                           201 Main St., Ste. 2500
                                           Fort Worth, Texas 76102
                                           (817) 878-3562 (telephone)
                                           (817) 335-2820 (facsimile)
                                           Email: russell.cawyer@kellyhart.com

                                           **ATTORNEYS FOR DEFENDANT
                                           UNITED AIRLINES, INC.**

16

## <u>CERTIFICATE OF SERVICE</u>

On October 19, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jordan M. Matthews*
Jordan M. Matthews
