UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**DAVID SAMBRANO ET AL.,**

Plaintiffs,

v.                                                                No. 4:21-cv-1074-P

**UNITED AIRLINES, INC.,**

Defendant.

## OPINION & ORDER

Before the Court is Plaintiffs' Motion for Preliminary Injunction, filed August 22, 2021. ECF No. 5. For the following reasons, the Court will **DENY** Plaintiffs' Motion for Preliminary Injunction.

## INTRODUCTION

This case is not about the constitutionality or efficacy of vaccine mandates promulgated by the government or private entities. Instead, this case focuses on United Airline Inc.'s ("United") accommodation policy for employees who were granted religious or medical exemptions from United's vaccine mandate. Plaintiffs allege that United failed to reasonably accommodate exempted employees and that United retaliated against employees for requesting exemptions.

This Order does not rule on the ultimate merits of this case. Instead, this Order merely rules on Plaintiffs' request for the extraordinary remedy of a preliminary injunction to enjoin United from placing Plaintiffs, and other similarly situated employees, on unpaid leave. As detailed below, the Court concludes that the Motion must be denied because Plaintiffs do not clearly carry their burden to show they would suffer imminent, irreparable harm absent a preliminary injunction.

## FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs are employed by United in a range of different roles. David Sambrano is an aircraft Captain; Genise Kincannon is a Flight Attendant; David Castillo is an Aircraft Technician and mechanic;

Kimberly Hamilton is a Station Operations Representative; and Debra Jennefer Thal Jonas is a Customer Service Representative.[1] Am. Compl. ¶¶ 5–9, ECF No. 67. Plaintiffs brought this employment discrimination and retaliation lawsuit on behalf of themselves and other similarly-situated employees.[2] *See id.* ¶¶ 1–2.

Plaintiffs' claims arise from United's COVID-19 vaccine mandate policy. Plaintiffs allege United violated Title VII of the Civil Rights Act of 1964 by refusing to engage in an interactive process, by failing to provide reasonable religious accommodations, and by retaliating against Plaintiffs for engaging in a protected activity (i.e., requesting an exemption). Similarly, Plaintiffs allege United violated the Americans with Disabilities Act ("ADA") by failing to provide reasonable medical accommodations for qualified employees and for retaliating against those who requested medical exemptions.

On August 6, 2021, United lit the fuse for this lawsuit by announcing that all its employees would be required to get a COVID-19 vaccine. To that end, United mandated that its employees must be vaccinated within five weeks after the Food and Drug Administration ("FDA") approved a vaccine, or five weeks after September 20, 2021, whichever came sooner. TRO Br. at 9, ECF No. 6. Because the FDA approved a Pfizer COVID-19 vaccine on August 23, 2021, United required its employees to receive a vaccine by September 27, 2021. *Id.*

United employees could request an exemption from the mandate for religious or medical reasons, but not both. Am. Compl. ¶ 43. Captain Sambrano, Ms. Hamilton, and Ms. Kincannon requested and received religious exemptions, while Ms. Jonas requested and received a medical

---

[1] Plaintiff Seth Turnbough is an aircraft Captain for United. Am. Compl. ¶ 10, ECF 67. Because the Court concluded that it lacked personal jurisdiction over Captain Turnbough's claims against United (ECF No. 103), the Court does not include his claims in the following analysis.

[2] Plaintiffs filed a Motion to Certify Provisional Class on November 1, 2021. ECF No. 101. United has not responded to the Motion to Certify as of the date of this Order, and the Court has thus not ruled on that motion.

exemption.[3] Mr. Castillo's situation is slightly different because he did not timely submit his exemption request on United's online system.[4] Instead, Mr. Castillo emailed his supervisor after the August 31, 2021 deadline and requested both medical and religious emptions. PI Hr'g Tr. Vol. II at 89:10–22, ECF No. 92. Mr. Castillo stated that a United human resources agent said his medical exemption request would be considered, but his tardy religious exemption request would not. *Id.*

Overall, United granted approximately 80% of the requests for religious exemptions and 63% of the requests for medical exemptions from the vaccine mandate. *Id.* at 172:4–173:2. United offered these exempted employees the "accommodation" of indefinite unpaid leave.[5] United consistently claimed that this heavy-handed approach was the only feasible solution for many of its employees, especially flight-crew members like Captain Sambrano and Ms. Kincannon.[6]

Accordingly, Plaintiffs filed this lawsuit on September 21, 2021. Pls.' Compl., ECF No. 1. The Court held a hearing on Plaintiffs' Motion for Temporary Restraining Order on September 24, 2021. *See* Order, ECF No. 10. At this hearing, the Parties reached an agreement that obviated the need for the Court to then rule on that motion. *See* Order Deferring

---

[3]Captain Sambrano attempted to request a medical exemption as well, but United's online request system forced him to choose one or the other.

