**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| DAVID SAMBRANO, individually, and on behalf of all others similarly situated, | § § § § | |
| Plaintiffs, | § § | Civil Action No. 4:21-CV-01074-P |
| v. | § § | |
| UNITED AIRLINES, INC., | § § | |
| Defendant. | § § | |

**APPENDIX IN SUPPORT OF DEFENDANT'S OPPOSITION**
**TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING**
**ORDER AND IMMEDIATE ENTRY OF PRELIMINARY INJUNCTION**

NOW COMES, Defendant United Airlines, Inc. and files this Appendix in Support of Its Opposition to Plaintiffs' Motion for Temporary Restraining Order and Immediate Entry of Preliminary Injunction .

| EXHIBIT | DESCRIPTION | APP NO. |
|---|---|---|
| A | Sambrano vs. United Airlines, Fifth Circuit Slip Opinion February 17, 2022 | App. 1 - 82 |
| B | Declaration of Natalie James | App. 83-84 |
| 1 | November 9, 2021 Notice provided to pilots detailing updates to United's reasonable accommodation process | App. 85-88 |
| 2 | November 9, 2021 Notice provided to flight attendants detailing updates to United's reasonable accommodation process | App. 89-92 |
| 2 | Correspondence between Captain Sambrano and Natalie James on January 20, 2022 and January 21, 2022 | App. 93-95 |

Respectfully submitted,


_____/s/ Russell D. Cawyer_____
Russell D. Cawyer
State Bar No. 00793482
Taylor Winn
State Bar No. 24115960
**KELLY HART & HALLMAN LLP**
201 Main St., Ste. 2500
Fort Worth, Texas  76102
(817) 878-3562 (telephone)
(817) 335-2820 (facsimile)
Email: russell.cawyer@kellyhart.com

Jordan M. Matthews
IL Bar No. 6300503
JONES DAY
77 W. Wacker Drive, Suite 3500
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
Email: jmatthews@jonesday.com

Donald J. Munro
D.C. Bar No. 453600
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: dmunro@jonesday.com

Alexander V. Maugeri
NY Bar No. 5062666
JONES DAY
250 Vesey Street
New York, NY  10281-1047
Telephone: (212) 326-3880
Facsimile: (212) 755-7306
Email: amaugeri@jonesday.com

**ATTORNEYS FOR DEFENDANT
UNITED AIRLINES, INC.**

**<u>CERTIFICATE OF SERVICE</u>**

On February 18, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Russell D. Cawyer*
Russell D. Cawyer

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 17, 2022

Lyle W. Cayce
Clerk

No. 21-11159

---

DAVID SAMBRANO, *on their own behalf and on behalf of all others similarly situated*; DAVID CASTILLO, *on their own behalf and on behalf of all others similarly situated*; KIMBERLY HAMILTON, *on their own behalf and on behalf of all others similarly situated*; DEBRA JENNEFER THAL JONAS, *on their own behalf and on behalf of all others similarly situated*; GENISE KINCANNON, *on their own behalf and on behalf of all others similarly situated*; SETH TURNBOUGH, *on their own behalf and on behalf of all others similarly situated*,

*Plaintiffs—Appellants*,

*versus*

UNITED AIRLINES, INCORPORATED,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC 4:21-CV-1074

---

Before SMITH, ELROD, and OLDHAM, *Circuit Judges*.

App. 1

PER CURIAM:*

Plaintiffs are United Airlines employees.  United has given them a choice: receive the COVID-19 vaccine or be placed on unpaid leave indefinitely.  The question we address here is narrow.  If United's policy is not preliminarily enjoined, are plaintiffs likely to suffer irreparable harm? For the two plaintiffs who received religious exemptions and remain on unpaid leave, we hold that they are.  We therefore REVERSE the decision of the district court and REMAND for consideration of the other factors courts must evaluate when deciding whether to issue a preliminary injunction.[1]

Critically, we do not decide whether United or any other entity may impose a vaccine mandate.  Nor do we decide whether plaintiffs are ultimately entitled to a preliminary injunction.  The district court denied such an injunction on one narrow ground; we reverse on that one narrow ground and remand for further consideration.

## I.

In August of 2021, United announced that each of its United States-based employees would be required to get the COVID-19 vaccine.  The announcement came with a deadline of either five weeks after the FDA formally approved the vaccine or five weeks after September 20, whichever was sooner.  The FDA approved the Pfizer COVID-19 vaccine on August 21, 2021, which set the vaccination deadline as September 27, 2021.  Employees

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

[1] The dissenting opinion dedicates at least six pages to raising concerns about the unpublished nature of this decision.  Under our court's procedures, any member of this panel may require this opinion to be published.  *See* 5th Cir. R. 47.5.2.  Apparently the one thing all three of us agree on is that this decision need not be.  And the reason is quite simple: today's decision is interlocutory, decides nothing on the merits, and answers only the irreparable-injury question asked by the district court.  *Cf.* 28 U.S.C. § 1292(b).  The merits—and hence the decision that might merit publication—await another day.

App. 2

No. 21-11159

who were not vaccinated by that deadline were terminated. United does not require any passenger on its planes to be vaccinated. Nor does it require its employees based in other countries to get vaccinated—even though those employees work with and come into contact with U.S.-based crews. And neither does it require pilots from other airlines who ride in the cockpit jumpseat on United flights to be vaccinated.

United purported to provide exemptions for those who could not get vaccinated for either religious or medical reasons. That is, within ten days after the FDA approved the COVID-19 vaccine, a United employee could apply for an exemption from the vaccine mandate for either religious or medical reasons. But at a town-hall meeting, United's CEO warned that not many exemptions would be granted and remarked that any employee who "all the sudden decid[ed], 'I'm really religious'" would be "putting [her] job on the line" by requesting an accommodation. Once an employee requested a religious exemption, United would ask the employees about their past vaccinations, the use of stem cells in those vaccines, and "why receiving such vaccines or medications were not a violation of" the employees' "sincerely held [religious] belief" on those prior occasions. United also asked why the employees' religious beliefs prevented them from receiving the COVID-19 vaccine "but not taking other types of medicine." Some employees were asked to provide a letter from a pastor or other third party attesting that the employee actually held religious beliefs.[2]

---

[2] United's bizarre inquisition into the sincerity of its employees' beliefs is somewhat at odds with our usual approach of taking parties at their word regarding their own religious convictions. *Cf. Whole Woman's Health v. Smith*, 896 F.3d 362, 371 (5th Cir. 2018) (quoting *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012) (recognizing courts take a "light touch" when it comes to examining religious belief and practice)); *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013) ("[C]laims of

App. 3

No. 21-11159

After United would determine which employees were sufficiently religious, it provided those employees with an "accommodation." The employee could keep her job, but could not go to work, would not be paid, and would not receive company-paid benefits. To go back to work, the exempt employee had to get the COVID-19 vaccine. And if the employee would not, she could instead wait it out and start work again after the pandemic "meaningfully recedes" (which United guesses could be another "72 months" or so).

United's campaign was not limited to forcing employees to choose between the vaccine and indefinite unpaid leave. For example, in August 2021, United began sending postcards to unvaccinated employees stating that United had not received evidence of their vaccination and they needed to get vaccinated to avoid being "separated from United." Plaintiffs credibly contend that United sent postcards rather than letters in order to broadcast employees' unvaccinated status to family members and enlist those family members in coaxing employees to receive the vaccine.

Plaintiffs are several United employees who requested religious or medical accommodations from United. Those requesting religious accommodations did so out of concern that aborted fetal tissue was used to develop or test the COVID-19 vaccines.[3] Others requested medical

---

sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions."); *see also, e.g., Chalifoux v. New Caney Indep. Sch. Dist.*, 976 F. Supp. 659, 670 (S.D. Tex. 1997) ("The fact that wearing a rosary as a necklace is not mandated by orthodox Catholicism does not defeat their First Amendment rights to free exercise of their personal beliefs.").

[3] This is a common basis for religious objections to the COVID-19 vaccine. *Dr. A v. Hochul*, 142 S. Ct. 552, 553 (2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief); *Does 1–3 v. Mills*, 142 S. Ct. 17, 18–19 (2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief).

App. 4

No. 21-11159

accommodations because they had preexisting conditions which they believed made receiving a vaccine unnecessarily risky. For their concerns, United threatened to stop paying them or providing any benefits.

Plaintiffs filed EEOC charges in September 2021. But because United's policy would go into effect before they received right-to-sue notices, plaintiffs sued and moved for a preliminary injunction, alleging United's vaccine policy violated their rights under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act. Plaintiffs specifically asserted that "United has put its religious and disabled workers in an impossible position—take the COVID-19 vaccine, at the expense of their religious beliefs and health, or face a lengthy period of unpaid leave."

After plaintiffs filed suit, United changed its policy to allow certain employees with non-customer-facing operational roles—for example, aircraft mechanics—the accommodation of working pursuant to a masking-and-testing protocol. United also permitted some customer-service representatives to switch to remote positions rather than be placed on unpaid leave. This allowed three plaintiffs—Kimberly Hamilton, David Castillo, and Debra Jonas—to continue to work and be paid without receiving a COVID-19 vaccine. But for customer-facing employees, including pilots, flight attendants, and most customer-service agents, indefinite unpaid leave remains the only "accommodation" United will provide. Plaintiffs David Sambrano and Genise Kincannon—a pilot and a flight attendant, respectively—fall into this category and thus are only eligible for unpaid leave.[4]

---

[4] The sixth named plaintiff, Seth Turnbough, is also a pilot. But the district court found that it lacked personal jurisdiction over United with respect to his claims, and the issue of personal jurisdiction is not properly before us on this interlocutory appeal. *See*

App. 5

No. 21-11159

After a hearing, the district court denied plaintiffs' motion for a preliminary injunction. Though the district court noted that plaintiffs' claims were "compelling and convincing," it ultimately concluded that plaintiffs could not establish irreparable injury.[5] Plaintiffs appealed and moved for an injunction pending appeal, which a panel of this court denied. *See Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 839 (5th Cir. 2021). We have jurisdiction under 28 U.S.C. § 1292(a)(1).

II.

The question presented to us in this appeal is whether the district court erred by denying plaintiffs a preliminary injunction on the ground that they have not demonstrated a likelihood of irreparable injury if United's policy continued to operate against them while their Title VII suit is pending. We hold that the district court erred as to the plaintiffs who remain on unpaid leave and have brought Title VII actions.[6] Plaintiffs are being subjected to

---

*Seahorse Boat & Barge Corp. v. Jacksonville Shipyards, Inc.*, 617 F.2d 396, 397 (5th Cir. 1980). We therefore do not consider Turnbough's claims.

[5] Ironically, the dissenting opinion accuses us of omitting facts because they "would get in the way of a good story"—right after repeatedly doing exactly that. *Post* at 28. For example, the townhall-meeting statements by United's CEO receive no mention from the dissenting opinion, despite figuring prominently in the district court's opinion and the parties' briefing. The dissenting opinion also asserts that "[b]ecause union contracts and federal regulations cap the time that pilots can spend on duty, requiring unvaccinated pilots to test would reduce the time they can spend in the air." *Post* at 27. Yet the dissenting opinion ignores the fact that plaintiffs are willing to test at their own expense *and on their own time*. They even filed supplemental briefing in the district court explaining that doing so would be consistent with the relevant FAA regulations and collective-bargaining agreements. Instead, the dissenting opinion emphasizes other facts, like the reasons why United provided masking-and-testing accommodations to some employees but not others, even when they have no bearing on the irreparable-harm inquiry before us.

[6] We refer to those two plaintiffs, Sambrano and Kincannon, simply as "plaintiffs" from this point forward for ease of reading. We do not reverse the district court as to any plaintiffs who have been provided other accommodations and are not on unpaid leave.

App. 6

No. 21-11159

ongoing coercion based on their religious beliefs. That coercion is harmful in and of itself and cannot be remedied after the fact.[7]

## A.

"The decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court and may be reversed on appeal only by a showing of abuse of discretion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984)). When considering whether a plaintiff is entitled to a preliminary injunction, courts must consider questions of fact and of law. *Apple Barrel*, 730 F.2d at 386. Factual conclusions of the trial court may be reversed only if clearly erroneous. *Id.*; Fed. R. Civ. P. 52(a). Legal conclusions "are subject to broad review and will be reversed if incorrect." *Commonwealth Life Ins. Co. v. Neal*, 669 F.2d 300, 304 (5th Cir. 1982).

## B.

The purpose of a preliminary injunction is to preserve the *status quo* and prevent irreparable injury until the court renders a decision on the merits. *See, e.g.*, *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). A plaintiff is entitled to a preliminary injunction if she shows: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief

---

[7] The dissenting opinion asserts that plaintiffs have not alleged a coercion injury and instead rely simply on an allegation that United has taken adverse employment action. But the plaintiffs have alleged the coercion harm both at the district court and here when arguing that they will suffer irreparable injury without an injunction. The dissenting opinion from the motions panel addressed that particular harm as well. *Sambrano*, 19 F.4th at 840–42 (Ho, J., dissenting from the denial of injunctive relief pending appeal). This opinion does not create the theory for them.

App. 7

No. 21-11159

will not disserve the public interest." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017) (citation and quotation omitted). In this appeal we address only the second factor. But before doing so, we must address the broader issue whether a preliminary injunction is ever available to plaintiffs suing private employers under Title VII. We hold that it is.

1.

Nothing in our precedent forecloses the general availability of a preliminary injunction to a plaintiff bringing a Title VII action against a private employer.[8] Indeed, binding precedent supports the availability of such relief. In *Drew v. Liberty Mutual Insurance Co.*, we held that "in the limited class of cases" in which an employee establishes both an irreparable injury and a likelihood of success on the merits, the employee "may bring her own suit to maintain the status quo pending the action of the [EEOC] on the basic charge of discrimination." 480 F.2d 69, 72 (5th Cir. 1973). This case follows directly in *Drew*'s footsteps. Plaintiffs here filed an action with the EEOC and are currently awaiting action from that agency. Thus, they may be entitled to a preliminary injunction until the EEOC's decision if they can make the required showing under the equitable factors.

The Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), limited the ability of private plaintiffs to sue for injunctions in civil rights actions. But it did not do so for cases like this one. In *Sandoval* the Supreme Court held that plaintiffs had no private right of action under § 602

---

[8] Much of the dissenting opinion's most emphatic rhetoric stems from its contrary position that "[f]inding irreparable harm here would contravene decades of settled precedent." *Post* at 40; *see also, e.g., id.* at 61 (calling this opinion an "orgy of jurisprudential violence"). Yet even United's counsel admitted at oral argument that not one court of appeals opinion has expressly rejected plaintiffs' theory of irreparable injury. *See* Oral Argument at 47:07, *Sambrano v. United Airlines* (No. 21-11159) ("[N]o, I'm not aware of one, but again, they haven't cited a case where they can . . . .").

App. 8

No. 21-11159

of Title VI of the Civil Rights Act. *Id.* at 293. The Court specifically noted, however, that plaintiffs can bring such suits under § 601. *Id.* at 279–80. The difference between the provisions is that while § 601 specifically provides for private rights against discrimination, § 602 only gives instructions to federal agencies. *Id.* at 288–89. Section 703 of Title VII, like § 601 of Title VI, provides for private rights against discrimination. *See* 42 U.S.C. § 2000e-2. Thus, Title VII plaintiffs have the benefit of the Supreme Court's holding in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), where the Court explained that "when [a] remedy is necessary or at least helpful to the accomplishment of the statutory purpose, the Court is decidedly receptive to its implication under the statute." *Id.* at 703; *see also Lakoski v. James*, 66 F.3d 751, 753–54 (5th Cir. 1995) (assuming that Title VII provides for a private cause of action as a general matter if the plaintiff has properly exhausted administrative remedies).[9]

---

[9] *Sandoval* gives us no reason to depart from our decision in *Drew* or the Court's decision in *Cannon*. In *Sandoval*, the Court first looked to see whether § 602 contained either an express private right of action or, following *Cannon*, "rights-creating language" indicating an implicit intent to create a private remedy. *Sandoval*, 532 U.S. at 288–89. Finding neither, it then determined that § 602's "elaborate restrictions on agency enforcement" "contradict a congressional intent to create privately enforceable rights through § 602 itself." *Id.* at 290.

This case is a far cry from *Sandoval*. First, § 703 does create private rights against discrimination. *See* 42 U.S.C. § 2000e-2. The language that Title VII plaintiffs may privately enforce under *Drew* is much closer to the rights-creating language of § 601 than the language of § 602 that the Court considered in *Sandoval*. *See id.* § 2000e-2(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin."). And second, § 706 creates neither "elaborate restrictions on agency enforcement" nor an entirely alternative "remedial scheme." *See Sandoval*, 532 U.S. at 290–91; 42 U.S.C. § 2000e-5.

The dissenting opinion's response is particularly head-scratching. It claims that this conclusion "is like holding that, because a case's facts are closer to *Swift v. Tyson*, 41

App. 9

No. 21-11159

Having concluded that the remedy of preliminary injunction is not *per se* unavailable to Title VII plaintiffs suing private employers, we now must consider whether plaintiffs here can pursue that remedy. United asserts that they cannot because they have not properly exhausted their administrative remedies with the EEOC as required by Title VII. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1). We disagree and hold that plaintiffs in this case need not have fully exhausted administrative remedies before seeking a preliminary injunction in federal court.

The general rule established by statute and precedent is that before bringing a Title VII action in an Article III court, "a plaintiff must exhaust administrative remedies by filing a charge with the EEOC within 180 days of the discriminatory action." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 337 (5th Cir. 2021). "To exhaust, a plaintiff must file a timely charge with the EEOC and then receive a notice of the right to sue." *Id.*

But the exhaustion requirement is qualified. This court has held that in Title VII cases, an "individual employee may bring her own suit to maintain the status quo pending the action of the [EEOC] on the basic charge of discrimination." *Drew*, 480 F.2d at 72. Plaintiffs here filed a request with the EEOC in September of 2021 and are awaiting the agency's decision. Thus, although plaintiffs did not exhaust EEOC remedies before filing suit, they may still seek a preliminary injunction. United asserts that *Drew* is inapplicable for two reasons: (1) the plaintiff in that case purportedly had

---

U.S. (16 Pet.) 1 (1842), than they are to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the general common law governs after all." *Post* at 33. *Erie*, of course, overruled *Swift*. 304 U.S. at 69. So this analogy would make some sense if *Sandoval* had overturned *Cannon*. But the whole basis for our reasoning is the fact that *Sandoval reaffirmed Cannon*. While *Sandoval* did not come to praise *Cannon*, neither did it come to bury it.

