**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **DAVID SAMBRANO, et al., individually, and on behalf of all others similarly situated,** | § § § § § | |
| | § | **Civil Action No.** |
| **Plaintiffs,** | § § | **4:21-CV-01074-P** |
| **v.** | § § | |
| **UNITED AIRLINES, INC.,** | § § | |
| | § | |
| **Defendant.** | | |

**APPENDIX IN SUPPORT OF DEFENDANT'S**
**MOTION TO TRANSFER VENUE AND BRIEF IN SUPPORT**

NOW COMES, Defendant United Airlines, Inc. and files this Appendix in Support of Its Motion to Transfer Venue and Brief in Support.

Ex. A    Declaration of Kirk Limacher ....................................................... App. 1 - 2

Ex. B    Complaint and Demand for Jury Trial,
*Anderson et al v. United Airlines, Inc.,*
1:23-cv-00989, No. 1-1 (N.D. Ill. Feb. 17, 2023) ...................... App. 3 - 68

Ex. C    Defndant's Motion to Dismiss Third Amended Complaint,
*Anderson et al. v. United Airlines, Inc.,*
3:21-cv-01050, No. 45 (M.D. Fla. Jan. 12, 2022) ................... App. 69 - 104

Ex. D    Declaration of Kirk Limacher,
*Anderson et al. v. United Airlines, Inc.,*
3:21-cv-01050, No. 45-1 (M.D. Fla. Jan. 12, 2022) ............. App. 105 - 109

Ex. E    Notice of Viluntary Dismissal Without Prejudice,
*Anderson et al. v. United Airlines, Inc.,*
3:21-cv-01050, No. 59 (M.D. Fla. Mar. 29, 2022) ........................App. 110

Ex. F    Plaintiff's Complaint,
*Caraffa v. United Airlines, Inc.,*
1:23-cv-01800, No. 1 (N.D. Ohio Sep. 15, 2023) ................. App. 111 - 124

Ex. G          Order Denying Motion for Leave to Amend and Directing Entry
               of Judgment, *Ellis v. United Airlines,*
               1:23-cv-00123, No. 36 (N.D. Ill. Oct. 18, 2023) ............................App. 125

Ex. H          Defendant's Motion to Dismiss with Incorporated Memorandum
               of Law, *Engstrom v. Air Line Pilots Association, International,*
               6:22-cv-02130, No. 48 (M.D. Fla. Jun. 1, 2023) .................. App. 126 - 150

Ex. I          Order granting Motion to Transfer Venue,
               *Hassett v. United Airlines Incorporated,*
               4:23-cv-00960, No. 34 (N.D. Tex. Oct. 5, 2023).................. App. 151 - 155

Ex. J          Notice of Dismissal Pursuant to Federal Rules of Civil
               Procedure 41(a), *Myers v. United Airlines, Inc.,*
               1:23-cv-11113, No. 7 (D. Mass. Aug. 30, 2023) ............................App. 156

Ex. K          Complaint, *Oka v. United Airlines, Inc.,*
               2:23-cv-00135, No. 1 (E.D. Ky. Oct. 3, 2023) .................... App. 157 - 179

Ex. L          Complaint, *Soto v. United Airlines, Inc.,*
               2:23-cv-02148, No. 1 (E.D. Cal. Sep. 27, 2023)................... App. 180 - 190

Ex. M          Order on Defendant's Motion to Transfer Vneue,
               *Wickstrom v. United Airlines Master Executive Council,*
               1:23-cv-02631, No. 31 (N.D. Ill. Apr. 25, 2023)................. App. 191 - 201

Respectfully submitted,

_____/s/ Russell D. Cawyer_____

Donald J. Munro                          Jordan M. Matthews
D.C. Bar No. 453600                      IL Bar No. 6300503
Jones Day                                JONES DAY
51 Louisiana Avenue, NW                  77 W. Wacker Drive, Suite 3500
Washington, DC 20001                     Chicago, Illinois 60601
Telephone: (202) 879-3939                Telephone: (312) 782-3939
Facsimile: (202) 626-1700                Facsimile: (312) 782-8585
Email: dmunro@jonesday.com               Email: jmatthews@jonesday.com

Russell D. Cawyer
State Bar No. 00793482
Taylor J. Winn
State Bar No. 24115960
**Kelly Hart & Hallman LLP**
201 Main St., Ste. 2500
Fort Worth, Texas  76102
(817) 878-3562 (telephone)
(817) 335-2820 (facsimile)
Email: russell.cawyer@kellyhart.com
Email: taylor.winn@kellyhart.com

Alexander V. Maugeri
NY Bar No. 5062666
Jones Day
250 Vesey Street
New York, NY  10281-1047
Telephone: (212) 326-3880
Facsimile: (212) 755-7306
Email: amaugeri@jonesday.com

**ATTORNEYS FOR DEFENDANT
UNITED AIRLINES, INC.**

### CERTIFICATE OF SERVICE

On October 24, 2023, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

/s/ *Russell D. Cawyer*
Russell D. Cawyer

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DAVID SAMBRANO, *et al.*, individually, and on behalf of all others similarly situated, | § § § | |
| Plaintiffs, | § § | Civil Action No. |
| v. | § § | 4:21-CV-01074-P |
| UNITED AIRLINES, INC., | § § | |
| Defendant. | § § | |

<u>DECLARATION OF KIRK LIMACHER</u>

1.      My name is Kirk Limacher. I am over the age of eighteen and am competent to provide this Declaration.

2.      I am currently employed by United Airlines, Inc. ("United") as its Vice President Flight Operations Planning & Development in Chicago, Illinois.

3.      I submit this Declaration in support of United's Motion to Transfer Venue. The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided by individuals working with me or under my supervision, or my opinion based on my experience, knowledge, and information regarding matters related to United and its policies. If called to testify, I could and would competently testify to the facts set forth in this Declaration.

4.      I am familiar with the Plaintiffs in the above-captioned action (*i.e.*, "the *Sambrano* Plaintiffs") as well as Plaintiffs' proposed putative class members.

5.      The documentation and records relevant to the *Sambrano* litigation, including employment records and reasonable accommodation files, are maintained in Illinois.   The vast majority of witnesses who made decisions regarding the *Sambrano* Plaintiffs' and putative class

- 1 -



APP. 1

members' employment, as well as United's Employee Service Center are located in Chicago, Illinois. The Employee Service Center processes accommodations, administers leaves of absence, and implements and/or administers other relevant policies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⎯23⎯ day of October, 2023, in Chicago, Illinois.

Kirk Limacher
Vice President Flight Operations Planning & Development

APP. 2

# EXHIBIT 1

**EXHIBIT**

**B**

All Law Division initial Case Management Dates will be heard via Zoom.

Case: 1:23-cv-00989 Document #: 12-1 Filed: 03/17/23 Page 2 of 66 PageID #:8

For more information, see the Court's website at ...

Case: 4:23-cv-00110-P Document #: 21 Filed: 10/24/23 Page 7 of 204_SealeD #: 6273

Remote Court date: 4/12/2023 9:00 AM

FILED DATE: 1/19/2023 2:01 PM   2023L000571

FILED
1/19/2023 2:01 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L000571
Calendar, W
21110899

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT, LAW DIVISION

THOMAS ANDERSON, JAMES BREITSPRECHER, LORA BAUER, KEVIN CAMPBELL, DAVID CATALA, JAMES CURTIS, NICHOLAS DECKER, AIMEE DOLL, TOM FLOYD, KEVIN HENDERSHOT, THAD KRUPA, KENNETH LOCKE, BRENDA MALLETT, BRENDA MARSDEN, SYLVIA FITCH-MCCONNELL, MICHELE MILLER, JOHN MORRIS, CAROLE O'KOBRICK, STEPHANIE PATI, FRANK QUINTAS, PAUL ROZELL, DARLEEN SHANLEY-GILBERT, RICHARD SHERLOCK, RANDY SIKORA, CHARLES SNYDER, JOHN SULLIVAN, DOUG TURNER, RHETT WOLFF, JAMES ZIETLOW, KEVIN ZWIERKO, individuals,

              Plaintiffs,

    v.

UNITED AIRLINES INC., a Delaware corporation, and SCOTT KIRBY, BRETT J. HART, KATE GEBO, JOSH EARNST, GREGORY HART, LINDA JOJO, GERALD LADERMAN, ANDREW NOCELLA, JANET LAMKIN, JONATHAN M. ROITMAN, JOHN SLATER, TORBJORN J. ENQVIST, THERESA FARIELLO, SASHA JOHNSON, BRYAN QUIGLEY, KIRK LIMACHER, EDWARD M. PHILIP, CAROLYN CORVI, MATTHEW FRIEND, MICHAEL J. HAMILTON, MICHAEL HARRISON,

|  | Cause No. |
|---|---|

**COMPLAINT** AND **DEMAND FOR JURY TRIAL**

FILED DATE: 1/19/2023 2:01 PM   2023L000571

BARNEY HARFORD, MICHELE J.
HOOPER, TODD M. INSLER,
WALTER ISAACSON, RICHARD
JOHNSEN, JAMES A.C. KENNEDY,
EDWARD L. SHAPIRO, DAVID J.
VITALE, JAMES M. WHITEHURST,
LAYSHA WARD, individuals,

Defendants.

## **NATURE OF THE CASE**

1.     Plaintiffs are unvaccinated[1] pilots, flight attendants, ramp service workers, mechanics, technicians, customer service representatives (CSRs) and other ground staff of United Airlines, Inc. ("United") who have been fired, placed on unpaid leave, or otherwise had their careers at United limited or terminated without just compensation.  Plaintiffs have all submitted, or attempted to submit requests for religious accommodations that would have allowed them to continue working at United without receiving coronavirus vaccinations, and all Plaintiffs have natural immunity from the disease.

2.     This is an action for legal and equitable relief to redress Defendants' invasions of privacy, negligence, failure to accommodate, religious discrimination, creation of a hostile work environment, violations of the Genetic Information Non-Disclosure Act ("GINA") and otherwise wrongful conduct that was perpetrated, encouraged, and condoned by Defendants.  Such wrongful conduct was predicated on Defendants' unlawful discrimination, harassment, and retaliation against Plaintiffs based on their requests for religious accommodations from Defendants' coronavirus vaccine mandate.

---

[1] Some plaintiffs may have been coerced into taking one or more COVID-19 vaccine injections.  But all plaintiffs are considered unvaccinated by United, and all plaintiffs have suffered and continue to suffer the harms described in this complaint.

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 5

FILED DATE: 1/19/2023 2:01 PM   2023L000571

3.    Specifically, this lawsuit is grounded in Defendants' willful, wanton, and blatant disregard of Plaintiffs requests for religious accommodations from Defendants' execution of the novel coronavirus vaccine mandate and subsequent termination on discriminatory grounds.    Such a willful disregard of this magnitude flies in the face of one of our countries founding freedoms; the freedom of religion.

4.    This lawsuit also seeks declaratory relief from the Defendants' vaccine mandate on the basis that Defendants' conduct was indistinguishable from that of a state actor and Defendants' vaccine mandate, as applied, violates privacy, equal protection and due process protections secured by both the Constitution of Illinois and the Constitution of the United States.

5.    Defendants    used    deception,    discrimination,    psychological manipulation,  and  physical  isolation  to  force  Plaintiffs,  under  threat  of termination, to participate in a dangerous social and medical experiment.

6.    Defendants, have made Plaintiffs second-class citizens within the company and targeted them in a campaign of harassment designed to force plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy.  Defendants' vaccine mandate was illegally constituted, lacked a learned intermediary, and it engendered a hostile working environment for Plaintiffs.  Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never wanted to make; take an experimental gene-based therapy  at  the  expense  of  their  religious  beliefs  and/or  health  or  lose  their livelihoods and the means by which they provide for their families.

7.    In some cases, Defendants wrongfully terminated Plaintiffs who correctly requested religious accommodations.  In other cases, Defendants placed Plaintiffs who correctly filed for religious exemptions on indefinite unpaid leave (termination  in  place)  with  an  ever-present  possibility  of  termination  and characterized this as a 'reasonable accommodation'.  In other cases, Defendants granted Plaintiffs religious 'accommodation' and immediately proceeded to create a hostile work environment by forcing Plaintiffs to wear individually identifiable

FILED DATE: 1/19/2023 2:01 PM   2023L000571

symbols distinguishing them from their peers and gave public disclosure of their private and protected health information.

8.    Even after Defendants allowed some Plaintiffs to return to work, a toxic and hostile work environment, where isolation, open discrimination, and the enforced use of individually identifiable political symbols remained.

9.    Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the vaccine without any information on the potential risks or benefits. Several Plaintiffs (and other United employees) have suffered adverse side-effects and harm as a result of submitting to the vaccine.  In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects.

10.    These risks may even extend to Defendants' customers if pilots who submitted to Defendant pressure to take the vaccines suffer health effects while flying.[2]

11.    A number of Plaintiffs were constructively discharged and took early retirement to escape the hostile work environment during this period.  This suit is further brought to redress the harms Defendants have dispassionately brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved.

## **PARTIES**

12.    Plaintiff, Thomas Anderson is an individual and employee or former employee of United.

13.    Plaintiff, James Breitsprecher is an individual and former employee of United for 22 years, working as a 777 First Officer. He was twice furloughed by United. He applied for a religious exemption, but it was denied and he was

---

[2] See, Hoft, Jim. "Pilot dies suddenly after collapsing shortly after takeoff from Chicago airport," *Gateway Pundit.*  November 22, 2022 (detailing sudden death of a vaccinated pilot for another airline while in flight; only the skill of a copilot saved the lives of dozens of passengers).

FILED DATE: 1/19/2023 2:01 PM    2023L000571

subsequently terminated for choosing not to submit to COVID-19 vaccine. He also served as United States Navy SEAL for 9 years.

14. Plaintiff, Lora Bauer is an individual and employee or former employee of United.

15. Plaintiff, Kevin Campbell is an individual and former employee of United for 37 years, working as an aircraft technician/inspector. He was granted a religious exemption but was terminated shortly thereafter due to "non-compliance."

16. Plaintiff, David Catala is an individual and employee or former employee of United.

17. Plaintiff, James Curtis is an individual and employee or former employee of United.

18. Plaintiff, Nicholas Decker is an individual and employee or former employee of United.

19. Plaintiff, Aimee Doll is an individual and employee **or** former employee of United.

20. Plaintiff, Tom Floyd is an individual and employee or former employee of United.

21. Plaintiff, Kevin Hendershot is an individual and employee or former employee of United.

22. Plaintiff, Thad Krupa is an individual and employee or former employee of United.

23. Plaintiff, Kenneth Locke is an individual and employee or former employee of United.

24. Plaintiff, Brenda Mallett is an individual and employee or former employee of United.

25. Plaintiff, Brenda Marsden is an individual and employee or former employee of United.

26. Plaintiff, Sylvia Fitch-McConnell is an individual and employee or former employee of United.

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 8

27. Plaintiff, Michelle Miller is an individual and employee or former employee of United.

28. Plaintiff, John Morris is an individual and employee or former employee of United.

29. Plaintiff, Carole O'Kobrick is an individual and employee or former employee of United.

30. Plaintiff, Stephanie Pati is an individual and employee or former employee of United.

31. Plaintiff, Frank Quintas is an individual and employee or former employee of United.

32. Plaintiff, Paul Rozell is an individual and former employee of United for 27 years, working as a ramp services agent. He made multiple attempts to apply for a religious exemption, but he purportedly missed United's arbitrarily imposed deadline. He was terminated for choosing not to submit to a COVID-19 vaccine.

33. Plaintiff, Darleen Shanley-Gilbert is an individual and employee or former employee of United.

34. Plaintiff, Richard Sherlock is an individual and employee or former employee of United.

35. Plaintiff, Randy Sikora is an individual and employee or former employee of United.

36. Plaintiff, Charles Snyder is an individual and employee or former employee of United.

37. Plaintiff, John Sullivan is an individual and employee or former employee of United.

38. Plaintiff, Doug Turner is an individual and employee or former employee of United.

39. Plaintiff, Rhett Wolff is an individual and employee or former employee of United.

40. Plaintiff, James Zietlow is an individual and employee or former employee of United.

FILED DATE: 1/19/2023 2:01 PM    2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

41.   Plaintiff, Kevin Zwierko is an individual and employee or former employee of United.

42.   Defendant, United Airlines, Inc. ("United") is a corporation formed under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. United is a major American airline that operates a large domestic and international route network with a fleet of roughly 834 aircraft and approximately 67,000 employees.

43.   Defendant, Scott Kirby is an individual and Chief Executive Officer of United.

44.   Defendant, Brett J. Hart is an individual and President of United.

45.   Defendant, Kate Gebo is an individual and Executive Vice President for Human Resources and Labor Relations at United.

46.   Defendant, John Slater is an individual and Senior Vice President of Inflight at United.

47.   Defendant, Josh Earnst, is an individual and Senior Vice President and Chief Communications Officer at United.

48.   Defendant, Gregory (Greg) Hart is an individual and Executive Vice President at United.

49.   Defendant, Linda JoJo is an individual and Executive Vice President and Chief Customer Officer at United.

50.   Defendant, Gerald (Gerry) Laderman is an individual and Executive Vice President and Chief Financial Officer at United.

51.   Defendant, Andrew Nocella is an individual and Executive Vice President and Chief Commercial Officer at United.

52.   Defendant, Janet Lamkin is an individual and Senior Vice President for Market and Community Innovation at United.

53.   Defendant, Jonathan M. Roitman is an individual and departed Executive Vice President and Chief Operating Officer at United.

54.   Defendant Torbjorn (Toby) J. Enqvist is an individual and   Executive Vice President and Chief Operations Officer at United.

FILED DATE: 1/19/2023 2:01 PM  2023L000571

55.  Defendant Theresa (Terry) Fariello is an individual and Senior Vice President, Government Affairs and Global Public Policy at United.

56.  Defendant, Sasha Johnson is an individual and Vice President of Corporate Safety at United.

57.  Defendant, Bryan Quigley is an individual and Senior Vice President of Flight Operations at United.

58.  Defendant, Kirk Limacher is an individual and the Vice President of Human Resources at United.

59.  Defendant, Edward M. Philip is an individual and Board Member of United.

60.  Defendant, Carolyn Corvi is an individual and Board Member of United.

61.  Defendant, Matthew Friend is an individual and Board Member of United.

62.  Defendant, Michael J. Hamilton is an individual and a departed Board Member of United.

63.  Defendant, Michael Harrison is an individual and acting Board Member of United.

64.  Defendant, Barney Harford is an individual and Board Member of United.

65.  Defendant, Michele J. Hooper is an individual and Board Member of United.

66.  Defendant, Todd M. Insler is an individual and departed Board Member of United.

67.  Defendant, Walter Isaacson is an individual and Board Member of United.

68.  Defendant, Richard Johnsen is an individual and Board Member of United.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

69. Defendant, James A.C. Kennedy is an individual and Board Member of United.

70. Defendant, Edward L. Shapiro is an individual and Board Member of United.

71. Defendant, David J. Vitale is an individual and departed Board Member of United.

72. Defendant, James M. Whitehurst is an individual and Board Member of United.

73. Defendant, Laysha Ward is an individual and Board Member of United.

## MISNOMER/ ALTER EGO

74. In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification", "misnomer," and/or such parties are/were "alter egos' of parties named herein.  Alternatively, Plaintiffs contend that any "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## JURISDICTION AND VENUE

75. This Court has subject matter jurisdiction over this case pursuant to S.H.A. Art. 6, § 9 of the Illinois Constitution, which states: "Circuit Courts shall have original jurisdiction of all justiciable matters except when the Supreme Court has original and exclusive jurisdiction."3

76. This Court has personal jurisdiction over Defendants through domicile of the corporation because, pursuant to 2-209(b) of the Illinois Code of Civil Procedure, a Defendant who is either "physically present in Illinois, or who

---

3 See, *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334, 770 N.E.2d 177, 184 (2002) ("With the exception of the circuit court's power to review administrative action, which is conferred by statute, a circuit court's subject matter jurisdiction is conferred entirely by our state constitution.").

consents to defend a lawsuit in Illinois, is subject to personal jurisdiction under the common law of Illinois."[4] Personal and subject matter jurisdiction further exist under Illinois' long-arm statute as codified in section 2-209(a) of the Illinois civil code. Defendants and their agents engaged in business in the state and engaged in the commission of a tortious act within the state and other enumerated acts described in this complaint.

77.    Venue is proper in this Circuit Court pursuant to 735 ILCS 5/2-103.[5] and Code section 5/2-101 where, as a general rule, a "plaintiff may file a civil action in any county where (1) any defendant joined in good faith resides, or (2) any part of the transaction giving rise to the cause of action occurred." Since United, including its affiliates and leadership, do a high percentage of their business and  is headquartered in Illinois, venue is proper in Illinois.[6]

## **BACKGROUND**

### A.    **The COVID-19 Pandemic and Vaccine Response**

78.    The United States ("U.S.") government responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus (SARS-COV-2), commonly known as ("COVID-19"), that has been detected in over 190 countries internationally, all 50 states, the District of Columbia, and all U.S. territories.

79.    On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization ("WHO") declared the outbreak a "Public Health Emergency of International Concern."

---

[4] *See,* 735 Ill. Comp. Stat. Ann. 5/2-209.

[5] *See*, Michael, 3 Illinois Practice: Civil Procedure Before Trial §§ 2.1 to 14.6.

[6]  *See, People ex rel. Madigan v. Leavell*, 388 Ill. App. 3d 283, 329 Ill. Dec. 11, 905 N.E.2d 849 (4th Dist. 2009). *See also, Long v. Gray*, 306 Ill. App. 3d 445, 239 Ill. Dec. 744, 714 N.E.2d 1041 (1st Dist. 1999).

COMPLAINT AND DEMAND FOR JURY TRIAL                APP. 13

-- 10 --

FILED DATE: 1/19/2023 2:01 PM   2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

80.   Three (3) separate COVID-19 vaccines have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson.  None of the products are vaccines in the traditional meaning of the word. Vaccines developed to eliminate diseases like polio, smallpox and the measles provide individuals with immunity from contracting the particular condition. These products do not provide individuals with immunity from contracting COVID-19.  Instead, they are promoted on the grounds that they provide a "level of protection against contracting COVID-19" or that they may provide a level of protection against the "effects of COVID-19." Nevertheless, these medical products are commonly given the misnomer "vaccine."

81.   Traditional vaccines contain whole or part of a harmless bacteria or virus that is sought to provide inoculation by speeding up a process that occurs naturally.  These traditional vaccines allow one's cells to 'learn' how to defend against the viral agent without suffering the consequence of a 'live' virus.  In contrast, all three COVID-19 vaccines utilize never-before tested on humans technology which constitutes "gene therapy."  Two vaccines contain messenger ribonucleic acid ("mRNA"), inserted into the cell nucleus, which serve as instructions or a recipe for the creation of a spike protein that triggers an immune response; they are synthetic surrogates of the body's genetic information. Johnson & Johnson's medical product uses a different platform but retains same type of gene therapy end result.

82.   The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the medical product manufactured by Pfizer-BioNTech on December 11, 2020.  One week later, the FDA issued an EUA for the Moderna

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 14

FILED DATE: 1/19/2023 2:01 PM   2023L000571

COVID-19 medical product.  Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 medical product on February 27, 2021.[7]

83.  An EUA is not synonymous with FDA approval.  Instead, an EUA is an administrative mechanism that allows the use of an 'unapproved' medical product.  An EUA may be granted by the FDA to (among other reasons) facilitate medical countermeasures against the spread of infectious diseases.  EUA's may be terminated or revoked by the FDA as additional information about the use of the individual medical product becomes better known. None of the aforementioned medical products have received actual "approval" by the FDA.

**B.    Recent History of Vaccination Mandates & Accompanying Litigation.**

84.  Three (3) realms of employment have been the primary issue in COVID-19 litigation: (i) employees of federal contractors; (ii) private sector employees; and (iii) government employees and establishments that receive Medicare and Medicaid.

85.  First, the U.S. Court of Appeals for the Eleventh Circuit addressed the realm of litigation involving federal contractors.  On January, 20, 2021, President Joseph Biden ("Biden") signed Executive Order 13991 ("EO 13991"), establishing the creation of the "Safe Federal Workforce Task Force" ("Task Force"), whose stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic.[8]   On September 9, 2021, Biden signed Executive Order 14042 ("EO 14042"),[9] to

---

[7] On August 23, 2021, the FDA issued EUA for the Pfizer vaccine, Comirnaty, for individuals sixteen (16) years of age and older.  On January 31, 2022, the FDA announced the EUA of Moderna's COVID-19 vaccine that is marketed as Spikevax.  At this time, Johnson & Johnson's COVID-19 vaccine has yet to be FDA approved for anything other than EUA.

[8] 86 Fed. Reg. 7,045-48 (Jan. 20, 2021).

[9] 86 Fed. Reg.  50,985-88 (Sept. 9, 2021).

FILED DATE: 1/19/2023 2:01 PM   2023L000571

"promote[ ] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government."[10]   On December 9, 2021, a Georgia federal district court judge issued a preliminary nationwide injunction that halted enforcement of EO 14042 in the case, *Georgia v. Biden*.[11]   The scope of this injunction was applicable to all federal contractors and subcontractors in all covered contracts in any state or territory of the U.S.   The Eleventh Circuit Court of Appeals subsequently held that the injunction should be narrowed to specific states, to a specific industry group, and in the narrow situation of deciding whether to grant a contract to those specific members or to other contract bidders.[12]

86.   Second, the U.S. Supreme Court tackled the issue of vaccine mandates on private sector employees on January 13, 2022, in the case, *NFIB v. OSHA*.[13] On September 9, 2021, Biden announced "a new plan to require more Americans to be vaccinated."   This would be achieved by the Department of Labor issuing an emergency rule (OSHA's COVID-19 Emergency Temporary Standard (ETS)) requiring all employers with at least 100 employees to be vaccinated or show a negative test once a week.[14]   The- declared purpose of the mandate was to increase vaccination rates at "businesses all across America,"[15] forcing eighty-four (84)

---

[10] *Id.*

[11] *Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. 2021).

[12] *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022).

[13] *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

[14] *Id.* at 663.

[15] *Id.* (quoting Remarks on the COVID-19 Response and National Vaccination efforts, 2021 Daily Comp. of Pres. Doc. 775, p.2).

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 16

FILED DATE: 1/19/2023 2:01 PM   2023L000571

million Americans to submit to the medical products. Unvaccinated employees who did not comply with OSHA's rule would be "removed from the workplace." The rule allowed for individuals to submit religious or medical accommodation requests in accordance with the requirements of Title VII[16] of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin. The U.S. Supreme Court described the rule as, "a significant encroachment into the lives – and health – of a vast number of employees" and ultimately struck down the ETS on January 13, 2022.[17]

87. Third, the U.S. Supreme Court on January 13, 2022, simultaneously addressed the realm of healthcare service providers when the Court upheld a regulation issued by the Secretary of Health and Human Services ("HHS") that required facilities that accept Medicare and Medicaid funding to require their employees to be vaccinated.[18] However, the Court held that <u>a facility must still recognize an individual's religious and medical accommodation</u>/ exemption requests pursuant to the rule, and must comport with the obligations prescribed by Title VII.[19] [Emphasis added]

## C.    Conflation of Issues and Strict Interpretation of Religion under Title VII.

88. Plaintiffs are of the belief that recent litigation efforts to redress unlawful business practices have been to no avail because business entities, like Defendants, are able to side-step their obligations under Title VII for two (2) primary reasons. First, Plaintiffs contend that recent litigation surrounding this developing area of the law has been the result of conflating the issues of vaccination mandates with Title VII discrimination analysis. Second, Plaintiffs also contend that there has been too strict of an interpretation given to an

---

[16] *See*, Fed. Reg. 61402-551 (Nov. 5, 2021).

[17] *Id.*

[18] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

[19] 86 Fed. Reg. 61571-72.

individual's sincerely held religious beliefs and that Plaintiffs "sincerely held religious beliefs" are synonymous with Title VII's enumerated depiction of the word "religion."[20]

89.   In addressing the first issue, one of the purposes of this complaint is to seek applicable redress afforded to Plaintiffs pursuant to Title VII, which prohibits the unlawful employment practices undertaken by Defendants.[21]  While this suit also seeks to challenge the constitutionality of the Defendants' vaccine mandate, as applied, differentiation between these claims is necessary when conducting Title VII analysis.

90.   In addressing the second issue, Plaintiffs contend that there has been too strict of an interpretation of their "sincerely held religious beliefs" and that their religious beliefs are to be considered synonymous with the Title VII's specific statement affording protections based on "religion."  Under Title VII, religion is defined broadly to include all aspects of an individual's belief, observance, and practice.[22]  Furthermore, this broad definition has been incorporated by the U.S. Equal Employment Opportunity Commission ("EEOC") in promulgation of regulations pertaining to religious discrimination.

91.   Plaintiffs sincerely held religious beliefs are congruent with Title VII's depiction of religion, U.S. Supreme Court precedent, applicable regulations pertaining to religion, and with EOCC guidance.

---

[20] Title VII of the Civil Rights Act of 1964 provides in pertinent part:

(a)      It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…religion…; or

(2) to limit, segregate, or classify his employees or applicants for employment in a way which would deprive or tend to deprive any individual of employment opportunities or adversely affect his status as an employee, because of such individual's…religion.

42 U.S.C. § 2000e-(2)(a)(1) and (2) (emphasis added)

[21]See, 42 U.S.C. § 2000e et seq.

[22] 42 U.S.C. § 2000e(j).

FILED DATE: 1/19/2023 2:01 PM     2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

**D.      Plaintiffs Possess Sincerely Held Religious Beliefs Recognized by Law.**

92.   Plaintiffs' possess sincere held religious beliefs that their body is a temple, and that their Creator planned their existence upon their creation. Plaintiffs should not be compelled to be inoculated with any experimental foreign substance or biological/medical material that violates their religious convictions and will alter the biological aspects of their human body.

93.   Plaintiffs' sincere religious beliefs are commonly shared by millions of people around the world.

94.   Plaintiffs religious beliefs are not based upon social, political, economic, or personal philosophies.

95.   Plaintiffs' religious beliefs are founded by the teachings of a globally accepted monotheistic religion that espouses moral or theistic beliefs as to what is right and wrong and concerns ultimate ideas about an individual's life, purpose, and death.

96.   Moreover, Plaintiffs contend that it is instrumental to note that the current three (3) commercialized 'vaccines' are not "vaccines" by any traditional definition; rather, these vaccines are gene-altering experimental therapies. Plaintiffs contend that the introduction of mRNA into their body, or gene therapy, which contains a body-foreign biological/medical substance that delivers metaphorical instructions that alter cell behavior and design, is incongruent with their deeply held religious beliefs that their body is a temple and that their Creator planned their existence and biological design before birth.  Further, the introduction of gene therapy medical products cause a fundamental change in the genetic design that their Creator imparted within them.  This differentiation illustrates a fundamental difference between-traditional vaccines, such as chicken pox or the measles, and the three commercialized COVID-19 'vaccines'.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

97. Based on this interpretation, Plaintiffs contend there is a substantial difference between non-mRNA vaccinations and gene therapy vaccines in terms of their religious beliefs.  Accordingly, Plaintiffs contend comparing a these two (2) types of vaccines is a false equivalency.

98. Plaintiffs have conducted themselves with grace in the face of Defendants' oppressive and discriminatory conduct and are entitled to the relief sought.

## **GENERAL ALLEGATIONS**

99. By mid-March 2020, even though the untreated mortality rate was below one-half of one percent, COVID-19 had been declared a pandemic. The subsequent lockdowns and measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

100. The three (3) "vaccines" developed as a response to the COVID-19 virus did not go through any standard form of clinical trials or normal FDA approval. Rather, they were rushed through pursuant to EUA's.

101. A vaccine may be deemed unreasonably dangerous because of the absence of an adequate warning accompanying the product, as the product may be unavoidably unsafe without such warning. No warnings regarding these medical products were available.

102. Nowhere in American law is there any authority to mandate EUA medicines without informed consent. "Informed" establishes that a person must be informed of known and potential benefits, known and potential risks of such use, and of the extent to which such benefits and risks are unknown.  "Consent" establishes that all persons must have the option to refuse administration of the product. Punishments or consequences for refusing medical products are strictly prohibited based on the express wording and intent of the law.[23]

---

[23] *See*, 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III).

FILED DATE: 1/19/2023 2:01 PM    2023L000571

103. Further, the administration of these vaccines is performed through intermuscular injection and implicates significant, constitutionally protected privacy interests, such as the right to be safe from battery.

104. Plaintiffs are not unique or abhorrent. Millions of Americans refused to take these experimental medical products—*for numerous reasons, including for religious reasons.*

105. Those who chose to not take a COVID-19 'vaccine' were prescient. These vaccines are ineffective, dangerous and—in many cases—deadly, as shown both anecdotally and through the Vaccine Adverse Effects Reporting System ("VAERS") and Department of Defense Medical Epidemiology Database ("DOD DMED").[24]  These data were referenced to the Defendants before Defendant's mandate deadline.  Cases of myocarditis, pericarditis, Sudden Adult Death Syndrome (SADS), and other unexplainable deaths appear to be unique to people who did receive these COVID-19 vaccines.

106. COVID-19 vaccines are Virus-Based Gene Therapies according to the FDA's own definition.[25] These medical products are unequivocally based upon injecting genetic information into a person to change or manipulate the person's genetic information.

