# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>*Defendant*. | Civil Action No.: 4:21-cv-01074-P |

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF
# MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF COUNSEL

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 3

    A.    United Imposed a COVID-19 Vaccine Mandate for Marketing Purposes. ........... 3

    B.    United Discouraged Employees from Requesting an Accommodation. ............... 8

    C.    United Made the Accommodation Process Purposefully Difficult. ..................... 11

    D.    United Offered a Uniform and Unreasonable Accommodation. .......................... 15

    E.    After This Lawsuit was Filed, United Devised New Ways to Punish
        Those Seeking an Accommodation. ................................................................... 18

ARGUMENT .......................................................................................................... 23

I.    Plaintiffs Satisfy Rule 23(a)'s Threshold Requirements. .................................. 24

    A.    The Proposed Class is Ascertainable. ................................................................ 24

    B.    The Proposed Class is Sufficiently Numerous. .................................................. 25

    C.    There are Common Questions of Law and Fact Across the Proposed Class. ....... 26

    D.    Plaintiffs and Plaintiffs' Counsel Will Fairly and Adequately Protect the
        Interests of the Class. ........................................................................................ 30

II.    The Court Should Certify a Class Under Rule 23(b)(2). .................................... 31

    A.    Plaintiffs Challenge Company-Wide Policies. .................................................. 32

    B.    The Rule 23(b)(2) Class is Entitled to Injunctive Relief and Punitive
        Damages. ............................................................................................................ 34

III.    The Claims of the Customer-Facing Subclass Are Appropriate for Certification
      Under Rule 23(b)(3). ......................................................................................... 37

    A.    Common Questions Predominate. ..................................................................... 37

    B.    A Class Action is the Superior Means of Resolving These Claims. .................... 41

    C.    Plaintiffs Satisfy Rule 23(b)(3)'s Notice and Opt-Out Provisions. .................... 42

IV.    The Claims of the Non-Customer-Facing Subclass Are Also Appropriate for
      Certification Under Rule 23(b)(3). .................................................................... 43

V.    Plaintiffs Satisfy the Additional Requirements of Local Rule 23.2 ................................. 45

CONCLUSION ....................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Abboud v. Agentra, LLC,*
    No. 3:19-cv-00120-X, 2021 WL 1380428 (N.D. Tex. Apr. 12, 2021) .................................... 43

*Abner v. Kansas City S. R. Co.*,
    513 F.3d 154 (5th Cir. 2008) .................................................................. 32

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ................................................... 23, 35, 36

*Amara v. CIGNA Corp.*,
    775 F.3d 510 (2d Cir. 2014) .................................................................. 35

*Angell v. GEICO Advantage Ins. Co.*,
    67 F.4th 727 (5th Cir. 2023) .................................................................. 30

*Ansonia Bd. of Educ. v. Philbrook*,
    479 U.S. 60 (1986) ........................................................................... 39, 43

*Baucom v. Sisco Stevedoring, LLC*,
    560 F. Supp. 2d 1181 (S.D. Ala. 2008) ................................................ 40

*Berry v. Schulman*,
    807 F.3d 600 (4th Cir. 2015) ................................................................. 36

*Bolden v. Walsh Const.*,
    688 F.3d 893 (7th Cir. 2012) ................................................................. 33

*BST Holdings, LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ................................................................. 27

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) .................................................................. 41

*Cimino v. Raymark Indus. Inc.*,
    151 F.3d 297 (5th Cir. 1998) ................................................................ 41

*Davis v. Fort Bend Cnty.*,
    765 F.3d 480 (5th Cir. 2014) ......................................................... 13, 38

*EEOC v. Boh Bros. Constr. Co.*,
    731 F.3d 444 (5th Cir. 2013) ................................................................ 40

*EEOC v. United Airlines*,
    No. 1:10-cv-1699 (N.D. Ill.) .................................................................. 35

*EEOC v. Universal Mfg. Corp.*,
    914 F.2d 71 (5th Cir. 1990) .................................................................. 39

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ................................................................ 36

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997) ............................................................... 37

*Feist v. La., Dep't of Just.*,
    730 F.3d 450 (5th Cir. 2013) ......................................................... 23, 27

*Frey v. First Nat'l Bank Sw.*,
    602 F. App'x 164 (5th Cir. 2015) .................................................... 24, 25

*Greathouse v. Cap. Plus Fin., LLC*,
    No. 4:22-cv-0686-P, 2023 WL 5746927 (N.D. Tex. Sept. 6, 2023).........................................24

*Griffith v. Landry's, Inc.*,
    No. 8:14-cv-3213, 2017 WL 11002193 (M.D. Fla. 2017)...................................................42

*Haliye v. Celestica Corp.*,
    717 F. Supp. 2d 873 (D. Minn. 2010)...............................................................................39

*Holmes v. Godinez*,
    311 F.R.D. 177 (N.D. Ill. 2015)........................................................................................33

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996)............................................................................................37

*In re Parker Drilling Offshore USA LLC*,
    323 F. App'x 330 (5th Cir. 2009)....................................................................................40

*In re Rodriguez*,
    695 F.3d 360 (5th Cir. 2012)............................................................................................35

*Jenkins v. Raymark Indus., Inc.*,
    782 F.2d 468 (5th Cir. 1986)....................................................................................37, 41

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
    702 F.3d 364 (7th Cir. 2012)............................................................................................36

*Johnson v. Ry. Express Agency, Inc.*,
    421 U.S. 454 (1975).........................................................................................................42

*McNeill v. Tyson Fresh Meats, Inc.*,
    No. 2:23-cv-041-Z, 2023 WL 8532408 (N.D. Tex. Dec. 8, 2023) .........................13, 23, 27, 38

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999)....................................................................................25, 26

*Nelson v. Cooper T. Smith Stevedoring Co.*,
    No. CIV.A. 12-2890, 2013 WL 4591362 (E.D. La. Aug. 28, 2013) .......................................40

*Newkirk v. Pierre*,
    No. 19-cv-4283, 2020 WL 5035930 (E.D.N.Y. Aug. 26, 2020) ............................................33

*Sambrano v. United Airlines, Inc.*,
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) ..............................................*passim*

*Seeligson v. Devon Energy Prod. Co., L.P.*,
    761 F. App'x 329 (5th Cir. 2019)..............................................................................26, 28

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) ....................................................................................26, 28, 31

*Sughrim v. New York*,
    No. 19-cv-7977, 2023 WL 5713191 (S.D.N.Y. Sept. 5, 2023) ........................................32, 34

*Toney-Dick v. Doar*,
    No. 12 CIV. 9162, 2013 WL 5295221 (S.D.N.Y. Sept. 16, 2013).....................................33, 34

iii

*Tran v. Abdon Callais Offshore, LLC*,
    No. CV 12-0999, 2014 WL 12538905 (E.D. La. Sept. 22, 2014) ........................................ 40

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)......................................................................................................... 38, 41

*Vita Nuova, Inc. v. Azar*,
    No. 4:19-cv-00532-O, 2020 WL 8271942 (N.D. Tex. Dec. 2, 2020)............................... 24, 25

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).............................................................................................................. *passim*

*Weber v. Roadway Express, Inc.*,
    199 F.3d 270 (5th Cir. 2000) ................................................................................................. 23

**Statutes**

28 U.S.C. § 1331................................................................................................................................ 45

42 U.S.C. § 1981a............................................................................................................................. 36

**Other Authorities**

1 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. 2023) ...................... 25

1 Wm. B. Rubenstein, *Newberg on Class Actions* (5th ed. 2011) ................................................. 24

2 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. 2023) .......... 38, 42, 45

Chris Isidore, *United says vaccinated pilots and flight attendants could refuse to fly
    with unvaccinated coworkers*, CNN (Oct. 26, 2021)............................................................ 10

EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act,
    and Other EEO Laws, K. Vaccinations-Overview, ADA, Title VII, and GINA*
    (May 15, 2023)......................................................................................................................... 6

Gio Benitez, *Risk of COVID-19 exposure on planes 'virtually nonexistent' when masked,
    study shows*, ABC News (Oct. 15, 2020)................................................................................ 7

Gypsyamber D'Souza, *What is Herd Immunity and How Can We Achieve It With
    Covid-19*, Johns Hopkins Bloomberg Sch. of Health (Apr. 16, 2021) .................................... 7

*Oversight of the U.S. Airline Industry Before the S. Comm. on Com., Sci., & Transp.*,
    117th Cong. (2021)................................................................................................................. 7

*United Airlines takes multi-layered approach to assure safety for customers,
    employees*, ABC 7 Denver (Aug. 15, 2020) ............................................................................ 7

**Rules**

Fed. R. Civ. P. 23.................................................................................................................... *passim*

Local Rule 23.2....................................................................................................................... *passim*

This case arises out of United Airlines' strategic company-wide campaign to coerce its employees to violate their religious beliefs and ignore their health. To accomplish this goal, United refused to provide any reasonable accommodations to its COVID-19 vaccine mandate. Instead, United told *every* employee who requested an accommodation—whether the employee requested a religious or medical accommodation and whether or not the employee was "customer facing"— that they would be effectively terminated by being placed on indefinite, unpaid leave. As the Fifth Circuit confirmed, that decision caused immediate and significant harm by creating a "crisis of conscience." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at \*9 (5th Cir. Feb. 17, 2022). Worse, discovery confirmed that United imposed this pressure campaign so that it could advertise a 100% vaccination rate after deciding that marketing was more important than its employees' civil rights. Because United treated all employees requesting an accommodation uniformly, this Court should do likewise and certify a class to hold United accountable.

From the outset, United's CEO Scott Kirby made clear that he would not allow United to provide any reasonable accommodation to its vaccine mandate, despite United's legal obligations to do so. Kirby did not believe any such accommodations were necessary because, in his mind, United employees were making up their beliefs and "all [of a] sudden decid[ing] I'm really religious." That disdain for United employees of faith flowed directly from Kirby to those in Human Resources charged with reviewing accommodation requests who followed their CEO's lead and openly criticized the faith and medical conditions of employees seeking accommodations.

This was all part of United's campaign to coerce compliance and ignore United's legal obligations to provide reasonable accommodations. That is no doubt why United designed a purposefully vague and coercive accommodation process, imposed unreasonable and arbitrary deadlines, subjected employees to hostile and invasive questions criticizing their beliefs and

health, and failed to engage in any discussion with employees about their job duties or the types of accommodations that would allow the employees to continue working. The specifics did not matter, since United had already decided to offer only the accommodation of indefinite, unpaid leave. This universal accommodation plan sent a clear punitive message to coerce employees: acquiesce or be functionally terminated.

Only after Plaintiffs filed this lawsuit did United start making changes for some employees. But even then, employees could not escape United's coercion. Rather, United adopted a uniform discriminatory approach, dividing everyone who requested accommodations into just two groups: (1) those placed on indefinite, unpaid leave, consisting mostly of employees United deemed customer facing; and (2) all other "accommodated" employees, whom United subjected to a harsh masking-and-testing accommodation, which required wearing a respirator at all times, even while sitting alone outside, and taking frequent tests for COVID-19, even while on vacation or extended absence. Through this "accommodation," it was easy for other employees to identify and harass the "accommodated" employees. Making clear that the masking-and-testing accommodation was intended to be coercive, Kirby demanded that this policy sound "very serious" and impose harsh consequences, including immediate termination for any infractions.

