**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*, | § § § | |
| Plaintiffs, | § § | Civil Action No. 4:21-CV-01074-P |
| v. | § § | |
| UNITED AIRLINES, INC., | § § | |
| Defendant. | § § § § | |

**DEFENDANT UNITED AIRLINES, INC.'S OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND .......................................................................................... 3

A.     United's Vaccine Policy ........................................................................... 4

B.     Employees' Reasons for Seeking Accommodations ................................ 5

C.     The Process of Reviewing Accommodation Requests .............................. 7

D.     The Accommodations Offered by United .................................................. 9

E.     The End of the Pandemic ......................................................................... 12

STANDARD OF REVIEW ........................................................................................... 13

ARGUMENT .................................................................................................................. 14

I.     Plaintiffs Do Not Satisfy the Requirements of Rule 23(a). .................... 14

    A.     Plaintiffs Fail to Establish Commonality. ................................... 14

        1.     Coverage Under Title VII:  Sincere Religious Belief is an Individualized Inquiry. .................................................. 15

        2.     Coverage Under the ADA:  Disability is an Individualized Question. ......... 19

        3.     Reasonableness Requires an Individualized Assessment. ........................... 21

        4.     Adverse Action Requires an Individualized Assessment. ........................... 24

        5.     Undue Hardship Requires an Individualized Assessment. ........................... 24

    B.     Plaintiffs Cannot Evade Their Commonality Problems. .............................. 26

        1.     There is Not a Common Question About Any United "Policy." .................. 26

        2.     United Has Not Waived Its Right to Question Putative Class Member Sincerity or Disability. .......................... 27

    C.     Plaintiffs Fail to Establish Typicality. ...................................................... 29

II.     Plaintiffs Do Not Satisfy the Requirements of Rule 23(b)(2). ............... 31

    A.     Monetary-Relief Claims Foreclose Reliance on Rule 23(b)(2). ............ 32

    B.     The Claim For Injunctive Relief Does Not Satisfy Rule 23(b)(2) Even Considered In Isolation. ...................................................... 35

III.     Plaintiffs Do Not Satisfy the Requirements of Rule 23(b)(3). .............. 37

    A.     Plaintiffs Fail to Establish Predominance. ................................................ 37

        1.     Individualized Liability Issues Preclude Predominance. .............................. 38

        2.     Individualized Damages Issues Also Preclude Predominance. .................... 39

    B.     Plaintiffs Have Not Established Rule 23(b)(3) Superiority. ...................... 42

IV.     Lack of Personal Jurisdiction Precludes Certification of a Nationwide Class. ..................... 45

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

**Page**

CASES

*Ackerman v. Washington*,
16 F.4th 170 (6th Cir. 2021) ..................................................................15, 18

*Aliano v. Township of Maplewood*,
2023 WL 4398493 (D. N.J. July 7, 2023)...............................................................18

*Allen v. Benson*,
2023 WL 5961647 (E.D. Tex. Sept. 12, 2023).......................................................28

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ........................................................ passim

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)...............................................................................43

*Anderson v. United Airlines, Inc.*,
2023 WL 5721594 (N.D. Ill. Sept. 5, 2023) ..................................... passim

*Antoine v. First Student, Inc.*,
713 F.3d 824 (5th Cir. 2013) ................................................................15

*Baucom v. Sisco Stevedoring, LLC*,
560 F. Supp. 2d 1181 (S.D. Ala. 2008)...................................................41

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ................................................................39

*Bolin v. Sears, Roebuck & Co.*,
231 F.3d 970 (5th Cir. 2000) ..........................................................34, 35

*Braidwood Management, Inc. v. EEOC*,
70 F.4th 914 (5th Cir. 2023) ................................................................16

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
582 U.S. 255 (2017)...............................................................................45

*Bruff v. N. Miss. Health Services*,
244 F.3d 495 (5th Cir. 2001) ..........................................................23, 29

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) .................................................................................43

*Chandler v. City of Dallas*,
    2 F.3d 1385 (5th Cir. 1993) .................................................................................19

*Chavez v. Plan Benefit Servs., Inc.*,
    957 F.3d 542 (5th Cir. 2020) ...............................................................................13

*Cholakyan v. Mercedes-Benz, USA, LLC*,
    281 F.R.D. 534 (C.D. Cal. 2012) .........................................................................42

*Colindres v. QuitFlex Mfg.*,
    235 F.R.D. 347 (S.D. Tex. 2006)..............................................................32, 33, 34

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).................................................................................................39

*Cruson v. Jackson Nat'l Life Ins.*,
    954 F.3d 240 (5th Cir. 2020) ...............................................................37, 39, 45

*Davis v. Fort Bend Cnty.*,
    765 F.3d 480 (5th Cir. 2014) ...............................................................................15

*Davoll v. Webb*,
    194 F.3d 1116 (10th Cir. 1999) ...........................................................................19

*EEOC v. Universal Mfg. Corp.*,
    914 F.2d 71 (5th Cir. 1990) ...........................................................................21, 24

*Ellison v. Inova Health Care Servs.*,
    2023 WL 6038016 (E.D. Va. Sept. 14, 2023).............................................1, 16, 18

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997) ...............................................................................35

*Flecha v. Medicredit, Inc.*,
    946 F.3d 762 (5th Cir. 2020) ...............................................................13, 15, 43

*FPX, LLC v. Google, Inc.*,
    276 F.R.D. 543 (E.D. Tex. 2011)..........................................................................37

*Gardner-Alfred v. Fed. Rsrv. Bank*,
    2023 WL 6214863 (S.D.N.Y. Sept. 25, 2023)................................................17, 27

*Gene and Gene LLC v. BioPayLLC,*
    541 F.3d 318 (5th Cir. 2008) ....................................................................38

*Greathouse v. Capital Plus Fin., LLC,*
    2023 WL 5746927 (N.D. Tex. Sept. 6, 2023).........................2, 13, 42, 44

*Groff v. DeJoy,*
    600 U.S. 447 (2023)..........................................................................24, 31

*Guice-Mills v. Derwinski,*
    967 F.2d 794 (2d Cir. 1992)....................................................................29

*Haliye v. Celestica Corp.,*
    2009 WL 1653528 (D. Minn. June 10, 2009)..................................16, 24

*Hamilton v. Dallas County,*
    79 F.4th 494 (5th Cir. 2023) ...................................................................24

*Harris v. Union Pac. R.R. Co.,*
    953 F.3d 1030 (8th Cir. 2020) .................................................................26

*Hernandez v. W. Texas Treasures Est. Sales, L.L.C.,*
    79 F.4th 464 (5th Cir. 2023) ...................................................................36

*Hirsch v. USHealth Advisors, LLC,*
    337 F.R.D. 118 (N.D. Tex. 2020) ............................................................29

*Hohider v. UPS,*
    574 F.3d 169 (3d Cir. 2009)....................................................................19

*Horvath v. City of Leander,*
    946 F.3d 787 (5th Cir. 2020) .............................................................22, 29

*Hughes v. Terminix Pest Control, Inc.,*
    2023 WL 5015314 (E.D. La. Aug. 7, 2023) ............................................19

*Ibe v. Jones,*
    836 F.3d 516 (5th Cir. 2016) ...................................................................42

*In re Wilborn,*
    609 F.3d 748 (5th Cir. 2010) ...................................................................32

*Kittel v. City of Oxnard,*
    2018 WL 6004524 (C.D. Cal. Feb. 20, 2018)..........................................26

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999)..........................................................................................32

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007) ..........................................................................35

*Ludstrom v. Contra Costa Health Servs.*,
    2022 WL 17330842 (N.D. Cal. Nov. 29, 2022) .............................................20

*M.D. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ....................................................................13, 35

*Madison v. Chalmette Refining, L.L.C.*,
    637 F.3d 551 (5th Cir. 2011) ...............................................................37, 42, 44

*Maldonado v. Ochsner Clinic Found.*,
    493 F.3d 521 (5th Cir. 2007) ..........................................................................35

*Marionneux v. Groendyke Transp., Inc.*,
    170 F.3d 183 (5th Cir. 1999) ..........................................................................27

*Martinez v. Tyson Foods, Inc.*,
    533 F. Supp. 3d 386 (N.D. Tex. 2021) ...........................................................45

*McManus v. Fleetwood Enterprises, Inc.*,
    320 F.3d 545 (5th Cir. 2003) ....................................................................34, 35

*Miller v. Grand Canyon University, LLC*,
    540 F. Supp.3d 625 (N.D. Tex. 2023) ...................................................... passim

*Moss v. Harris Cty.*,
    851 F.3d 413 (5th Cir. 2017) ..........................................................................23

*Mueck v. LaGrange Acquisitions, L.P.*,
    75 F.4th 469 (5th Cir. 2023) ...........................................................................19

*Myers v. Hose*,
    50 F.3d 278 (4th Cir. 1995) ............................................................................28

*O'Hailpin v. Hawaiian Airlines, Inc.*,
    2023 WL 8600498 (D. Haw. Dec. 12, 2023).......................................... passim

*Pegues v. Mississippi State Employment Service*,
    899 F.2d 1449 (5th Cir. 1990) ........................................................................40

*Prantil v. Arkema Inc.*,
    986 F.3d 570 (5th Cir. 2021) ...........................................................................14

*Reichert v. Infusion Partners, L.L.C.*,
    2023 WL 4685377 (E.D. La. July 21, 2023) ...................................................27

*Riley v. Compucom Sys.*,
    2000 WL 343189 (N.D. Tex. Apr. 3, 2000) ....................................................43

*Robertson v. McKesson Corp.*,
    2023 WL 5177406 (S.D. Ohio Aug. 11, 2023)................................................38

*Rubinstein v. Adm'rs. of Tulane Educ. Fund*,
    218 F.3d 392 (5th Cir. 2000) ..........................................................................32

*Sambrano v. United Airlines, Inc.*,
    2022 WL 486610 (5th Cir. Feb. 17, 2022) .....................................................30

*Shields v. Main Line Hosps., Inc.*,
    2023 WL 7129953 (E.D. Pa. Oct. 27, 2023)...................................................18

*Slade v. Hershey Co.*,
    2011 WL 3159164 (M.D. Pa. July 26, 2011)...................................................20

*Slade v. Progressive Sec. Ins. Co.*,
    856 F.3d 408 (5th Cir. 2017) ..........................................................................42

*Speer v. UCOR LLC*,
    2023 WL 7305037 (E.D. Tenn. Nov. 6, 2023) ...................................1, 16, 21, 24

*Stacker v. IntelliSearch, LLC*,
    2021 WL 2646444 (D. Kan. June 28, 2021)...................................................45

*Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006) ..........................................................................42

*Tagore v. United States*,
    735 F.3d 324 (5th Cir. 2013) ..........................................................................15

*Together Emps. v. Mass Gen. Brigham Inc.*,
    573 F. Supp. 3d 412 (D. Mass. 2021) .............................................................25

*US Airways Inc. v. Barnett*,
    535 U.S. 391 (2002)........................................................................................21

*Vandi Zande v. State of Wis. Dep't of Admin.*,
    44 F.3d 538 (7th Cir. 1995) ........................................................................28

*Vinning-El v. Evans*,
    657 F.3d 591 (7th Cir. 2011) ......................................................................18

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................ passim

*Warren v. Reserve Fund, Inc.*,
    728 F.2d 741 (5th Cir. 1984) ......................................................................30

*Williams v. Bristol-Myers Squibb Co.*,
    2023 U.S. Dist. LEXIS 226112 (D.N.J. Dec. 18, 2023)....................1, 24

**STATUTES AND RULES**

42 U.S.C. § 12102................................................................................................19

42 U.S.C. § 12112(b)(5)(A).................................................................................19

42 U.S.C. § 12182(b)(3).......................................................................................36

42 U.S.C. § 1981a(b)(3)(D)..................................................................................43

42 U.S.C. § 2000e-5(g) ................................................................................ passim

42 U.S.C. § 2000e-5(k)........................................................................................43

Fed. R. Civ. P. 23........................................................................................ passim

## INTRODUCTION

The COVID-19 pandemic is over.  United Airlines no longer has any vaccination requirement, and the accommodations that were in place for unvaccinated employees at the height of the pandemic have long since ended.  Nevertheless, the Plaintiffs in this case continue to insist that United must be punished for the steps it took – during a period of extreme uncertainty, when hundreds of Americans were dying every day – to try to protect its employees.  To that end, they want to certify a sprawling, complex, multi-part class covering all employees in a diverse array of jobs who (a) went on unpaid leave and declined alternative job options; (b) went on unpaid leave but then accepted an alternative job; (c) received an alternative accommodation and were never put on leave at all; (d) were denied an exemption and resigned or were terminated; and/or (e) chose to get vaccinated.  Their proposed class raises an amalgamation of Title VII claims and ADA claims and seeks a range of monetary and injunctive relief.