[4]At the Preliminary Injunction Hearing, Mr. Castillo explained the reason for this delay. PI Hr'g Tr. Vol. II at 88:1–89:19. He explained that United initially required a "pastor's note" to accompany employees' religious exemption requests. *Id.* Mr. Castillo is a practicing Buddhist, and thus had no pastor from whom he could obtain such a note. *Id.* United later changed this policy so that any third-party could attest to the requesting employees' beliefs, but Mr. Castillo explained he did not learn of this change until after the submission deadline. *Id.*

[5]United gave medically-exempted employees the option to use their accumulated sick-leave pay until it was exhausted, at which point they would be placed on indefinite unpaid leave. United did not provide religiously-exempted employees with this option.

[6]United argued at the Preliminary Injunction Hearing that it would roll out an updated accommodation policy for some non-flight-crew employees, such as Ms. Hamilton and Ms. Jonas. *See* ECF No. 93, at 90. For instance, United asserted that some employees would be given the option to wear a mask and engage in regular testing as an alternative accommodation to getting the vaccine or indefinite unpaid leave. *Id.* As of the date of this Order, however, United has not provided evidence of this updated accommodation policy.

on Ruling, ECF No. 28. Specifically, the Parties stipulated that United would temporarily refrain from placing exempted employees on leave for not complying with United's vaccine mandate.

The Court then set Plaintiffs' Motion for Preliminary Injunction for a hearing on October 8, 2021. *Id*. The day before that hearing, however, United filed a Partial Motion to Dismiss, alleging the Court lacked personal jurisdiction over claims raised by several Plaintiffs against United. *See* Mot. to Dismiss, ECF No. 47. To permit Plaintiffs reasonable time to respond to United's jurisdictional challenge, the Court set an expedited briefing scheduling and reset the evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction to October 13, 2021. Order for Expedited Briefing, ECF No. 49.

After the Preliminary Injunction Hearing was reset, on October 12, 2021, the Court issued a Temporary Restraining Order ("TRO"). *See* TRO, ECF No. 66. As detailed in the TRO, and further clarified in the Court's October 18, 2021 Order, this TRO merely extended the Parties' stipulated agreement. *See* TRO and Clarifying Order, ECF Nos. 66, 72. This TRO was necessary to avoid the risk of irreparable injury and to maintain the status quo until Could hold a hearing on and resolve Plaintiffs' Motion for Preliminary Injunction.

On October 13, 2021, the Court held an evidentiary hearing on the Motion for Preliminary Injunction. *See* ECF No. 86. At this two-day hearing, both Parties admitted exhibits, offered live witness testimony, cross examined the other Party's witnesses, and orally presented their expert witnesses' opinions.[7] The Parties offered competing expert testimony addressing possible alternative accommodations, and their views on whether such accommodations were effective and feasible.

---

[7]Because United filed its Partial Motion to Dismiss at the eleventh-hour before the initial Preliminary Injunction Hearing, the Court was forced to reset the hearing to the following week. *See* ECF Nos. 47, 49. Because Plaintiffs' expert witnesses were not available for the new hearing date, Plaintiffs moved to continue the new hearing date. ECF No. 50. The Court held a telephonic hearing to address these issues. *See* EFC No. 53. To avoid potential prejudice, the Court determined that if Plaintiffs' experts were unable to attend the rescheduled hearing, both sides would be required to submit their expert testimony through written declarations or affidavits. *See* ECF No. 54. Counsel for the Parties were permitted to orally summarize their experts' opinion at the Preliminary Injunction Hearing.