App. 10

No. 21-11159

exhausted EEOC remedies by the time we issued our decision; and (2) the Supreme Court's decisions in *Sandoval*, 532 U.S. 275, and *Ross v. Blake*, 578 U.S. 632 (2016), implicitly overruled *Drew*. We disagree on both points. *Drew* remains good law and binds us in this case.

First, although the EEOC proceedings had concluded by the time this court issued the *Drew* decision, the plaintiff had not yet exhausted when the motion for a preliminary injunction was initially filed. 480 F.2d at 70–72. The court thus squarely addressed whether a plaintiff could file a suit for injunction while the EEOC was still considering the matter. That issue was "[t]he basic question decided by the trial court," and this court held that it was "still a viable issue" on appeal. *Id.* at 72. Thus, that factual distinction has no relevance to the applicability of *Drew*'s rule; rather, *Drew* by its own terms applies to any Title VII case "in which irreparable injury is shown and likelihood of ultimate success has been established." *Id.*

Second, *Sandoval* and *Ross* did not implicitly overrule *Drew*. In *Sandoval*, the Court held that private individuals may not sue to enforce disparate-impact regulations promulgated under Title VI. 532 U.S. at 293. As discussed above, however, the Court specifically recognized that individuals may sue under the provisions of Title VI which, unlike the provision at issue in that case, include language establishing a right against discrimination. *Id.* at 288–89. Title VII also contains rights-creating language, so *Sandoval* does not apply.

Nor does *Ross* apply. In that case the Court held that there is no "special circumstances" exception to the Prison Litigation Reform Act's administrative exhaustion requirement. 578 U.S. at 635, 648–49. It explained that "mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Id.* at 639. But *Ross* involved a § 1983 claim for damages against government officials

App. 11

No. 21-11159

resulting from the use of excessive force against a prisoner. *Id.* at 636–37. This case is different because it involves a request for a *preliminary injunction* to avoid irreparable harm. Time is of the essence in such cases, so while a plaintiff must exhaust EEOC remedies before ultimately prevailing in a Title VII action, she need not do so to simply request that the *status quo* be preserved until the EEOC reaches a decision. As we explained in *Drew*, although the plaintiff "normally would not be permitted to file a suit on the merits unless the [EEOC] had been unable for a period of 180 days to effect conciliation," the 180-day provision did not apply "because the action brought by [the plaintiff was] merely one to seek temporary relief *pending the action of the [EEOC].*" 480 F.2d at 73 n.5; *see also Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944 (1st Cir. 1983) (declining "to adopt a rule categorically barring all suits for preliminary relief pending administrative disposition" in Title VII cases); *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981).[10]

In any event, beyond the factual and legal differences, "[i]t is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court. This rule is strict and rigidly applied." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (citation omitted). United points to no statutory amendment or *en banc* Fifth Circuit decision to undercut *Drew*. "[F]or a Supreme Court decision to change our Circuit's law, it must be more than merely illuminating with respect to the case before [the court] and

---

[10] The dissenting opinion is thus wrong to claim that "*Drew* itself does not address Title VII's exhaustion requirement." *Post* at 59. *Drew* expressly permits a federal court to act *pending EEOC action*—in other words, before the EEOC process has concluded. 480 F.3d at 73 n.5.

App. 12

Case: 21-11159    Document: 00516206629    Page: 13    Date Filed: 02/17/2022
Case 4:21-cv-01074-P    Document 137    Filed 02/18/22    Page 16 of 98    PageID 5040

No. 21-11159

must unequivocally overrule prior precedent." *Id.* at 792 (citation and quotations omitted). Neither *Sandoval* nor *Ross* unequivocally overruled *Drew*, so *Drew* remains good law.[11]

2.

Now we address the central question presented—whether the district court erred by concluding that plaintiffs have not shown that they will suffer irreparable harm without a preliminary injunction. This case is rather unique among Title VII cases. Plaintiffs allege a harm that is ongoing and cannot be remedied later: they are actively being coerced to violate their religious convictions. Because that harm is irreparable, we reverse the district court.

The district court held that plaintiffs have not demonstrated a likelihood of irreparable harm as they must do to be entitled to a preliminary injunction. As for harms resulting from being placed on unpaid leave like lost pay, loss of skill or seniority, stigmatic injury, and marital strain, the district court noted that such injuries are either too speculative or could be remedied by later court action. As for plaintiffs' assertion that they are harmed by being coerced into a choice between their religious convictions and continued employment, the district court concluded that plaintiffs could not assert such harm because while it may be cognizable in a First Amendment case brought against a government entity, it is not a cognizable harm in a Title VII case

---

[11] The dissenting opinion contends that even if *Drew* is good law, it cannot apply to excuse plaintiffs' failure to exhaust EEOC remedies unless "the plaintiffs show that their substantive claims are likely to succeed." *Post* at 61. Perhaps the dissenting opinion misunderstands our position. By relying on *Drew*, we do not now hold that the plaintiffs *are* entitled to an injunction despite any failure to exhaust. We simply hold that because of *Drew* an injunction is not foreclosed. Again, we only address the irreparable-injury prong. The district court on remand should consider the other elements necessary to support an injunction, including, of course, whether the plaintiffs are likely to succeed on the merits.

13

App. 13

No. 21-11159

brought against a private entity.  We disagree with the district court's conclusion about the coercion harm.

In lawsuits alleging wrongful termination or adverse employment action, the plaintiff is ordinarily not irreparably harmed.  That is because the statutory relief available at the conclusion of a successful lawsuit (including reinstatement and back pay) can adequately compensate the plaintiff for the employer's wrongful conduct.  As the Supreme Court has explained, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quotation omitted).

Our cases recognize two different categories of harm in employment cases.  The first and by far the most common harm is the adverse employment action itself; *Sampson* addressed that category.  A Title VII plaintiff is obviously injured by an adverse employment action, and that adverse action can in turn cause all sorts of other harms.  But under *Sampson*, none of those harms can support a preliminary injunction.  After all, the entire point of Title VII's remedial scheme is to return the employee to the *status quo* and to compensate her (as closely as possible) for all damages that stem from the adverse employment action.

Our decision in *Morgan v. Fletcher*, 518 F.2d 236 (5th Cir. 1975), illustrates the first type of harm.  In that case the employee allegedly suffered sex discrimination and attempted to get an injunction to prevent her termination. *Id.* at 238.  We held that the employee failed to show irreparable harm because her injuries stemmed exclusively from the employer's decision to terminate her. *See id.* at 240.  It therefore did not matter that the plaintiff's salary represented 45% of her family's income, that losing it would likely result in foreclosure of her home, and that losing medical benefits could affect her mental health. *See id.* at 238.  Such harms resulted *only* from the

App. 14

No. 21-11159

employer's decision to fire her.  And that decision—to take an adverse employment action—cannot support an injunction.

The second category of harm recognized in our cases includes injuries that are independent from the adverse employment action.  Very few employment suits involve such harms.  That is so because in most Title VII cases, an adverse employment action has occurred and is the basis of the suit.  *See, e.g.*, *Davis v. Fort Bend County*, 765 F.3d 480, 485 (5th Cir. 2014).  And under *Sampson* and *Morgan*, any harm caused by that adverse action is compensable if at all only at the end of the suit.

Neither can a plaintiff show such independent harm by pointing to the strength of her case.  We explained in *White v. Carlucci* that:

> [T]here is no nexus between the strength and nature of the underlying claim and the element of irreparable harm.  Such irreparable harm must be proven separately and convincingly.  The burden of proof is not reduced by either the existence of an extremely strong likelihood of success or the egregiousness of the alleged wrong upon which the underlying claim is based.

862 F.2d at 1212.  The rationale for the principle recognized in *White* is simple: If the plaintiff has a strong case on the merits, she is likely to win her suit and get compensated with Title VII remedies; just as in *Sampson* and *Morgan*, that is a textbook example of *reparable* harm.

But the fact that such independent harms are rare does not mean they never exist.  To the contrary, both *Sampson* and *White* explicitly recognize that Title VII plaintiffs can sometimes (even if rarely) establish irreparable harm separate and apart from their underlying claims.  *Id.*; *see also Sampson*, 415 U.S. at 90 (noting that showing irreparable injury is possible, even if that is not so in the "ordinary" case).

App. 15

No. 21-11159

Plaintiffs in this case alleged precisely the sort of exogenous and irreparable harm that cases like *Sampson* and *White* envisioned. Crucially, plaintiffs are not seeking an injunction merely to prevent an adverse employment action or any harm stemming from such action. Indeed, plaintiffs admit that *Sampson* and *White* would preclude injunctive relief if United simply fired them. Their allegation of irreparable harm based on coercion is antecedent to, independent from, and exogenous to any adverse employment action. Plaintiffs specifically allege that United wants to coerce them into getting a vaccine that violates their sincerely held religious beliefs and thus *avoid* any adverse employment action.

Properly understood, the plaintiffs are alleging two distinct harms— one of which is reparable under *Sampson* and *Morgan*, and the other of which is irreparable under *Sampson* and *White*. The first is United's decision to place them on indefinite unpaid leave; that harm, and any harm that flows from it, can be remedied through backpay, reinstatement, or otherwise. The second form of harm flows from United's decision to coerce the plaintiffs into violating their religious convictions; that harm and that harm alone is irreparable and supports a preliminary injunction.

This court and the Supreme Court have held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("Most basically, Opulent Life has satisfied the irreparable-harm requirement because it has alleged violations of its First Amendment and RLUIPA rights."). Indeed, we recently held that plaintiffs had suffered irreparable harm from being coerced into "a choice between their job(s) and their jab(s)," *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), or "between their beliefs and their benefits," *Sambrano*, 19 F.4th at 841 (Ho, J., dissenting).

App. 16

No. 21-11159

In each of those cases the plaintiffs brought actions against the government or government officials, so the First Amendment applied. Plaintiffs here have brought a statutory action under Title VII against a private employer. Certainly when a court considers whether a plaintiff is likely to succeed on the merits it must consider both the provision the action is brought under and the identity of the defendant, among many other things. But here we consider only whether plaintiffs are likely to suffer irreparable harm. The answer to that question depends simply on the effect of the defendant's action on the plaintiffs. *See* 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2942 (3d ed. Apr. 2021 update) (explaining that irreparable harm is a plaintiff-focused inquiry which asks whether the "plaintiff is being threatened by some injury for which he has no adequate legal remedy"); *see also Sambrano*, 19 F.4th at 841–42 (Ho, J., dissenting) ("We focus on the plaintiff—and our ability to remedy the plaintiff's injury—not the identity of the defendant. As we've repeatedly observed, 'Plaintiffs are entitled to a preliminary injunction if they show . . . a substantial threat that *they*'—meaning, the plaintiffs—'will suffer an irreparable injury if the injunction is not granted.'" (quoting *Doe I v. Landry*, 909 F.3d 99, 106 (5th Cir. 2018) (emphasis added))).

In other words, we do not agree that the fact that this is a statutory action instead of an action under the First Amendment meaningfully transforms what a plaintiff must show to demonstrate irreparable injury. In *Opulent Life*, we considered a claim brought under both RLUIPA and the First Amendment. 697 F.3d at 295. We explained that under both the constitutional *and* statutory provisions a plaintiff demonstrates irreparable harm by alleging a violation of her rights to freely exercise her religion. *Id.* It is true that RLUIPA is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of [its] chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). And Title VII

17

App. 17

No. 21-11159

does not contain such specific language. But Title VII does prohibit
discrimination by an employer "against any individual with respect to his
compensation, terms, conditions, or privileges of employment, because of
such individual's . . . religion[.]" 42 U.S.C. § 2000e-2(a)(1).[12] Indeed,
though we have not addressed the matter squarely (and need not do so in this
case either), this court has favorably quoted the proposition that, through
Title VII, Congress "intended to protect the same rights in private
employment as the Constitution protects[.]" *Riley v. Bendix Corp.*, 464 F.2d
1114, 1116 (5th Cir. 1972) (quoting 118 Cong. R. § 228).[13] Simply put, any
dispute over whether an employer's actions ultimately violate Title VII is, at
the preliminary injunction stage, a question under the "likelihood of success
on the merits" prong. Here we are considering only whether plaintiffs have
shown substantial likelihood of irreparable injury.

We believe that they have. United has presented plaintiffs with two
options: violate their religious convictions or lose all pay and benefits
indefinitely. That is an impossible choice for plaintiffs who want to remain

---

[12] "And '[a]t the risk of belaboring the obvious, Title VII aimed to ensure that
employees would *not* have to sacrifice their jobs to observe their religious practices.'"
*Sambrano*, 19 F.4th at 842 (Ho, J., dissenting) (quoting *Adeyeye v. Heartland Sweeteners*, 721
F.3d 444, 456 (7th Cir. 2013)).

[13] We recognize the limited relevance of *Riley*. In that case, this court considered
the extent to which Title VII prohibits adverse employment action because of an
employee's Sabbath observance. We quoted the Senate floor remarks of the sponsor of an
amendment to Title VII. 464 F.2d at 1116–17. The amendment, which is now codified at
42 U.S.C. § 2000e(j), explains that "[t]he term 'religion' includes all aspects of religious
observance and practice, as well as belief, unless an employer demonstrates that he is
unable to reasonably accommodate to an employee's or prospective employee's religious
observance or practice without undue hardship on the conduct of the employer's
business." The sponsor's remarks expressed that though courts had "come down on both
sides of the issue" whether Title VII provides as many protections in the private
employment context as the First Amendment does in the public context, the amendment
was intended "to resolve [that issue] by legislation." 464 F.2d at 1116.

App. 18

No. 21-11159

faithful but must put food on the table.  In other words, United is actively coercing employees to abandon their convictions.[14]  Indeed, at a town-hall meeting, United's CEO revealed United's sentiments towards parties like plaintiffs.  He noted that "very few" religious exemptions would be granted. And he warned that any employee who "all the sudden decid[ed], 'I'm really religious'" would be "putting [her] job on the line" by requesting an accommodation.   Of course, even those who successfully requested a religious exemption were deprived of all meaningful employment benefits by being placed on indefinite unpaid leave.  Thus, plaintiffs are continually subjected to a coercive choice between pay and adhering to religious convictions.[15]

United complains that this conception of irreparable harm gets things backwards.  It asserts that it could have simply fired all its unvaccinated employees, and they would have had no basis to seek an injunction during the pendency of their suits.  But because United took what it labels the "more accommodating" approach of giving them a timeframe within which they could get vaccinated and keep their jobs, it is now subject to a preliminary

---

[14] United also argues that the "impossible choice" is not a choice at all: Because plaintiffs say they will *never* get the COVID-19 vaccine, they cannot be coerced.  But even if that is true now, it does not mean it will always be so.  As plaintiffs point out, this policy has proved effective—the record contains the affidavit of one United employee who opposed taking the COVID-19 vaccine on religious grounds but nonetheless received it after deciding "I could not afford to lose my job."

[15] Recent decisions from other circuits do not foreclose this conception of irreparable harm.  *See Together Employees v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 8 (1st Cir. 2021) (while considering irreparable injury, observing that "appellants cannot point to an 'impossible choice' as a special factor here; they have already made their choices"); *see also We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 294 (2d Cir. 2021) (concluding that the plaintiffs could not show irreparable harm, but only considering "loss of employment and professional standing" injuries).

App. 19

No. 21-11159

injunction.  United argues it is illogical that seeking to "accommodate" its employees renders it subject to an injunction.

United's argument has some intuitive appeal, but it mischaracterizes both United's conduct and plaintiffs' injuries.  United labels its approach an "accommodation" compared to simply terminating unvaccinated employees, but the content of its accommodation for customer-facing employees merely gives them time to consider whether to acquiesce to United's demands rather than indefinitely lose pay.  United argues that such treatment is better than simply firing the employees because it gives them a choice they would not otherwise have.  But not all choices are received as an advantage.  Plaintiffs assert that the choice United has given them has created a crisis of conscience, pressuring them to abandon their religious commitments.  By threatening termination, United has enlisted employees and their families in the project of reforming employees' religious commitments.  Putting employees to this coercive choice imposes a distinct and irreparable harm beyond lost pay, benefits, seniority, and other tangible and remediable losses.  *Cf. Sambrano*, 19 F.4th at 842 (Ho, J., dissenting) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level.").

If plaintiffs here merely alleged that a past action by the employer caused and will continue to cause economic harms, our precedent likely would not allow us to conclude that they have demonstrated irreparable harm.  But plaintiffs allege a harm of a different nature, and one that is ongoing.  Thus, this is one of the "extraordinary cases" in which "the circumstances surrounding [the employer's actions], together with the resultant effect on the employee, may so far depart from the normal situation

App. 20

No. 21-11159

that irreparable injury might be found." *Sampson*, 415 U.S. at 92 n.68.[16] Plaintiffs are not merely seeking to prevent or undo the placement on unpaid leave itself, but are also challenging the ongoing coercion of being forced to choose either to contravene their religious convictions or to lose pay indefinitely. In such cases, when an employee is subjected to *ongoing coercion* because of a protected characteristic, the irreparable harm factor of the preliminary injunction analysis is satisfied.[17]

---

[16] Although such cases are extraordinary and rare, they are not confined to the religious-accommodation context. Consider a company's policy to, five weeks in the future, place on unpaid leave all employees in same-sex relationships. After five weeks, employees in such relationships could maintain their pay only by ending the relationship. United concedes that under its approach such employees would not be entitled to a preliminary injunction of that openly discriminatory policy. *See* Oral Argument at 41:04–42:20, *Sambrano v. United Airlines* (No. 21-11159).

Nor is this a vaccine-specific exception to the general unavailability of preliminary injunctive relief under Title VII. Take another example: Imagine an airline announced a policy that, effective in one month, flight attendants would be placed on unpaid leave for wearing any head covering during their flights. In the time between the announcement and the implementation of the policy, those who wear hijabs as part of their religion would be given the same impossible choice. Under United's approach, they are "better off" being given a choice (between maintaining their income and honoring their religious beliefs) rather than just being fired for their religious beliefs. *See* Oral Argument at 44:04–47:01, *Sambrano v. United Airlines* (No. 21-11159). But allowing preliminary relief under those circumstances obviates the independent harm of having to make such a choice in the first place.