107. According to the FDA: "Gene therapy products are all products that mediate their effects by transcription and/or translation of transferred genetic material and/or by integrating into the host genome and that are administered as nucleic acids, viruses, or genetically engineered microorganisms."[26]

---

[24] *See*,https://openvaers.com/?utm_source=newsletter_31&utm_medium=email&utm_camp aign=the-openvaers-red-box-report ; *See also*, https://health.mil/Military-Health-Topics/Health-Readiness/AFHSD/Data-Management-and-Technical-Support/Defense-Medical-Epidemiology-Database ; *See also*, https://renz-law.com/dmed-data/

[25] *See*, https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy

[26] *See*, Section I, Ftn't 1 of FDA's guidance entitled: "Design and Analysis of Shedding Studies for Virus or Bacteria-Based Gene Therapy and Oncolytic Products" dated August, 2015. https://www.fda.gov/media/89036/download

FILED DATE: 1/19/2023 2:01 PM          2023L000571

108. According to the Center for Disease Control ("CDC"): "Messenger RNA, or mRNA, is genetic material that tells your body how to make proteins."[27]

109. According to Genome.gov: "mRNA acts as a cellular messenger. DNA, which is stored in a cell's nucleus, encodes the genetic information for making proteins. mRNA transfers a copy of this genetic information outside of the nucleus, to a cells' cytoplasm, where it is translated into amino acids by ribosomes and then folded into complete proteins."[28]

110. According to Pfizer, its vaccine contains messenger mRNA, a kind of genetic material, and a piece of the SARS-CoV-2 virus' genetic material that instructs cells in the body to make the virus' distinctive "spike" protein and trigger the immune system to learn to react defensively, producing an immune response against the virus.[29] The Johnson & Johnson medical product uses viral vector technology to instruct the cells, and causes similar gene altering effects, much like the other two (2) gene therapies.

111. Accordingly, the three (3) COVID-19 medical products change the patient's genetic composition.[30]

112. As such, the use of the word "vaccine" to describe these products is a misnomer and those who have been injected with a COVID-19 gene therapy product necessarily possess different genetic material or genetic information from those who were not injected. United's employment practices further discriminate and/or provide unequal opportunities against Plaintiffs because of this genetic difference resulting from having not been injected with these medical products.

---

[27] *See*, https://www.cdc.gov/coronavirus/2019-ncov/downloads/vaccines/COVID-19-mRNA-infographic_G_508.pdf

[28] See, https://www.genome.gov/genetics-glossary/messenger-rna

[29] *See*, https://www.pfizer.com/science/innovation/mrna-technology; *See also,* https://www.pfizer.com/news/articles/what_makes_an_rna_vaccine_different_from_a_conventional_vaccine; *See also*, https://www.pfizer.com/news/articles/understanding_six_types_of_vaccine_technologies

[30] See, Zhang L., et. al., 'Reverse-transcribed SARS-CoV-2 RNA can integrate into the genome of cultured human cells and can be expressed in patient-derived tissues.' *PNAS*, 2021.Vol. 118, No. 21 e2105968118 https://doi.org/10.1073/pnas.2105968118; *See also*, Alden, M. et al., 'Intracellular Reverse Transcription of Pfizer BioNTech COVID-19 mRNA Vaccine BNT162b2 In Vitro in Human Liver Cell Line.' *Curr. Issues Mol. Biol*. 2022, Vol.44, 1115–1126. https://doi.org/10.3390/cimb44030073

COMPLAINT AND DEMAND FOR JURY TRIAL                                          APP. 22

FILED DATE: 1/19/2023 2:01 PM    2023L000571

That discrimination is a violation of the Genetic Information Non-Discrimination Act ("GINA").[31]

113. These genetic alterations pose further problems to Plaintiffs, who have sincerely held religious beliefs and objections to these alterations.

114. Some Plaintiffs are legally prohibited from taking the experimental vaccine since none of them have been actually approved by the Federal Aviation Administration ("FAA").[32] Only "FAA-approved" drugs may be taken by pilots. Pilots must declare any drugs or medical procedures they have taken since their last flight physical.[33] If a pilot takes an unapproved medical product, the issuing flight surgeon must take administrative measures to revoke or deny issuance of flight physical certificate until the FAA rules on the safety of that product. Typically, it takes twelve (12) months for an FDA approved drug to be approved by the FAA.[34] The use of, or administration of a drug not approved by the FAA is a violation of federal aviation regulation.[35] Nonetheless, Defendants encouraged, coerced and even paid pilots to violate federal law, yet the ones who refused to break the law were the ones punished and discriminated against, as set forth below.

---

[31] See, 42 U.S.C. § 2000ff-1, *et seq.*

[32] See, attached exhibit entitled "Vaccines" (noting that COVID-19 vaccines are not included in the list of FAA approved vaccines).

[33] See, FAA's Guide for Aviation Medical Examiners https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/; *See also*, FAA's Guide for Aviation Medical Examiners- Pharmaceuticals (Therapeutic Medications) Do Not Issue - Do Not Fly https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/dni_dnf/

[34] Note that the FAA cannot approve the COVID vaccines because they have not been officially 'approved' by the FDA.

[35] *See*, 14 C.F.R. § 61.53, which states in pertinent part, "no person who holds a medical certificate…may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person:
    (1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation; or
    (2) Is taking medication or receiving other treatment for a medical condition that results in the person being unable to meet the requirements for the medical certificate necessary for the pilot operation.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

115. On August 6, 2021, United CEO Scott Kirby ("Kirby") announced all employees would be required to receive a COVID-19 vaccine within five weeks of the FDA granting EUA of a vaccine, or five weeks after September 20, 2021, whichever came first. United's announcement of the 'vaccine' mandate policy demonstrated the policy's disingenuousness from the beginning. It purported to be concerned about "safety":

> "We know some of you will disagree with this decision to require the vaccine for all United employees. But, we have no greater responsibility to you and your colleagues than to ensure your safety when you're at work, and the facts are crystal clear: everyone is safer when everyone is vaccinated."

116. However, Defendants' concerns about safety overwhelmingly support Plaintiffs' decisions to *not* be injected with the COVID-19 medical products. *[Emphasis added].*

117. The FDA 'approved' an EUA Pfizer vaccine on August 23, 2021. Thus, United employees were to receive at least the first dose of the vaccine by September 27, 2021. Employees were required to upload a copy of their vaccination record to a United database called Flying Together by that date. Employees who failed to do so would be terminated.

118. If safety had been Defendants' real objective, they would have grounded all flights until it was safe to fly. In truth, Defendants' objective was to increase profit through rent-seeking activities in-spite-of perceived dangers.

119. This was made obvious by Defendants' own actions, since Defendants (i) did not mandate any *passenger* flying on its aircraft or interacting with its staff to be vaccinated; (ii) did not mandate vaccination of employees from other countries, (even though many Plaintiffs worked on the same aircraft and had contact with them); (iii) did not mandate vaccination of regional airline partners that fly United customers on shorter routes that feed United's mainlines; and (iv) did not mandate

FILED DATE: 1/19/2023 2:01 PM   2023L000571

vaccinations for pilots from other airlines allowed to ride in the "jump seat" of any United aircraft.

120. To intimate compliance with Title VII, Defendants created a "Help Hub" link for accommodations – an online system to request accommodations from Defendants' vaccine mandate. Plaintiffs and their colleagues were given the option to request accommodations based on religious beliefs or medical reasons through United's Reasonable Accommodation Process ("RAP").

121. Plaintiffs were *not permitted* to seek *both* a religious and medical accommodation. *[Emphasis added].*

122. Defendants established August 31st, 2021 as the cutoff date, and required after that date, no subsequently submitted accommodation requests would be permitted.

123. Plaintiffs were left with the choice to request an accommodation, take COVID-19 medical products, or be terminated.

124. As Plaintiffs began submitting RAP requests, Defendants followed-up with probing questions seeking to determine the legitimacy of their beliefs and conditions.

125. For example, questions were asked such as: "Are you aware if any vaccines or medications you have previously received were created, researched, tested or otherwise involved the use of stem cells?" and if so, "please explain why receiving such vaccines or medications were not a violation of your sincerely held belief." Other questions included "What about your religious belief prevents you from getting COVID vaccines, but not taking other types of medicine?"; "Have you received vaccinations in the past"; and "Do you currently take, or have you taken medications of any kind (over the counter or prescription)?"

126. Defendants imposed unreasonable deadlines on responses. For example, Defendants required responses to vaccine-related dictates within 3 days, often over the weekends and holidays. When Plaintiffs asked via the Help Hub

whether the 3-day window meant working days or calendar days, the Hub provided no answers.

127. The Help Hub would not alert Plaintiffs when additional information was requested; in fact, Plaintiffs stopped receiving email notifications when updates were available, causing some to miss artificially imposed deadlines for failing to provide additional information.

128. Defendants acted with hostility against Plaintiffs with religious objections throughout the process. United used every possible tactic and tool to wrongfully deny accommodation requests.

129. CEO Kirby sarcastically described employees such as Plaintiffs as "all of a sudden deciding 'I'm really religious'."

130. Defendants never provided any 'accommodated' employee or Plaintiff with a date by which they could return to work and stated the period of unpaid leave could last up to 72 months (6 years). Plaintiffs were then told that any employee whose accommodation request was denied must receive the vaccine by September 27, 2021 or be terminated.

131. Defendants also discriminated between customer-facing employees and non-customer facing employees. For those customer-facing (i.e. pilots and flight attendants), the unpaid leave is to last until the risk of COVID-19 is low enough that Defendants deemed it safe or until the pandemic "meaningfully" subsides.

132. On or about September 9, 2021, Defendants began "granting" requests for accommodations stating that for any accommodation request granted, those employees who sought same would be placed on indefinite, unpaid leave with no benefits, starting October 2, 2021. All benefits were denied to Plaintiffs. Far from being an 'accommodation', this was simply a *different color* of being fired. And, in *true color*, some were terminated without an opportunity to return to work. *[Emphasis added].*

FILED DATE: 1/19/2023 2:01 PM   2023L000571

133. All standard benefits were revoked and denied to Plaintiffs as a result of religious accommodation. The ability to travel in 'non-revenue' status was denied. Access to retirement savings, 401 contributions, and health savings accounts were denied. Ironically, Defendants revoked Plaintiffs health insurance and life insurance benefits during a pandemic under the pretense of ensuring health safety. Clearly, the loss of income and the sudden burden of costly health benefits was intended to punish Plaintiffs.

134. The "indefinite unpaid leave" deadline was pushed to November 12th, 2021 due to the temporary restraining order issued by a federal court in Texas.[36]

135. On October 25, 2021, United sent out an update to let the 'accommodated' know what metrics they would use to bring people back to work. The criteria to return was based on the U.S. Community Transmission Rate, which was published daily by the CDC. For customer facing employees, "the community transmission rate must be "moderate" or below for at least 21 consecutive days in your state." For cabin crew (flight attendants and pilots) "Nationwide daily case count must be at or below 10,000 per day for 21 consecutive days on a rolling 7-day average." However, on or about March 10, 2022, Kristin Fiori, Managing Director of Corporate Safety, specifically said, "Since COVID numbers have decreased significantly across the country, we have stopped reporting out on numbers and aren't doing the COVID briefings anymore." Defendants continued to punish Plaintiffs when they failed to restore Plaintiffs as described. When the reporting numbers stopped or when the COVID briefings were canceled is unknown. For non-customer facing employees (i.e., mechanics, customer service agents and ramp agents), the unpaid leave is slated to last an undefined time until the "details and logistics of mitigation measures" are worked out which may include testing mandates, discriminatory mask policies, and requiring unvaccinated employees to wear identification badges; a political symbol

---

[36] See, *Sombrano vs. United Airlines,* 3:21-cv-01050-TJC-LLL.

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 27

-- 24 --

FILED DATE: 1/19/2023 2:01 PM   2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

eerily similar to those imposed on Jews during the Holocaust to induce societal condemnation, ridicule, obloquy, and *worse. [Emphasis added].*

136. Plaintiffs were never considered for meaningful accommodations, and those exemptions granted were essentially the same as being "terminated in place" by being placed into an unpaid medical leave or unpaid leave of absence for a period of time until Defendants determined the COVID-19 pandemic was no longer a threat, or until Plaintiffs submitted to their mandate. This ambiguity forced many employees to rescind their accommodation requests out of a fear of lost income, deny their own sincerely held religious beliefs, and take an experimental gene-based therapy.

137. United CEO Kirby's statements make clear that Defendants never intended to comply with Title VII. He said preemptively that "very few people would get through the medical and religious exemption process" and warned that Plaintiffs and their colleagues "ought to be very careful about requesting accommodations." Kirby outright threatened Plaintiffs, warning that should they seek accommodations, they are "putting their jobs on the line."

138. In addition to Kirby's expressed threats, Defendants applied various other forms of veiled coercions, pressures and public humiliations.  In early-September, 2021, Defendants sent postcards to Plaintiffs and their colleagues who had not yet provided proof of vaccination. The postcards were sent without the use of a privacy envelope (meaning the content of the postcards could be seen by anyone) to Plaintiffs.  The postcards stated, "Our records indicate that you have not uploaded your COVID-19 vaccine information to Flying Together" and then, in bold text, "[u]nvaccinated employees without a reasonable accommodation will be separated from United."

139. Unsatisfied with attempting to control Plaintiffs' lives with vaccine mandates, Defendants also bullied, harassed and intimidated Plaintiffs including mechanics and ramp agents with an onerous mask mandate policy. On September

30, 2021, United implemented a new mask policy whereby "N95 or KN95 Masks are Required" for unvaccinated employees who had filed for religious accommodation. That policy not only illustrates the disparate treatment of employees with religious beliefs, but also caused division among employees—by forcing them to wear a political symbol, differentiating them from their peers—and caused targeting of religious employees with humiliation and harassment solely for punitive purposes.

140. Plaintiffs were not even permitted to take their masks off outside so long as they were on United property; which means they could not remove their political symbols to breathe fresh air. Forcing Plaintiffs to wear N95 masks for ten-plus hour shifts caused among other things: nausea, light-headedness, brain fog and severe headaches. Since wearing political symbols–does not serve any necessary business interest, it can reasonably be concluded that the purpose of Defendants policies was to promulgate tribalism, encourage discrimination, harass and publicly disparage Plaintiffs in front of their peers based on their religious beliefs.

141. One of the effects of this policy was numerous emotional outbursts and accusatory confrontations against Plaintiffs by co-workers. Defendants successfully created and encouraged an atmosphere of "us vs. them."

142. These actions, which were approved by Defendant officers of United, as well as the Defendant Board Members of United, caused massive harm to Plaintiffs, including lost income, emotional pain and suffering, damage to their family relationships, and more.

143. On or about March 10, 2022, with the politics of COVID-19 and vaccine mandates having changed dramatically in the preceding weeks, Defendants offered Plaintiffs who were on "unpaid leave" to return to work by March 28, 2022. This followed shortly after the Southern District issued an order Jan. 13, 2022,

FILED DATE: 1/19/2023 2:01 PM   2023L000571

blocking the federal vaccine mandate requiring businesses with 100 or more employees to ensure that employees are fully vaccinated.[37]

144. Even after Defendants allowed some Plaintiffs to return to work, a toxic, hostile work environment, where isolation, and open discrimination, remained.

145. The communications Defendants sent to Plaintiffs made clear that they had not changed their policy of discriminating against those who have chosen to not be vaccinated for religious reasons.  Specifically, Defendants made clear that their prior actions in discriminating against the religious employees and either terminating them or placing them on unpaid leave was justified, and that they could re-implement its vaccine mandate at any time and for any reason in the future. Specifically, for example, United's Vice President for Human Resources Kirk Limacher stated:

> "But of all these efforts, the one that remains the most effective at protecting our employees and customers is our successful employee vaccination policy. Since November–a time that included the record-breaking Omicron surge–our vaccinated employees were remarkably safe *compared to* our employees who were on an approved request for reasonable accommodation (RAP), as well as compared to the general population…
>
> …*Of course, if another variant emerges* or the COVID trends suddenly reverse course, we will reevaluate the appropriate safety protocols at that time…
>
> …Finally, I hope you will *join me* in getting a booster when it's your time, consistent with CDC guidance. It's the best way to reduce the risks associated with COVID."

---

[37] *See*, discussion *infra ¶ 85.*

FILED DATE: 1/19/2023 2:01 PM   2023L000571

*[Emphasis Added]*.

146. In the communication to mechanics, Defendants made clear that "It's also important to note that if another variant emerges or the COVID-19 trends suddenly reverse course in the future, we will reevaluate our safety protocols at that time to continue to ensure we're doing everything we can to keep you and your colleagues safe."

147. In addition, Defendants communication to flight attendants appears to indicate that if they do not return to work or provide proof of a medical condition that prevents return to work by March 28, 2022, they will be terminated:

> "If you are unable to return on March 28, 2022 due to your own medical condition, you must substantiate your medical condition by either faxing a completed Absence Certificate from your treating physician to United Medical at 847-700-2600, or submitting it through Help Hub, no later than March 28, 2022. Your treating physician must provide United Medical with your medical facts or restrictions to support your inability to return, treatment plan, dates of office visits, prognosis and expected return to work date. *Failure to substantiate your medical condition by the above deadline will be considered your failure to return to service and you will be separated from United Airline at that time.*"

*[Emphasis added]*.

148. Further, Defendants continued to directly discriminate against Plaintiff pilots and flight attendants for the purported reason that certain countries:

> "...maintain various COVID-19 rules or restrictions that prohibit, restrict, or otherwise interfere with the Company's ability to staff flights with unvaccinated pilots. Therefore, while your reasonable accommodation allows you to return to work, that

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 31

FILED DATE: 1/19/2023 2:01 PM   2023L000571

> accommodation is subject to the responsibility to avoid bidding for flights to countries that impose such requirements. If you bid for and are awarded a schedule containing pairings to a destination that imposes restrictions based on your vaccination status, you will be removed from those trips without pay. Additionally, you are prohibited from picking-up or trading into any trips to any of these locations."

149. However, most of the countries listed don't have COVID-19 vaccine requirements. Rather the countries only have testing requirements. These continued discriminatory policies would result, for example, in Plaintiff pilots having a 25-30% pay reduction because they would be unable to fly to those countries.

150. This pay reduction is a result of Defendants forcing Plaintiff pilots to switch from flying higher-paying widebody airplanes (B-787, B-777, B-757/B-767) to lower paying narrowbody airplanes (B-737, A-320). United's policy against the unvaccinated Plaintiffs states:

> "If your seniority prevents you from bidding around trips to Japan, South Africa or Taiwan and you are awarded one of these trips in Preferential Bidding System, you will be removed from the trip and placed on AV (standby) days. If you are placed on AV (standby) days for this reason or awarded a reserve line in a Category that operates to Japan, South Africa or Taiwan, you will be required bid to a Category (i.e. a forced airplane downgrade) that does not operate to any of those destinations on the next vacancy bid."

This was directly contrary to United's standard seniority policy and altered the terms of employment. It directly discriminated against, and punished Plaintiff

FILED DATE: 1/19/2023 2:01 PM   2023L000571

pilots based on their religious beliefs who had previously put in decades of hard work in their career progression.

151. For example, Defendants chose the countries of Japan, South Africa, Taiwan to force these discriminatory changes and punish Plaintiff pilots even though widebody plane (B-787, B-777, and B-757/767) pilots can fly to many other destinations with reasonable accommodation. Defendants refused to work with these religious pilots to allow them to continue flying these widebody planes to countries with which there is no issue. Ironically, United bent over backwards to accommodate Global Elite and 1K passengers with their travel needs, regardless of their vaccine status.

152. In addition, United stated on March 24, 2022, that vaccine cards are still required:

> "At this time, the vaccine card is required. Many destinations require it for country entry, hotel check-in, public dining and use of transportation."

Yet, around the United States and the globe, vaccine cards and vaccine passports for country entry, hotel-check in, public dining and transportation were being eliminated. The use of vaccine cards—a symbol to distinguish Plaintiffs from their peers--is another discriminatory tactic utilized to harm Plaintiffs who chose not to take an experimental and harmful gene-based therapy, since they would not have a card. This policy was created and enforced to broadcast the identity of Plaintiffs for continued harassment and disparate treatment.

153. These statements make clear that contrary to the March 28th offer to return to work, Defendants' discriminatory and illegal vaccine mandate policies are to continue, in effect. Those Plaintiffs who return to work under these conditions will be subject to the same disparate treatment and hostile work environment as before. Those who decide not to return to work because of this treatment may be terminated by Defendants, and Defendants are explicitly

FILED DATE: 1/19/2023 2:01 PM   2023L000571

stating they may re-implement their vaccine mandate at any time. This was another method by Defendants to punish Plaintiffs, and demonstrate Defendants' newly acquired authoritarian power as a State Actor.

154. The fake gestures of extension by Defendants in the form of offers for Plaintiffs to return to work,' combined with the hostile work environment designed to harass and disparage Plaintiffs in front of their peers constitute constructive discharge.

### UNITED'S FAILURE TO MAKE ACCOMMODATIONS AND/OR CREATION OF A HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

155. Defendants' actions against Plaintiffs have violated Title VII's prohibition against discrimination, harassment and the perpetuation of a hostile work environment.

156. Title VII of the Civil Rights Act of 1964 prohibits Defendants from engaging in numerous forms of discrimination in virtually every employment circumstance. Specifically, Title VII provides, in relevant part:

> "It shall be an unlawful employment practice for an employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, <u>religion</u>, sex, or national origin…"[38]

[<u>Emphasis added</u>]. Regardless of whether the vaccination mandate was held constitutional (for healthcare workers),[39] employers are still bound to fulfill their

---

[38] 42 U.S.C. § 2000e-2

[39] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

FILED DATE: 1/19/2023 2:01 PM    2023L000571

obligations to employees pursuant to Title VII. These obligations prescribe that the employer, *inter alia*, not engage in discriminatory, harassing, or retaliatory conduct.

157.   As such, not only does Title VII of the Civil Rights Act of 1964 prohibit Defendants from engaging in numerous forms of discrimination but the statute also protects employees from being subject to other unlawful employment practices, such as the creation of a hostile work environment or harassment.

158. Given the foregoing disparate treatment set forth in the facts herein, Defendants' conduct had a disparaging impact on Plaintiffs, which led to their termination, early retirement, placement on unpaid leave or, for those Plaintiffs who were allowed to work, a hostile work environment accompanied by harassment.

159.   Defendants' conduct satisfies the elements for claims of religious discrimination due to disparate treatment, failure to provide accommodations, harassment, and the creation of a hostile work environment.

## UNITEDS' FRAUDULANT STATEMENTS AND REPRESENTATIONS

160. Defendants have made and continue to make intentionally false statements of fact about COVID-19 and the vaccines it has mandated on its employees to deceive Plaintiffs into believing that Defendants are learned intermediaries.

161. Defendant Kirby, speaking for United, stated that "every piece of data collected to date confirms these vaccines are safe . . ." and that "vaccines are – by far – the most effective way to protect people from COVID" and that "we know now that an unvaccinated person is about 50 times more likely to be hospitalized for COVID than a vaccinated person and nearly 300 times more likely to die." This data was never even remotely accurate.

162. Kirby also falsely stated during a public appearance that United's unvaccinated employees were *1300 times* more likely to die than vaccinated

FILED DATE: 1/19/2023 2:01 PM   2023L000571

employees.  Kirby made this figure up to create fear among unvaccinated and to further coerce them into getting "jabbed".  In addition, Mr. Kirby stated he calculated "*in his head*" that he could save 20 to 30 company employees by mandating full 100% vaccine compliance.  He did so without providing any specific scientific analysis to his life-saving statement. *[Emphasis added]*

163. Defendants advanced a **false political narrative**, not a health agenda as evidenced by the fact that Defendants did not disclose:

- There are known and potentially life-threatening risks associated with the vaccines
- That the employee assumes all risk associated with the vaccine if they take the vaccine
- That long-term adverse effects are unknown
- That there is emerging evidence and data as to the vaccine's lack of efficacy
- Multiple mRNA injections per year will likely be required for efficacy– the safety of which is unknown
- Vaccinated individuals can still catch and spread COVID
- The fact that sick people – irrespective of their vaccination status – are the ones most likely to spread the virus
- Employees who have been injured by the vaccine
- That COVID is treatable and has a survival rate of over 98% for all age groups, co-morbidities, races, special populations and socio-economic classes combined (generally comparable to the flu at 99% or tuberculosis at 92% or community acquired pneumonia)
- Taking the vaccine without FAA approval would jeopardize flight physical standards

FILED DATE: 1/19/2023 2:01 PM    2023L000571

164. Defendants also posted an internal data update on cases that made the following false, unsupported claims: "Fully vaxxed people make up as few as 0.1% of those hospitalized with COVID; Fully vaxed people are less infectious than unvaccinated people, and; serious side effects from vaccine are extremely unlikely." Yet the FDA itself acknowledges numerous, possible serious adverse events that can (and do) result in permanent injuries, autoimmune diseases, chronic diseases, disabilities, and death from the COVID-19 vaccines. Even Pfizer data from early testing showed over 148,000 adverse effects in the first 90 days of testing.[40]

165. Defendants were aware of the foregoing conduct and false statements and participated in these wrongful acts that have caused and perpetuated massive pain, suffering, emotional distress, mental anguish, loss of job opportunities and future income.

### CONFLUENCE OF UNITED AIRLINES AND THE UNITED STATES GOVERNMENT

166. In February of 2020, United executives and insiders, including Defendants, conveniently sold off large swaths of United stock just prior to the emergency declaration on March 13th, 2020.   Defendants knew about the administration's announcement before it was made public.  Defendants divested in United stock just before, United's common stock share price dropped dramatically.

---

[40] See, 5.3.6 Cumulative Analysis of Post-Authorization Adverse Event Reports of PF-07302048 (BNT162B2) received through 28-FEB-2021 (FDA-CBER-2021-5683-0000054)

COMPLAINT AND DEMAND FOR JURY TRIAL                                    APP. 37

FILED DATE: 1/19/2023 2:01 PM   2023L000571



167. Subsequent to Defendants receiving upward of $1.9M in royalty payments, the U.S. Government increased investment and interest in United; as shown by the following Securities and Exchange Commission Report from April 30th, 2020:

> "United has entered into an agreement to receive approximately $5.0 billion from the U.S. Treasury Department through the Payroll Support Program under the CARES Act in the form of a $3.5 billion grant and a $1.5 billion 10-year loan which will be used to protect the salaries and benefits of employees through Sept. 30, 2020. In connection with this funding, UAL will issue warrants to

FILED DATE: 1/19/2023 2:01 PM   2023L000571

purchase approximately 4.6 million shares of UAL common stock to the federal government. The first installment of approximately $2.5 billion was received by United on April 21, 2020 and warrants to purchase approximately 2.3 million shares of UAL common stock were issued."[41] [Emphasis added]

168.   As a result of this new "agreement", the U.S. Government now owned a large share of United[42] thereby wielding substantial influence in the operation of corporate entity.  In effect, United could no longer operate as a private entity because they were largely Government owned/indebted.  Thus, United is a "person" and a "state actor" under 42 U.S.C. § 1983.[43]  United was further indebted to the federal government shown in the September 28, 2020 SEC Report showing up to $7.5 billion dollars of funding.[44]

169. On December 11, 2020 the U.S. Government began stumping for United:

> "[United] does not expect the recovery to follow a linear path, however, recent positive results in vaccine development and efficacy show an encouraging line of sight to the other side of the pandemic —".[45]

---

[41] *See*, Form 8-K, SEC Report (April 30, 2020).; *see also,* Form 424B5, *Form of prospectus disclosing information, facts, events covered in both forms*, United Airlines Holding, Inc. (June 30, 2021).

[42] Per Yahoo business,  326.93M shares.  That's only about 2%, but with a net market value cap of 14B, US Govt now controls nearly half of that value in loans and stock.

[43] *H.H. v. Garland*, 52 F.4th 8 (C.A.1, 2022) (noting that private party can be treated as "state actor," for purpose of determining whether private party acts under color of law, in § 1983 context, in rare circumstances falling into three categories: (1) if private party assumes traditional public function when performing the challenged conduct, (2) if private party's conduct is coerced or significantly encouraged by the state, and (3) if private party and state have become so intertwined that they were effectively joint participants in challenged conduct).

[44] *See*, Form 8-K, SEC Report (Sept. 28, 2020).

[45] *See*, Form 8-K, SEC Report (Dec. 11, 2020).

170. This nexus between the U.S. Government was further substantiated when the Department of Defense partnered with *only* United to conduct an airplane air quality study.[46]   United was further selected by the U.S. Government as the only commercial airline for transporting the COVID-19 vaccines from overseas manufacturing sites to the U.S.[47]

171. CEO Kirby sent Biden a letter in January of 2021 stating:

> "As you prepare to begin your term, please know that I stand ready to work with you, your administration, and Congressional leaders in support of our nation, our economy, and our environment."[48]

172. United, now considerably controlled by the U.S. Government, started acting in lockstep with the government agenda of masking (compelled wearing of political symbols), social distancing, testing, and ultimately the Biden Administration's ambition of universal inoculation with experimental gene-based therapy products.  On August 6, 2021, just prior to the Biden Administration's announcement, United revealed the collusion with the government by mandating the covid shot for 100% of its (domestic) employees.[49]  Anyone who did not comply would be terminated.  This was exactly what the Biden Administration advised and perpetuated.

173. In the months leading up to the mandate in August of 2021, there were multiple instances where Kirby alluded to the close partnership United had with

---

[46] Benitez, G. & Sweeny, S.  "Risk of COVID-19 exposure on planes 'virtually non-existent' when masked, study shows," *ABC News*. October 15, 2020.

[47] Thomas, Dillon. "United Airlines lands vaccines in Denver, becoming only commercial airline to transport vaccines," *CBS Broadcasting, Inc.* (December 22, 2020).

[48] *See*, https://skift.com/wp-content/uploads/2020/11/United-Airlines-Congratulatory-Letter-.pdf

[49] Holt, Lester. "United CEO discussed employee Covid vaccine mandate in exclusive interview," *NBC Universal*. (Aug. 9, 2021)

FILED DATE: 1/19/2023 2:01 PM                    2023L000571

FILED DATE: 1/19/2023 2:01 PM     2023L000571

the federal government, and especially the Biden administration.[50]  The Biden Administration could not mandate 100% vaccine inoculation but hoped to enforce a mandate through "so-called" private employers; surrogate state actors like United.  After the United vaccine mandate, the lines between a privately operated airline and a U.S. Government controlled state actor United continued to blur as meetings and announcements from Biden and Kirby continued to flow as if commonly orchestrated.[51]

174. Biden continually and specifically named and praised United as a beacon of what the country should be doing.   Biden said, "United went from 59% of their employees to 99% of their employees (vaccinated) in two months after implementing the requirement."[52] Biden conveniently omitted the oppressive conduct described herein needed to achieve such compliance. Kirby stated, as though representing a government agency, "Customers can book with confidence on United … but if you're booking on an airline that doesn't have a vaccine

---

[50] *See*, Klint, Matthew. "United Airlines 'ready to partner' with Biden Administration," *Live and Let's Fly* (Jan. 22, 2021); *see also*, Zumbach, Lauren. "Mandatory employee vaccines: United Airlines CEO makes his case to Chicago business leaders," *Chicago Tribune,* (Feb. 2, 2021); *see also*, Products and Customer Experience, "United sweepstakes gives vaccinated customers a shot to win free flights, a year of travel," *United Airlines*, (May 27, 2021); *see also*, Aspen Idea's interview with Scott Kirby and Walter Isaacson, https://www.aspenideas.org/sessions/flying-smart.

[51] *See*, Hunnicut, Trevor. "United Airlines: Biden administration examining what authority private businesses have to mandate vaccines," *Reuters*, (Aug. 6, 2021); *see also*, Hunnicut, Trevor & Rucinski, Tracy. "Biden meets with United Airlines CEO, others on COVID vaccine efforts," *Reuters,* (Aug. 11, 2021); *see also*, Hunnicut, Trevor & Rucinski, Tracy. "United CEO expects more companies will heed Biden's call to vaccinate," *Reuters,* (Aug. 11, 2021); *see also*, Downey, Caroline. "United Airlines CEO tells Biden: vaccine mandates a 'basic safety issue'," Yahoo, (Aug. 11, 2021); *see also*, Towey, Robert & Josephs, Leslie. "Covid vaccine mandates sweep across corporate America as Delta variant spurs action," *CNBC LLC.*, (Aug. 9, 2021); *see also*, Smith-Schoenwalder, Cecelia. "More companies mandate COVID-19 vaccines for employees, but is it enough to make a difference?" *U.S. News & World Report L.P.*, (Aug. 30, 2021); *see also,* Shepardson, David. "Biden vaccine mandate will test OSHA, U.S. workforce regulator," *Reuters,* (Sept. 13, 2021); *see also*, Klint, Matthew. "Why is United Airlines CEO carrying water for Biden administration?" *Live and Let's Fly*, (Sept. 20, 2021); *see also*, Klint, Matthew. "United Airlines CEO meets with President Biden" *Live and Let's Fly*, (Aug. 12, 2021); see also, Ruhl, Stephanie. "United Airlines CEO on vaccine requirements for workers: 'mandates work'," *NBC Universal*, (Oct. 6, 2021).

[52] See, KUSI Newsroom. "Biden: United Airlines Has 99% Vaccination Rate After Firing All Unvaccinated Employees," *Mckinnon Broadcasting*, (October 7, 2021).

requirement, they've got government rules they have to follow and *caveat emptor*,"[53]

175. The Biden administration pushed for major companies, like United, to enforce vaccine mandates though it was unclear if those efforts would survive judicial review. They did not survive.[54] Still, the White House seized on Kirby's January letter and held it up as an example of vaccine mandates working. "That's the difference. That's vaccines. That's a requirement," tweeted Ben Wakana, the Deputy Director of Strategic Communications & Engagement for the White House's Covid-19 response team.[55]

176. Recent events not tied to the "vaccine" mandate reveal preferential treatment between government and United when United was selected to fly Afghan refugees to the U.S.,[56] and when United was selected to fly baby formula from overseas.[57] Further, of all the successful people in America specially qualified to fill the position, the Biden Administration selected Kirby by special appointment to the homeland security advisory council.[58] Also, as though a type of payment for loyalty to the administration, Kirby has been invited to the White House to attend exclusive formal dinners.[59]

---

[53] See, Russell, Edward. "United CEO Says Beware Flying Airlines Without A Vaccine Mandate," *Skift*, (October 20, 2021).