United's discriminatory scheme is an affront to the liberties that civil rights laws are designed to safeguard. Under both Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act ("ADA"), United must provide reasonable accommodations for employees with religious or medical reasons for needing accommodations. When a company ignores those requirements and engages in blatantly intentional discrimination, as United did here, these laws permit both injunctive and monetary relief. And, through Rule 23 of the Federal Rules for Civil Procedure, Congress provided class actions for groups of individuals subjected to the same and

2

harmful policies to seek a collective remedy, including claims for punitive damages.

Based on United's across-the-board decision to place all "accommodated" employees on indefinite, unpaid leave, the Court should certify a class under Rule 23(b)(2) consisting of all individuals who submitted an accommodation request and who faced the choice of: (1) abandoning their faith or medical needs; (2) being placed on indefinite, unpaid leave; or (3) being fired or otherwise separated.  Additionally, certification is appropriate under Rule 23(b)(3), where the Court should certify two sub-classes consisting of: (1) all "accommodated" employees who were put on unpaid leave; and (2) all "accommodated" employees who were subject to United's harsh masking-and-testing accommodation.

These classes cover thousands of employees.  And, for each, the common and predominant issue is whether United's universal accommodation process and policies were inherently unreasonable and discriminatory.  There are no individualized issues that overshadow this central question.  Rather, United chose to implement uniform classwide accommodations.  Thus, while class actions may not be common under Title VII or the ADA, United's extraordinary decision to treat thousands of employees as a single group makes class treatment appropriate here.  United cannot avoid classwide liability by now backpedaling from its uniform approach.

## BACKGROUND

### A.    United Imposed a COVID-19 Vaccine Mandate for Marketing Purposes.

1. By Spring 2020, COVID-19 was spreading rapidly around the world, and United implemented mitigation measures for its workforce, including: wearing United-issued masks and gloves, social distancing, and temperature checks.  United also bolstered the cleaning regimens of its aircraft—spraying cabins with an anti-viral spray between flights and upgrading its aircraft HEPA filters.  App.798; App.137.  With these precautions in place, United stated that it considered its employees and passengers safe.  App.798, 799, 801.  In fact, United participated in a

3

Department of Defense study that looked at COVID-19 transmission rates on airplanes and concluded that "it was highly unlikely that COVID could be transmitted in the airplanes due to the filtration system and airflow." App.800.

Beginning in December 2020, several COVID-19 vaccines received authorization for use in the United States. Initially, each received Emergency Use Authorization ("EUA") from the Food and Drug Administration ("FDA"). *See* 2d Am. Compl. ("SAC") ¶ 33 (Doc. 156). And, starting on August 23, 2021, the FDA began issuing full approvals for the vaccines. *See id.*

In late 2020, Kirby began trying to leverage this crisis for United's benefit by publicly discussing a potential vaccine mandate. App.51. In January 2021, without telling his executive team beforehand, Kirby made national headlines by stating that United should mandate a COVID-19 vaccine for its 60,000 employees and that he wanted other companies to "adopt a similar stance." App.113–14; 771–74 (Kate Gebo, Executive VP of HR, explaining that she "was surprised that [Kirby] said that to the press"). Rather than focusing on safety, Kirby was clearly focused on the financial markets. According to Kirby, he did not want United to be "the only company that requires vaccines," App.114, but wanted United to be the first, *see* App.394; App.503. At that time, United's leadership had been relying on Kirk Limacher, VP of HR Services, to collect data about COVID-19 and to organize United's response. App.51–52; App.486. Based on his knowledge of the data, Limacher stated on July 23, 2021, that he "would *not* advocate for a mandate." App.397 (emphasis added). Rather, Limacher observed that many employees were already getting vaccinated voluntarily, "most employees are NOT getting COVID at work but rather outside of work," and a mandate would consume "frontline management and HR resources." *Id.* In fact, Limacher even stated that an increase in deaths would make the case for a mandate only "a *little* stronger." *Id.* (emphasis added). United's head of HR, Kate Gebo, agreed. *Id.*

("Thank you and well said").

But Kirby ignored that view, focusing again on what he saw others doing.  In July 2021, when he believed someone might get ahead of United, Kirby insisted that United "be prepared to be an early mover in requiring vaccinations if this movement gains momentum."  App.56.  To appease Kirby, Limacher abruptly abandoned his view that a mandate was unnecessary and began putting the process in place to implement a mandate.

Less than two weeks later, on August 6, 2021, United announced its mandate that all U.S.-based United employees receive a COVID-19 vaccine.[1]  App.137.  Kirby was so intent on receiving accolades for his plan that he proactively notified the head of the CDC, Dr. Walensky, about the mandate before even announcing it to his employees, and he invited Dr. Walensky "to reach out with any questions."  App.447 ("Sending a quick note to give you a personal heads up that tomorrow morning we will be informing United employees that we will be requiring our employees to be vaccinated by this fall.") (emphasis in original).

Under United's mandate, all U.S.-based employees were required to be fully vaccinated within five weeks of the FDA's granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first.[2]  App.139, 140.  The announcement made clear that United was taking, as Kirby directed, "industry-leading action."  App.137.  Notably, the announcement said nothing about providing employees reasonable accommodations.

United's mandate was absolute and uniform—there was no alternative for periodic testing, mask wearing, or social distancing, even for employees who already recovered from COVID-19

---

[1] Surprisingly, that same week, the United States was experiencing the lowest death and hospital rates from COVID-19 for all of 2021.  App.775–77; App.569–71.

[2] In other words, despite acknowledging concerns about mandating vaccines that receive only EUA approval, App.769–71; App.51, United abandoned those concerns when it thought doing so would be good for marketing.

and still enjoyed immunity from the disease, despite EEOC guidance suggesting then and now that these alternatives are appropriate accommodations.[3]   Rather, every United employee was forced to choose vaccination or termination.   Or, as discussed below, employees could accept an "accommodation" and indefinitely forgo pay and benefits.

Recognizing the negative impact of such a broad mandate, Visa's CEO asked Kirby if United was worried that the mandate would cost United employees.  App.413.  Kirby responded that only "time will tell," adding that he thought it would be a small number "because the jobs [at United] are just too good to leave."  App.413–14.  Even then, Kirby understood the coercive effect of threatening paychecks.

2. Although United now claims that its mandate was motivated by safety, an overwhelming number of facts contradict that claim.   Most significantly, United's company-wide mandate announcement said nothing about the Delta variant that United suggests was the motivation for the mandate.   Rather, the announcement focused on United's being an early market mover and included the unsupported statement that an unvaccinated person was "nearly 300 times more likely to die" from COVID-19 than a vaccinated person.  App.137.  There was no citation for this surprising statistic, which United later repeated in a town hall meeting with employees.  App.10. As it turns out, that was "math Scott Kirby did in his head," and the company was scrambling to "find the basis for" it.  App.145.

Additionally, United's safety rationale is undermined by the notable list of individuals who United did *not* subject to its mandate: (1) passengers; (2) pilots or flight attendants from other airlines who flew in United jumpseats; (3) international United employees; (4) United employees

---

[3] *See* EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, K. Vaccinations-Overview, ADA, Title VII, and GINA* (May 15, 2023), http://tinyurl.com/3mvvnkvc.

residing in Montana; and (5) United's vendors and contractors, including regional airline partners that fly United customers on shorter United routes. App.139–40; App.802, 805–07; App.778, 779, 793–94; App.816–17. These passengers, employees, or contractors all interacted with United's employees, but United did not require them to be vaccinated. App.830–33; App.802–08.

Further, United's suggestion that a mandate was necessary to increase safety on its airplanes ignored the air filtration system that already made the risk of exposure to COVID-19 onboard United's aircrafts "virtually nonexistent."[4] In fact, United told its customers that United aircraft cabins were among the safest indoor environments. App.581.[5] And Kirby boasted to Congress that, because of the air filtration systems, sitting next to a passenger in a United plane is equivalent to sitting 15 feet from the person in a typical building.[6] Thus, when it came to marketing, United planes were among the safest places someone could be. But when it came to employees' civil rights, it was too dangerous for them to be anywhere near the plane.

United also ignored that, even before the mandate, over 60% of its workforce was already vaccinated. App.434. United's workforce had thus already nearly achieved herd immunity.[7] And, as early as January 2021, United confirmed that herd immunity was the target, telling employees: "The sooner the vaccine is widely accessible and administered, the faster we will reach herd immunity." App.233. But United's true goal was 100% compliance with the mandate, not herd immunity. App.145; App.481 ("Great news! Less than 1% of our active employee population are

---

[4] Gio Benitez, *Risk of COVID-19 exposure on planes 'virtually nonexistent' when masked, study shows*, ABC News (Oct. 15, 2020), http://tinyurl.com/yucpu2as.

[5] *United Airlines takes multi-layered approach to assure safety for customers, employees,* ABC 7 Denver (Aug. 15, 2020), http://tinyurl.com/ccuzsvjz.

[6] *Oversight of the U.S. Airline Industry Before the S. Comm. on Com., Sci., & Transp.*, 117th Cong. (2021) (Dec. 15, 2021 video testimony of Scott Kirby at 55:56).

[7] Gypsyamber D'Souza, *What is Herd Immunity and How Can We Achieve It With Covid-19,* Johns Hopkins Bloomberg Sch. of Health (Apr. 16, 2021), http://tinyurl.com/yhakxatw.

out of compliance with our vaccination requirement… Beginning later today and into tomorrow morning, we'll ... start[]" the termination process.).

Finally, future events confirmed that United was not focused on safety. United ignored its own statement that it would "follow CDC guidance when it comes to boosters," choosing not to do so when the CDC recommended them for all adults. App.87; App.780–81. By that point, the marketing value had diminished and this lawsuit had started.

### B.    United Discouraged Employees from Requesting an Accommodation.

To achieve total compliance with its mandate, United immediately began pressuring employees not to seek accommodations. Kirby threatened employees to "be very careful" about requesting such accommodations because "few people" would "get through the medical and religious exemption process." Doc. 7 at 11. And Kirby derisively described such employees as "all [of a] sudden decid[ing] I'm really religious." *Id*. Making his plans clear, Kirby warned that employees requesting an accommodation were "putting [their] job on the line." *Id.*

The same message was communicated within United's leadership. United required its leaders to "call out that it's a high bar for" the reasonable accommodation process ("RAP"), App.145, and that "only a small percentage of RAPs are expected to be granted," App.425. United's leadership confirmed that it would apply this "high bar" to accommodation requests because this was "a Scott-level initiative" made "consciously knowing that [it] would upset some people." App.147. In fact, United did not even want its leaders to discuss accommodations with employees, worrying that doing so might legitimize accommodation requests. App.145. When one town hall included a 20-minute discussion of the RAP process, United's leadership expressed "concern" about spending so much time on a topic where "the bar is very high." *Id.*

In a further effort to create a workplace that would coerce compliance, Kirby even proposed requiring accommodated employees to walk around with special stickers on their badges

8

broadcasting their vaccination status. App.96. Unsurprisingly, United's lawyers shot down this idea. App.786. And Limacher acknowledged that the company thought Kirby's idea would "create conflict" in the workplace. App.825–826. In fact, even some HR employees were taken aback by Kirby's proposal, stating that putting stickers on unvaccinated employees' badges is "like the scarlet letter…Oh my goodness. Who are we???" App.533.