Such a class would be truly unprecedented.  In the twenty-five years since the Fifth Circuit's watershed decision in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), the court of appeals has not upheld class certification in any case against a private employer under Title VII or the ADA.  In fact, the Fifth Circuit has *never* upheld certification of such a class pursuing "failure to accommodate" claims under those statutes.  And in the last two years, other federal courts have expressly rejected class treatment in similar cases involving challenges to employers' vaccine policies.  *See, e.g.*, *O'Hailpin v. Hawaiian Airlines, Inc.*, 2023 WL 8600498, at *1 (D. Haw. Dec. 12, 2023) (Title VII and ADA claims against an airline that denied almost all exemptions from its vaccine policy).[1]

---

[1]     *Ellison v. Inova Health Care Servs.*, 2023 WL 6038016, at *12 (E.D. Va. Sept. 14, 2023); *Speer v. UCOR LLC*, 2023 WL 7305037, at *11 (E.D. Tenn. Nov. 6, 2023); *Williams v. Bristol-Myers Squibb Co.*, 2023 U.S. Dist. LEXIS 226112 at *11 (D.N.J. Dec. 18, 2023) (App. 4587).

1

This Court should do the same. Every substantive element of Plaintiffs' religious and disability claims – *i.e.* sincere religious belief or disability, adverse action, unreasonableness of accommodations, no undue hardship, damages, and so on – requires some degree of individualized inquiry. As a result, Plaintiffs cannot satisfy even the threshold requirements under Rule 23(a). *See infra* Part I. Moreover, their proposed (b)(2) class, which seeks monetary and injunctive relief that is inherently individualized, is untenable under governing precedent, including *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). *See infra* Part II. And their (b)(3) sub-classes likewise fail to meet predominance and superiority requirements. *See infra* Part III..

Rather than try to explain how the elements of their claims could be litigated on a mass basis, either legally or practically, Plaintiffs instead focus on the notion that United enacted "uniform," "harsh," and "coercive" policies. That is not so, but even if it were, it would not absolve Plaintiffs of the need to carry their various burdens under Rule 23 and Fifth Circuit precedent (which they either ignore or mischaracterize). As this Court has explained, "even when multiple people are wronged by the same party, they must prove that litigating their claims via class action will serve" the interests of "efficiency and economy of litigation." *Greathouse v. Capital Plus Fin., LLC*, 2023 WL 5746927, at *1 (N.D. Tex. Sept. 6, 2023). So the question here is not whether United's COVID-19 vaccine policy accommodations were reasonable or coercive, fair or discriminatory, wise or unwise. The only question is whether this matter could be properly litigated as a class action. As shown in detail below, there is no way that a class proceeding could manage the multitude of factual variations in this case, protect the interests of absent class members, and guarantee United's statutory and constitutional rights to present all of its defenses. Hence, this Court should deny class certification and direct the parties to propose an efficient and prompt schedule for the litigation of the remaining Plaintiffs' individual claims.

## FACTUAL BACKGROUND

Plaintiffs contend that – in response to the COVID-19 pandemic – United adopted a sweeping, universal policy, devoid of any nuance or individualized considerations, to compel vaccinations. They claim that all vaccine-related decisions were driven by United's CEO, Scott Kirby, who supposedly harbors animus toward a multitude of different religions (as well as medical conditions). *See* ECF No. 239 ("Pl. Br.") at 1, 4-6, 8, 20, 34. Pursuant to a "marketing" plan, Plaintiffs argue, the company made categorical determinations about all employees who asked for a RAP, treating them as an undifferentiated mass, and offering only one "blanket" accommodation (unpaid leave) to "every" employee. *Id.* at 1, 15-18. As a result, they say, all employees were similarly-situated, and all suffered the same or similar harms. *Id.* at 28-30.

Virtually every aspect of Plaintiffs' version of events is contested by United. Plaintiffs are mischaracterizing and/or ignoring both extensive witness testimony and the huge documentary record.[2] But perhaps more importantly for present purposes, many of Plaintiffs' allegations – especially with respect to animus and United's supposed motives for its policies – are not relevant to whether it is appropriate to certify a class. Indeed, much of Plaintiffs' motion reads more like a request for summary judgment than for class certification. And on the factual issues that are relevant – to questions such as commonality and typicality – Plaintiffs gloss over a multitude of important details. They obscure the complexity, variability, and temporal evolution of United's policies and the decisions it made pursuant to those policies. The real story is much more complicated than Plaintiffs suggest.

---

[2]     In the sections below, we highlight a handful of the more egregious examples of Plaintiffs' misrepresentations of the factual record. United's Appendix provides a detailed index to Plaintiffs' factual allegations, summarizing the specific record cites that disprove or rebut each of those claims. *See* App. 82-115.

A.      **United's Vaccine Policy**

On August 6, 2021, following the deaths of dozens of United employees from COVID-19, United announced it would require its U.S.-based employees to be vaccinated by late September. App. 1486.  This decision was *not* made by Scott Kirby alone.  At least 15 different United executives, leaders, and managers were part of the decision-making process, which extended over the better part of a year.  App. 2345, 2273; *see also* Pl. Br. at 4 (noting that vaccine requirement was still being debated in July 2021).  United also consulted with outside medical experts at the Cleveland Clinic and the CDC, among others.  App. 1626, 2225-27.  It ultimately concluded that vaccination was necessary for safety reasons.[3]  App. 1473, 1480-85, 1488.

Plaintiffs suggest that the timing of United's decision to adopt a vaccine requirement was due to a desire to "receive[] accolades" or be an "early mover" or for "marketing" purposes.  Pl. Br. at 5.  That is not so.  As United's witnesses testified, several United employees died from COVID-19 in late July 2021, and so the company saw an immediate and urgent need to act.  App. 789-90, 399-400, 405, 2261.

---

[3]      Plaintiffs have said that they are not challenging United's decision to implement a vaccine requirement, acknowledging the policy reflects a "business judgment" that United was entitled to make.  App. 1180. Nevertheless, Plaintiffs have repeatedly questioned the need for vaccination, suggesting that there was no real safety justification. Pl. Br. at 6-8.  Each of their objections is unfounded.  For example, they ask why the policy did not apply to customers, vendors, and other third parties.  Pl. Br. at 6-7.  The record shows that United's vaccine policy addressed its own employees because the airline had a heightened responsibility to protect its own employees.  App. 400, 406-407, 412, 417, 518, 523, 525.  Moreover, United understood that a vaccine policy applicable only to its own employees would still be effective even if they interacted with some unvaccinated individuals because the vaccine reduced the risk of hospitalization and death.  App. 1481.  Likewise, Plaintiffs cite the fact that air filtration systems reduced the risk of transmission on board planes. Pl. Br. at 7.  They ignore United witnesses' explanation that employees spend a lot of time in other locations – such as airports, crew vans, and hotels – where no such protection exists. App. 856-61.  Plaintiffs even dispute whether COVID-19 vaccines reduced deaths, Pl. Br. at 6, despite the fact that it is now well-established that vaccines were very effective in that regard. App. 1342-43, 1358.  And in any event, the inability to craft a perfect policy does not preclude an employer from crafting a policy that it deems useful in the usual run of circumstances.

United's vaccine policy was successful in dramatically reducing the company's COVID death rate.  In fact, so far as it is aware, United did not lose any fully vaccinated employees to COVID in the months after the policy was implemented.  App. 1475.  Tragically, some unvaccinated United employees did die during that same period of time.  App. 1478.

**B.      Employees' Reasons for Seeking Accommodations**

Plaintiffs allege that United "said nothing about . . . accommodations" when it announced its vaccine policy.  Pl. Br. at 5.  That is incorrect.  United was well aware that some of its employees had sincere religious beliefs and/or medical complications that precluded a vaccine.  Contrary to Plaintiffs' characterization, United's core company values include deep respect for religious beliefs, and it has a long-standing, robust practice and policy of accommodating both religion and disability.  App. 2269-72 (Working Together Guidelines Excerpt, April 2020); App. 1086-87.  Thus, in its initial policy announcement regarding the new vaccine requirement, United explicitly stated it would accommodate employees who could not be vaccinated for religious or medical reasons.  App. 1490-91.

However, while some employees had religious or medical reasons for avoiding vaccinations, other employees opposed the COVID-19 vaccine for different reasons.  Some employees objected to mandatory imposition of medical treatment (especially by the government), or had other political or ideological views opposing vaccination.  App. 4348 (G.D. RAP Statement); 4365 (J.A. Rap Statement).  Some doubted that the vaccines would be effective, or even might be harmful.  App. 4306 (A.H. Rap Statement).  And then there were those who had more esoteric concerns, such as the notion that the vaccines altered human DNA or were part of some nefarious government plot to kill Americans.  App. 1292, 1310-13, 1315 (complaint in *Anderson, et al. v. United Airlines*, Case 1:23-cv-00989 ¶¶ 96, 166-168, 179 (Ill. Cir. Ct. Feb. 17, 2023)).

Because people had such a wide range of reasons for opposing the COVID-19 vaccine, United needed to distinguish between requests warranting accommodation and those that did not.[4] This made the process more difficult than the comparatively straightforward review of religious accommodation requests that do not have any alternative secular basis, such as asking to wear religious garments.  App. 131 at ¶ 5.  Moreover, some employees with secular objections to vaccines knew those reasons are not legally protected, and thus they had an incentive to cast their objections in religious or medical terms.  As a March 2022 Pew Research study noted, two-thirds of Americans – including large majorities of Protestants and Catholics from both political parties – believe most people claiming a religious objection "are just using religion as an excuse to avoid the vaccine."  App. 1429, 1433; *see also* App. 472 (putative class member acknowledging that some people who submitted a religious request may not be "telling the truth").

These concerns were the motivation for Mr. Kirby's comments about the exemption procedure during a meeting with employees.  App. 118 at ¶ 10.  Plaintiffs continue to rely heavily on Mr. Kirby's statement that any employee who "all of a sudden decided 'I'm really religious'" would be "putting your job on the line . . . ."  Pl. Br. at 8 (quoting ECF No. 7 at 11).  While Plaintiffs characterize this as proof of contempt for religious beliefs, Mr. Kirby was actually "saying that employees should not lie or pretend to be religious in order to apply for an exemption." App. 118 at ¶ 10.  As he explains, "[d]oing so is not just unethical; it is insulting to our many employees who have legitimate and strongly-held religious beliefs."  *Id.*; *see also* App. 229-30 (plaintiff testimony acknowledging it is wrong to lie about religion to get exemption).

---

[4]     United received a number of exemption requests that had no plausible religious or disability basis.  *See, e.g.* App. 4-39, 50-59.  Some of these requests were highly individualized, to say the least.  *See* App. 4321 (RAP request seeking exemption as member of "Church of the Holy Cow" because he had "herd immunity.").  *See also infra* Part I.A.1. (discussing lack of commonality with respect to sincerity of religious beliefs).

## C.    The Process of Reviewing Accommodation Requests

Contrary to Plaintiffs' characterizations, United did not create some "purpose[ful]ly vague" or "intentionally complicated" mechanism to handle exemption requests.  Pl. Br. at 11-12. Rather, it relied on an existing human resources system – Help Hub – that had been in place for years and was familiar to United employees.[5]  App. 766-69, 1345, 1636, 2325.  Employees were given more than three full weeks to submit an accommodation request.[6]  App. 1002-03, 1486.