Then, to encourage an amicable resolution of this dispute without further Court intervention, on October 20, 2021, the Court issued a Mediation Order. *See* Med. Order, ECF No. 81. The Mediation Order appointed Hon. Kent Hance, Chancellor-Emeritus and Hon. Royal Furgeson (Ret.), Dean-Emeritus as mediators, and required the Parties to attend a mediation by October 26, 2021. *Id.* On October 25, 2021, the Court granted Plaintiffs' Motion to Extend the TRO to maintain the status quo while the Parties attended mediation. Order Extending TRO, ECF No. 95. The Parties filed a Settlement Conference Report informing the Court that they were unable to reach a settlement at the mediation and outlining the issues that remained. Joint Med. Report and Supp., ECF Nos. 98, 102. Accordingly, Motion for Preliminary Injunction is now ripe for review. As detailed below, the Court cannot grant the Motion for Preliminary Injunction because Plaintiffs have not clearly carried their burden on the second element—irreparable harm.

## LEGAL STANDARD

The purpose of a preliminary injunction is to "preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (citation omitted). To obtain to a preliminary injunction, the movant must satisfy each of the following equitable elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *Id.* Because a preliminary injunction is an "extraordinary remedy," courts should grant them only if the movant "clearly carries the burden of persuasion on all four requirements." *Id.* Because Plaintiffs do not meet their burden on the irreparable harm element, the Court analyzes this element alone. *See Roho, Inc. v. Marquis*, 902 F.2d 356, 261 (5th Cir. 1990); *see also Miller Pharmacy Servs., LLC v. Amerisource Bergen Drug Corp.*, No. CV-3:21-0207, 2021 WL 1095322, at *1 (W.D. La. Feb. 5, 2021) ("If a plaintiff fails to meet his burden regarding any of the necessary elements, the Court

5

need not address the other elements necessary for granting a preliminary injunction.").

## ANALYSIS

### A. No Irreparable Harm

To satisfy the "irreparable harm" prong of the preliminary injunction test, a movant must show an "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Pendergest–Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 569 (5th Cir. 2010). Generally, "a harm is irreparable where there is no adequate remedy at law[.]" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Further, the threatened harm must be "more than mere speculation." *Id.* at 601. Instead, to prevail, the movant must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Dickey's Barbecue Rest., Inc. v. GEM Inv. Grp., L.L.C.*, No. 3:11-CV-2804-L, 2012 WL 1344352, at *4 (N.D. Tex. Apr. 18, 2012) (quoting *Humana, Inc. v. Jacobson,* 804 F.2d 1390, 1394 (5th Cir. 1986)). For example, irreparable harm may exist if a "meaningful decision on the merits would be impossible without an injunction[.]" *Janvey*, 647 F.3d at 600. But when a movant does not establish this element, the Court must deny the application for preliminary injunction. The Court analyzes each of Plaintiffs' theories that attempt to show irreparable harm will occur without an injunction, but finds each theory wanting.

1. <u>Plaintiffs' "Impossible Choice" Theory of Irreparable Harm Fails</u>

Plaintiffs first argue that "United has put its religious and disabled workers in an impossible position—take the COVID-19 vaccine, at the expense of their religious beliefs [or face indefinite] unpaid leave." Pls.' PI Br. at 16, ECF No. 37. Because the vaccine cannot be removed from their bodies, an individual who chooses to get the shot cannot undo that choice.[8] Plaintiffs argue that acquiescing to United and getting the vaccine in violation of their beliefs will cause irreparable harm.

---

[8] To illustrate this point, Plaintiffs direct the Court to the story of David Lockwood as an example. Mr. Lockwood requested a religious exemption from the vaccine mandate, but when faced with the prospect of being placed on unpaid leave, he "ultimately decided to violate his religious beliefs and acquiesce to United's coercion."

6

This argument, however, conflates the potential harm arising from United's accommodation policy with the personal difficulty of deciding to decline the vaccine. United exempted Plaintiffs from the vaccine mandate; Plaintiffs were not required to violate their religious beliefs. United's employees claimed they faced an impossible choice: get the vaccine or endure unpaid leave. But they have chosen the chose the latter. Their dispute thus centers on United's response to their choice.

Plaintiffs also argue that United caused them irreparable harm by "simply forcing them to choose between their livelihood and their right to live out their faith absent undue hardship from their employer." Pls.' PI Br. at 19–20. To support this contention, Plaintiffs cite a recent Supreme Court case that held "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)).

But this authority is inapposite because Plaintiffs do not assert any First Amendment violations in this action. It is undisputed that United exempted Plaintiffs from the vaccine mandate. Plaintiffs, therefore, have not been denied the freedom to exercise their religious beliefs. Indeed, by declining to receive the vaccination, they have acted in accordance with their religious beliefs. So, again, Plaintiffs' grievances lie with United's response to their decision.