[17] The dissenting opinion would go on to affirm the denial of a preliminary injunction on other grounds. But with the grant or denial of such relief being within "the sound discretion of the trial court," the better course is to allow the district court to consider the other factors in the first instance. *White*, 862 F.2d at 1210 n.1, 1211; *see also Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017) ("[A] court of appeals sits as a court of review, not of first view."). The district court noted not only that plaintiffs' merits arguments were "compelling and convincing," but also that further briefing and evidentiary development was necessary regarding, for instance, United's updated policy and its effects on the plaintiffs in this case. As a result, rather than go beyond the limited scope of this interlocutory appeal, we remand to allow the district court to address the rest of the preliminary injunction factors in the first instance.

App. 21

No. 21-11159

\*        \*        \*

We REVERSE the district court's conclusion that plaintiffs have not demonstrated irreparable injury absent an injunction, and we REMAND for consideration of the remaining preliminary injunction factors.

App. 22

No. 21-11159

Jerry E. Smith, *Circuit Judge*, dissenting:

In its alacrity to play CEO of a multinational corporation, the majority shatters every dish in the china shop. It rewrites Title VII to create a new cause of action. It twists the record to fit that invention. It defies our precedent and the commands of the Supreme Court. But this majority is no senseless bull. Knowing exactly what it has wrought, the majority declares that its unsigned writing will apply to these parties only. By stripping its judgment of precedential effect, the majority all but admits that its screed could not survive the scrutiny of the en banc court.

We should affirm the district court's cogent and compelling order denying the plaintiffs a preliminary injunction.[1]

For every conceivable reason that the plaintiffs could lose this appeal, they should. The statute does not allow the relief they seek. Nor do our precedents; if they did, the Supreme Court has overruled them. If they have not been overruled, fifty years of precedent and centuries of Anglo-American remedies law show that preliminary relief may not issue. If it could issue, it shouldn't, because the only plaintiffs with standing claim no harm from the "impossible choice" between full postjudgment relief and eternal damnation. If we accepted the plaintiffs' theory and twisted the facts to support it, we must dismiss the appeal because the plaintiffs have not exhausted their administrative remedies. If we excused that, they do not answer United's defenses, so they have not shown that they are likely to win. And if they had shown that, the equities and the public interest would preclude an injunction.

Instead of confronting those odds, the majority ignores them and

---

[1] *Sambrano v. United Airlines, Inc.*, No. 21-cv-1074, 2021 U.S. Dist. LEXIS 215285 (N.D. Tex. Nov. 8, 2021) (Pittman, J.).

App. 23

No. 21-11159

invents a new Title VII sin called "ongoing coercion," resulting in the plain-
tiffs' win.  Alleging "ongoing coercion" now supplies a private right to
preliminary injunctive relief—not because of text, history, or precedent, but
because two well-intentioned but misguided judges say so.

My distinguished colleagues claim that as faithful textualists, they
accurately apply the statutory text and caselaw to this controversy.  I dispute
that and show why.

I respectfully dissent.

## I.

The majority insists that this case is "extraordinary and rare."  *Ante*
at 21 n.16.  But to believe that, my distinguished colleagues distort the record
and the parties' arguments.  Let's complete the picture.

## A.

Last summer (2021), the Delta variant drove coronavirus
hospitalizations to a new high.[2]  Amid that surge, private businesses large and
small began requiring their employees to vaccinate against the disease.  So
did United Airlines.

In August, United announced that it would require U.S.-based
employees to vaccinate against the coronavirus within two months.
Employees could seek religious or medical exemptions.  United
conscientiously explained that it would work with exempted employees to
"determine whether a reasonable accommodation can be provided that does

---

[2] *See* Deepa Shivaram, *More Than 100,000 People Are Hospitalized with COVID-19,
the Most Since January*, Nat'l Pub. Radio (Aug. 26, 2021), https://www.npr.org/
sections/coronavirus-live-updates/2021/08/26/1031264193/100-k-covid-hospitalization-
highest-peak.

App. 24

No. 21-11159

not create an undue hardship for United and/or does not pose a direct threat to the health or safety of others in the workplace or to the employee." Employees who received neither the vaccine nor an exemption would be fired.

United requested that applicants provide some basic information. It required those applying for a medical exemption to submit a one-page form, signed by their physician, stating "the medical reason for vaccine exemption." To seek a religious accommodation, an employee only had to explain her sincerely held religious belief. Consistent with federal guidance, United asked some employees to supplement their requests.[3] For example, plaintiff Sambrano was asked to explain his religious beliefs and to supply a letter from a third party attesting to them. He did so, and his request was promptly approved. The majority calls that process a "bizarre inquisition." *Ante* at 3 n.2. Bizarre indeed, because United approved 82% of religious-accommodation requests and 63% of medical-accommodation requests.

In early September, as approvals rolled out, United contacted employees to lay out its plans. "Given our focus on safety and the steep increases in COVID infections," United's message began, "all active employees whose request[s] [are] approved will be placed on temporary,

---

[3] *See* U.S. Equal Emp. Opportunity Comm'n, Off. of Legal Couns., EEOC-CVG-2021-3, Section 12: Religious Discrimination, § 12-I-A-3 (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination ("If . . . an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice, the employer would be justified in seeking additional supporting information."). That guidance also notes that when investigating a charge of religious discrimination, EEOC officials "may need to ask follow-up questions about the nature and tenets of the asserted religious beliefs" or "seek evidence such as oral statements, affidavits, and other documents from [the employee's] religious leader(s), if applicable." *Id.*

App. 25

No. 21-11159

unpaid personal leave on October 2 while specific safety measures for unvaccinated employees are instituted."

The message then detailed those measures. Given the differences in "employee and customer interaction . . . from role to role," United separated its employees into three groups.

The first group included "operational, customer-facing" employees, such as pilots, flight attendants, and customer service agents. Those employees, who interact with many persons each day, would receive "unpaid personal leave" until the pandemic "meaningfully recedes."

The second contained operational employees with roles that are less social. Think technicians, baggage crew, and the like. Those employees would "undergo weekly COVID-19 testing" and "wear a mask at all times."

The last group held the rest of United's workforce—its office staff across the country. United planned to place that group on unpaid leave as it devised safety measures for its diverse membership. But United began offering remote work to those whose duties allowed it.

Days after that message, the plaintiffs submitted charges to the EEOC and sued United in federal court. The plaintiffs are five United employees.[4] All are exempt from United's vaccine requirement. Sambrano is a pilot; Kincannon, a flight attendant. The other three are not flight-crew members. Castillo repairs planes; Hamilton coordinates ground operations. Neither works with customers. But Jonas did, at the United Club in Dallas–Fort Worth Airport.

In the weeks that followed, United delivered on its pre-suit promise and more. As its message foretold, United allowed unvaccinated, non-

---

[4] There were six, but one was dismissed for want of personal jurisdiction.

App. 26

No. 21-11159

customer-facing operational employees—the second group—to return to work subject to a masking-and-testing requirement. That covered Castillo and Hamilton. Office staff, the third group, transitioned to remote work or masking and testing.

The first group—customer-facing staff—presented a greater challenge. Their roles are more interactive and thus carry more risk. But United accommodated nearly all its customer-service representatives, including Jonas, with new roles requiring only masking and testing.[5] The company offered non-customer-facing positions to pilots and flight attendants, whom United also authorized to find jobs elsewhere until they could return.

United did not offer a masking-and-testing accommodation to pilots or flight attendants. *See ante* at 5–6. But the majority neglects to tell the reader why.

For pilots like Sambrano, United cannot require masking and testing as an alternative to vaccination. Masking poses special hazards in the cockpit. Masks inhibit communication, visibility for glasses wearers, and the donning of oxygen masks in emergencies. No one wants the pilot to crash because she's fiddling with a mask.

Testing encounters legal, contractual, and logistical limits. Because union contracts and federal regulations cap the time that pilots can spend on duty, requiring unvaccinated pilots to test would reduce the time they can spend in the air. And when pilots get sick, United must delay or cancel flights

---

[5] The majority claims that for "most" customer-service representatives, "indefinite unpaid leave remains the only 'accommodation' United will provide." *Ante* at 5–6. Hogwash. Only *nine* customer-facing CSRs in United's entire U.S. workforce have received unpaid leave as an accommodation, and none is a plaintiff here.

App. 27

No. 21-11159

or rearrange its crews to fill the gap. Sickness is bad for business—and for unvaccinated pilots, who are more likely to die from the coronavirus than are their vaccinated colleagues.

Unlike pilots, flight attendants can mask on the job, but they, too, are subject to duty-time limits. Plus, pilots and flight attendants work, travel, dine, and stay together during their trips, which extend for days at a time. United concluded that those prolonged close contacts would defeat alternative accommodations. As one of United's corporate officers testified, United cannot "control the environment" for its flight crews. That challenge sets those employees apart. "[W]hether it's mask compliance, safety protocols, social distancing, [or] management oversight," the witness explained, it's "very difficult" to enforce "any type of moderated accommodation" for those employees.

Notice how few of these facts appear in the majority opinion. They would get in the way of a good story.

## B.

The sole issue on this interlocutory appeal is whether the district court correctly denied the plaintiffs a preliminary injunction. The plaintiffs asked the district court to stop United from placing them on unpaid leave. The court declined because the plaintiffs had not shown irreparable harm. The plaintiffs appeal that judgment per 28 U.S.C. § 1292(a)(1).

A preliminary injunction may issue only if the plaintiffs show that (1) they are likely to win; (2) they are likely to endure irreparable harm without an injunction; (3) the injunction will protect the plaintiffs more than it will harm the defendant; and (4) the injunction won't "disserve the public

App. 28

No. 21-11159

interest."[6]    The plaintiffs must prove *every* factor "by a clear showing." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (citation omitted). And we may affirm the denial of an injunction on any basis that the record supports.[7]

The majority reverses the district court as to Sambrano and Kincannon—the pilot and flight attendant.[8]  The majority concedes that all their injuries are reparable[9] but one: the "impossible choice" between vaccinating and seeking full postjudgment relief from a federal court.

To reach that result, the majority invents a new cause of action for employees who allege "ongoing coercion" by their employer.  The majority says that such employees may seek a preliminary injunction even without exhausting their administrative remedies, as Title VII requires.  Moreover, we must presume their irreparable harm no matter what the record shows.

---

[6] *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016), *reh'g en banc denied*, 865 F.3d 211 (5th Cir. 2017).

[7] *See Future Proof Brands, L.L.C. v. Molson Coors Bev. Co.*, 982 F.3d 280, 288 (5th Cir. 2020); *see also Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014) ("We may affirm on any ground supported by the record, including one not reached by the district court." (cleaned up)).

[8] The majority denies relief to Castillo, Jonas, and Hamilton.  That's correct.  Those plaintiffs lack standing to press their appeal because they are not, nor will be, on unpaid leave.  *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

[9] Lost seniority is not irreparable harm because the district court may award retroactive seniority to the plaintiffs after trial.  The loss of chances to bid for desirable routes at United is not irreparable harm because that loss is either speculative or remediable with damages.  Likewise, the sundry effects of unpaid leave are not irreparable harms, because the plaintiffs may win reinstatement, back pay, and other postjudgment remedies at trial.  Although the delay before a final judgment may result in hardships, those "injuries, however substantial," are not "irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted).

App. 29

No. 21-11159

\*  \*  \*  \*  \*

This panel must answer three questions.  The first is whether federal law entitles our plaintiffs to seek a preliminary injunction.  It does not.

But if it did, the second is whether the plaintiffs' "impossible choice" between full postjudgment relief and vaccination is an irreparable injury.  It is not.

But if it were, the third issue is whether we may affirm the denial of injunctive relief on other grounds.  We may—for at least four reasons.  *One*, the plaintiffs have not exhausted their administrative remedies.  *Two*, even if we could excuse that, the plaintiffs have not shown they are likely to win.  *Three*, even if they had shown that, an injunction would harm United more than it would help the plaintiffs.  *Four*, an injunction would disserve the public interest.  We should not hasten to crush a private firm's effort to protect its customers and employees during a global pandemic.

## II.

Before examining whether the plaintiffs are entitled to a preliminary injunction, we must consider whether the law permits them to seek one at all.  It does not.

Start, as we must, with the text.[10]  Title VII explains whom it empowers to seek preliminary injunctions:

> Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary

---

[10] "The plain text should be the first and—if at all possible—the only step in a statutory analysis."  *Morgan v. Plano Indep. Sch. Dist.*, 724 F.3d 579, 589 (5th Cir. 2013) (Elrod, J., dissenting); *see also Cochran v. SEC*, 20 F.4th 194, 214 (5th Cir. 2021) (en banc) (Oldham, J., concurring) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous." (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004))).

App. 30

No. 21-11159

investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge.

42 U.S.C. § 2000e-5(f)(2).[11] Thus, in cases involving the government, the Attorney General may seek a preliminary injunction; in other cases, only the EEOC may do so.

As any law student can tell you, *expressio unius est exclusio alterius*; "things not enumerated are excluded." *BMC Software, Inc. v. Comm'r*, 780 F.3d 669, 676–77 (5th Cir. 2015) (Elrod, J.). When a statute grants a power to certain listed entities, it does *not* grant that power to anyone else.[12] For instance, suppose that a state legislature enacts a law allowing the disabled and infirm to vote without entering a polling place. "By extending the accommodation to that group *only*, the Legislature impliedly excluded everyone else." *Hotze v. Hudspeth*, 16 F.4th 1121, 1129 (5th Cir. 2021) (Oldham, J., dissenting).

That principle controls here. Because Title VII empowers the EEOC and the Attorney General to seek preliminary injunctions, it denies that power to everyone else—including the private plaintiffs here, who have other statutory remedies.[13]

---

[11] The ADA incorporates Title VII's remedial scheme, as well as its limits. *See* 42 U.S.C. § 12117(a). So unless I note otherwise, any discussion of Title VII in this opinion applies also to the ADA.

[12] *See* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107–11 (2012).

[13] *See* 42 U.S.C. § 2000e-5(g)(1) (authorizing courts, after a final judgment, to

App. 31

No. 21-11159

Instead of offering a contrary reading, the majority claims to be bound by *Drew v. Liberty Mutual Insurance Co.*, 480 F.2d 69 (5th Cir. 1973). That panel did recognize the right of individual employees to seek preliminary injunctions in Title VII cases. Because Title VII created a general "right to be free from [certain] discriminatory conduct," *Drew* claimed that we could "fashion an equitable remedy to vindicate th[at] right." *Id.* at 73. We could do that, *Drew* concluded, even though Congress had vested that remedy in the EEOC *only. See id.* at 73–74.

As anyone who has taken a federal-courts class in the past two decades will recognize, *Drew* is not good law, however convenient it may be for this panel majority to claim its benefits. Our precedents do not survive "intervening and overriding Supreme Court decisions," *White v. Estelle*, 720 F.2d 415, 417 (5th Cir. 1983),[14] and *Drew* does not survive *Alexander v. Sandoval*, 532 U.S. 275 (2001).

*Sandoval* held that private rights of action "must be created by Congress." *Id.* at 286. The judicial role is limited to "interpret[ing] the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Applying that principle, *Sandoval* rejected a private right to enforce a provision of Title VI. By creating only "one method" of enforcement, the Court explained, "Congress intended to preclude others." *Id.* at 290. *Sandoval* marked the end of the "*ancien regime*" in which courts invented remedies to vindicate

---

(1) "order such affirmative action as may be appropriate," including "reinstatement"; (2) permanently enjoin a defendant "from engaging in [an] unlawful employment practice"; and (3) grant "any other equitable relief as the court deems appropriate"); *id.* § 1981a(b) (authorizing punitive damages and special forms of compensatory damages).

[14] *See also United States v. Norbert*, 990 F.3d 968, 987 (5th Cir.) (Oldham, J., dissenting) (stating that "we mustn't follow" precedent that the Court has "squarely contradicted"), *reh'g en banc granted*, 2 F.4th 505 (5th Cir. 2021).

App. 32

No. 21-11159

the rights created by Congress. *Id.* at 287.

Recognizing *Sandoval*'s significance, panels of this court have disre-garded precedents that "relie[d] on pre-*Sandoval* reasoning."[15] *Drew* should receive the same treatment. Perhaps it already has; before today, we had not cited *Drew* since 1981, the year when the Eleventh Circuit split from the Fifth. Indeed, we cabined the decision in 1975, noting that its interpretation of Title VII conflicted with the Supreme Court's understanding of that statute. *See Morgan v. Fletcher*, 518 F.2d 236, 240 n.11 (5th Cir. 1975). By 1995, plaintiffs knew that they had to turn elsewhere to seek preliminary relief for injuries at the hands of private employers. *See Lakoski v. James*, 66 F.3d 751, 753 (5th Cir. 1995). *Drew* no longer binds us, no matter how much the majority would like it to.

*Drew* is not the only relic from the bygone era of judge-made remedies that the majority exhumes for attention. The other is *Cannon v. University of Chicago*, 441 U.S. 677 (1979)—or at least that language within it that permits courts to create a remedy where it "is necessary or at least helpful to the accomplishment of the statutory purpose." *Id.* at 703. But the law *today* is that courts may not make up a remedy "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 287. *Cannon* survives only as far as its holding was "independently supported by the text of the statute." *Id.* at 288.

The majority here, like the court in *Drew*, makes no pretense of textual fidelity. Not once does it look to the text. Instead, the majority applies *Cannon* rather than *Sandoval* because the statute here is more like the one at

_____

[15] *Stokes v. Sw. Airlines*, 887 F.3d 199, 205 (5th Cir. 2018) (alteration adopted) (quoting *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016)).

App. 33

No. 21-11159

issue in *Cannon* and less like the one in *Sandoval*. *Ante* at 9. That is like holding that, because a case's facts are closer to *Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842), than they are to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the general common law governs after all. That holding would be wrong.

As with *Swift* and *Erie*, the difference between *Sandoval* and *Cannon* is one of method. The post-*Sandoval* Court waxes scholastic about that far-off time when the existence of statutory rights implied the existence of remedies. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). Judicial invention is dead. Yet this majority exhumes it to wring one last blunder from its corpse. "*Sandoval* does not apply," the majority declares, because Title VII "contains rights-creating language." *Ante* at 12. That reasoning defies *Sandoval*'s holding that the statute's *text* must create "not just a private right *but also a private remedy*." 532 U.S. at 286 (emphasis added). We cannot so lightly ignore the Supreme Court's commands.[16]

The majority takes pains to stress that the plaintiffs' injury is unique. That is why, the majority claims, this circumstance has never occurred before in the history of man, and why recognizing it will not flood the courts with similar suits. That's all wrong, of course. More on that soon. But the majority does not, and could not, offer any such assurances about its resurrection of *Drew* and cabining of *Sandoval*.