[54] *See*, *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

[55] *See*, Schaeffer, Joe. "United Airlines CEO openly serves as Biden's co-pilot on vaccine push…on NBC's friendly airwaves," *Trib 247*, (Jan. 13, 2022).

[56] See, Schaeffer, Joe. "Instantly-formed Rockefeller group continues to settle refugees of dubious loyalty on behalf of the USA," *Trib 247*, (Feb. 9, 2022).

[57] *See*, Nerozzi, Timothy. "United Airlines to fly baby formula from London to US as part of Biden's Operation Fly Formula," *FOX News Network, LLC.,* (June 1, 2022).

[58] *See*, Klint, Matthew. "United Airlines CEO appointed to Homeland Security Advisory Council," *Live and Let's Fly* (March 22, 2022).

[59] See, Scott Kirby's Linkedin Post- https://www.linkedin.com/posts/jscott-kirby_last-night-kathleen-and-i-were-honored-to-activity-7004487004084125696-VyvF

COMPLAINT AND DEMAND FOR JURY TRIAL                                    APP. 42

-- 39 --

FILED DATE: 1/19/2023 2:01 PM     2023L000571

177. In the course of its actions, Defendants consistently acted in lockstep with the widely publicized goals of the Biden Administration.  For purposes of these actions, whether by incentive or threat, United has become a State Actor.

178. The Biden Administration delegated its authority to the private sector and sought companies like United to do its bidding. In turn, Defendants gave its employees an unconscionable ultimatum: choose between their jobs or take an experimental, life-threatening gene-based therapy/vaccine, for a disease known to have a very high survivability rate and for which effective alternative treatments exist.

179. The Government has acted in concert with United to publicly support its private employer vaccine mandate.  Defendants are engaged in a *quid pro quo* arrangement whereby United is enforcing the agenda of the government.  In exchange, the Biden Administration is lining the pockets of United and the other Defendants at the expense of Plaintiffs' lives.

180. State Actor executives CEO Kirby and President Hart both personally gained from this Biden Administration *quid pro quo* with key Biden Administration appointments.

181. To induce compliance with its vaccine mandate, United even colluded with unions. For instance, in the letter of agreement between United and its pilots in the service of United Airlines, Inc., as represented by The Air Line Pilots Association, International ("ALPA"), it states that United and ALPA:

> "[s]eek to incentivize Pilots to become fully vaccinated against COVID. . ."

The agreement continues by stating those who are fully vaccinated within the manufacturer's recommended time frame shall be provided *added pay*:

> ,,,"a new hire Pilot shall have 30 days after the Pilots' date of hire in order to complete the first (1st) dose in the vaccination process to be eligible for Add Pay in accordance with this

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 43

-- 40 --

Agreement, unless vaccination has become a requirement of the new hire Pilot's employment."

…

"Pilots who receive a COVID booster dose necessary to maintain status as fully vaccinated shall receive one (1) hour of Add Pay for the first (1st) such booster during the effective period of this Agreement. A Pilot who utilizes sick leave to take the COVID booster does (including any post-dose period mandated by the FAA) shall not be eligible to receive such *Add Pay*."

United is also encouraging on-going booster shots in order to maintain "fully vaccinated" status despite the fact that the safety of multiple injections with COVID-19 vaccines is unknown. *[Emphasis added]*.

### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S ("EEOC") FAILURE TO MITIGATE INJURY AND PLAINTIFFS ONGOING IRREPRABLE HARM

182. The EEOC has taken the position that they do not and will not interfere with or prevent employers from following the guidelines and suggestions made by the CDC or state/local public health authorities about steps employers should take regarding COVID-19:

"The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services ("HHS") [FDA] for the administration of three COVID-19 vaccines. These three vaccines were granted [EUA] by the FDA. It is beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach. Individuals seeking more information about the legal implications of

FILED DATE: 1/19/2023 2:01 PM    2023L000571

FILED DATE: 1/19/2023 2:01 PM          2023L000571

EUA or the FDA approach can visit the FDA's EUA page."[60]

183. The EEOC has not taken any actions much less made any public statements condemning these patently unlawful employment practices. For these reasons and others set forth below, Plaintiffs are not required to first seek recourse via the EEOC prior to bringing their discrimination and/or employment claims.

184. Also, irreparable harm has already resulted from the delays associated with exhaustion of administrative remedies. Millions of people have been hurt and thousands have been killed due to the COVID-19 vaccines that United mandated Plaintiffs take. Not only can these vaccines cause injury generally, but the gene therapies pose specific harms to Plaintiffs working in the airline industry, which has requirements that employees maintain a certain standard of health for safety purposes. Waiting 180 days for the EEOC process to complete or to receive a right to sue letter is not a viable option as irreparable harm is imminent not only for their jobs, but also for their safety and the safety of consumers.

185. Additionally, the EEOC lacks the institutional capacity to resolve the particular types of issues presented given there are millions of employees across the United States who seek to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all of the claims. Also, the EEOC does not have the authority to address the Constitutionality of all the claims associated with the employment practices at issue and does not possess the institutional knowledge or authority to redress those matters relating to health, safety and welfare. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile, useless and inadequate to redress Plaintiff's employment issues and to prevent the irreparable harm.

---

[60] See, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K

COMPLAINT AND DEMAND FOR JURY TRIAL          APP. 45

**CAUSES OF ACTION**

**––– COUNT I –––**

**Invasion of Privacy - Public Disclosure of Private Facts
All Plaintiffs vs. All Defendants**

186.  Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

187. Defendants gave publicity to Plaintiffs protected health information ("PHI") by publishing the PHI in postcards to Plaintiffs and by forcing Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

188. The publication of Plaintiffs PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

189. As a proximate result of Defendants public disclosure of Plaintiffs PHI, Plaintiffs have suffered injury. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

**––– COUNT II –––**

**Negligence *Res Ipsa Loquitur*
All Plaintiffs vs. All Defendants**

190. Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

191. Defendants owe a duty of reasonable care during the course of operating their business.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

192. This duty includes protecting Plaintiffs PHI via appropriate means and procedures.

193. Defendants breached their duty of care when by publishing Plaintiffs PHI in postcards and by forcing Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

194. Defendants negligence "speaks for itself" and was in violation of state and federal laws designed to protect Plaintiffs against the type of harm caused by the Defendants conduct.

195. As a proximate cause of Defendants negligence, Plaintiffs have suffered injury

## ––– COUNT III –––

### Violation of Whistleblower Act, 740 ILCS 174/ 20, *et seq.*

### Defendants Retaliation for Refusal to Participate in a Prohibited Activity

### Tom Anderson; James Breitsprecher; Nicholas Decker; Tom Floyd; Thad Krupa; Kevin Hendershot; James Curtis; John Morris; Frank Quintas; Richard Sherlock; Rhett Wolfe; James Zietlow; Kevin Zwierko.
### Vs.
### All Defendants

196. Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

197. Pilot Plaintiffs refused to participate in Defendants vaccine mandate program that violates 14 C.F.R. § 61.53.

198. Defendants retaliated against Plaintiffs for their refusal to participate in a prohibited activity through termination, unpaid leave, disparate treatment, creation of a hostile work environment, discrimination and prejudice.

199. As a proximate cause of Defendants retaliation, Pilot Plaintiffs have suffered injury.

200. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of

FILED DATE: 1/19/2023 2:01 PM   2023L000571

the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

### — COUNT IV —
### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Defendants' Failure to Accommodate – Religious Discrimination
### All Plaintiffs vs. United

201.   Plaintiffs reallege and incorporates all paragraphs above as fully set forth herein.

202.   Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, *et seq.*

203.   Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three (3) COVID-19 vaccines, at the expense of their religious beliefs, or losing their livelihoods.  In doing so, Defendants have violated Title VII of the Civil Rights Act of 1964 by taking a tangible employment action against Plaintiffs based on their sincerely held religious beliefs, failing to engage in the interactive process, and failing to provide reasonable accommodations to Plaintiffs.

204.   Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

205.   Plaintiffs are members of a protected class.

206.   Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for the multitude of reasons provided for in this Complaint.

207.   Plaintiffs were qualified to perform their duties as demanded by their employment.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

208.  In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its obligations.

209.  Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their sincerely held religious beliefs as well as the repeated acts of filing formal declinations and religious accommodation requests and are qualified for religious protection that is cognizable under Title VII of the Civil Rights Act of 1964.

210.  Plaintiffs informed Defendants of their sincerely held religious beliefs and requested religious exemptions from the vaccine mandate that is applicable to them but were met with disdain.

211.  Defendant refused to engage in meaningful discussions regarding their beliefs, to identify any potential accommodations, and undertook tangible employment actions that disparately effected Plaintiffs on the basis of their religious beliefs.

212.  During the course of Plaintiffs' employment with Defendants and since the announcement of Defendants' COVID-19 mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their religious beliefs.  Disparate treatment for their religious beliefs included, but was not limited to:

(i)      Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received one of the three experimental vaccines;

(ii)     Harassing statements, threats, humiliation, and constructively stripped Plaintiffs of their important responsibilities, which were extended to other employees, and undermined their ability to effectively perform their job duties at United as compared to similarly situated employees who received one of the three experimental vaccines;

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 49

FILED DATE: 1/19/2023 2:01 PM    2023L000571

(iii) Consistent denial of Plaintiffs' religious accommodation requests;

(iv) The arbitrary nature of granting and/or revocation of Plaintiffs' religious accommodation requests without substantive justification;

(v) Plaintiffs were arbitrarily forced to wear political symbols, differentiating them from other employees who received one of the three experimental vaccines;

(vi) Plaintiffs being constructively discharged and/or terminated for not receiving one of the three experimental vaccines, which are against their sincerely held religious beliefs.

213. Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' sincerely held religious beliefs.

214. Defendants did not engage with Plaintiffs regarding clarification of their requested relief but instead made broad assumptions based on misattributed facts in rendering its conclusions.

215. Defendants failed to provide Plaintiffs with any accommodations for their religious beliefs.

216. Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, in addition to failing to engage in the interactive process or offer any accommodations, Defendants deprived the Plaintiffs of their constitutional right to protection under law in violation of Title VII of the Civil Rights Act of 1964. Moreover, this deprivation was done intentionally, purposefully, and willfully.

217. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of

FILED DATE: 1/19/2023 2:01 PM   2023L000571

the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

218.   As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

## —— COUNT V ——

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Defendant's Disparate Treatment – Religious Discrimination
### All Plaintiffs vs. United

219.   Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

220.   Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, *et seq.*

221.   Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three (3) COVID-19 vaccines, at the expense of their religious beliefs, or losing their livelihoods.  In doing so, Defendants have violated Title VII of the Civil Rights Act of 1964 by taking a tangible employment action against Plaintiffs based on their sincerely held religious beliefs, failing to engage in the interactive process, and failing to provide reasonable accommodations to Plaintiffs.

222.   Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

223.   Plaintiffs are members of a protected class.

224. Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for a multitude of aforementioned reasons.

COMPLAINT AND DEMAND FOR JURY TRIAL                APP. 51

FILED DATE: 1/19/2023 2:01 PM   2023L000571

225.  Plaintiffs were qualified to perform their duties as demanded by their employment.

226.  In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its obligations.

227.  Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their sincerely held religious beliefs as well as the repeated acts of filing formal declinations and religious accommodation requests and are qualified for religious protection that is cognizable under Title VII of the Civil Rights Act of 1964.

228.  Plaintiffs informed Defendants of their sincerely held religious beliefs and requested religious exemptions from the vaccine mandate that is applicable to them but were met with disdain.

229.  Defendant refused to engage in meaningful discussions regarding their beliefs, to identify any potential accommodations, and undertook tangible employment actions that disparately effected Plaintiffs on the basis of their religious beliefs.

230.  During the course of Plaintiffs' employment with Defendants and since the announcement of Defendants' COVID-19 mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their religious beliefs.  Disparate treatment for their religious beliefs included, but was not limited to:

(i)      Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received one or more of the three (3) experimental vaccines;

(ii)      Harassing statements, threats, humiliation, and constructively stripped Plaintiffs of their important responsibilities, which were extended to other employees, and undermined their ability to effectively perform their job

FILED DATE: 1/19/2023 2:01 PM   2023L000571

duties at United as compared to similarly situated employees who received one of the three experimental vaccines;

(iii)      Of Plaintiffs who were not terminated, Defendants sought to replace Plaintiffs' employment positions by individuals who did not seek religious and/or medical accommodation.

(iv)      Defendants disproportionately compensated employees who did not seek religious and/or medical accommodation.

(v)      Defendants disclosed medical documentation, medical, information, and vaccine status to customers, Defendants employees, agents, and supervisors by forcing Plaintiffs to wear identifying political symbols, differentiating them from other employees who received one of the three experimental vaccines;

(vi)      Plaintiffs being constructively discharged and/or terminated for not receiving one of the three experimental vaccines, which are against their sincerely held religious beliefs as Christians.

231.  Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' sincerely held religious beliefs.

232.  Defendant failed to provide Plaintiffs with any accommodations for their religious beliefs.

233.  Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion", were the motivating factor by which defendant engaged in such discriminatory conduct against Plaintiff.

234.  But-for Plaintiffs' religious beliefs, Defendant would not have engaged in such conduct that had a disparaging effect upon Plaintiffs and only individuals similarly situated to Plaintiffs.

235. Defendants' conduct is evident that Defendants have engaged in a pattern or practice of discriminating against otherwise qualified individuals on the basis of their religion.

236. This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

237. Defendants' policies are only targeted at Plaintiffs and like-situated persons of religious beliefs.

238. Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, in addition to failing to engage in the interactive process or offer any accommodations, Defendants deprived the Plaintiffs of their constitutional right to protection under law in violation of Title VII of the Civil Rights Act of 1964. Moreover, this deprivation was done intentionally, purposefully, and willfully.

239. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

240. As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

## ––– COUNT VI –––

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Defendants' Creation of a Hostile Work Environment**
**All Plaintiffs vs. United**

241. Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

242.  Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, *et seq*.

243.  Plaintiffs suffered mistreatment based on their protected religious characteristics.

244.  Defendants conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

245.  Plaintiffs were qualified to perform their duties as demanded by their employment.

246.  In good-faith, Plaintiffs undertook all requisite and applicable procedures to inform Defendant of the harassment and toxicity that was pervasive around the workplace.

247.  In an effort to achieve Defendants' political goal in conjunction with the Biden Administration, of total compliance to the vaccine mandate, Defendants' actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

248.  Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

249.  Plaintiffs are members of a protected class.

250.  Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for a multitude of aforementioned reasons and the Defendants repeated attempts to coerce Plaintiffs to go against their religious beliefs was unwelcomed harassment.

251.  Additionally, after refusal to submit to unwelcomed and offensive actions against Plaintiffs religious beliefs, Plaintiffs were subjected to such consistent discriminatory, harassing, coercing, and intimidating conduct undertaken by  the Defendants and was based on their sincerely held religious

beliefs as a protected class under Title VII.   Plaintiffs were subjected to discriminatory and coercive conduct including but not limited to"

(i)   Offensive or derogatory jokes in the office;

(ii)   Severe and persistent pressure to undertake a medical procedure;

(iii)   Unwelcomed comments about Plaintiffs' religious beliefs;

(iv)   Defendants intentional dissemination of Plaintiffs' PHI and vaccination status to customers, Defendants employees, agents, and supervisors by forcing Plaintiffs to wear identifying political symbols and badges, differentiating them from other employees who received one of the three experimental vaccines;

(v)   Defendants intentional disclosure or Plaintiffs PHI and vaccination status for the whole world to see when Defendants mailed postcards containing Plaintiffs PHI and vaccination status;

(vi)   Abuse of power by Defendants, who compelled managers and supervisors to make unreasonable demands of Plaintiffs during the course of their job responsibilities;

(vii)   Pyschological harassment by excluding Plaintiffs from staff gatherings, blatant rejection of Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate Plaintiffs.

(viii)   Retaliatory conduct in response to Plaintiffs' finling declination of vaccination forms and filing religious accommodation forms;

(ix)   Defendants' creation of inflexible policies that directly target Plaintiffs on the basis of their religion;

(x)   Defendants' inablility to train its agents, employees, managers, or supervisors concerning Title VII of the Civil Rights Act of 1964; and/or

(xi)   Failing to participate in a meaningful manner or otherwise engage with Plaintiffs regarding their religious accommodation.

FILED DATE: 1/19/2023 2:01 PM    2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

252.   Plaintiffs' subjugation to such conduct was motivated on religious grounds that were authorized, ratified, encouraged, and condoned by Defendants.

253.   Defendants egregious conduct toward Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.

254.   Defendants are responsible for the creation of a hostile work environment under a theory of vicarious liability or direct liability.

255.   Defendants' were directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

256.   Accordingly, Defendants had actual knowledge of the actions of its managers and supervisors bsed on its involvement or conversely had constructive knowledge of such conduct based on the internal organizational policies advanced by Defendants.

257.   Over the course of their employment, Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding Defendants' conduct toward Plaintiffs and their disparate treatment.

258.   Defendants, its supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

259.   Defendants, through its agents and employees, developed and encouraged animus against Plaintiff's because of their religious  convictions.

260.   The systematic discrimination, as previously set forth, further adversely affected the Plaintiffs through Defendants' promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of an "anti-vaxxer."

261.   Defendant failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

262.  Defendants' egregious discriminatory conduct, given the totality of circumstances, raises to a level that an objectively reasonable person could find constitutes a hostile work environment.

263.  The actions of Defendants, as set out herein, violate Title VII.

264.  As a result of Defendants conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.

265. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceeded to act with indifference to the high probability of injury to the Plaintiffs

266.  Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

#### ── COUNT VII ──

### Violation of Title 42 U.S.C. § 2000ff-1(a)(1) and (a)(2)
### Defendants' Discrimination Based on Genetic Information
### All Plaintiffs vs. United

267. Plaintiffs reallege and incorporates all the above paragraphs as if fully set forth herein.

268. The Genetic Information Non-Discrimination Act ("GINA") prohibits discrimination based on genetic information. Specifically, it is an unlawful employment practices for an employer to fail to refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee because of genetic information.

FILED DATE: 1/19/2023 2:01 PM   2023L000571

269. GINA also prohibits employers from limiting, segregating, or classifying the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee because of genetic information.

270. United is an employer within the meaning of GINA and at all times relevant hereto was engaged in an industry affecting commerce and has at all times had fifteen (15) or more employees.

271. Plaintiffs are employees as defined by GINA.

272. United has and continues to violate GINA by discriminating against Plaintiffs and other employees based on whether they have taken a COVID-19 gene therapy medical product.

273. United unlawfully discriminated and violated GINA when they took adverse employment actions against Plaintiffs and other employees because they are not or refuse to be vaccinated.

274. United unlawfully discriminated and violated GINA when they afforded better opportunities (i.e., routes, schedules and benefits) and greater compensation to those who are vaccinated than to Plaintiffs who are not, and requiring those who are unvaccinated to wear political symbols, while permitting those who are vaccinated to go without wearing political symbols.

275. Defendants engaged in these practices with malice and indifference to Plaintiffs' right to be free from discriminatory employment practices.

276. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression.   Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

277. United's discrimination has harmed and will continue to harm Plaintiffs.

278. Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so and the remainder are in the process of doing so.

#### ---- COUNT VIII ----

**Violation of Title 42 U.S.C. § 2000ff-1(b)**
**Defendants' Acquisition of Genetic Information**
**All Plaintiffs vs. United**

279. Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

280. GINA makes it unlawful for an employer to request, require or purchase genetic information with respect to an employee or a family member of the employee.

281. Polymerase Chain Reaction ("PCR") tests are used to amplify small segments of DNA which is genetic material. This is the same sort of test used for forensics, cloning, genome projects for mapping genes and DNA sequencing. Genetic test means a test that analyzes DNA, RNA or chromosomes for purposes of such as the prediction of disease or vertical transmission risks, or monitoring, diagnosis or prognosis.

282. For genetic tests, the first step is extraction of genetic material from a human specimen either through blood, hair, or oral swab. This is the exact same process used in the PCR test required and requested by United to detect the genetic material of COVID-19.

283. Defendants have and continue to violate GINA when requesting and requiring the genetic information from their employees by mandating they take the PCR test. Defendants violated GINA by requesting and requiring Plaintiffs to have their genetic information collected via nasopharyngeal or nasal swab (the swab scrapes the cells from inside the nasal cavity which has the genetic material from the person for whom the specimen is collected).

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 60

FILED DATE: 1/19/2023 2:01 PM   2023L000571

FILED DATE: 1/19/2023 2:01 PM   2023L000571

284. Defendants violated GINA when they requested Plaintiffs vaccination status because they are asking for their genetic information given the vaccines are gene therapies.

285. Defendants limited, segregated, discriminated or classified Plaintiffs based on their genetic information.

286. Defendants have engaged in these practices with malice and indifference to Plaintiffs' right to be free from discriminatory employment practices.

287. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

288. Defendants discrimination has harmed and will continue to harm Plaintiffs.

289. Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

—— **COUNT IX** ——

**Violation of Title 42 U.S.C. § 1983, *et seq*.**
**Defendants' Invasion of Right to Privacy, Denial of Equal Protection and**
**Due Process of Law**
**All Plaintiffs vs. United**

290. Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

291. Plaintiffs are citizens of the United States.

292. At all times relevant hereto, United was a government actor and a person acting under the color of law. That is, United has taken decisive employment actions that have caused Plaintiffs harm that is so impregnated with

COMPLAINT AND DEMAND FOR JURY TRIAL          APP. 61

governmental character that it can be regarded as government action. The government is compelling United's actions whether through incentive or threat.

293. United is also acting under color of law as it has conspired with Government officials to leverage Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire Plaintiffs personal, genetic information. United and the federal government have acted in lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights. Through private and public meetings, executive orders, and unlawful coercion and duress, United has acted in concert with the federal government at the expense of their employees including Plaintiffs.

294. First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

295.  Article 1, Section 6 of the Constitution of Illinois provides heightened privacy protections; greater than those provided in the Constitution of the United States

296. Applied here, Plaintiffs fundamental right to privacy includes the reasonable expectation to be free from coercion or put under duress and subjected to battery by United to inject an unwanted, experimental, foreign gene therapy into their body to save their livelihoods.

297. This privacy right also includes Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and

FILED DATE: 1/19/2023 2:01 PM   2023L000571

released. As a means of coercion, United violated Plaintiffs' privacy rights when they broadcast their private information on internal memos, published postcards with PHI and forced Plaintiffs to wear political symbols.

298. Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

299. Prior to and after the August 6, 2021 announcement of the vaccine mandate, vaccinated employees received preferential treatment compared to Plaintiffs who had not been vaccinated, which included increase in pay, preferential scheduling, additional benefits and privileges.

300. United knowingly and willfully discriminated against unvaccinated Plaintiffs who expressed religious concerns and treated persons who are vaccinated differently without lawful justification.

301. United, by allowing similarly situated Plaintiffs (those who are vaccinated) to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear political symbols, engaged in a facial deprivation of equal protection.

302. While United's vaccine mandate appeared neutral on its face, in practice it denies Plaintiffs equal protection under the law.

303. Mandated vaccinations, compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus there is no legitimate public interest promoted.

COMPLAINT AND DEMAND FOR JURY TRIAL          APP. 63

FILED DATE: 1/19/2023 2:01 PM   2023L000571

304. Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

305. Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.

306. The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes United as a State Actor from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

307. Here, United's actions are those of a State Actor and, while courts have recognized a compelling state interest in controlling the spread of infections, United lacks a compelling state interest to impose a vaccine mandate because the COVID-19 vaccines themselves do not provide immunity, reduce transmissibility, and are rampant with a host of tertiary health consequences, including death.

308. Assuming the vaccines could be said to satisfy the interest of preserving public health, United's mandate is not narrowly tailored since it is not the least restrictive means necessary as numerous, less restrictive means than vaccination exist that serve the public interest of protecting the public's health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to provide greater protection than the COVID-19 vaccines. Service to the public interest can be accomplished through safer, less restrictive treatments,

preventatives for early treatment, or medications, like the use of hydroxychloroquine, zinc and ivermectin.

309. As a direct and proximate result of United's policies, practices, regulations and conduct, Plaintiffs have suffered harm.

310. The conduct of United as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

311. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

### –– COUNT X ––

### Intentional Infliction of Emotional Distress
### All Plaintiffs vs. All Defendants

312. Plaintiffs reallege and incorporates the paragraphs above as if fully set forth herein.

313. Defendants acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

314. Defendants conduct has been and continues to be extreme and outrageous.

315. As a proximate result of Defendants' actions, Plaintiffs have suffered severe emotional distress.

316. The harm caused by Defendants was a reasonably foreseeable consequence of the Defendants conduct.

COMPLAINT AND DEMAND FOR JURY TRIAL

APP. 65

-- 62 --

FILED DATE: 1/19/2023 2:01 PM    2023L000571

317. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression.  Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs

#### ---- COUNT XI ----

#### Negligent Infliction of Emotional Distress
#### All Plaintiffs vs. All Defendants

318. Plaintiffs reallege and incorporates all paragraphs above as if fully set forth herein.

319. Defendants acted negligently and with "reckless and/or wanton disregard of the interests of Plaintiffs" with respect to the conduct set forth in this Complaint.

320. As a proximate result of Defendants' conduct, Plaintiffs have suffered serious and/or severe emotional distress.

321. The harm caused by Defendants was a reasonably foreseeable consequence of the Defendants conduct.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELEIF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

i.    An award of compensatory damages in appropriate amounts to be established at trial, including the sum of salaries that would be earned until natural retirement along with post-retirement pensions and benefits in amount no less than an average of $4,500,000 per Plaintiff;

COMPLAINT AND DEMAND FOR JURY TRIAL                    APP. 66

ii.   Consequential damages or the maximum permitted by law as determined by the jury (up to $30,000,000 per Plaintiff);

iii.  Incidental damages or the maximum permitted by law as determined by the jury;

iv.   Punitive damages permitted by law as determined by the jury but in no event less than $30,000,000,000;

v.    An award of attorneys' fees and costs associated with this action;

vi.   Reinstatement and/or compensatory damages for all employees who retired early or separated in lieu of dismissal, as a result of the United's vaccine mandate;

vii.  An award of prejudgment and post-judgment interest at the legal rate to the maximum extent permitted by law; and

viii. Such other and further relief as the Court may deem just and proper.

Dated: January 19, 2023                  Respectfully submitted,


**John Pierce Law, P.C.**


By:  */s/ John Pierce*_____
John M. Pierce
jpierce@johnpiercelaw.com
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
Telephone: (213) 349-0054

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, W

FILED DATE: 1/19/2023 2:43 PM     2023L000571

FILED
1/19/2023 2:43 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L000571
Calendar, W
21114866

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## LAW DIVISION

Thomas Anderson, et al.,            )
                                    )
            Plaintiffs,             )      Case No. 2023L000571
                                    )
v.                                  )      **Jury Trial Demanded**
                                    )
United Airlines, et. al.,           )
                                    )
            Defendants.             )

### RULE 222 AFFIDAVIT

Pursuant to Supreme Court Rule 222, the undersigned attorney, based upon

information and belief, certifies that the total money damages sought exceeds Fifty

Thousand Dollars ($50,000). Plaintiffs reserve the right to amend this affidavit and

the amount of damages sought pursuant to Supreme Court Rule 222(b).

                                    Respectfully Submitted,

                                    By: /s/ John M. Pierce

                                    One of Plaintiff's Attorneys

Attorney John M. Pierce
jpierce@johnpiercelaw.com
21550 Oxnard St., 3rd Fl PMB 172
Woodland Hills, CA 91367
Telephone: (213) 349-0054

APP. 68

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| THOMAS ANDERSON, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 3:21-CV-01050-TJC-LLL |
| | § | |
| UNITED AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

**DEFENDANT UNITED AIRLINES, INC.'S MOTION TO DISMISS
PLAINTIFFS' THIRD AMENDED COMPLAINT
AND INCORPORATED MEMORANDUM IN SUPPORT**



EXHIBIT
**C**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................2

LEGAL STANDARD ..........................................................................2

ARGUMENT ....................................................................................3

    I.    The Court Lacks Personal Jurisdiction Over the Vast Majority of the Named Plaintiffs' Claims. .........................................................3

        a.    United Is Not Subject to General Jurisdiction in Florida. .......3

        b.    United Is Not Subject to Specific Jurisdiction As to Claims of Named Plaintiffs Who Work Outside Florida. .........5

    II.    Plaintiffs' Third Amended Complaint is a "Shotgun" Pleading..........7

    III.    Plaintiffs Fail To State Any Plausible Nuremberg Claim Or Other International Law Violation. ..................................................... 8

    IV.    Plaintiffs Fail To Plausibly State a TVPA Claim...............................10

    V.    Plaintiffs Cannot State Any Plausible EUA Claim. ......................... 11

    VI.    Plaintiffs Cannot State Any Plausible Claim Against United Based on the U.S. Constitution or Section 1983. ............................. 12

        a.    United Is Not a State Actor. ................................................... 12

        b.    Even if United Were a State Actor, Plaintiffs' Constitutional Causes of Action Fail to State a Claim. ........... 15

    VII.    Plaintiffs' Employment Claims Under GINA, the ADA, and Title VII Fail to State Plausible Claims for Relief. ........................... 17

        a.    Plaintiffs Have Not Exhausted Administrative Remedies, So Their Employment Claims Are Barred. ........... 17

        b.    Exhaustion Aside, Plaintiffs Have Not Stated Plausible Violations of ADA, GINA, or Title VII. ....................................19

CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abdullahi v. Pfizer, Inc.*
    562 F.3d 163 (2d Cir. 2009) ..................................................................9

*AFL-CIO v. City of Miami,*
    637 F.3d 1178 (11th Cir. 2011) ............................................................2

*Aldana v. Del Monte Fresh Produce, N.A., Inc.,*
    416 F.3d 1242 (11th Cir. 2005) ........................................................... 8

*Ansonia Bd. of Educ. v. Philbrook,*
    479 U.S. 60 (1986) ......................................................................22, 25

*Baloco ex rel. Tapia v. Drummond Co., Inc.,*
    640 F.3d 1338 (11th Cir. 2011) ..........................................................10

*Barmapov v. Amuial,*
    986 F.3d 1321 (11th Cir. 2021) ...........................................................7

*Bassett v. Sinterloy Corp.,*
    2002 WL 1888477 (N.D. Ill. Aug. 15, 2002) ......................................3

*Beadle v. City of Tampa,*
    42 F.3d 633 (11th Cir. 1995) ............................................................ 24

*Beadle v. Hillsborough Cnty. Sheriff's Dep't,*
    29 F.3d 589 (11th Cir. 1994) .............................................................23

*Beck v. PRC/IAC,*
    2009 WL 10698418 (S.D. Fla. Jan. 21, 2009) ....................................3

*Beckerich v. St. Elizabeth Med. Ctr.,*
    2021 WL 4722915 (E.D. Ky. Sept. 30, 2021) .................................... 15

*Beckerich v. St. Elizabeth Med. Ctr.,*
    No. 21-105-DLB-EBA, 2021 WL 4398027
    (E.D. Ky. Sept. 24, 2021) ..............................................................13, 15

*Berenato v. Tankel,*
2011 WL 2784438 (M.D. Fla. July 15, 2011)....................................................3, 25

*BNSF Ry. Co. v. Tyrrell,*
137 S. Ct. 1549 (2017) ...............................................................................4

*Brackin v. Anson,*
585 F. App'x 991 (11th Cir. 2014) ...........................................................16

*Bridges v. Houston Methodist Hosp.,*
2021 WL 2399994 (S.D. Tex. June 12, 2021) ................................................ 9, 12

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.,*
*San Francisco Cnty.,*
137 S. Ct. 1773 (2017)...............................................................................6

*Carmouche v. Tamborlee Mgmt., Inc.,*
789 F.3d 1201 (11th Cir. 2015) ...............................................................3

*Children's Health Defense v. Facebook Inc.,*
No. 20-cv-05787-SI, 2021 WL 2662064 (N.D. Cal. June 29, 2021)................ 13

*Ciraci v. The J.W. Smucker Co.,*
2021 WL 6064748 (Dec. 12, 2021 N.D. Ohio)..................................12, 14, 18, 25

*Cox v. Nobles,*
15 F.4th 1350 (11th Cir. 2021) ...............................................................3

*Daimler AG v. Bauman,*
571 U.S. 117 (2014)...............................................................................3, 4

*Dalberiste v. GLE Assocs., Inc.,*
814 F. App'x 495 (11th Cir. 2020) ...................................................... 24

*EEOC v. Papin Enters., Inc.,*
2009 WL 2256023 (M.D. Fla. July 28, 2009)...................................................25

*Estate of McCall v. United States,*
642 F.3d 944 (11th Cir. 2011) ...............................................................16

*Federal Exp. Corp. v. Holowecki,*
552 U.S. 389 (2008).........................................................................19, 20, 25

- iii -

*Florida v. Dep't of Health and Hum. Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ................................................................. 15

*Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021) ........................................................................................ 5

*Forehand v. Fla. State Hosp. at Chattahoochee*,
    89 F.3d 1562 (11th Cir. 1996) .............................................................. 17

*Fort Bend County v. Davis*,
    139 S. Ct. 1843 (2019) ...................................................................................... 18

*Fry v. Muscogee Cnty. Sch. Dist.*,
    150 F. App'x 980 (11th Cir. 2005) ........................................................ 18

*Great Am. Assurance Co. v. Ride Sols., Inc.*,
    2017 WL 78645 (M.D. Fla. Jan. 9, 2017) .................................... 2, 14

*Greenfield v. City of Miami Beach*,
    844 F. Supp. 1519 (S.D. Fla. 1992) ...................................................... 23

*Habitat for Human. Int'l v. Morris*,
    2020 WL 1677304 (M.D. Fla. Apr. 6, 2020) ................................. 22

*Harvey v. Harvey*,
    949 F. 2d 1127 (11th Cir. 1992) ................................................... 13, 17

*Hencey v. United Airlines, Inc.*,
    2021 WL 3634630 (S.D. Fla. Aug. 17, 2021) ................................... 8

*Hollis v. W. Acad. Charter, Inc.*,
    782 F. App'x 951 (11th Cir. 2019) ........................................................ 18