However, others responsible for processing accommodation requests heard Kirby's message of ostracization and derision loud and clear. As United's records show, the HR representatives responsible for reviewing accommodation requests felt free to mock and criticize those requests. For instance, one HR representative suggested that "[t]hese people are probably going to do what they have been doing … buying fake vaccine cards and adding it, or filing a 'religious exemption'… Our employees cannot be trusted[.]" App.507. Another United employee responsible for reviewing accommodation requests called an employee's request for a medical exemption "bullsh**" and assumed the condition was fabricated after this lawsuit was filed. App.472. And yet another HR representative criticized an employee seeking a religious accommodation for "purchas[ing] a statue of [] Buddha from Amazon." App.553–54; *see also* App.464 ("I want to know where ppl are getting these sham Drs to write them off for these alleged illness[es]."). These criticisms were sufficiently pervasive that United's senior leadership was aware of them. *See* App.821.

In a further effort to discourage employees from seeking accommodations, United ensured that the only message being broadcast within the company was its pro-vaccine message. To accomplish this, United removed the ability of employees to post comments on internal communications about the mandate, as United explained that it was "not really all that interested in an open forum of commentary." App.61. And United intentionally avoided providing

employees with details about the accommodation process, as Limacher told HR leaders that the company was "being purposely vague about the details of the COVID-19 RAP process."  App.127.

Instead, United constantly pressured its employees to abandon their faith and health before the deadline for submitting an accommodation request.  For instance, in August 2021, United broadcast its employees' vaccination status by sending postcards to all employees who had not yet provided proof of vaccination. App.436–38. And United acknowledged that this was an important part of its pressure campaign. App.818–20. While the postcards were being developed, Limacher insisted that they state, in clear "red text" that "stand[s] out," that failing to be vaccinated will result in termination.  App.437.  Limacher stated that he wanted to ensure that the "spouse not … miss [the warning]."  *Id.*  For United leadership, it wasn't enough to pressure employees in the workplace, they also wanted employees considering an accommodation to be pressured at home. And United continued this pressure through the national media, emphasizing that accommodated employees would be ostracized throughout the workplace.  Chris Isidore, *United says vaccinated pilots and flight attendants could refuse to fly with unvaccinated coworkers*, CNN (Oct. 26, 2021), http://tinyurl.com/2e6vhy2t.

United's actions had their desired effect, as bullying and harassment became commonplace across United's workforce.  Just weeks after the mandate was announced, one supervisor documented the "Serious Situation Regarding Covid-19 Vaccine and Discrimination thereof." App.562.  The supervisor reported that an employee said he had to acquiesce "to feed [his] kids but it sucks to be treated badly for my belief[]s."  *Id.*  The supervisor also reported employees stating that "everyone in this room that's not vaccinated should get sick and die."  *Id.*  The supervisor then recounted similar distress among employees experiencing "really bad anxiety" and not coming to work because of the pressure, coercion, and discrimination.  *Id.*  The supervisor

10

concluded by stating that this "bullying" was a direct violation of United's Guidelines.  App.563.

Similarly, Dave Castillo testified that he was harassed by employees demanding that he pull his mask up while eating.  App.631–32.  And, after Castillo's supervisor informed his entire workgroup that Castillo was not vaccinated, App.632, his coworkers began "just making up stuff about me to try to get me in trouble."  App.633; *accord* App.634 (describing coworkers puncturing oil cans and blaming Castillo).  And they began harassing him.  App.635 (discussing comments Castillo received at the same time from coworkers about his appearance); App.636, 637 (discussing an incident where another United employee harassed Castillo "for having COVID by throwing … [a] tennis ball at my head").  Ultimately, the record is clear that United's employees felt free to criticize accommodated employees when they saw their CEO doing the same thing.

### C.   United Made the Accommodation Process Purposefully Difficult.

As noted, United continued its coercion by crafting a "purposely vague" accommodation process.  App.127.  For instance, United required employees to submit requests through an impersonal centralized system—HelpHub—by an arbitrary date of August 31, 2021.  App.127–28; App.846.  United did not hide its reason for this arbitrary deadline: "Our end goal through all of this is to get vaccinated. So if an employee calls in with a scenario … just tell them to get vaccinated.  It is the best way to get through this." App.178.

Further demonstrating United's confusing and harsh approach, United arbitrarily applied this deadline, considering some (but not all) late medical accommodation requests, but refusing to consider nearly all late religious accommodation requests.  App.125 ("[W]e are not allowing any late submissions for a religious RAP."); App.484 ("Is this for a religious RAP or Medical? If it is for religious (my guess), I would say too late; if for Medical, she should submit through HelpHub.").  Applying yet another standard, one HR leader stated that extensions would only be granted for incidents like natural disasters.  App.168.  In another instance, an employee explained

that she missed the submission deadline because her elderly parent broke their hip.  But United's HR team in charge of assessing the request mocked the employee by sharing various memes in their group chat and stating that there would be no exceptions to the deadline.  App.195–96.  As United explained, it relied on a uniform deadline after receiving too many requests to allow for different deadlines.  App.125.

Even worse, United gave employees and new hires false hope by allowing some individuals to submit religious accommodation requests after the deadline, all while planning to deny the requests automatically.  App.500.  United wanted to *appear* like it considered the application instead of "auto disallow[ing]" it, even though United planned to deny such requests as untimely: "No I think we need to show we considered vs auto disallowed… I think this is like the new hires where they'll be able to submit but they'll be denied."  *Id.*

United also developed a confusing accommodation system that did not allow requesters to submit both a medical and religious accommodation request.  Rather, the system required the requester to select only one, App.840–41, despite many employees wanting to submit both types of requests, App.386–88; App.490.  But United apparently devised an arbitrary and unannounced process where it might consider both types if an employee was prescient enough to mention both types in the documentation supporting their request.  App.840–45.

Thereafter, once an employee navigated United's intentionally complicated accommodation-request system, United imposed impossible deadlines for submitting supporting documentation—demanding documentation on a three-day timeline, often over holidays or weekends.  *See, e.g.*, App.206–07; App.370, 372.  In fact, United told one employee on a Friday evening that she had to submit a doctor's note *that same day*.  App.110.

These deadlines were particularly harsh because United refused to tell requesters up front

that it would require supporting documentation even though United had already decided to require *every* religious accommodation requester to provide this documentation.  App.837–39.  In other words, instead of telling employees to submit supporting documents along with their accommodation request, United waited until the employee submitted the request then sent an automated follow-up email demanding supporting documentation within unreasonable timeframes.  *Id.*  That way, United created another procedural hurdle for employees to clear.

What is more, the substance of these requests for supporting documentation was intentionally harsh and coercive.  Initially, United demanded a letter from a religious leader as proof of the employee's religious beliefs.[8]  App.590.  For some, that requirement had exactly the desired coercive effect.  After United demanded a pastoral letter on "church letterhead," one employee withdrew his request and got vaccinated, causing a United HR Director, Neil Robb, to celebrate: "Excellent news."  App.274, 276.  Another United employee, David Castillo, did not initially apply for a religious accommodation because, as a Buddhist, he does not belong to an organization with religious leaders who could provide such a letter.[9]  App.626–27.

But United went further, also sending a list of offensive questions to anyone who requested a religious accommodation.  For example, one question implied that requesters were harming others, asking: "Do your religious beliefs or practices prevent you from getting vaccinated for the

---

[8] United stated that it only planned to approve requests where the requester's church opposed vaccines.  App.127.  Of course, that is not the law. *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014); *McNeill v. Tyson Fresh Meats, Inc.*, No. 2:23-cv-041-Z, 2023 WL 8532408, at *9 (N.D. Tex. Dec. 8, 2023) ("As always, 'Title VII's intention is to provide protection and accommodation for a broad spectrum of religious practices and belief,' and not 'merely those beliefs based upon organized or recognized teaching of a particular.'" (citation omitted)).

[9] Although United subsequently switched to requesting a third-party letter rather than a pastoral letter, the impact of the demand remained unchanged.  App.589–90; App.784–85.

sake of helping others avoid COVID-19?"[10]  App.187.  Recognizing the harassing nature of these questions, one union president, Craig Symons, expressed to Gebo and Kirby that United was "over the line" and attempting to institute a "purge of religious orthodoxy."  App.64. Gebo acknowledged that she could see why these questions would lead employees to "raise the concern."  App.783–84.  Other HR employees agreed, stating that they "feel incredibly uncomfortable having my name attached to cases that question someone's religious faith… Many of the cases that we are receiving are from people who believe with their very CORE in what they are requesting."  App.566–67.

Eventually, United abandoned these offensive questions, but only after concluding that it needed to treat all requesters the same due to "the volume of requests," which United found "too onerous" to process individually.  App.589.  Instead, United adopted a uniform formula for evaluating religious accommodation requests.  If an employee articulated a religious reason for not receiving the vaccine and provided an "attestation from someone the employee knows firsthand," United approved the RAP because United concluded that the employee had a "deeply held religious belief."  App.99; App.377–78.

United devised a similarly complicated and invasive process for those seeking medical accommodations—employees with "a disability or long term limitations."  App.419–20.  Those employees had to submit follow-up documentation from their physicians, and HR and lawyers then determined whether the employees had sufficient medical reasons for not getting vaccinated.  App.492.  Demonstrating United's desire to process everything in one fashion, United cut Pat

---

[10] Similarly, United told employees that getting vaccinated was about "loving your neighbor and colleague as yourself."  App.145. That hostility continued during litigation, with United's counsel asking parties and non-parties offensive and irrelevant questions, including asking Kimberly Hamilton whether she would "donate to a group that believed that gay and lesbian parents shouldn't be able to adopt children," App.668, asking Dave Castillo whether he believes his drinking alcohol conflicts with Buddhist precepts, App.630, and asking non-party Dennis Cole whether he uses Johnson & Johnson soap on his grandchild, App.646–47.

Baylis—the Corporate Medical Director—out of the decisions regarding employees' medical exemption requests. App.259; App.492. Instead, to Baylis's disbelief, United relied solely on HR and in-house counsel to make these medical determinations. App.492 (Baylis stating that "they have been told not to use me and so they go to the lawyers to make a medical decision," and the response that it is "[i]ncredible that they want the lawyers to weigh in on this!").