The vast majority of United's employees had no difficulty navigating this supposedly "confusing" system, as evidenced by the fact that United received a total of 5,885 accommodation requests.  App. 4305; *see infra* at 8.  United individually reviewed and made a separate decision on every request.  App. 2176, 4305.  This was an enormous undertaking.  More than 3,000 employees, including dozens of managers, from 17 different departments were involved in the implementation of United's COVID-19 vaccination policy.[7]  App. 135 at ¶ 26.  Reviewers had to account for different employee job categories, different reasons for requesting exemptions, individualized degree of compliance with the process requirements, and so on.  The following chart summarizes some of the relevant statistics:

---

[5]    Plaintiffs allege that Help Hub forced employees to select only a religious or a medical basis for requesting an accommodation.  Pl. Br. at 12.  In fact, employees were entitled to submit under both grounds.  App. 1021, 1605.

[6]    Plaintiffs complain that this was an "arbitrary" deadline and that United extended it for medical requests but not for religious requests.  They ignore United's explanation of why it had a deadline and why that deadline was reasonable.  App. 800-801.  They also ignore that the reason United allowed extensions of the medical deadline was to accommodate employees who were recovering from COVID-19 and thus had to wait to get vaccinated.  App. 65, 1024, 1244 at ¶ 7.

[7]    A good example of how Plaintiffs ignore witness testimony is their claim that "United cut Pat Baylis – the Corporate Medical Director – out of the decisions regarding employees' medical exemption requests," and instead left the decisions to "HR and in-house counsel."  Pl. Br. at 14-15.  Ms. Baylis rejected that characterization, testifying that Plaintiffs are just misinterpreting an email she sent.  App. 151-155.  As she explained, the HR department had its own medical staff, and they were the ones who made the relevant decisions.  *Id.*

7



App. 1697-1708, 1711, 2188-2194, 2260, 2364-2372, 4305.

Plaintiffs insist that United imposed a "high bar" for requests and said that only a "small percentage of RAPs" would be granted. Pl. Br. at 8.[8]  That is not what happened.  To the contrary, United took a generous approach, as evidenced by the fact that it approved a substantial majority of the timely requests, including 75 percent of the religious requests and 51 percent of the medical requests – approving, overall, 69 percent of all requests.  App. 4305.  In approving those requests, United did *not* require "sufficient evidence to satisfy the legal requirements of Title VII or the ADA."  App. 131 at ¶ 6, 1244 at ¶ 6.  More specifically, contrary to Plaintiffs' assertions, Pl. Br. at 38 n.30, United did not make any determination about whether any particular request met the legal threshold for a "sincere" religious belief.  App. 992, 1011.  Likewise, United accepted essentially every plausible medical excuse, even if it did not rise to the level of a disability.  App. 50-59.  United did, however, deny requests when employees failed to submit on time or otherwise failed to comply with RAP procedures.  App. 64.

## D.    The Accommodations Offered by United

United considered a number of options for accommodating employees who were approved for an exemption.  App. 1236-37 at ¶¶ 5-8, 1247 at ¶¶ 17-19.  Social distancing was generally infeasible in United's workplace, and "self-reporting" of illness was unworkable due to the lag time between infection and the onset of symptoms (meaning that people would be coming to work and unknowingly spreading the virus).  App. 552, 1140, 1145-46, 1166-67.  United also considered masking and testing for various job categories.  *Id.*; App. 1236-37 at ¶¶ 5-6.

---

[8]    According to Plaintiffs, it was the CEO, Scott Kirby, who insisted on a "high bar" for accommodation.  Pl. Br. at 8, 26.  Again, that is not so.  The record is very clear that Mr. Kirby had almost no involvement in any of the decisions about how the accommodation requests would be processed, what criteria would be used, or what accommodations would be offered.  App. 117 at ¶ 7, 395-398.  To the extent Mr. Kirby offered any suggestions on particular forms of accommodations, Plaintiffs acknowledge those suggestions were not adopted.  Pl. Br. at 20.

Plaintiffs say that United ultimately imposed a "universal" accommodation of unpaid leave for everyone.  Pl. Br. at 15-16.  But that is not what actually occurred.  Rather, United decided to provide different accommodations to different groups of employees based on different levels of health-and-safety risks as well as different operational complications.  App. 1245-46 at ¶¶ 10-13, 1606, 1609, 1619.  Plaintiffs point to announcements stating that all accommodated employees would be put on unpaid leave, but ignore the contemporaneous explanation that for many employees, United was working to develop alternative masking and testing protocols.[9]  App. 1161. After United voluntarily agreed to extend the date for the start of unpaid leave to October 15, 2021, it completed plans for masking and testing, which were implemented on October 18, 2021.  Thus, none of the non-customer-facing employees were ever placed on unpaid leave.  App. 1260 at ¶ 4.

Of course, Plaintiffs have a litany of complaints about United's masking and testing rules. Pl. Br. at 18-21.  For example, they say that employees were forced to wear a "respirator" – conjuring up dystopian images of employees working in gas masks –  when in fact the rules just required a KN95 mask.  App. 1607, 1625.  They also assert that United failed to provide "training" about how to wear a mask,  Pl. Br. at 20, despite the fact that (a) no such training was required (or necessary) and (b) United nonetheless did provide training.  App. 567-68, 570.  Likewise, Plaintiffs claim that United terminated employees subject to masking-and-testing "for just two mistakes," Pl. Br. at 36, ignoring the fact that no employee with a RAP was ever terminated on this ground. Plaintiffs also admit that the supposed "harm" varied widely, from being forced to eat alone outside, to harassment, to alleged breathing problems.  Pl. Br. at 18-21.

---

[9]     Like any corporation engaged in a major initiative, United obviously considered various options that it never implemented.  App. 119 at ¶ 14.  Moreover, as this Court has noted, telling an employee that he will be placed on temporary unpaid leave is not actionable if the employee is never actually placed on leave.  ECF No. 231 at 8.

Other employees received different accommodations.  For customer service representatives (CSRs), United created temporary non-customer-facing positions.  App. 1260-61 at ¶¶ 6, 8. Likewise, dozens of employees in non-customer-facing, non-operational roles were offered the opportunity to work remotely.  App. 1606.

For flight crew – pilots and flight attendants – United initially offered temporary unpaid leave as an accommodation.  (Prior to the pandemic, leave had been a common accommodation for employees who are temporarily unable to safely perform their jobs. App. 1246 at ¶ 15.)  A total of 376 pilots and 881 flight attendants were placed on unpaid leave, beginning on November 16, 2021.  App. 1614, 4306-4441.

Plaintiffs characterize this as a monolithic policy with monolithic consequences for all accommodated flight crew employees, but once again, that is not so.  There were multiple critical variations, even just among flight crew employees. First, employees who qualified for medical leave had the option to use paid sick leave.  App. 2354.  Second, any employee who had pre-scheduled vacation during the period of unpaid leave was entitled to take (and be paid for) that time.  App. 125 at ¶ 9, 138-39 at ¶¶ 9-10.  Third – and most importantly – every employee who was placed on unpaid leave had the option to accept a temporary transfer to any available non-customer-facing job for which the employee was qualified.  App. 132-33 at ¶ 13, 1612.

When United informed accommodated employees about this option to accept an alternative position, there were more than 2,000 open positions, covering a huge range of jobs.  App. 132-33 at ¶¶ 10, 14.  These available jobs varied widely in terms of location, pay, qualifications, and the like.  *Id.*  Hence, the attractiveness of these jobs to accommodated employees would necessarily depend on their personal circumstances.  For example, virtually every flight attendant on unpaid leave had access to multiple alternative jobs that paid at least as much, if not more, than their

maximum pay.  *Id.* at ¶ 11.  Most pilots, by contrast, would have taken a temporary pay cut unless they had special skills or experience in other areas.  *Id.* at ¶ 17.  But ultimately, everyone on unpaid leave could have kept working for United in some capacity if they wished to do so.

In addition to making some *ad hoc* offers to employees with unique skills, United created a special application link for RAP employees on leave.  App. 132 at ¶ 8, 1612.  United eventually received 925 inquiries about alternative positions.  Many employees declined to finish the application process, and others were rejected because they applied for jobs for which they were unqualified (or because they used the external website and so could not be identified as a RAP candidate).  Nevertheless, more than 100 employees on a RAP received an offer.  App. 134 at ¶ 20.  United also lifted restrictions that would have otherwise prohibited employees from pursuing outside employment while on unpaid leave.  App. 794.  At least some employees on unpaid leave chose to avail themselves of those opportunities.  App. 134 at ¶ 20.  Others chose not to work at all or make any effort to find work.  App. 133-34 at ¶ 18, 290-91, 512, 714, 731-32.

### E.    The End of the Pandemic

United initially announced that accommodated employees would remain on unpaid leave until the pandemic "meaningfully recedes," which it later defined in terms of specific CDC metrics.  App. 1608.  But with the rise of less deadly variants in early 2022, United concluded it could safely return employees to work even earlier.  App. 1615.  Hence, on March 10, 2022, United informed employees on leave that they would be permitted to return to their regular jobs beginning on March 28, 2022.  *Id*.  Virtually all employees chose to return to work.  Since then, United has rescinded all of its COVID vaccine requirements and has no plans to re-implement them.  ECF No. 144 at 8.  Indeed, United has entered into a new agreement with its pilots that precludes imposition of any such requirements in the future.  App. 4304.

## STANDARD OF REVIEW

In *Miller v. Grand Canyon University, LLC*, 540 F. Supp.3d 625 (N.D. Tex. 2023), this Court summarized the general standards that apply to motions for class certification under Rule 23(b)(2) or 23(b)(3).  As it explained, "[c]lass actions are 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Id.* at 631 (quoting *Dukes*, 564 U.S. at 348).  A class action "fundamentally alters" the rights of "present and absent members," and improperly certified class actions could deprive the defendant of its due-process right to raise "individualized" defenses. *Chavez v. Plan Benefit Servs., Inc*., 957 F.3d 542, 546-47 (5th Cir. 2020).  That is a particular concern under Title VII, which bars relief to employees who did not suffer discrimination.  42 U.S.C. § 2000e-5(g)(2).

Accordingly, a court must enforce the requirements of Rule 23 "vigorously."  *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020).  More specifically, a court assessing certification must require the plaintiff to "affirmatively demonstrate" compliance with each element of Rule 23(a), plus the applicable requirements of Rule 23(b)(2) or Rule 23 (b)(3).  *Dukes*, 564 U.S. at 350; *see also, e.g., Flecha*, 946 F.3d at 768 ("courts must certify class actions based on proof, not presumptions"); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (plaintiff "bear[s] the burden of proof to establish . . . the requirements of Rule 23.").  A certification motion is subject to a "rigorous analysis," requiring the trial court "to probe behind the pleadings" to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination."  *Chavez*, 957 F.3d at 544, 546.  At the same time, however, the Rule 23 inquiry is solely about the propriety of class treatment, not the ultimate merits.  Thus, if any prerequisite under Rule 23 is absent, a court must deny class certification even if it believes that any individual plaintiffs might "have legitimate grievances." *Greathouse v.*, 2023 WL 5746927, at *1.

13

**ARGUMENT**

Class certification is not justified in this case.  In Part I below, we show that Plaintiffs cannot clear even the initial hurdles in Rule 23(a).  Next, in Part II, we address Plaintiffs' proposed (b)(2) class, explaining that their demand for monetary relief forecloses any such class, and that even their injunctive relief proposal, standing alone, is unjustified.  In Part III, we demonstrate that Plaintiffs' two proposed (b)(3) subclasses are both inadequate for multiple reasons, including lack of predominance and superiority.  Finally, in Part IV, we explain that even if Plaintiffs were entitled to class certification, any such class could not include any individuals over whom this Court lacks personal jurisdiction.

**I.      Plaintiffs Do Not Satisfy the Requirements of Rule 23(a).**

Rule 23(a) requires proof of numerosity, commonality, typicality, and adequacy of representation.  *See* Fed. R. Civ. P. 23(a).  In this case, Plaintiffs stumble over two of those four elements:  commonality and typicality.