Plaintiffs nevertheless argue, without citing supporting authority, that these constitutional protections should apply in the context of statutory anti-discrimination laws. Pls.' PI Br. at 20. Courts in other circuits, however, have rejected similar arguments:

---

Pls.' PI Hr'g App'x at App. 26–27. Plaintiffs argue Mr. Lockwood exemplifies how other employees may respond when faced with the stark realities of indefinite unpaid leave: these "employees *may consider* violating their beliefs" by getting the vaccine. *See id.* (emphasis added). If they do so, Plaintiffs argue "the harm will be permanent—the breach of religious belief will already have occurred—and the Court cannot later fashion a remedy to undo that harm." Pls.' PI Br. at 17. But the Court cannot conclude irreparable harm exists to warrant a preliminary injunction based on Plaintiffs' "mere speculation" that others may follow Mr. Lockwood's lead. *See Janvey*, 647 F.3d at 601; *see also Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017).

> No Plaintiff is being imprisoned and vaccinated against his or her will . . . . Rather, these Plaintiffs are choosing whether to comply with a condition of employment, or to deal with the potential consequences of that choice. Even if they believe the condition or the consequences are wrong, the law affords them an avenue of recourse—and that avenue is not injunctive relief on this record.

*Beckerich v. St. Elizabeth Med. Ctr.*, No. 21-105, 2021 WL 4398027, at *7 (E.D. Ky. Sept. 24, 2021); *see also Harsman v. Cincinnati Children's Hosp. Medical Center*, No. 1:21-CV-597, 2021 WL 4504245, at *4 (S.D. Ohio Sept. 30, 2021). The Court likewise declines to elevate statutory protections from private-company-discrimination to the level of constitutional protections from government encroachment.

The Court appreciates the difficulty conscientious employees face when asserting their religious rights. These employees are statutorily protected from employers' attempts to discriminate or retaliate against these employees for living out their religious convictions. But that difficulty does not demonstrate irreparable harm.

   2. <u>Plaintiffs' Loss of Seniority Theory of Irreparable Harm Fails</u>

Plaintiffs next argue they would not accrue seniority while on unpaid leave, which would in turn cause them irreparable harm. Testimony offered by one of Plaintiffs' experts, Fred Bates, shows how seniority permeates nearly every aspect of an airline employees' job, regardless of their role. Pls.' PI Hr'g App'x at 178–80, ECF No. 75. For instance, a pilot's seniority affects the aircraft he flies, the base he operates from, the flight schedule he keeps, the amount and timing of vacation time-off he receives, and myriad other aspects of his employment. *See id.* Similarly, the seniority of an employee working inside an airport dictates their ability to relocate to more desirable terminals. *See id.* A mechanic's seniority affects her ability to choose more desirable jobs, like working inside an aircraft. *See id.* Less senior mechanics are assigned more "dirty, heavy-lifting jobs" that would include cleaning the lavatory filters, changing breaks and tires, lube jobs, and working on the exterior of an aircraft where she is exposed to the elements. PI Hr'g Tr. Vol II at 90:20–91:22. Mr. Bates concludes that employees who lose seniority would suffer irreparable harm, regardless of their role with

United. Pls.' PI Hr'g App'x at 178–80. Specifically, Mr. Bates opines that any employee who "passes [Plaintiffs] in seniority while they are on leave will forever be senior to them, even if [Plaintiffs] were hired first." *Id.* at 180.

In response, United does not dispute that employees on leave will cease accruing seniority during leave; rather, United argues the Court could retroactively restore Plaintiffs' seniority if they succeed on their claims. *See* PI Hr'g Tr. Vol. III at 91:12–92:7. The "aim of Title VII relief, whether back-pay, *retroactive seniority*, or other injunctive relief, is thus to make whole the victims of discrimination according to what would have been their experience in a non-discriminatory work setting." *Claiborne v. Ill. Cent. R. R.*, 583 F.2d 143, 149 (5th Cir. 1978) (emphasis added). The Court has "broad discretion" to craft relief to achieve this protective aim of Title VII. *See Moseley v. Goodyear Tire & Rubber Co.*, 612 F.2d 187, 191 (5th Cir. 1980). For instance, if the Court determines United "engaged in unlawful employment practices, 42 U.S.C. § 2000e-5(g) gives [the Court] power to order such affirmative action as it may deem appropriate." *Id.* "Such affirmative action *includes the granting of remedial seniority*." *Id.* (emphasis added); *see also Sims v. City of Dallas*, No. 3:95-CV-177-X, 1996 WL 722052, at *2 (N.D. Tex. Dec. 5, 1996) (denying injunctive relief based on a lack of irreparable harm because 42 U.S.C § 2000e-5(g) provided a legal remedy, including restoration of seniority, for the alleged harms). Indeed, counsel for United stipulated on the record that the Court has authority to "order restoration of seniority . . . if [the Court] finds a violation of law at the end of this case." PI Hr'g Tr. Vol. III at 91:24–92:2.