The decades-long shift from cases like *Drew* and toward those like *Sandoval* was a triumph of textualism and judicial restraint. One might have expected this majority to approve, but that is beside the point. What matters

---

[16] *See Stokes*, 887 F.3d at 204 ("When the Supreme Court expressly or implicitly overrules one of our precedents, we have the authority *and obligation* to declare and implement this change in the law." (cleaned up)).

App. 34

No. 21-11159

is this:  Under the majority's reading of Title VII, *every* private employee in Texas, Louisiana, and Mississippi now has a cause of action to seek a preliminary injunction.  And that is not half the problem:  With *Sandoval* recast as a mere reading of one section of Title VI, *every* other statute that acknowledges some right may now have new remedies forced into it.

It's difficult to imagine what creative lawyers—not to mention federal judges spurred on by zealous law clerks—will do with these new tools.  But a safe guess is that there will be more work for courts, more disruption and uncertainty for private business, and more power for judges.  Whether those are good things is not up to us.

For the majority to enact that sweeping change is, at the very least, regrettable.  Departing from our well-established procedures, by not publishing the opinion, undermines the decisionmaking process of this common-law court.  But I get ahead of myself.

### III.

Suppose that's all wrong.  For purposes of a purely academic discussion, let's pretend that *Drew* permits private plaintiffs to obtain preliminary injunctive relief, despite decades of contrary binding precedent and the text and structure of Title VII.  Even then, we must affirm because the plaintiffs have not proved their irreparable harm.

Decades of precedent and centuries of Anglo-American legal practice are clear:  Preliminary injunctive relief is unavailable where there's an adequate remedy at law.  That principle resolves this case.  Because Title VII entitles successful plaintiffs to robust legal and equitable remedies, the choice between seeking those remedies and refusing United's accommodation is neither an impossible choice nor an irreparable harm.  And even if it were both, the instant plaintiffs who have standing claim no harm from that "crisis of conscience," as even the majority admits.  *See ante* at 19 n.14.

App. 35

No. 21-11159

To conquer those nettlesome facts, the majority erases decades of precedent requiring our plaintiffs to plead *and prove* irreparable injury. It then invents a new *per se* rule: To show irreparable harm, a Title VII plaintiff need only allege "ongoing coercion because of a protected characteristic." *Ante* at 22 (emphasis omitted). Find that rule in the statute, our caselaw, or the law of any federal circuit. You won't; it's completely fabricated.

### A.

Equitable relief is extraordinary. It is unavailable where there is an adequate remedy at law.[17] As every judge should know, the classic remedy at law is an award of damages.[18] That has been the law for centuries.[19]

To be sure, the mere availability of damages does not justify denying equitable relief. Damages may not suffice where the plaintiff's injury defies

---

[17] *See, e.g.*, *Hipp ex rel. Cuesta v. Babin*, 60 U.S. (19 How.) 271, 277 (1856); *see also O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) ("Courts of equity should not act . . . when the moving party has an adequate remedy at law . . . ." (cleaned up)); 1 Norman Fetter, Handbook of Equity Jurisprudence 10 (1895) ("Wherever a court of law . . . has power to proceed to a judgment which affords a plain, adequate, and complete remedy, the plaintiff must proceed at law . . . .").

[18] *See* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2944 (3d ed), Westlaw (database updated Apr. 2021) ("[I]f [a] plaintiff . . . can bring a legal action and seek damages that will provide full compensation, . . . the alternative remedy is adequate."); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959) ("[E]quity has always acted only when legal remedies were inadequate . . . .").

[19] *See, e.g.*, 2 Joseph Story, Commentaries on Equity Jurisprudence 104 (1st ed. 1836) ("It may be stated, as a general proposition, that, for breaches of contract and other wrongs and injuries, cognizable at law, Courts of Equity do not entertain jurisdiction to give redress by way of compensation or damages . . . . And, indeed, the just foundation of equitable jurisdiction fails in all such cases, as there is a plain, complete, and adequate remedy at law."); 1 *id.* at 5 (tracing Anglo-American equity jurisprudence to Roman law, which limited equity's power to those cases "not regulated by some express or written law").

App. 36

No. 21-11159

measurement or where damages cannot redress it.[20]  For example, harms to
real property, every plot of which is unique, often call for equitable remedies,
while harms to personal property do not.[21]  For like reason, constitutional
violations inflict irreparable harm.  *See, e.g.*, *BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604, 618 (5th Cir. 2021).  "[D]ollars and cents" cannot capture the
damage that the government inflicts when it deprives rights that it exists to
defend.  *Id.*

But where a remedy of damages is available and adequate, equity has
no role, even if that remedy is not available right away.  That rule makes good
sense.  "A preliminary injunction is an extraordinary and drastic remedy."
*White*, 862 F.2d at 1211 (cleaned up).  It would become ordinary, if not
mandatory, if the years of litigation standing between a plaintiff and his
remedy would render that remedy inadequate.

The courts in *Sampson v. Murray*, 415 U.S. 61 (1974), and *Morgan v.
Fletcher*, 518 F.2d 236 (5th Cir. 1975), applied that principle to employment-
discrimination cases.

In *Murray*, a federal court had temporarily enjoined the termination of
a government employee.  415 U.S. at 66–67.  Rejecting the court's finding of
irreparable injury, the Court reversed.  It explained that neither "the
temporary loss of income" nor the "money, time, and energy necessarily
expended in the absence of a stay" can show irreparable injury when

---

[20] *See* 11A WRIGHT & MILLER, *supra* note 18, § 2944.

[21] *Compare* 5 JOHN NORTON POMEROY & JOHN NORTON POMEROY JR.,
TREATISE ON EQUITY JURISPRUDENCE § 2092, at 4713 (4th ed. 1919) ("In cases
involving personal property there is ordinarily a complete and adequate remedy at law,
and therefore relief is as a rule refused."), *with id.* § 1909, at 4327–28 (citing the law of trespass
as an example of how some courts "treat land as *per se* property of peculiar value," awarding
"specific performance without reference to [the land's] quality, use[,] or value").

App. 37

No. 21-11159

"adequate compensatory or other corrective relief will be available at a later date." *Id.* at 90 (cleaned up). Perhaps irreparable injury would arise in an "extraordinary" case. *Id.* at 92 n.68. But as if anticipating this case, the Court stressed that an "insufficiency of savings" or other "external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself . . . will not support a finding of irreparable injury, *however severely they may affect*" the plaintiffs. *Id.* (emphasis added).

In *Morgan*, we applied *Murray* to reverse a preliminary injunction. 518 F.2d at 239–41. The district court had enjoined an agency from firing the plaintiff, finding irreparable injury because the plaintiff earned half her household's income and would lose her health insurance and her home if she were removed. *Id.* at 238–39. We acknowledged those findings but reversed. Any loss of income was "temporary," we reasoned, because the statute would provide "full back pay should her discharge later prove wrongful." *Id.* at 240. Of course, that statement isn't strictly true. If the plaintiff lost her home, she might never recover it. But damages need not address every conceivable effect of job loss to be adequate. Those indirect harms—all the things that lost wages cause—"are not the type of irreparable harm justifying injunctive relief." *White*, 862 F.2d at 1213 (citing *Morgan*, 518 F.2d at 240).

Lest anyone doubt that that principle applies in Title VII cases, we applied it in *White v. Carlucci*. White, a civilian employee of the U.S. Navy, accused the Navy of racial discrimination. 862 F.2d at 1210. Two months later, the Navy reassigned him. White asked the district court to enjoin that decision while he pressed his discrimination claim. The district court declined, noting that White had not proved irreparable harm. White appealed, insisting that stating a Title VII claim sufficed to show irreparable injury. *See id.* at 1211.

App. 38

No. 21-11159

We rejected that "untenable assertion" and affirmed.  *Id.* at 1213.
"Without question," we stated, "the irreparable harm element must be
satisfied by independent proof, or no injunction may issue."  *Id.* at 1211.
Applying *Murray* and its progeny, we found White's proof wanting and
affirmed the district court.  *See id.* at 1212–13.

## B.

Our precedents make this an easy case.  Title VII supplies adequate
remedies at law.  And the plaintiffs' claimed harm—the coercive effect of
lost income—stems from "the temporary loss of income, ultimately to be
recovered."  *Murray*, 415 U.S. at 90 (cleaned up).  We have repeatedly said
that is not irreparable harm.  *Id.*; *Morgan*, 518 F.2d at 240; *White*, 862 F.2d at
1213.  No injunction may issue.

### 1.

The plaintiffs have an adequate remedy at law.  Indeed, that's a gross
understatement: Title VII confers *enviable* remedies.  If the plaintiffs win at
trial, the district court may order back pay, reinstatement, "or any other
equitable relief as the court deems appropriate."  42 U.S.C. § 2000e-5(g)(1).
The factfinder also may compensate "future pecuniary losses, emotional
pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and
other nonpecuniary losses."  *Id.* § 1981a(b)(3).  Even punitive damages are
available, if the plaintiffs prove that United acted "with malice or with reck-
less indifference" to their rights.  *Id.* § 1981a(b)(1).  And the court may award
"a reasonable attorney's fee, including expert fees," to the winning side.  *Id.*
§ 2000e-5(k) (cleaned up).  The mere "possibility" of those sweeping reme-
dies "weighs heavily against a claim of irreparable harm."  *Murray*, 415 U.S.
at 90 (cleaned up).

The plaintiffs insist that their case is "extraordinary," *id.* at 92 n.68,
because the mounting hardship of lost pay may "coerce" them to breach

App. 39

No. 21-11159

their religious commitments, which would inflict irreparable harm. "Each day," they say, "the pressure to choose between a job and a jab" grows "heavier" (cleaned up).

But that gives away the store. At bottom, the plaintiffs complain that they might decline unpaid leave and take the vaccine because back pay, reinstatement, and other postjudgment remedies are unavailable during their suit. That means, though, that the alleged coercion stems *only* from "the temporary loss of income, ultimately to be recovered" if the plaintiffs win at trial. *Id.* at 90.

Our caselaw leaves no doubt: That injury is reparable. *See id.* Even the majority admits that "unpaid leave . . . and *any harm that flows from it*" are reparable harms. *Ante* at 16 (emphasis added). I agree. That means the plaintiffs must lose on this limited, interlocutory appeal.

Finding irreparable harm here would contravene decades of settled precedent. The indefinite loss of income is not irreparable injury. *Murray*, 415 U.S. at 89. Nor is reputational harm. *Id.* Nor are costs incurred "in the absence of a stay." *Id.* at 90. Nor is losing one's health insurance or home. *Morgan*, 518 F.2d at 238–40. Nor is reassignment. *White*, 862 F.2d at 1212. Nor is the appointment of another person to a position the plaintiff would have occupied but for the employer's unlawful discrimination. *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975) (per curiam).

In short, neither the loss of income nor any result of that loss is irreparable injury. Our plaintiffs allege a harm that results from that loss of income, so their harm is not irreparable. We need no logician to get that answer.

This is not the "extraordinary" case that *Murray* suggested could warrant preliminary relief. Irreparable harm is harm that destroys the court's power "to render a meaningful decision on the merits." *Canal Auth. v.*

40

App. 40

No. 21-11159

*Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). But these plaintiffs' injuries have legal remedies; Title VII offers back pay, reinstatement, lost seniority, emotional damages, and many other remedies.

If plaintiffs persist, they may win those remedies. So for their case to be special, they must show that those remedies are unavailable, but they have not done that—not even close. They haven't shown that United lacks the funds to comply with an adverse final judgment, for example,[22] or that "recoupment will be impossible" absent an injunction. *Conkright v. Frommert*, 556 U.S. 1401, 1403 (2009) (Ginsburg, J., in chambers). Without that showing, our plaintiffs cannot transform their ordinary, compensable harms into irreparable ones.

The interim loss of pay may make it harder for the plaintiffs to press their case. But that's true of nearly every plaintiff who accuses her employer of discrimination after being fired, yet we may not restore those plaintiffs to their jobs just to assuage the hardships of litigating their cases to judgment.[23] That principle holds even when the reparable harm from the interim loss of pay spawns more remote harms (such as the foreclosure of one's home) as the case proceeds.[24]

---

[22] *See Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers) ("Normally the mere payment of money is not considered irreparable, but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable." (citing *Murray*, 415 U.S. at 90)).

[23] *See, e.g.*, *Van Arsdel v. Texas A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980) ("Since reinstatement after trial, coupled with back pay, would suffice to redress appellee's alleged wrong, we find that the preliminary injunction must be vacated.").

[24] *See White*, 862 F.2d at 1212–13 (citing *Morgan*, 518 F.2d at 240); *see also Murray*, 415 U.S. at 92 n.68 ("[A]n insufficiency of savings . . . will not support a finding of irreparable injury, *however severely [it] may affect a particular individual*." (emphasis added)).

App. 41

No. 21-11159

2.

Despite our settled law, the majority concludes that the plaintiffs have suffered irreparable injury. That conclusion rests on at least two faulty legal premises. The first is that the plaintiffs pleaded a coercion injury that's somehow distinct from any adverse employment action. The second is that United's alleged Title VII sin is so severe that the plaintiffs have established irreparable injury.

The first premise is both wrong and irrelevant, and the second is nonsense that our precedent expressly forbids.

a.

The majority concedes, as it must, that harms flowing from an adverse employment action are not irreparable, given that federal law supplies attractive postjudgment remedies, including back pay and reinstatement. But that creates a problem for the majority; it means that these plaintiffs, who have alleged such a harm, cannot show irreparable injury.

Because the "impossible choice" theory is a loser, the majority rewrites it. It insists that the plaintiffs alleged a coercion injury *distinct* from United's offer of unpaid leave. The plaintiffs' harm is irreparable, the majority contends, because it is "antecedent to, independent from, and exogenous to any adverse employment action." *Ante* at 16. "Crucially," the majority explains, "plaintiffs are not seeking an injunction to prevent an adverse employment action or any harm stemming from such action"; they "are not merely seeking to prevent or undo the placement on unpaid leave itself." *Ante* at 16, 21–22. Instead, the majority says, the "[p]laintiffs specifically allege that United wants to coerce them into getting a vaccine that violates their sincerely held religious beliefs and thus *avoid* any adverse employment action." *Ante* at 16.

None of that is true. The plaintiffs brought this appeal to stop United

App. 42

No. 21-11159

from placing them on unpaid leave—*because unpaid leave is an adverse employment action that violates Title VII.* That is the whole point of their suit. That's what they told both the district court[25] and us.

If I didn't know better, I might surmise that the majority didn't even read the plaintiffs' brief. "[T]his appeal presents a narrow question," the first page says. "Do workers suffer immediate and irreparable injury when an employer . . . offers only indefinite unpaid leave as an accommodation?" Did the majority read United's? "[Plaintiffs] seek the extraordinary remedy of a preliminary injunction prohibiting use of temporary unpaid leave as an accommodation . . . ."

The record is to the same effect. The original and amended complaints state at least *six times each* that unpaid leave is an adverse

---

[25] The plaintiffs posited that an injunction should issue because they "will . . . be able to show that they suffered an adverse employment action. The only accommodation United offered was indefinite unpaid leave, and leave without pay differs very little from termination . . . . Plaintiffs are thus likely to satisfy the 'adverse employment action' requirement."

The plaintiffs repeated that theory *ad nauseam.* Here are two other examples; there are many more:

- "United failed to provide Plaintiffs with reasonable accommodations for their religious beliefs, as indefinite unpaid leave is not a reasonable accommodation. Instead, indefinite unpaid leave is an adverse employment action." Plaintiffs' Class Action Complaint, ¶ 129 (ECF No. 1); *see also id.* ¶ 137 ("United's . . . draconian threat of years of unpaid leave is an adverse employment action intended to force employees to forgo their religious beliefs and receive the COVID-19 vaccine.").

- "[E]ven relatively brief periods of unpaid leave—when not requested by the employee as an accommodation—is an adverse employment action. An adverse employment action, that keeps people out of work, is neither reasonable nor an accommodation . . . ." Plaintiffs' Resp. to Defendant's Advice to the Court at 1 (ECF No. 96).

App. 43

No. 21-11159

employment action.[26]  And on the same basis, the plaintiffs sought "a preliminary injunction enjoining United from terminat[ing] or placing on indefinite unpaid leave any employee with a religious or medical basis for seeking an accommodation . . . ."

The district court declined; that is the order on appeal.  The plaintiffs are seeking *exactly* what the majority says they are *not*—and claim precisely the harm that the majority admits cannot warrant a preliminary injunction.[27]

But let's patronize.  Let's suppose the plaintiffs' claims were as the majority describes:  Rather than vying to end United's unpaid-leave accommodation, the plaintiffs had asked us just to undo United's "exogenous" coercion, whatever that is.  *Ante* at 16.

If that's right, this case is over.  The plaintiffs would lack a Title VII cause of action.  Title VII prohibits "adverse employment actions."[28]  It does

───────────────

[26] "United failed to provide Plaintiffs with reasonable accommodations for their religious beliefs, as indefinite unpaid leave is not a reasonable accommodation.  Instead, *indefinite unpaid leave is an adverse employment action.*  United thereby discriminated against Plaintiffs because of their religious beliefs . . . .  United's discriminatory actions were . . . in violation of Title VII."  Plaintiffs' Amended Class Action Complaint ¶¶ 132–35 (ECF No. 67) (emphasis added); *see also id.* ¶¶ 140, 141, 156, 157, 158; Plaintiffs' Class Action Complaint, ¶¶ 129, 137, 138, 153, 154, 155 (ECF No. 1).

The plaintiffs' third count—an ADA failure-to-accommodate claim—does not require an adverse employment action.  Instead, the employee must show that her "employer failed to make reasonable accommodations" for her disability.  *Jennings v. Towers Watson*, 11 F.4th 335, 343 (5th Cir. 2021) (cleaned up).  Lo and behold, paragraph 149 of the amended complaint and paragraph 146 of the original complaint state that "indefinite unpaid leave" is also—you guessed it—a "failure to accommodate."

[27] *See ante* at 14 ("A Title VII plaintiff is obviously injured by an adverse employment action, and that adverse action can in turn cause all sorts of other harms.  But under *Sampson* [*v. Murray*], none of those harms can support a preliminary injunction.").