*Hopkins v. Jacksonville Ass'n of Firefighters*,
    2018 WL 6696999 (M.D. Fla. Dec. 20, 2018) ............................... 24

*Interim Healthcare, Inc. v. Interim Healthcare of*
    *Se. Louisiana, Inc.*,
    2020 WL 3078531 (S.D. Fla. June 10, 2020) ................................... 2

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905) ............................................................................................ 15

APP. 73

*Jesner v. Arab Bank, PLC,*
   138 S. Ct. 1386 (2018) ...................................................................10

*Johnson v. Golfcrest Healthcare Ctr.,*
   2019 WL 1900968 (S.D. Fla. Apr. 29, 2019) ....................................18

*Khanthapixay v. Loyola Marymount Univ.,*
   No.: 2:21-cv-06000-AB, 2021 WL 4025796
   (C.D. Cal. Aug. 9, 2021) ................................................................13

*Lane v. Piedmont Healthcare,*
   No. 1:21-CV-2430-TWT, 2021 WL 5074494
   (N.D. Ga. Oct. 13, 2021) ................................................................13

*Manhattan Cmty. Access Corp. v. Halleck,*
   139 S. Ct. 1921 (2019) .............................................................. 14, 15

*McCarter v. Harris Cnty.,*
   2006 WL 1281087 (S.D. Tex. May 5, 2006) .................................. 24

*McCutcheon v. Enlivant ES, LLC,*
   2021 WL 5234787 (S.D. W. Va. Nov. 9, 2021)................................12

*Mohamad v. Palestinian Auth.,*
   566 U.S. 449 (2012)........................................................................10

*Montgomery Cty. Comm'n v. Fed. Hous. Fin. Agency,*
   776 F.3d 1247 (11th Cir. 2015)....................................................... 17

*Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO,*
   860 F.2d 1022 (11th Cir. 1988) .......................................................14

*Nestle USA, Inc. v. Doe,*
   141 S. Ct. 1931 (2021).......................................................................9

*Phillips v. Harbor Venice Mgmt., LLC,*
   2020 WL 495224 (M.D. Fla. Jan. 30, 2020)...................................22

*Rodriguez v. Verizon Comm'ns,*
   2018 WL 2441748 (D.N.J. May 30, 2018)......................................22

*Ross v. Blake,*
578 U.S. 632 (2016)..................................................................................19

*Sambrano v. United Airlines, Inc.,*
2021 WL 5178829 (N.D. Tex. Nov. 8, 2021)................................4, 5, 6

*Sculptchair, Inc. v. Century Arts, Ltd.,*
94 F.3d 623 (11th Cir. 1996)..................................................................2

*Snow v. DirecTV, Inc.,*
450 F.3d 1314 (11th Cir. 2006)..............................................................3

*Story v. Heartland Payment Sys. LLC,*
461 F. Supp. 3d 1216 (M.D. Fla. 2020) .............................................6, 7

*Ungaro-Benages v. Dresdner Bank AG,*
379 F.3d 1227 (11th Cir. 2004)..............................................................8

*United Techs. Corp. v. Mazer,*
556 F.3d 1260 (11th Cir. 2009) .............................................................2

*Vallarta v. United Airlines, Inc.,*
497 F. Supp. 3d 790 (N.D. Cal. 2020) ..................................................4

*Waite v. All Acquisition Corp.,*
901 F.3d 1307 (11th Cir. 2018) .............................................................5

*Walden v. Ctrs. for Disease Control & Prevention,*
669 F.3d 1277 (11th Cir. 2012) ...........................................................23

*Walden v. Fiore,*
571 U.S. 277 (2014).................................................................................6

*Washington v. Glucksberg,*
521 U.S. 702 (1997)...............................................................................16

*Weiland v. Palm Beach Cty. Sheriff's Off.,*
792 F.3d 1313 (11th Cir. 2015).............................................................7

*Wisskopf v. United Jewish Appeal-Federation of Jewish
Philanthropies of N.Y.,*
889 F. Supp. 2d 912 (S.D. Tex. 2012) ..................................................3

*Zito v. United Airlines, Inc.*,
    523 F. Supp. 3d 377 (W.D.N.Y. 2021) ..................................................................4

*Zurich American Ins. Co. v. Tavistock Rests. Grp., LLC*,
    2021 WL 5104302 (M.D. Fla. Nov. 1, 2021) .......................................................16

**STATUTES**

8 U.S.C. § 1101(a)(3) .......................................................................................... 8

28 U.S.C. § 1350, note, § 3(b)(1) ..........................................................................10

42 U.S.C. § 2000e-5................................................................................... 17, 18

42 U.S.C. § 2000e(j) ......................................................................................23, 25

42 U.S.C. § 2000ff ................................................................................ 3, 17, 18, 20

42 U.S.C. § 12112(d)(4)(A).................................................................................19

42 U.S.C. § 12117(a) ................................................................................... 17, 18

**OTHER AUTHORITIES**

29 C.F.R § 1635.3(f)(3)(ii) ................................................................................ 20

Mem. Op. for the Deputy Counsel to the President, Whether Section
    564 of the Food, Drug, and Cosmetic Act Prohibits Entities from
    Requiring the Use of a Vaccine Subject to an Emergency Use
    Authorization, 45 Op. O.L.C. ___, at 1 (July 6, 2021),
    https://www.justice.gov/olc/file/1415446/download ..................................... 11

What You Should Know About COVID-19 and the ADA, the
    Rehabilitation Act, and Other EEO Laws, E.E.O.C. (updated Dec.
    14, 2021), https://www.eeoc.gov/wysk/what-you-should-know-
    about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ....11, 19, 20, 25

United Airlines, Inc. ("United") hereby moves to dismiss Plaintiffs' Third Amended Complaint ("TAC" or "Complaint"), ECF No. 27, under Federal Rule of Civil Procedure ("Rule") 12(b)(2) and 12(b)(6), for the following reasons.

### INTRODUCTION

"At 223 pages, the TAC is verbose and contains much irrelevant, inflammatory, and conclusory content." ECF No. 44 at 4 ("PI Order"). It levels scattershot international-law, constitutional, and statutory claims against United on behalf of 56 disjointed Plaintiffs in this putative class action. Plaintiffs' objective is to prohibit United from taking *any* precautions to combat the COVID-19 pandemic, which has claimed over 800,000 American lives: no masks, no COVID-19 testing, and no vaccines for employees who do not qualify for a medical or religious accommodation.

The Court should dismiss the Complaint. *First*, the vast majority of the named Plaintiffs work outside of Florida and cannot establish personal jurisdiction. Part I. *Second*, despite having multiple chances to replead (and having a similar lawsuit dismissed on this basis), the TAC is a "shotgun pleading" that violates several of the requirements the Eleventh Circuit prescribes for complying with Rule 8 and Rule 10. Part II. *Third*, each of Plaintiffs' 14 Counts fails to state a claim upon which relief can be granted—because (a) it is bereft of facts necessary to plausibly advance a claim, (b) it cannot satisfy the elements of the cause of action, or (c) both. Parts III-VII.

APP. 77

## BACKGROUND

United refers to the declaration of Kirk Limacher, VP-HR, filed herewith in support of objections to personal jurisdiction under Rule 12(b)(2). For purposes of United's Rule 12(b)(6) motion, Plaintiffs' well-pled, non-conclusory allegations are taken as true. For background, United refers to its brief opposing a preliminary injunction, ECF No. 30, at 2-5, and the Court's PI Order, ECF No. 44.

## LEGAL STANDARD

Plaintiffs bear the burden of demonstrating personal jurisdiction. *See United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1274 (11th Cir. 2009). If the defendant submits evidence against jurisdiction, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* at 1274; *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). "[W]hen the plaintiff offers no competent evidence to the contrary, [the] court may find that the defendant's unrebutted denials [are] sufficient to negate plaintiff's jurisdictional allegations." *Interim Healthcare, Inc. v. Interim Healthcare of Se. Louisiana, Inc.*, 2020 WL 3078531, at *7 (S.D. Fla. June 10, 2020).

A complaint must be dismissed under Rule 12(b)(6) unless it contains "sufficient factual allegations to 'state a claim to relief that is plausible on its face,' and 'raise a right to relief above the speculative level.'" *Great Am. Assurance Co. v. Ride Sols., Inc.*, 2017 WL 78645, at *1 (M.D. Fla. Jan. 9, 2017) (Corrigan, J.). For each claim, the plaintiff must set forth factual allegations that establish all "the material elements of a cause of action." *AFL-CIO v. City of Miami*, 637 F.3d 1178,

APP. 78

1186 (11th Cir. 2011). Well-pled facts must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"—facts "merely consistent with liability" are not enough. *Berenato v. Tankel*, 2011 WL 2784438, at *1 (M.D. Fla. July 15, 2011) (Corrigan, J.). The Court should "dismiss a complaint if it rests only on 'conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts.'" *Cox v. Nobles*, 15 F.4th 1350, 1356–57 (11th Cir. 2021).

## ARGUMENT

### I. THE COURT LACKS PERSONAL JURISDICTION OVER THE VAST MAJORITY OF THE NAMED PLAINTIFFS' CLAIMS.

#### a. United Is Not Subject to General Jurisdiction in Florida.

Where a district court has federal-question jurisdiction, but the federal statute does not provide for nationwide service of process, the forum state's long-arm statute determines personal jurisdiction, subject to the constraints of due process.[1] *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006).

Absent an "exceptional case," a corporation only is "at home" and subject to general personal jurisdiction consistent with due process where it is incorporated and where it has its principal place of business. *Daimler AG v. Bauman*, 571 U.S.

---

[1] None of Plaintiffs' statutory claims authorizes nationwide service of process. *See Wisskopf v. United Jewish Appeal-Federation of Jewish Philanthropies of N.Y.*, 889 F. Supp. 2d 912, 920 (S.D. Tex. 2012) (ATS and TVPA); *Beck v. PRC/IAC*, 2009 WL 10698418, at *3 n.3 (S.D. Fla. Jan. 21, 2009) (Title VII); *Bassett v. Sinterloy Corp.*, 2002 WL 1888477, at *2 (N.D. Ill. Aug. 15, 2002) (ADA); 42 U.S.C. § 2000ff, *et seq.* (GINA). United addresses the due-process analysis for personal jurisdiction because it constrains the reach of Florida's long-arm statute, *see, e.*g., *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015), without conceding that Plaintiffs satisfy the long-arm statute's requirements. Plaintiffs purport to invoke both federal-question jurisdiction and diversity jurisdiction. *See TAC* ¶ 9. In diversity, courts also look to the forum state's long-arm statute—and, again, subject to due process limits. *Carmouche*, 789 F.3d at 1203.

117, 138-39, 139 n.19 (2014); *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017) (railroad not subject to general personal jurisdiction in Montana despite over 2,000 miles of railroad track and 2,000 employees there).

As Plaintiffs admit, United is a Delaware corporation with its principal place of business in Illinois. Limacher Decl. ¶ 2; *see also* TAC at 2 (Delaware); *id.* ¶ 7 (Illinois). Courts have already held that United does not satisfy *Daimler*'s "exceptional case" in various states outside these twin bases for general jurisdiction. *See Vallarta v. United Airlines, Inc.*, 497 F. Supp. 3d 790, 799 (N.D. Cal. 2020) (no general jurisdiction in California, where United had two hubs and "a substantial number of employees"); *Sambrano v. United Airlines, Inc.*, 2021 WL 5178829, at *4 (N.D. Tex. Nov. 8, 2021) (no general jurisdiction in Texas, where United had "one of its seven hubs" and "16% of its employees work"); *Zito v. United Airlines, Inc.*, 523 F. Supp. 3d 377, 383–84 (W.D.N.Y. 2021) (no general jurisdiction in New York where United alleged to "regularly and continually conduct[] business"). United has even fewer connections to Florida than to these other states. *See* Limacher Decl. ¶ 4 (none of United's seven airport hubs is in Florida, and "less than 3% of United's active U.S. employees work in Florida"). Were these Florida contacts deemed sufficient to confer general jurisdiction over United, it would violate the Supreme Court's teaching that a "corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler*, 571 U.S. at 139 n. 20. Plaintiffs therefore cannot carry their "heavy burden" of

showing that United is "at home" in Florida. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1317 (11th Cir. 2018).

### b. United Is Not Subject to Specific Jurisdiction As to Claims of Named Plaintiffs Who Work Outside Florida.

For a court to have specific personal jurisdiction over a plaintiff's claim, the claim must "arise out of or relate to the defendant's forum-state contacts." *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). Plaintiffs cannot clear this basic prerequisite under the Due Process Clause for the vast majority of the named Plaintiffs' claims.

Here, Plaintiffs contest United's vaccination requirement for employees nationwide, but offer *no* allegations as to their individual locations of employment or residency. The facts are that at least 42 of the 56 named Plaintiffs both work *and* live *outside* of Florida. *See* Limacher Decl. ¶ 5 (detailing the work and home location of the named Plaintiffs). These 42 named Plaintiffs do not—and cannot—demonstrate that their injuries occurred in Florida, and they allege no Florida-specific conduct by United underlying their claims. *See* Limacher Decl. ¶ 3 (explaining that United's reasonable accommodation policy was designed in Chicago, Illinois). It is thus axiomatic that their claims do not "arise out of or relate" to any Florida contacts by United and must be dismissed. *Ford Motor Co.*, 141 S. Ct. at 1026; *Waite*, 901 F.3d at 1313-314 (specific jurisdiction focuses on the suit-related "activity or occurrence" in the forum state, ignoring "defendant's unconnected activities in the [s]tate"); *see also Sambrano*, 2021 WL 5178829, at *7

(dismissing employment claim of named plaintiff living and working for United in Illinois as "not relate[d] to the forum state" of Texas).

Furthermore, two of the 14 remaining Plaintiffs, including lead Plaintiff Thomas Anderson, are not based in Florida for their work with United, but reside in Florida. Limacher Decl. ¶ 5. A plaintiff who merely lives in the forum state and works outside the forum state cannot establish specific personal jurisdiction over claims involving his or her employment *outside* the forum state. Therefore, personal jurisdiction is also absent as to these additional two named Plaintiffs. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014) (explaining that "the plaintiff cannot be the only link between the defendant and the forum"); *but see Sambrano*, 2021 WL 5178829, at *6 (finding specific jurisdiction because plaintiff lived in forum).[2]

At present, this Court should grant United's motion to dismiss any named Plaintiff who does not work in Florida, or at least the 42 named Plaintiffs who *neither* live *nor* work in Florida, "without prejudice to their joining as members of a national class in the event the Court certifies ones and they qualify as members"

---

[2] Consistent with a prior ruling of this Court and the recent *Sambrano* decision, United does not move, at this time, for the dismissal of *putative* class members' claims for lack of personal jurisdiction. If any claims survive 12(b)(6) dismissal and Plaintiffs move for class certification, United expects to move to dismiss absent putative class members' claims under *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1781 (2017) ("The mere fact that other plaintiffs were [injured] in [Florida]—and allegedly sustained the same injuries as did the nonresidents—does not allow the [state] to assert specific jurisdiction over the nonresidents' claims."). *See, e.g., Story v. Heartland Payment Sys. LLC*, 461 F. Supp. 3d 1216, 1230 n.22 (M.D. Fla. 2020) (Corrigan, J.) (dismissing named plaintiffs in a putative class action for lack of personal jurisdiction and deferring consideration of "*Bristol-Myers'* application or the outcome if plaintiffs move for class certification"); *Sambrano*, 2021 WL 5178829, at *8 (holding that "putative class members are always treated as nonparties" and that, thus, the court would entertain United's motion to "dismiss all out-of-state putative class members" at the class-certification stage).

with a cognizable basis for specific jurisdiction. *Story*, 461 F. Supp.3d at 1232. Not only does due process require this, but excluding these Plaintiffs will streamline any subsequent pre-class certification litigation and discovery.

## II.   PLAINTIFFS' THIRD AMENDED COMPLAINT IS A "SHOTGUN" PLEADING.

The Eleventh Circuit does not tolerate "shotgun" pleadings. *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) ("A shotgun pleading is a complaint that violates either [Rule] 8(a)(2) or Rule 10(b), or both.") Yet, as this Court recognized and provided clear notice to Plaintiffs, "the TAC is . . . an impermissible shotgun pleading." PI Order at 5. *First*, the TAC commits the "mortal sin" of "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before." *Barmapov*, 986 F.3d at 1324-25; *see, e.g.*, TAC ¶ 395. *See* PI Order at 5 (explaining that "each count incorporates each of the preceding counts." (citing *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015))).

*Second*, the TAC commits "the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1322. As this Court explained, among other things, the "TAC does not state the fifty-six named plaintiffs' current of former positions at United [or], explain how they specifically have been harmed by United's policies." PI Order at 5. *Third*, the TAC "commits the sin of not separating into a different count each cause of action or claim for relief." *Weiland*, 792 F.3d at 1322-

23. Plaintiffs improperly attempt to allege additional claims by asserting various "violations" embedded *within* the same count. *E.g.*, TAC ¶¶ 252–65.

On any, or all, of these bases, the TAC constitutes a "shotgun" pleading. The proper course is to dismiss it with prejudice without a claim-by-claim analysis: Plaintiffs have been repeatedly warned about their shotgun pleadings (in this case and, represented by the same counsel, when many of them filed a similar lawsuit, *Hencey v. United Airlines, Inc.*, 2021 WL 3634630, at *2 (S.D. Fla. Aug. 17, 2021)). Plaintiffs have taken four opportunities to file a proper complaint. That is enough.

## III.   PLAINTIFFS FAIL TO STATE ANY PLAUSIBLE NUREMBERG CLAIM OR OTHER INTERNATIONAL LAW VIOLATION.

Count XIII asserts United violated the Nuremberg Code with its vaccine Policy. *See* TAC ¶¶ 369-93. As this Court recognized, PI Order at 16-19 & n.7, these claims must be dismissed for three reasons. *First*, a "private right of action for violations of international law [exists] only where there is a statute expressing Congress's intention to permit private suits." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1232 n.7 (11th Cir. 2004). No such statute exists here. Plaintiffs cannot rely on the Alien Tort Statute ("ATS"), TAC ¶ 10, because no Plaintiff alleges alien status. *See* 8 U.S.C. § 1101(a)(3); PI Order at 17-18. "As an American citizen, [a] plaintiff cannot rely on the Alien Torts Claims Act" for a cause of action. *Ungaro-Benages*, 379 F.3d at 1232 n.7; *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005). *Second*, this Court correctly recognized that, "as other courts have held, COVID-19 vaccine mandates are simply not equivalent to the forced experimentation on concentration camp victims that led

- 8 -

to the writing of the Nuremberg Code." PI Order at 19 (citing *Johnson v. Brown*, 2021 WL 4846060, at *11 (D. Or. Oct. 18, 2021); *Bridges v. Houston Methodist Hosp.*, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021)).

A comparison to the ATS case invoked by Plaintiffs, *Abdullahi v. Pfizer, Inc.* 562 F.3d 163 (2d Cir. 2009), shows why the claim fails against United on these two bases. Unlike the Plaintiffs here, the *Abdullahi* plaintiffs *were* aliens (Nigerian children and their guardians). *Id.* at 168. Further, those aliens claimed that the defendant "recruited two hundred sick children" and subjected them to non-consensual trials, without any follow-up care, of a drug that lacked FDA approval. *Id.* Plaintiffs do not (and cannot) allege United did anything of the sort.

*Third*, for good reason the Eleventh Circuit has not adopted the holding of the divided Second Circuit panel in *Abdullahi* that a Nuremberg Code claim properly can be advanced under the ATS. At the time, Judge Wesley viewed it as out-of-step with Supreme Court precedent, and more recent cases from the Supreme Court counseling extreme caution before recognizing new ATS claims make this even clearer. *See Abdullahi*, 562 F.3d at 192 (Wesley, J., dissenting) (disagreeing with the majority's recognition of "a norm against non-consensual medical experimentation on humans by private actors [that] is universal and obligatory"); *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1939 (2021) ("Our decisions since *Sosa*, as well as congressional activity, compel the conclusion that federal courts should not recognize private rights of action for violations of international law beyond the three historical torts identified in *Sosa*."). This Court correctly

recognized, along these lines, that the fact that principles akin to the Nuremberg Code "have been incorporated into domestic law," such as FDA regulations, makes it especially implausible to conclude that the U.S. Plaintiffs here have valid international law claims under the ATS. PI Order at 18.

## IV.   PLAINTIFFS FAIL TO PLAUSIBLY STATE A TVPA CLAIM.

Count XIV asserts that United violated the Torture Victim Protection Act of 1991 ("TVPA"). TAC ¶¶ 395-398. Two independent grounds require dismissal. *First*, United is a corporation—not an individual—and therefore cannot be liable under the TVPA. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1404 (2018) (explaining the "key feature of the TVPA . . . is that it limits liability to 'individuals,' which, the Court has held, unambiguously limits liability to natural persons"); *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

*Second*, as the Court explained, "the TVPA creates an express cause of action for victims of torture[.]" PI Order at 17 n.6. Nothing alleged about United's vaccine policy remotely approaches the necessary TVPA element of "torture." *See* Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992), codified at 28 U.S.C. § 1350, note, § 3(b)(1) (defining "torture" as an act "directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual . . . a confession, punishing that individual . . ., intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind"); *Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640

F.3d 1338, 1346 (11th Cir. 2011). The conduct alleged by Plaintiffs to violate the TVPA—ranging from emails and postcards encouraging employees to upload proof of vaccination, to phone calls inquiries about vaccine status, to offering employees incentives to take the vaccine (TAC ¶ 397)—lacks any of this.

## V. PLAINTIFFS CANNOT STATE ANY PLAUSIBLE EUA CLAIM.

Count VI invokes the Emergency Use Authorization (EUA) statute, 21 U.S.C. § 360bbb-3. TAC ¶¶ 279-290. This statute "authorizes the [FDA] to issue an 'emergency use authorization' ("EUA") for a medical product, such as a vaccine, under certain emergency circumstances."[3] The FDA initially approved the three major COVID-19 vaccines through this process. *See* OLC Memo at 6. However, the deadline for United's COVID policy allowed employees to become vaccinated after the FDA granted full, as opposed to emergency, approval of Pfizer's COVID vaccine, rendering the EUA irrelevant. TAC ¶¶ 92, 94 (noting that United's vaccine policy was tied to the FDA's August 23, 2021 full approval of Pfizer's Comirnaty).

Even accepting Plaintiffs' flawed premise that the vaccines had only received EUA approval, this claim must be dismissed. There is no prohibition on "private entities . . . imposing vaccination requirements for a vaccine that is subject to an EUA," as explained by the U.S. Justice Department and EEOC.[4] Courts agree and

---

[3] See Mem. Op. for the Deputy Counsel to the President, Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization, 45 Op. O.L.C. ___, at 1 (July 6, 2021) ("OLC Memo"), https://www.justice.gov/olc/file/1415446/download.

[4] *See* OLC Memo at 18; What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, E.E.O.C. (updated Dec. 14, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

uniformly have legally rejected EUA claims against private employers like United. *See Ciraci v. The J.W. Smucker Co.*, 2021 WL 6064748, at \*2 n.1 (Dec. 12, 2021 N.D. Ohio) (holding "EUA statute does not apply to private actors"); *Bridges*, 2021 WL 2399994, at \*2 (dismissing claim under EUA to private employer's COVID vaccine requirement); *McCutcheon v. Enlivant ES, LLC*, 2021 WL 5234787, at \*3 (S.D. W. Va. Nov. 9, 2021) (dismissing claim because EUA "outlines the rights and responsibilities of the Secretary of Health and Human Services in an emergency; it has no impact upon the rights and responsibilities of private employers.").

## VI. PLAINTIFFS CANNOT STATE ANY PLAUSIBLE CLAIM AGAINST UNITED BASED ON THE U.S. CONSTITUTION OR SECTION 1983.

### a. United Is Not a State Actor.

The TAC asserts seven constitutional claims (many of which overlap): Count V (separation of powers), Count VII (Equal Protection Clause), Count VIII (Commerce Clause and states' rights), Count IX (right to privacy under 42 U.S.C. § 1983), Count X (another Equal Protection Clause claim), Count XI (substantive due process rights), and Count XII (procedural due process rights). TAC ¶¶ 266–278, 291–368. The scattershot nature of these allegations aside, each constitutional claim fails for a simple reason this Court already recognized: Plaintiffs do "not plausibly allege that United is a state actor, rather than a private business." PI Order at 15. Every other court to consider similar arguments in the

context of the COVID-19 pandemic has rejected efforts to transform private employers into state actors subject to constitutional claims.[5]

As this Court explained in its PI Order, applying the Eleventh Circuit's test for state action under the Constitution or Section 1983 makes clear that this is *not* one of those "rare circumstances [where] a private party [can] be viewed as a 'state actor.'" *Harvey v. Harvey*, 949 F. 2d 1127, 1130 (11th Cir. 1992). *See* PI Order at 14-16. The TAC does not plausibly allege facts satisfying any of the "three tests for establishing state action . . . [1] the public function test, [2] the state compulsion test, and [3] the nexus/joint action test." *Id.*

**Public Function and Compulsion Tests.** "[T]he public function test shows state action only when private actors are given powers (or perform functions) that are traditionally the *exclusive prerogative* of the State." *Id.* at 1131 (internal quotation marks omitted) (emphasis added). Plaintiffs do not (and cannot) plausibly allege "that United has taken on a public function under this test." PI Order at 15. At best, Plaintiffs try to contend that the United States is compelling United's vaccine policy on the view that it was implemented with "the

---

[5] *See, e.g.*, *Lane v. Piedmont Healthcare*, No. 1:21-CV-2430-TWT, 2021 WL 5074494, at *2 (N.D. Ga. Oct. 13, 2021) (defendant not state actor despite receiving "significant amounts of public funds, including those appropriated for responding to the COVID-19 pandemic"); *Beckerich v. St. Elizabeth Med. Ctr.*, No. 21-105-DLB-EBA, 2021 WL 4398027, at *3 (E.D. Ky. Sept. 24, 2021) (rejecting argument that funding to private hospital transformed it into a "state actor[] for purposes of constitutional questions"); *Khanthapixay v. Loyola Marymount Univ.*, No.: 2:21-cv-06000-AB (KSx), 2021 WL 4025796, at *3 (C.D. Cal. Aug. 9, 2021) (university not state actor for following county COVID-19 guidelines and policies); *Children's Health Defense v. Facebook Inc.*, No. 20-cv-05787-SI, 2021 WL 2662064, at *11 (N.D. Cal. June 29, 2021) (social media company not state actor for "working together" with the government to reduce COVID-19 health or vaccine misinformation).

- 13 -

full power and backing of the Federal government," TAC ¶ 363, claiming that the executive branch is "actually compelling United" to "do [its] proverbial . . . dirty work for" it, *id.* at ¶ 193. But the TAC is clear that United announced its vaccine policy *before* any federal requirement was in place. *See id.* at ¶ 92. Thus, Plaintiffs fail to assert "factual allegations to 'state a claim to relief that is plausible on its face.'" *Great Am. Assurance Co.*, 2017 WL 78645, at *1. *Cf. Ciraci*, 2021 WL 6064748, at *2 (Plaintiffs unlikely to succeed in showing state action on constitutional claim against private employer where defendant "announced its formal [vaccine] policy" on "a date that does not correspond to any action by the federal government"). The government's mere approval (*see* TAC ¶ 187) of "the initiatives of a private party is not sufficient" for state compulsion. *Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1025 (11th Cir. 1988). *See* PI Order at 15 ("Anderson has not alleged that United is compelled by law to impose its COVID-19 measures.").

**Nexus/Joint Action Test.** Aside from alleging that United and the Federal Government shared a common objective of promoting vaccination (TAC ¶ 187) —which, as noted, is insufficient to make United a state actor, *see, e.g.*, *Nat'l Broad. Co.*, 860 F.2d at 1025,—Plaintiffs allege United became a state actor by accepting COVID-19 relief funding. *See, e.g.*, TAC ¶¶ 187-195. But as precedent makes plain, the receipt of federal funds, even substantial amounts, does not convert a private party into a state actor. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) (receipt of government funds or subsidies

does not transform a private actor into a state actor). Were it otherwise, "a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities," which unquestionably "is not the law." *Id.* Accordingly, as the Court recognized, there are no plausible allegations of state action "[u]nder the nexus/joint [action] test." PI Order 15. *See also Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4722915, at *1 (E.D. Ky. Sept. 30, 2021) (even the prospect of "a vaccine mandate in exchange for receipt of federal . . . dollars doesn't convert [a private defendant] into a state actor. Nor does the receipt of government funding").

### b. Even if United Were a State Actor, Plaintiffs' Constitutional Causes of Action Fail to State a Claim.

Even if Plaintiffs plausibly could allege that United were a state actor—which the Court recognized they have not—Plaintiffs' constitutional claims would still fail to state a claim. *First*, the Supreme Court already has rejected arguments that state actors are precluded from requiring vaccination in the face of lethal disease. *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). *Jacobson* has been relied on during the COVID-19 pandemic. *E.g.*, *Florida v. Dep't of Health and Hum. Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021) (citing *Jacobson* in COVID-19 case for rule that "mandatory vaccinations for the public at large have long been held valid"); *Beckerich*, 2021 WL 4398027, at *8-9 (challenge to COVID-19 vaccine requirement fails under *Jacobson*).

*Second*, even without *Jacobson*, Plaintiffs' constitutional claims do not state any plausible violation. Principally, Plaintiffs assert equal protection, due process

and privacy claims (*see* Counts VII, IX, XI, and XII). Equal protection claims that, like here, do not implicate a fundamental right are judged under rational basis review, and United plainly has a rational justification for its vaccine policy: workplace health and safety. *See Brackin v. Anson*, 585 F. App'x 991, 995 (11th Cir. 2014).[6] Nor is being free of vaccinations, testing, or masking "so deeply rooted in our history and traditions, or so fundamental to our concept of constitutionally ordered liberty, that they are protected" by substantive due process, including any component privacy right. *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997). Finally, as to procedural due process (Count XII), the TAC offers no failure of constitutionally-required process by United.

Plaintiffs' remaining constitutional claims arise under concepts of allocating government power, including the Tenth Amendment, separation of powers, and the dormant Commerce Clause (Counts V, VIII (TAC ¶¶ 266-278, 300-306); *see also, e.g.*, TAC ¶ 159). The Court should dismiss these "bald legal assertions." *Zurich American Ins. Co. v. Tavistock Rests. Grp., LLC*, 2021 WL 5104302, at *2 (M.D. Fla. Nov. 1, 2021). Plaintiffs claim that United's vaccination policy *supports* the Federal Government's position, *e.g.*, TAC ¶ 1, not undermines the Federal Government's authority to regulate commerce free of state or local interference. Plaintiffs do not allege United is exercising any federal legislative powers, but

---

[6] Rational basis review requires courts to uphold an action as constitutional "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Estate of McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011). That requires Plaintiffs to negate "every conceivable basis which might support" it. *Id.*

rather addressing the conduct of *its own* employees. Finally, the Tenth Amendment's "anti-commandeering" rule does not allow the Federal Government to "require a state legislature to enact any laws" or "command state officers to administer or enforce a federal regulatory program," *Montgomery Cty. Comm'n v. Fed. Hous. Fin. Agency*, 776 F.3d 1247, 1260-261 (11th Cir. 2015), Plaintiffs' Complaint, however, contains no allegations that United commandeered (or could commandeer) state officials.

In sum, Plaintiffs' constitutional claims must be dismissed because United is not a state actor, even government-mandated vaccine requirements are constitutional under *Jacobson*, and they are not plausible on their own terms.[7]

**VII.    PLAINTIFFS' EMPLOYMENT CLAIMS UNDER GINA, THE ADA, AND TITLE VII FAIL TO STATE PLAUSIBLE CLAIMS FOR RELIEF.**

### a. Plaintiffs Have Not Exhausted Administrative Remedies, So Their Employment Claims Are Barred.

As the Court already recognized, Plaintiffs failed to exhaust "claims with the Equal Employment Opportunity Commission ("EEOC"), as is required before filing claims under Title VII, the ADA, and GINA." PI Order at 11. They were required to file a charge with the EEOC and to receive a right-to-sue notice. 42 U.S.C. §§ 2000e-5(b) & (f)(1) (Title VII); *id.* § 12117(a) (ADA); *id.* § 2000ff-6(a)(1) (GINA); *see also Forehand v. Fla. State Hosp. at Chattahoochee*, 89 F.3d 1562,

---

[7] To the extent Plaintiffs invoke a purported "conspiracy" in Counts IX through XIV (*E.g.*, TAC ¶¶ 311, 326, 341, 360, 370, 397), this legally fails. As to the constitutional claims, a plaintiff cannot successfully plead conspiracy where no state actor exits. *Harvey*, 949 F.2d at 1133–34 ("Because we find no state actors, there can be no state-based conspiracy as an alternative means of showing state action."); Part VI. Nor can alleging conspiracy overcome the legal barriers to the ATS or TVPA claims. Parts III-IV.

1567-68 (11th Cir. 1996) (Title VII); *Fry v. Muscogee Cnty. Sch. Dist.*, 150 F. App'x 980, 981-82 (11th Cir. 2005) (ADA); *Johnson v. Golfcrest Healthcare Ctr.*, 2019 WL 1900968, at \*3-4 (S.D. Fla. Apr. 29, 2019) (GINA). Unless and until the EEOC provides the charging party with a notice of right to sue, and for up to "one hundred and eighty days from the filing of [the] charge," the EEOC has exclusive litigation authority. *E.g.*, 42 U.S.C. §§ 2000e-5(f)(1) & (f)(2); *id.* 12117(a) (ADA), *id.* § 2000ff-6(a)(1) (GINA).