Finally, United kept the pressure on employees even after they fully submitted their accommodation requests. For instance, shortly after the August 31 deadline for accommodation requests, United sent a letter to all requesting employees stating that it could not "in good conscience" allow these employees to continue working even though these employees had been working safely for over a year and half since the pandemic started. App.153; *see also* App.798, 799, 801 (United concluded that the mitigation measures sufficiently kept the workforce safe). United also told employees that vaccination is the "most effective way – by far – to avoid dying or be hospitalized." App.154. Of course, United offered the not-so-subtle reminder that it was not too late for employees to abandon their faith or health and get vaccinated. *Id.*

Thus, from start to finish, United did everything possible to discourage employees from seeking and obtaining accommodations and to coerce them to abandon their faith and health.

### D.     United Offered a Uniform and Unreasonable Accommodation.

For those employees who withstood United's intense coercion, United offered them a blanket "accommodation"—indefinite, unpaid leave. When United made this offer to *all* accommodated employees, it ignored any differences in job responsibilities. Despite employing 60,000 individuals in wide-ranging jobs, United stated that it would put *all* accommodated employees on indefinite, unpaid leave, including pilots, technicians, dispatchers, contact center agents, and those in catering operations. App.95–96. Before reaching this conclusion, United did not ask any requesters about their individual job duties or about what types of accommodation

15

would allow them to continue fulfilling those duties. And United gave employees only five days to accept or reject unpaid leave—there was no alternative or opportunity for discussion. App.891. In fact, rather than following its past practices, United did not even "hold[] a RAP meeting" with individual employees to discuss the request. App.478. Instead, United treated all requesters as a single class—unpaid leave for all. App.286 ("*[A]ll* active employees with an approved and accepted exemption request *will be placed* on a temporary, unpaid personal or medical leave of absence effective October 2") (emphasis added); App.153 (same); App.122 (explaining that the choices are vaccination, unpaid leave, or termination); App.403 (United talking points stating that all "who refuse to get vaccinated will face unpaid leave and/or termination").

In fact, although it hid the information from employees, United had decided on this universal accommodation months before announcing the mandate. In May 2021, United's Medical Director explained to doctors at the Cleveland Clinic that "[t]here is already a plan in place on how to handle those that need a reasonable accommodation. Basically, they will not be allowed to work but take sick time or unpaid leave." App.119. And United reiterated this plan internally in July 2021, and again on September 1, 2021, the day after the accommodation request deadline. App.403; App.94–97. Thus, before even reviewing any accommodation requests, United had already decided to put all accommodated employees on indefinite, unpaid leave.

And, when it implemented the "unpaid leave for all" accommodation, the only differentiation United made across its entire workforce was that those with a religious accommodation would be put on personal leave (with no pay or company benefits) and those with a medical accommodation would be permitted to first burn through all of their sick leave and then move onto unpaid leave. App.99. While United also stated that it would eventually permit those in non-customer facing roles to return to work with certain safety protocols in place, United

16

conceded that it had not developed any such protocols when it was putting everyone on unpaid leave. Nor had United determined a date by which it would develop those protocols. App.150. Similarly, United informed customer-facing employees that they would remain on unpaid leave until the pandemic "meaningfully recedes," but United also failed to define that term.[11] App.598–99; App.68. In other words, despite such statements about the future, United's only clear plan was indefinite, unpaid leave for all.[12]

In reaching this decision, United confirmed that safety was not a motivator. In fact, United did not even involve its *head of Safety*, Sasha Johnson, in the decision to place all accommodated employees on unpaid leave. As Johnson explained, United's Safety and Medical teams were heavily involved in developing general masking-and-testing protocols, but they were not consulted about unpaid leave, which were not "safety measures." App.809–11.

Unsurprisingly, the threat of unpaid leave caused many United employees to rescind their requests out of a fear of lost income and health insurance, and United rejected subsequent requests to resubmit accommodation requests. For instance, when one employee asked to reinstate a RAP request after "withdr[awing] [the] original RAP decision under coercion and duress," Neil Robb responded: "Short answer. Can't do it." App.457; *see also* App.238; App.416 ("I am writing to reinstate my request…I only withdrew my exemption because I felt bullied and rushed in the short 5 calendar day timeline that United gave me. I also did not feel as though the accommodation was

---

[11] United also claims it provided customer-facing employees with the ability to apply for and receive preference for alternative jobs. But United could recall only a single pilot who received such an alternative role. App.829; *see also* App.737–40 (explaining that there were no such jobs available); App.658–59 (putative class member explaining that she applied for one of these alternative jobs and "was instantly denied.").

[12] When United believed this Court was likely to enter an injunction "requir[ing] United to no longer use unpaid leave as a RAP," United planned to "move these RAP employees to paid leave or return them to active status." App.158. Thus, paid leave and active status were clearly possible.

very reasonable.").  Others facing this threat retired out of duress because United informed them that they would not be able to retire once put on leave.  App.102–03; App.70 ("I am saddened and discouraged that I am basically being discharged because I will not violate my sincerely held beliefs.").  Or they resigned due to financial strain.  App.268 (spreadsheet showing Flight Attendants who resigned after unpaid leave decision announced).

### E.    After This Lawsuit was Filed, United Devised New Ways to Punish Those Seeking an Accommodation.

After Plaintiffs filed this lawsuit on September 21, 2021, United quickly realized it might not get away with its campaign to coerce employees to abandon their beliefs and health. Accordingly, United tried to impose a few changes to its policy, each of which United applied broadly to entire groups of employees seeking accommodations.

1. First, United blatantly tried to pick off the named Plaintiffs by offering special treatment. For example, United had scheduled a termination meeting for Dave Castillo because he was not vaccinated and had been unable to complete an accommodation request due to the initial requirement for a letter from a religious leader.  App.367; App.638–40.  But after Castillo brought this lawsuit, Limacher intervened and allowed Castillo to submit a religious accommodation after the August 31 deadline.  App.367.  A similar sequence of events happened with Plaintiff Jonas, who was supposed to be given a termination warning.  App.496.  When Limacher informed others that she was a plaintiff in this case, the warning was "delay[ed]."  *Id.*[13]

2. Second, United responded to this lawsuit by imposing a harsh masking-and-testing

---

[13] United also offered Plaintiff Sambrano a special assignment.  App.746–47.  Sambrano is unaware of anyone else who was offered this job, and he had to explain to his supervisor that he was not qualified for this other job.  App.748–49.

accommodation for employees it deemed non-customer-facing.[14]  This group included over a thousand accommodated employees with jobs ranging from airport operations (both above the wing and below the wing) to those who worked in catering.  App.95–96.

United made clear that this accommodation had nothing to do with an individualized assessment of anyone's job.  Rather, the accommodation was imposed only because of this litigation: "As a result of the current litigation, on Friday we communicated to non-vaccinated employees the requirement that N95/KN95 mask be worn in all United locations…We are evaluating additional safety measures that could be implemented as part of reasonable accommodation plans depending on the outcome of this week's injunction hearing."  App.78.

However, United ensured that this accommodation was also punitive.  Regarding masks, "accommodated" employees could not wear the cloth masks worn by others—they had to wear N95/KN95 respirators *at all times* unless actively taking bites of food or drinking.  App.165.  This was true even while eating alone outside, which they were required to do irrespective of weather and often surrounded by the dirty conditions of the ramp where planes are located.  *Id.*; *see also* App.787 (Gebo stating that employees could contract COVID-19 sitting alone outside).  And it was true whether an employee's particular job involved night or day shifts, involved limited interactions with other employees, or was primarily outdoors.  And accommodated employees had to wear respirators "regardless of social distancing."  App.409.  Further, this policy contradicted United's earlier guidance from August 2021 that employees, vaccinated and unvaccinated, need not wear masks outdoors.  App.220.  Astonishingly, United even told accommodated employees

---

[14] United also allowed certain employees within this group to work briefly in different roles, but the new roles were clear demotions.  For example, Plaintiff Jonas had worked safely throughout the pandemic in a customer-facing role in the United Club, a job she had dreamed of her whole career.  App.687.  But United moved her to a non-customer facing role—Agent on Demand— where she worked "in a little room with a bunch of people and no windows."  App.691.

to wear these respirators while on *personal* travel.  App.165.

Kirby made clear that the masking-and-testing accommodation was intended to be excessive, as he wanted the policy to "sound[] very serious to them.  Masks at all times (including outdoors) and *automatic termination* for violating the policy."  App.94 (emphasis added).  HR had to remind Kirby that his proposed termination policy would violate the employees' collective bargaining agreements.  App.130.  Kirby acquiesced (slightly) and allowed just one warning before termination.[15]  *Id.*; *see also* App.300.  Similarly, Gebo later pursued "remov[ing] discipline from everyone who has been vaccinated but has a mask warning in the record."  App.573.  Of course, United did not make such offers to *accommodated* employees with mask violations.  App.791–92.

At this same time, United also ignored federal requirements that it provide training, medical evaluations, and fit testing to ensure the employees were properly wearing the respirators.  App.72–73.  Nor were employees provided the required breaks to remove the respirator to replenish oxygen levels.[16]  Only after the policy was implemented did United's safety team scramble to come up with *some form* of the required "training" that it could broadcast to all employees, *id.*, but United also told employees that no training was necessary because the policy was voluntary, as employees had "a choice to stay at home" on unpaid leave or "get vaccinated[.]"  App.242.[17]  To this day, the head of United's HR, Kate Gebo, has no explanation for the N95/KN95 policy.  In her words, people do not need to wear such respirators unless they work in jobs like welding.  App.788–90.

---

[15] Even the warning was severe, where an accommodated employee caught not wearing a respirator would receive a warning that "remain[ed] in effect *for eighteen (18) months.*"  App.866. (emphasis added); *see also* App.295–96 (same).

[16] This had had real-life consequences, with employees experiencing headaches and dizziness from wearing a respirator for so long.  App.25 (employee asking "why can't I sit away somewhere with no one around so I can wear regular mask please.");  App.2.

[17] Yet Virginia fined United for not providing the proper training.  App.112.  And United received multiple inquiries from OSHA about this respirator policy.  App.427, 429.

That is why she says she has not worn one.  *Id.*

In addition to respirators, United implemented harsh testing requirements on these "accommodated" employees.  United required them to take COVID-19 tests twice a week, even when on vacation or immediately after recovering from COVID.  Once again, many in HR recognized the absurdity of this requirement, asking: "If someone's camping, we're really going to require them to test?"  App.106.  And, even when United's Medical Director, Pat Baylis, explained that employees who recently recovered from COVID-19 should not be required to test twice a week, as they might still test positive but were not contagious under CDC guidelines, HR overruled Baylis and insisted that these employees continue testing and stay out of work.  App.27–29; App.80–84.  HR explained that United was ignoring CDC guidance because it was part of the "whole RAP issue," App.44, and United applied a uniform policy for all "accommodated" employees, who were too numerous to track, App.27.  HR acknowledged that these employees might continue to test positive for months after recovering from Covid, but they were still "being pulled from service."  App.38–39; App.32–34.