**A.      Plaintiffs Fail to Establish Commonality.**

Commonality requires proof of "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A common question is one that is "of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  Thus, what matters "is not the raising of common 'questions' . . . but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id*.  By contrast, "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member."  *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 n.25 (5th Cir. 2021); *see also Dukes*, 564 U.S. at 350 ("Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.").

14

Because this test focuses on issues that are "central to the validity of each one of the claims," courts must analyze commonality through the lens of "the elements of the underlying cause of action." *Flecha*, 946 F.3d at 766-67. Here, the elements of Plaintiffs' "failure to accommodate" claims under Title VII and the ADA give rise to multiple "crucial questions," *Miller*, 540 F. Supp. 3d at 634, including (a) whether each putative class member is covered under Title VII (*i.e.* whether they have a "sincere religious belief") or the ADA (whether they have a "disability"); (b) whether each person was denied a "reasonable accommodation"; (c) whether any cognizable "adverse action" was taken against each individual; and (d) whether the accommodations sought would have imposed an "undue hardship" on United. *See* ECF Nos. 24-25, 41-42, 77-78, 209, 215, 244. Common answers are not possible for any of these questions.

### 1. *Coverage Under Title VII: Sincere Religious Belief is an Individualized Inquiry.*

To bring a claim for failure to accommodate under Title VII, a putative class member must have a sincere belief that is religious in nature and conflicts with United's COVID vaccine requirement. *See Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013); *Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013). Indeed, "[t]he sincerity of a plaintiff's belief in a particular religious practice is an essential part of the plaintiff's prima facie case under . . . Title VII[.]" *Tagore*, 735 F.3d at 328.

Like most questions that turn on credibility and state of mind, whether a plaintiff has a sincere religious belief is a highly individualized issue. *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) ("The sincerity of a person's religious belief is a question of fact unique to each case" and must "focus[ ] upon the individual's motivation."); *see also Ackerman v. Washington*, 16 F.4th 170, 180 (6th Cir. 2021) ("[S]incerity prong . . . requires courts to determine whether the line drawn by the plaintiff . . . reflects an honest conviction.").

15

As the Fifth Circuit recently held, individualized questions about sincerity of belief cannot be resolved on a class-wide basis. *Braidwood Management, Inc. v. EEOC* was a case brought by two employers seeking declaratory relief that they were entitled to a religious exemption from Title VII. 70 F.4th 914, 920-21 (5th Cir. 2023). The trial court certified two classes, including a class of "religious-business-type employers." *Id.* at 923. In doing so, it rejected the government's commonality objection, concluding that "fact-specific inquiries regarding the sincerity of belief do not prevent certification" because "[t]he sincerity inquiry" is "not an exacting one." *Id.* at 934.

The Fifth Circuit reversed, explaining that "the fact that a review of religious sincerity may not be demanding does not mean it is a nonexistent requirement or non-essential for Rule 23 purposes." *Id.* at 935. The court thus held that the sincerity "determination can be made *only on a case-by-case basis and not at [a higher] level of abstraction at the class-certification stage*." *Id.* (emphasis added). It further stated that the class definitions at issue were improperly "based on the class members' state of mind," which is "a subjective factor." *Id.*[10]

Plaintiffs entirely ignore this recent and controlling precedent. Yet *Braidwood* forecloses their position. Plaintiffs have not even tried to establish that all of the putative class members had a "sincere" religious belief and, especially in light of *Braidwood*, the Court cannot just presume that they did. Moreover, the record provides ample basis to question the sincerity of at least some putative class members:

---

[10]     A number of other courts have rejected certification of putative classes that depend on or incorporate some element of religious sincerity. *See, e.g.*, *Ellison*, 2023 WL 6038016, at *11 ("The Court notes that, given the personal nature of religious beliefs, Plaintiffs' claims do not lend themselves to common resolution."); *Speer*, 2023 WL 7305037, at *9 ("Even if all class members did hold the same beliefs, a factfinder still would have to determine the sincerity of each person's beliefs. This requires an in depth look at each class member's background, including the recency of belief and how strictly the class member has adhered to the belief."); *Haliye v. Celestica Corp.*, 2009 WL 1653528, at *8 (D. Minn. June 10, 2009) (Title VII religious-accommodation claim "requires an individualized inquiry into whether the plaintiff has a bona fide religious belief [and] whether the plaintiff informed her employer of her belief.").

(a)    *Written RAP submissions.*  Many employees emphasized safety or policy objections in their exemption requests or mentioned religious belief only in passing (if at all).[11]  Based on those statements, a jury could conclude some of these employees did not have a sincere religious reason for their request.

(b)    *Testimony from putative class members.*  United deposed a sample of just five putative class members, but even among that small group, there was evidence that some may not have had a sincere religious reason for refusing vaccination.  For example, one pilot who received a religious RAP testified that she decided against the vaccine because she perceived "[v]ery serious safety risks."  App. 328, 332.  In fact, she had planned to take the vaccine but then cancelled as a result of "information from the CDC about negative [safety] side effects." App. 349-350 362.[12]

(c)    *Examples of coaching or sham third party letters.*  Submission of purchased or mass-produced materials to support a vaccine exemption request also tends to undermine sincerity. *See, e.g.*, *Gardner-Alfred v. Fed. Rsrv. Bank*, 2023 WL 6214863, at *12 (S.D.N.Y. Sept. 25, 2023) (finding lack of sincerity based in part on sham "'affidavit' that is available to anyone who would pay").  In this case, United could introduce evidence at trial to show that at least 180 employees appear to have submitted RAP statements and/or verifications of belief from on-line entities that

---

[11]    Table 2 in the Appendix is an index to more than 200 examples of RAP submissions that incorporate potentially non-religious or insincere articulations of religious reasons for requesting an exemption. App. 4-39.  Employees' reasons included health or safety concerns, constitutional or policy objections, mistrust of pharmaceutical companies and/or the government, conspiracy theories, and various other claims.  *Id.*; *see also supra* Part I.A.1.  Some of these requests were approved by United (often after giving the employee further chances to submit a religious basis for their request) and others were denied.  The latter group is included because they would be part of Plaintiffs' proposed (b)(2) class.  *See* Pl. Br. at 23.

[12]    The lawsuit filed by a group of 30 putative class members in Chicago also emphasizes various non-religious reasons for opposing vaccines.  *Anderson*, Case 1:23-cv-00989 (N.D. Ill. Feb. 17, 2023), ECF No. 1–1 ¶ 96 (alleging COVID vaccines "are gene-altering experimental therapies") (App. 1292); ¶ 105 (the "vaccines are ineffective, dangerous and . . . deadly[.]") (App. 1294).

gave out such materials to anyone who asked.  App. 40-49 (Table 3).  Other employees appear to have copied materials from each other or from other sources, which also raises questions about the existence of a sincere belief.  *Id*.

(d)    *Examples of selective adherence.*  United can also show that some employees who claim to have a sincere religious objection to the COVID vaccine have not adhered to such beliefs in analogous contexts.  *Ackerman*, 16 F.4th at 181 ("Whether [employees] have 'wavered in their dedication' also appears to be relevant to the sincerity analysis.").  This would include employees who assert a religious objection to COVID vaccines because of fetal stem cell testing, but not to other treatments that use the same tests.[13]  *Shields v. Main Line Hosps., Inc*., 2023 WL 7129953, at *5 (E.D. Pa. Oct. 27, 2023) (use of "medications that were tested on fetal tissue . . . goes to the sincerity of [plaintiff's beliefs], which is a question of fact").  Several employees admit to inconsistent practices in this regard. App. 188-189, 246-248, 341, 626-627.

(e)    *Deviation from organizational tenets.*  Although "sincerity rather than orthodoxy is the touchstone," a factfinder is "entitled to give *some* consideration to an organization's tenets" since "the more a given person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held."  *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011).  Here, discovery showed that many of the churches attended by the class members do not object to COVID vaccination by their congregants.  App. 356, 358, 452, 1069, 1130.  This is yet another reason to question sincerity for some putative class members.

---

[13]    A fetal-cell or abortion-related objection to the COVID vaccine is also insufficient unless the individual's anti-abortion views stem from religion, which needs to be individually established. *Ellison*, 2023 WL 6038016, at *7, *11–12; *Aliano v. Township of Maplewood*, 2023 WL 4398493, at *10 (D. N.J. July 7, 2023).  In this case, one pilot who submitted a religious accommodation admitted that abortion "go[es] against [his] personal beliefs[,] not religious" beliefs.  App. 4340.  Dozens of other employees reference fetal cells or abortion without tying the issue to religion. App. 4-39.

## 2.      *Coverage Under the ADA:  Disability is an Individualized Question.*

Plaintiffs face similar commonality problems with their ADA failure-to-accommodate claims.  Under the ADA, a plaintiff must show, *inter alia*, that he has a "disability," which turns on whether he suffers from a qualifying "impairment" and whether such impairment "substantially limits one or more major life activity." 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).[14]  The ADA "*requires an individualized assessment* of the impact of the impairment on an individual's major life activities." *Mueck v. LaGrange Acquisitions, L.P.*, 75 F.4th 469, 479 (5th Cir. 2023) (emphasis added). Because existence of a "disability" is an individualized inquiry, ADA claims cannot be resolved on a class-wide basis. *See Chandler v. City of Dallas*, 2 F.3d 1385, 1396 (5th Cir. 1993) (determinations "of whether an individual is handicapped [are] necessarily individualized inquiries" for which "class certification and class relief [are] inappropriate") (applying Rehabilitation Act standards that correspond to ADA).[15]

Just as the Court cannot assume sincerity of religious belief for all putative class members, it cannot assume that individuals who sought a medical RAP have a qualifying disability – or that any such disability is one that would conflict with receiving a COVID-19 vaccine – but rather would need to engage in a person-by-person review.  Here, the record confirms that at least some members of the putative class would not qualify.  For example:

---

[14]      Moreover, when the claim is one of failure to accommodate a disability, the disability must be one that conflicts with the job requirement for which the employee seeks an exemption or accommodation.  *See* 42 U.S.C. § 12112(b)(5)(A); *Hughes v. Terminix Pest Control, Inc.*, 2023 WL 5015314, at *3 (E.D. La. Aug. 7, 2023*) (dismissing ADA accommodation claim where alleged disability was unrelated to vaccine policy).

[15]      *Accord Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999) (rejecting "proposed class description defin[ing] its membership in part as those [individuals] who were disabled" because "[t]he district court would have had to conduct individualized inquiries to determine whether a potential class member met the statutory definition") (citing *Chandler*); *Hohider v. UPS*, 574 F.3d 169, 191-96 (3d Cir. 2009) (rejecting certification of ADA reasonable accommodation case); *O'Hailpin*, 2023 WL 8600498, at *13-17.

(a)   *Prior COVID or "natural immunity."*  At least 300 employees submitted RAP requests alleging that they had already had COVID and/or had "natural immunity."  App. 60-63 (Table 5).  A prior COVID infection is often not even an existing medical condition, let alone a disability within the meaning of the ADA.  *See Ludstrom v. Contra Costa Health Servs.*, 2022 WL 17330842, at *5 (N.D. Cal. Nov. 29, 2022) ("COVID-19 infection is not a disability.").[16]  Indeed, the Plaintiffs and putative class members concede this point.  App. 67, 1134-1135.

(b)   *Jarrad Rains.*  Two named Plaintiffs in this case have asserted ADA claims, one of whom is Jarrad Rains.  While Mr. Rains' claim was dismissed as untimely, ECF No. 231 at 24, it illustrates the individualized nature of the inquiry. Plaintiffs allege in their complaint that Mr. Rains is disabled because of "allergies" and a "heart condition." ECF No. 156 ¶¶ 161 163.  But in discovery, Mr. Rains conceded that was inaccurate; he does not assert any "allergic reaction as a basis for [his] medical RAP" or ADA claims. App. 938-940. Moreover, Mr. Rains' testimony undermined the idea that his heart condition impairs any of his life activities.  App. 943-49.