The Court thus concludes that Plaintiffs' looming loss of seniority is insufficient to constitute irreparable harm.

3. <u>Plaintiffs' Theory of Irreparable Harm Related to Loss of Income, Benefits, and Downstream Effects of the Same Fails</u>

Plaintiffs next argue that exempted employees face a "host of serious and irreparable injuries resulting from their loss of salary." Pls.' PI Br. at 17. Plaintiffs cite *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72 (2006) to argue being placed on unpaid and losing income would cause them irreparable injury harm. *See* Pls.' TRO Br. at 11.

9

There, the Supreme Court noted that a 37-day period of unpaid leave can constitute a "serious hardship." *Burlington Northern*, 548 U.S. at 72. But the issue in that case was whether an employer committed an adverse employment action by placing its employee on unpaid leave. *See id.* The Supreme Court did not decide if "serious hardship" caused by lost income during the period of unpaid leave constituted irreparable harm. *See id.* This precedent is thus of limited probative value at this stage of proceedings.

Here, the Court declines to expand the definition of serious to mean irreparable.[9] Rather, this Court follows the sound logic of the Honorable United States District Judge Terry R. Means, who held that the "irreparable harm necessary to obtain a preliminary injunction is not established by loss of income, financial distress, or inability to find other employment.*" Hopkins v. Cornerstone Am.*, No. 4:05-CV-332-Y, 2006 WL 8453061, at *3 (N.D. Tex. Feb. 6, 2006) (citing *Aldrich v. Skillern & Sons, Inc.*, 493 F.Supp. 1073, 1075 (N.D. Tex. 1980)).

Plaintiffs also claim that the secondary effects of lost income—loss of housing, health care, possible loss of educational and employment opportunities, and psychological harm—are irreparable. Pls.' PI Br. at 17–18. Mr. Castillo testified that he lives paycheck-to-paycheck and that he will face homeless if United places him on unpaid leave. PI Hr'g Tr. Vol. II, 90:4–10. Ms. Hamilton testified that, if placed on unpaid leave, she would lose the income and medical insurance that currently fund her husband's cancer treatment. *See id.* at 48:5–50:2. Similarly, Ms. Jonas testified that she will be unable to provide necessary healthcare for her disabled husband without the income and medical insurance provided by her employment with United. Pls.' TRO App'x at 26, ECF No. 7. Mr. Sambrano argues that, if placed on unpaid leave, he will need to evaluate how to pay for his child's college education and whether his family will need to consider alternative education options. *Id.*

---

[9]*Compare* "serious," in the context of injuries, defined as "potentially resulting in death or other severe consequences" *with* "irreparable injury," defined as "[a]n injury that cannot be adequately measured or compensated by money and is therefore often conserved remediable by injunction." *Serious, Irreparable Injury,* BLACK'S LAW DICTIONARY (9th ed. 2009).

Further, Plaintiffs assert, without citing supporting authority, that being placed on unpaid leave in lieu of getting vaccinated "stigmatizes them, harms their reputations, and makes transfer to another airline for employment difficult." Pls.' PI Br. at 19. Plaintiffs did not direct the Court to evidence supporting this contention. Without concrete evidence on this point, the Court is dubious that potential difficulty obtaining employment based on a perceived stigma qualifies as more than "mere speculation" of a future injury, let alone an irreparable one. *See Janvey*, 647 F.3d at 601.