[28] *See* 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer to . . . discriminate against any individual *with respect to his compensation, terms,*

App. 44

No. 21-11159

not prohibit actions that are "antecedent to, independent from, and exogenous to"— a long way of saying *not*—adverse employment actions. If, as the majority suggests, the plaintiffs did not plead that unpaid leave is an adverse employment action, then forget an injunction; *no* relief may issue.[29]

#### b.

The majority then tries a different tack. The key fact here, the majority thinks, is that United didn't just fire its objecting employees. It did something much worse: By accommodating them with unpaid leave, United "enlisted employees and their families in the project of reforming employees' religious commitments." "Putting employees to this coercive choice," the majority explains, "imposes a distinct and irreparable harm beyond lost pay, benefits, seniority, and other tangible and remediable losses." *Ante* at 21.[30] That harm, the majority says, is "ongoing coercion

---

*conditions, or privileges of employment*, because of such individual's . . . religion . . . ." (emphasis added)); *see also Stroy v. Gibson*, 896 F.3d 693, 699 (5th Cir. 2018) (Elrod, J.) (requiring an "adverse employment action" to sustain a Title VII discrimination claim); *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 433 (5th Cir. 2021) ("To establish Title VII retaliation, Wright must show that . . . she suffered an adverse employment action . . . ."); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (same, for ADA retaliation); *Jennings*, 11 F.4th at 344 (same, for a disability-discrimination claim). The term "adverse employment action" is how courts refer to Title VII's requirement that a plaintiff must identify "an employment decision that affects the terms and conditions of employment." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014).

[29] *See Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 444 n.22 (5th Cir. 2020) ("[B]ecause the plaintiffs haven't stated a claim, they cannot show that the district court abused its discretion in denying them a preliminary injunction."), *cert. denied*, 141 S. Ct. 2746 (2021).

[30] No good deed goes unpunished. In adopting the theory that the act of choosing harms the plaintiffs, the majority rebukes United as Dostoevsky's Grand Inquisitor rebuked Jesus: "Instead of taking over men's freedom, you increased it and forever burdened [the plaintiffs] with its torments . . . . [D]id it not occur to you that he would eventually [sue] if he was oppressed by so terrible a burden as freedom of choice?"

---

App. 45

No. 21-11159

because of a protected characteristic." *Ante* at 22 (emphasis omitted).

That passage, like the rest of the majority opinion, assumes that the severity of United's perceived wrong proves the plaintiffs' irreparable harm. By putting plaintiffs to the "coercive choice" between unpaid leave and vaccination, United "discriminate[d] against" its employees "with respect to [their] compensation, terms, conditions, or privileges of employment, because of [their] . . . religion."   42 U.S.C. § 2000e-2(a)(1).   From that assertion of Title VII liability, the majority concludes that United irreparably harmed the plaintiffs.

Our precedent forbids that mistake. *White* explained that

there is no nexus between the strength and nature of the underlying [Title VII] claim and the element of irreparable harm.  Such irreparable harm must be proven separately and convincingly. *The burden of proof is not reduced by either the existence of an extremely strong likelihood of success or the egregiousness of the alleged wrong upon which the underlying claim is based.*

862 F.2d at 1212 (emphasis added).  The point we made in *White* is clear and irrefutable:   The severity of the Title VII injury proves *nothing* about irreparable harm.  Whether United pressured the plaintiffs to abandon their religious commitments may tell us whether United violated the law.  But the fact of that violation, even if proved, cannot show whether the harms that result are irreparable.

The majority insists that it does not disregard *White*, which, the

---

Fʏᴏᴅᴏʀ Dᴏsᴛᴏᴇᴠsᴋʏ, Tʜᴇ Bʀᴏᴛʜᴇʀs Kᴀʀᴀᴍᴀᴢᴏᴠ 255 (Richard Pevear & Larissa Volokhonsky trans., 12th ed. 2002).  Let United be grateful that its punishment is a mere injunction.  "For if anyone has ever deserved our stake, it is" he who forgets that "even death [is] dearer to man than free choice." *Id.* at 254, 260.

46

App. 46

No. 21-11159

majority claims, does not control because the plaintiffs ask us to enjoin an "independent harm," not an adverse employment action. *Ante* at 15. But if that were true, then the plaintiffs would not have stated a Title VII claim and thus could get no relief from this court, as I've explained. The majority never addresses that problem, and I don't see how it could. Our plaintiffs have endured Schrödinger's harm: It stems from Title VII and does not stem from Title VII at the same time—whichever suits the majority's need.

## C.

But suppose that everything I've said is wrong. Let's posit, instead, that we accept that a "crisis of conscience" resulting from an adverse employment action may constitute irreparable injury, despite decades of contrary precedent and bedrock principles of the law of remedies. Even then, the plaintiffs should lose, because the record does not show that they are likely to suffer the harm that they allege.

The majority admits that fact but declares it irrelevant. Casting aside circuit precedent that requires Title VII plaintiffs to plead *and prove* irreparable harm, the majority invents a new *per se* rule: When an employee alleges "ongoing coercion because of a protected characteristic," irreparable harm exists, no matter what the record shows. Never mind that the Supreme Court has told us not to fashion such presumptions. Nothing, especially not the law, will thwart this majority's plans.

## 1.

Sambrano and Kincannon are the only plaintiffs who face unpaid leave. According to the majority, they will suffer irreparable harm without an injunction because United is forcing them to choose between adhering to their faith and "put[ting] food on the table." *Ante* at 19. The plaintiffs, the majority asserts, endure "a crisis of conscience" about their religious convictions. *Ante* at 20.

App. 47

No. 21-11159

But the record belies that conclusion. Neither plaintiff testified to facing a "crisis of conscience" or anything like it, so neither has shown that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). That means no injunction may issue.

Sambrano, the pilot, declined the vaccine because he believes that it was developed with aborted fetal tissue. United accommodated Sambrano with unpaid leave. In his affidavit, Sambrano stated that his annual salary exceeds $350,000. He then explained that

> [t]he current situation has put terrible stress on me and my family. If I cannot continue earning a paycheck, we will have to make difficult choices regarding the college education of three children, one of whom is currently in college, and my . . . twins who will be going to college soon. For my child currently in college, the loss of an income source could put in jeopardy my ability to continue paying tuition. Additionally, there are many opportunities we have been pursuing as a family that I cannot afford if I lose my United salary.

In his live testimony, Sambrano stressed how lost seniority would affect him. Seniority, he said,

> determines the lifestyle you have. It determines the house you are able to afford and the place that you want to live in. It determines the schools your children go to. It determines the time off that one has. It determines whether I'm going to be there for my kids—or my children's events . . . . It determines whether I have weekends off . . . .

Not once did Sambrano say or suggest that he felt a "crisis of conscience" or pressure "to abandon [his] religious commitments." *Ante* at 20. Instead, he noted the effects of unpaid leave on his lifestyle and on his ability to pay for his child's college tuition. Such harms, the majority

App. 48

No. 21-11159

concedes, are reparable.[31]

Kincannon refused the vaccine for the same reason and received a like accommodation. A flight attendant, she earns 35% of her household's income. She said that unpaid leave will require her family to change its "daily financial decisions" and may threaten her ability to afford college tuition. She also testified to marital strain, personal stress, and her fear of "losing good friends at work." But no crisis of conscience. "No matter the cost," she swore, "I will never take this vaccine."[32]

The majority says those facts don't matter a whit. A nonparty United employee testified that he took the vaccine despite his religious objections, the majority contends, so we can ignore that our "plaintiffs say they will *never* get the COVID-19 vaccine." *Ante* at 19 n.14. "[E]ven if that is true now," the majority reasons, "it does not mean it will always be so." *Id.*

That fortune-cookie aphorism would find irreparable harm everywhere. Such is not the law, except according to this panel majority. A plaintiff seeking preliminary relief must show that irreparable harm is *likely* without it. *Winter*, 555 U.S. at 22. And because the plaintiff is the one seeking relief, the plaintiff must show that *she* will endure that harm if no injunction issues. *Id.* at 20.

Our plaintiffs have shown neither. That a nonparty took the vaccine despite his religious objections tells us nothing about the likelihood of harm *to the plaintiffs*. But even if relevant, that fact suggests, at most, only a remote

---

[31] *See ante* at 16 ("[U]npaid leave . . . and any harm that flows from it, can be remedied through backpay, reinstatement, or otherwise.").

[32] *Cf.* 1 *Corinthians* 10:13 ("God is faithful, and he will not let you be tested beyond your strength . . . .").

App. 49

No. 21-11159

chance of future harm.  That does not suffice.[33]

## 2.

The record cannot support a finding that the plaintiffs suffered the "crisis of conscience" on which they base their demand for relief.  So once again, the majority junks our precedent to get the answer it wants.

### a.

Our caselaw commands that Title VII plaintiffs must plead *and prove* irreparable harm.

In *White*, we decided "whether and to what extent a Title VII plaintiff must show a likelihood of irreparable harm for a preliminary injunction to issue."  862 F.2d at 1210.  We said that a Title VII plaintiff "must establish irreparable harm" through a specific factual showing.  *See id.* at 1213.  *White*'s plaintiff did not meet that test, we explained, because he "does not, and cannot, make any *fact-specific* argument as to how he will be irreparably harmed."  *Id.* (emphasis added).  We also rejected the plaintiff's "untenable assertion" that "the nature of his [Title VII] claim eliminates the need for such a showing."  *Id.*

Twice over, *White* forecloses our plaintiffs' "impossible choice" theory.

*First*, *White* requires plaintiffs to identify specific facts showing that they are likely to suffer irreparable harm.  Neither of our plaintiffs has done that.  Neither Sambrano nor Kincannon testified to feeling any pressure to abandon religious beliefs.  They cited other difficulties—lifestyle changes,

---

[33] *Id.* at 22; *see also O'Shea*, 414 U.S. at 502 (describing "the likelihood of substantial and immediate irreparable injury" as a "basic requisite[ ] of the issuance of equitable relief").

App. 50

No. 21-11159

reduced financial security, and the like—which even the majority concedes are reparable harms. *See, e.g.*, *ante* at 14–16.

*Second*, *White* held that the need to show irreparable harm cannot vary with "the nature" of the Title VII claim. That means we cannot excuse our plaintiffs' failure to prove their irreparable harm with specific facts. When a plaintiff pleads a Title VII claim, it does not matter who the plaintiff is, what he alleges, or whom he sues. That plaintiff must supply "independent proof" of irreparable harm, or no preliminary relief may issue. *White*, 862 F.2d at 1211.

b.

Unable to overcome *White*, the majority guts it. No longer must Title VII plaintiffs prove their irreparable harm. Instead, the majority transforms the "untenable assertion" that *White* repudiated into the law of this circuit. Now, the nature of a Title VII claim *can* erase the need to show irreparable harm: When a plaintiff pleads "ongoing coercion because of a protected characteristic," the majority holds, "the irreparable harm factor . . . is satisfied." *Ante* at 22 (emphasis omitted).

The majority describes its made-up rule as a natural outgrowth from our First Amendment caselaw. We assume irreparable harm when the government violates constitutional[34] and statutory free-exercise rights. Because United's coercion feels the same to our plaintiffs as government coercion would feel, the majority suggests, we may assume irreparable harm here, too.[35] Because "we consider only whether plaintiffs are likely to suffer

---

[34] *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *BST Holdings*, 17 F.4th at 618.

[35] *See ante* at 17; *see also Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841–42 (5th Cir. 2021) (Ho, J., dissenting) ("[T]o the person of faith who is forced to confront this challenge of conscience, what matters is not who imposed the mandate, but that the

No. 21-11159

irreparable harm," the majority says, all that matters is "the effect of the defendant's action on the plaintiffs." *Ante* at 17.

The majority's illogic proceeds from a faulty premise. The "effect of the defendant's action on the plaintiffs" is *not* the same in constitutional cases because constitutional violations work a different harm. Government exists to protect and uphold the Constitution. When government exceeds the consent of the governed to deny the rights it has sworn to protect, that betrayal is a unique, freestanding, and immeasurable injury—distinct from the results of the government's misconduct, which damages may remedy.[36]

It matters not that the injury to free exercise *feels* the same to the plaintiffs; what matters is that the injury is *in fact* different. Importantly, our plaintiffs did not plead a constitutional injury.

Unlike constitutional injuries, Title VII injuries are neither unique nor freestanding. Our plaintiffs' cause of action exists at the pleasure of Congress; it is not the foundation of our social compact. Nor is there the same measurement problem; there's no question how to make an employee whole for a Title VII injury. When an employer violates Title VII, we need only decide how much compensation—back pay, reinstatement, and the

---

mandate conflicts with religious conviction . . . . Whether the interference with religious conviction comes from the public or private sector, a person of faith suffers a harm that cannot be adequately compensated monetarily." (citation omitted)).

[36] *See* 11A WRIGHT & MILLER, *supra* note 18, § 2948.1 ("When an alleged deprivation of a *constitutional right* is involved, . . . most courts hold that no further showing of irreparable injury is necessary." (emphasis added) (footnotes omitted)); 13 MOORE'S FED. PRAC. § 65.22 (3d ed.) (noting that the "deprivation of *constitutional rights*" has "ordinarily been held to be irreparable" (emphasis added)), Lexis (database updated Dec. 2021). *But see* Anthony DiSarro, *A Farewell to Harms: Against Presuming Irreparable Injury in Constitutional Litigation*, 35 HARV. J.L. & PUB. POL'Y 743, 763–65 (2012) (arguing that *Elrod*'s statement that First Amendment harms are irreparable is legally "indefensible").

App. 52

No. 21-11159

like—will restore the employee to the position she would have occupied but for the employer's violation. *Cf. Claiborne v. Ill. Cent. R.R.*, 583 F.2d 143, 149 (5th Cir. 1978). That is how we and the Court have always treated such cases, and that is why postjudgment relief has always sufficed. *See, e.g.*, *White*, 862 F.2d at 1212–13; *Morgan*, 518 F.2d at 240; *see also Murray*, 415 U.S. at 89–91.

That point exposes a bizarre consequence of the majority's position. The majority draws on constitutional law to justify its presumption. Constitutional harm is special, as I've explained, because the government inflicts it. Yet we do not presume irreparable harm in Title VII cases against the government. We know that because *White* addressed a Title VII claim by a government employee, 862 F.2d at 1210, and required that plaintiff to plead and prove his irreparable harm, *id.* at 1213. So if the majority has not annulled *White*, our law is now an absurdity: When private parties, who cannot violate the Constitution, violate Title VII, we must presume irreparable harm because those violations "feel like" constitutional injuries. Yet we do not presume irreparable harm when plaintiffs bring the same claims against the government. Color me confused.

To salvage its groundless presumption, the majority highlights *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012). There, we presumed irreparable harm from a church's claims under the First Amendment and RLUIPA, a federal law that prohibits governments from substantially burdening religious exercise.[37] Like Title VII, RLUIPA is a statute. Thus, the majority concludes, we may presume irreparable harm.

*Opulent Life* itself rejects that sloppy reasoning. After stating that the

---

[37] RLUIPA stands for the "Religious Land Use and Institutionalized Persons Act" and is codified at 42 U.S.C. § 2000cc *et seq.*

App. 53

No. 21-11159

church's First Amendment claims warranted a presumption of irreparable harm, Judge Elrod wrote that this "principle applies with equal force to the violation of RLUIPA rights *because RLUIPA enforces First Amendment freedoms*." *Opulent Life*, 697 F.3d at 295 (emphasis added). Unlike RLUIPA, Title VII does not, and could not, enforce First Amendment freedoms against private parties. The Constitution applies to the United States, not to United Airlines. *See, e.g.*, *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976).

The majority also asserts that Congress desired to "protect the same rights in private employment as the Constitution protects." *Ante* at 18 (citation omitted). But even if that were true, that desire could not transform a statutory injury into a constitutional one. Congress may only *enforce* constitutional rights; it cannot "determine what constitutes a constitutional violation." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).

Of course, Congress may instruct us to presume irreparable harm for certain statutory violations. It did that last year when amending the Lanham Act.[38] But Title VII does no such thing, so we must await legislative command. A presumption of irreparable harm is "a major departure from the long tradition of equity practice," which "should not be lightly implied." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (cleaned up). Once again, the majority snubs the Supreme Court to remake the law for these plaintiffs and their favored cause.

\* \* \* \* \*

The majority's treatment of irreparable harm flouts blackletter law, the record, and even the Supreme Court. But I pause here to protest how the

---

[38] *See* 15 U.S.C. § 1116(a) (creating a "rebuttable presumption of irreparable harm" for certain Lanham Act plaintiffs).

App. 54

No. 21-11159

majority tortures our precedent to extract its desired result.

The majority admits that it cannot overrule circuit precedent "absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *Ante* at 13 (quoting *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)). Indeed, my colleagues repeatedly invoke that rule of orderliness to defend their fanatic devotion to *Drew*, a fifty-year-old case that employs an interpretative method that the Court repudiated in *Sandoval*. The majority then scraps *White* without citing even *one* case or statute precluding its control here.[39]

That move is astounding. The rule of orderliness binds us "to follow our earlier precedent, and [we] must in any event adhere to Supreme Court precedent." *Yates v. Collier*, 868 F.3d 354, 365 n.6 (5th Cir. 2017) (Elrod, J.). Yet this majority ignores *White*, defies *Sandoval*, and mows down countless other authorities—all while it fashions from *Drew* a golden calf.[40] I could discern no reason for the majority's selective orderliness,[41] but for every

---

[39] Since its issuance in 1989, *White*, which I wrote, has been cited in nearly three hundred cases. This court cites it routinely, though this majority casually sends it now to the dustbin. Contrast *Drew*, which has not appeared in a Fifth Circuit opinion for more than forty years.

[40] *Cf. Exodus* 32.

[41] *See, e.g.*, *Oliver v. Arnold*, 19 F.4th 843, 855 (5th Cir. 2021) (en banc) (Elrod, J., dissenting from the denial of reh'g *en banc*) (contending that the rule of orderliness required granting qualified immunity to a schoolteacher); *Douglass v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 300 (5th Cir.) (Elrod, J., specially concurring) (agreeing that the rule of orderliness bound the panel and urging the en banc court to reconsider its precedent), *reh'g en banc granted*, 2 F.4th 525 (5th Cir. 2021); *Davis v. Fort Bend Cnty.*, 893 F.3d 300, 304–05 (5th Cir. 2018) (Elrod, J.) (applying the rule of orderliness and holding that Title VII's exhaustion requirement is a nonjurisdictional "prerequisite to suit"); *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302–04 (5th Cir. 2018) (Oldham, J.) (applying the rule to overrule circuit precedent that the Court had implicitly rejected); *Norbert*, 990 F.3d at 987 (Oldham, J., dissenting) ("*Navarette* binds us. It is the Supreme

App. 55

No. 21-11159

error pointing toward the result my colleagues find most satisfying.

IV.