Failure to exhaust is "mandatory if timely raised," *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1846 (2019)—as United has done here (*see also* ECF No. 30 at 9)—and, thus, this is an insuperable barrier to Plaintiffs' claims and requires their dismissal. *See Hollis v. W. Acad. Charter, Inc.*, 782 F. App'x 951, 954 (11th Cir. 2019) (affirming dismissal of Title VII claims for failure to exhaust); *Johnson*, 2019 WL 1900968, at \*4 (dismissing improperly exhausted ADA and GINA claim); *Ciraci*, 2021 WL 6064748, at \*1 (recognizing, in a challenge to private employer's COVID vaccine policy, that "the failure to timely exhaust available administrative remedies is an appropriate basis for dismissal of [a] Title VII action").

Plaintiffs admit that they have not exhausted their administrative remedies—and, apparently, do not intend to. TAC ¶ 173. They suggest that they do not have sufficient time, and that the EEOC "lacks the institutional capacity" to review their claims. *See id.* ¶¶ 174–75. Courts, however, lack the authority to create exceptions to similar statutory exhaustion provisions, even when presented with

supposed "special circumstances." *Ross v. Blake*, 578 U.S. 632, 639 (2016). *See* PI Order at 11 (recognizing this principle under *Ross*).

### b. Exhaustion Aside, Plaintiffs Have Not Stated Plausible Violations of ADA, GINA, or Title VII.

#### i. ADA SECTION 12112(D)(4).

Count III (TAC ¶¶ 246-251) asserts United violated Section 12112(d)(4) of the ADA "by requiring the PCR [COVID-19] test[.]" TAC ¶ 249. That claim is legally baseless, as this Court already recognized, because the ADA permits medical testing when it is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). *See* PI Order at 13. Plaintiffs do not (nor could they) allege that United's use of COVID-19 testing for some employees is anything but compliant with CDC guidance, and the EEOC recognizes such COVID testing "meet[s] the ADA's 'business necessity' standard." EEOC, supra n.4, at § A.6. *See Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (EEOC's interpretive statements "reflect a body of experience and informed judgment to which courts and litigants may properly resort to guidance"). Plaintiffs have no plausible ADA claim.

#### ii. GINA.

Count I and Count II arise under the Genetic Information Nondiscrimination Act ("GINA"). TAC ¶¶ 217-245. Plaintiffs premise their GINA claim on the allegation that those who received a COVID-19 vaccine "possess different genetic material or genetic information than those who do not." *Id.* ¶ 233

While this allegation is false, accepting its truth does not state a GINA claim because it fails to trigger GINA's specialized definition of "genetic information,"

which limits the statute's scope. GINA bars adverse actions "because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a)(1), (2). GINA expressly defines "genetic information" to "mean[], with respect to any individual, information about" (i) "such individual's genetic tests"; (ii) "the genetic tests of family members"; and (iii) "the manifestation of a disease or disorder in family members of such individual." 42 U.S.C. § 2000ff(4)(A). "Genetic test," in turn, means "an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal changes." 42 U.S.C. § 2000ff(7)(A). United's employment decisions are based on COVID-19 vaccination status and not based on a "genetic test" or "manifestation of a disease or disorder in family members." Consistent with GINA's plain text, the EEOC determined that "administering a COVID-19 vaccine does not involve the use of the employee's genetic information to make employment decisions or the acquisition or disclosure of genetic information." E.E.O.C., supra n.4, at § K.14; PI Order at 13 (same); *see also Holowecki*, 552 U.S. at 399.

Plaintiffs also contend that testing employees for the COVID-19 virus constitutes "genetic" testing. But, as the GINA regulations reflect, "[a] medical examination that tests for the presence of a virus that is not composed of human DNA, RNA, chromosomes, proteins, or metabolites" is "not [a] genetic test." 29 C.F.R § 1635.3(f)(3)(ii). Plaintiffs do not (and cannot) allege that COVID-19 is *human* DNA or RNA, and, thus, testing for its presence is not "genetic testing."

### iii.  Plaintiffs Fail to Plausibly State a Title VII Claim.

Count IV asserts a single count of "religious discrimination" under Title VII. TAC ¶¶ 252-265. Plaintiffs claim United did not reasonably accommodate their asserted religious objections to the COVID-19 vaccine, while also embedding two other purported "violations" within the same count. *Id.* ¶ 258, 265. This claim fails because it is an improper "shotgun" claim and unexhausted (Parts II & VII.a). It also fails for lack of well-pled plausible allegations and for other legal reasons.[8]

#### 1.  Plaintiffs have no well-pled allegations as to any of the 56 named Plaintiffs' Title VII claims.

Plaintiffs' allegations amount to collective claims regarding "employees," or—at best—the 56 "Plaintiffs" in the collective. As this Court explained, PI Order at 5, nowhere do Plaintiffs identify, let alone explain, their 56 individual experiences with United's vaccine policy. By Plaintiffs' own account (however sparse), their experiences differed—for example, some allegedly "informed United of th[eir] beliefs and requested . . . religious accommodations," while others allegedly "wanted to request" such accommodations but did not. *See* TAC ¶ 257. Yet, within the same paragraph, Plaintiffs collectively claim to have "provided United adequate notice of same and submitted religious exemption request in earnest." *Id.* Plaintiffs also allege that, even among those who requested accommodations, United employed different standards for approval, *id.* ¶¶ 162, 258, but they then complain of a generic, singular experience of "employees" in the

---

[8] The Court previously found that "Anderson has not shown that he is substantially likely to succeed on his Title VII claim." PI Order at 14.

accommodation process, *id.* ¶ 164. These internal inconsistencies and ambiguities result from Plaintiffs' intentional refusal to plead any factual allegations as to their individual Title VII claims. Plaintiffs fail to plead facts as fundamental as when, or if, they individually requested accommodations, their job title or responsibilities, and when, or if, their individual requests were granted. *See, e.g.*, *id.* ¶ 166 (only alleging a general date that United "began 'granting' requests" for all employees). Count IV should thus be dismissed. *See, e.g.*, *Habitat for Human. Int'l v. Morris*, 2020 WL 1677304, at *2 (M.D. Fla. Apr. 6, 2020) (dismissing allegations of discrimination as "conclusory and insufficient" where they "fail[ed] to cite specific dates or circumstances in which the allegedly discriminatory acts occurred"); *Phillips v. Harbor Venice Mgmt., LLC*, 2020 WL 495224, at *5 (M.D. Fla. Jan. 30, 2020) (dismissing failure-to-accommodate claim under where the plaintiff failed to "articulate where, or to whom [she] requested reasonable accommodations, what reasonable accommodations she requested, or [when] she requested them").

### 2. Plaintiffs' Title VII claim fails for other legal reasons.

**Reasonableness.** Even beyond its lack of facts, Plaintiffs Title VII claim still fails as a matter of law. Plaintiffs contend that unpaid leave "until the pandemic 'meaningfully' subsides,'" TAC ¶ 168, is an adverse employment action sufficient to support their failure-to-accommodate claim, *see id.* ¶ 263, but courts recognize unpaid leave as a *reasonable* accommodation. *E.g.*, *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986); *Rodriguez v. Verizon Comm'ns*, 2018 WL 2441748, at *5 (D.N.J. May 30, 2018) (recognizing that "unpaid leave has

consistently been found to be a reasonable accommodation" under Title VII);

*Greenfield v. City of Miami Beach*, 844 F. Supp. 1519, 1526–27 (S.D. Fla. 1992)

("In [*Ansonia*], the U.S. Supreme Court held that unpaid leave is a reasonable

accommodation of religion, unless the employer forbids employees from using

leave for religious purposes, but allows employees to use leave for any other

purpose."). Plaintiffs do not allege that unpaid leave was *only* assigned to those

requesting religious accommodations—instead, Plaintiffs admit that unpaid leave

was also an accommodation for medical requests. TAC ¶ 130. Nor can Plaintiffs

claim an accommodation is "unreasonable" because it is not their preferred option.

*Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293–94 (11th

Cir. 2012) ("Title VII does not require an employer to give an employee a choice

among several accommodations[.]"); *Beadle v. Hillsborough Cnty. Sheriff's Dep't*,

29 F.3d 589, 592 (11th Cir. 1994) (similar).

Plaintiffs also acknowledge that temporary unpaid leave was just one of the

forms of accommodations that United offered. *See, e.g.*, TAC ¶ 168 (recognizing

the accommodation for non-customer facing employees involved testing and

masking). Given this, and the case law (i) recognizing unpaid leave, itself, as

reasonable, and (ii) that plaintiffs are not entitled to their choice of

accommodation, the Complaint does not plausibly state a Title VII violation.

**Undue Hardship.** Additionally, Plaintiffs correctly plead that United need

not incur undue hardship in providing an accommodation, *see* 42 U.S.C. §

2000e(j), and they acknowledge that "'[u]ndue hardship' exists, *as a matter of*

- 23 -

APP. 99

*law*, when an employer is required to bear more than a de minimus [sic] cost," TAC ¶ 151 & n.70 (emphasis added). *See also, e.g.*, *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995) (instructing this "entails not only monetary concerns, but also the employer's burden in conducting its business"). Plaintiffs propose no "alternative" accommodation that would enable United to respond to COVID-19: they seek a ruling that United cannot require vaccination, testing, or even masking. *See, e.g.*, TAC ¶¶ 211, 215, 334.

Accordingly, this is a case where the Court can conclude as a matter of law, using judicial experience and common sense, that "accommodating" Plaintiffs' request, *i.e.*, taking no actions to prevent the spread of COVID-19, would impose a "more than de minimis" hardship on Plaintiffs' co-workers, and on United's operations, by imperiling safe and efficient operations. *Dalberiste v. GLE Assocs., Inc.*, 814 F. App'x 495, 496–98 (11th Cir. 2020); *McCarter v. Harris Cnty.*, 2006 WL 1281087, at *5 (S.D. Tex. May 5, 2006) ("Questions of undue hardship have been resolved as a matter of law where the employer showed that the proposed accommodation would either cause or increase safety risks or the risks of legal liability for the employer."); *see Hopkins v. Jacksonville Ass'n of Firefighters*, 2018 WL 6696999, at *1 (M.D. Fla. Dec. 20, 2018) (on a Rule 12(b)(6) motion, courts are guided by "judicial experience and common sense").

**Other Alleged Violations.** Plaintiffs' two embedded "violations" in Count IV fare no better. Plaintiffs contend that "questioning the validity or sincerity of . . . religious beliefs" violates Title VII. TAC ¶ 258. But "[t]he EEOC's

- 24 -

own publications acknowledge that some inquiry into the sincerity of an employee's belief as well as into the religious nature of the belief is appropriate" under Title VII. *EEOC v. Papin Enters., Inc.*, 2009 WL 2256023, at *4 & n.11 (M.D. Fla. July 28, 2009). The EEOC's COVID-19 guidance confirms this. *See* EEOC, supra n.4, § L.2; *Holowecki*, 552 U.S. at 399. And Plaintiffs recognize that United *can* inquire into asserted religious beliefs. *See* TAC ¶ 260. Because the law permits United to inquire into sincerity and Plaintiffs' pleading is threadbare and inconsistent, this claim "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Berenato*, 2011 WL 2784438, at *1.

Plaintiffs also assert that United "fail[e]d to engage in [an] interactive process" under Title VII. *Id.* ¶ 265. But they cite no authority for treating this as a standalone claim under Title VII. The text of Title VII contains no such mandate. 42 U.S.C. §§ 2000e(j); *see also Ansonia*, 479 U.S. at 69 (rejecting as in "conflict[] with both the language of the statute" in § 2000e(j) and legislative history, a requirement of 'bilateral cooperation' under Title VII's religious accommodation provision"); *Ciraci*, 2021 WL 6064748, at *2 ("[T]he United States Supreme Court has declined to find that an interactive process is required when evaluating religious accommodation requests."). Plaintiffs therefore fail to state a Title VII claim as a matter of law, and the additional "violations" do not alter this.

## CONCLUSION

The Court should dismiss the Third Amended Complaint in its entirety for lack of personal jurisdiction and failure to state a claim.

Dated: January 12, 2022

Respectfully submitted,

*/s/ Alexander V. Maugeri*

Christopher R.J. Pace
Florida Bar No. 721166
crjpace@jonesday.com
Michelle Hogan
Florida Bar No. 1010992
mhogan@jonesday.com
JONES DAY
600 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 714-9700
Facsimile: (305) 714-9799

Donald J. Munro (*pro hac vice*)
dmunro@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Alexander V. Maugeri (*pro hac vice*)
amaugeri@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Jordan M. Matthews (*pro hac vice*)
jmatthews@jonesday.com
JONES DAY
77 West Wacker, Suite 3500
Chicago, IL 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585

- 26 -

## <u>LOCAL RULE 3.01(G) CERTIFICATION</u>

Counsel for Defendant certifies that they have telephonically conferred with counsel for Plaintiffs in a good faith effort to resolve the issues implicated by this Motion and that counsel for Plaintiff opposes the relief requested herein.

<u>*/s/ Alexander V. Maugeri*</u>
Alexander V. Maugeri

*Attorney for Defendant*
*United Airlines, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 12, 2022, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

*/s/ Alexander V. Maugeri*
Alexander V. Maugeri

*Attorney for Defendant*
*United Airlines, Inc.*

- 28 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

THOMAS ANDERSON, *et al.*,           §
                                     §
                    Plaintiffs,      §
                                     §
v.                                   §    No. 3:21-CV-01050-TJC-JRK
                                     §
UNITED AIRLINES, INC.,               §
                                     §
                    Defendant.       §
                                     §
                                     §
                                     §

## DECLARATION OF KIRK LIMACHER

I, Kirk Limacher, declare as follows:

1.      I currently serve as the Vice President of Human Resource Services for United Airlines, Inc. ("United").   I have held this position since October 2016.  I have personal knowledge of the information herein.

2.      United is a Delaware corporation with its principal place of business in Chicago, Illinois.   United's corporate headquarters is in Chicago and its senior leadership team manages the Company's worldwide operations from there.   United employs approximately 68,000 domestic active employees located in airports across the country, United's corporate headquarters, and all its offices.

1



3.      United's reasonable accommodation policy concerning the COVID-19 vaccine was designed by me and my leadership team, who work in Willis Tower in Chicago.

4.      United operates hubs at seven airports throughout the continental United States: Chicago-O'Hare, Denver, Houston, Los Angeles, Newark, San Francisco, and Washington Dulles International Airports. None of United's seven hub airports are located in Florida, and less than 3% of United's active U.S. employees work in Florida.

5.      In my capacity as Vice President of Human Resources Services, I am familiar with United's process of maintaining employment records. It is the regular practice of United for its employees to create and update a record for each United employee that includes (among other things) the location where the employee works and where the employee resides. United keeps these employee records in the course of its regularly conducted business activities. Based on a review of United's regularly maintained employment records, the named plaintiffs include flight crew (flight attendants and pilots); customer-facing operational employees, such as customer service representatives; and non-customer-facing operational employees, such as ramp service employees. As set forth in the below table, at least 42 of the named plaintiffs both work and live outside of Florida.

| Named Plaintiff | Job Title | Work Location (State) | Home Location (State) |
|---|---|---|---|
| Anderson, Thomas | First Officer – B-737 | NJ | FL |
| Bement, Nate | Line Technician | VA | WV |
| Bement, Nathan | Sheet Metal Technician-Line | FL | FL |
| Borja, Richard | Line Technician | VA | VA |
| Brazell, Marlon | Flight Instructor MV | CO | CO |
| Breitsprecher, James | First Officer – B-777 | CA | UT |
| Bauer, Lora | Line Technician | IL | IN |
| Cain, Gary | Captain – A-320 | CO | TX |
| Camp, Amy | Flight Attendant - Domestic | OH | OH |
| Campbell, Kevin | Line Technician | CA | CA |
| Catala, David | Line Technician | FL | FL |
| Decker, Nicholas | Flight Instructor | CO | MO |
| Dell'Aira, Paul | First Officer – B-777 | NJ | OH |
| Duchamp, Tami | Sr Spec-Refund Spc Dsk | TX | TX |
| Feck, Martin | Avionics Technician-Line | FL | FL |
| Floyd, Tom | Captain- B-737 | IL | TN |
| James, Chad | First Officer – A-320 | CA | LA |
| Jensen, Firman | Customer Svc Rep | MA | RI |
| Klebold, Shaun | First Officer -787 | VA | VA |
| Kropp, Tammy | Customer Svc Rep | AZ | AZ |
| Krupa, Thad | Flight Instructor MV | CO | CO |
| Lalkowski, Lisa | Flight Attendant - Domestic | OH | OH |
| Locke, Kenneth | Flight Attendant - Domestic | CA | OR |
| Lough, Susanne | Flight Attendant - Domestic | NJ | NY |
| Lowry, Christine | First Officer - 787 | NJ | PA |
| Marston (Mardsem), Brenda | Flight Attendant - Domestic | VA | TX |
| Matacia, Steve | First Officer - 787 | VA | OH |
| McConnell, Sylvia | Customer Service Representative | HI | HI |
| MacKenzie, Ronald | Lead Sheet Metal Tech-Line | FL | FL |

3

| Named Plaintiff | Job Title | Work Location (State) | Home Location (State) |
|---|---|---|---|
| Miller, Michelle | Customer Svc Rep | CA | CA |
| Morris, John | Captain - 787 | IL | IA |
| Matschulat, Peter | First Officer- B-767/B-757 | NJ | NJ |
| Neal, Robert | Captain - 787 | VA | VA |
| Oakes, Russell | Captain – B-737 | CO | CO |
| Panaro, Jackie | Flight Attendant - Domestic | OH | OH |
| Quintas, Frank | Captain o B-767/B-757 | NJ | FL |
| Rozell, Paul | Ramp Service Employee | NJ | NJ |
| Ramos, William | Lead Avionics Technician-Line | FL | FL |
| Robbin, Matthew | First Officer – B-737 | VA | TN |
| Sheffler, Todd | Line Technician | VA | WV |
| Shelton, Tiana | Flight Attendant - Domestic | IL | KY |
| Sherlock, Richard | Flight Instructor MV | CO | CO |
| Sims, Tory | Sheet Metal Technician-Line | FL | FL |
| Sikora, Randy | Line Technician | FL | FL |
| Snyder, Charles | Line Technician | FL | FL |
| Soto, Rogelio | Flight Attendant - Domestic | CA | CA |
| Sullivan, John | Line Technician | VA | VA |
| Turner, Doug | Lead Line Technician | FL | FL |
| Wasilewski, Gene S. | Flight Instructor MV | CO | CO |
| Wendorff, Joseph | Line Technician | FL | FL |
| Wolfe, Holly | First Officer - 787 | CA | KS |
| Woodin, Christopher | Lead Avionics Technician-Line | FL | FL |
| Witt, Ralph | Line Technician | IL | IN |
| Wright, William | Line Technician | FL | IN |
| Zietlow, James | First Officer - 787 | CA | CO |
| Zwierko, Kevin | First Officer – A-320 | VA | NC |

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on  January  11 , 2022.

Kirk Limacher
Vice President of Human Resource Services

APP. 109

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THOMAS ANDERSON, ET AL,

      Plaintiffs,

   -against-

UNITED AIRLINES, INC., ET AL,

      Defendant.

Case No. 3:21-cv-1050-TJC-LLL

THOMAS ANDERSON

      Plaintiff,

   -against-

UNITED AIRLINES, INC., ET AL,

      Defendants.

Case No. 3:22-cv-107-TJC-LLL

## NOTICE OF VOLUNARY DISMISSAL WITHOUT PREJUDICE

**WHEREAS**, no defendant has filed an answer or a motion for summary judgment in these actions;

**NOW, THEREFORE**, all Plaintiffs hereby voluntarily dismiss these actions in their entirety without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).

Dated: March 28, 2022

                       John M. Pierce

                       John M. Pierce
                       **JOHN PIERCE LAW**
                       21550 Oxnard Street
                       3rd Floor, PMB#172
                       Woodland Hills, CA 91637
                       (213) 279-7846
                       jpierce@johnpiercelaw.com

                       *Attorneys for Plaintiffs*



**EXHIBIT**
**E**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SUSANNE CARAFFA** | ) | CASE NO. |
| 4617 Bruening Drive | ) | |
| Parma, Ohio 44134 | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE: |
| -vs- | ) | |
| | ) | |
| **UNITED AIRLINES, INC** | ) | |
| c/o Statutory Agent | ) | **PLAINTIFF'S COMPLAINT** |
| CT Corporation | ) | |
| 1300 East Ninth Street | ) | |
| Cleveland, Ohio 44114 | ) | |
| | ) | **(JURY DEMAND ENDORSED** |
| Defendant. | ) | **HEREON)** |

### PARTIES

1. Plaintiff Susanne Caraffa hereinafter referred to as ("Ms. Caraffa") is a citizen of the United States and resides in Cuyahoga County, State of Ohio.

2. Defendant United Airlines Inc., hereinafter referred to as ("Defendant") is a foreign corporation, conducting business within the State of Ohio, with its principal place of business located 233 South Wacker Drive, Chicago, Illinois 60606.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over this dispute pursuant 28 U.S.C. 1332, and Title VII of the Civil Rights Act of 1964, as amended.

4. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) of the United States Code as the acts and/or omissions outlined in the claims alleged below occurred within the jurisdiction of this Court.



**EXHIBIT**
**F**

5. Ms. Caraffa filed a Charge of Discrimination with the Equal Employment Opportunity Commission. Ms. Caraffa also filed a Charge of Discrimination with the Ohio Civil Rights Commission.  Ms. Caraffa received a Right to Sue Letter from the Equal Employment Opportunity Commission attached as Exhibit 1.

## FACTUAL BACKGROUND

6. This case challenges Defendant's refusal to grant Ms. Caraffa a reasonable accommodation to Defendant's COVID19 vaccine mandate based upon her religious beliefs and subsequent retaliatory action based upon Ms. Caraffa's filing of charges of discrimination with both federal and state agencies.

7. Defendant is a major American airline headquartered  in Chicago, Illinois.

8. Defendant operates a large domestic and international route network traveling to cities large and small across the United States and all six inhabited continents.

9.  Once Defendant merged with Continental Airlines, it became the third-largest airline in the world.

10. Defendant has eight hubs located in the United States: (1) Chicago-O'Hare International Airport; (2) George Bush International; Airport; (3) Denver International Airport; (4) Washington Dulles International Airport; (5) Los Angeles International Airport; (6) Newark Liberty International Airport; (7) San Francisco International Airport; and (8) Antonio B. Wan Pat International Airport.

11. Since June 8, 1996, Ms. Caraffa has been employed in various management roles in various states by Defendant.

12. Throughout her employment, Ms. Caraffa has been an exceptional employee while receiving outstanding performance evaluations and multiple promotions.

13. In December 2019, Wuhan, China experienced an outbreak of a pneumonia-like illness that did not respond well to standard treatments.

14. By Spring 2020, the novel coronavirus SARS-CoV-2, which can cause COVID19, had spread rapidly around the world.

15. Around this same time, Defendant began to implement health and safety protocols requiring its employees to wear United issued masks, gloves, and eye protection; maintain a safe distance from others; and participate in temperature checks.

16. Defendant also began to increase the cleaning of its aircraft.

17. During the pandemic, the United States government suggested that individuals get vaccinated against the COVID19 virus.

18. In February 2021, Ms. Caraffa received the Thomas J. Kelly Leadership Award, which is United's highest leadership award and is awarded to only one employee.

19. On or around June 1, 2021, Ms. Caraffa was promoted to Managing Director of Customer Service working out of Newark Liberty International Airport.

20. On or around August 6, 2021, Defendant's Chief Executive Officer ("CEO") Scott Kirby announced that all of Defendant's employees were required to be vaccinated within five (5) weeks of the Food and Drug Administrations ("FDA") approval of the vaccine or five (5) weeks after September 20, 2021, whichever came first.

21. On August 18, 2021, based upon her strong faith and religious beliefs against being vaccinated, Ms. Caraffa applied for a religious exemption to the vaccine mandate.

22. On August 23, 2021, the FDA approved Pfizer's COVID19 vaccine.

23. As a result, Defendant advised its employees that they must receive the first dose of the vaccine by September 27, 2021.

APP. 113

24. Defendant required its employees to upload proof of vaccination to a United database.

25. Although it instituted a mandate, Defendant indicated that employees could apply for a medical or religious exemption from the vaccination mandate.

26. As part of the religious exemption, Defendant required an employee to provide written documentation from at least one third-party, known personally to the employee, who is aware of the employee's sincerely held religious beliefs and could support the request for a religious accommodation.

27. Ms. Caraffa supplied Defendant with three (3) letters in support of her request for a religious accommodation.

28. Defendant's CEO warned that not many exemptions would be granted and remarked that any employee who "all the sudden decid[ed], 'I'm really religious' " would be "putting [her] job on the line" by requesting an accommodation.[1]

29. When an employee requested a religious exemption, Defendant would ask the employees about previous vaccinations, the use of stem cells in those vaccines, and "why receiving such vaccines or medications were not a violation of" the employees' "sincerely held [religious] belief" on those prior occasions. Defendant also asked why the employees' religious beliefs prevented them from receiving the COVID-19 vaccine "but not taking other types of medicine." Some employees were asked to provide a letter from a pastor or other third party attesting that the employee actually held religious beliefs.[2]

30. In addition, Defendant placed unimaginable pressure on its employees by sending out postcards to employees who had yet to provide proof of vaccination.

---

[1] *Sambrano v. United Airlines Incorporated,* (2022) WL 486610.
[2] *Id.*

31. Part of the postcard stated that "unvaccinated employees without a reasonable accommodation will be separated from United."

32. On September 13, 2021, Defendant approved Ms. Caraffa's request for a religious exemption to the vaccine mandate.

33. Less than a month later, on or around October 4, 2021, Defendant revoked Ms. Caraffa's approved religious exemption.

34. Ms. Caraffa was told that because she was the only employee at her level who had not been vaccinated, she was "not being a good role model by not getting the vaccine."

35. As a result, Ms. Caraffa was placed on paid leave.

36. On or around October 28, 2021, Ms. Caraffa was advised that she could either choose to be separated from the company or be placed on unpaid leave.

37. On December 21, 2021, Ms. Caraffa was placed on unpaid leave.

38. On December 22, 2021, exactly one (1) day after being placed on unpaid leave, Ms. Caraffa's Managing Director of Customer Service position was filled.

39. While on unpaid leave, Ms. Caraffa applied for several positions within United and, despite having twenty-five (25) years of broad experience, did not receive a single job offer.

40. On or around January 10, 2022, Ms. Caraffa was demoted to a remote Executive Solutions Specialist position (out of Cleveland) which is a significantly less paying position than her previous Managing Director position.

41. On March 28, 2022, Defendant lifted its vaccine mandate.

42. Upon the lifting of the mandate, Ms. Caraffa repeatedly asked to be returned to the Managing Director position at Newark Liberty International Airport, to which she was repeatedly denied.

43. As a result, on July 15, 2022, Ms. Caraffa filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging claims for religious discrimination and retaliation.

44. After Ms. Caraffa filed her Charge of Discrimination, Defendant posted for an MD-AO Ramp Service position which Ms. Caraffa previously performed in Newark.

45. Based upon her previous experience and qualifications, Ms. Caraffa applied for the position.

46. On or around October 7, 2022, Ms. Caraffa interviewed for the MD-AO Ramp Service position.

47. On November 10, 2022, despite her previous experience and qualifications, Ms. Caraffa was not selected for the position, despite previously holding the role.

48. On or around December 27, 2022, Ms. Caraffa filed an amended Charge of Discrimination asserting that the failure to hire her into the MD-AO Ramp Service position, for which she was clearly qualified, was in retaliation for filing her previous Charge of Discrimination and previous complaints of religious discrimination.

49. To date, Ms. Caraffa remains demoted and continues to lose significant compensation and benefits.

## **FIRST CAUSE OF ACTION**
(Religious Discrimination in Violation of 42 U.S.C. 2000 *et seq.*)

50. Ms. Caraffa incorporates by reference paragraphs 1-49 as if fully realleged herein.

APP. 116

51. 42 U.S.C. §2000e2(a)(1) states that is shall be unlawful for any employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

52. Defendant is an "employer" as that term is defined under 42 U.S.C. §2000e(b).

53. Ms. Caraffa is an "employee" as that term is defined in 42 U.S.C. §2000e(f).

54. Ms. Caraffa is a Christian, was raised Catholic, and currently attends a Pentecostal Church.

55. Throughout her employment, Ms. Caraffa has successfully performed the duties and responsibilities of the positions she has held.

56. At the time of her demotion, Ms. Caraffa was qualified for the position she held.

57. Defendant discriminated against Ms. Caraffa on the basis of her religion and/or religious belief when she requested a religious accommodation by placing her on unpaid leave, demoting her and refusing to promote, transfer, rehire, or recall her into other available positions and/or her previous Managing Director of Customer Service position and/or MD-AO Ramp Service position for which she was qualified, in violation of 42 U.S.C. § 2000 *et seq.*

58. As a direct and proximate result of Defendants' conduct, Ms. Caraffa has suffered and will continue to suffer economic and non-economic injuries, including but not limited to pain and suffering and the loss of salary, benefits and other privileges and conditions of employment, for which Defendant is liable.

59. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for economic and non-economic compensatory damages, punitive

damages, and reasonable attorney's fees and costs.

**SECOND CAUSE OF ACTION**
(Retaliation in Violation of 42 U.S.C. §2000e-3(a))

60. Ms. Caraffa incorporates by reference paragraphs 1-59 as if fully realleged herein.

61. During her employment, Ms. Caraffa requested a religious exemption to Defendant's COVID19 vaccine mandate.

62. When Ms. Caraffa requested a religious exemption, she was engaged in protected activity.

63. Defendant's decision to retaliate against Ms. Caraffa on the basis of her religion and/or request for a religious exemption by placing her on unpaid leave, demoting her and refusing to promote, transfer, rehire, or recall her into other available positions and/or her previous Managing Director of Customer Service position and/or MD-AO Ramp Service position for which she was qualified, violates 42 U.S.C. §2000e-3.

64. As a direct and proximate result of Defendant's conduct, Ms. Caraffa has suffered and will continue to suffer economic and non-economic injuries, including but not limited to, pain and suffering and the loss of salary, benefits and other terms and conditions of employment for which Defendant is liable.

65. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for economic and non-economic compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**THIRD CAUSE OF ACTION**
(Retaliation in Violation of 42 U.S.C. §2000e-3))

66. Ms. Caraffa incorporates by reference paragraphs 1-65 as if fully realleged herein.

67. On or around July 15, 2022, Ms. Caraffa filed a Charge of Discrimination with the

EEOC for religious discrimination and retaliation.

68. When Ms. Caraffa filed her charge, she was engaged in protected activity.

69. Defendant's decision to retaliate against Ms. Caraffa on the basis of her religion and/or request for a religious exemption and for filing a Charge of Discrimination by placing her on unpaid leave, demoting her and refusing to promote, transfer, rehire, or recall her into other available positions and/or her previous Managing Director of Customer Service position and/or MD-AO Ramp Service position for which she was qualified, violates 42 U.S.C. §2000e-3.

70. As a direct and proximate result of Defendant's conduct, Ms. Caraffa has suffered and will continue to suffer economic and non-economic injuries, including but not limited to, pain and suffering and the loss of salary, benefits and other terms and conditions of employment for which Defendant is liable.

71. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for economic and non-economic compensatory damages, punitive damages, and reasonable attorney's fees and costs.

**FOURTH CAUSE OF ACTION**
(Religious Discrimination Pursuant to O.R.C. 4112.02(A))

72. Plaintiff incorporates by reference paragraphs 1-71 as if fully realleged herein.

73. Plaintiff is a Christian, was raised Catholic, and currently attends a Pentacostal church.

74. Defendant is an employer within the meaning of Section 4112.01(A)(2) of the Ohio Revised Code.

75. Defendant discriminated against Ms. Caraffa on the basis of her religion and/or religious beliefs when she requested a religious accommodation by placing her on unpaid leave, demoting her and refusing to promote, transfer, rehire, or recall her into

other available positions and/or her previous Managing Director of Customer Service position and/or MD-AO Ramp Service position for which she was qualified, in violation of in violation of Sections 4112.02 and 4112.99 of the Ohio Revised Code.

76. As a direct and proximate result of Defendant's conduct, Ms. Caraffa has suffered and will continue to suffer economic and non-economic injuries, including but not limited to pain and suffering and the loss of salary, benefits and other privileges and conditions of employment, for which Defendant is liable.

77. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for economic and non-economic compensatory damages, punitive damages, and reasonable attorney's fees and costs.

### FIFTH CAUSE OF ACTION
(Retaliation in Violation of O.R.C. 4112.02(I))

78. Plaintiff incorporates by reference paragraphs 1-77 as if fully realleged herein.

79. During her employment, Ms. Caraffa requested a religious exemption to Defendant's COVID19 vaccine mandate.

80. When Ms. Caraffa requested a religious exemption, she was engaged in protected activity.

81. Defendant's decision to retaliate against Ms. Caraffa on the basis of her religion and/or request for a religious exemption by placing her on unpaid leave, demoting her and refusing to promote, transfer, rehire, or recall her into other available positions and/or her previous Managing Director of Customer Service position and/or MD-AO Ramp Service position for which she was qualified, violates Ohio Revised Code Section 4112.02(I).

APP. 120

82. As a direct and proximate result of Defendant's conduct, Ms. Caraffa has suffered and will continue to suffer economic and non-economic injuries, including but not limited to, pain and suffering and the loss of salary, benefits and other terms and conditions of employment for which Defendant is liable.

83. Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for economic and non-economic compensatory damages, punitive damages, and reasonable attorney's fees and costs.

### FIFTH CAUSE OF ACTION
(Retaliation in Violation of O.R.C. 4112.02(I))

84. Plaintiff incorporates by reference paragraphs 1-83 as if fully realleged herein.

85. On or around July 15, 2022, Ms. Caraffa filed a Charge of Discrimination with the EEOC for religious discrimination and retaliation.

86. When Ms. Caraffa filed her charge, she was engaged in protected activity.

87. Defendant's decision to retaliate against Ms. Caraffa on the basis of her religion and/or request for a religious exemption and for filing a Charge of Discrimination by placing her on unpaid leave, demoting her and refusing to promote, transfer, rehire, or recall her into other available positions and/or her previous Managing Director of Customer Service position and/or MD-AO Ramp Service position for which she was qualified, violates O.R.C. 4112.02(I).