Discipline for those who missed a test was just as severe as it was for those who made any small error regarding the respirator-at-all-times policy.  United gave employees who missed just one test a termination warning and terminated those who missed any further tests.  App.443 ("Let them know that there is a discipline process associated with non-compliance (Term warning, first offense, termination for the second"); App.265; App.270–71 (termination warning sent to accommodated employee that would last in employee's file for 15 months).

3. Third, for those in customer-facing roles, United also made litigation-driven changes while continuing to punish accommodated employees.  And this prevented employees from having any way to anticipate how long they would be forced onto unpaid leave.  After originally telling

customer-facing employees that they would return to work when the pandemic "meaningfully recedes," United acknowledged having no idea what it meant by that term.  Rather, Limacher stated that this metric was first defined "in October 2021 in response to pending litigation and questions from Judge Pittman."  App.158; App.68 ("Judge Pittman is very concerned about the lack of a metric.  Thus, we have a limited time to act (*if we choose*) before his ruling in the coming days.").  Indeed, even by October 2021, United still did not know what it meant by this term.  Pat Baylis asked the CDC how to define the term in October 2021 because United did not know how to "determine that the pandemic has 'meaningfully receded.'"  App.48.

Although United finally decided to use a community transmission rate to define "meaningfully recedes," App.391, it changed course when it seemed more advantageous for litigation.  After the Fifth Circuit held that Plaintiffs were being irreparably harmed, *Sambrano*, 2022 WL 486610, at *6, United looked for a different metric, App.292 (discussing changing the metric to "ICU Capacity and Death Rate").  Accordingly, even United's decision to bring employees back to work in March 2022, after forcing them on indefinite, unpaid leave for months, was driven by this litigation rather than safety.

Even at this late stage, however, United continued to discourage employees from applying for accommodations.  For instance, one week before the unpaid-leave employees returned, United told HR to "not be proactive" about informing employees about accommodations.  App.280.  Indeed, this is what happened to Alyse Medlin, a United flight attendant who was on maternity leave during August 2021.  Upon return, she requested an accommodation, but United rejected her request as untimely and terminated her *the day before* United announced that accommodated flight attendants could return to work.  App.723–24; App.584–85; App.200.  In doing so, United violated its own policy to allow employees on leave to request accommodations shortly before their return.

22

App.873.  Even then, United could not stop its pattern of coercion.

## ARGUMENT

United systematically violated its statutory obligations under Title VII and the ADA to provide reasonable accommodations.  *See Weber v. Roadway Express, Inc.*, 199 F.3d 270, 272–73 (5th Cir. 2000); *Feist v. La., Dep't of Just.*, 730 F.3d 450, 452 (5th Cir. 2013).[18]  Because United violated these statutes in the same way for broad swaths of employees, a class action is the appropriate and expeditious way to hold United accountable.  *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 409–10 (5th Cir. 1998).  As demonstrated below, Plaintiffs easily clear the threshold requirements for a class action under Rule 23(a).  From there, classes should be certified under both Rule 23(b)(2) and 23(b)(3).  For each class, the questions that predominate the class are whether United's accommodations were inherently unreasonable and whether United should compensate these class members for their economic and punitive harms.

Accordingly, the Court should certify the following classes:

- Rule 23(b)(2) class: All individuals who submitted a request for a reasonable accommodation from United's COVID-19 vaccine mandate due to a sincerely held religious belief or medical disability and then faced the choice of: (1) abandoning their religious beliefs or medical needs (*i.e.*, get vaccinated); (2) accepting indefinite leave; or (3) being fired or otherwise separated.

- Rule 23(b)(3) subclasses:

  o All employees United deemed customer facing who received an accommodation due to a sincerely held religious belief or medical disability and who were put on unpaid leave.

  o All employees United deemed non-customer-facing who received an accommodation due to a sincerely held religious belief or medical disability and

---

[18] Although the Court dismissed Plaintiffs' retaliation claims, the record confirms that dismissal was incorrect, as the accommodations were so punitive as to be retaliatory under both Title VII and the ADA.  *See McNeill*, 2023 WL 8532408, at *6 (permitting claim to proceed that an accommodation of unpaid leave to a COVID-19 vaccine mandate was retaliatory).

were subject to the purposely punitive masking-and-testing accommodation.[19]

## I.     Plaintiffs Satisfy Rule 23(a)'s Threshold Requirements.

Plaintiffs satisfy each threshold requirement for certification under Rule 23(a): "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.  23(a).  Further, the class is "adequately defined and clearly ascertainable."   *Greathouse v. Cap. Plus Fin., LLC*, No. 4:22-cv-0686-P, 2023  WL 5746927, at *3 (N.D. Tex. Sept. 6, 2023) (Pittman, J.) (quotation marks and citation omitted).

### A.     The Proposed Class is Ascertainable.

As to ascertainability, the Fifth Circuit only requires Plaintiffs to demonstrate that "the court [will] be able to identify class members at some stage of the proceeding," not that "the court … know[s] the identity of each class member before certification."  *Frey v. First Nat'l Bank Sw*., 602 F. App'x 164, 168 (5th Cir. 2015) (quoting 1 Wm. B. Rubenstein, *Newberg on Class Actions* § 3:3 (5th ed. 2011)).  Applying this standard, "[t]he Fifth Circuit has upheld the ascertainability of a class even when a definition necessitates individualized membership assessments that might follow litigation, so long as the class definition is sufficiently clear."  *Vita Nuova, Inc. v. Azar*, No. 4:19-cv-00532-O, 2020 WL 8271942, at *3 (N.D. Tex. Dec. 2, 2020).

Plaintiffs easily satisfy this requirement because United has the records necessary to identify each class member.  The threshold requirement for each class is having requested an accommodation.  United has that information.  *See* App.95 (listing employees who applied for an accommodation).   United also knows the number and identity of all employees granted an

---

[19] *See* Local Rule ("L.R.") 23.2(b)(2).

accommodation and thus subjected to the unpaid leave plan. *See* App.58; App.202. United no doubt also knows how many employees applied for an accommodation and were terminated, retired under duress, or withdrew the request. And United knows how many "accommodated" employees were considered customer facing and non-customer-facing. App.95–96. Indeed, United maintained many spreadsheets that detail all of the information needed to identify class members.[20] *See* App.231; App.266; App.267.[21]

Thus, with United's robust records, the Court will "be able to identify" each class member, and Plaintiffs have therefore satisfied the ascertainability requirement. *Frey*, 602 F. App'x at 168.

### B.   The Proposed Class is Sufficiently Numerous.

Plaintiffs also meet the numerosity requirement. Fed. R. Civ. P. 23(a)(1). While there is no hard line for when a class becomes "so numerous that joinder of all members is impracticable," a "class of 40 or more members raises a presumption of impracticability of joinder[.]" 1 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3.12 (6th ed. 2023) ("1 Rubinstein, *Newberg*"); *accord Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (a class size of 100 to 150 members "is within the range that generally satisfies the numerosity requirement"). Whichever of these standards the Court applies, Plaintiffs satisfy numerosity.

United's records show that there were more than 5,000 accommodation requests submitted. App.202; App.589. And there were nearly 2,300 approved accommodation requests. App.261. Of those, United forced over a thousand employees onto indefinite, unpaid leave. App.246–48, 250. And United forced at least 800 employees to work under the onerous masking-and-testing

---

[20] Moreover, the majority of requests were based on religious objections to the use of aborted fetal cell lines. App.58; App.869–70. And a class defined by the religious belief of the class members is sufficiently ascertainable. *Vita Nuova*, 2020 WL 8271942, at *3.

[21] While these spreadsheets are too large to attach to Plaintiffs' motion, Plaintiffs are willing to provide them to the Court upon request.

accommodation.  App.29.  Accordingly, Plaintiffs clearly "satisf[y] the numerosity requirement."  *Mullen*, 186 F.3d at 624; *see also* L.R. 23.2(b)(1).

### C.    There are Common Questions of Law and Fact Across the Proposed Class.

Plaintiffs also satisfy the next two requirements of Rule 23(a)—commonality and typicality—which "tend to merge."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011).  For commonality, Plaintiffs must show that there is "some glue holding the alleged reasons for all [the discriminatory] decisions together."  *Id.* at 352.  Specifically, there must be "a common contention" the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.  "[E]ven a single common question will do."  *Id.* at 359 (cleaned up).  And "[t]his requirement can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse."  *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334–35 (5th Cir. 2019) (cleaned up).  And "[s]ignificant proof that an employer operated under a general policy of discrimination" demonstrates commonality.  *Dukes*, 564 U.S. at 353 (quotation marks and citation omitted).

The related question—typicality—"is not demanding."  *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002).  Rather, "[i]t focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."  *Id.*  And there need not be "complete identity of claims," but rather only "the same essential characteristics" between the Plaintiffs' claims and those of the class.  *Id.*  This requirement can be satisfied where, as here, "the claims arise from a similar course of conduct and share the same legal theory[.]"  *Id.*

As an initial matter, the "glue" holding the claims together here is the United's "general policy" of disdain for *anyone* who dared not march in lockstep with its vaccine mandate.  *Dukes*, 564 U.S. at 352–53.  Led by its CEO, United uniformly discouraged and disparaged accommodation requests by imposing a "very high" bar for accommodations and derisively

26

accusing those with religious objections as "all the sudden" becoming religious. *Sambrano*, 2022 WL 486610, at *9; App.145. United then instituted a uniform "purposely vague" RAP system, with arbitrary deadlines, condescending questions, and unreasonable demands. App.127; App.125; App.382; App.187–88; App.206–07; App. 370–72. And this "general policy" of harassing requesters was implemented by HR representatives who openly criticized United employees. App.545–60; App.507–23; App.472–73; App.460–67. For employees who withstood the harassment and applied for an accommodation, United doubled down with a uniform policy of imposing only punitive and retaliatory accommodations. These intentionally discriminatory policies meet the commonality and typicality requirements.

1. As to commonality, the policies discussed above are "significant proof" that United "operated under a general policy of discrimination" through its accommodation process and the accommodations it provided to employees. *Dukes*, 564 U.S. at 353. Those so-called accommodations present two primary common questions: (1) whether universal unpaid leave is a lawful accommodation; and (2) whether United violated the law with its intentionally harsh masking-and-testing accommodation.[22]

On the first, determining that indefinite, unpaid leave was an unlawful accommodation, as the Fifth Circuit suggested, *see Sambrano*, 2022 WL 486610, at *9; *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), will resolve claims across the board. Similarly, determining that United's harsh masking-and-testing accommodation was unlawful will resolve additional claims brought by a large part of the class.

---

[22] These questions go directly to Plaintiffs' discrimination claims for failure to accommodate. SAC ¶¶ 199–227. When an employer refuses to provide a reasonable accommodation, that is discrimination under the ADA and Title VII. *Feist*, 730 F.3d at 452; *McNeill*, 2023 WL 8532408, at *9. Answering these questions directly settles the claims in this case because, through the same discriminatory process, United provided the same accommodations across the class.