(c)   *D.J. Jonas.*  Ms. Jonas, the other named Plaintiff asserting an ADA claim, admitted that neither she nor her doctor made any effort to verify that her claimed allergies would conflict with any ingredient in the COVID vaccine.[17]  App. 619-622.  *See Slade v. Hershey Co*., 2011 WL 3159164 at *4 (M.D. Pa. July 26, 2011) ("[C]ourts repeatedly find no disability where plaintiff suffers an avoidable allergic reaction.").  Similar questions would exist for the more than 1,500 other putative class members who asked for a medical RAP.  App. 4305.

---

[16]   So-called "Long COVID" might be a disability, but "[a]n individualized assessment is necessary to determine whether the effects of a person's COVID or Long COVID substantially limit a major life activity." App. 1386-88.

[17]   Ms. Jonas claimed her egg allergy prevents vaccination but also admitted that she cannot identify any such allergen in the COVID vaccines, admitted she can eat baked goods that contain eggs, and could not explain why her reaction to the COVID vaccine—if it contained eggs—would differ. App. 618-20.

### 3.     *Reasonableness Requires an Individualized Assessment.*

As this Court has noted, "whether an accommodation is reasonable is a fact-specific inquiry." ECF No. 231 at 9.  "Questions of reasonableness are best left to the fact finder," and so there is no checklist of "what is or is not a 'reasonable' accommodation." *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990).   "What is reasonable for one employee might be unreasonable for an employee with different duties and responsibilities." *Speer*, 2023 WL 7305037, at *9 ("A factfinder would have to conduct an analysis of what would be a reasonable accommodation . . . for each employee"); *see also US Airways Inc. v. Barnett*, 535 U.S. 391, 405 (2002) (whether an accommodation is reasonable depends on "the particular facts" of a plaintiff's case).[18]   Accordingly, these are not questions that can be resolved on a class-wide basis. *O'Hailpin*, 2023 WL 8600498, at *9, 15 ("[W]hether a reasonable accommodation exists (that [the airline] could therefore be liable for failing to offer) is necessarily individualized, based on [among other things] the person's position and location").

Here, Plaintiffs have never articulated what specific "reasonable accommodation" they sought, let alone pointed to any evidence showing that every putative class member wanted the same accommodation.  Nor could they.  While some employees have suggested that masking would have been a reasonable option, others complain bitterly about that very same requirement. App. 67-72 (Table 8).   Because there was no common request, Plaintiffs point to the accommodations provided, asserting that United offered only "unpaid leave." Pl. Br. at 16.  The "common question," they say, is whether "universal" unpaid leave was reasonable. *Id.* at 27-28.

---

[18]     This inquiry often considers reasonableness from the employee's perspective. *Universal Mfg.*, 914 F.2d at 73.  However, the employer's perspective may be relevant as well. *See, e.g.*, *Barnett*, 535 U.S. at 401–02 (accounting for employer's needs and views).  In this analysis, we consider reasonableness primarily from the employee's perspective and address United's perspective as part of the undue-hardship analysis, *see infra* Part I.A.5.

There are multiple problems with that theory. *First*, many members of the putative class were never put on unpaid leave at all, and instead were accommodated with masking and testing or remote work. App. 1606, 1609, 1611, 1617; *see also supra* at 8 (detailing the number of employees who were accommodated in different ways). Among the masking and testing cohort, the reasonableness of those accommodations depends on a host of individualized facts, such as where the employee worked, what sort of mask they used and for how long, their personal reactions to wearing a mask (*i.e.* to what degree they could show it interfered with breathing), what sort of "harassment" they claim to have experienced, where they ate, and so on. *Compare* App. 262 (Castillo testimony) *with* App. 589, 606 (Jonas testimony).

*Second*, as to the group of employees who were placed on leave, the question of reasonableness would depend on various individualized factors:

(a)     *Alternative job options.* As described above, every person who was put on leave could have gotten a temporary alternative position with United. *See supra* at 11; App. 132-133 at ¶ 13. Depending on the particulars, the offer of an alternative job as a religious accommodation to a vaccine requirement can be reasonable under Title VII, even if it is a less "desirable position" and requires "the plaintiff 'to take a significant reduction in salary.'" *Horvath v. City of Leander*, 946 F.3d 787, 792 (5th Cir. 2020). As applied here, the reasonableness of any United employee's accommodation – unpaid leave *or* a temporary job – would depend on what alternative job options the employee had, how the pay compared to their regular compensation, where the jobs were located, and so on. A fact-finder might conclude that a temporary alternative assignment is reasonable for, say, a flight attendant who could work for the same (or more) pay near her home base, but not for a pilot who would have to travel to a distant base to work for less compensation. In any event, it is a highly individualized inquiry.

(b)   *Pay during leave*.  Although Plaintiffs invariably characterize the leave as "unpaid," that is not accurate.  Employees granted a medical RAP had the right under their CBA to draw on sick pay, which in some cases could have covered the entire period of leave.  App. 1233 at ¶ 18.  In addition, employees who had scheduled vacation during the leave period – including some named Plaintiffs – were paid for that time.  App.  138-39.  For employees who were paid, a jury could conclude that their accommodation was reasonable, even if it was unreasonable for others.

(c)   *Individual circumstances.*  Whether unpaid leave was reasonable for any person would depend on the details of his or her personal situation, including their current financial resources, whether there was another breadwinner in the family, potential outside earning opportunities during leave, and the like.  App. 1117.  Some flight attendants, for example, fly only part-time because they have other business interests.  App. 698-99, 867-68, 4465, 4503.  For at least those individuals, unpaid leave might be reasonable.  *See Moss v. Harris Cty.*, 851 F.3d 413, 418 (5th Cir. 2017) ("Time off, whether paid or unpaid, can be a reasonable accommodation.").

*Third*, Plaintiffs' (b)(2) class also includes employees who "submitted a request" but were denied, Pl. Br. at 23, which implicates additional individualized questions.  Some of them failed to comply with the deadline; others did not submit a third-party letter; still others refused to engage at all after applying.  App. 64 (Table 6).  Because "[a]n employee has a duty to cooperate" in the accommodation process, some of them may have forfeited their claims.  *Bruff v. N. Miss. Health Services*, 244 F.3d 495, 503 (5th Cir. 2001).  Nor is there any practical way to assess the reasonableness of United's decisions vis-à-vis those individuals on a collective basis. For example, a jury might conclude that the August 31 deadline was fine for most employees but not as to someone who had a good medical excuse.  *See Anderson*, 2023 WL 5721594, at *5 (requiring individualized allegations to support claim that United's deadline was "arbitrary").

23

4.      *Adverse Action Requires an Individualized Assessment.*

The need for individualized consideration of the "adverse action" element of the putative class members' claims in the (b)(2) and non-customer facing (b)(3) class is amply illustrated by this Court's recent Order applying *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023), to dismiss the claims of two of the three Plaintiffs who received a masking-and-testing accommodation. ECF No. 231 at 4-8. As the Court explained, whether a United employee who was never placed on unpaid leave and instead remained on the job suffered an "adverse action" depends on the details. If they only had to comply with masking and testing protocols, that does not clear "the *de minimis* threshold." *Id.* at 7. It may be different for others if they "lost responsibilities or were forced to change jobs." *Id.* at 8. The Plaintiffs tacitly concede this point, arguing in their recent motion to reconsider that whether there was any "adverse action" depends on a "fact-specific" inquiry. ECF No. 242 at 20. Such an inquiry is not consistent with class certification. Nor could the Court plausibly certify a class that would include individuals who have already been dismissed for lack of this essential element.

5.      *Undue Hardship Requires an Individualized Assessment.*

Like reasonableness, undue hardship "is a question of fact." *Universal Mfg.*, 914 F.2d at 74; *Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (test must be applied "in a manner that takes into account all relevant factors in the case at hand"). Plaintiffs ignore this issue entirely, but because undue hardship is an "inherently individualized question," this is yet another critical question that cannot be addressed on a class-wide basis. *Speer*, 2023 WL 7305037, at *7. *See also Williams*, 2023 U.S. Dist. LEXIS 226112, at *14 ("the Court would have to analyze . . . whether that [requested] accommodation as to that employee in that position would cause undue hardship to Defendant.") (App. 4583); *Haliye*, 2009 WL 1653528, at *8 (same).

Even if limiting the inquiry to employees who were placed on unpaid leave, there is no way to conduct an accurate class-wide analysis of whether any alternative "reasonable accommodations" – presumably masking and testing – would have caused an "undue hardship." Individualized factors relevant to hardship would include the following:

(a)     *Variations in testing capabilities in different airports.*  United was able to conduct some pre-departure testing at some of its seven large hubs, which are large facilities.  ECF No. 77 at 7-9.  By contrast, it would have been difficult, if not impossible, to conduct testing at smaller airports due to limited space and staff.  App. 316-18, 457, 458, 461, 916; *see also* App. 529-30.

(b)     *Availability of reserve crews.*  Only a limited number of airports always have reserve crews available. If a flight crew member tested positive at a location that did not, United would have needed to cancel the flight.  App. 1254; *see also* ECF No. 77 at 9.

(c)     *Differences in state laws.*  Different states have or had laws that required employers to pay for any testing (including, in some cases, time spent testing).  ECF No. 77 at 6.  A fact-finder could conclude that, at least in those locations where United would have had to bear all the costs, testing would have been an undue hardship.  *See* App. 1249.

(d)     *Working conditions and risks.*  Accommodations that would have been less effective in protecting United employees (and others) from severe complications of COVID-19 could be deemed to impose an undue hardship.  *See, e.g.*, *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022).  That analysis implicates the risks that employees faced based on where they worked, how much interaction they had with the public, and the relative feasibility of implementing masking and testing.  For example, pilots could not safely wear masks on the flight deck, which means that a masking-and-testing protocol would have been less effective for them.  App. 228-29, 301-02, 1174.

### B.      Plaintiffs Cannot Evade Their Commonality Problems.

In an effort to downplay their obvious challenges in establishing commonality (and predominance), Plaintiffs offer two main arguments.  Neither stands up to scrutiny.

### 1.      *There is Not a Common Question About Any United "Policy."*

First, Plaintiffs insist that this case concerns common "policies."  Pl. Br. at 26-28, 32-33.  United applied, they say, a "high bar" for vaccine exemptions and then imposed "universal and punitive accommodations" on everyone.  *Id.*  This, they argue, is the "glue" that holds the claims together.  *Id.* at 26-27 (citing *Dukes*, 564 U.S. at 352-53).

Plaintiffs' argument misunderstands how the commonality test applies in cases challenging an alleged common "policy."  Courts require a showing that a company policy is *facially* discriminatory or is otherwise illegal *in every case*, as distinguished from a policy that might be illegal *as applied to certain individuals*.  *See, e.g.*, *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020) (need for individualized inquiries precludes class-wide determination of "whether the 'policy itself' constituted a pattern or practice of unlawful discrimination").[19]  Plaintiffs cite four out-of-circuit district-court cases as examples of class-wide challenges to "centralized policies that widely inhibit adequate accommodation under Title VII or the ADA."  Pl. Br. at 32-33.  But every one of those cases concerned a blanket policy that was either facially discriminatory or did not permit any accommodations at all.  Moreover, the question whether there might be individualized defenses to liability was neither considered by the courts, nor raised by the defendants, in those cases.

---

[19]      *See also Allison*, 151 F.3d at 420 (alleged "practices or policies" do not obviate need to consider "individual-specific issues"); *Kittel v. City of Oxnard*, 2018 WL 6004524, at *8 (C.D. Cal. Feb. 20, 2018) ("[I]ndividualized inquiries . . . render Plaintiff's citation to the *Teamsters* framework inadequate to render these [ADA] claims amenable to class treatment.").

Here, by contrast, the challenged "policies" that Plaintiffs allege were unambiguously compliant with Title VII and the ADA for at least *some* putative class members, including those who (1) had no sincere religious objection to the vaccine; (2) had no disability that prevented vaccination; (3) suffered no adverse action; (4) received a reasonable accommodation; and/or (5) sought an accommodation that would pose an undue hardship on United. Indeed, it is possible that the alleged policies were lawful in all, most, or some circumstances, and thus there is no way to adjudicate legality in "one stroke." *Dukes*, 564 U.S. at 350. Rather, adjudication of challenges to United's alleged policies can only occur on an individual basis.