Finally, Plaintiffs argue that losing their income would cause them to suffer irreparable psychological harms. These include marital strain, family stress, and stress-induced high blood pressure. Pls.' TRO App'x at 4, 24, 29. The Court has no doubt that the strain, stress, and pressure that Plaintiffs describe are genuinely felt. But these psychological stressors, as alleged, are again simply too speculative. Further, such stressors are ubiquitous in employment discrimination disputes involving lost income (not to mention the subsequent litigation). The Court sees no reason, however, that these alleged harms could not be compensated through monetary relief. *See Hopkins*, 2006 WL 8453061, at *3. If the Court held that this type of psychological harm is irreparable, almost any employee alleging discrimination could meet the irreparable harm element for injunctive relief.

The Court is not insensitive to Plaintiffs' plight. A loss of income, even temporary, can quickly ripple out to touch nearly every aspect of peoples' lives, and the lives of their families and dependents. But the Court's analysis must be guided by the law, not by its sympathy.[10] Despite the novel facts presented here, the case law is clear that

---

[10]The Court is reminded of the celebrated Virginia jurist Brockenbrough Lamb, who observed in a case with tragic facts that although he

> regret[ed] that the conclusion reached will prevent a recovery and may thereby defeat the ends of justice in the particular case before [the court], but however that may be, *we must declare the law as we find it written and comfort ourselves with the confident belief that in its results it will promote the ends of justice to all.*

Judge Brockenbrough Lamb, *The Duty of Judges: A Government of Laws and Not of Men,* in Handbook for Judges 93 (Donald K. Carroll ed., 1961) (emphasis added).

11

hardships stemming from loss of income are remediable; axiomatically such hardships cannot be called irreparable.

4. Plaintiffs' Skill-Deterioration Theory of Irreparable Harm Fails

Plaintiffs next argue that being "forced onto leave will cause [their] perishable skills to deteriorate, and no amount of financial compensation on the backend can return to employees the time they lost—potentially years . . . ." Pls.' PI Br. at 18–19. For example, Plaintiffs asserted that "pilots must remain up to date on current technology and fly frequently to maintain their skills." *Id.* While on leave, pilot-Plaintiffs argue they could not continue "to develop the skills necessary for their careers, and [those skills] would increase their value to United and, potentially, other carriers." *Id.* These Plaintiffs further argue that they could lose their FAA certification to fly if they went an extended period without completing flights. *See* PI Hr'g Tr. Vol. II at 127. This, in turn, would require them to undergo additional training that would not otherwise be necessary. *Id.*

While the Court acknowledges the sophisticated skillset that airline pilots possess and recognizes the importance of maintaining those skills, this argument is ultimately unpersuasive. *First*, this deterioration of skills is too speculative to constitute harm that is both imminent and irreparable. Testimony from the Preliminary Injunction Hearing showed that this skill-deterioration would happen over for several months, not days. *Id.* at 133. *Second*, United provided the Court with adequate evidence that there are ways to mitigate these harms. *Id.* at 74. For instance, Plaintiffs are permitted to complete simulated flights to avoid losing their certification and being disqualified from flying. *Id.* Plaintiffs offered expert testimony claiming that simulator training is less optimal than real-world flights. *See* Pls.' PI Hr'g App'x at 179. But the Court cannot conclude that this difference will cause irreparable harm. *Finally*, the Court is persuaded that Plaintiffs' skill-deterioration argument sweeps too broad. *See* PI Hr'g Tr. Vol. III at 46. If the Court agreed with Plaintiffs' argument, nearly every skilled professional in employment discrimination cases could make the same claim to obtain injunctive relief. *See id.*

12

Plaintiffs raise similar arguments with respect to other airline employees. For instance, Plaintiffs argue that flight attendants "rely on instincts and quick thinking to handle unexpected incidents that happen in the cabin." PI Hr'g Tr. Vol. III at 16:6–11. Similarly, Plaintiffs argue that mechanics and aircraft traffic directors "work under intense pressure, and exercise skills that will be diminished if they're put out of the workforce for an extended period of time." *Id.* at 16:12–19. Plaintiffs conclude such skills may become irrevocably rusted. *Id.* at 16:3–19.

Flight attendants, mechanics, and other employees undoubtedly possess valuable skillsets that are kept most sharp by continuous use. These allegations of potential skill-deterioration are, however, too speculative for Plaintiffs to clearly carry their burden on this element.