But suppose that's all wrong.  Let's pretend that the plaintiffs have shown irreparable injury.  This court still should affirm the denial of a preliminary injunction because the plaintiffs are not likely to succeed on the merits.  *See Winter*, 555 U.S. at 20.

Indeed, following the majority's logic, we *must* look to that prong of the preliminary-injunction test, because the cause of action that we devised in *Drew* is available only in the "limited class of cases" in which "likelihood of ultimate success has been established."[42]  The district court made no findings beyond irreparable harm, but we may affirm the denial of an injunction on any basis that the record supports.[43]

The plaintiffs are unlikely—indeed, unable—to succeed on the merits for two reasons, one procedural and one substantive.  On procedure, Title VII requires "an aggrieved individual [to] pursue administrative

_____

Court's most-recent decision on this topic.  And it postdates [our contrary precedent] by 7 years.  We have zero excuse for ignoring *Navarette*.").

[42] *Drew*, 480 F.2d at 72; *see also Garza v. Tex. Educ. Found., Inc.*, 565 F.2d 909, 910 (5th Cir. 1978) (applying *Drew*).

[43] "It is an elementary proposition, and the supporting cases too numerous to cite, that this court may affirm the district court's judgment on any grounds supported by the record."  *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (cleaned up).

*White* noted that would be inappropriate for this court to *grant* an injunction in this posture, rather than to reverse on the issue of irreparable injury and remand, unless "the record is exceptionally clear and remand would serve no useful purpose."  862 F.2d at 1210 n.1.  But even if the plaintiffs' other failings are not exceptionally clear, *White* does not contradict the principle that this court may affirm the judgment—here being the denial of an injunction—for reasons other than those that the district court gave.  *See, e.g.*, *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 345 (5th Cir. 1988).

App. 56

No. 21-11159

remedies before seeking judicial relief." *Lakoski*, 66 F.3d at 753. Our plaintiffs have not done that, so their claim fails. On substance, the plaintiffs cannot win if accommodating their religious beliefs would impose an "undue hardship" on United. *See, e.g.*, *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977). Alternative accommodations would impose just such a hardship.

## A.

First, the procedural problem. For plaintiffs to prevail on a Title VII claim, they must first exhaust their administrative remedies with the EEOC. 42 U.S.C. § 2000e-5(f)(1). To exhaust, plaintiffs "must file a timely charge with the EEOC and then receive a notice of the right to sue." *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 337 (5th Cir. 2021).

That exhaustion requirement is "a mainstay of proper enforcement of Title VII remedies." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 272 (5th Cir. 2008). It encourages parties to resolve their disputes without the cost and delay of litigation.[44] It protects the EEOC's unique "investigative and conciliatory functions" and its role "as the primary enforcer of antidiscrimination laws" against private actors. *Ernst*, 1 F.4th at 337 (citation omitted). Requiring exhaustion also protects courts from a flood of premature claims.[45] For those reasons, "[c]ourts should not condone lawsuits that exceed the

---

[44] *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498 (5th Cir. 1968); *see also Davis*, 893 F.3d at 307 (Elrod, J.) (Title VII's requirement of "[a]dministrative exhaustion is important because it provides an opportunity for voluntary compliance before a civil action is instituted."); *Pinkard v. Pullman-Standard*, 678 F.2d 1211, 1220–21 (5th Cir. Unit B 1982) (per curiam) (T. Clark, J., dissenting) ("[T]he EEOC effectively stands at the door of the courthouse in the congressional scheme [of Title VII] . . . . The EEOC, if fully given the chance to operate, may solve many employer-employee disputes through mediation.").

[45] *See, e.g.*, *Stroy*, 896 F.3d at 698; *see also Pinkard*, 678 F.2d at 1221 (T. Clark, J., dissenting).

App. 57

No. 21-11159

scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation." *McClain*, 519 F.3d at 273.

As the majority does not dispute, our plaintiffs have not exhausted. Nor has United forfeited or waived the requirement; it has pressed the exhaustion issue at every turn. Failure to comply with an exhaustion requirement precludes plaintiffs from showing that they are likely to succeed on the merits.[46] We regularly apply that principle to Title VII cases. *See, e.g.*, *Stroy*, 896 F.3d at 698 & n.2 (Elrod, J.).[47] Because our plaintiffs have not exhausted, they cannot succeed on the merits. Game, set, match.

The majority answers that deficiency by placing even more weight on *Drew*, that flimsiest of rods. But for the same reason that the majority cannot rely on *Drew* for a private right to a preliminary injunction, it cannot rely on *Drew* now: The Supreme Court has made clear that we cannot devise remedies or exceptions that a statute's text does not contain. But there's a second, even more fundamental problem with the majority's use of *Drew*: that case does not say what the majority wants it to.

### 1.

If the majority reads *Drew* correctly, then *Drew* is not good law. That's not only because this majority's choice to fashion an equitable remedy contradicts *Sandoval*, but also because its failure to enforce Title VII's exhaustion requirement contradicts *Ross v. Blake*, 578 U.S. 632 (2016).

*Ross* reversed the Fourth Circuit, which had invented a "special

---

[46] *See, e.g.*, *Murphy v. Collier*, 942 F.3d 704, 713–14 (5th Cir. 2019) (Elrod, J., dissenting).

[47] *See also Torres v. Cnty. of Webb*, 150 F. App'x 286, 293 (5th Cir. 2005).

App. 58

No. 21-11159

circumstances" exception to the exhaustion requirement of the Prison Liti-
gation Reform Act. *Id.* at 635. But *Ross* did not confine its holding to that
statute: It endorsed the sensible proposition that "mandatory exhaustion
statutes . . . establish mandatory exhaustion regimes, foreclosing judicial dis-
cretion." *Id.* at 639. We have repeatedly cited the case to proscribe judge-
made exceptions to mandatory exhaustion regimes other than that of the
PLRA.[48] And Title VII's exhaustion requirement is mandatory. *See Fort
Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1852 (2019).

As with *Sandoval*, the majority tries to save its version of *Drew* by
cabining *Ross*. The majority does not pretend that *Ross* applies only to the
PLRA, but the notion it advances is no more persuasive: *Ross* does not apply
to preliminary injunctions because "[t]ime is of the essence" in granting
them. *Ante* at 12. The majority cites no authority for that convenient
distinction.

*Ross* says we cannot impose "unwritten limits" on statutory exhaus-
tion requirements. 578 U.S. at 639. Period. *Ross* offers no basis for distin-
guishing damages from injunctive relief. And sure enough, this court applies
*Ross* to require exhaustion before plaintiffs may seek injunctions.[49] If *Drew*
ever allowed this court to forgive noncompliance with a mandatory exhaus-

---

[48] *See, e.g.*, *United States v. Pedroza-Rocha*, 933 F.3d 490, 498 (5th Cir. 2019) (per
curiam); *cf. Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 294 (5th Cir. 2019) (Oldham, J.)
(citing *Ross* and refusing to apply judge-made exception to limits on removal jurisdiction).

[49] *See, e.g.*, *Valentine v. Collier*, 956 F.3d 797, 804–05 (5th Cir. 2020) (per curiam)
(staying an injunction because the plaintiffs failed to exhaust, among other reasons);
*McMillan v. Dir., Tex. Dep't of Crim. Justice-Corr. Insts. Div.*, 540 F. App'x 358, 359 (5th
Cir. 2013) (per curiam) ("Requests for injunctive relief are not exempt from the exhaustion
requirement, and failure to completely exhaust prior to filing suit cannot be excused."
(citing *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) (per curiam))); *Muhammad v.
Wiles*, 841 F. App'x 681, 685–86 (5th Cir. 2021) (per curiam) (same); *see also Valentine v.
Collier*, 993 F.3d 270, 294 (5th Cir. 2021) (Oldham, J., concurring in the judgment).

App. 59

No. 21-11159

tion requirement, it no longer does.

### 2.

But the majority faces a more fundamental problem than the Supreme Court's intervention: *Drew* itself does not address Title VII's exhaustion requirement, and *Drew*'s reasoning does not support a "time is of the essence" exception to that requirement.

The plaintiff in *Drew* filed her initial complaint before exhausting administrative remedies. *See Drew*, 480 F.2d at 71. But she *had* exhausted, receiving her "right to sue letter," by the time she filed the complaint that we considered on appeal. *Id.* Thus, *Drew* never presented the exhaustion issue and could not have done so beyond *dictum*. That's why our Title VII decisions describe exhaustion as an absolute condition to suit, unaware of the qualification that the majority has created.[50]

But even if *Drew* were relevant to exhaustion, it would still say nothing justifying a "time is of the essence" exception to *Ross*. By the time we decided *Drew*, the EEOC had had the plaintiff reinstated at her job. *See Drew*, 480 F.2d at 72. That would have mooted the case, but for the fact that the trial court had awarded costs to the defendant. So we did not grant a preliminary injunction; doing so was unnecessary to preserve the *status quo ante*. *See id.* at 76. That result leaves the majority with no basis to say that *Drew*'s holding on exhaustion, phantasmal though it is, survives *Ross*.

### 3.

Even after it ignores statutory text, reimagines a defunct precedent, and plows that altered precedent through Supreme Court commands, the majority produces a rule that does not help the plaintiffs.

---

[50] *See, e.g., Ernst*, 1 F.4th at 337; *McClain*, 519 F.3d at 273; *Stroy*, 896 F.3d at 698.

App. 60

No. 21-11159

The majority says that *Drew* exempts plaintiffs from the exhaustion requirement when time is of the essence to maintain the *status quo*. But our plaintiffs sued to alter an *existing* policy, and they did so by theorizing an injury that no longer exists. Since this case was filed, three of the plaintiffs have received other accommodations, and two (Sambrano and Kincannon) are on unpaid leave. All have made or avoided the "impossible choice."

Although Sambrano and Kincannon continue to endure lost pay and benefits, that's the kind of pedestrian Title VII injury that the majority concedes is reparable. The majority's reading of *Drew* suggests that our plaintiffs could have sought a preliminary injunction, but *Drew* also suggests that granting an injunction now, when time is no longer of the essence, would be improper. To enjoin United's policy now would be an unprecedented intrusion into the management of a private business, yet it would not prevent the injury that the plaintiffs feared they would suffer.

The exhaustion requirement is just one more casualty of the majority's orgy of jurisprudential violence. If anyone takes the majority seriously, the number of Title VII cases will explode; unexhausted claims will flood the courts; and organizations large and small will grind to a halt—all results contrary to the statute's text, purpose, and established interpretation.

B.

But suppose that's all wrong, too. Let's imagine that *Drew does* excuse the plaintiffs' failure to exhaust, and let's assume that every sentence of *Drew* still binds this court. Even then, *Drew* does not excuse exhaustion unless the plaintiffs show that their substantive claims are likely to succeed. *Drew*, 480 F.2d at 72. The plaintiffs have not shown that.

Sambrano and Kincannon are the only plaintiffs with standing. They

App. 61

No. 21-11159

sought only religious accommodations, so they have two claims.[51]  The first is that United's accommodation of unpaid leave amounted to religious discrimination under Title VII.  The second is that United retaliated against them for seeking religious accommodations.  Neither claim can succeed.

1.

Title VII bars an employer from discriminating against an employee because of her religion.  42 U.S.C. § 2000e-2(a)(1).  But to avoid liability, an employer need only show that it reasonably accommodated the claimant or that such accommodation would impose an "undue hardship" on the employer's business.  42 U.S.C. § 2000e(j).

Unpaid leave may be a reasonable accommodation for Sambrano and Kincannon; indeed, our cases typically describe unpaid leave as a *benefit*.[52]

---

[51] Sambrano and Kincannon also say that United discriminated and retaliated against them because of their disabilities.  I won't belabor those claims; the record shows they will fail.  The plaintiffs must show that United knew of their disabilities and the resulting limitations.  *See Jennings*, 11 F.4th at 343.  Yet neither Sambrano nor Kincannon requested a medical accommodation, and Kincannon never alleged a disability or any desire for a medical accommodation.  *See Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) ("It is the plaintiff's burden to request reasonable accommodations.").

Though Sambrano says he wanted a medical accommodation, his claimed disability—his past coronavirus infection—is far from meeting the ADA's "demanding" definition of disability.  *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003) (citation omitted); *see also id.* at 656–57 (holding that "no reasonable jury could conclude" that an employee's chronic pancreatitis, which caused him to miss work regularly, was an ADA disability); 42 U.S.C. § 12102(1) ("The term 'disability' means . . . a physical or mental impairment that substantially limits one or more major life activities of [the] individual.").  And even if the plaintiffs could surmount those hurdles, United would have a strong "undue hardship" defense.  *See Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996).

[52] *See, e.g.*, *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 522 (5th Cir. 2001); *cf. Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) ("Time off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave." (citation omitted)).

App. 62

No. 21-11159

United also invited its flight-crew members to apply for non-customer-facing roles, with the possibility of returning to their prior responsibilities when the pandemic subsides. Allowing an employee "to find another position" that may lessen "conflict[ ] with her religious beliefs" is a reasonable accommodation, *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501–02 (5th Cir. 2001), even when those positions would inconvenience the employee or substantially reduce her income, *see id.* at 502 n.23; *see also Horvath v. City of Leander*, 946 F.3d 787, 792 (5th Cir. 2020).

But none of that matters. Even if unpaid leave is not a reasonable accommodation, the plaintiffs have not shown that United can accommodate them without undue hardship, so they cannot succeed on the merits.

Undue hardship exists where the employer must bear any more than a trivial cost to accommodate the Title VII claimant.[53] Even the "mere possibility of an adverse impact on co-workers" is an undue hardship. *Bruff*, 244 F.3d at 501 n.14 (citation omitted). It's an undue hardship to require an employer to impose a shift change, *Hardison*, 432 U.S. at 84–85, or the chance of "extra work," *Tagore v. United States*, 735 F.3d 324, 330 (5th Cir. 2013), on a claimant's coworkers. Undue hardship also exists wherever an employer would bear economic costs, logistical challenges, or inconvenience to accommodate an employee's beliefs.[54]

---

[53] *See, e.g., Antoine v. First Student, Inc.*, 713 F.3d 824, 839 (5th Cir. 2013) ("Undue hardship exists when an employer is required to bear more than a de minimis cost.").

[54] *See Bruff*, 244 F.3d at 501 (requiring counselors "to assume a disproportionate workload" or to adjust their travel schedules is "an undue hardship as a matter of law"); *Howard v. Haverty Furniture Cos.*, 615 F.2d 203, 206 (5th Cir. 1980) (finding undue hardship despite "[t]he fact that Haverty incurred no direct money cost from plaintiff's absence," because Haverty believed in good faith that the plaintiff's absence would disrupt warehouse operations); *Tagore*, 735 F.3d at 330 (finding undue hardship because allowing the plaintiff to bring her ceremonial knife to work would burden security personnel with a

No. 21-11159

==United has satisfied that low bar.== It offered unrebutted testimony that masking is hazardous in the cockpit and that requiring pilots and flight attendants to test will reduce the time that they can spend in the air. United also explained that its flight-crew members travel in close quarters for days at a time, increasing the risk of disease transmission and reducing the efficacy and enforceability of alternative accommodations. Vaccinated employees also are less likely to get sick or to transmit the coronavirus to other employees. That means fewer delays, cancellations, and logistical puzzles—not to mention lower health risks for United employees. If imposing a shift change is an undue hardship, *see Hardison*, 432 U.S. at 84, imposing a greater risk of disease must be one, too.

Perhaps the plaintiffs can rebut that evidence. But so far, they have not even tried. Their initial brief mentions undue hardship only once, to assert, without explanation, that "United has not seriously alleged or shown" it. United's brief belies that claim; it exhaustively explains why it did not provide alternative accommodations to flight-crew members. Yet the plaintiffs' reply and the majority ignore that evidence, instead casting aspersions that cannot survive even a casual encounter with the facts. Three of those innuendos merit scrutiny.

*First*, the plaintiffs complain, and the majority parrots, that United does not "require its employees based in other countries to get vaccinated—even though those employees work with and come into contact with U.S.-based crews." *Ante* at 3. By that, they imply that United's policy is rank hypocrisy or, worse, a pretext for religious discrimination against its domestic

---

"time-consuming" and "impractical" inquiry into the blade's dangers, and because permitting the plaintiff to work from home "could require coworkers . . . to perform extra work").

App. 64

No. 21-11159

employees.[55]  But United rebutted that precise point in its brief before this court.  "United has been limited by foreign laws in its ability to require (rather than incentivize) vaccination for its international employees," United wrote, citing witness testimony.  The plaintiffs acknowledged that testimony and *did not rebut it*; the majority ignores it.  In any event, forcing United to violate foreign law or to rearrange its crews to avoid all contact between foreign and U.S.-based employees would impose obvious hardships.  *See Hardison*, 432 U.S. at 84.

*Second*, the plaintiffs and the majority fault United for allowing pilots from other airlines to ride in the cockpit jump seat.  *Ante* at 3.  They again imply that the policy reflects United's disdain for its religious employees.  But they again omit contrary facts and ignore the obvious.

Jump seaters are one-off travelers—pilots or flight attendants who need to get to the plane's destination to start their own trips.  Like regular passengers, they don't mix with the flight crew for days at a time.  Their only exposure to the crew is on the flight deck, and they must mask there unless the captain commands otherwise.[56]

Now to the obvious point: Pilots from other airlines are not United's employees.  United cannot require them to vaccinate.  And because jump seat

---

[55] The insinuation of pretext is almost self-refuting.  If United were bent on quashing its employees' religious rights, as the majority believes, one would think that United would press that policy everywhere, not just within our borders.

[56] The captain may call on a jump seater during emergencies.  *See, e.g.*, Alan Levin & Harry Suhartono, *Pilot Who Hitched a Ride Saved Lion Air 737 Day Before Deadly Crash*, Bᴌᴏᴏᴍʙᴇʀɢ (Mar. 19, 2019), https://www.bloomberg.com/news/articles/2019-03-19/how-an-extra-man-in-cockpit-saved-a-737-max-that-later-crashed ("As the Lion Air crew fought to control their diving Boeing Co. 737 Max 8, they got help from an unexpected source: an off-duty pilot who happened to be riding in the cockpit.  That extra pilot, who was seated in the cockpit jumpseat, correctly diagnosed the problem and told the crew how to disable a malfunctioning flight-control system and save the plane.").

App. 65

No. 21-11159

rights arise from contracts among airlines, barring other pilots from United's jump seats would threaten United's ability to transport its own crews.

*Third*, the majority—like the plaintiffs—grumbles that United does not require passengers to vaccinate. *Ante* at 3. The implication is that United does not care whether its planes are safe; safety is just a pretext for United's illegal discrimination against religious employees.