88. As a direct and proximate result of Defendant's conduct, Ms. Caraffa has suffered and will continue to suffer economic and non-economic injuries, including but not limited to, pain and suffering and the loss of salary, benefits and other terms and conditions of employment for which Defendant is liable.

89. Defendant's conduct was willful, wanton, reckless and/or malicious for which

APP. 121

Defendant is liable for economic and non-economic compensatory damages, punitive damages, and reasonable attorney's fees and costs.

## **CONCLUSION**

**WHEREFORE,** Plaintiff Susanne Caraffa states that she seeks an amount in excess of $75,000 to fully, fairly, and justly compensate her for injury, damage and loss, and respectfully pray that this Court enter judgment in her favor and award her economic and non-economic compensatory damages, back wages, interest, fringe benefits, witness fees and fees for experts, consequential damages, liquidated damages, incidental damages, punitive damages, all costs and reasonable attorneys' fees, and grant such additional or alternative relief as the Court may determine to be just and equitable.

Respectfully submitted,

*/s/ David A. Young*
DAVID A. YOUNG (0065551)
The Law Firm of David A. Young, LLC
The Hoyt Block Building
700 W. St. Clair Avenue, Ste. 316
Cleveland, Ohio 44113
PHONE (216) 621-5100
FAX (216) 621-7810
EMAIL: dyoung@davidyounglaw.com

Attorney for Plaintiff

APP. 122

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a

trial by jury of all issues so triable.

Respectfully submitted,


*/s/ David A. Young*
DAVID A. YOUNG (0065551)
The Law Firm of David A. Young, LLC
The Hoyt Block Building
700 W. St. Clair Avenue, Ste. 316
Cleveland, Ohio 44113
PHONE (216) 621-5100
FAX (216) 621-7810
EMAIL: dyoung@davidyounglaw.com

Attorney for Plaintiff

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/27/2023

**To:** Mrs. Susanne M. Caraffa
4617 Bruening Drive
PARMA, OH 44134
Charge No: 524-2021-01667

EEOC Representative and email:     SETH SINCLAIR
Lead Systemic Investigator
seth.sinclair@eeoc.gov

---

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 524-2021-01667.

On behalf of the Commission,

Digitally Signed By:Diane I. Smason
06/27/2023
Diane I. Smason
Acting District Director



PLAINTIFF'S
EXHIBIT

APP. 124

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN ELLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23 C 123** |
| | ) | |
| **UNITED AIRLINES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER DENYING MOTION FOR LEAVE TO AMEND
AND DIRECTING ENTRY OF JUDGMENT**

For the reasons stated below, the Court denies plaintiff's motion for leave to file a second amended complaint [31] and directs the Clerk to enter judgment as follows: Judgment is entered in favor of defendant United Airlines, Inc. and against plaintiff John Ellis.

**Statement**

The Court dismissed plaintiff John Ellis's amended complaint and advised that unless he filed a proposed second amended complaint that stated a viable claim, the Court would enter judgment against him.  Mr. Ellis has filed a motion for leave to amend and has included a proposed second amended complaint.

In his second amended complaint, Mr. Ellis does not include any new factual allegations that affect in any material way the grounds on which the Court dismissed his amended complaint.  Rather, Mr. Ellis's key contention is that the Court got it wrong. That may provide him a viable basis for appeal, but it does not entitle him to file an amended complaint.   The Court concludes that amendment would be futile for the reasons discussed in detail in its decision dismissing the amended complaint.  The Court therefore denies Mr. Ellis's motion for leave to amend.

At this point, it is clear that Mr. Ellis cannot plead a viable federal claim—he has had at least two, or possibly three tries, depending on how one counts.  There is no viable basis to believe that another do-over would change anything.  The Court therefore directs the Clerk to enter judgment against him.

Date:  October 18, 2023

_____
MATTHEW F. KENNELLY
United States District Judge



APP. 125

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**JAMES E. ENGSTROM and
RICHARD SHAW,**

      **Plaintiffs,**

**v.**

**AIR LINE PILOTS
ASSOCIATION,
INTERNATIONAL and
UNITED AIRLINES, INC.**

      **Defendants.**

**CASE NO.: 6:22-CV-02130-WWB-RMN**

## DEFENDANT UNITED AIRLINES, INC.'S MOTION TO DISMISS WITH INCORPORATED MEMORANDUM OF LAW

Defendant United Airlines, Inc., pursuant to Fed.R.Civ.P. 12(b)(2),(3), and (6), moves to dismiss Plaintiffs' claims against it asserted in their First Amended Complaint (Doc. 23), and in support thereof, states as follows:

## INTRODUCTION

In this action, Plaintiffs allege various claims related to Defendant United Airlines, Inc.'s ("United Airlines") COVID-19 vaccination policies and their application to Plaintiffs. Plaintiffs were employed by United Airlines outside Florida; their residence in the State is insufficient to confer personal jurisdiction to this Court over Defendant, a non-resident corporation, for the claims at issue, and the exercise of jurisdiction here would run afoul of the Constitution's due process

**EXHIBIT
H**

APP. 126

analysis. Therefore, the Court should dismiss Plaintiffs' claims for lack of personal jurisdiction.

In the alternative, the Court should dismiss Plaintiffs' claims for improper venue because the substantial part of the events or omissions giving rise to the claim occurred did not take place in this District.

In the alternative, even if the Court did have personal jurisdiction, Plaintiffs' Complaint is subject to dismissal as an improper shotgun pleading. Plaintiffs also fail to state a claim under the Florida Civil Rights Act for extraterritorial acts (Counts I – VI), for Retaliation (Count VI), Intentional Infliction of Emotional Distress (Count XVIII), and Civil Conspiracy (Count XIX).

## **MEMORANDUM OF LAW**

## I. **LACK OF PERSONAL JURISDICTION**

### **A. Legal Standard**

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie

case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). This pleading failure warrants dismissal. *See MSP Recovery Claims, Series LLC v. Northland Ins. Co.*, No. 20-CV-24176-WILLIAMS/MCALILEY, 2022 U.S. Dist. LEXIS 108423, at *10 (S.D. Fla. June 16, 2022) (dismissal warranted even prior to consideration of any evidence as the allegations of the complaint failed to establish personal jurisdiction). Here, Plaintiffs failed to adequately allege facts establishing that United Airlines is subject to personal jurisdiction in Florida for Plaintiffs' claims.

**B. Florida's Long Arm Statute.**

For purposes of this motion, United Airlines does not contest that it is subject to personal jurisdiction under the Florida Long-Arm Statute, Fla. Stat. 48.193(2). However, because Florida's long arm statute does not include an analysis of federal due process, "courts routinely dismiss claims for lack of jurisdiction based on a finding that the plaintiff failed to satisfy due process, even if the requirements of the long-arm statute are satisfied." *Nunes v. CNN Inc.*, No. 8:22-cv-2659-SCB-AEP, 2023 U.S. Dist. LEXIS 36441, at *7 (M.D. Fla. Mar. 1, 2023).

**C. Due Process.**

In analyzing whether the exercise of personal jurisdiction over a defendant violate the Due Process Clause of the Constitution, courts look to whether it can exert jurisdiction based on either general or specific jurisdiction. *Rowe v. Gary,*

*Williams, Parteni, Watson & Gary, P.L.L.C.*, 723 F. App'x 871, 874 (11th Cir. 2018).

Plaintiffs cannot establish general jurisdiction or specific jurisdiction in this case

because United Airlines is not at home in Florida, nor do Plaintiffs' claims arise out

of any conduct in Florida.

### 1. General Jurisdiction.

The U.S. Supreme Court holds that for an out-of-state corporation to be

subject to general jurisdiction in a state, their affiliations with the State must be "so

'continuous and systematic' as to render them essentially at home in the forum

State." *BNSF Ry. v. Tyrrell*, 581 U.S. 402, 404, 137 S. Ct. 1549, 1552 (2017)

(internal citations omitted). Generally, a corporate defendant is at home in the

"corporation's place of incorporation and its principal place of business." *Id.* Only in

an "exceptional case" when a corporate defendant's ties are "so substantial and of

such a nature as to render the corporation at home in that state" may general

jurisdiction in a state other than its state other than its state of incorporation or

principal place of business. *Id.* (finding no general jurisdiction when defendant was

neither incorporated nor headquartered in state, and only small percentage of

company's workforce was in state).[1] General personal jurisdiction is improper unless

---

[1] The "exceptional case" referenced by Supreme Court involved a company that temporarily relocated their headquarters to a state, and therefore was held to be at home in the state, even though their headquarters were in a different location. *See BNSF Ry. v. Tyrrell*, 581 U.S. 402, 413, 137 S. Ct. 1549, 1558 (2017) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 72 S. Ct. 413, 96 L.Ed. 485, 63 Ohio Law Abs. 146 (1952)).

the defendant is "essentially at home" in the state. *Rowe v. Gary, Williams, Parteni, Watson & Gary, P.L.L.C.*, 723 F. App'x 871, 875 (11th Cir. 2018).

As it relates to airlines, courts routinely hold that airlines incorporated and headquartered in other states are not subject to general personal jurisdiction solely because they operate flights to that state. *See Regueiro v. Am. Airlines, Inc.*, No. 19-23965-CIV-MARTINEZ-LOUIS, 2022 U.S. Dist. LEXIS 116153, at *4 (S.D. Fla. June 30, 2022) (airline headquartered and incorporated out of state was not subject to general personal jurisdiction in Florida because the state was not a surrogate for a headquarters or state of incorporation and collecting cases showing airlines not subject to general jurisdiction in states based on routine business in those states); *Vallarta v. United Airlines, Inc.*, 497 F. Supp. 3d 790, 799 (N.D. Cal. 2020) (United Airlines not subject to general jurisdiction in California despite having two hub airports in the state).

As set forth in Plaintiffs' Amended Complaint, United Airlines is a Delaware Corporation with a principal place of business in Illinois. Amended Complaint ¶ 20. The only other allegation potentially relevant to general jurisdiction is that Plaintiffs allege that "United regularly operates flights which fly to and from Orlando, Orange County, Florida and maintains offices and employees at Orlando International Airport, which is located within this judicial district." *Id.* This is insufficient to establish general personal jurisdiction over United Airlines. For example, in both

5

*Rugueiro* and *Vallarta*, *supra,* airlines were held not to be subject to general personal jurisdiction even though they regularly operated flights in and out of the judicial district and had offices in the district. Likewise, United Airlines is not subject to general personal jurisdiction in Florida because it is not at home in Florida.

2. Specific Jurisdiction.

Plaintiffs similarly cannot establish specific jurisdiction over United Airlines. Plaintiffs' Amended Complaint is devoid of any allegations that Plaintiffs were employed by United Airlines in Florida. Plaintiffs instead allege that they were employed by United Airlines in New Jersey and Texas, and that the only ties between this litigation and Florida is Plaintiffs' residence in the state.

Courts apply a three-part due process test in determining whether specific jurisdiction which examines:

> (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.

*Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (internal citations omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a 'compelling case'

6

that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id*.

As to the first prong, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021) (internal citations omitted). "The principal way to establish this relationship is through an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Skyhop Techs., Inc. v. Narra*, 58 F.4th 1211, 1229 (11th Cir. 2023) (internal citations omitted). "The incidental effects of a defendant's actions are not by themselves sufficient to justify jurisdiction over the defendant in the forum." *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1311 (11th Cir. 2022) (affirming dismissal because "defendant's conduct within the forum and the cause of action is necessary to exercise specific jurisdiction").

In employment disputes, an airline is generally not subject to specific personal jurisdiction in a state solely because an employee resides in the state. *See e.g., Schenck v. United Airlines*, No. 21-CV-659-LJV, 2023 U.S. Dist. LEXIS 29405, at *11 (W.D.N.Y. Feb. 22, 2023) (no personal jurisdiction in New York when plaintiff worked in New Jersey); *Hardin v. United Airlines*, Civil Action No. H-20-3893, 2021 U.S. Dist. LEXIS 162520, at *7 (S.D. Tex. July 15, 2021) (no personal

7

jurisdiction when Texas plaintiff was based out of Virginia). A plaintiff's state of residence is insufficient to create specific personal jurisdiction in a state. *See e.g. Banks v. Am. Airlines*, No. 19-CV-04026-JSC, 2019 WL 5579479, at *4 (N.D. Cal. Oct. 29, 2019) (no specific personal jurisdiction over airline in California in case brought by flight attendant who lived in California, was based out of Arizona, and alleged discrimination occurring in North Carolina and Arizona); *Coffey v. Mesa Airlines Inc.*, No. CV183688DMGPLAX, 2019 WL 4492952, at *6 (C.D. Cal. Apr. 15, 2019) (no specific personal jurisdiction over airline in California in suit brought by pilot who lived in California but was based out of Texas when challenging employment decisions made by managers in Texas and Arizona), *aff'd*, 812 F. App'x 657 (9th Cir. 2020); *Agher v. Envoy Air, Inc*., No. 18-CV-6753-R, 2018 WL 6444888, *2 (C.D. Cal. Oct. 12, 2018); *South v. GoJet Airlines*, LLC, No. 4:12-cv-00378- JEG, 2013 WL 6253582, at *6 (S.D. Iowa Sept. 30, 2013) (Iowa court lacked specific personal jurisdiction over airline in FMLA case brought by pilot who lived in Iowa but was based out of Illinois where decision to terminate was made in Missouri); *Auf v. Howard Univ.*, No. 19-22065-CIV, 2020 U.S. Dist. LEXIS 53226, at *29 (S.D. Fla. Mar. 25, 2020) (no personal jurisdiction over employer when they hired FL employee to work in DC).

Plaintiff Engstrom alleges he was employed in New Jersey, meaning the venue in which they were expected to work, was New Jersey. Amended Complaint

¶ 130. Plaintiff Shaw similarly alleges he worked in Houston Texas. Amended Complaint ¶ 162. Plaintiffs' Amended Complaint is devoid of any allegations of conduct of United Airlines that occurred within the state of Florida. Instead, the only alleged activity in Florida is that Plaintiffs "felt the impact" of United Airlines' employment practices in Florida, including receiving a vaccine. Amended Complaint ¶ 7.  However, Plaintiffs' state of residence is not relevant in determining whether Plaintiffs' claim arose in the State of Florida. *Herederos, supra*.

Furthermore, Plaintiffs cannot establish that United Airlines purposefully availed itself of the state of Florida as it relates to their claims. Instead, they appear to base their contentions on the fact that they were allowed to commute from Florida to their respective states of employment. Plaintiffs' choice to reside in Florida despite being employed elsewhere does not equate to United Airlines purposeful availment of the jurisdiction of Florida.

Finally, the exercise of jurisdiction over United Airlines in this case does not comport with traditional notions of fair play and substantial justice. By employing Plaintiffs in New Jersey and Texas, United Airlines could reasonably expect to be sued in Delaware, Illinois, or their respective states of employment, but not in Florida. Plaintiffs cannot haul United Airlines into court based solely on Plaintiffs' residence, which they could unilaterally change. Therefore, the Court should dismiss Plaintiffs' claims against United Airlines for lack of personal jurisdiction.

## II. **IMPROPER VENUE**

In the alternative, if the Court finds that Plaintiffs have established personal jurisdiction, it should nonetheless dismiss Plaintiffs' claims for improper venue. As a threshold matter, "Plaintiff has the burden of showing that venue . . . is proper." *Maresca v. Marela*, No. 6:09–cv–1386–Orl–19DAB, 2010 WL 745755, * 1 (M.D. Fla. Feb. 26, 2010). "A civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). An action may also be brought in "a judicial district in which ***a substantial part*** of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2) (emphasis added).

In analyzing whether venue is proper, "[o]nly the events that directly give rise to a claim are relevant. And of the places where the events have taken place, only those locations hosting a 'substantial part' of the events are to be considered.'" *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003); *see also Frees v. United Airlines*, No. 8:08-CV-2370-T-27MAP, 2009 U.S. Dist. LEXIS 137720, at *2 (M.D. Fla. May 14, 2009) (Illinois based flight attendant could not show that substantial part of events occurred in Florida even though she lived in Florida); *Bell v. United Air Lines, Inc.*, No. 11-61393-CIV, 2011 U.S. Dist. LEXIS 137563, at *6 (S.D. Fla. Nov. 30, 2011) (Virginia based airline employee could not show that venue was proper in Florida under Title VII).

10

"Because venue protects defendants, the focus is on the defendant's activities, not on the plaintiff's activities." *McGrew v. Morgan*, No. 3:20-cv-1371-BJD-PDB, 2021 U.S. Dist. LEXIS 156671, at *20 (M.D. Fla. May 3, 2021) (citing *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)). When analyzing venue, only acts that "have a close nexus to the wrong" are considered and a "court should ask what acts or omissions give rise to the claim, and of those acts or omissions, did a substantial part of them occur in the venue?" *Id.* For employment claims, venue is therefore proper where the employee would work, and for tort claims, where the defendants engaged in the actions that are allegedly tortious. *Auf v. Howard Univ.*, No. 19-22065-CIV, 2020 U.S. Dist. LEXIS 53226, at *37 (S.D. Fla. Mar. 25, 2020).

As set forth above, United Airlines is not a resident of the state of Florida, and instead is a resident of Delaware and Illinois. Therefore, Plaintiffs can only establish that venue is proper if a substantial part of the events giving rise to Plaintiffs' claims occurred in the district.[2] The Amended Complaint fails to show that a substantial part of the conduct at issue occurred in the Middle District of Florida. Instead, Plaintiffs worked in New Jersey and Texas. Any decisions as to United Airlines' policy were orchestrated from its headquarters in Illinois. Therefore, the claims

---

[2] Plaintiffs fail to allege that a ***substantial*** part of the events took place in the district. Instead, Plaintiffs only allege that "a part of the events or omissions which give rise to this action" took place in this District. *See* Amended Complaint ¶ 23. Plaintiffs therefore fail to meet their pleading burden to allege facts showing that venue is proper in this Court.

11

against United Airlines (Counts I-V,XVIII, XIX) should be dismissed for improper venue, as no substantial part of Plaintiffs' claims took place in the district. *See, e.g., Frees v. United Airlines*, 2009 U.S. Dist. LEXIS 137720, at *2.

## III. <u>FAILURE TO STATE A CLAIM</u>

In the alternative to its arguments to dismiss for lack of personal jurisdiction and improper venue, United Airlines moves to dismiss Plaintiffs' Amended Complaint for failure to state a claim.

### A. Legal Standard

The U.S. Supreme Court has explained that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v Twombly*, 127 S.Ct. 1955, 550 U.S. 544, 555 (2007) (citations omitted); Such "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Twombly*, at 555, 570.

### B. Shotgun Pleading

The U.S. Court of Appeals for the Eleventh Circuit has described impermissible shotgun pleadings to include complaints "replete with conclusory,

vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (citation omitted) (emphasis added).[3] "Shotgun pleadings violate Rule 8, which requires a short and plain statement of the claim showing that the pleader is entitled to relief . . . by fail[ing] to one degree or another . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1294–95 (11th Cir. 2018).

As the Eleventh Circuit emphasized in *Paylor v. Hartford*, 748 F.3d 1117 (11th Cir. 2014), "[a] defendant served with a shotgun complaint should move the district court to dismiss the complaint pursuant to Rule 12(b)(6) or for a more definite statement pursuant to Rule 12(e) on the ground that the complaint provides it with insufficient notice to enable it to file an answer." *Id*. at *7 (footnotes omitted)*; see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 979 (11th Cir. 2008) ("this court has been roundly, repeatedly and consistently condemning [shotgun pleading] for years, long before this lawsuit was filed"); *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) ("[]w]e have frequently railed about the evils of shotgun pleadings and urged district courts to take a firm hand");

---

[3] *See also Anderson v. Dist. Bd. of Trustees of Cent. Fl. Comm. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) (a complaint which incorporates a long list of factual allegations such that it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief," constitutes an improper "shotgun" pleading).

*Starship Enters. of Atlanta, Inc. v. Coweta County, Ga.,* 708 F.3d 1243, 1250 n.7 (11th Cir. 2013) (explaining that shotgun pleadings may constitute "an abusive tactic" of litigation). "Shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of all preceding counts; (2) conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate each cause of action or claim for relief into distinct counts; or (4) combining multiple claims against multiple defendants without specifying which defendant is responsible for which act." *Clifford v. Federman*, 855 F. App'x 525, 528 (11th Cir. 2021); *see also Cummings v. Mitchell*, No. 20-14784, 2022 U.S. App. LEXIS 3036, at *8 (11th Cir. Feb. 2, 2022) ("When plaintiffs indiscriminately incorporate assertions from one count to another, they run afoul of Rule 8(a)(2) by materially increase[ing] the burden of understanding the factual allegations underlying each count.")

Here, Plaintiffs' Amended Complaint is an impermissible shotgun pleading. The Amended Complaint contains 436 paragraphs, and Plaintiffs incorporate all preceding allegations into each count, meaning that by Count XIX, Plaintiffs have incorporated the entirety of the Amended Complaint into the Count, in clear disregard for the pleading standards of this Court. Furthermore, by vaguely comingling the allegations against Defendants in Plaintiffs' tort claims, the Plaintiffs

fail to adequately specify which defendant is responsible for which act giving rise to their tort claims.  Accordingly, the Amended Complaint should be dismissed.

### C. Plaintiffs Cannot State Claims Under the Florida Civil Rights Act.

Plaintiffs FCRA Claims against United Airlines should be dismissed because Plaintiffs allege they were employed to work in states other than Florida. No Florida state court, nor any court in the Middle District of Florida appears to have addressed the issue of whether an individual who resides in Florida, but is employed in another state, is covered by the FCRA. However, courts have held that the statute does not apply to a foreign employer employing individuals abroad. *Taylor v. Air Atl. Icelandic*, No. 11-CV-60289, 2011 U.S. Dist. LEXIS 174616, at *19 (S.D. Fla. May 27, 2011)("One can reasonably argue that the Florida Civil Rights Act of 1992 provides no protection for alleged unlawful acts occurring outside the State of Florida or the territory of the United States because the purpose of the Florida Civil Rights Act of 1992 is only to secure 'all individuals within the state from discrimination'"). That analysis equally applies to Plaintiff's claims here, as Plaintiffs' employment relationship with United Airlines is not subject to the FCRA solely because Plaintiffs elected to reside here. Notably, many courts have consistently applied the law of the state of employment to claims of workplace discrimination. *Shah v. Am. Airlines, Inc., No. CV 17-6298, 2022 WL 3098087, at *7 (D.N.J. Aug. 4, 2022),* motion for relief from judgment denied, No. CV 17-6298,

2022 WL 4471897 (D.N.J. Sept. 23, 2022), and aff'd, No. 22-2599, 2023 WL
2945901 (3d Cir. Apr. 14, 2023); *Buccilli v. Timby, Brown & Timby*, 283 N.J.Super.
6, 10–11, 660 A.2d 1261 (App.Div.1995) (a New Jersey resident, employed in
Pennsylvania, could not assert a claim under the NJLAD against a law firm even
though it had offices in New Jersey); *Satz v. Taipina*, 2003 WL 22207205, at *18
(D.N.J.2003) (plaintiff could not assert a claim under the NJLAD where defendants
had offices in New Jersey, but plaintiff worked exclusively in Pennsylvania and
Delaware); *Brunner v. Allied Signal, Inc*., 198 F.R.D. 612, 613–14 (D.N.J.2001);
*Tuttle v. Dobbs Tire & Auto Ctrs., Inc.*, 590 S.W.3d 307, 312 (Mo. 2019) (Missouri
Human Rights Act did not apply based on presumption against extraterritoriality);
*Jahnke v. Deere & Co.*, 912 N.W.2d 136, 143 (Iowa 2018) (Iowa civil rights act did
not apply extraterritorially when the employment relationship with Iowa resident
was rooted in China or another state). The rationale behind the application of the law
of the state of employment is to protect employers from the potential unfairness of
having to comply with several different legal regimes merely because they may have
employees that reside in different states. *McGovern v. Sw. Airlines, No*. CIV.A. 12-
3579 JBS, 2013 WL 135128, at *1–2 (D.N.J. Jan. 8, 2013); *Buccilli* at 11, 660 A.2d
1261 (noting that "making the rights of each of several co-workers dependent on his
or her state of residence would be an entirely unreasonable result"). In other words,
"[l]ooking to the state of employment ensures that the law in the jurisdiction with

the strongest interest in the outcome of the litigation controls." *Weinberg v. Interep Corp.*, CIV. 05–5458(JBS), 2006 WL 1096908, *7 (D.N.J. Apr. 26, 2006). Similarly, Plaintiffs cannot assert claims under the FCRA arising from their employment in other states.[4]

As established above, Plaintiffs cannot establish personal jurisdiction over United Airlines. For the same reasons set forth in that analysis, exercise of legislative jurisdiction over United Airlines as it relates to Plaintiffs' employment similarly offends the Due Process clause. *See e..g Am. Charities for Reasonable Fundraising Reg., Inc. v. Pinellas Cty.*, 221 F.3d 1211, 1216 (11th Cir. 2000); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1192, 1214 (S.D. Fla. 2021).

### D. Plaintiffs Fail to State a Claim for Disparate Impact

Plaintiffs Disparate Impact Claims are deficient because they fail to identify a neutral policy that had a disparate impact on a group of people, and because they exceed the scope of Plaintiff's Charges of Discrimination.

"To succeed on a disparate impact claim under the [FCRA], plaintiff must prove that a facially neutral practice caused a "significant discriminatory effect." *Pritchard v. Fla. High Sch. Ath. Ass'n*, No. 2:19-cv-94-FtM-29MRM, 2019 U.S.

---

[4] Florida has clarified in the criminal context, that its statutes do not regulate extraterritorial conduct. *See Simmons v. State,* 944 So. 2d 317, 335 (Fla. 2006) ("Florida's criminal jurisdiction extends only to conduct which has sufficient connections with the state. No wholly extraterritorial conduct is ever affected").

Dist. LEXIS 75850, at *11 (M.D. Fla. May 6, 2019).[5] Count V of Plaintiffs'
complaint is devoid of any allegations sufficient to state a claim for disparate impact.
Instead, the allegations show only that Plaintiffs were impacted by the policy, not
that there was a significant discriminatory effect.[6]

Plaintiffs' Charges of Discrimination are similarly devoid of any allegations
of disparate impact, meaning that they failed to exhaust their administrative remedies
as to that claim.  "Before a plaintiff may bring an FCRA civil action, he must exhaust
his administrative remedies, as set forth in Fla. Stat. § 760.11." *McCullough v. Nesco
Res. LLC*, 760 F. App'x 642, 646 (11th Cir. 2019) Plaintiffs' Charges only
encompasses disparate treatment claims and not any disparate impact claim as they
do not identify or describe any neutral employment practice by United Airlines
which is alleged to disproportionately affect religious or disabled individuals. (Doc
23-1, 23-2). As such, Plaintiffs' disparate impact claim exceed the scope of their
Charges and should be dismissed for failure to exhaust administrative remedies.  *See
Murray v. Bombardier*, 2019 U.S. Dist. LEXIS 28578 (S.D. Fla. 2019) (dismissing
disparate impact claims for failure to exhaust where such claims exceeded scope of
Charge filed with EEOC); *see also Lee v. Geo Secure Servs.*, No. 22-CV-60689-

---

[5] FCRA claims are analyzed under the same rubric as the ADA/Title VII. *Smith v. Miami-Dade
Cty.*, 621 F. App'x 955, 959 n.1 (11th Cir. 2015)
[6] Plaintiffs also appear to comingle disparate impact based on religious and disability, making it
unclear if the disparate impact claim is limited to religious individuals with disabilities or some
other subset.

RUIZ/STRAUSS, 2022 U.S. Dist. LEXIS 208846, at *13 (S.D. Fla. Nov. 16, 2022) (no exhaustion of administrative remedies as charge focused on disparate treatment); *Price v. M & H Valve Co.,* 177 F. App'x 1, 14 (11th Cir. 2006) (holding that plaintiff failed to exhaust his administrative remedies as to his claim of disparate impact where EEOC charge stated that employer denied him the opportunity to apply for a supervisory position because of his race; and (2) subjected him and other African-American employees to harassment through racial slurs, jokes, and differences in treatment); *Butler v. Matsushita Commc'n Indus. Corp. of U.S.,* 203 F.R.D. 575, 582 (N.D. Ga. 2001) ("Because the charge and the investigation dealt only with intentional discrimination, and not a facially neutral employment policy, the Plaintiffs' claim of disparate impact is not reasonably related to the charge or investigation. Therefore it exceeds the scope of the EEOC charge and is dismissed").

### E. Plaintiffs Fail to State a Claim for Retaliation Against United Airlines.

"To make out a prima facie case of retaliation, a plaintiff must show: (1) that []he engaged in an activity protected under [FCRA]; (2) []he suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action."[7] *St.-Cyr v. Walgreen Co.*, No. 21-82066-CIV-, 2022 U.S. Dist. LEXIS 81007, at *18 (S.D. Fla. May 4, 2022) (quoting *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013)). To state a claim for retaliation, a

---

[7] FCRA claims are analyzed under the same standard as Title VII/ADA claims.

plaintiff must set forth sufficient factual allegations regarding the existence protected activity. S*ee also Williams v. Polk Cty. Bd. of Cty. Comm'rs*, 2021 U.S. Dist. LEXIS 52059, at *9 (M.D. Fla. Mar. 19, 2021) (plaintiff "must identify the protected activity" in complaint); *Blackman v. Purifoy Constr.*, 2020 U.S. Dist. LEXIS 26202, at *9 (N.D. Fla. Jan. 14, 2020) (denying default judgement due to failure allege that plaintiff engaged in any protected activity); *Mutka v. Top Hat Imps., LLC*, No. 2:18-cv-539-FtM-38MRM, 2018 U.S. Dist. LEXIS 199438, at *5 (M.D. Fla. Nov. 26, 2018) (denying default judgment where employee failed to allege "content or manner of any objection, when any objection was made, or to whom any objection was directed"); *Silien v. Waste Mgmt. Inc. of Fla.*, No. 22-cv-81531-WPD, 2022 U.S. Dist. LEXIS 231965, at *10 (S.D. Fla. Nov. 10, 2022) (threadbare recitals that plaintiff had engaged in protected activity did not meet burden to make factual allegations regarding protected activity).

The Amended Complaint is devoid of factual allegations of protected activity. Instead, Plaintiffs state in a conclusory fashion that they engaged in protected activity by "opposing United's COVID-19 policy which discriminated against them." However, Plaintiffs fail to state when or how they opposed this policy. Furthermore, as this policy inherently predates their complaints about the policy, it is entirely unclear how the policy can be retaliation. Opposition to an existing policy, followed by enforcement of that policy, cannot be retaliation. *See Lucky v. Cobx*,

Co., No. 22-12514, 2023 U.S. Dist. LEXIS 81969, at *5 (E.D. Mich. May 10, 2023) (granting motion to dismiss because plaintiff could not plausibly that accommodation request to not obtain COVID-19 vaccination, rather than policy requiring vaccination, was the "but-for" cause of disciplinary action for failure to obtain vaccine). Similarly, to the extent Plaintiff's retaliation claim is based on a request for accommodation, their retaliation claim is wholly subsumed within their failure to accommodate claims. Plaintiffs therefore fail to both adequately allege protected activity and causation.

### F. Plaintiffs Fail to State a Claim for Intentional Infliction of Emotional Distress.

Under Florida law, intentional infliction of emotional distress is reserved for truly heinous conduct not found here. "In order to prove a claim for intentional infliction of emotional distress, Plaintiffs must establish (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the complained of conduct caused the suffering; and (4) the suffering was severe." *Martinez v. Pavex Corp.*, 422 F. Supp. 2d 1284, 1296 (M.D. Fla. 2006); (citing *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985)). "Behavior claimed to constitute the intentional infliction of emotional distress must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. 2d DCA 2007) (internal citations omitted. Employee terminations are not sufficiently extreme or outrageous to

support a claim for intentional inflection of emotional distress. *See e.g. McCalla v. AvMed, Inc.*, No. 11-60007-CIV, 2011 U.S. Dist. LEXIS 99650, at *29 (S.D. Fla. Sep. 6, 2011) (termination of employment was not extreme and outrageous, and plaintiff had adequate redress under applicable employment statutes); *Williams v. Worldwide Flight Servs.*, 877 So. 2d 869, 870 (Fla. 3d DCA 2004) (racial slurs, false accusations of theft, and improper employment actions were not sufficient to support intentional inflection of emotional distress claim); *Food Lion, Inc. v. Clifford,* 629 So. 2d 201, 202-03 (Fla. 5th DCA 1993) (false accusation of theft was insufficient to support a cause of action for intentional inflection of emotional distress where the employer terminated an at-will employee).

Plaintiffs do not allege conduct by United Airlines rising to the level of outrageousness required to state a claim for intentional inflection of emotional distress. The gravamen of Plaintiffs' suit is that they were not adequately accommodated as it relates to United Airlines' Covid-19 vaccine requirement. This is not the type of heinous misconduct, beyond all possible bounds of decency, that is required to support this cause of action. Therefore, the Court should dismiss Count XVIII of Plaintiffs' Complaint.

### G. Plaintiffs Fail to State a Claim for Civil Conspiracy

To state a claim for civil conspiracy, a plaintiff must allege "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by

unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and

(d) damage to plaintiff as a result of the acts done under the conspiracy." *United*

*Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009). "A civil-conspiracy

claim must "set forth clear, positive, and specific allegations of civil conspiracy. . .

General allegations of conspiracy are inadequate." *Corbett v. Transp. Sec. Admin.*,

968 F. Supp. 2d 1171, 1190 (S.D. Fla. 2012) (internal citations omitted). "In bringing

a claim of civil conspiracy, the plaintiff must provide some factual basis for the legal

conclusion that a conspiracy existed…. Thus, plaintiffs "may not simply aver that a

conspiracy existed; [the defendant] must be put on notice as to the nature of the

conspiracy alleged." *Williams v. Michelin N. Am., Inc.*, No. 6:04-cv-815-Orl-

31DAB, 2005 U.S. Dist. LEXIS 24427, at *7 (M.D. Fla. Oct. 21, 2005) "Because a

civil conspiracy claim is not an independent cause of action in Florida, if a court

dismisses the predicate claim, ... the court must also dismiss the conspiracy claim."