In all, the legality of United's universal and punitive accommodations is a common question that can be resolved on a classwide basis. *Dukes*, 564 U.S. at 350; *see also* L.R. 23.2(b)(4).  And the only remaining questions will concern how United's actions harmed the class members—some lost income, others sacrificed their beliefs and health by acquiescing to United's demands, others resigned or retired under duress, and still others were terminated.  The different types of harm, however, do not undermine commonality. *See Seeligson*, 761 F. App'x at 334–35.

Other common questions abound: (1) whether United's accommodation process employed arbitrary requirements (*e.g.*, deadlines, required documentation, etc.) for the purpose of additional harassment; (2) whether injunctive relief is appropriate where United repeatedly refuses to commit not to place employees on unpaid leave again as an accommodation; and (3) whether punitive damages are appropriate because United's accommodation process and the accommodations themselves were intentionally and egregiously discriminatory. *See* L.R. 23.2(b)(4).  These questions can also be answered on a classwide basis, as they all stem from United's systemic discrimination and not from United's individual treatment of accommodated employees, as no such individual treatment occurred.  Plaintiffs thus satisfy the commonality requirement.

2.  These same issues are typical of the claims advanced by Plaintiffs and the class members since they "arise from a similar course of conduct and share the same legal theory[.]" *Stirman*, 280 F.3d at 562.  Plaintiffs were subject to United's campaign of coercion and the discriminatory accommodations described above.  They each received the constant messaging from United that their religious beliefs or disabilities were irrelevant because getting the vaccine was the right and loving thing to do and the only way to keep their coworkers safe.  App.617–20 (Burk 128:11–131:9); App.672–676 (Hamilton 122:7–126:20); App.692–693 (Jonas 235:1–236:13); App.703–704 (Kincannon 52:11–53:21); App.725; App.731–734.  The class members experienced the same

28

harassment, as shown by the testimony of various putative class members United deposed. *See* App.603–05, 608–09 (Beyer 25:7–27:14, 72:10–73:9); App.648 (Cole 116:4–25); App.683 (Hovila 142:8–19); App.661–62 (Davis 122:11–123:10); App.758 (Tovar 103:13–21).

Plaintiffs also applied for either a religious or medical accommodation and were thus subject to United's harassing arbitrary deadlines and timeframes to provide supporting documentation. App.614 (Burk 90:1–22); App.750 (Sambrano 292:1–16); App.628–29 (Castillo 79:11–80:11); App.669–71 (Hamilton 108:24–110:24); App.694–97 (Jonas 265:24–268:9); App.705 (Kincannon 144:3–13); App.711–17; App.734–36. So too with respect to the class members. *See* App.606, 607 (Beyer 31:5–23, 40:1–9); App.649 (Cole 117:3–25); App.682 (Hovila 47:9–18); App.656–57 (Davis 61:3–62:14); App.756, 757 (Tovar 85:8–20, 98:6–23). And Plaintiffs, like the class, were subject to the impossible choice between indefinite, unpaid leave, which applied to everyone who requested an accommodation, or losing their job. App.286–87.

Simply put, each Plaintiff (like all class members) experienced discrimination through the RAP process and United's unreasonable accommodations. Thus, Plaintiffs fairly represent the legal theories that underpin the claim for injunctive relief and punitive damages under Rule 23(b)(2) discussed below. *See also* L.R. 23.2(b)(3).

It is of no moment that some Plaintiffs did not experience United's discrimination in exactly the same way. For example, Plaintiff Burk was coerced to violate his sincere religious beliefs when he could not afford indefinite, unpaid leave. App.615–16 ("I just felt the pressure, and I violated my faith and I took the vaccine for the job."). But that difference does not undermine the similarity of experiences that Burk and the class members faced. In fact, Burk's experience underscores the coerciveness of United's universal "get vaccinated or be punished" policy. *Dukes*, 564 U.S. at 353 (stating that a "general policy of discrimination" would satisfy not just the

29

commonality requirement but also the typicality requirement).[23]

Nor does it matter that some Plaintiffs, like Ms. Jonas, received a medical accommodation rather than a religious accommodation. The discriminatory process and Hobson's choice of "get vaccinated or suffer an adverse employment action" applied to *all* employees seeking an accommodation, regardless of whether that request was based on religious beliefs or disabilities. App.697 (confirming that she "would have been in the same position" whether United "had granted both your religious and medical RAP"). Jonas was also punished for having an approved RAP through objectively unreasonable accommodations—the threat of indefinite, unpaid leave followed by a harsh masking-and-testing accommodation. App.688–90.[24]

Thus, there are no factual differences that preclude this Court from finding that all Plaintiffs meet the typicality requirement, as all Plaintiffs were subject to and suffered from United's discriminatory and punitive accommodation policies.

### D.    Plaintiffs and Plaintiffs' Counsel Will Fairly and Adequately Protect the Interests of the Class.

Finally, Plaintiffs satisfy the adequacy requirement, which "encompasses class

---

[23] As another employee put it: "Shame on you United. After an emotional roller coaster and near panic from my wife and I that was about to lose my job and family livelihood of over 30 years, I have succumb[ed] to the pressures … and have taken the COVID vaccine despite my [religious] objections." App.450.

[24] It is of no moment that, after the Court's motion-to-dismiss decision, the remaining Plaintiffs put on unpaid leave brought Title VII claims and the remaining Plaintiff subject to masking and testing brought an ADA claim. Because United treated all accommodated employees the same, the experiences of the remaining Plaintiffs mirror the experiences of class members who requested religious or medical accommodations and were put on unpaid leave or subject to the harsh masking-and-testing accommodation. That is why each original Plaintiff brought similar legal claims—discrimination (failure to accommodate) and retaliation. *See Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) ("A complete identity of claims is not required; rather, the critical inquiry is whether the named plaintiff's claims have the same essential characteristics as those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.") (cleaned up).

representatives, their counsel, and the relationship between the two." *Stirman*, 280 F.3d at 563 (citation omitted).  Under this standard, the Court must consider "[1] the zeal and competence of the representative[s'] counsel and ... [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interest of absentees." *Id.*

Since the start of this case, Plaintiffs and their counsel have been actively involved—they have participated in hearings and mediation, provided written discovery, and sat for depositions. App.877–78.  And Plaintiffs have no conflict of interest with the members of the class.  Rather, Plaintiffs, like the putative class, have sincerely held religious beliefs and/or disabilities that prevent them from receiving the COVID-19 vaccine.  And Plaintiffs, like the putative class, applied for accommodations and were harmed by United's discriminatory RAP process. Accordingly, Plaintiffs' interests are exactly those that Title VII and the ADA protect, and Plaintiffs' claims rise and fall with the claims of the rest of the class.  *See* L.R. 23.2(c).[25]

Additionally, counsel will adequately represent the class.  Courts consider counsel's experience "identifying or investigating potential claims in the action," "handling class actions" and other "complex litigation," "knowledge of the applicable law," and "resources."  Fed. R. Civ. P. 23(g)(1)(A).  Here, Plaintiffs' counsel have identified and prosecuted Plaintiffs' claims through many hearings, motions, and extensive class discovery.  Moreover, Plaintiffs' counsel have extensive experience in complex litigation in cases involving Title VII, the ADA, and class actions. *See* App.875–78; App.885–87.

## II.   The Court Should Certify a Class Under Rule 23(b)(2).

The Court should first certify a class under Rule 23(b)(2) because United systematically

---

[25] Further, under L.R. 23.2(c), Plaintiffs' counsel represents that Plaintiffs will not be financially responsible for this action.  And Plaintiffs' counsel will continue to be paid its hourly fees each month, as has been the case throughout the duration of this litigation.  *See* L.R. 23.2(g).

discriminated against all "accommodated" employees by informing them that they would each be placed on indefinite, unpaid leave.  A Rule 23(b)(2) class is appropriate in the face of such systemic discrimination.  *Dukes*, 564 U.S. at 343.  And punitive damages are appropriate to provide "the deterrence that Congress intended in the most egregious discrimination cases."  *Abner v. Kansas City S. R. Co.*, 513 F.3d 154, 163 (5th Cir. 2008).

### A. Plaintiffs Challenge Company-Wide Policies.

Although failure-to-accommodate claims are often brought by individual plaintiffs, United's actions confirm that this case should proceed instead as a class.  Indeed, United treated all requesters the same, and United cannot now protest class treatment.

For certification under Rule 23(b)(2), the key is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360.  As a result, "cases against parties charged with unlawful, class-based discrimination are prime examples of what (b)(2) is meant to capture."  *Id.* at 361 (citation omitted).  And district courts therefore routinely certify (b)(2) classes when plaintiffs identify centralized policies that widely inhibit adequate accommodation under Title VII or the ADA.

For example, in *Sughrim v. New York*, No. 19-cv-7977, 2023 WL 5713191 (S.D.N.Y. Sept. 5, 2023), the court certified a (b)(2) class based on the defendant's alleged systemic failure to comply with Title VII's religious accommodation requirement.  The plaintiffs—a group of correctional officers—claimed that the prison system's accommodation policies failed to accommodate their dress and grooming needs.  Rather than viewing the claims as a series of individualized inquiries, the court emphasized that "each religious accommodation request was denied by the same … officials in ... [defendant's] central office," and that "Plaintiffs challenge central and systemic failures of Defendants' religious accommodation policies as they affect the

class as a whole." *Id.* at *24–25 (cleaned up).

The Northern District of Illinois reached the same conclusion in *Holmes v. Godinez*, 311 F.R.D. 177 (N.D. Ill. 2015), where the court certified a class claiming a widespread failure to accommodate hearing disabilities under the ADA. Explaining that the plaintiffs were not "challenging hundreds of individual decisions regarding inmate hearing accommodations," but rather were challenging the defendant's "system-wide policies," *id.* at 218, the court emphasized that a "single system-wide illegal practice or policy can satisfy the commonality requirement" for a (b)(2) claim, *id.* at 217. And certification was proper "[e]ven if determining appropriate hearing accommodations requires individualized considerations down the line," because "[c]ommon issues bind the Plaintiffs' claims together if [the defendant's] high level policies and practices do not conform to the law." *Id.* at 218. Other courts have reached the same conclusion. *Newkirk v. Pierre*, No. 19-cv-4283, 2020 WL 5035930, at *8–9 (E.D.N.Y. Aug. 26, 2020); *Toney-Dick v. Doar*, No. 12 CIV. 9162, 2013 WL 5295221, at *2 (S.D.N.Y. Sept. 16, 2013).

These decisions are squarely in line with *Dukes*, where the plaintiffs sought certification of a 23(b)(2) class for a Title VII sex discrimination claim. 564 U.S. at 343. The plaintiffs alleged that the company had a "corporate culture" that permitted bias against women in certain hiring decisions. *Id.* at 345. The Supreme Court rejected certification because the plaintiffs had not shown the "glue holding the alleged *reasons* for all those decisions together." *Id.* at 352. Thus, under 23(b)(2), there must be "proof of a system-wide policy acting as 'glue'" to hold the challenged decisions together. *Holmes*, 311 F.R.D. at 218; *accord Bolden v. Walsh Const.*, 688 F.3d 893, 898 (7th Cir. 2012) (a "single national policy was the missing ingredient in *Wal-Mart*").