### 2. *United Has Not Waived Its Right to Question Putative Class Member Sincerity or Disability.*

Next, Plaintiffs suggest – in a footnote buried in their discussion of Rule 23(b)(3) predominance – that to the extent United approved many of the exemption requests, it necessarily concluded that those employees had a sincere religious belief and/or disability, and thus any such questions are now "irrelevant" to class certification. Pl. Br. at 38, n.30. For at least two reasons, that is wrong.

*First*, the law is clear that employers should not be penalized or denied their rights in litigation by choosing voluntarily to accommodate individuals who may be unable to prevail in litigation. *See, e.g.*, *Marionneux v. Groendyke Transp., Inc.*, 170 F.3d 183, at *1 n.1 (5th Cir. 1999) (defendants are "free to exceed the requirements of the ADA"). Two recent religious accommodation cases involving COVID vaccines illustrate this principle. *See Reichert v. Infusion Partners, L.L.C.*, 2023 WL 4685377, at *3-4 (E.D. La. July 21, 2023); *Gardner-Alfred*, 2023 WL 6214863, at *12-16. In both cases, the employer had granted a religious accommodation to the plaintiff, but the court nevertheless rejected the plaintiff's claim on grounds of lack of religious sincerity. *See id.*

27

This makes good sense. If the law were otherwise, it would disincentivize a generous approach to granting accommodations. Employers would need to take a hard look at employees' exemption requests and/or craft policies that demand actual proof of a disability (not just a medical condition) or a sincere religious belief. *See Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) (a contrary rule would "[d]iscourag[e] discretionary accommodations," as that "good deed would effectively ratchet up liability"); *Vandi Zande v. State of Wis. Dep't of Admin*., 44 F.3d 538, 545 (7th Cir. 1995) (same). In this case, Plaintiffs are highly indignant about United's modest efforts to confirm the bases for their exemption requests, Pl. Br. at 13, yet simultaneously imply that United was obliged to apply a much stricter standard.

*Second*, Plaintiffs' theory is not factually supported by the record. As noted above, United did *not* make any determination of "sincerity" or "disability" when it granted accommodations. For religious exemptions, United did not apply the legal standard of sincerity, but rather required employees to simply submit an attestation from any third party.[20] App. App. 131 at ¶ 6, 1244 at ¶ 6. Moreover, for employees who submitted both medical and religious requests, United considered the medical request first, and thus, if it approved that request, would not have reached the sincerity question at all. App. 1605. On the medical side, United exempted "pregnancy . . . or having a documented medical condition that contraindicates the vaccination" *as well as* disabilities. App. 1528-29. Plaintiffs do not point to any evidence to the contrary.

---

[20]      Plaintiffs argue that this requirement was imposed as part of an alleged effort to make the accommodation process "purposefully difficult," which in turn is part of their broader theme that United acted with discriminatory intent. Pl. Br. at 11, 27, 33-34. However, accommodation claims do not have an "intent" element and Plaintiffs have never "assert[ed] a [pure] disparate treatment claim . . . ; rather Plaintiffs assert[] only a failure-to-accommodate" theory. *Allen v. Benson*, 2023 WL 5961647, at *9 (E.D. Tex. Sept. 12, 2023). Thus, Plaintiffs' allegations of discriminatory intent do not lead to any "common answers" about any essential element of their proposed class-wide claims. Even proof of intent would not, for example, permit employees without a sincere belief or a disability to pursue relief.

### C.   Plaintiffs Fail to Establish Typicality.

Rule 23(a) typicality ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 350 n.5.   Certification "should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Miller*, 540 F. Supp. at 634-35; *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 133 (N.D. Tex. 2020) (holding that even if proposed class "satisfied commonality, it would still fail the test for typicality because circumstances unique to [the named plaintiff] will likely become the litigation's focus.").   Here, given the complexity and variability of the issues above, it should be no surprise that each of the named Plaintiffs' claims raise unique defenses or factual issues:

### 1.   David Sambrano.

Unlike most other employees in the putative class, Mr. Sambrano had years of prior management experience, working as a "Chief Tech Pilot" and "Flight Operations Duty Manager," among other roles.   *See* App. 133-34 at ¶ 18, 4467-68.   That experience – not his status as a named Plaintiff – is why United offered him a remote assignment, performing duties similar to what he had done in the past.   App. 1470-71.   Had he accepted, Mr. Sambrano would have been paid at an annual rate of $399,000 and qualified for the same benefits as his regular job.[21]   *Id.*; App. 133-34 at ¶ 18.   Such an offer is an eminently reasonable accommodation. *See Horvath*, 946 F.3d at 791-92.[22]   Accordingly, even if a jury found that unpaid leave was not

---

[21]   Mr. Sambrano rejected the offer.   Contrary to Plaintiffs' representation that Mr. Sambrano did so because he was "not qualified," Pl. Br. at 18, n.13, he said at the time that he turned it down because it was "not the right time or opportunity."   App. 1470. This is a significant fact issue unique to Mr. Sambrano.   His lack of work in Texas is another potential issue, *see infra* at 45, n.27 (preserving personal jurisdiction argument).

[22]   *See also, e.g., Bruff*, 244 F.3d at 501-02 (allowing employees to find another position is a reasonable accommodation); *Guice-Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992) (under the Rehabilitation Act, offer of an alternative position at same pay and benefits is reasonable "virtually as a matter of law").

reasonable, it could find that Mr. Sambrano was properly accommodated.  Thus, his claim is atypical.  *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (even when "ultimate success" of a unique defense "is not certain," it justifies denial of certification).

      **2.**    **Genise Kincannon.**  The only other named Plaintiff who was put on unpaid leave is Ms. Kincannon.  Like other members of the putative class, she had the option of taking an alternative position with United (she declined to do so).  App. 133 at ¶ 16.  But unlike many members of the putative class, Ms. Kincannon chose to fly a very light schedule; she flew a total of just 18 times in the six months preceding November 2021 (including zero flights from February through July).  App. 4466, 4503 (flight schedule and earnings data).  Given how little she flew, a jury could easily conclude that unpaid leave was a reasonable accommodation for Ms. Kincannon, even if it found otherwise for pilots and flight attendants who worked a full-time schedule.

      **3.**    **Charles Burk.**  Mr. Burk seeks to represent "individuals that are unique to my specific situation," which was "[t]hat I ended up taking the vaccine, that I was under duress and coerced into taking the shot to save my job."  App. 177.  Even assuming that such a class would be ascertainable, such a concededly unique claim cannot be litigated on a class-wide basis.  *Miller*, 540 F. Supp. 3d at 635 (no typicality where named class member's claim based on "her unique circumstances").  Every employee's experience will be different, depending on individualized factors such as the strength of their convictions and their financial situation.[23]

---

[23]    Plaintiffs refer to the Fifth Circuit panel majority's statement that "the threat" of unpaid leave was harmful, suggesting that all putative class members were "coerced" in this regard.  Pl. Br. at  34-35, n.26.  They ignore, however, the panel's related statement that such harm is "exogenous to any adverse employment action" and thus not remediable in the normal course under Title VII.  *Sambrano v. United Airlines, Inc.*, 2022 WL 486610, at *7 -9 (5th Cir. Feb. 17, 2022).  They also ignore the testimony by multiple Plaintiffs who, unlike Mr. Burk, would never violate their religious beliefs and thus could not have faced any "crisis of conscience."  App. 245-46, 353, 426, 489, 923.  Again, this illustrates the factual variation in Plaintiffs' claims.

**4.     D.J. Jonas.**    The only remaining named Plaintiff who was accommodated with masking and testing is Ms. Jonas.  However, Ms. Jonas was a United Club employee, which is not the same as a typical CSR, let alone all of the other ground crew employees she would purport to represent.  App. 580-81, 583-84, 601.  The accommodations she says she was owed (and the injuries she says she suffered) are quite different than other employees who complain about masking and testing.  App. 601.  Moreover, she only has an ADA claim because her Title VII claim was dismissed as exceeding the scope of her EEOC charge.  ECF No. 231 at 27-28.  As such, litigation of her claims would not consider, among other issues, Title VII's undue-hardship standards – which are different than the ADA's standards, *see Groff*, 600 U.S. at 471 – and would require considering the ADA's unique direct-threat defense.

## II.     Plaintiffs Do Not Satisfy the Requirements of Rule 23(b)(2).

Even if Plaintiffs could satisfy Rule 23(a)'s prerequisites for class certification, they would still falter when reaching Rule 23(b)'s requirements.  Plaintiffs primarily request that this Court certify a class under Rule 23(b)(2) for injunctive relief and punitive damages on behalf of all individuals who requested an accommodation.  Pl. Br. at 23, 31-37.  But Rule 23(b)(2) applies only where the defendant "has acted or refused to act on grounds that apply generally to the class, so that *final injunctive relief* or corresponding declaratory relief is appropriate respecting *the class as a whole*."  Fed. R. Civ. P. 23(b)(2) (emphasis added).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Dukes*, 564 U.S. at 360.  Here, Rule 23(b)(2) certification would be improper: (A) the claim for punitive damages precludes a (b)(2) class; and (B) the claim for injunctive relief does not satisfy (b)(2) even considered in isolation.

### A.      Monetary-Relief Claims Foreclose Reliance on Rule 23(b)(2).

Although Rule 23(b)(2) refers only to claims for "injunctive" or "declaratory relief," the Fifth Circuit has, as Plaintiffs note, permitted class certification under (b)(2) if monetary relief is "incidental" to prospective injunctive relief.  Pl. Br. at 35-36.  "Incidental" monetary relief, however, must "flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Allison*, 151 F.3d at 415.  Thus, class members must "be *automatically entitled* to the monetary remuneration once liability is established for the class," and relief must be "comput[ed] by means of objective standards and not dependent in any way on the intangible, subjective differences of each class member's circumstances." *In re Wilborn*, 609 F.3d 748, 757 (5th Cir. 2010) (emphasis added).  For two reasons, Plaintiffs' monetary-relief claims in this case plainly do not qualify as "incidental."

*First*, Plaintiffs seek punitive damages, Pl. Br. at 35-36, but the courts in this Circuit have consistently held that such damages are *not* "incidental" under Rule 23(b)(2).  *E.g.*, *Allison*, 151 F.3d at 417; *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 377-78 (S.D. Tex. 2006).  That is because awarding punitive damages to each class member would necessarily require highly individualized determinations that go well beyond any classwide-liability finding.  To begin, *whether to even award* punitive damages is a discretionary decision that arises in "only a subset of cases" where the defendant's discriminatory practice was undertaken "with malice or with reckless indifference." *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534-35 (1999) (emphasis omitted).  Given the need to make that additional finding, punitive damages would be "merely consequential to" class-wide liability, rather than "concomitant with" it. *Allison*, 151 F.3d at 415.  Moreover, when *determining the amount* of punitive damages a given class member should receive, juries and courts must consider not just the reprehensibility of the defendant's conduct but also the nature and degree of "the harm suffered by the plaintiff." *Rubinstein v. Adm'rs of Tulane Educ. Fund*,

218 F.3d 392, 408-09 (5th Cir. 2000).  Even when "broad policies and practices" are challenged, that does not mean that "each plaintiff was affected by these policies and practices in the same way." *Allison*, 151 F.3d at 417.  Here, United is entitled to argue – and a jury is entitled to find – that punitive damages would not be warranted, at the very least, for those who were not financially burdened by unpaid leave, or who were not troubled by masking and testing, or who failed to accept alternative employment, and so on.  *See supra* at Part I.A.3.

Tellingly, Plaintiffs cite *no case* deeming punitive damages to be "incidental" under Rule 23(b)(2).  Instead, they misquote *Allison*.  They portray it as having said: "'punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts.'"  Pl. Br. at 36.  But that omits the critical word "Assuming" that preceded this half-sentence in *Allison* as well as the actual holding that followed in the rest of the sentence and paragraph – namely, that punitive damages are *not* incidental even making this assumption, for the reasons discussed above.  *See Allison*, 151 F.3d at 417; *accord Colindres*, 235 F.R.D. at 377 ("*Allison* held that punitive damages cannot be assessed without proof of liability to individual class members.").