### B. Other Preliminary Injunction Elements

Because the Court concludes that Plaintiffs have not "clearly carried" their burden to show irreparable harm will occur absent a preliminary injunction, the Court need not address the other three elements at this time. *See Roho, Inc.*, 902 F.2d at 261; *see also Miller Pharmacy Servs., LLC*, 2021 WL 1095322, at *1 ("If a plaintiff fails to meet his burden regarding any of the necessary elements, the Court need not address the other elements necessary for granting a preliminary injunction."). The Court notes, without ruling on the likelihood of success, that Plaintiffs' arguments appear compelling and convincing at this stage.

But several nascent questions remain unanswered, especially on Plaintiffs' Title VII discrimination claims and ADA retaliation claims. For instance, United represented at the Preliminary Injunction Hearing that it would implement a more robust policy to accommodate "below-the-wing" employees. *See* PI Hr'g Tr. Vol. II at 193:17–194:19, Vol. III at 90:9–23. In turn, United argued that this updated policy could moot some of Plaintiffs' claims. United has not, however, filed evidence of this policy or informed the Court whether such a policy was ever implemented. Further, it remains to be seen whether United would in fact incur a more than de minimis burden in accommodating Plaintiffs. This is, in part, because of another issue that was just recently brought before the Court: the prospect of class certification. The scope of any burden United may incur in reasonably accommodating exempted

13

Plaintiffs would correlate with the number of Plaintiffs that would need accommodated. This is especially true considering the architect of United's accommodation policy, Mr. Limacher, testified that the burden of accommodating a single employee would be no more than de minimis. *See* PI Hr'g Tr. Vol. II at 199:23–200:1.

### C. Conclusion

The Court faces the difficult task of balancing individual liberties against a company's ability to exercise its business judgment. As the Court noted at the beginning of the Preliminary Injunction Hearing, it is emphatically the province and duty of the Court to apply the law as written, rather than creating policy from the bench.[11] This is particularly apt regarding a private company's human resource policy.

There are many divergent views on how United handled this delicate situation. To be sure, the Court is disturbed by United's seemingly calloused approach to its employees' deeply personal concerns with injecting a foreign substance into their bodies. This is especially true since United stated on the record that 99% of its employees are vaccinated and that there is virtually no chance to transmit COVID-19 on its planes. *See* PI Hr'g Tr. Vol. II at 162:16–19, 236:2–237:8. United has thus instituted a regime in which nothing short of complete compliance with its commands will suffice. Any dissenters will be given the trifling pittance of indefinite unpaid leave. United's mandate thus

---

[11] In reaching this holding, the Court notes its agreement with Judge Edward C. Burks of the Supreme Court of Virginia, who wrote in a heartbreaking 1878 opinion:

> The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. "Compassion," said an eminent Virginia chancellor, "ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy."

*Harris v. Harris*, 72 Va. 31 Gratt. 13, *32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & wife, in* Wythe's Reports 282 (Minor's Ed. 1794)).

14

reflects an apathy, if not antipathy, for many of its employees' concerns and a dearth of toleration for those expressing diversity of thought.[12]

The Court's concerns were substantiated by evidence presented at the Preliminary Injunction Hearing. For instance, Plaintiffs showed a video where United's CEO, Scott Kirby, expressed skepticism and apparent disdain for any religiously-motivated exemption requests. *See* Video Clip of Scott Kirby during United Town Hall, ECF No. 75-29. At a United town-hall meeting, Mr. Kirby publicly cautioned that "very few" religious exemptions would be granted. *Id.* Mr. Kirby then publicly warned "any employee [who] all the sudden decided I'm really religious" would unequivocally be "putting your job on the line. You'd better be very careful about that." *Id.* Such statements paint a vivid picture of United's perspective on employees who requested religious exemptions. United's subsequent actions in "accommodating" these employees suggest that United's actions may not have been motivated by safety concerns. Instead, United's actions may be viewed as merely pretextual.

Ultimately, however, it is not for the Court to decide if United's vaccine mandate is bad policy. Rather, it is the Court's role to determine if Plaintiffs carried their burden to obtain a preliminary injunction.

## ORDER

Bound by precedent, the Court concludes that Plaintiffs have not clearly carried their burden to show they would likely suffer imminent, irreparable injury absent an injunction. The Court thus **DENIES** Plaintiffs' Motion for Preliminary Injunction. ECF No. 5.

**SO ORDERED** on this **8th day** of **November, 2021.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

[12] "The allowance of opinions or beliefs, [especially] religious ones, that differ from prevailing norms." *Toleration*, BLACK'S LAW DICTIONARY (9th ed. 2009).