That is absurd. A restaurant's concern for food safety is not pretextual because only cooks, and not customers, must wear hairnets. Likewise, passengers and flight crews are not similarly situated.

Passengers pose less danger to flight-crew members than those employees pose to each other. The plaintiffs do not contest that passengers must mask during flight and do not follow the flight crew throughout their days-long trips. The plaintiffs even stress that the coronavirus does not transmit easily on planes. But that fact, which assumes "diligent mask wearing . . . at all times during the flight," *validates* United's concern about employees' close contacts in the cockpit and outside the aircraft. In those places, United has shown, other measures to mitigate disease are costly, unsafe, or unenforceable. Neither the plaintiffs nor the majority confronts those concerns.

Our plaintiffs point to nothing that could defeat United's defense of undue hardship. That defect by itself precludes preliminary relief.

2.

Title VII prohibits employers from retaliating against employees for "oppos[ing] any [unlawful employment] practice." 42 U.S.C. § 2000e-3(a). To prove retaliation, a plaintiff must show that he opposed such a practice, such as by filing a charge with the EEOC, and that his employer took an adverse employment action *because of that opposition. McCoy v. City of*

App. 66

No. 21-11159

*Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (per curiam).[57]  The plaintiff will lose if his employer can identify "a legitimate, nondiscriminatory . . . reason for its employment action."  *Id.* at 557.

These plaintiffs cannot show retaliation.  United's offer of unpaid leave preceded the plaintiffs' objections to that offer, so those objections could not have "caused" that offer.  *See id.* (requiring "a causal connection . . . between the protected activity and the adverse employment action").  But even if one rejected the laws of time and causality, United placed the plaintiffs on unpaid leave not because they opposed any unlawful employment practice, but because they declined the vaccine.  That is a nondiscriminatory reason for United's policy.

\* \* \* \* \*

If *Drew* applies just as the majority claims, our plaintiffs must show that they are likely to succeed on the merits before we may excuse their failure to exhaust.  As the movants for extraordinary relief, the plaintiffs must carry a heavy burden of persuasion.  *See Black Fire Fighters Ass'n of Dall. v. City of Dall.*, 905 F.2d 63, 65 (5th Cir. 1990).  They have not done that.  They do not counter United's undue-hardship defense, and their retaliation claim is incoherent.  None of that means that the plaintiffs cannot win their case after a trial, but it dictates that they cannot receive preliminary relief.

## V.

But suppose that's all wrong.  Let's pretend that the plaintiffs have overcome every hurdle so far:  They have shown that they may seek an

---

[57] *See also Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) ("Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." (citation omitted)).

App. 67

No. 21-11159

injunction, despite *Sandoval* and despite Title VII's text and structure. They
have established irreparable harm because United put them to an
"impossible choice" between full monetary damages and the coronavirus
vaccine. And they have shown a likelihood of success on the merits, even
though they did not exhaust, as the statute requires, and have not countered
United's defenses.

Even so, we should affirm; the plaintiffs cannot overcome the re-
maining factors required to obtain a preliminary injunction. An injunction
would hurt United far more than it will help the plaintiffs. It also would
disserve the public interest. We should not rush to stop private businesses
from shielding their employees and customers during a global pandemic.

A.

Preliminary relief may not issue if it would hurt the defendant more
than it would help the plaintiff. *Def. Distributed*, 838 F.3d at 459. So it is
here. Even if we assume that the plaintiffs suffered irreparable harm from
the choice between vaccination and full monetary damages, compensation
after trial can redress nearly all their claimed harms. That is not true for
United. An injunction will force United to bear unrecoverable costs that far
exceed the plaintiffs' irreparable harm. The equities disfavor injunctive
relief.

Insofar as these plaintiffs suffer irreparable harm, that harm must be
small. It is not lost wages or benefits; nor is it compensation for emotional
distress, mental anguish, inconvenience, or the like. Money can measure and
compensate all those harms if the plaintiffs win at trial. Nor can the harm be
that they must violate their religious beliefs or their bodily autonomy; the
plaintiffs face unpaid leave only if they adhere to their beliefs and decline the
vaccine.

Under the majority's theory, the only harm that an injunction can fix

68

App. 68

No. 21-11159

arises from whatever part of the "impossible choice" injury that would have accrued from the date the injunction issues. That must be so because a prospective order cannot erase past injuries. Nothing we say can change the fact that the plaintiffs declined the vaccine since United announced its policy. I cannot say which portion of that "injury" arises from the plaintiffs' first refusal, and which from all those that followed.

Is the plaintiffs' decisional injury subject to the law of diminishing returns? Or is each instant where a plaintiff could choose to vaccinate equally soul-searing? In either case, an injunction can redress only a small slice of the plaintiffs' claimed injury.

On the other hand, an injunction will force United to choose whether to maintain its vaccination policy. That choice will inflict significant and unrecoverable costs.

If United persists with its policy, it must place unvaccinated flight-crew members on paid leave. That will cost millions of dollars per month.[58] Those funds are unrecoverable; nothing in the record suggests that the plaintiffs or the putative class can repay those losses if United wins and the injunction is dissolved.[59]

---

[58] William Limacher, United's Vice President for Human Resources, testified that paid leave for just unvaccinated pilots—not flight attendants—would cost the airline $1.4 million every two weeks.

[59] Before an injunction may issue, a movant for preliminary relief must "give[ ] security" to redress the costs of a wrongful injunction. Fed. R. Civ. P. 65(c). But the movant need only post "an amount that the [district] court considers proper." *Id.* That last provision vests vast discretion in the trial court; indeed, we have said that the trial judge "may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) (per curiam) (citations omitted); *see also Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (reaffirming *Corrigan Dispatch*).

The district court required the plaintiffs to post a bond of only a few thousand dol-

App. 69

No. 21-11159

But if United reverses its policy and allows unvaccinated employees to return to work, it must accept greater risks to its employees and its operations. United required vaccination because it would reduce sickness and death among its employees. Even the plaintiffs' experts acknowledge that vaccination reduces the severity and transmission of COVID-19.[60]

Reduced rates of vaccination will cause more sickness and death among employees, disrupting United's operations. And those disruptions will occur even without a surge of illness. Before United's vaccination policy took effect, vaccination status caused conflicts in the cockpit. Those conflicts often ended with one pilot's refusal to fly with the other, which forced United to scramble to find other pilots or to delay or cancel flights. Those problems will recur if United reinstates its unvaccinated employees.

The plaintiffs reply that the balance of harms favors them because United is violating Title VII. Even if that notion were true, it lacks legal significance. We have "expressly reject[ed]" that we must presume that the balance of harms favors the movant when the movant shows he is likely to prevail in the suit. *Def. Distributed*, 838 F.3d at 457 (citation omitted).

----

lars before it issued a temporary restraining order against United. That choice was within the court's discretion, but so small a bond cannot begin to redress the harm that United will suffer if an injunction is granted.

[60] The plaintiffs' experts do not contest the benefits of vaccination. Instead, they argue that United should exempt, from its vaccine requirement, employees who have recovered from a COVID-19 infection. United could accommodate such employees, the theory goes, with regular antibody testing to confirm their immunity.

But even if we assume that accommodation is feasible (and United has made a good case that it's not), there's a problem: Antibody tests would violate the plaintiffs' religious beliefs. The plaintiffs object that a fetal stem-cell line was used to develop the coronavirus vaccines, but antibody tests were developed using the same stem-cell line. When confronted with that fact, both Sambrano and Kincannon admitted that they would not accept antibody testing as an accommodation.

App. 70

No. 21-11159

The plaintiffs then reheat their innuendos. United cannot satisfy the balance of harms, the plaintiffs say, because it does not require foreign employees to be vaccinated, because it allows pilots from other airlines to ride in the jump seat, and so on. I won't plow that barren soil again. Those claims deserve no weight.

The balance of harms disfavors an injunction. The plaintiffs have not shown otherwise.

### B.

An injunction would disserve the public interest. We must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (cleaned up). The majority does not do that. Instead, it all but invites the district judge to obliterate a vaccine requirement designed to protect United's employees and customers during a global pandemic. Doing that at this early stage would be foolish.

We need not decide the wisdom or lawfulness of United's policy to know that making decisions during a crisis is not easy. Businesses large and small have carried that burden since this pandemic began. United is no different. It is a multinational company that employs tens of thousands of persons around the world: pilots, flight attendants, customer service agents, gate employees, ramp operators, ticket sellers, and countless others. When the pandemic struck, passengers vanished, and United's revenue evaporated. United fought for survival. It lost $7 billion in 2020.[61] It also lost many of its

---

[61] Kate Duffy, *United Airlines Lost $7 Billion in 2020, and Burned Through $33 Million Per Day in the Fourth Quarter. It Says 2021 Will Be a 'Transition' Year That Prepares It For Recovery.*, Bus. Insider (Jan. 21, 2021), https://www.businessinsider.com/united-airlines-financial-results-losses-covid-pandemic-scott-kirby-2021-1.

App. 71

No. 21-11159

employees to the coronavirus.

United responded by requiring its employees to vaccinate. Employees who refused were fired, but those with genuine medical and religious objections received accommodations. United tailored those accommodations to the risk that it perceived to each subset of employees. That's why non-customer-facing employees received more generous accommodations—such as remote work or masking-and-testing—than did flight-crew members, whom United placed on unpaid leave.

None of that suggests that United aims to eradicate its employees' religious convictions. The record instead shows a company wrestling with an evolving crisis and choosing an uncertain path forward. If such a choice calls for injunctive relief, it's hard to imagine which choices during this time would not. Granting this injunction would announce to all similarly situated entities that their decisions will be summarily second-guessed. We should not chill life-saving answers to this pandemic.

The majority, if acting as CEO, would have made a different choice for United. That's why the majority erases the usual requisites of preliminary relief, trusting the district court to enact the corporate policy it prefers. Though such aggressive intrusion could prevent some harms, there is far greater danger from inviting unelected judges to dictate, with so little proof and at this early stage, what measures a private business must take to confront an evolving pandemic.

The diffuse experimentation of states, localities, and firms has served the public interest throughout this crisis. Insinuating ourselves into the boardroom will forfeit those benefits.[62]    We "should not intervene to

---

[62] *Cf.* F.A. Hayek, The Constitution of Liberty 83 (Ronald Hamowy,

App. 72

No. 21-11159

establish the basis for future intervention that would be so intrusive and unworkable." *O'Shea*, 414 U.S. at 500.

## VI.

The majority chose not to publish this opinion. That is curious indeed—or maybe not. Under our court's rule governing publication, "opinions that may in any way interest persons other than the parties to a case should be published." 5TH CIR. R. 47.5.1. Unpublishing this case conflicts with nearly every factor highlighted in that rule.

Under Rule 47.5.1, "an opinion is published if it"

- "Establishes a new rule of law . . . ."[63] Check. Ever heard of "ongoing coercion" before? Me neither.
- "[A]lters[ ] or modifies an existing rule of law . . . ."[64] Quintuple check. We now have a *Drew*-sized exception to *Sandoval*'s prohibition on judicially created remedies.[65] The majority extends *Drew* to excuse the nonexhaustion of EEOC remedies,[66] while cutting back *Ross* to make room.[67] *Opulent Life* now means that violating any statute related to a

---

ed., Routledge 2020) (orig. 1960) ("We shall never get the benefits of freedom, never obtain those unforeseeable new developments for which it provides the opportunity, if it is not also granted where the uses made of it by some do not seem desirable . . . . Our faith in freedom does not rest on the foreseeable results in particular circumstances but on the belief that it will, on balance, release more forces for the good than for the bad.").

[63] 5TH CIR. R. 47.5.1(a).

[64] *Id.*

[65] *See supra* Part II.

[66] *See supra* Part IV.A.1.

[67] *See supra* Part IV.A.2.

App. 73

No. 21-11159

constitutional subject creates an irreparable injury.[68] And Title VII plaintiffs who plead ongoing coercion need not show that irreparable injury is likely or even probable; now, we must *presume* irreparable harm.[69]

- "[C]alls attention to an existing rule of law that appears to have been generally overlooked."[70] Check. This majority is the first panel of our court to dust off *Drew* in over forty years.[71]

- "Applies an established rule of law to facts significantly different from those in previous published opinions applying the rule."[72] Check. This is the first time we have applied *Drew* to a case involving religious accommodations.

- "Explains, criticizes, or reviews the history of existing decisional or enacted law."[73] Check. To save *Drew*, the majority explains away *Sandoval*, *Ross*, and *Drew*'s own facts.

- "Creates or resolves a conflict of authority either within the circuit or between this circuit and another."[74] Triple check. Title VII now regulates harms that are "antecedent to, independent from, and exogenous to any adverse employment action"[75]—never mind our decisions recognizing that

---

[68] *See supra* Part III.C.2.b.

[69] *See supra* Part III.C.1.

[70] 5TH CIR. R. 47.5.1(a).

[71] *See Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir. Unit B Sept. 1981).

[72] 5TH CIR. R. 47.5.1(b).

[73] 5TH CIR. R. 47.5.1(c).

[74] 5TH CIR. R. 47.5.1(d).

[75] *Ante* at 16.

App. 74

No. 21-11159

Title VII applies *only* to adverse employment actions.[76]  Forget about *White*, too; Title VII plaintiffs no longer must prove irreparable harm.[77]  And despite our many cases holding that Title VII's exhaustion requirement is absolute, the majority ignores that requirement for this class of plaintiffs.[78]

- "Concerns or discusses a factual or legal issue of significant public interest."[79]  Check.  More people listened to the oral argument here than to any other in this court's history.  That's no surprise.  The national media has closely covered United's vaccination policy and the plaintiffs' challenge to it.[80]  And if you didn't know that vaccine mandates are controversial in this

---

[76] *See supra* Part III.B.2.a.

[77] *See supra* Part III.B.2.a–b.

[78] *See supra* Part IV.A.

[79] 5TH CIR. R. 47.5.1(e).

[80] *See, e.g.*, David K. Li, *United CEO Says Vaccine Mandate Appears to Have Ended Weekly Deaths of Employees from Covid*, NBC NEWS (Jan. 11, 2022), https://www. nbcnews.com/news/us-news/united-ceo-says-vaccine-mandate-appears-ended-weekly-deaths-employees-rcna11760; Sabrina Canfield, *Attorneys Spar over United Airlines Vaccine Mandate at Fifth Circuit*, COURTHOUSE NEWS SERV. (Jan. 4, 2022), https://www. courthousenews.com/attorneys-spar-over-united-airlines-vaccine-mandate-at-fifth-cir cuit; Katherine Hamilton, *Exclusive—United Airlines Outsources Work to Potentially Unvaccinated London Flight Attendants*, BREITBART (Jan 2, 2022), https://www.breit bart.com/politics/2022/01/02/exclusive-united-airlines-outsources-work-potentially-un vaccinated-london-flight-attendants; David Shepardson, *U.S. Appeals Court Declines to Block United Airlines Vaccine Mandate*, REUTERS (Dec. 14, 2021); https://www. reuters.com/business/aerospace-defense/us-appeals-court-declines-block-united-airlines-vaccine-mandate-2021-12-14.

App. 75

No. 21-11159

country[81] and in the courts,[82] you haven't been paying attention.

The rule concludes that "[a]n opinion may also be published if it is accompanied by a concurring or dissenting opinion" or if it "reverses the decision below or affirms it upon different grounds.[83] Check and check.

All told, the majority has disregarded every factor in Rule 47.5.1 but one: The majority's opinion has not been "rendered in a case that has been reviewed previously and its merits addressed by an opinion of the United States Supreme Court"—at least, not yet.[84] 5TH CIR. R. 47.5.1(f). But that should be small comfort: In life, as in baseball, one out of ten falls far short of even the "Mendoza line."[85]

All that leads one to wonder: if the judges in the majority truly believe that their decision is sound, why didn't they publish it?

\* \* \* \* \*

---

[81] *See, e.g.*, Alexa Corse, *Protesters March in Washington Against Covid-19 Vaccine Mandates*, WALL ST. J. (Jan. 23, 2022), https://www.wsj.com/articles/protesters-march-in-d-c-against-covid-19-vaccine-mandates-11642963718; Katie Rogers & Sheryl Gay Stolberg, *Biden Mandates Vaccines for Workers, Saying, "Our Patience Is Wearing Thin*,*"* N.Y. TIMES (Nov. 12, 2021), https://www.nytimes.com/2021/09/09/us/politics/biden-mandates-vaccines.html.

[82] *See, e.g.*, *Biden v. Missouri*, 142 S. Ct. 647 (2022) (per curiam); *NFIB v. Dep't of Labor*, 142 S. Ct. 661 (2022); *Feds for Med. Freedom v. Biden*, No. 21-cv-356, 2022 WL 188329 (S.D. Tex. Jan. 21, 2022).

[83] 5TH CIR. R. 47.5.1.

[84] "[E]ven if that is true now, it does not mean it will always be so." *Ante* at 19 n.14.

[85] "The 'Mendoza Line' is a .200 batting average." *Mendoza Line*, MAJOR LEAGUE BASEBALL, www.mlb.com/glossary/idioms/mendoza-line (last visited Feb. 2, 2022).

App. 76

No. 21-11159

If I ever wrote an opinion authorizing preliminary injunctive relief for plaintiffs without a cause of action,[86] without a likelihood of success on the merits (for two reasons),[87] and devoid of irreparable injury,[88] despite the text, policy, and history of the relevant statute, despite the balance of equities[89] and the public interest,[90] and despite decades of contrary precedent from this circuit and the Supreme Court,[91] all while inventing and distorting facts to suit my incoherent reasoning,[92] "I would hide my head in a bag."[93] Perhaps the majority agrees. Why else shrink behind an unsigned and unpublished opinion?

The greatest danger presented by the majority's opinion is not the dire consequences of its substantive rulings for employment law, religious expression, and pandemic response. Instead, the bigger threat is the use of a new decisionmaking process that reaches a result which—while unavailable under established law—will prove popular in some quarters.

I call this the "one and done" method of decisionmaking. Two judges randomly selected for a panel decide that—for whatever reason—a particular result is correct but can be achieved only by divorcing the opinion from the common-law tradition, by evading precedent, and by obscuring the path in the shroud of an unpublished per curiam opinion. The obvious result is to

---

[86] *See supra* Parts II and III.B.2.a.

[87] *See supra* Part IV.

[88] *See supra* Part III.

[89] *See supra* Part V.A.

[90] *See supra* Part V.B.

[91] *Supra passim.*

[92] *Supra passim.*

[93] *Obergefell v. Hodges*, 576 U.S. 644, 719 n.22 (2015) (Scalia, J., dissenting).