*Springboard Media, LLC v. Augusta Hitech Soft Sols., LLC*, No. 22-20191-CIV-

GRAHAM, 2022 U.S. Dist. LEXIS 106015, at *13 (S.D. Fla. June 14, 2022)

(internal citations omitted).

Plaintiffs fail to adequately allege any facts showing the exitance of a

conspiracy, much less the "clear, positive, and specific facts required." Instead of

alleging specific actions taken by Defendants in furtherance of a conspiracy,

Plaintiffs allege merely that Defendants "refused to bargain"[8] and appear to assume that because Defendant ALPA did not behave as Plaintiffs desired, there must have been a conspiracy of some sort. This is not enough to state a claim. Plaintiffs are required to provide Defendants a short and plain statement of the facts giving rise to their conspiracy claim, and Plaintiffs have failed to do so. Furthermore, because Plaintiffs' intentional infliction of emotional distress claim fails as a matter of law, Plaintiffs' civil conspiracy claim fails to the extent it is predicated on that claim. To the extent Plaintiffs attempt to base their conspiracy claim on some failure to bargain in violation of the relevant collective bargaining agreement, that fails as a matter of law because a breach of contract claim cannot support a civil conspiracy. *Gastón v. NNN Inv. Advisors*, 48 Fla. L. Weekly D912 (Fla. 4th DCA May 3, 2023) ("breaching a contract is not a tort. Without a tort, there can be no conspiracy to commit a tort").[9]

Accordingly, the Court should dismiss Count XIX of Plaintiffs' Compliant.

## IV. **CONCLUSION**

---

[8] An analysis of the civil conspiracy claim is complicated by Plaintiffs' shotgun pleading and incorporation of every allegation in the Amended Complaint into Count XIX. It is unclear whether Plaintiffs' attempt to base their civil conspiracy claim on the FCRA claims, or merely on the breach of the UPA and infliction of emotional distress. *See* Amended Complaint ¶ 429. As set forth above, the intentional infliction claims are without merit, and therefore require the dismissal of any conspiracy claim predicated on that tort.

[9] Furthermore, as set forth in Defendant ALPA's Motion to dismiss, Plaintiff's state law tort claims are preempted to the extent they are premised on the interpretation of the CBA. *See Pilkington v. United*, 112 F.3d 1532, 1538 (11th Cir. 1997).

APP. 149

Plaintiffs' claims against United Airlines cannot proceed in this Court for the reasons set forth above. Plaintiffs have failed to establish that this Court has personal jurisdiction over United Airlines and cannot show that the exercise of personal jurisdiction over United Airlines in this case comports with the limitations of the Due Process Clause of the constitution. Venue is not proper in this district, as a substantial part of the events giving rise to Plaintiffs' claims did not occur here. Finally, Plaintiffs fail to allege sufficient facts to state a claim as a matter of law.

## <u>CERTIFICATE OF GOOD FAITH CONFERENCE</u>

Pursuant to Middle District of Florida Local Rule 3.01(g), undersigned counsel certifies that he conferred in good faith regarding the relief requested herein, and that Plaintiff opposes the relief requested.

Dated this 1 day of June 2023.                    Respectfully submitted,

*/s/ West Holden*
Jessica T. Travers
Florida Bar No.: 18129
Email: jtravers@littler.com
West A. Holden
Florida Bar #113569
Email: wholden@littler.com
LITTLER MENDELSON P.C.
111 North Orange Avenue
Suite 1750
Orlando, FL   32801.2366
Telephone:   407.393.2900
Facsimile:    407.386.9081
Attorneys for Defendants

25

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

JOHN HASSETT,

    Plaintiff,

v.                  **No. 4:23-cv-0960-P**

UNITED AIRLINES, INC.,

    Defendant.

## ORDER

Before the Court is Defendant's Motion to Dismiss or Alternatively Transfer this matter to the Northern District of Illinois (ECF No. 28). For the reasons below, the Court **GRANTS** Defendant's alternative Motion to Transfer (ECF No. 28).

## BACKGROUND

This case arises from Defendant's COVID-19 vaccine mandate, which required employees to be vaccinated against COVID-19 or face indefinite, unpaid leave. Plaintiff is a citizen of Arizona and a pilot for Defendant. Plaintiff's "home base" in his role as a pilot is Houston, Texas, and Defendant is a citizen of Illinois.

Despite Defendant's former chief executive officer's contention that commercial airliners were among "as safe an environment as you're going to find" for individuals during the pandemic—due to state-of-the-art air filtration systems and various sanitation practices already common among the industry—Defendant's current chief executive, Scott Kirby, was bent on requiring vaccines for its employees and flight crews to remain at work—but not for customers to continue to fly aboard his airline.[1]

---

[1] *See* Victoria Knight, *Southwest CEO's Boast About Airplanes' Low COVID Risk Flies by Key Concerns*, KFF HEALTH NEWS (May 11, 2020) https://kffhealthnews.org/news/fact-check-southwest-ceos-boast-about-airplanes-low-covid-risk-flies-by-key-concerns/. Evidently, the Coronavirus is sufficiently



**EXHIBIT I**

APP. 151

Plaintiff alleges that he requested religious exemption from the vaccine mandate. Plaintiff further alleges that his exemption was approved, but that his "accommodation" was to be placed on unpaid leave without benefits for up to 72 months—after which he must be vaccinated to return to work or face termination.

Plaintiff sued in the District of Arizona, alleging religious discrimination and failure to accommodate under Title VII. The parties subsequently transferred the case to this Court. Defendant filed the instant Motion to Dismiss or Transfer this case to the Northern District of Illinois.

## LEGAL STANDARD

Under § 1404(a)'s venue framework, a district court may transfer any civil case to "any other district or division where it might have been brought." 28 U.S.C. § 1404(a). But where a suit was originally brought in the wrong venue, § 1406 applies, requiring dismissal or alternatively allowing transfer of the case "to any other district or division in which it could have been brought." 28 U.S.C. § 1406(a). The district courts have broad discretion in deciding whether to order a transfer. *See In re Volkswagen of America, Inc.*, 545 F.3d 304, 311 (5th Cir. 2008).

Title VII contains a specific venue provision allowing an action to be brought "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has its principal office." 42 U.S.C. § 2000e-5(f)(3). The district where an unlawful employment practice is committed has generally been held to be where the alleged discriminatory act occurred, not necessarily where its effects are felt. *See e.g. Ausler v. ASG/DKS Installations, LLC*, 2021 WL 24542, at *2 (N.D. Tex. Jan. 4, 2021)

---

intelligent—or shall we say that it "sufficiently discriminates"—to infect occupants of an airplane's cockpit, but not its cabin.

(Horan, M.J.); *Kapche v. Gonzales*, 2007 WL 3270393, at *4 (S.D. Tex. Nov. 2, 2007) (Rainey, J.).

## ANALYSIS

While Plaintiff's counsel avers that he was "blissfully" unaware of the existence of the *Sambrano* case when he conferred with Defendant's counsel in Arizona, *see* ECF No. 33 at 5, let all parties be assured that this litigation has conferred on this Court anything *but* bliss. Nonetheless, "he who seeks the transfer must show good cause." *In re Volskwagen*, 545 F.3d at 315.

To determine whether a case should be transferred, courts must analyze four private and four public interest factors—none of which are given dispositive weight. *See In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004). The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Volkswagen*, 545 F.3d, at 315. And the public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Id.*

In sum, this litigation involves an Arizona citizen working in Houston for an Illinois corporation. It would be a rarity for the Court to encounter a more incorrect choice of forum based on its traditional rules of venue. Under the venue provisions of either § 1404 or § 1406, the districts where this action could have been brought are either: (1) the District of Arizona; (2) the Southern District of Texas; or (3) the Northern District of Illinois. *See* ECF Nos. 28, at 11; 33, at 15. The only venue provision which appears to authorize this Court's exercise of jurisdiction is a single clause of § 2000e-5(f)(3), allowing the action to be brought in any judicial district within the state in which the unlawful practice is alleged to have been committed. 42 U.S.C. § 2000e-5(f)(3).

3

But this provision alone is ==not heavy enough to anchor this matter to Fort Worth.== Defendant contends that the convenience of the parties and witnesses, ease of access to sources of proof, cost and expediency of litigation, local interests, and judicial economy favor transfer to Illinois. ECF No. 28 at 15–22. Poignantly, ==Defendant points to a host of decisions by this Court in which it has used its "wide discretion" to transfer matters out of the Northern District of Texas and to other jurisdictions.== *Id.* at 14. And Defendant correctly notes that ==the relative ease of access to evidence and witnesses clearly points toward transferring this case to Illinois.== *Id.*, at 15–22; *See Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.*, 844 F. Supp. 1163, 1166 (S.D. Tex. Mar. 2, 1994) (Crone, J.) ("The relative convenience to the witnesses is often recognized as the most important factor . . . in ruling on a motion under § 1404(a)."). All the pertinent records and data involved in this litigation will be in Defendant's possession in Illinois, as will the majority of Defendant's witnesses—like those involved in fashioning the vaccine policy.

Plaintiff responds by contending that it would be no more difficult to access evidence and witnesses in Fort Worth, since Defendant's local counsel is the same as counsel in *Sambrano*—presumably in possession of all the evidence—and that case has already progressed to the class certification stage. ECF No. 33, at 11. While a creative point to get around document and evidentiary access, this doesn't solve Plaintiff's need to access witnesses—nor does it address any of the other pertinent factors. Defendant, no doubt, is involved in various lawsuits around the country at any given time, and the commonality of local counsel in one of them doesn't remove the thorn from Plaintiff's flesh.

Likewise, ==the cost of litigation will be drastically reduced by transferring this matter to Illinois and judicial economy will be served by having this case heard there.== With Defendant in possession of almost all relevant evidence and witnesses in this case, the overall costs of litigation, attendance, and ==compulsion of parties' attendance== will be greatly lowered. As Defendant notes, it is currently facing several other suits involving similar employment claims in the Northern District of Illinois. ECF No. 28, at 18–19.

As to the public interest factors, this Court cannot think of a more poignant local interest than having Defendant's case—as an Illinois resident—decided in Illinois. Given that the private interests in access to evidence and witnesses maintained in Illinois and reducing the overall costs of litigation tie this case to Illinois, Illinois has a far greater interest than Texas in settling this dispute locally. And federal jurisdiction in this matter rests on a federal question involving a uniformly applied federal statute, not diversity of citizenship. Thus, the remaining public interest factors in the avoidance of conflicts of law and the familiarity of the governing law in the forum hearing the case are inapplicable.

In sum, Defendant correctly notes—as it neglected to do in *Sambrano*—that both the private and public interest factors on balance favor transfer to Illinois. As this Court's traditional venue rules clearly suggest that transfer to Illinois is appropriate, and the Title VII venue provision concurrently allows for this case to be brough where the relevant employment records are maintained, or alternatively where Defendant has its principal office, this Court concludes that this case ought to be transferred to the Northern District of Illinois for consideration.

## CONCLUSION

For the reasons stated above, Defendant's alternative Motion to Transfer (ECF No. 28) is **GRANTED**. This case is hereby **TRANSFERRED** to the Northern District of Illinois.

**SO ORDERED** on this **5th day of October 2023.**

*[signature: Mark T. Pittman]*

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SHEYENNE MYERS,** | |
| *Plaintiff*, | |
| v. | Civil Action No.: 1:23-cv-11113-MJJ |
| **UNITED AIRLINES, INC.** | |
| *Defendant.* | |

## NOTICE OF DISMISSAL PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 41(a)

Please take notice of this Dismissal of the action in its entirety by the Plaintiff pursuant to Fed. R. Civ. P. 41(a).

Respectfully submitted,

Dated: August 30, 2023

/s/ WILLIAM E. GENS
William E. Gens [BBO 556595]
GENS & STANTON, P.C.
12 Ericsson Street
Boston, MA 02122
(617) 206-4675
billgens@genslawoffices.com



1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**

|  |  |  |
|---|---|---|
| JOSEPH JOHN OKA, | ) | |
| | ) | **Case No. 2:23-CV-135-DLB-CJS** |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| UNITED AIRLINES, INC. & | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants.* | ) | |
| | ) | |

## INTRODUCTION

1. Section 5 of the Kentucky Constitution states: "the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching." Furthermore, "[n]o human authority shall, in any case whatever, control or interfere with the rights of conscience."

2. Kentucky state law has been created to mirror these civil rights in many settings, including employment, to safeguard the liberties of the citizens of Kentucky.

3. United Airlines, Inc., and the Air Line Pilots Association, International, have elected to woefully violate these safeguards, at the expense of their loyal employees and union members, with no possible justification for doing so.

4. Plaintiff Joseph John Oka ("Mr. Oka" or "Plaintiff") seeks relief from Defendants United Airlines, Inc. 's ("United's") and the Air Line Pilots Association's (ALPA's) pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious or medical exemptions from United's COVID-19 vaccination mandate policy.



1

5. United implemented a COVID-19 vaccine mandate as a condition of employment for all employees, including Plaintiff, that was tyrannical, coercive, and lacking in all scientific reasoning.

6.  As a result of United's illegal policies, Mr. Oka was subject to religious discrimination at the hands of United Airlines, Inc.

7. United's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving an experimental COVID-19 biologic, at the expense of his religious beliefs, bodily autonomy, medical privacy, and at risk to his health, or losing his livelihood and being unable to provide support for himself and his family.

8. This Faustian bargain is no bargain at all and is precisely what is forbidden by Kentucky law. The relief sought herein is precisely what both those laws expressly approve: equitable relief.

9. The Plaintiff only seeks this court to order that United and ALPA comply with the laws protecting the rights of Kentucky citizens against precisely such Catch-22 "choices."

10. Plaintiff now seeks declaratory and compensatory relief for United Airlines, Inc.'s illegal COVID-19 vaccination mandate that was improperly supported by the Air Line Pilots Association, International, and the financial and emotional distress injury Plaintiff sustained as a result.

11.  This case calls into question whether a large, private corporation, such as United Airlines, with the backing of union leadership that wasn't supporting its members, can force employees to submit to experimental medical procedures as a condition of continued employment through the implementation of a mandate.

12. In August 2021, when United initiated a compulsory vaccination mandate for its unionized pilot personnel, there was scarcely any resistance from Defendant ALPA. Despite being the exclusive collective bargaining representative for United's pilots and amid negotiations for a new contract under a previously negotiated and amendable collective bargaining agreement, ALPA did not challenge the vaccination directive.

13. The pilots' union not only refrained from opposing the enforced vaccination program on its members, but also attempted to dissuade members from lodging any complaints against the program.

14. When pilots did register "status quo" grievances, Defendant ALPA restricted the scope of these grievances, ensuring that the actual vaccination program, which changed the employment conditions, was not questioned.

15. The union eventually opted to halt the processing of grievances from unvaccinated pilots, despite having received legal analyses indicating that the initial grievances were valid under the United Pilots Agreement ("UPA") and were suitable for challenging United's vaccine mandate.

16. The union's actions represented the climax of a deliberate effort, spanning nearly two years, to ensure the enforcement of United's vaccine mandate on Defendant's membership. This was done to retain United's federal funding and align with the political narrative set by the current administration.

## PARTIES

17. Plaintiff Joseph John Oka is a citizen and resident of Kentucky in Kenton County. He was a first officer for United Airlines and a dues-paying member in good standing of Air

APP. 159

Line Pilots Association, International, until he was effectively terminated for refusing to comply with United Airlines' mandatory COVID vaccination requirements.

18.  Defendant United Airlines, Inc. ("United"), is a large, major American airline headquartered at Willis Tower in Chicago, Illinois. United Operates a large domestic and international route network with a fleet of roughly 834 aircraft and approximately 67,000 employees. United is the current employer of Plaintiff.

19. Defendant Air Line Pilots Association, International ("ALPA") is the largest pilot union in the world, representing more than 75,000 pilots from 43 U.S. and Canadian airlines. Its headquarters are in McLean, Virginia.

20. At all relevant times, United and ALPA knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

21.  This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq. and the Railway Labor Act pursuant to 48 U.S.C. § 151 et seq.

22. This Court has supplemental jurisdiction over the state claims raised in this matter pursuant to 28 U.S.C. § 1367. Plaintiff seeks remedies under Kentucky's civil rights law.

23. Venue is proper under 28 U.S.C. §1391(b)-(e) because substantial parts of the acts or omissions giving rise to the claim occurred in this district.

24. An actual and justiciable controversy exists between Plaintiff and Defendants.

## FACTS AND BACKGROUND

25. On August 6, 2021, United emerged as the first airline carrier and one of the initial large corporations to require a COVID-19 vaccine as a prerequisite for employment for its workforce.

26. Around April 15, 2020, United received approximately $5 billion in funds through the Federal Coronavirus Aid, Relief, and Economic Security ("CARES") Act. The company reaped further financial benefits through subsequent federal initiatives such as the Payroll Support Program and the American Rescue Plan, alongside federal contracts.

27. Based on information and belief, ALPA fully backed all COVID-19 measures taken by United aiming to preserve the airline's federal funding. This included a substantial increase in United's credit line shortly after United Chairman Scott Kirby expressed his inclination for achieving a 100 percent vaccination rate within the firm.

28. United's declaration on August 6, 2021, of mandating COVID-19 vaccinations came after several months of misleading actions, manipulation, and coercion by United to incentivize employees to "voluntarily" get vaccinated, initially offering additional pay and benefits, and later through threats of wage loss and termination.

29. Under the pretense of ensuring safety, United resolved to be the first in the aviation sector to require the COVID-19 vaccine. In making this decision, United significantly intruded into the lives and well-being of every employee, pressuring them to undergo an experimental medical procedure that impacts their lives beyond the workplace.

30. United announced that all employees would be required to become fully vaccinated for COVID-19 within five weeks of the FDA granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first. While initially setting a date in

5

late October as the deadline for employees to prove their vaccination status, United

Airlines, Inc. ultimately moved the deadline to September 27, 2021.

31. To become "fully vaccinated" an employee was required to show proof that he or she

received two doses of the Pfizer or Moderna vaccine or one dose of the Johnson &

Johnson vaccine. Employees who remained unvaccinated by that deadline would be

terminated.

32. United implemented an accommodation request system in which Plaintiff was given the

option to request accommodations based on religious beliefs or medical reasons via

United's Reasonable Accommodation Process ("RAP"). Employees were not allowed to

seek both religious and medical accommodations, but were forced to choose between

their constitutionally and federally protected rights.

33. The system description on the Flying Together United Company website led United

employees to believe that the RAP process would be interactive.  It was reasonable for

Mr. Oka to believe the company description, and he relied on this description as a

promise that he would have a meeting with his supervisor and human relations personnel

on how he could continue working. That meeting has never happened.

34. Plaintiff was required to submit his exemption and accommodation request by August 31,

2021. After that date, no requests would be accepted.

35. On or about September 9, 2021, United began granting requests for "accommodations"

stating that for any accommodation request granted, those employees who sought the

same would be placed on indefinite, unpaid leave, with no benefits. This was no

accommodation at all but another name for being constructively fired.

36. United never provided any "accommodated" employee or Plaintiff with a date by which they could return to work; and stated this period of unpaid leave might last up to 72 months.

37. Plaintiff was informed that any employee whose accommodation request was denied must receive the vaccine by September 27, 2021, or be terminated.

38. Plaintiff and his colleagues were never meaningfully considered for accommodations, and those exemptions granted were essentially the same as being terminated by being placed into an unpaid medical leave or unpaid leave of absence for an unknown period of time.

39. This adverse employment action was unreasonable, open-ended, punitive, and retaliatory in nature to all employees who did not choose to be vaccinated. United's coercive policy was done with the intent to discriminate, segregate, humiliate, and intimidate employees who sought an exemption on religious or medical grounds.

40. While United sought a 100 percent vaccination rate for flight crew, the passengers had no such vaccine requirement and were allowed to board wearing a mask. Even after removing all unvaccinated crew members from its ranks, United never operated a single passenger flight that contained only vaccinated persons. It is clear, the intent was never safety, it was the appearance of safety, at the expense of the rights of employees who did not receive the experimental vaccine, which does not prevent the spread of COVID-19.

41. Indeed, having a fully vaccinated workforce did not prevent the spread of the COVID-19 virus at United Airlines.

*ALPA Shifts Stance to Back United's Mandate*

42. Throughout the unfolding of the events delineated in this Complaint, both ALPA and United were functioning under the stipulations of an amendable, to-be-negotiated collective bargaining agreement. Given this scenario, the Railway Labor Act ("RLA") mandated all parties to adhere to the terms and conditions set forth in the previous collective bargaining agreement until a new one was formalized.

43. Merely two weeks after United CEO Scott Kirby's hinting at a foreseeable compulsory vaccination within the workplace, ALPA reflected Kirby's statements in a memo distributed to its membership on January 25, 2021. Defendant ALPA wrongly asserted that a vaccine mandate was contractually allowed (though provided no backing from the United Pilots' Agreement) and sought to downplay the likelihood of individual exemptions on religious or disability grounds.

44. ALPA did not at any point conduct a survey or engage in discussions with its membership regarding opposing a vaccine mandate enforced by United's management. Contrarily, ALPA, in violation of the Railway Labor Act and its collective bargaining duties, initiated a collaborative endeavor with United to enforce vaccination mandates on its workforce, partially or wholly, to sustain federal funding.

45. Initially, ALPA acknowledged the problems inherent in United's obligatory vaccination scheme when it highlighted in an editorial featured in ALPA magazine on September 1, 2021, that ALPA "has been very clear that any vaccination requirements are an issue that must be bargained for and ultimately agreed to by each ALPA pilot group."

46. Likewise, on May 28, 2020, ALPA informed the United pilot membership to anticipate attempts by United's management to unilaterally amend the collective bargaining

APP. 164

agreement concerning working conditions due to the COVID-19 pandemic and rallied for a unified stance to thwart United's managerial endeavors.

47. However, the union shifted its stance during the autumn and early winter of 2020-21. ALPA negotiated several letters of agreement with United pertaining to seniority and furlough alleviation. Specifically, Letter of Agreement ("LOA") 20-05 was negotiated with United, then presented to the union membership for approval in alignment with Article XIII, Section 7 of the United MEC policy manual. This clause necessitates member approval when an agreement between the Defendant and United "substantially affect wages, working conditions."

48. Through Letter of Agreement (LOA 21-02), ALPA aided United's management in establishing a dual-tier system constraining compensation for unvaccinated pilots two months later, without delivering the LOA to United pilot membership – as mandated.

49. LOA 21-02 devised a bifurcated framework for pilots within United. Vaccinated pilots were granted the latitude to operate nearly all routes within the network, whereas unvaccinated pilots were confined to specific routes. The financial repercussions started to afflict the unvaccinated pilots as their route choices narrowed and their prospects for alternative routes were obliterated by the LOA's terms.

50. Subsequent to its enactment on May 25, 2021, United violated the stipulations of LOA 21-02 by demanding employees to substantiate their vaccine exemption requests prior to the LOA's conclusion.

51. In August 2021, Plaintiff tried to grieve this breach of the LOA and was turned away and told his point was moot as the company planned on ending LOA 21-02 with the September 27, 2021, vaccination deadline.

52. ALPA didn't contest this violation; instead, it posited that the matter was of a "personal" nature and thus, between its union members and United. Additionally, the union took no action to prevent United management from arbitrarily identifying and expanding the number of airports and countries as "vaccination destinations" per the stipulations of LOA 21-02. This action effectively narrowed the number of accessible airports for unvaccinated pilots, amplifying the chances that they would incur a financial detriment based on their vaccination status.

53. The senior leadership of ALPA exhibited personal animosity towards union members who remained unvaccinated. For instance, on May 27, 2021, the chairman of United Airlines Master Executive Counsel, Todd Insler, responded to a member voicing concerns over the emergency use authorization status of the vaccine with a harsh rebuke, advising the member to "go get a fucking shot and collect $4K or he can STFU."

### Defendants' Treatment of Plaintiff Joe Oka

54. Joseph John Oka worked for more than 28 years for United Airlines, reaching the position of captain in November, 2021, when he was promoted from first officer.

55. Mr. Oka was forced to deal with multiple obstacles because of COVID-19 policies.

56. For instance, Mr. Oka received his upgrade to captain on November 16, 2021 – five days *after* he was put on unpaid leave under United's coercive vaccination policy. This forced him to give up the captain's position and remain a first officer.

57. Two days after returning Mr. Oka to work, on March 30, 2022, United informed Mr. Oka that if he was not senior enough as a captain to bid around certain destinations prohibited by their choosing he would be forced to give up his captain upgrade to a base/equipment/seat (BES) available in the next upcoming vacancy bid.  What this means

is that First Officer Oka would get trained as a Captain and be junior in seniority then potentially be scheduled to one of the prohibited destinations.  This would in turn force Captain Oka to choose from a list of BES available that might put him in a lower-paying equipment or seat and/or cause him to have to switch bases.  The hardship created by this non-contractual and un-negotiated work condition forced him to give up the captain's position and remain a first officer.

58. Mr. Oka, who's a Catholic, holds sincere religious objections to the COVID-19 vaccine that prevented him from complying with United's vaccination mandate.

59. For example, Mr. Oka eschews medical products that use aborted fetal cells in their development, production and implementation. And he follows the church teaching on Therapeutic Proportionality. By this teaching the recipient of a medical intervention or treatment must assess whether the benefits of the proposed medical intervention or treatment outweigh the undesirable side-effects and burdens that come with them.  This assessment is not taken lightly and the church teaches the assessment involves looking at the integral good of the recipient, their family, as well as spiritual, psychological and bodily goods. The teaching of Therapeutic Proportionality affirms that this assessment must be respected and can only be made by the potential recipient (the Plaintiff) not by public health authorities or a corporation.

60. Mr. Oka requested religious accommodation and exemption from United's mandate. Without an approved religious or medical exemption, Mr. Oka knew that he would be terminated on September 27, 2021, United's deadline for its employees to get the COVID-19 vaccine.

61. Following the submission of his exemption request, United pestered Mr. Oka with additional questions regarding his religious beliefs, vaccination history, and a request for third-party validation of his sincerely held religious beliefs.

62. Mr. Oka was subject to disparate treatment as an unvaccinated employee. For example, in the Spring of 2021, United offered a bonus of 14 hours extra pay for employees who got the vaccination, which would have amounted to about $4,000 for Mr. Oka, had he agreed to get vaccinated. Since Mr. Oka wasn't vaccinated, he lost out on this bonus.

63. In September 2021, United approved Mr. Oka's religious exemption.

64. However, the only "accommodation" provided by United was placement on an indefinite leave of absence without pay, benefits, vacation, retirement contributions, or travel privileges – which is no accommodation at all.

65. United left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving the experimental COVID-19 vaccine, at the expense of his religious beliefs, and even his health, or losing his livelihood and being unable to provide food, housing, and support for himself and his family.

66. On November 11, 2021, Mr Oka was on unpaid leave as United began denying compensation.

67. Mr. Oka remained on unpaid leave for about five months, during which time he was denied all pay and benefits.

68. United's discriminatory actions caused severe financial hardship and emotional distress to Mr. Oka.

69. He lost about $197,000 in pay and benefits, plus another $100,000 in back pay since he had to give up his post as a captain and remain a first officer.

70. LOA 21-02 established a two-tier structure for pilots within United. Vaccinated pilots were allowed to fly virtually all routes within the system while unvaccinated pilots were limited to specific routes. Pilots who were unvaccinated began to suffer financial loss as their routes were limited and their options for taking on alternative routes were shut down by the terms of the LOA.

71. Mr. Oka came back to work at United on March 28, 2022.

72. Two days later, on March 30, he was given a list of 30 countries that he couldn't fly to. If he was assigned to one of those countries, he would get dropped without pay.

### *COVID Vaccines Violate Plaintiff's Religious Beliefs*

73. Plaintiff holds sincere concerns surrounding the process used to manufacture the vaccines.

74. Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[1]



Los Angeles County
**COVID-19 VACCINE AND FETAL CELL LINES**

In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

75. For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-

76. In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

77. As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[4] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[5] that took place in the Netherlands.[6]

78. While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

79. Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on religious grounds to accept or be forced to accept the COVID-19 vaccines.

*/// ///*

---

johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[5] *COVID-19 Vaccine and Fetal Cell Lines.*

[6] *Ibid.*

## COUNT I:  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e et seq. – Religious Discrimination

80. Plaintiff hereby incorporates by reference the allegations contained in the preceding

   paragraphs as if fully set forth herein.

81. Title VII prohibits "discriminat[ion] against any individual with respect to their

   compensation, terms, conditions, or privileges of employment, because of such

   individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see*

   *also EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768 (2015).[7]

82. Title VII imposes upon an employer the duty to make reasonable accommodations for the

   religious observances short of incurring an undue hardship.

83. Plaintiff asserted bona fide religious beliefs that conflicted with United's mandatory

   vaccine policy and notified United of those beliefs by filing an exemption and

   accommodation request per United's policies.

84. Defendants United and ALPA utterly failed to offer any reasonable accommodation,

   failed to engage in the interactive process with Plaintiff after promising it in company

   web pages, and failed to perform an individualized assessment of Plaintiff's request.

   Although Defendant granted Plaintiff's religious exemption request, Defendant offered

---

[7] As the Supreme Court has recognized, employees' "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [legal] protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)

an "accommodation" that was no accommodation at all – unpaid, unprotected, and unelected leave of absence.

85. Defendants took adverse employment action against Plaintiff by constructively terminating employment by putting Plaintiff on unpaid leave.

86. By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendants discriminated against Plaintiff due to his religious beliefs.

87. Defendants' failure to provide religious accommodations has substantially injured Plaintiff. Being placed on unpaid leave because of his religious beliefs – and having the threat of termination hang over him for months – was stressful and depressing for Plaintiff.

88. On these facts, Plaintiff establishes a prima facie case that shows Defendants failed to make any reasonable accommodation, discriminated against him on the basis of religion, and violated Plaintiff's Title VII rights.

89. Defendants cannot show that allowing Plaintiff to continue in his position as he had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

90. As such, Defendants have violated Plaintiff's rights under Title VII by discriminating against him on the basis of his religious beliefs and failing to provide reasonable accommodation.

## COUNT II:  VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT - SECTION 344.040 – Religious Discrimination

91. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

APP. 172

92. Under the Kentucky Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire, or to discharge any individuals, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, *religion*, national origin, sex, age forty (40) an dover, because the person is a qualified individual with a disability…" 344.040(1)(a).

93. 344.040(1)(b) also prohibits employers from "limit[ing], segregat[ing] or classify[ing[ employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect status as an employee, because of the individual's . . . religion."

94. Employers are required to make reasonable accommodations to the religious needs of employees so long as they can be made without undue hardship. *Irvin v. Aubrey*, 92 S.W.3d 87, 89 (Ky. Ct. App. 2001). The hardship to an employer must exceed a *de minimum* cost. *Id.*

95. Plaintiff holds sincere religious beliefs that preclude him from receiving a COVID-19 vaccine. While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Kentucky, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

96. Once an employee has articulated his or her sincerely held religious objections to acceptance or receipt of the currently available COVID-19 vaccines, the proper inquiry is thus at its end as to that element.

97. Defendant's COVID-19 vaccine mandate, which threatens termination for non-compliant employees, discriminates against employees who do not wish to receive the vaccine on religious grounds.

APP. 173

98. Plaintiff sought an exemption from United's COVID-19 vaccine mandate based on his sincere religious beliefs.

99. Defendants granted Plaintiff's exemption request – but forced him to go on unpaid leave. Plaintiff was left without any compensation nor benefits.

100.    As such, United has failed to provide *any* reasonable accommodation, but has rather implemented a punitive measure against employees who choose to exercise their religious rights.

101.    United was made fully aware of the conflict between its COVID-19 vaccine mandate and Plaintiff's religious beliefs. United responded with disciplinary action by discharge poorly disguised as an accommodation.

102.    As a result of United's draconian mandate, Plaintiff, and other similarly situated employees, were forced to seek alternative employment during his leave of absence.

103.    Plaintiff's position, should he decide to get vaccination, would not be guaranteed upon his return.

104.    United's failure to provide reasonable accommodations to Plaintiff's sincere religious beliefs has injured and will continue to injure Plaintiff by discriminatorily denying his income and by terminating his livelihood.

105.    Because Plaintiff has established a *prima facie* showing of religious discrimination, the burden would then shift to United to demonstrate that it could not accommodate the Plaintiff's religious needs without undue hardship, which it cannot do here.

APP. 174

106.        United cannot show that affording Plaintiff other accommodations (scheduled testing, masking, etc.), many of which United has been implementing since March 2020, would impose an undue hardship in the context of employer vaccination policies.

107.        United has thus failed to consider any reasonable accommodations to Plaintiff.[8] Rather, United has implemented a consequence that is tantamount to termination and a far cry from the "individualized" assessment required by the EEOC.[9]

108.        As such, United discriminated against Plaintiff based on his sincerely held religious beliefs, failed to provide a reasonable accommodation to Plaintiff's religious exemption request, and therefore, violated the Kentucky Civil Rights Act.

## COUNT III:  Breach of the Duty of Fair Representation

109.        Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

110.        In this claim, Plaintiff accuses ALPA of neglecting its duty of fair representation towards the Plaintiff under the Railway Labor Act ("RLA"), 48 U.S.C. § 151 et seq.

111.        Courts have interpreted the RLA to impose a duty of fair representation on unions due to their exclusive bargaining status. It's the jurisprudence surrounding the RLA and labor relations that have solidified and clarified the concept of the duty of fair representation.

---

[8] See EEOC Guidance for employers whose employees are unable to be vaccinated due to their sincerely held religious beliefs. What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (the "COVID-19 Technical Assistance", https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26,2021.
[9] *See supra,* at section J, ¶¶ 103-110.