That "glue" is abundantly present in this case, where United devised a uniform accommodation system, which was implemented by a small group of officials to coerce all

"accommodated" employees to forgo their beliefs and health. App.259; App.492; App.811. In fact, discovery confirmed that this policy was driven almost entirely by Kirby. *See* App.147 (the RAP process was "a Scott-level initiative" made "consciously knowing that [it] would upset some people."). And the same "high bar" applied to all accommodation requests, App.145, where United determined that all "accommodated" employees would be placed on indefinite, unpaid leave, App.286–87. As the Fifth Circuit confirmed, that uniform plan was harmful. Only after this lawsuit was filed did United create some sort of separation among its accommodated employees, but even then, that separation consisted of just two broad groups of employees subject to uniform accommodation policies.

Each of these actions demonstrates United's desire to prevent all employees from availing themselves of their right to reasonable accommodations for religious or medical reasons. *See*, *e.g.*, *Toney-Dick*, 2013 WL 5295221, at *2 (granting class certification when plaintiffs alleged that the "design and implementation" of a county program failed "to provide reasonable accommodations for individuals with disabilities" because the program "created an inflexible application system" where application was permitted at only two sites and where the program "[a]llowed for only a short period of time during which individuals could apply" (cleaned up)). And, because these decisions were enacted "by the same ... officials in ... [defendant's] central office," they "affect[ed] the class as a whole" and warrant certification under 23(b)(2). *Sughrim*, 2023 WL 5713191, at *24–26 (citations omitted); *see also* L.R. 23.2(a).

**B.      The Rule 23(b)(2) Class is Entitled to Injunctive Relief and Punitive Damages.**

Under Rule 23(b)(2), injunctive relief is appropriate to prevent continued application of a systemic discriminatory policy. Fed. R. Civ. P. 23(b)(2); *Dukes*, 564 U.S. at 360. Here, that requires an injunction ordering United not to impose (or threaten to impose) unpaid leave as an accommodation. The Fifth Circuit has already confirmed that even the threat of such an

34

accommodation is irreparably harmful, and the Court should ensure United does not return to such a harmful policy.[26]  *Sambrano*, 2022 WL 486610, at *3.  United made numerous decisions based on this lawsuit, including the decisions about how and when to allow "accommodated" employees back to work.  *See supra* pp.18–22.  And United has steadfastly refused to grant any assurance that they will not revert to their pre-litigation conduct in the future.  App.827–28.

Additionally, punitive damages are appropriate under Rule 23(b)(2) as "incidental" damages.[27]  As the Fifth Circuit confirms, monetary damages are permissible under Rule 23(b)(2) when they apply classwide and are "incidental" to the claims for injunctive relief.  *Allison*, 151 F.3d at 415.  Damages are incidental when they "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief."  *Id.*

The Supreme Court's decision in *Dukes* did not alter this rule, but rather acknowledged the Fifth Circuit's standard for incidental damages and, although it concluded that the claims in that case did not qualify as incidental, the Court left open the question of what forms of "incidental" damages are consistent with Rule 23(b)(2).  564 U.S. at 365–66.  After *Dukes*, many appellate courts—including the Fifth Circuit—have upheld the validity of incidental monetary damages under Rule 23(b)(2).  *See In re Rodriguez*, 695 F.3d 360, 369 (5th Cir. 2012); *Amara v. CIGNA Corp.*, 775 F.3d 510, 519–20 (2d Cir. 2014) (following "our sister circuits [that] have concluded that [incidental monetary] relief may be appropriate where it 'flow[s] directly from liability to the

---

[26] It cannot be, as the Court recently suggested, that the threat of unpaid leave is not an actionable harm.  The Fifth Circuit already concluded that the threat of unpaid leave harmed employees.  *Sambrano*, 2022 WL 486610, at *9. Title VII exists to compensate employees for *precisely* this type of harm.  And a company cannot simply change course and never be held to account for such harm.  That would strip the Fifth Circuit's holding of all meaning.

[27] The EEOC also demands punitive damages when employers violate laws like the ADA.  *See, e.g.,* Compl. at 5, *EEOC v. United Airlines*, No. 1:10-cv-1699 (N.D. Ill.) (ECF No. 51).

class *as a whole*' from 'claims forming the basis of ... injunctive or declaratory relief.").[28]

Punitive damages are one such type of incidental monetary damages available under Title VII and the ADA, where a plaintiff need only show that the employer discriminated "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Allison*, 151 F.3d at 410 (quoting 42 U.S.C. § 1981a(b)(1)(2)). Thus, "punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts." *Id.* at 417.

Plaintiffs satisfy this requirement here. Plaintiffs challenge a single policy and set of practices enacted by the same officials in the same office over a short period of time. And those policies punished employees with religious objections or disabilities from the outset. *Id.* United uniformly discouraged employees from applying for accommodations, mocked those with religious objections or disabilities, subjected employees to an arbitrary accommodation process, and forced employees into a crisis of conscience at the prospect of losing their livelihoods. The Fifth Circuit confirmed that this "coercion is harmful in and of itself" and "imposes a distinct and irreparable harm beyond lost pay, benefits, seniority, and other tangible and remediable losses." *Sambrano*, 2022 WL 486610, at *3, *9. United then continued the punishment through severe masking-and-testing accommodations resulting in termination for just two mistakes. This intentional and systemic retribution towards those who had religious or medical objections to the COVID-19 vaccine warrants punitive damages for the various reasons discussed above.

---

[28] *See also Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) ("Rule 23(b)(2) classes may be certified in some cases even when monetary relief is at issue"); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012) ("Should it appear that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program ... the district court can award that relief without terminating the class action and … without converting this (b)(2) class action to a (b)(3) class action."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011).

In all, the intangible harm Plaintiffs suffered from this coercive choice warrants a two-pronged remedy: (1) an injunction prohibiting United from engaging in this conduct again; and (2) a class-wide award of incidental (here, punitive) damages given the intentional discrimination behind these egregious actions, which would be available to every class member in a set amount to be determined by the fact-finder in this case.[29]

## III.   The Claims of the Customer-Facing Subclass Are Appropriate for Certification Under Rule 23(b)(3).

The Court should also certify two subclasses under Rule 23(b)(3), the first of which includes those placed on indefinite, unpaid leave.  For this subclass, Plaintiffs satisfy the additional requirements for certification under Rule 23(b)(3)—predominance and superiority.  Indeed, United treated the subclass the same, and placing these employees on indefinite, unpaid leave was plainly unlawful.  These class members are thus due equitable backpay and punitive damages.

### A.   Common Questions Predominate.

Plaintiffs satisfy the predominance requirement of Rule 23(b)(3) for similar reasons as they satisfy the commonality requirement in subdivision (a)(2) "in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues."  *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084 (6th Cir. 1996) (citing *Newberg* § 3.10).   In this Circuit, common issues "predominate" when they "constitute a significant part of the individual cases," *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986), such that the "proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

---

[29] If the Court disagrees, it should instead "adopt a 'hybrid' approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage."  *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997).

As predominance is a qualitative test, it does not require that *all* questions be common amongst the class. Rather, "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted). As long as "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*; *accord* 2 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4.54 (6th ed. 2023) ("2 Rubenstein, *Newberg*"). Here, common questions predominate on both liability and damages.

1. As to liability, the reasonableness of United's "accommodation" of indefinite, unpaid leave can be answered on a class-wide basis with evidence that applies to the entire subclass. In administering its universal accommodation process, United categorized more than a thousand employees as customer facing. App.95. For those employees, United forced them all onto unpaid leave without engaging in any individualized inquiries to determine the reasonableness of the accommodation it offered to each employee. This irrational uniformity in treatment makes the predominance question easy, as there are no individualized questions regarding the accommodation of each class member.[30] Because United treated all customer-facing employees the same regardless of the nuances of their position, United cannot now claim that the

---

[30] United will argue that sincerity of beliefs defeats predominance. Not so. *Sambrano*, 2022 WL 486610, at *1 n.2 ("United's bizarre inquisition into the sincerity of its employees' beliefs is somewhat at odds with our usual approach of taking parties at their word regarding their own religious convictions."); *Davis*, 765 F.3d at 486 (admonishing courts to have "judicial shyness" on such questions). Considering that United already granted the requests for this subclass, questions about sincerity are irrelevant. *McNeill*, 2023 WL 8532408, at *9 ("The Supreme Court has made it clear that it is not a court's role to determine the reasonableness of an individual's beliefs.").

reasonableness of the decision is individualized.  Rather, this Court should—as United did—limit its inquiry to the reasonableness of that accommodation on a class-wide basis.

Additionally, common questions of discriminatory intent predominate.  As relevant here, courts must ensure that the "guise of reasonableness" is not used to hide discrimination against an employee's beliefs.  *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 74 (5th Cir. 1990).  To do so, courts must consider the underlying intent, where "an accommodation that would ordinarily be considered reasonable may not be considered reasonable when the employer withholds a more favorable accommodation for discriminatory reasons."  *Haliye v. Celestica Corp.*, 717 F. Supp. 2d 873, 881 (D. Minn. 2010) (citing *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70–71 (1986)). And an accommodation that is unnecessarily strict or harsh, so as to discourage employees from seeking the accommodation, is necessarily unreasonable.  *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015) (explaining that Title VII "prohibits actions taken with the *motive* of avoiding the need for accommodating a religious practice").

The record demonstrates that United's class-wide "accommodation" of indefinite, unpaid leave was the result of discriminatory intent, as United withheld more favorable accommodations and chose unpaid leave to coerce its employees.  Indeed, United celebrated each employee who acquiesced under the pressure. App.274.  And the belated suggestion that the accommodation was driven by safety crumbles under the weight of the evidence discussed above.

This clearly demonstrates United's class-wide discriminatory intent, where the issue of the reasonableness of unpaid leave as an accommodation is central to Plaintiffs' claim of liability and it predominates over any individualized issues.  Plaintiffs thus satisfy the predominance requirement of Rule 23(b)(3).  *See Dukes*, 564 U.S. at 350.

2.  As to damages, common questions also predominate.  Equitable backpay for the

39

customer-facing subclass can be calculated using a simple, mechanical, and class-wide formula. By averaging each employee's actual earnings over a period of time when they were permitted to work, the Court can determine the "average wage rate" to use when calculating lost income.

Indeed, "[i]t is well-established in the Fifth Circuit that the trier of fact may rely on a lost income stream calculation that is based on an average wage rate, particularly if the plaintiff has an inconsistent work history." *Nelson v. Cooper T. Smith Stevedoring Co.*, No. CIV.A. 12-2890, 2013 WL 4591362, at *1 (E.D. La. Aug. 28, 2013); *accord In re Parker Drilling Offshore USA LLC*, 323 F. App'x 330, 335 (5th Cir. 2009) (same); *Tran v. Abdon Callais Offshore, LLC*, No. CV 12-0999, 2014 WL 12538905, at *2 (E.D. La. Sept. 22, 2014) (same).