*Second*, Plaintiffs also seek backpay and compensatory damages, Pl. Br. at 40-41, which they do not even attempt to argue is "incidental" monetary relief.  And for good reason, given that such an argument that would be contrary to black-letter law.  *See Dukes*, 564 U.S. at 366-67; *Allison*, 151 F.3d at 418; *Miller*, 540 F. Supp. 3d at 637-638.  Trying to circumvent this problem, Plaintiffs drop a footnote that proposes a "'hybrid' approach" under which their claims for monetary relief would be certified under Rule 23(b)(3), yet claims for injunctive relief could be certified under Rule 23(b)(2) regardless.  Pl. Br. at 37 n.29.  That hybrid approach is improper under the law in this Circuit.

As this Court has recognized, "Rule 23(b)(2) 'does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.'" *Miller*, 540 F. Supp. 3d at 647-38 (quoting *Dukes*, 564 U.S. 360-61).   The Fifth Circuit in *Allison* "specifically rejected the possibility of a 'hybrid' class with injunctive relief under Rule 23(b)(2) and damages relief under Rule 23(b)(3)," in light of predominance and superiority concerns. *Colindres*, 235 F.R.D. at 370.   Moreover, a hybrid approach "would undo the careful interplay between Rules 23(b)(2) and (b)(3)," because the right of putative class members to opt out under (b)(3) would be nullified if they remained bound by the preclusive effect of a loss on an injunctive-relief claim certified under (b)(2).  *See McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 554 (5th Cir. 2003).  Worse still, a hybrid approach would at least potentially deprive United of its right to have all liability-related facts found by the juries that would determine monetary relief in separate trials.  *See Allison*, 151 F.3d at 422-25; *Colindres*, 235 F.R.D. at 370.

All these problems are exacerbated because the injunctive relief sought by Plaintiffs would have little or no practical meaning.  United ended the challenged practices nearly two years ago. In addition, the company has recently entered into a collective bargaining agreement with its pilots that precludes imposition of new vaccine requirements, meaning that United cannot reimplement the policy at issue. App. 4304.  Moreover, Plaintiffs' proposed (b)(2) class includes *former* employees, *see* Pl. Br. at 23, 28, who "have no need for prospective injunctive relief at all," *Miller*, 540 F. Supp. 3d at 638. Because Plaintiffs have little to "nothing to gain from an injunction," certification under Rule 23(b)(2) "is not 'appropriate'" in these circumstances.  *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975, 978 (5th Cir. 2000) (quoting *Allison*, 151 F.3d at 413).  Rather, given that monetary relief is the predominant relief they seek, Plaintiffs must proceed under Rule 23(b)(3) or not at all.  *Id.*.

Ignoring the law in this Circuit, Plaintiffs rely on an inapposite and outdated D.C. Circuit opinion. *See Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997). That case (at most) suggested that, where certification of monetary claims is *appropriate* under Rule 23(b)(3), a court can still certify the injunction claim under Rule 23(b)(2) so long as it adequately protects opt-out rights for the monetary claims. It certainly did not suggest that, even if (b)(3) certification of the monetary claims is improper – as is the case here, *see infra* Part III – a court can still certify an injunction claim under (b)(2), leaving the monetary claims to be resolved in the same individual trials that rendered (b)(3) certification improper in the first place. And more fundamentally, the D.C. Circuit's 1997 opinion cannot be squared with the Supreme Court's later decision in *Dukes* or the Fifth Circuit's later decisions in *Allison*, *Bolin*, and *McManus*. Thus, Plaintiffs' monetary-relief claims completely foreclose (b)(2) certification.

### B. The Claim For Injunctive Relief Does Not Satisfy Rule 23(b)(2) Even Considered In Isolation.

In all events, Plaintiffs' request for injunctive relief is not "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A "(b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group." *Allison*, 151 F.3d at 413. "To qualify for class-wide injunctive relief, class members must have been harmed in essentially the same way." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Certification under (b)(2) is not appropriate if awarding injunctive relief to each class member would require "complex individualized determinations" or "numerous individualized hearings." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 317 (5th Cir. 2007). Likewise, a (b)(2) injunction must "specify[] exactly" what common conduct is enjoined as to all class members, *Maldonado*, 493 F.3d at 524, rather than "order[ing] the defendant to craft individualized 'injunctive-type' relief for certain class members." *Perry*, 675 F.3d at 847.

35

Here, even if there were a common question about whether unpaid leave (with or without alternative job options) was an unreasonable accommodation, that does not establish that the provision of any such accommodation "can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360. As detailed above, there would still be myriad individualized issues for any given class member:

- Whether the class member in fact lacked a sincere religious belief or disability. *See* Part I.A.1-2, *supra*.

- Whether the class member forfeited any accommodation claim by failing to reasonably participate in United's accommodation process. *See* Part I.A.3, *supra*.

- Whether the class member never in fact incurred any adverse action, such as the putative class members who were already dismissed as named plaintiffs on this very basis. *See* Part I.A.4, *supra*.

- Whether providing a different accommodation to any individual class member would have imposed an undue hardship on United in light of that employee's particular job conditions and responsibilities, geographic location, or other personal characteristics. *See* Part I.A.5, *supra*.

- Whether the class member is no longer a United employee and thus not entitled to injunctive relief. *See* Part II.A., *supra*.

Moreover, many of the class members may be subject to additional individualized defenses concerning the timeliness and scope of their EEOC charges.[24] Indeed, this Court has already dismissed the claims of Ms. Medlin and Messrs. Rains and Castillo because a fact-intensive review of their EEOC submissions revealed that their charges were untimely, *see* ECF No. 231 at 17-26, and likewise dismissed the Title VII claim of Ms. Jonas because a fact-intensive review of her

---

[24]    Likewise, for class members asserting disability claims, United would have an additional defense under the ADA where accommodating a particular "individual poses a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3); *see Hernandez v. W. Texas Treasures Est. Sales, L.L.C.*, 79 F.4th 464, 469 (5th Cir. 2023) (holding that the direct-threat defense "is a complicated, fact intensive determination"); *O'Hailpin*, 2023 WL 8600498, at *52-54 (denying class certification in part for this reason).

EEOC charge revealed that it omitted such a claim, *see id.* at 27-28.  Obviously, none of those dismissed Plaintiffs are entitled to receive injunctive relief as part of a Rule 23(b)(2) class, and United is entitled to raise these and any other individualized defenses against any similarly situated class members.  *See Dukes*, 564 U.S. at 367; *FPX, LLC v. Google, Inc.*, 276 F.R.D. 543, 550-51 (E.D. Tex. 2011) ("Plaintiffs' request for class certification should fail because of the fact-specific inquiries the court would have to evaluate to address Defendants' affirmative defenses.").

Plaintiffs cite no precedent from this Circuit that supports (b)(2) certification despite these many individualized problems with granting class-wide injunctive relief.  They cite just a handful of out-of-circuit district court decisions, Pl. Br. at 32-33, that are inapposite and/or erroneous, *see supra* at 26.  Certification under (b)(2) should be denied.

## III.    Plaintiffs Do Not Satisfy the Requirements of Rule 23(b)(3).

Under the controlling law of this Circuit, it is difficult, if not impossible, to certify a class in a Title VII or ADA case under Rule 23(b)(3).  *See generally Allison*, 151 F.3d at 418-20 (rejecting (b)(3) class under Title VII).  Plaintiffs' attempt to do so, Pl. Br. at 37-45, runs afoul of the (b)(3) standards for both predominance and superiority.

### A.    Plaintiffs Fail to Establish Predominance.

"At bottom, the predominance inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial."  *Miller*, 540 F. Supp. 3d at 636 (quoting *Cruson v. Jackson Nat'l Life Ins.*, 954 F.3d 240, 253 (5th Cir. 2020)).  This "is a far more demanding hurdle than Rule 23(a)'s commonality requirement."  *Cruson*, 954 F.3d at 253 (quotations omitted).  A court must ensure that a class, if certified, would not "degenerat[e] into a series of individual trials." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555-57 (5th Cir. 2011) (court must consider how "the administration of the trial" would function, and may not adopt "a figure-it-out-as-we-go-along approach").

1.    *Individualized Liability Issues Preclude Predominance.*

As set forth in detail above, Plaintiffs' claims raise a litany of individualized questions. *See* Part I.A, *supra*.  At trial, those issues would easily swamp any common question Plaintiffs might pose.  Take, for example, the threshold questions of sincerity and disability.  How would those matters be addressed, given that the answers cannot just be assumed?  Testimony from and cross-examination of every single class member?  Likewise, how would the parties address whether any individual who was accommodated with masking and testing did in fact "experienc[e] dizziness, headaches, and difficulty breathing"?  Pl. Br. at 44.  Or whether the people who accepted an alternative job – and never lost pay or benefits – were denied a reasonable accommodation?  Or whether United would have any undue hardship or direct-threat defenses based on any particular class member's working conditions? *See O'Hailpin*, 2023 WL 8600498, at *12 (individualized issues "predominate over any common inquiry").

Plaintiffs do not propose any "viable theory employing generalized proof" that would overcome these problems.  *Gene and Gene LLC v. BioPayLLC*, 541 F.3d 318, 328 (5th Cir. 2008).  Rather, they just assert "there are no individualized questions regarding the accommodation of each class member." Pl. Br. at 38.  Ignoring the issues is not a "viable theory."  Plaintiffs also say that they satisfy predominance because everything United did was "the result of discriminatory intent." *Id.* at 39.  As noted above, the issue of United's intent is hotly contested, but even leaving that aside, it does not obviate the need to address all of the other questions listed above.[25] *See supra* at 26-27 & 28, n.20.  Plaintiffs fail to cite any case for their contrary proposition.

---

[25]    Many of the Plaintiffs' allegations of "intent" concern discrimination on the basis of vaccination status, not religion or disability.  *See, e.g.*, Pl. Br. at 11 (alleging Mr. Castillo was harassed because he "was not vaccinated"). Being unvaccinated is not protected under either Title VII or the ADA.  *See Anderson*, 2023 WL 5721594, at *6; *Robertson v. McKesson Corp.*, 2023 WL 5177406, at *6 (S.D. Ohio Aug. 11, 2023).

**2.      *Individualized Damages Issues Also Preclude Predominance.***

"Even where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a class-wide basis.'"  *Cruson*, 954 F.3d at 258 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  The issue of damages will defeat predominance "where the calculation of damages is not susceptible to a mathematical or formulaic calculation."  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003).

Predominance with respect to damages is especially challenging in employment discrimination cases, where damages "are uniquely dependent on the subjective and intangible differences of each class member's individual circumstances." *Allison*, 151 F.3d at 418.  "Claims for compensatory and punitive damages must therefore focus almost entirely on facts and issues specific to individuals rather than the class as a whole." *Id.* at 419.

In this case, Plaintiffs have failed to offer any approach to damages that would solve the need for individualized review. They lack a viable class-wide damages model for any of the following categories:

(a)      *Backpay.* Plaintiffs have proposed various ideas for how they could calculate backpay for flight crew employees who were on unpaid leave for some period of time between November 2021 and spring 2022. They initially said that they could just use "salary" as the basis, and later shifted to arguing that they could calculate backpay by using average earnings prior to the unpaid leave period.  App. 1268, 1271.  After deposing United's expert, they proposed two more methods:  (1) using 2.8 hours per day for pilots – but not flight attendants – based on a provision of the pilot collective bargaining agreement for paid absences (and certain other purposes) or (2) using current hourly pay rates and multiply by an average of each class member's flight time hours or an average pay per month over the past year.  Pl. App. 851, 853-54, 863.

None of these proposed methods would be a fair or accurate way to measure the amount of pay that each putative class member might have earned during leave.  United's expert witness on calculation of earnings – Dr. Donald Deere (Ph.D, Texas A&M University) – explains in detail why Plaintiffs' theories do not work. App. 4445-4582. (Plaintiffs have no rebuttal expert.)  The testimony of United's personnel also supports Dr. Deere's conclusions.  App. 124-29, 137-44.