App. 77

No. 21-11159

foster whatever happens to be the "Blue Plate Special" cause on a given day.

"Move along, folks. Nothing to see here. We're doing no damage to the law; this decision is not precedent." Justices of the peace do that every day, hearing the facts and dispensing shade-tree "justice" without need for consistency or predictability because they aren't courts of record (at least not in Texas). The announced result applies only to the two parties; the bailiff then calls "Next case!"

The majority implies that its decision is for this case only.[94] It assures that "[t]his case is rather unique among Title VII cases," *ante* at 13, that "[v]ery few employment suits involve such harms," *id.* at 15, that "such independent harms are rare," *id.*, that "plaintiffs can . . . rarely[ ] establish [such] irreparable harm," *id.* at 16, that "this is one of the 'extraordinary cases,'" *id.* at 21, and that "such cases are extraordinary and rare," *id.* at 21 n.16. Hence, the scenario goes, today's decision is "one and done."[95]

The rub is that by its ruling, this panel majority gives leave for any loose-cannon district judge[96] or future Fifth Circuit majority of two to decide that a cause is so compelling that "the law be damned, we will find a way." What is the hapless trial judge or conscientious advocate to do in the wake of

---

[94] In some quarters, it may seem innocent enough to accept the majority's methodology (i.e., announcing major rulings in an unpublished opinion) for this important case only. But we shouldn't want the Fifth Circuit to get hooked on one-off decisionmaking.

[95] The "unpublished" device is a clever way of avoiding, or at least trying to avoid, en banc review. We have some judges who are disinclined to grant en banc rehearings except in the most extreme situations. The fact that an opinion is unpublished furnishes just another reason to vote to deny en banc scrutiny. But by today's ruling, the Good Ship Fifth Circuit is afire. We need all hands on deck.

[96] If there are no such district judges in this circuit today, someday there could be jurists who are delighted that Supreme Court and Fifth Circuit precedent of which they aren't fond need not be followed.

App. 78

No. 21-11159

such a methodology?

In one way, it is fortunate that this case is not precedential. If it were, it could spawn countless misdirections in the law of Title VII and beyond. But published or not, the opinion is grave error: The majority, with what I'm sure are the most wholesome intentions, junks facts, text, history, and precedent, resulting in a one-off change in the law that alters the result for these parties.

One might suspect that my esteemed colleagues hope that no one will take their unpublished opinion as meaningful, except to the extent that it affects the immediate parties to this interlocutory appeal.[97] But as I have shown, the consequences for our jurisprudence and for our court's longstanding mode of decisionmaking are far greater. "[Textualism] for me, but not for thee, is not [textualism] at all." *Cole v. Carson*, 935 F.3d 444, 479 (5th Cir. 2019) (en banc) (Ho and Oldham, JJ., dissenting).[98]

---

[97] It's easy to tell where this panel majority—given the opportunity—would go on the merits. "United's bizarre inquisition into the sincerity of its employees' beliefs is somewhat at odds with our usual approach of taking parties at their word regarding their own religious convictions." *Ante* at 3 n.2. "Plaintiffs credibly contend that United sent postcards rather than letters [to employees' homes] in order to broadcast employees' unvaccinated status to family members and enlist those family members in coaxing employees to receive the vaccine." *Id.* at 4. "United has presented plaintiffs with two options: violate their religious convictions or lose all pay and benefits indefinitely. That is an impossible choice for plaintiffs who want to remain faithful but must put food on the table. In other words, United is actively coercing employees to abandon their convictions." *Id.* at 19 (footnote omitted).

[98] This is no personal criticism of my two conscientious co-panelists, who serve with integrity, dedication, and skill. It's a main reason we have panels of three, allowing for honest differences on matters large and small.

App. 79

No. 21-11159

I respectfully but sternly dissent.[99]

---

[99] There's a much easier, straightforward way to resolve this appeal of the denial of a preliminary injunction. Like the district court, the motions panel majority got it exactly right. The motions panel did so in one comprehensive sentence: "IT IS ORDERED that Appellants' opposed motion for an injunction pending appeal is DENIED for the reasons stated in the district court's Opinion & Order of November 8, 2021 and Orders of November 19, 2021 and November 23, 2021." *Sambrano*, 19 F.4th at 839 (per curiam) (citation omitted). This merits panel could do the same, affirming the denial of injunctive relief and returning this matter to the district court for a badly needed resolution on the merits.

App. 80

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

February 17, 2022

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

        No. 21-11159   Sambrano v. United Airlines
                       USDC No. 4:21-CV-1074

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and 5th Cir. R. 35, 39, and 41
govern costs, rehearings, and mandates.  **5th Cir. R. 35 and 40
require you to attach to your petition for panel rehearing or
rehearing en banc an unmarked copy of the court's opinion or order.**
Please read carefully the Internal Operating Procedures (IOP's)
following Fed. R. App. P. 40 and 5th Cir. R. 35 for a discussion
of when a rehearing may be appropriate, the legal standards applied
and sanctions which may be imposed if you make a nonmeritorious
petition for rehearing en banc.

Direct Criminal Appeals.  5th Cir. R. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari.**  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

App. 81

The judgment entered provides that each party bear its own costs on appeal.

                                    Sincerely,

                                    LYLE W. CAYCE, Clerk

                                    By: _____
                                    Nancy F. Dolly, Deputy Clerk

Enclosure(s)

Mr. H. Christopher Bartolomucci
Mr. Russell Daniel Cawyer
Mr. Brian Field
Mr. Alexander Virgil Maugeri
Mr. Hashim M. Mooppan
Mr. Donald James Munro
Mr. Mark R. Paoletta
Mr. Joshua James Prince
Mr. Gene C. Schaerr
Mr. Esteban Shardonofsky
Mr. John Clay Sullivan
Mr. Robert C. Wiegand

App. 82

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*, | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. 4:21-01074-P |
| v. | § | |
| | § | |
| UNITED AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

## <u>DECLARATION OF NATALIE JAMES</u>

I, Natalie James, declare as follows:

1.     My name is Natalie James.  I am employed by United Airlines, Inc. ("United") as a Senior Manager for Human Resources & Employee Relations.

2.     Attached as Exhibit 1, please find a true and correct copy of United's November 9, 2021 Notice provided to pilots that details updates to United's reasonable accommodation process.

3.     Attached as Exhibit 2, please find a true and correct copy of United's November 9, 2021 Notice provided to flight attendants that details updates to United's reasonable accommodation process.

4.     Attached as Exhibit 3, please find a true and correct copy of correspondence between Captain David Sambrano and me on January 20, 2022 and January 21, 2022, regarding a special assignment that was offered to Captain Sambrano.

5.     Neither Captain Sambrano nor Ms. Kincannon has accepted United's offer of preferential rights to available non-customer-facing positions, and instead both have elected to remain on unpaid leave.

App. 83

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2022.

Natalie James

App. 84

EXHIBIT 1

# Your reasonable accommodation update



Dear United Pilot,

As a Pilot at United, your role requires in-person interactions with a large number of people every day. That's why, for your safety and the safety of the customers and employees around you, we previously communicated that you would be placed on a temporary personal or medical leave of absence as an accommodation to United's COVID-19 vaccination requirement under the reasonable accommodation program (RAP). Below are some important updates about your RAP:

**Leave of Absence**

You will be placed on either a personal or medical leave of absence starting November 12, 2021 subject to the provisions of your Collective Bargaining Agreement. You will remain in this temporary leave status until you are able to safely return to work in your current pilot position, as outlined below. Please visit Help Hub for additional information on medical leaves of absence if you have a Medical RAP and personal leaves of absence if you have a Religious RAP.

**Alternative Accommodations**

As an alternative to a leave of absence, you are eligible to apply for and secure a non-customer facing job. As part of your approved RAP status, you will have preferred consideration for open non-customer facing roles.[1] You are encouraged to apply to these open positions and you can subscribe to automated updates about job availability within certain functional areas and/or location. **You must use this link to ensure you are identified as an internal RAP candidate with preferential rights to the job:**

**https://ft.ual.com/employee-services/careeropportunities/availableopportunities**

App. 86

If you meet the minimum requirements for the role, you will be placed in that role and required to follow the safety protocols for non-customer facing roles, including masking and twice weekly testing.

To initiate this alternative accommodation process, you need to use the above link to identify a position and indicate that you meet the minimum qualifications. Someone from Talent Acquisition will then reach out to you and assist with next steps. You will be expected to complete all requirements for the job including any assessments and training. If you move into a non-customer facing role, you will be subject to the terms and conditions of employment for that job, including the relevant pay and benefits. More information regarding pay and benefits can be found within each job posting.

The onboarding process for a non-customer facing role can take some time due to, among other things, the regulatory constraints imposed by the clearance process for many of these roles. Given this potential delay, you will remain in your applicable leave of absence status until the transition process to any non-customer facing job is complete.

If you transfer to a non-customer facing job, you may have rights to return to your current position pursuant to your Collective Bargaining Agreement when the pandemic metrics are met for your current work area and/or work location (as outlined in the communication you received on October 25, 2021 and detailed below).

**Duration of Accommodation**

Your accommodation as described above will extend until it is safe for you to return to your current position. As noted in a communication to you on October 25, United is using the U.S. community transmission rate published daily by the CDC as well as nationwide daily case counts when making the determination on when it is safe for accommodated employees to return to their regular job. Additional details for these metrics are included below:

| Employee Group | Meaningfully Recede Metric Guidance |
| --- | --- |
| **For crew (flight attendants & pilots):** | Since crew travel across the U.S., we will use national data. |
| | ***Nationwide daily case count must be at or below 10,000 per day for at least 21 consecutive days.*** |
| | The nationwide daily case count on Oct. 28 was 68,792, which is a reduction from 78,556 from Oct. 21. However, should the nationwide daily count exceed 15,000 per day for 7 consecutive days, you will be returned to unpaid leave. |

Given the dynamic nature of the COVID-19 pandemic, we will review these metrics every 30 days and take into account any additional guidance from the CDC, state and/or local public health authorities. Please note that even when the "meaningfully recede" metric is met on a local or national level, other safety accommodations may continue to apply, including masking and regular COVID-19 testing and restrictions on flying based on requirements for the destinations we serve.

**Additional Time to Get Vaccinated**

App. 87

If your circumstances have changed and you would like to continue working in your Pilot role, you may choose to get either a one-shot vaccine or the first shot of a two-dose vaccine and upload your vaccine card **prior to 5 p.m. CST on Nov. 11, 2021.** You must get your second dose of a two-dose vaccine and upload your vaccine card **prior to 5 p.m. CST on Dec. 16, 2021** in order to be fully compliant with United's policy. If you choose to get vaccinated and report your status after the November 11th deadline, you will be returned to service as soon as administratively possible after uploading proof of full vaccination to My Info.

If you have any questions, please visit Help Hub.

[1]You will be provided the preferred consideration for any non-customer facing front-line role and select available management and administrative positions. If more than one person expresses interest in a role with limited openings, the most qualified person will be placed in the role.

4

App. 88

EXHIBIT 2

## Your reasonable accommodation update



Dear United Flight Attendant,

As a Flight Attendant at United, your role requires in-person interactions with a large number of people every day. That's why, for your safety and the safety of the customers and employees around you, we previously communicated that you would be placed on a temporary personal or medical leave of absence as an accommodation to United's COVID-19 vaccination requirement under the reasonable accommodation program (RAP). Below are some important updates about your RAP:

**Leave of Absence**

You will be placed on either a personal or medical leave of absence starting November 16, 2021 subject to the provisions of your Collective Bargaining Agreement. On November 12, 2021 we will remove trips departing on or after November 16, 2021. If you have a trip that departs prior to November 16, 2021 and extends onto or past November 16, 2021, you may continue to work that trip and you will be placed on leave once that trip is completed. You will remain in this temporary leave status until you are able to safely return to work in your current Flight Attendant position, as outlined below. Please visit Help Hub for additional information on medical leaves of absence if you have a Medical RAP and personal leaves of absence if you have a Religious RAP.

**Alternative Accommodations**

As an alternative to a leave of absence, you are eligible to apply for and secure a non-customer facing job. As part of your approved RAP status, you will have preferred consideration for open non-customer facing roles, including but not limited to: Ramp Service, Storekeeper, Technician, Reservations Sales and Services Representative and some Management and Administrative positions.[1] You are encouraged to apply to these open positions, and you can subscribe to automated updates about job availability within certain functional areas and/or location. **You must use this link to ensure you are identified as an internal RAP candidate with preferential rights to the job:**

**https://ft.ual.com/employee-services/careeropportunities/availableopportunities**

If you meet the minimum requirements for the role, you will be placed in that role and required to follow the safety protocols for non-customer facing roles, including masking and twice weekly testing.

App. 90

To initiate this alternative accommodation process, you need to use the above link to identify a position and indicate that you meet the minimum qualifications. Someone from Talent Acquisition will then reach out to you and assist with next steps. You will be expected to complete all requirements for the job including any assessments and training. If you move into a non-customer facing role, you will be subject to the terms and conditions of employment for that job, including the relevant pay and benefits. More information regarding pay and benefits can be found within each job posting.

The onboarding process for a non-customer facing role can take some time due to, among other things, the regulatory constraints imposed by the clearance process for many of these roles. Given this potential delay, you will remain in your applicable leave of absence status until the transition process to any non-customer facing job is complete.

If you transfer to a non-customer facing job, you may have rights to return to your current Flight Attendant position pursuant to your Collective Bargaining Agreement when the pandemic metrics are met for your current work area and/or work location (as outlined in the communication you received on October 25, 2021 and detailed below). We recommend that you consult with your union about how a transfer to another position within United may impact your seniority and/or your ability to return to the Flight Attendant position.

**Duration of Accommodation**

Your accommodation as described above will extend until it is safe for you to return to your current position. As noted in a communication to you on October 25, United is using the U.S. community transmission rate published daily by the CDC as well as nationwide daily case counts when making the determination on when it is safe for accommodated employees to return to their regular job. Additional details for these metrics are included below:

| Employee Group | Meaningfully Recede Metric Guidance |
| --- | --- |
| **For crew (flight attendants & pilots):** | Since crew travel across the U.S., we will use national data.<br><br>***Nationwide daily case count must be at or below 10,000 per day for at least 21 consecutive days.***<br><br>The nationwide daily case count on Oct. 28 was 68,792, which is a reduction from 78,556 from Oct. 21. However, should the nationwide daily count exceed 15,000 per day for 7 consecutive days, you will be returned to unpaid leave. |

Given the dynamic nature of the COVID-19 pandemic, we will review these metrics every 30 days and take into account any additional guidance from the CDC, state and/or local public health authorities. Please note that even when the "meaningfully recede" metric is met on a local or national level, other safety accommodations may continue to apply, including masking and regular COVID-19 testing and restrictions on flying based on requirements for the destinations we serve.

**Additional Time to Get Vaccinated**

If your circumstances have changed and you would like to continue working in your Flight Attendant role, you may choose to get either a one-shot vaccine or the first shot of a two-

App. 91

dose vaccine and upload your vaccine card **prior to 5 p.m. CST on November 11, 2021.** You must get your second dose of a two-dose vaccine and upload your vaccine card **prior to 5 p.m. CST on December 16, 2021** in order to be fully compliant with United's policy. If you choose to get vaccinated and report your status after November 11th, you will be returned to service as soon as administratively possible after uploading proof of full vaccination to My Info.

If you have any questions, please visit Help Hub.

---

[†]*Available Management and Administrative positions are levels 8 and 9. If more than one person expresses interest in a role with limited openings, the most qualified person will be placed in the role.*

App. 92

EXHIBIT 3

**From:** Sambrano, David <david.sambrano@united.com>
**Sent:** Friday, January 21, 2022 4:28 PM
**To:** James, Natalie <Natalie.James@united.com>
**Cc:** Emden, Philip <philip.emden@united.com>; Galbraith, Rob <rob.galbraith@united.com>
**Subject:** Re: SA Assignment

Good afternoon Natalie,

Thank you for reaching out to me. As I told Rob Galbraith, this I not the right time or opportunity.

Regards, Dave

**Captain David Sambrano**

---

**From:** James, Natalie <Natalie.James@united.com>
**Sent:** Thursday, January 20, 2022 08:21
**To:** Sambrano, David <david.sambrano@united.com>
**Cc:** Emden, Philip <philip.emden@united.com>; Galbraith, Rob <rob.galbraith@united.com>
**Subject:** SA Assignment

Dear Captain Sambrano:

I am the Human Resources Busines Partner who supports Flight Operations and assisted Rob Galbraith, Director Flight Operations Line Operations, with the special assignment offer you received. I am writing to follow-up on that offer. As you know, you have been granted an accommodation from United's vaccine requirement based on your religion. Under the current terms of that accommodation, you must remain on unpaid leave until the metrics described in United's October 25, 2021 notice have been met. You also have preference for any available non-customer facing position, as outlined in the notice dated November 9, 2021.

On Monday, January 3, 2022, as a further accommodation, Captain Galbraith offered you a non-customer facing special assignment in Flight Operations. As he explained, the compensation for this position is 90 hours per month at your hourly rate of pay (totaling approximately $399,000 per year) and qualifies for the same benefits as your previous position. You were offered this special assignment because of the unique skills and experience that you have from your prior management roles, and because we concluded that you are otherwise fully qualified for the job.

You informed Captain Galbraith that you declined this offer on Monday, January 10, 2022. I understand that your father is or was in the hospital and you are or were caring for him. I wanted to make clear that the special assignment that Captain Galbraith offered to you is a remote position that also can include some flexibility in terms of when you would need to work and complete assignments. In addition, if you returned to active status and need to care for your ill father, you may be entitled to leave pursuant to the Family and Medical Leave Act. If this clarification leads you to conclude that you would like to accept this offer of special assignment, please let me know by 5 pm central on January 21. After that time period we will pursue other candidates.

If you do not accept the remote position , you will remain on unpaid leave, subject to the terms specified in the October 25 notice. United otherwise reserves all applicable rights, including but not limited to further modifications of the duration or terms of your current accommodation if necessary and appropriate.

If you have any questions regarding this matter, please contact me or Captain Galbraith.

Best regards,
Natalie James

**Natalie W. James, PHR, SHRM CP**
**Senior Manager, Human Resources & Employee Relations**

United Airlines | Willis Tower, 233 S. Wacker Drive, 23rd Flr  - WHQHR | Chicago, IL  60606
Tel 872.825.4818 | Mobile 847.508.4692 | **natalie.james@united.com**



App. 95