APP. 175

112.     A union is seen as breaching its duty of fair representation if its actions are

arbitrary, discriminatory, or carried out in bad faith, as per *Martin v. American Airlines,*

*Inc.*, 390 F. 3d 601, 606 (8th Cir. 2004).

113.     The union's collusion with Plaintiff's employer, United Airlines, and the refusal to

address Plaintiff's valid grievances against the new vaccination mandate are deemed

violations of their duty of fair representation, given that such conduct is seen as being in

bad faith, arbitrary, and discriminatory.

114.     The actions alleged in the preceding paragraphs either directly or indirectly

contravened the United Pilots Agreement (Section 1(a)) between Defendant and United,

along with the stipulations of the RLA. Despite its earlier assertion that the vaccine

mandate would be a mandatory subject of collective bargaining before implementation,

Defendant ALPA chose to overlook United's unlawful actions and instead endorsed and

supported them.

115.     Bad faith in a union occurs when actions or failures to act stem from improper

motives, as per *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003).

Defendant ALPA collaborated with United in rolling out the vaccine mandate, declined

to contest the mandate, and refused to represent pilots who were placed on unpaid leave

or terminated due to the mandate.

116.     According to 45 U.S.C. § 156, both Defendant ALPA and United were obliged to

notify employees of an "intended change in agreements affecting rates of pay, rules, or

working conditions." United was prohibited from altering rates of pay, rules, or working

conditions while these changes were under mediation and finalization—essentially,

United was required to uphold the "status quo."

117.     When United Airlines went against the collective bargaining agreement and the RLA by unilaterally enforcing the vaccine mandate, Defendant ALPA was obliged to challenge the implementation of this mandate, given that it altered the rates of pay and working conditions for unvaccinated pilots specifically.

118.     Defendant ALPA was wrongly driven by its wish to represent United's interests and its own leadership bias, instead of representing its members fairly, as it was legally obliged to do. This bias was exhibited as Defendant ALPA sought to gain favor with the leadership of United Airlines and other politically connected groups advocating for vaccine mandates.

119.     Defendant ALPA's negligence in adhering to its own policies that necessitated member ratification of LOAs, and its collusion with United to not challenge an alternative to the company's fundamental employment conditions, was so unreasonable as to be irrational. Moreover, by colluding with United and not submitting LOA 21-02 for member ratification, Defendant's actions towards Plaintiff were sinister, deceitful, and dishonest, demonstrating arbitrary, discriminatory, or bad faith motivation.

120.     Arbitrary conduct is described as conduct that is "so far outside a wide range of reasonableness as to be irrational," as per *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991).

121.     To violate the duty of fair representation, discriminatory conduct must be "intentional, severe, and unrelated to legitimate union objectives," as per *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. Of Am. V. Lockridge,* 403 U.S. 274, 301 (1971).

APP. 177

122.     United effectively bifurcated pilots into two groups with LOA 21-02—those vaccinated and those unvaccinated, continuing this discrimination in its vaccine mandate. Defendant ALPA did not challenge United's discriminatory policies where vaccinated pilots enjoyed certain benefits and incentives, while unvaccinated pilots encountered dropped flights and salary reductions.

123.     Defendant ALPA's prejudiced and discriminatory conduct was further exacerbated by its refusal to advocate for unvaccinated pilots who were put on unpaid leave or terminated following the mandate's implementation. Defendant ALPA's collaboration with United and refusal to challenge the two-tier system and the mandate was deliberate, severe, and unrelated to valid union objectives.

124.     As a direct consequence of Defendant ALPA's bad faith, arbitrary, and discriminatory behavior, and its failure to fulfill its duty of fair representation to Plaintiff, the Plaintiff has been, and continues to be deprived of full wages and benefits under his employment with United Airlines.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

a.  For a finding that Defendants United and ALPA violated Title VII of the Civil Rights Act of 1964, the Kentucky Civil Rights Act and any other relevant statute when it engaged in religious discrimination against Plaintiff and failed to provide Plaintiff with a reasonable accommodation pertaining to its COVID-19 vaccination mandate;

b.  For a finding that Defendant ALPA violated the Railway Labor Act and breached its duty of fair representation;

APP. 178

c.  An order that Plaintiff be compensated, to the extent allowable, for his monetary

damages, stress and emotional upheaval;

d.  An order that Defendants pay Plaintiff's costs associated with bringing this lawsuit,

including his reasonable attorneys' fees and costs; and

e.  A grant of any such further relief as the Court deems necessary and proper in the public

interest.

DATED: October 3, 2023                       Respectfully submitted,

/s/ Taylor J. Ferguson
Taylor J. Ferguson, Atty No. 97655
BIESECKER DUTKANYCH & MACER, LLC
144 N. Delaware St.
Indianapolis, Indiana 46204
Office:   (317) 991-4765
Facsimile:       (812) 424-1005
Email:   tferguson@bdlegal.com
*Counsel for Plaintiff*

Robert E. Barnes, Esq.
California Bar No. 235919
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com

**Counsel for Plaintiff Joseph John Oka**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA
### Fresno Division

| | | |
|---|---|---|
| ROGER SOTO, | ) | **Case No. _____** |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| UNITED AIRLINES, INC. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendant.* | ) | |
| | ) | |

## INTRODUCTION

1. Plaintiff Roger Soto ("Mr. Soto" or "Plaintiff") seeks relief from Defendant United Airlines, Inc. 's ("United") pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious or medical exemptions from United's COVID-19 vaccination mandate policy.

2. United implemented a COVID-19 vaccine mandate as a condition of employment for all employees, including Plaintiff, that was tyrannical, coercive, and lacking in all scientific reasoning.

3. As a result of United's illegal policies, Mr. Soto was subject to discriminatory treatment, wrongful constructive termination, and assault at the hands of United Airlines, Inc.

4. Plaintiff now seeks declaratory and compensatory relief for United Airlines, Inc.'s ("Defendant's) illegal COVID-19 vaccination mandate and the financial and emotional distress injury Plaintiff sustained as a result.



1

5.   This case calls into question whether a large, private corporation, such as United Airlines, can force its employees to submit to experimental medical procedures as a condition of continued employment through the implementation of a mandate.

## PARTIES

6.   Plaintiff Roger Soto is a flight attendant for United who requested an exemption from the mandatory vaccination on religious grounds. Mr. Soto was denied any accommodation and was placed on unpaid leave. He is a resident of Calaveras County, California.

7.   Defendant United Airlines, Inc. ("United"), is a large, major American airline headquartered at Willis Tower in Chicago, Illinois. United Operates a large domestic and international route network with a fleet of roughly 834 aircraft and approximately 67,000 employees. United is the current or former employer of Plaintiff.

8.   At all relevant times, United knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

9.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332 as the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs and is between citizens of different states.

10. This Court has supplemental jurisdiction over the state claims raised in this matter pursuant to 28 U.S.C. § 1367. Plaintiff seeks remedies under California common law.

11. Venue is proper under 28 U.S.C. §1391(b)-(e) because substantial parts of the acts or omissions giving rise to the claim occurred in this district.

12. An actual and justiciable controversy exists between Plaintiff and Defendant.

2

## FACTS AND BACKGROUND

13. On August 6, 2021, United became the first airline carrier and one of the first large corporations to mandate a vaccine for COVID-19 as a condition of employment for its workforce.

14. This announcement followed several months of deception, manipulation and coercion by United to incentivize employees to "voluntarily" receive the vaccine with additional pay and benefits and later through threats of lost wages and termination.

15. Under the guise of safety, United decided it would be first in the aviation industry to mandate the COVID-19 vaccine. In so doing, United conducted a significant encroachment into the lives and health of every United employee by coercing employees to undertake an experimental medical procedure that affects their lives outside the workplace.

16. United announced that all employees would be required to become fully vaccinated for COVID-19 within five weeks of the FDA granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first. While initially setting a date in late October as the deadline for employees to prove their vaccination status, United Airlines, Inc. ultimately moved the deadline to September 27, 2021.

17. To become "fully vaccinated" an employee was required to show proof that he or she received two doses of the Pfizer or Moderna vaccine or one dose of the Johnson & Johnson vaccine. Employees who remained unvaccinated by that deadline would be terminated.

18. United implemented an accommodation request system in which Plaintiff was given the option to request accommodations based on religious beliefs or medical reasons via

United's Reasonable Accommodation Process. Employees were not allowed to seek both religious and medical accommodations, but were forced to choose between their constitutionally and federally protected rights.

19. Plaintiff was required to submit his exemption and accommodation request by August 31, 2021. After that date, no requests would be accepted.

20. On or about September 9, 2021, United began "granting" requests for "accommodations" stating that for any accommodation request granted, those employees who sought the same would be placed on indefinite, unpaid leave starting October 2, 2021, with no benefits. This was no accommodation at all but another name for being constructively fired.

21. United never provided any "accommodated" employee or Plaintiff with a date by which they could return to work; and stated this period of unpaid leave might last up to 72 months.

22. Plaintiff was informed that any employee whose accommodation request was denied must receive the vaccine by September 27, 2021, or be terminated.

23. Plaintiff and his colleagues were never meaningfully considered for accommodations, and those exemptions granted were essentially the same as being terminated by being placed into an unpaid medical leave or unpaid leave of absence for an unknown period of time.

24. This adverse employment action was unreasonable, open-ended, punitive, and retaliatory in nature to all employees who did not choose to be vaccinated. United's coercive policy was done with the intent to discrimination, segregate, humiliate, and intimidate employees who sought an exemption on religious or medical grounds.

4

25. While United sought a 100 percent vaccination rate for flight crew, the passengers had no
such vaccine requirement and were allowed to board wearing a mask. Even after
removing all unvaccinated crew members from its ranks, United never operated a single
passenger flight that contained only vaccinated persons. It is clear, the intent was never
safety, it was the appearance of safety, at the expense of the rights of employees who did
not receive the experimental vaccine, which does not prevent the spread of COVID-19.

26. Indeed, having a fully vaccinated workforce did not prevent the spread of the COVID-19
virus at United Airlines.

**United's Treatment of Plaintiff Roger Soto**

27. Plaintiff Rogelio Soto was employed as a flight attendant for United. Mr. Soto had been
working in his position for twenty-five years.

28. Mr. Soto is a devout traditional Roman Catholic. As part of his faith, he believes that the
sanctity of life is one of the most cherished commandments of his faith.

29. Taking an injection of a vaccine that uses aborted fetal tissue in its use and/or
development violates his strongly held religious beliefs, honoring the Fifth
Commandment of "Thou Shalt Not Kill."

30. On August 10, 2021, Mr. Soto submitted his religious exemption request, along with a
letter from his priest explaining his conflict of conscience with the COVID-19 vaccines,
via United's Help Hub. The next day, Mr. Soto received notice that his exemption request
had been received, but additional supporting documents were required.

31. On August 13, 2021, Mr. Soto received a phone call from Adrienne Kelly, a
representative in United's Employee Service Center, requesting to ask additional
questions regarding his religious exemption as a condition of his exemption request.

Later that day, during their conversation, Ms. Kelly asked a series of comprehensive and intrusive questions while interrogating Mr. Soto about his religious beliefs.

32. Yet again on August 25, 2021, Mr. Soto was contacted via an email from Human Resources stating that his position on vaccines was not clear and more information was required, although Mr. Soto had provided ample evidence regarding his religious conflict with United's COVID-19 vaccine mandate.

33. Mr. Soto responded to United's second request for additional information on August 26, 2021.

34. Mr. Soto did not receive a response to his email. On August 31, 2021, Mr. Soto called Adrienne Kelley to seek an update on his religious exemption. Ms. Kelley did not answer or return Mr. Soto's call.

35. Although United ultimately granted Mr. Soto's religious exemption, rather than provide an accommodation, United placed Mr. Soto on an unpaid, unprotected, and unelected leave of absence.

36. Mr. Soto and his family were significantly damaged by United's actions. Both Mr. Soto and his wife were under immense stress and emotional distress as a result of United's discriminatory conduct, coercion, and constant holding of Mr. Soto's employment hostage.

37. On October 3, 2021, shortly after Mr. Soto was placed on unpaid leave, Mr. Soto's wife had a heart attack that is believed to have been caused by the undue stress that resulted from United's actions.

38. United terminated Mr. Soto's health insurance on December 1, 2021, leaving Mr. Soto and his wife, who recently withstood a heart attack, without any medical coverage.

39. Mr. Soto was forced to stay on unpaid leave for several months, during which time he was denied all pay and benefits.

40. Mr. Soto was subject to unlawful termination, in violation of long-held public policy, federal law, and state law protecting religious freedoms in the workplace.

## FIRST CAUSE OF ACTION
### Wrongful Discharge In Violation of Public Policy

41. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

42. The tort cause of action for wrongful termination in violation of public policy provides a vehicle for recourse that otherwise would be unavailable under general rules of the at-will employment doctrine.6 *Phillips v. St. Mary Reg'l Med. Ctr.*, 96 Cal. App. 4th 218, 225–26, 116 Cal. Rptr. 2d 770, 775 (2002). First recognized by the California Supreme Court in *Tameny v. Atlantic Richfield Co.,*7 this public policy exception allows an employee to bring a tort cause of action against an employer who terminates an at-will employment on a ground that violates fundamental public policy. *Id.*

43. The exception is based on the principle that, although an employer may terminate an at-will employee for no reason, or any arbitrary or irrational reason, the employer has no power to terminate the employee for a reason contrary to the law or fundamental public policy.

44. To support a wrongful discharge claim, the policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." *Phillips v. St. Mary Reg'l Med. Ctr.,* 96 Cal. App. 4th 218, 226, 116 Cal. Rptr. 2d 770, 775 (2002)

7

45. In addition to being violative of the California State Constitution, the Fair Employment and Housing Act (FEHA) establishes a civil right to be free from job discrimination based on certain classifications, including religion.

46. 15 Government Code section 12920 provides: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical disability, medical disability, medical condition, marital status, sex, age, or sexual orientation." FEHA's provisions prohibiting discrimination may provide the policy basis for a claim for wrongful discharge in violation of public policy. *Phillips v. St. Mary Reg'l Med. Ctr.*, 96 Cal. App. 4th 218, 227, 116 Cal. Rptr. 2d 770, 776 (2002).

47. United's actions infringing on Mr. Soto's religious beliefs, denying any reasonable accommodation for his religious conflict with United's vaccine mandate, and adverse employment action against Mr. Soto for exercising his religious beliefs is in direct violation to state law and established freedoms.

48. It is in the public interest to be protected from discriminatory employment practices that violate long-standing principles of the free exercise of religion.

49. This right had been well established as of 2021 when United implemented its mandate. Both the California and United States Constitutions recognize the right to free exercise of religion. It is further codified in numerous federal and state civil rights law, and particularly in the employment context.

50. This is a substantial infringement on Mr. Soto's religious beliefs. Adhering to his beliefs did not have a minor consequence; rather, it cost him his entire job and livelihood. Under

United's view, refusing to inject oneself with an experimental drug that contains cells

from aborted babies is a fireable offense.

51. This is a clear exception to the default at-will employment doctrine. Allowing an

employer to wantonly disregard an employee's religious beliefs in this manner would gut

religious freedoms in the employment context.

## SECOND CAUSE OF ACTION
### Common Law Assault

52. Plaintiff hereby incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

53. Under California law, the elements of a claim for civil assault are that: (1) a defendant

intended to cause harmful or offensive conduct, or the imminent apprehension of such

contact; and (2) a plaintiff was put in imminent apprehension of such contact. *See Austin*

*v. Terhune,* 367 F.3d 1167, 1172 (9th Cir.2004) (citations omitted); *see also Judicial*

*Council of California Approved Jury Instructions,* CACI 1301.

54. Defendant has threatened intentional, imminent harmful and offensive contact upon

Plaintiff by way of forced vaccine injection of an experimental, untested, and ineffective

mRNA vaccine, under penalty of being terminated from his employment.

55. Defendant's coercion, emboldened by tight deadlines, uncompromising exemption

protocols, and a hostile and censored work environment, contributed to Plaintiff's stress

and fear concerning Defendant's vaccine mandate.

56. Defendant's COVID-19 vaccine mandate caused Plaintiff to reasonably believe that

Defendant was about to carry out the threat of harmful and offensive contact upon him,

by way of forcing Plaintiff to inject an untested and potentially unsafe substance into his

body.

57. Plaintiff did not consent to United's conduct, nor did he consent to receiving the COVID-19 vaccine. Defendant's unlawful requirement of employment was an unwelcome invasion of Plaintiff's privacy and bodily integrity.

58. United's COVID-19 vaccine mandate has caused Plaintiff harm, including but not limited to by way of fear, anxiety, fright over being threatened with the injection of an untested and potentially unsafe substance into the body, and the resulting loss of his income and livelihood either temporarily or permanently.

59. United's conduct alleged herein was a substantial factor in causing Plaintiff harm.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

a. A finding that Defendant wrongfully discharged Plaintiff in violation of California public policy;

b. A finding that Plaintiff has a fundamental right to his bodily autonomy, and to make health decisions in accordance with his beliefs and conscience.

c. A finding that Defendant wrongfully engaged in assault against Plaintiff;

d. An order that Plaintiff be compensated, to the extent allowable, for his monetary damages;

e. An order that Defendant pay Plaintiff's costs associated with bringing this lawsuit, including their reasonable attorneys' fees and costs; and

f. A grant of any such further relief as the Court deems necessary and proper in the public interest.

DATED: September 27, 2023                    Respectfully submitted,

_/s/ Robert E. Barnes_____
Robert E. Barnes, Esq.
California Bar No. 235919
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com

***Counsel for Plaintiff Roger Soto***

APP. 190

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| KEVIN D. WICKSTROM ET. AL., | § | |
| | § | |
| v. | § | |
| | § | EP-22-CV-315-DB |
| AIRLINE PILOTS ASSOCIATION, | § | |
| INTERNATIONAL. | § | |

## ORDER ON DEFENDANT'S MOTION TO TRANSFER VENUE

On this day, the Court considered Defendant Airline Pilots Association, International's ("the Union") "Contested Motion to Transfer Venue [ ]" ("Motion"). ECF No. 19. Plaintiffs Kevin D. Wickstrom, Robert D. Williamson, Erik W. Wichmann, James R. Breitsprecher, Tony H. McKenzie, Leigh Smith, Jon A. Sterling, Forace Hogan, Christopher P. Gates, and John Ellis ("the Pilots") filed a timely response, and the Union filed a timely reply. ECF Nos. 25 and 27. In the interest of justice and for the convenience of the parties, the Court grants the Union's Motion and transfers the case to the Northern District of Illinois.

## BACKGROUND

Ten United Airlines pilots claim that their Union failed to fairly represent their interests when United planned and imposed a mandatory vaccination program for its pilots. Complaint ("Compl.") 2–4, ECF No. 1. The Pilots reside all over the country, with three residing in Colorado and one residing in El Paso County, Texas. *Id.*

The Union has its principal place of business in McLean, Virginia, "and was at all relative times the certified collective bargaining representative under the Railway Labor Act for [the Pilots]." *Id.* at 4. In 2021, United leadership indicated that it expected to implement mandatory workplace vaccinations. *Id.* at 6. The Union did not poll its members about whether it should oppose mandatory vaccinations and took the stance that the mandatory vaccinations were



EXHIBIT
M

APP. 191

contractually permissible. *Id.* at 6–7. The Pilots also allege that the Union "via a Letter of Agreement (LOA 21-02) assisted United management in instituting a two-tier system limiting compensation for unvaccinated pilots two months later, without submitting the LOA to United pilot membership as required." *Id.* at 7. The Pilots argue that the Union was hostile to union members who were unvaccinated, discouraged members from filing grievances in opposition to the vaccine mandate, and did not object to United's reasonable accommodation process ("RAP") for vaccine objectors. *Id.* at 8, 10.

The Court now examines the Union's Motion to transfer the case from the Western District of Texas to the Northern District of Illinois under 28 U.S.C. § 1404. ECF. No. 19. First, the Court will consider whether venue is appropriate in the Northern District of Illinois. Then the Court will weigh the *Volkswagen* public and private interest factors to determine whether the Northern District of Illinois is a "clearly more convenient" venue. *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 315 (5th Cir. 2008) (*en banc*) ("*Volkswagen II*").

## LEGAL STANDARD

Unless otherwise provided by law, in a civil action venue is permissible "only in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . or (3) a judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C. §1391(b). When multiple venues are permissible, in the interest of justice and for the convenience of the parties, a district court may transfer a case to any other district or division where it could have been brought. 28 U.S.C. §1404(a) ("§ 1404(a)").

2

District courts have "broad discretion" to transfer a case pursuant to § 1404(a).

*Volkswagen II*, 545 F.3d at 311. "The preliminary question under § 1404(a) is whether a civil action 'might have been brought' in the destination venue." *Id.* at 312. If venue is proper in the destination venue, the moving party bears the burden of demonstrating that good cause exists to transfer the case for convenience purposes. *Id.* at 315.

In deciding whether to transfer, courts consider various private and public interest factors. *Id.* The private factors considered are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* The public factors considered are "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* These factors are "not necessarily exhaustive or exclusive" and "none . . . [is] dispositive." *Id.*

## ANALYSIS

First, the Court addresses the question of personal jurisdiction. *Leroy v. Great Western United Corp.*, 443 U.S. 173, 180 (1979) (A court usually considers jurisdictional challenges before determining whether venue is proper). The Union asserts that the Court should dismiss the case because it lacks personal jurisdiction over it. Mot. to Dismiss for Lack of Jurisdiction, ECF No. 20.[1] However, the Court need not resolve this claim because the Fifth

---

1 "ECF No." refers to the Electronic Case Filing ("ECF") number for documents docketed in this matter. Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

3

Circuit has "construed the discretionary transfer language of 28 U.S.C. §1404(a) to permit transfer

. . . even if no personal jurisdiction existed in the transferring court." *Aguacate Consol. Mines,*

*Inc. of Costa Rica v. Deeprock, Inc.*, 566 F.2d 523, 524 (5th Cir. 1978). Thus, this Court will

analyze Defendant's Motion to Transfer Venue without addressing whether the Court can exercise

personal jurisdiction over them.

      The Union proposes that the Court transfer this action to the Northern District of

Illinois. Mot. 6, ECF No. 19. The Pilots object to transferring the case, arguing that it should

remain in the Western District of Texas. Plaintiff's Response ("Resp.") 4–6, ECF No. 25.

      Venus is proper in a judicial district where a "substantial part of the events or

omissions giving rise to the claim occurred, or a substantial part of property that is the subject of

the action is situated." 28 U.S.C. § 1391(b)(2). Both parties argue for their respective venues

under this "substantial part of the events" prong of §1391(b). *See* ECF Nos. 19, 25. First, the

Court will examine the acts or omissions underlying the Pilots' claims, and second it will consider

whether substantial events material to those claims occurred in the Northern District of Illinois.

I.    **Venue is Proper in the Northern District of Illinois because a Substantial Part of the Events and Omissions Underlying the Pilots' Claim Occurred in that District.**

      The United pilots allege that the Union failed to fairly represent them during a

period of changes to United Airline's pilot vaccination policies. Compl. 4, 12–13, ECF No. 1.

The Pilots allege that the Union failed to discuss the vaccine mandate with the Pilots, entered into

a letter of Agreement ("LOA 21-02") with United that limited compensation for unvaccinated

pilots, failed to challenge United's requirement that employees justify their request for vaccine

exemption, and later failed to object to United's reasonable accommodation process ("RAP") for

vaccine objectors. *Id.* at 6–8. In addition, the Pilots claim that not only did the Union "fail to

challenge the involuntary vaccination program . . . but [it] also attempted to discourage its members

4

from filing any grievances against the program." *Id.* at 4.

Defendants argue that many of the events and omissions that the Pilots complain of took place in Chicago and Rosemont, both of which are in the Northern District of Illinois.[2] For example, "LOA 21–02 was negotiated and signed in the Northern District of Illinois, and United and [the Union] administered the LOA from that district, including [the Union's] decisions whether to file grievances." Mot. 7, ECF No. 19; *see also* Schleder Decl. ¶ 9. Additionally, to the extent that the Union was involved in the grievance procedures—mainly by ultimately deciding to not support the Pilots' grievances—the "in-person activities in connection with [the] grievance appeals and Grievance Review Panel proceedings took place primarily at [the Union's] Rosemont, IL office." Mot. 8–9; Schleder Decl. ¶ 15.j-k. "More generally, [the Union's] decisions and actions concerning the matters challenged by Plaintiffs (including the grievances, communications, and the RAP) occurred primarily from [the Union's] Rosemont office." Mot. 9; Schleder Decl. ¶ 10–12. The Pilots do not contest that these negotiations and decisions were made in the Northern District of Illinois.

Because many of the acts and omissions central to the Pilots' complaint took place in the Northern District of Illinois, venue is proper there under 28 U.S.C. § 1391(b)(2).

## II.    The Private and Public Convenience Factors

The Pilots argue that their choice of venue is entitled to deference. Resp. 4–5, ECF No. 25 (citing *Vasquez v. El Paso II Enterprises, LLC*, 912 F. Supp. 2d 445, 447 (W.D. Tex. 2012) (internal citations omitted)). This is true insofar as the transferee venue is not "clearly more convenient" than the Western District of Texas. *Volkswagen II*, 545 F.3d at 315. "When the movant demonstrates that the transferee venue is clearly more convenient, however, it has

---

2 About the Northern District of Illinois,
https://www.ilnd.uscourts.gov/Pages.aspx?NhWs0xTgfmuGF/mJVvb72w== (last visited April 3, 2023).

shown good cause and the district court should therefore grant the transfer." *Id.* In deciding whether to transfer, courts consider various private and public interest factors. *Id.*

### a. Private Factors

The private factors that courts consider are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* The Court finds the first three factors relevant in this case, so it will consider them in turn.

### i. The relative ease of access to sources of proof favors transfer.

Under this factor, the court "looks to where documentary evidence, such as documents and physical evidence, is stored." *Voxer, Inc. v. Facebook, Inc.*, No. 6:20-CV-00011-ADA, 2020 WL 3416012, at *2 (W.D. Tex. June 22, 2020).

The Union argues that both parties "maintain documents related to contract negotiations, the pertinent grievance proceedings, personnel records, and other documents critical to this action in their respective facilities located in the Northern District of Illinois." Mot. 18–19, ECF No. 19. The Pilots respond that since the Union's headquarters are located in McLean, Virginia, "it is logical to infer that the relevant documents (and particularly the company officials charged with producing them) and other sources of proof in this matter are located in Virginia." Resp. 6, ECF No. 25.

The Union provided a declaration by an employee with personal knowledge of the negotiations who asserted that "[the Union's] records generated . . . in connection with the fulfillment of [the Union's] duties to United pilots . . . are [ ] primarily stored at [the Union's] office in Rosemont, IL." Schleder Dec. ¶ 5. The Pilots do not provide proof that any relevant

6

documentary evidence is located in either Virginia or in the Western District of Texas.   *See* ECF
No. 25.   The Court finds that it will be easier to access sources of proof in the Northern District
of Illinois than in the Western District of Texas and thus this factor favors transfer.

### ii.  The availability of compulsory process to secure the attendance of witnesses is neutral.

This factor examines the extent to which any non-party witnesses would be subject
to subpoenas in one proposed venue versus the other.   *Volkswagen II*, 545 F.3d at 316.   The
Union argues that United witnesses who would testify about its negotiations with the union would
be subject to subpoenas in the Northern District of Illinois but not in the Western District of Texas.
Mot. 18–19, ECF No. 19.   The Pilots do not contest this but instead argue that they "do not intend
to depose or call any United-affiliated witnesses as part of their case."   Resp. 7, ECF No. 25.
The Union counters that it is difficult to imagine the Pilots refraining from deposing or calling
United witnesses in a case that alleges collusion between United and the Union.   Reply 3, ECF
No 27; Compl. 13, ECF No. 1.   The Court agrees.   However, the Court will assume that the
Pilots will not call United witnesses and thus finds this factor neutral in its analysis.

### iii.  The cost of attendance for willing witnesses is neutral.

"While the convenience of the witnesses is often regarded as the most important
factor to be considered in deciding whether to transfer venue, it is the convenience of non-party
witnesses which is accorded the most weight."   *ADS Sec. L.P. v. Advanced Detection Sec. Servs.,
Inc.*, No. A-09-CA-773-LY, 2010 WL 1170976, at *3 (W.D. Tex. Mar. 23, 2010) (internal
citations omitted).   Here, the Union argues that this convenience factor strongly favors transfer
and provides a list of specific witnesses, from both the Union and United, and the issues that they
may testify about that are relevant to this case.   Mot. 11–13, 19, ECF No. 19; Schleder Dec. 8–10.
Most of the witnesses who reside in Chicago are United employees.   Schleder Dec. 8–10.   The

7

Pilots assert that "the key witnesses in this matter are employees of [the Union]," not United, and that they have "no intention to call [United] witnesses." Resp. 10, ECF No. 24. Thus, the Court finds this factor neutral in its analysis.

### b. Public Factors

The public factors that courts examine are "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Volkswagen II*, 545 F.3d at 315. The parties either do not analyze the last two factors or they find them neutral. Thus, the Court will only analyze the first two factors.

### i. The administrative difficulties flowing from court congestion favor transfer.

"This factor concerns whether there is an appreciable difference in docket congestion between the two forums." *ParkerVision, Inc. v. Intel Corp.*, No. 6:20-CV-00108-ADA, 2021 WL 401989, at *6 (W.D. Tex. Jan. 26, 2021). The Union argues that court congestion favors transfer to the Northern District of Illinois because the Judicial Conference has declared a judicial emergency in the Western District of Texas. Mot. 21, ECF No. 19. The district has 850 weighted filings per judgeship, the second highest of any district court. *Id.*; *see* U.S. Courts, Judicial Emergencies, https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies (last visited March 29, 2023). In addition, the El Paso Division specifically has the second largest criminal docket of the entire district, which affects the congestion of the docket as a whole. *See* United States District Court Western District of Texas 2022 Fiscal Year Statistical Report, https://www.txwd.uscourts.gov/wp-content/uploads/District%20Statistics/2021/Fiscal%20Year%20Statistics%20-%202021.pdf (last

8

visited March 29, 2023).

The Pilots, on the other hand, argue that this factor weighs against transfer because the median time from filing to trial in a civil matter is significantly greater in the Northern District of Illinois than the Western District of Texas—53.5 months compared to 29.5 months. *See* U.S. District Court — Judicial Caseload Profiles, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2022.pdf (last visited March 29, 2023). Courts have noted that the time to trial factor is the "most speculative." *In re Genentech, Inc.*, 566 F.3d 1338, 1347 (Fed. Cir. 2009). A better metric is the median time from filing to disposition, which is 6.9 months in the Northern District of Illinois and 7.9 months in the Western District of Texas. *See* U.S. District Court — Judicial Caseload Profiles, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2022.pdf (last visited March 29, 2023). Here, where the difference between the median time from filing to disposition of a civil case is negligible, the Court does not place much weight on time to trial statistics because less than 1% of federal civil cases reach trial. *See* U.S. District Courts – Civil Federal Judicial Caseload Statistics, Table C-4 (Mar. 31, 2022), https://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2022.

The Court finds that the judicial emergency and large criminal docket in the Western District of Texas weighs in favor of transfer.

### ii. The local interest in having localized interests decided at home favors transfer.

"This public interest factor considers whether the dispute at issue has a closer factual connection with the transferee or the transferor venue." *Qualls v. Prewett Enterprises, Inc.*, 594 F. Supp. 3d 813, 825 (S.D. Tex. 2022) (internal citations omitted). "This factor generally favors the venue where the acts giving rise to the lawsuit occurred." *Id.*

The Union argues that this factor weighs in favor of transfer for the reasons outlined in Part I—the material events underlying this suit occurred in the Northern District of Illinois. Mot. 22, ECF No. 19. The Pilots respond that this district is the more appropriate district because one of the nine pilot plaintiffs resided in the Western District of Texas when he was terminated, whereas none of the plaintiffs reside in the Northern District of Illinois. Resp. 11, ECF No. 25. However, the root of this lawsuit comes from the Union's negotiations on behalf of its union members, not the firing of each individual member by United, a non-party. Compl. 14–15, ECF No. 1. Thus, the Court finds that this factor favors transfer.[3]

## CONCLUSION

The Court finds that a substantial part of the negotiations and decisions around the Union's response to United Airlines's mandatory vaccination program took place in the Northern District of Illinois. Consequently, it is a valid venue for this case. After analyzing the private and public interest factors laid out in *Volkswagen*, this Court finds that the relative access to sources of proof, the administrative difficulties flowing from court congestion, and the local interest in having localized interests decided at home weigh in favor of transferring the case. 545 F.3d at 315. The other factors are neutral. Hence, venue is "clearly more convenient" in the Northern District of Illinois and the Union's Motion should be granted. *Id.*

Accordingly, **IT IS HEREBY ORDERED** that Defendant Airline Pilots Association, International's ("the Union") "Contested Motion to Transfer Venue [ ]" ("Motion"), ECF No. 19, is **GRANTED.**

---

3 On April 24. 2023 the Union filed a Notice alerting the Court to two cases that also "involve United's vaccine mandate and the religious accommodations offered." Notice 1, ECF No. 30. Both cases are currently pending in the United States District Court for the Northern District of Illinois. Id. at 1–2. This information also weighs in favor of transfer. *See Tice v. Pro Football, Inc.*, 812 F. Supp. 255, 257 (D.D.C. 1993) ("It is pointless to keep separated two highly related cases . . . ").

10

**IT IS FURTHER ORDERED** that the above-captioned case be **TRANSFERRED** to the Northern District of Illinois.

**IT IS FINALLY ORDERED** that Defendant Airline Pilots Association, International's ("the Union") "Motion to Dismiss," ECF No. 20, is **DENIED AS MOOT**.

**SIGNED** this **25** th day of **April 2023**.

THE HONORABLE DAVID BRIONES
SENIOR UNITED STATES DISTRICT JUDGE

11

APP. 201