Relying on average earnings to calculate damages is also appropriate in cases like this one where an employee's base wages are variable. *See, e.g.*, *Baucom v. Sisco Stevedoring, LLC*, 560 F. Supp. 2d 1181, 1195 (S.D. Ala. 2008) (adopting a wage-averaging technique because it "accurately capture[d] [plaintiff]'s highly variable base wages"); App.763–64. Accordingly, despite the variability in monthly earnings for the pilots and flight attendants in this subclass, there are readily available methods for calculating backpay that courts in this Circuit routinely use. *See* App.853–854 (Sambrano Supp. Decl. ¶¶ 2–5) (each pilot is blocked for 2.8 hours per day or about 85 hours per month and the pilot's pay can be multiplied by that number, which is exactly how United paid pilots during the portion of November 2021 when United prevented pilots from flying); App.863 (Schuttloffel Decl. ¶¶ 27–29) (same); App.851 (Cote Decl. ¶ 14).

Additionally, as explained above in Part II.B, in addition to backpay, this subclass is entitled to punitive damages due to United's universal discriminatory unpaid-leave policy.[31] These

---

[31] Punitive damages are available when a plaintiff shows that a defendant acted with "malice and reckless indifference" to the plaintiff's civil rights. *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 467 (5th Cir. 2013). And this standard considers "the actor's state of mind" and an "employer's

damages can also be calculated on a class-wide basis by allowing the factfinder to determine an appropriate ratio of punitive to economic damages, which can then be mechanically applied to all members of this subclass.  Once again, the Fifth Circuit routinely follows this approach.  *See*, *e.g.*, *Cimino v. Raymark Indus. Inc.*, 151 F.3d 297, 323–24 (5th Cir. 1998) (approving the use of a multiplier to determine punitive damages in a class action); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 738 (5th Cir. 1996) (recognizing a procedure in which a jury establishes "a ratio of punitive damages to compensatory damages, which ratio thereafter would apply to each class member").

In sum, "common issues constitute a significant part of the individual cases." *Jenkins*, 782 F.2d at 472.  Those issues, concerning United's class-wide discrimination through unpaid leave, predominate both the questions of liability and damages.  And both the compensatory and punitive damages can be calculated by application of simple, mechanical formulas that apply class wide.  Thus, "the action may be considered proper under Rule 23(b)(3) even though other important matters [may] have to be tried separately." *Tyson Foods*, 577 U.S. at 453.

### B.    A Class Action is the Superior Means of Resolving These Claims.

Plaintiffs also satisfy the superiority requirement, where courts consider factors like class members' interests in individually controlling their own litigation and the desirability of concentrating claims in one judicial forum.   Fed. R. Civ. P. 23(b)(3)(A–D).   Each of these considerations is satisfied here.

Class actions are generally superior when cases involve "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court

---

knowledge that it may be acting in violation of federal law." *Id.* at 467.   Here, even in denying Plaintiffs' motion for preliminary injunction, the Court noted United's likely unlawful and "calloused approach."  Doc. 104 at 14.  Fully aware of that likelihood, United proceeded with its unlawful accommodations, clearly demonstrating the type of reckless indifference that warrants punitive damages.

at all." *Amchem Prods.*, 521 U.S. at 617. Among other things, this includes cases where plaintiffs "are vulnerable to reprisals by the defendant due to a continuing economic relationship, such as employment." 2 Rubenstein, *Newberg*, *supra*, § 4:65; *Griffith v. Landry's, Inc.*, No. 8:14-cv-3213, 2017 WL 11002193, at *8 (M.D. Fla. 2017) (same).

Here, many class members are still employed by United, and they are more vulnerable to reprisals for bringing individual suits. Given United's record of retaliating against its employees, the fear of reprisal is real. A class action thus presents the best vehicle for holding United responsible for conduct that violates federal anti-discrimination statutes.

A class action is also a superior method of adjudication in cases where aggregation avoids flooding the courts with repetitive and duplicative claims and thereby promotes judicial efficiency by "enabl[ing] faster processing of [a] multitude of claims." 2 Rubenstein, *Newberg*, *supra*, § 4:64; *see also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 466 n.12 (1975) (same). This subclass includes over a thousand potential plaintiffs who would raise identical claims. Piecemeal litigation of those cases by each individual would flood courts with thousands of repetitive cases. A class action is therefore the most efficient use of judicial resources for these claims.

### C. Plaintiffs Satisfy Rule 23(b)(3)'s Notice and Opt-Out Provisions.

Lastly, Rule 23(b)(3) requires the extra procedural protections of mandatory notice and the ability to opt out. *Dukes*, 564 U.S. at 364. Rule 23(c)(2)(B) further requires that the court "direct to class members the best notice that is practicable under the circumstances," which can be by physical mail or "electronic means." *Id.*

As noted above, United has contact information for every class member. Thus, notice can be served to class members via email and through physical mail. The Court should therefore order United to provide a list of class members within thirty days of the Court's Order on this motion.

And Plaintiffs propose that mailing notices go out within sixty days of receipt of that class list. Courts within this district have approved similar notice plans. *See, e.g.*, *Abboud v. Agentra, LLC*, No. 3:19-cv-00120-X, 2021 WL 1380428, Dkt. No. 49, (N.D. Tex. Apr. 12, 2021).  Once Plaintiffs receive the class list, they can provide the Court with an accurate estimate of the costs of mailing notice to that class list, the payment of which Plaintiffs' counsel will facilitate. *See* L.R. 23.2(e).[32]

## IV.   The Claims of the Non-Customer-Facing Subclass Are Also Appropriate for Certification Under Rule 23(b)(3).

The second subclass consists of all United employees who, after this lawsuit was filed, were subject to onerous masking-and-testing accommodations.  This subclass also satisfies Rule 23(b)(3)'s predominance and superiority requirements.

1.  As to predominance, the central issue for these Plaintiffs' failure-to-accommodate claim—the reasonableness of their accommodations—"predominate[s] over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  This subclass suffered inherently unreasonable accommodations—even if general mask and test requirements might otherwise be considered reasonable—because the requirements were purposefully punitive and motivated by a desire to discourage employees from seeking accommodations. *Ansonia Bd. of Educ.,* 479 U.S. at 70–71 (an accommodation that is "generally ... a reasonable one" is nevertheless *unreasonable* if a more generous accommodation was "provided for all purposes *except* religious ones" because such "discrimination against religious practices is the antithesis of reasonableness").

Plaintiff Jonas, for instance, suffered discrimination and harm in several ways.  United withheld from her more favorable (reasonable) masking-and-testing requirements with the purpose

---

[32] Given United's robust records and the ease of identifying and notifying class members here, Plaintiffs' counsel can handle the notice distribution.  However, if a claims processor is necessary, Plaintiffs' counsel will cover the costs of such a service. *See* L.R. 23.2(e).

of discriminating.  And the record shows that United imposed this same unnecessarily harsh masking-and-testing requirement on a class-wide basis.  Rather than a general masking-and-testing requirement, United forced accommodated employees (and *only* accommodated employees) to wear *respirators* without proper training, fit testing, or oxygen breaks.  App.72–73; App.242.  And it did so to coerce employees to abandon their beliefs and health, resulting in employees experiencing dizziness, headaches, and difficulty breathing, App.25, and complaints to OSHA, App. 427, 429.  United also required accommodated employees to wear these respirators in absurd circumstances, like when eating alone outdoors or while on personal travel.  App.165.  Confirming that United was singling out accommodated employees for harsh treatment, United agreed to remove disciplinary points for mask violations for vaccinated employees, but not for "accommodated" employees.  App.573.

As to testing, United unreasonably required accommodated employees (and *only* accommodated employees) to test while on vacation or leave or immediately after recovering from COVID-19, despite contrary CDC guidance.  App.106–07; App.44.  This forced employees to miss more work and either use sick leave or go without pay, despite United's knowing that the employees were not contagious.  App.38–39; App.32–34.

The record confirms that this accommodation was designed to be purposefully harsh.  In fact, Kirby crafted it to "sound[] very serious."  App.94.  While general masking and testing may have been considered reasonable, the specific requirements here were so unnecessarily onerous as to be discriminatory and punitive.  Thus, this entire subclass faced the same unreasonable accommodation and discrimination, which does not require the Court to address any individual circumstances specific to the Plaintiffs.  Accordingly, questions of liability for this subclass predominate.  *Dukes*, 564 U.S. at 350.

The same is true for damages.  Just as the punitive damages discussed above can be calculated on a class-wide basis, the same is true for this subclass, where an award would be available to every class member in a set amount determined by the factfinder.

2.  Next, a class action is superior because, as discussed above, the plaintiffs are still employed by United, and the threat of retaliation may dissuade individual suits.  2 Rubenstein, *Newberg*, *supra*, § 4:65.  Further, a class action is also superior because all members of this subclass would otherwise bring individual claims concerning the same issue—whether United's universal masking and testing accommodation was unreasonable.  *See* 2 Rubenstein, *Newberg*, *supra*, § 4:64.  Finally, Plaintiffs propose the same notice plan for this subclass as the notice plan outlined above for the customer-facing subclass.  *See supra* pp.42–43.

## V.    Plaintiffs Satisfy the Additional Requirements of Local Rule 23.2.

While Plaintiffs have addressed most of the requirements of L.R. 23.2 above, Plaintiffs also meet the remaining requirements.  First, L.R. 23.2(d) requires Plaintiffs to address "the basis for determining any required jurisdictional amount."  Because this Court has federal-question jurisdiction for Plaintiffs' Title VII and ADA claims under 28 U.S.C. § 1331, no jurisdictional threshold is required.  Second, the parties have already completed class discovery and thus no further discovery is needed before a hearing on class certification.  *See* L.R. 23.2(f).

## CONCLUSION

United's disdain for its employees' civil rights is clear from the lengths it went to coerce those employees to abandon their beliefs and health to allow United to claim a 100% vaccination rate.  Through its universally discriminatory accommodations process, United violated Title VII and the ADA, and a class action is the superior way for United to be held accountable.  Indeed, because United treated all employees as a class, the Court should do likewise.

45

January 12, 2024

Respectfully submitted,

*/s/ Mark R. Paoletta*
Mark R. Paoletta*
D.C. Bar No. 422746
Gene C. Schaerr*
D.C. Bar No. 416368
Brian J. Field*
D.C. Bar No. 985577
Cristina Martinez Squires
Texas Bar No. 24093764
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
mpaoletta@schaerr-jaffe.com

* Admitted *pro hac vice*

*/s/ John C. Sullivan*
John C. Sullivan
Texas Bar No. 24083920
David Austin R. Nimocks
Texas Bar No. 24002695
S|L LAW PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

**CERTIFICATE OF SERVICE**

On January 12, 2024, I filed the foregoing document with the clerk of court for the United States District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rule of Civil Procedure 5(b)(2) (ECF System).

*/s/ Brian J. Field*
Brian J. Field