*First*, flight crew do not have "salaries"; their compensation is highly variable, driven by personal preferences and available flights, plus the specific work they do on each flight, international pay, and a multitude of other factors. App. 183, 310-12, 380, 384, 389-90.  *Second*, the use of averages would, by definition, undercompensate some putative class members, potentially by a substantial amount.  App. 4448.  The Plaintiffs cannot just decide that they will, on behalf of absent class members, accept such a "Trial by Formula."  *See Dukes*, 564 U.S. at 367. *Third*, Plaintiffs' proposed methodologies would also overcompensate many putative class members.  For example, a 12-month person-by-person pay average fails to predict pay for at least 86% of pilots in the putative class.   App. 4545-48.   In dollar terms, averaging translates to overpayment for the highest paid pilots of approximately $19,000 over the leave period. *See id.*[26] The same is true if we use the 2.8 hours concept.  App. 4549-50.  Either way, Plaintiffs' proposals violate the principle that "[a] Title VII plaintiff is not entitled to recover an amount greater than his pecuniary losses."  *Pegues v. Mississippi State Employment Service*, 899 F.2d 1449, 1457 (5th Cir. 1990).  *Fourth*, absent some solution to the other problems with class-wide claims, backpay based on averages would end up compensating non-victims, in violation of Section 706(g) of Title VII, 42 U.S.C § 2000e-5(g).  *Fifth*, Plaintiffs' methodologies are unable to account for questions

---

[26]     Dr. Deere also shows that no class-wide measure of backpay is possible using the earnings of the flight crews who worked during the unpaid leave period because the pay between two flight attendants or two pilots varies widely. App. 4499-4502.

such as which categories of prior earnings to include, how to handle missing months, differences in the exact date that employees returned to work (which varied based on individual preferences and training schedules), or the international restrictions on accommodated flight crew once they returned.  App. 4451-52.  *Sixth*, a class-wide approach to backpay cannot address individualized questions about the degree to which class members did or did not comply with their duty to mitigate their damages.  App. 73-81 (index of testimony regarding mitigation).

Unsurprisingly, Plaintiffs cite no authority supporting the use of average backpay in a Title VII or ADA class action.  To be sure, they cite cases for the proposition that averaging may be used to calculate *individual* backpay, but that is a completely different inquiry.  Pl. Br. at 40.  In fact, the cases they cite confirm that individualized adjustments are often necessary to arrive at a fair backpay number.  *See Baucom v. Sisco Stevedoring, LLC*, 560 F. Supp. 2d 1181, 1195 (S.D. Ala. 2008) (noting need to take "into account [the plaintiff's] proclivity . . . to take several months off from work each year").  An individual could decide to accept the rough-justice of an average, particularly when tailoring it to his circumstances is possible.  The Plaintiffs here cannot, however, foist under-compensation on absent class members, nor can they deprive United of its statutory and constitutional rights not to overpay absent class members and not to compensate non-victims.

(b)     *Compensatory Damages*.  Plaintiffs' argument for class certification is oddly silent about non-backpay compensatory damages.  There is no doubt, of course, that they have sought such damages – their complaint expressly asks for "compensatory damages," and includes multiple allegations of, for example, emotional-distress injuries.  ECF No. 156 at ¶¶ 119, 132, 146; *see id.* at ¶¶ 11, 167.  Moreover, in depositions, the named Plaintiffs and putative class members have all listed a wide range of individualized damages they are seeking, ranging from 401(k) withdrawal penalties to paying for beauty school.  App. 296, 658-61, 667-68, 1124; Pl. App. 851.

There is no possible way, under *Allison* and its progeny, that such damages can be litigated on a class-wide basis. 151 F.3d at 417, 419-20.  They are all highly individualized and would require a series of mini-trials for each class member.  *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir. 2006) (emotional injury claims "necessarily implicate[] the subjective differences of each plaintiff's circumstances").  And if the named Plaintiffs now disclaim any desire to seek compensatory damages, it would undermine their adequacy as class representatives under Rule 23(a)(4).  *See*, *e.g.*, *Slade v. Progressive Sec. Ins. Co.,* 856 F.3d 408, 412 (5th Cir. 2017) ("[R]esolving the predominance problem with a waiver of claims raises a separate potential bar to class certification—adequacy."); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559, 565 (C.D. Cal. 2012) (plaintiff's willingness "to sacrifice individual class members' right to pursue the recovery of monetary damages . . . raises concerns about their adequacy").  Nor is it sufficient to suggest that putative class members could opt out to pursue such damages, as that threatens to undermine superiority.  *See Slade*, 856 F.3d at 412 n.2.

(c)     *Punitive damages*.  As discussed above, punitive damages require "proof of how discrimination was inflicted on each plaintiff."  *Allison*, 151 F.3d at 418.  Plaintiffs cannot assume that all class members would have an equal right to punitive damages.  *See supra* at Part II.A.

**B.     Plaintiffs Have Not Established Rule 23(b)(3) Superiority.**

In addition to predominance, Rule 23(b)(3) also requires proof "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This is a "fact-specific analysis and will vary depending on the circumstances of any given case."  *Greathouse*, 2023 WL 5746927, at *8 (quoting *Madison*, 637 F.3d at 555).  Among other considerations, a court must assess "the relative advantages of alternative procedures" for litigating the putative class members' claims.  *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016).

One of the keys to this inquiry is whether the case is one "in which individual damages run high," or whether "the individual stake is so small as to make a separate action impracticable." *Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997).  "The most compelling rationale for finding superiority in a class action" is "the existence of a negative value suit," in which "class members' claims would be uneconomical to litigate individually."  *Flecha*, 946 F.3d at 769-70.  Indeed, "[p]roof of a negative value suit may be necessary to prove superiority" even though "it is not sufficient to warrant class certification under Rule 23(b)(3)."  *Id.* at 770.

That "compelling rationale" is entirely missing in this case.  Individual plaintiffs are entitled to seek substantial damages under Title VII and the ADA.  The applicable cap on compensatory and punitive damages is $300,000, 42 U.S.C. § 1981a(b)(3)(D), and prevailing employees are also entitled to recover backpay and attorneys' fees.  42 U.S.C. § 2000e-5(g), (k). Because an individual recovery can be so large, "[c]ourts are . . . reluctant to find class treatment superior in the employment discrimination context."  1 McLaughlin on Class Actions § 5:76 (20th ed.); *see also, e.g.*, *Riley v. Compucom Sys.*, 2000 WL 343189 at *5 (N.D. Tex. Apr. 3,  2000) (finding lack of superiority in Title VII case because, among other reasons, "by statute each Plaintiff is potentially entitled to recover up to $ 300,000 plus attorneys' fees").

Where such large individual recoveries are possible, courts favor the "collective wisdom of individual juries" over consigning the fate of hundreds or thousands of parties to a single jury. *Castano v. American Tobacco Co.*, 84 F.3d 734, 752 (5th Cir. 1996).  As the Fifth Circuit has noted, "traditional ways of proceeding reflect far more than habit. They reflect the very culture of the jury trial." *Id.*  In this case, the number of separate lawsuits filed by putative class members, *see* App. 1-3, confirms that the "usual rule" of individual litigation is functioning just fine.  *Dukes*, 564 U.S. at 348.

43

Nor does the other rationale – judicial efficiency – apply here.  Litigation of this case on a class basis would be a mess, involving dozens of problems managing evidence on questions of sincerity, disability, reasonableness, and so on.  There would be a real risk that United would be effectively deprived of its ability to present its defenses, in violation of Rule 23 and Section 706(g) of Title VII.  Nor have Plaintiffs proposed any "detailed trial plans" to address those issues. *Madison*, 637 F.3d at 556.  To paraphrase this Court's decision in *Greathouse*:

> Given the divergent factual scenarios present in this case, a class action appears unmanageable.  At risk of sounding repetitive, the many circumstances that might lead to [any failure to provide a reasonable accommodation] would result in an ununiform and chaotic class.  Thus, the principal purposes of the class-action procedure—promotion of efficiency and economy of litigation—would thereby be frustrated.  As a result, individual claims—where each Plaintiff can argue the specific facts of their [claim]—are a better method of remedying the alleged wrongs present in this case.

2023 WL 5746927, at *8 (citations and quotations omitted).

Plaintiffs' primary argument in favor of (b)(3) superiority is that individual claims by employees could be hindered by fears of "reprisals."  Pl. Br. at 42.  There is zero evidence to support that theory. Dozens of individual employees have already signed their names to their own lawsuits, showing that they are not intimidated.  Nor have the Plaintiffs pointed to any form of "reprisal" by United in response to those suits.  In fact, the only "retaliation" that Plaintiffs have ever alleged in this case is the accommodations that United provided, and, as this Court has held, those accommodations are not properly characterized as retaliation.  ECF No. 231 at 17.

As for Plaintiffs' secondary concern about a "flood" of "repetitive cases," Pl. Br. at 42, there are effective procedural mechanisms to address related cases without an unwieldy class action.  Examples of plausible alternatives that have already been initiated include (1) the multi-plaintiff *Anderson* case and (2) the recent transfer of multiple individual vaccine cases to Judge Kennelly in the Northern District of Illinois.

**IV.    Lack of Personal Jurisdiction Precludes Certification of a Nationwide Class.**

In the Fall of 2021, this Court held that an individual Plaintiff from Chicago – Seth Turnbough, who neither lived in nor worked out of Texas – could not establish specific personal jurisdiction to pursue Title VII or ADA claims here.  ECF No. 103 at 9-11. The Court deferred ruling on the related question of jurisdiction over the claims of any non-Texas putative class members.  *Id*. at 12-14.

That earlier ruling supports the conclusion that even if this Court could certify a class, it could not do so nationwide, but rather would need to limit any class to just those individuals over whom the Court would have personal jurisdiction, *i.e.*, the putative class members who work in Texas.  Other case law – summarized in United's earlier motion – also supports that conclusion. *See, e.g.*, *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255 (2017); *see also generally* ECF No. 129 at 25; ECF Nos. 47 & 58 (outlining United's jurisdictional defense as to putative class members outside of Texas).[27]

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification and direct the parties to propose a schedule for the prompt resolution – by settlement, motion, or trial – of the remaining Plaintiffs' claims.

---

[27]    *See also, e.g.*, *Stacker v. IntelliSearch, LLC*, 2021 WL 2646444, at *8 (D. Kan. June 28, 2021) ("[T]he court agrees that the due process concerns recognized in *Bristol-Myers* and other Supreme Court precedent would foreclose a nationwide class action that is not limited to a nonresident defendant's conduct in the forum state."); *Martinez v. Tyson Foods, Inc.*, 533 F. Supp. 3d 386, 390-92 (N.D. Tex. 2021) (applying *Bristol-Myers*); *Cruson*, 954 F.3d at 247 n.4 (explaining the issue).  United elaborated on this defense at the October 2021 motion hearing.  *See* App. 1183-1227. United hereby respectfully preserves its related argument that the Court lacks personal jurisdiction over flight crew who, even if they live in Texas, rarely if ever work here.  *Id.*

Dated: February 9, 2024

Respectfully submitted,


/s/ *Russell D. Cawyer*

Russell D. Cawyer
TX Bar No. 00793482
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telephone: +1.817.878.3562
Facsimile: +1.817.335.2820
Email: russell.cawyer@kellyhart.com

Donald J. Munro
D.C. Bar No. 453600
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
Telephone: +1.202.879.3939
Facsimile: +1.202.626-1700
Email: dmunro@jonesday.com

Jordan M. Matthews
IL Bar No. 6300503
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60601
Telephone: +1.312.782.3939
Facsimile: +1.312.782.8585
Email: jmatthews@jonesday.com

Alexander V. Maugeri
NY Bar No. 5062666
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: +1.212.326.3939
Facsimile: +1.212.755.7306
Email: amaugeri@jonesday.com


**ATTORNEYS FOR DEFENDANT
UNITED AIRLINES, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.


/s/ *Russell D. Cawyer*