**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DAVID SAMBRANO, individually and on behalf of all others similarly situated, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED AIRLINES, INC.,<br><br>*Defendant*. | Civil Action No.: 4:21-cv-01074-P |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION**
**FOR CLASS CERTIFICATION AND APPOINTMENT OF COUNSEL**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 1

ARGUMENT ............................................................................................................... 5

I.      Plaintiffs Satisfy Rule 23(a)'s Threshold Requirements. ................................ 5

        A.      Plaintiffs Have Identified Common Questions of Law and Fact. ........... 5

        B.      These Common Questions are Also Typical Across the Class. ............. 13

        C.      United's Decision to Implement a Broad Policy Supports Certification. ............ 14

II.     The Court Should Certify a Class Under Rule 23(b)(2). ............................... 16

III.    The Court Should Also Certify a Class Under Rule 23(b)(3). ...................... 19

        A.      Common Questions Predominate. ....................................................... 20

        B.      A Class Action is the Superior Method for Resolving These Questions. ............ 22

IV.     There are no Jurisdictional Hurdles. ............................................................. 25

CONCLUSION........................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ........................................................... 16, 17, 18

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).................................................................................. 23

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ...................................................................... 21

*Braidwood Mgmt., Inc. v. EEOC*,
    70 F.4th 914 (5th Cir. 2023) .............................................................. 7, 8, 16

*Callahan v. Woods*,
    658 F.2d 679 (9th Cir. 1981) ....................................................................... 7

*Chandler v. City of Dallas*,
    2 F.3d 1385 (5th Cir. 1993) ....................................................................... 10

*Colindres v. QuitFlex Mfg.*,
    235 F.R.D. 347 (S.D. Tex. 2006)................................................................ 18

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983).................................................................................. 22

*Davis v. Fort Bend County*,
    765 F.3d 480 (5th Cir. 2014) ................................................................... 7, 8

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ........................................................................ 17

*Feder v. Elec. Data Sys. Corp.*,
   429 F.3d 125 (5th Cir. 2005) ................................................................. 13, 14

*Flecha v. Medicredit, Inc.*,
   946 F.3d 762 (5th Cir. 2020) ........................................................................ 23

*Glover v. St. Louis-San Francisco Ry. Co.*,
   393 U.S. 324 (1969) ...................................................................................... 18

*Groff v. DeJoy*,
   600 U.S. 447 (2023) ...................................................................................... 12

*Haliburton Co. v. Erica P. John Fund*,
   573 U.S. 258 (2014) ...................................................................................... 13

*Holmes v. Godinez*,
   311 F.R.D. 177 (N.D. Ill. 2015) ............................................................... 9, 10

*Hooks v. Landmark Indus., Inc.*,
   797 F.3d 309 (5th Cir. 2015) ........................................................................ 13

*In re Catfish Antitrust Litig.*,
   826 F. Supp. 1019 (N.D. Miss. 1993) ........................................................... 13

*In re Cmty. Bank of N. Va.*,
   418 F.3d 277 (3d Cir. 2005) .......................................................................... 22

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) .................................................................... 6, 14

*In re Rodriguez*,
   695 F.3d 360 (5th Cir. 2012) .................................................................... 6, 12

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999) ...................................................................................... 17

*Lehocky v. Tidel Tech.*,
   220 F.R.D. 491 (S.D. Tex. 2004) ................................................................. 13

*Madison v. Chalmette Refining, L.L.C.*,
   637 F.3d 551 (5th Cir. 2011) ........................................................................ 24

*McManus v. Fleetwood Enters., Inc.*,
   320 F.3d 545 (5th Cir. 2003) ........................................................................ 18

*McNeill v. Tyson Fresh Meats*,
   2023 WL 8532408 (N.D. Tex. Dec. 8, 2023) ............................................... 15

*Moussazadeh v. Tex. Dep't of Crim. Just.*,
   703 F.3d 781 (5th Cir. 2012) ................................................................. 6, 7, 9

*Mueck v. La Grange Acquisitions, L.P.*,
   75 F.4th 469 (5th Cir. 2023) ........................................................................ 10

*Mullen v. Treasure Chest Casino*,
    186 F.3d 620 (5th Cir. 1999) ................................................................ *passim*

*Nelson v. Cooper T. Smith Stevedoring, Co.*,
    2013 WL 4591362 (E.D. La. Aug. 28, 2013) ........................................ 22

*Sambrano v. United Airlines*,
    2022 WL 486610 (5th Cir. Feb. 17, 2022) ................................. 2, 6, 19

*Sambrano v. United Airlines*,
    570 F. Supp. 3d 409 (N.D. Tex. 2021) .................................................. 2

*Sambrano v. United Airlines, Inc.*,
    45 F.4th 877 (5th Cir. 2022) .................................................................. 2

*Sourgoutsis v. U.S. Capitol Police*,
    2019 WL 13285740 (D.D.C. Sept. 13, 2019) ....................................... 1

*Sughrim v. New York*,
    2023 WL 5713191 (S.D.N.Y. Sept. 5, 2023) ...................................... 15

*Swales v. KLLM Transp. Servs., L.L.C.*,
    985 F.3d 430 (5th Cir. 2021) ............................................................... 25

*Theriault v. Carlson*,
    495 F.2d 390 (5th Cir. 1974) ................................................................. 7

*Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981) ............................................................................ 7, 9

*U.S. Navy SEALs 1–26 v. Austin*,
    594 F. Supp. 3d 767 (N.D. Tex. 2022) .................................................. 8

*UnifySCC v. Cody*,
    2024 WL 333892 (N.D. Cal. Jan. 29, 2024) ....................... 1, 11, 20, 22

*United States v. Winn*,
    948 F.2d 145 (5th Cir. 1991) ................................................................. 1

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ......................................................... 5, 11, 12, 13

**Statute**

42 U.S.C. § 1981a ....................................................................................... 17

**Rules**

Fed. R. Civ. P. 23 ................................................................................ *passim*

Fed. R. Evid. 1006 ....................................................................................... 1

**Other Authorities**

2 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* (6th ed. 2023) ...................... 23

Niraj Chokshi & Noam Scheiber, *Inside United Airlines' Decision to
Mandate Coronavirus Vaccines*, N.Y. Times (Oct. 2, 2021) .................... 3

## INTRODUCTION

United Airlines asks the Court to excuse its actions because the company was allegedly doing its best balancing the burdens presented by the COVID-19 pandemic. But it is in difficult times that constitutional protections and civil rights laws serve their most important function.

Additionally, United fights against certification by pointing to all manner of allegedly individualized questions, suggesting that certifying a class would be "unprecedented" because failure-to-accommodate claims are not often certified. Opp'n at 1. That ignores the cases Plaintiffs already identified where classes were certified for such claims, and it ignores the recent certification of a class for Title VII claims challenging an employer's policy of imposing unpaid leave as an accommodation to a vaccine mandate. *UnifySCC v. Cody*, 2024 WL 333892, at *15 (N.D. Cal. Jan. 29, 2024).

Moreover, the truly *unprecedented* aspect of this case was United's decision to treat thousands of employees the same, effectively denying all accommodation requests. United itself created a class long before Plaintiffs sought one, and the Court should thus certify classes under Rule 23(b)(2) and 23(b)(3) to ensure that United is held accountable for its significant violations of Title VII and the Americans with Disabilities Act ("ADA").

## BACKGROUND

Although the underlying merits of the parties' claims and defenses are not directly at issue here, United's opposition includes several statements for which a brief response is necessary.[1]

---

[1] The Court should disregard Tables 2–10 of United's appendix. Those tables do not comply with Federal Rule of Evidence 1006, but rather are filled with argument. Tables 2–8 consist of excerpts from accommodation requests, where the underlying records range from five to fifteen pages and are not "too voluminous" for in-court examination. *Sourgoutsis v. U.S. Capitol Police*, 2019 WL 13285740, at *1 (D.D.C. Sept. 13, 2019). And Tables 9–10 consist almost entirely of deposition excerpts. But the Fifth Circuit holds that "[s]ummary of purely testimonial evidence is strictly speaking not within the purview of Rule 1006." *United States v. Winn*, 948 F.2d 145, 158 n.32 (5th Cir. 1991). Table 10 is a particularly egregious violation of FRE 1006, as United does not

For instance, United confirms its deep distrust of its employees, stating (at 6) that it assumed many employees were disguising "secular objections … in religious or medical terms." United defends this skepticism by pointing to a 2022 Pew Research Poll.  But a 2022 poll cannot explain United's conduct in 2021.  Rather, the poll confirms only that United joined others in distrusting people of faith.  That is hardly a defense.  United also suggests that this poll justifies Scott Kirby's 2021 threats to United employees.  According to Kirby, when he threatened the jobs of employees who requested an accommodation, he *meant* to say that employees just should not lie.  Def.'s App.117–118.  But the Court has already seen the video of Kirby's statements, and any reasonable viewer can see those statements for exactly what they were: a threat.[2]  ECF No. 75-29. That is why this Court, and the Fifth Circuit, made the same observations about Kirby's threats.[3]

On the accommodation process, United's opposition is also littered with inaccuracies.  For instance, United defends its arbitrary deadline for submitting accommodation requests by suggesting (at 7 n.6) that it was necessary because "we had a large number of reasonable accommodations that needed to be reviewed[.]"  Def.'s App.800.  But United set the deadline *before* the requests were submitted.  Supp.App.5.  United also incorrectly states (at 7 n.6) that it allowed certain medical requests to be submitted late because the extensions were provided for

---

even purport to summarize voluminous records.  Rather, this table is filled with argument and factual background—a clear effort to circumvent the page limits the parties jointly proposed.  ECF No. 218.  The Court should reject United's attempt to add 111 pages to its opposition, which significantly frustrates Plaintiffs' ability to respond within the page limits this Court set.

[2] Even if it weren't a threat, Kirby's belief that he needed to remind religious employees not to lie further demonstrates his distrust.

[3] *See Sambrano v. United Airlines*, 2022 WL 486610, at *9 (5th Cir. Feb. 17, 2022) (per curiam) (stating that "[Kirby] revealed United's sentiment towards parties like plaintiffs"), *reh'g and reh'g en banc denied,*45 F.4th 877 (5th Cir. 2022) (per curiam); *Sambrano v. United Airlines, Inc.*, 45 F.4th 877, 879 (5th Cir. 2022) (mem.) (Ho, J., concurring) (noting "evidence … below showing that United's CEO deliberately set out to coerce employees with religious scruples" (citing oral argument)); *Sambrano v. United Airlines*, 570 F. Supp. 3d 409, 420 (N.D. Tex. 2021).

2

those recovering from COVID-19 who "had to wait to get vaccinated." But United allowed *many* medical accommodation requests to be submitted after August 31. Pls.' App.484 (allowing late requests "if for Medical"). United simply wanted a harsher standard for religious requesters.

United is also mistaken when it attempts (at 4) to downplay Kirby's role in devising United's mandate and harsh accommodations by suggesting that other company leaders were also involved. That does not change the fact that Kirby began the process by speaking publicly about the mandate without first telling his executive team (Pls.' App.771–74); that Gebo and Limacher did not believe a mandate was necessary just days before Kirby directed them to implement a mandate (Pls.' App.397); and that it was Kirby's email demanding that United be an early market mover that rapidly accelerated the process (Pls.' App.56). United's argument is also contradicted by the fact that Kirby has admitted to making the mandate decision while by himself on vacation.[4]

As to the accommodations offered, United also misrepresents the record, stating (at 9) that it was infeasible to offer any accommodation other than unpaid leave, ignoring that *every other* major airline found a way to do so. Pls.' App.782. United also incorrectly states (at 4 n.3) that it limited the mandate to its employees (and not contractors) because it "had a heightened responsibility to protect its own employees." Again, the record shows otherwise, where United blamed various contracts for its failure to apply its mandate beyond employees. Supp.App.11–12.

Similarly, as to masks, United asks the Court (at 10) to ignore the fact that N95s *and* KN95s are respirators, which are substantially more cumbersome and (for some) dangerous and painful to wear. That is precisely why United required them for accommodated employees. Pls.' App.94. And United's statement (at 10) that there were no training requirements for respirators is flatly

---

[4] *See* Niraj Chokshi & Noam Scheiber, *Inside United Airlines' Decision to Mandate Coronavirus Vaccines*, N.Y. Times (Oct. 2, 2021), http://tinyurl.com/mux8umny.

contradicted by the fact that United was sanctioned for failing to provide that training.  Pls.' App.112, 427, 429.

Additionally, United's statement (at 5) that it did not lose any fully vaccinated employees to COVID-19 after the policy was implemented ignores that the significant majority of United employees were already vaccinated against COVID-19 before United's mandate (Pls.' App.434); that United imposed the mandate when death and hospitalization rates were at their lowest in 2021 (Pls.' App.569–71, 775–77); and that other COVID-19 mitigation measures were already in place.[5]

As to unpaid leave, United seeks to hide a wealth of evidence.  For instance, United incorrectly states (at 11) that employees put on unpaid leave were able to obtain other United jobs. The record shows the opposite.[6]  Similarly, United falsely states (at 12) that it called "accommodated" employees back because COVID-19 was becoming less deadly.  The record shows that United called employees back in response to litigation risk.  Pls.' App.158.

And, contrary to United's suggestion (at 12), the referenced pilot agreement does not preclude United from imposing another vaccine mandate or unpaid leave.  Rather, the agreement *expressly permits* United to reimpose a mandate.  Def.'s App.4304 (¶ 21-DD-1).  And it allows United to take pilots off any trips it determines necessary.[7]  *Id.* (¶ 21-DD-5).

---

[5] United's statement is also false, as vaccinated United employees also died from COVID-19.

[6] Such applications were often "instantly denied" because the accommodated employee was not vaccinated.  Supp.App.16–17.  And the positions were only available if the employee was willing "to giv[e] up [her] pilot position forever[.]"  Supp.App.18; Supp.App.24 (same for flight attendants).  For others, there was no alternative employment available in the same region, which meant an employee would need to uproot her family and move elsewhere.  Supp.App.23–25.  The entire system of offering alternative positions was unreasonable.

[7] United also falsely states that it discontinued its restricted city list "[a]s of November 2022." Def.'s App.127, 143.  These false statements raise questions about the accuracy of other statements in United's declarations.  Supp.App.2, 7 (showing restrictions into 2023).

## ARGUMENT

As demonstrated below, the Court should certify the requested classes because Plaintiffs first satisfy the commonality and typicality requirements of Rule 23(a). Additionally, Plaintiffs satisfy the requirements for (b)(2) and (b)(3) classes. And United's suggestion that this Court lacks jurisdiction to certify a nationwide class is meritless and premature.

## I. Plaintiffs Satisfy Rule 23(a)'s Threshold Requirements.

United concedes (at 14–31) that Plaintiffs satisfy Rule 23(a)'s requirements of ascertainability, numerosity, and adequacy. Thus, United only challenges commonality and typicality. Each of those challenges fails for largely the same reasons.

### A. Plaintiffs Have Identified Common Questions of Law and Fact.

As Plaintiffs already demonstrated (at 26–30), United's discriminatory actions and policies are the common "glue holding together the alleged reasons for" United's refusal to provide reasonable accommodations. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011). For this, Plaintiffs need only identify "a single common question[.]" *Id.* at 359 (cleaned up). But here, Plaintiffs have identified several common questions of law and fact applicable to the entire class. For instance, is involuntary unpaid leave a reasonable accommodation when there were other accommodations available? It isn't.[8] Does the ability to bid for other jobs—especially when such jobs were not actually available—make unpaid leave a reasonable accommodation? It doesn't. Did United devise a masking-and-testing regime that carried out its CEO's desire for a harsh accommodation to set up employees for harassment and easier termination? It did. Could United have feasibly implemented other accommodations without incurring substantial increased costs?

---

[8] Underscoring the need for an injunction, United continues to claim (at 23) that unpaid leave "can be a reasonable accommodation," ignoring the significant difference between unpaid leave *that an employee requests* versus indefinite, unpaid leave thrust upon the employee.

Yes.  Each of these questions applies broadly.  And the Fifth Circuit confirms that the potential presence of secondary questions does not defeat commonality.  *In re Rodriguez*, 695 F.3d 360, 367 n.9 (5th Cir. 2012) (commonality exists even when "Plaintiffs may have different claims, or claims that may require some individualized analysis" (quotation marks omitted)).

In response, United offers five flawed arguments for why there are no common questions here.  At each turn, United mischaracterizes the facts and ignores the law, which confirms that the presence of individualized questions does not defeat commonality.  *Id.*; *In re Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014) (presence of "diverse" "injurious effects" and "damages" does not undermine commonality).  Moreover, United overlooks that "[t]he test for commonality is not demanding."  *Mullen v. Treasure Chest Casino*, 186 F.3d 620, 625 (5th Cir. 1999).[9]

1.  United begins by spending a surprising amount of time arguing that the Court must engage in a rigorous analysis of each class member's religious beliefs, and that certification is thus impossible.  Not so.  In fact, the Fifth Circuit has already criticized this "bizarre inquisition into the sincerity of its employees' beliefs[.]"  *Sambrano*, 2022 WL 486610, at *1 n.2.  And United's view runs headlong into a wealth of authority in this Circuit holding that courts generally "tak[e] parties *at their word* regarding their own religious convictions."  *Id.*; *accord Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 791, 792 (5th Cir. 2012) ("[s]incerity is generally presumed or easily established" and any inquiry "must be handled with a light touch, or judicial shyness" (cleaned up)). In other words, the starting point here is a presumption of the employee's good faith.

---

[9] United's attempt to paint a confusing picture about the class through its graphic (at 8) is notable for its irrelevance.  United mentions "18 Different Divisions" for "accommodated" employees. But United refused to provide division-specific accommodations.  Similarly, the reference to "79 Unique Jobs" is irrelevant when only one of two accommodations was available.  And the "12 Different CBAs" might have been relevant if United argued that it was forced to employ 12 different accommodations to satisfy those CBAs.  But that is not the case here, and the Court can ignore United's attempt to make something simple look complicated.

United cannot avoid this principle by simply ignoring it. Indeed, this principle is not only foundational to Title VII, it is a bedrock principle across laws that protect a sincere religious belief, like the Free Exercise Clause, where a claimant's belief must also "be sincerely held." *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981) (citing *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir. 1974)). But courts proceed with circumspection because "examin[ing] religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Moussazadeh*, 703 F.3d at 792; *accord Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").

Rather than acknowledge these basic principles, United relies on a mischaracterization of *Davis v. Fort Bend County*, 765 F.3d 480 (5th Cir. 2014). Opp'n at 15. But *Davis* undercuts United's argument. There, the Fifth Circuit confirmed *again* that the court's role is minimal, only deciding "whether [the individual's beliefs] are, *in his own scheme of things,* religious." *Id.* at 485 (emphasis and alterations in original). Thus, *Davis* also confirms that the Court is not to engage in a detailed analysis of religious beliefs, and therefore this presents no obstacle to certification.

On this point, United's reliance on *Braidwood Management, Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023), suffers from a significant oversimplification. But once that case is properly understood, its irrelevance is clear. In *Braidwood*, the plaintiffs sought certification of a class consisting of "every employer in the United States that opposes homosexual or transgender behavior for religious or nonreligious reasons." *Id.* at 922. For that class, the district court would have been required to assess various codes of conduct for such employers, each of which may prohibit different behavior. *Id.* at 934–35. Unsurprisingly, the Fifth Circuit was concerned about the breadth of such a class, including how a court would determine the various ways employers

7

across the country act on their opposition to "homosexual or transgender behavior." *Id.* at 934–35. It was in *that context* that the Fifth Circuit rejected certification because the lawfulness of various codes of conduct could not be resolved "in one stroke." *Id.* at 935. That bears no resemblance to this case, where each class member objected to the same requirement in the same manner.

Similarly, United ignores binding precedent when it suggests (at 18) that it should be able to examine whether a person's belief matches church doctrine.[10] The Fifth Circuit has rejected that exact argument: "[W]hether the belief itself is central to the religion, *i.e.*, whether the belief is a true religious tenet, is '*not open to question.*'" *Davis*, 765 F.3d at 485 (emphasis added). The Supreme Court agrees. In *Thomas*, the Supreme Court considered claims where two Jehovah's Witnesses came to different conclusions about whether their beliefs prevented them from making weapons. 450 U.S. at 710. The Supreme Court emphasized that religious freedom "is not limited to beliefs which are shared by all of the members of a religious sect." *Id.* at 715–16. And courts are "singularly ill equipped to resolve such differences[.]" *Id.* at 715.

Even if United were correct that additional inquiries are needed, the record on these matters does not undermine commonality. For instance, United's parsing of written requests (at 17) ignores that its employees were not experts in drafting accommodation requests, and they likely did not describe their reasoning in perfect detail.[11] But United fails to identify authority for its

---

[10] United's focus (at 17) on accommodation letters "from on-line entities" ignores testimony that some employees had been attending those churches. Supp.App.22.

[11] United attempts (at 6) to divorce religious beliefs from the requests it selectively quotes. That ignores that each employee selected "religious" as the basis for the submitted request. Thus, the employees already explained that the reasoning provided was tied to their religious beliefs, which United *already accepted*. For similar reasons, the court in *U.S. Navy SEALs 1–26 v. Austin*, 594 F. Supp. 3d 767 (N.D. Tex. 2022), *appeal dismissed as moot,* 72 F.4th 666 (5th Cir. 2023), concluded that "potential class members ha[d] carried their (light) burden of demonstrating [that] their religious beliefs are sincere" when they had already submitted requests that the Navy had processed. *Id.* at 780.

proposal to impose such a rigorous standard for the wording of each request.  That also dooms United's suggestion (*id.*) that it may ignore accommodation requests that include similar language as other requests.  Here again, an employee's beliefs can be sincere even if she consults with others on the wording of her request.  And the only way United can discredit testimony "from putative class members" is to mischaracterize it.  *Compare* Opp'n at 17 (stating that request lacked a religious basis), *with* Def.'s App.336–38, 344 (explaining religious basis for request).

Similarly, the record does not include, as United suggests (at 18), evidence of "selective adherence" that undermines credibility.  Rather, United points only to its own lawyers' deposition questions, where they apparently believed they had identified a list of products developed using fetal cell lines.  Opp'n at 17 (citing record).  Setting aside the fact that United failed to establish that any of the products they asked about were actually developed using fetal cell lines, United's argument invites the Court to "stray into the realm of religious inquiry, an area into which [courts] are forbidden to tread."  *Moussazadeh*, 703 F.3d at 792.[12]

2.    United also tries (at 19–20) to defeat the "not particularly high" commonality requirement by arguing that the Court must undertake a rigorous analysis of each class member's disability.  Wrong again.  Where an employer implements a widespread and unlawful scheme in response to requests for medical accommodations, a class may be certified.  As the court in *Holmes v. Godinez*, 311 F.R.D. 177 (N.D. Ill. 2015), explained, certification in such circumstances is appropriate because the plaintiffs are not "challenging hundreds of individual decisions" regarding accommodation requests.  *Id.* at 218.  Rather, the "single system-wide illegal practice or policy can satisfy the commonality requirement."  *Id.* at 217.  And that is true even if there may later be

---

[12] Nor does United address the fact that "[a] finding of sincerity does not require perfect adherence to beliefs expressed by the inmate, and even the most sincere practitioner may stray from time to time."  *Moussazadeh*, 703 F.3d at 791; *accord Thomas*, 450 U.S. at 714.

individual issues presented.  *Id.* at 218.  Other courts have reached the same conclusion in failure-to-accommodate cases.  *See* Mot. at 33–34 (citing cases).

United fails to address *any* of these cases.  But ignoring authority is not a response to it.  Instead, United relies on a case that did not involve class claims.  Opp'n at 19 (citing *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 479 (5th Cir. 2023)).  *Mueck*'s unsurprising reference to an individualized assessment under the ADA does not suggest that ADA claims cannot satisfy the commonality requirement.  And United's other case, *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir. 1993), further undermines its position.  In *Chandler*, the Fifth Circuit concluded that a class could not be certified for Rehabilitation Act claims related to requests for medical accommodations, explaining that "the effect of a given type of impairment … can vary widely from individual to individual."  *Id.* at 1396.  The court continued, explaining that "[o]ne person with impaired vision may simply need to wear glasses, while another may need a guide dog."  *Id.*  In other words, there may be instances when the interactive process was too individualized to assess claims on a classwide basis because appropriate accommodations will differ by condition and position.  Not so here, where United refused to undertake any individualized analysis, providing instead only a blanket "accommodation" irrespective of condition or position.  That explains why the authority Plaintiffs cited is far more relevant—when an employer implements a broad policy for responding to accommodation requests, commonality is satisfied.  Mot. at 33–34.

3.  United is also mistaken when it argues (at 21) that the fact-bound nature of assessing the reasonableness of the accommodations precludes certification.  Here, United relies on a mischaracterization of authority.  True, this Court previously observed that "whether an accommodation is reasonable is a fact-specific inquiry best left to the factfinder."  ECF No. 231 at 9.  But United does not explain how that undermines commonality.

The recent certification decision in *UnifySCC* is instructive on why United's argument fails. 2024 WL 333892. In that case, the court concluded that the plaintiffs were not arguing that the "conduct toward individual employees [was] unreasonable but that the accommodation provided in the Policy [unpaid leave] [was] unreasonable, especially when considering alternatives[.]" *Id.* at *6. And that was true even though the employer offered "accommodated" employees alternative positions. On those facts, the court concluded that the Title VII claims satisfied the commonality requirement. *Id.* So too here, where United imposed broad accommodations for groups of employees without individualized assessments.

Rather than undermine commonality, the fact-bound questions here show why the reasonableness of United's "accommodations" is "capable of classwide resolution[.]" *Dukes*, 564 U.S. at 350. Although United attempts to distort the record, there were only two categories of such accommodations: (1) unpaid leave (threatened and implemented); and (2) punitive masking-and-testing. Within each category, there were various elements of the accommodation (*e.g.*, the requirement to eat alone; the ability for some to exhaust sick leave first; etc.). But the entire class received one or the other "accommodation," and the unlawfulness of each can be determined for each group. For instance, if a jury concludes that placing employees on indefinite, unpaid leave is unlawful, that will resolve the claims for many class members. And the jury's consideration of this claim can include assessing United's testimony about whether affected employees could use their limited sick leave, or whether affected employees were able to apply for other positions— and whether such positions existed. Opp'n at 21–23.

Similarly, commonality is not defeated by a fact-bound inquiry for the masking-and-testing "accommodation." A jury can assess the reasonableness of requiring these employees to wear

11

respirators, which set them apart and made them susceptible to harassment.[13]   And the jury can assess whether requiring these employees to eat alone and face a heightened threat of discipline was reasonable. Pls.' App.94, 165, 409.  By contending otherwise, United ignores that the presence of individualized questions does not defeat commonality.  *In re Rodriguez*, 695 F.3d at 367 n.9.

4.  The same is true for the adverse employment actions that the class suffered.  As Plaintiffs have demonstrated, unpaid leave is an adverse employment action, as was United's draconian masking-and-testing "accommodation."  ECF No. 253 at 4–5.  Again, United's only response (at 24) is that commonality does not exist when there may be a "fact-specific" inquiry. That simply is not the law, as shown above.  *See In re Rodriguez*, 695 F.3d at 367 n.9.

5.  Finally, while undue hardship "is central to the validity" of Plaintiffs' claims, a jury can also address it "in one stroke."  *Dukes*, 564 U.S. at 350.  On this question, the parties will present testimony about the costs of testing, which will address logistics at hub airports and non-hub airports.  Opp'n at 25.  This testimony will also address the costs of employees taking tests themselves and providing results, including whether any state laws are implicated.  *Id.*  And the parties can present testimony from employees within various work groups explaining why the alternative accommodations Plaintiffs proposed would have been feasible and inexpensive.

Once again, United's only response is to mistakenly argue that there can be *no* individualized questions in a class action.  But Rule 23's commonality requirement is not so rigid. *Mullen*, 186 F.3d at 625 ("The test for commonality is not demanding[.]").

Moreover, United's suggestion that the undue hardship analysis is too complex to satisfy commonality ignores the sea change resulting from the Supreme Court's decision in *Groff v. DeJoy*, 600 U.S. 447 (2023).  Under that new standard, United will struggle to show that providing

---

[13] That no doubt fed into the reasons that Plaintiff Castillo was harassed.  Mot. at 11.

reasonable accommodations to the class "would result in substantial increased costs[.]"  *Id.* at 470.

Thus, this question is even more straightforward now than it was when this litigation began.

### B.     These Common Questions are Also Typical Across the Class.

For similar reasons, Plaintiffs also satisfy typicality, which "tend[s] to merge" with

commonality as they each largely address the same question.  *Dukes*, 564 U.S. at 349 n.5.

Here again, United responds (at 29–30) by making mountains out of mole hills.  But the

Fifth Circuit confirms that focusing on slight variations with the facts of Plaintiffs' claims does

not defeat typicality.  *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137 (5th Cir. 2005) (rejecting

claim that typicality is "destroy[ed]" by "presence of an arguable unique defense"); *accord In re*

*Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1034–35 (N.D. Miss. 1993) (citing cases holding that

"typicality does not mean that the claims of class members must be identical").  Rather, "the key

typicality inquiry is whether a class representative would be required to devote considerable time

to rebut Defendants' claims."  *Lehocky v. Tidel Tech.*, 220 F.R.D. 491, 501–02 (S.D. Tex. 2004).

As Plaintiffs showed, there are no such individualized questions here.  For instance, United

points (at 29) to its decision to offer a specific job to Capt. Sambrano as defeating typicality.  As

Sambrano already explained, but which United ignores (at 29 n.21), he was not qualified for this

position.  2d Supp. Sambrano Decl. (Supp.App.34–36) (explaining qualification issue in detail).

And it cannot be that offering an unavailable job defeats typicality.  However, this does show the

length to which United was willing to go—just days after facing intense questioning from the Fifth

Circuit—to "pick off" Sambrano as a Plaintiff.  Courts are to be wary of such blatant efforts to

avoid class certification.  *Haliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 276 (2014)

(attempts to "pick off" class members "does not cause individual questions to predominate");

*Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 315 (5th Cir. 2015) (warning against courts

allowing defendants to "'pick off' individual plaintiffs before class certification").  Putting that

distraction aside, Sambrano's claims are very typical of the class.

The same is true of Plaintiff Kincannon.  Here, United's only argument (at 30) is that she does not make enough money from United for unpaid leave to have been harmful for her.  That argument is not only insulting, it is incorrect.  Were Kincannon's income unnecessary, as United suggests, her family likely would not have borrowed from retirement to pay off their mortgage when facing the loss of her income.  Supp.App.29.  Moreover, differences in levels of damages do not defeat typicality.  *Deepwater Horizon*, 739 F.3d at 810–11.

For Plaintiff Burk, United hardly attempts to identify unique questions presented by his claim.  United is correct (at 30) that "[e]very employee's experience will be different."  But Burk shares claims with many others who faced United's constant coercion and, in the face of indefinite, unpaid leave, acquiesced to that coercion.  While life circumstances may differ by employee, United's coercion and its direct effects are the same for each employee.  *Mullen*, 186 F.3d at 625 (finding typicality where plaintiffs and class members shared "legal and remedial theories[.]").

And for Plaintiff Jonas, the general questions about whether United's purposefully harsh masking-and-testing regime were unlawful will apply to Title VII and ADA class members alike.  The Fifth Circuit confirms that the presence of potential secondary questions or defenses unique to certain groups of employees does not defeat typicality.  *Feder*, 429 F.3d at 137.

## C.    United's Decision to Implement a Broad Policy Supports Certification.

The commonality and typicality of Plaintiffs' claims are also underscored by United's devising and implementing a uniformly discriminatory policy of refusing to provide reasonable accommodations.  Mot. at 27–30.  As Plaintiffs demonstrated, United's mandate and harsh "accommodations" flowed from the top.  After Kirby set the tone for the company's pattern of harassment and intimidation, the details of the accommodation process were determined by a central team.  Mot. at 4–5.  From there, United centralized review of the requests within its

14

corporate Human Resources division.[14]

Courts in this Circuit and elsewhere confirm that such a policy satisfies the commonality and typicality requirements. Mot. at 26–30. And, contrary to United's suggestion (at 27), Plaintiffs have shown that United's accommodation policy was uniformly unlawful. United's contention that the policy was "unambiguously compliant with Title VII and the ADA" for some employees is fanciful. Rather, the "accommodations" were uniformly unreasonable. And, as Plaintiffs further demonstrated (at 27–30), United's initial decision to put *all* accommodated employees on indefinite, unpaid leave was itself unlawful. *McNeill v. Tyson Fresh Meats*, 2023 WL 8532408, at *6 (N.D. Tex. Dec. 8, 2023). The same is true for the subsequent masking-and-testing regime that United devised. None of those decisions was "unambiguously compliant" with the law.

United also asks the Court (at 26) to ignore Plaintiffs' authority because "every one of those cases concerned a blanket policy that was either facially discriminatory or did not permit any accommodations at all." That only confirms why this authority is applicable—United's two blanket "accommodations" were also unreasonable and facially discriminatory. Mot. at 32–34 (explaining why the cited authority is similar to this case). Indeed, *Sughrim v. New York,* 2023 WL 5713191 (S.D.N.Y. Sept. 5, 2023), is particularly instructive, as it involved a class certified to bring Title VII claims. In that case, the court found that the claims could be considered on a classwide basis where, as here, the same "officials in … [defendant's] central office" decided whether to grant the request. *Id.* (quoting *Sughrim*, 2023 WL 5713191, at *24). And the plaintiffs there challenged "systemic failures" of the defendants to comply with Title VII. *Id.* So too here. United offers no response other than to ask the Court to ignore this authority.

---

[14] Discovery will also show that United approached this as a class action when interacting with the EEOC, submitting one of its standardized responses for all charges, rather than responding individually to each charge.

15

II.     **The Court Should Certify a Class Under Rule 23(b)(2).**

United also has no compelling response to Plaintiffs' showing that monetary and injunctive relief are available for Plaintiffs' Rule 23(b)(2) class.

1. As to monetary damages, United raises two arguments against certification of incidental monetary damages under (b)(2). Neither has merit, however, and neither forecloses certification of a (b)(2) class that includes incidental monetary damages.[15]

*First,* United's claim that punitive damages can never qualify as incidental under (b)(2) is incorrect. In making this claim, United misreads *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), and ignores *Allison*'s careful efforts to cabin its holding. *Allison* began its discussion of punitive damages by "[a]ssuming" that class-wide punitive damages awards "without individualized proof of injury" are available "where the entire class or subclass is subjected to the same discriminatory act or series of acts." 151 F.3d at 417. The court emphasized, however, that "no such discrimination is alleged in this case." *Id.* Instead, the claims in *Allison* "challeng[ed] various policies and practices" enacted by multiple parties in various locations "over a period of nearly twenty years." *Id.* Because "[s]ome discriminatory policies may have been implemented more—or less—harshly" than others and "[s]ome plaintiffs" were thus "subjected to more virile discrimination than others," the punitive damages at issue in that case were too individualized. *Id.*

From the outset, then, *Allison* emphasized what its holding reaches: *Allison* precludes certification in cases where plaintiffs seek to amalgamate a series of *individualized* punitive

---

[15] United's nitpicking of the (b)(2) class definition does not weigh against certification. While United suggests (at 23) that denied requests fall within the (b)(2) definition, United ignores the second part of the class definition, which limits it to individuals who faced the impossible choice imposed on them after United "granted" their requests. United also ignores that, should the Court have concern about any aspect of Plaintiffs' proposed class definitions, it "may modify the classes to fit the requirements better and should not dismiss an action purely because the proposed class definition is too broad." *Braidwood*, 70 F.4th at 934.

damages awards based on multiple policies and practices.  *Id.* at 418.  It does not, however, reach cases where a single, class-wide award of punitive damages is sought "without individualized proof of injury" because the entire class was "subjected to the same discriminatory act." *Id.* at 417. Such an award was not at issue in *Allison* and the decision to deny certification of punitive damages in that case does not, as United suggests, universally bar punitive damages as incidental damages.

Rather, the punitive damages claimed by Plaintiffs in this case fall in the scenario *Allison* did not reach—Plaintiffs seek a standardized, class-wide award of punitive damages because the entire class was subjected to the same discriminatory act, namely, the coercive choice between their beliefs or health and their livelihoods.  The appropriateness of punitive damages in this context turns on United's "conduct … and not the individual characteristics of the plaintiffs." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011).  Thus, if a jury finds that United acted "with malice or with reckless indifference," *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (quoting 42 U.S.C. § 1981a(b)(1)), it can easily award one uniform amount of punitive damages as a remedy for this uniformly harmful policy. *See*, *e.g.*, *Ellis*, 657 F.3d at 987.[16]

*Second*, United asserts that Plaintiffs' claims for backpay and compensatory damages prevent (b)(2) certification because they can never qualify as incidental.  But Plaintiffs do not seek certification of their claims for backpay and compensatory damages under (b)(2), they seek certification of those claims under (b)(3), where claims for individualized damages are appropriate.

In raising Plaintiffs' (b)(3) claims as an argument against (b)(2) certification, United seems to imply that a class action can only be certified under a single provision of Rule 23(b).  That approach is illogical and unsupported by Fifth Circuit decisions.  Indeed, discriminatory conduct

---

[16] Although United argues (at 28 n.20) that evidence of intent is irrelevant, evidence of discriminatory intent is both necessary and relevant to prove that United acted with the requisite "malice and reckless indifference" justifying a class award of punitive damages.

often gives rise to claims for both preventive injunctive and remedial monetary relief.  *See, e.g.*, *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324 (1969) (addressing both monetary damages and injunctive relief on a claim of race discrimination); *Akins v. S. Cent. Bell Tel. Co.*, 744 F.2d 1133 (5th Cir. 1984) (same).  In such cases, plaintiffs are permitted to seek *each* remedy under the appropriate prong of Rule 23(b).

And there is no Fifth Circuit authority foreclosing the availability of such hybrid relief.  Both United, and the case it cites, misconstrue *Allison*.  Opp'n at 34 (citing *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 370 (S.D. Tex. 2006) for the proposition that *Allison* "specifically rejected the possibility of a 'hybrid' class").  In *Allison*, the plaintiffs argued in the alternative that the district court should have certified a "hybrid" class action with the injunctive claims certified under (b)(2) and the monetary damages certified under (b)(3).  But *Allison* determined that plaintiffs' monetary claims did not meet the predominance and superiority requirements of (b)(3), and so the court declined to certify those claims at all.  *Allison* thus stands only for the non-controversial fact that the underlying claims in a hybrid action must be certifiable.  Again, United attempts to inappropriately twist *Allison*'s holding—which is necessarily confined by its facts—to create a universal prohibition against certification of money damages under (b)(2).[17]

2.  As to injunctive relief, United's arguments also fail, suggesting (at 35) that injunctive relief under (b)(2) must apply to the class "as a whole" and must "specify exactly what common conduct is enjoined as to all class members." (cleaned up).  The requested injunction does just that.

Indeed, Plaintiffs were all "harmed in essentially the same way."  *Id*.  The coercive harm

---

[17] Nor does *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545 (5th Cir. 2003), cited by United (at 34), prohibit certification of hybrid class actions.  That case addressed the appropriateness of injunctive relief in a breach of contract context, not the appropriateness of a hybrid class action.  Provided the requirements for each subsection are met, there is no reason that claims under both (b)(2) and (b)(3) cannot be brought in the same suit.

from United's vaccine mandate and threat of indefinite unpaid leave was uniform across the class. *Sambrano*, 2022 WL 486610, at *3 (noting that United's coercion was "harmful in and of itself"). As a result, Plaintiffs seek a single injunction prohibiting United from again imposing a vaccine mandate with the threat of indefinite, unpaid leave. This request does not require the court to craft any "individualized injunctive-type relief" for each class member. Opp'n at 35.

To the contrary, on closer inspection, the "myriad individualized issues" United lists (at 36) merely repeat arguments it made regarding the Rule 23(a) factors. That is, the "individualized" questions are questions about *who should be in the class*; none of them impacts the scope of the injunctive relief sought and none would prohibit class-wide injunctive relief.

Nor should this Court give credence to United's repeated attempts (at 34) to resurrect its mootness argument, which this Court has already rejected. ECF No. 231 at 29–30. United argues that Plaintiffs "have no need for prospective injunctive relief" because United (it asserts) ended the challenged practice two years ago. Opp'n at 34. But this court has already agreed that United's voluntary cessation of its challenged practice does not legally prevent United from renewing the conduct again in the future. ECF No. 231 at 30. That is especially true where, as here, United's representatives repeatedly *refused* to state under oath that the company would not revive the practice, Pls.' App.827–28, and United continues arguing (at 23) that unpaid leave is a reasonable accommodation. And United's new collective bargaining agreement with its pilots does not change this calculus. Rather, it confirms the need for an injunction. *See supra* at 4.

In any event, the proposed class here includes much more than pilots, and those employees also deserve legal protection against United's future discrimination. To provide that protection, the Court should certify a (b)(2) class for injunctive relief and incidental punitive damages.

## III.    The Court Should Also Certify a Class Under Rule 23(b)(3).

Additionally, because the common issues predominate and proceeding as a class action is

far superior to more than a thousand separate trials, Rule 23(b)(3)'s requirements are satisfied.

### A.      Common Questions Predominate.

The questions of fact and law are not only common, they predominate over any other issues.  Mot. at 37–41.  And once again, United misses the mark in trying to argue otherwise.

1.   As to liability, United fails to identify any questions of fact or law that would predominate over the common questions Plaintiffs identified.  For instance, United suggests (at 38) that inquiries into the sincerity of beliefs "would easily swamp any common question Plaintiffs might pose."  But that would only be the case if the Court ignores Fifth Circuit precedent and countenances United's proposed inquisition into religious beliefs.  *See supra* at 6–9.  Under binding precedent, there would be no "swamping" of issues.  And United is also wrong to argue (at 38) that the Court must determine whether every class member *experienced* "dizziness, headaches, and difficulty breathing" due to United's respirator accommodation.  Plaintiffs have not claimed that the accommodation was unlawful only for those who experienced such symptoms—it was unreasonable for *everyone*.  And Plaintiffs have shown that United developed this accommodation to be purposefully harsh and punitive.  That is basis enough to conclude that it was unlawful.  *See* Mot. at 39 (citing cases showing that an employer cannot use the "guise of reasonableness" to implement a purposefully harsh accommodation).

The same is true for the unreasonableness of the two "accommodations" United provided.  A jury can assess testimony from witnesses about the availability of alternative positions, including the reasonableness of forcing employees to give up their positions to obtain replacement income.  Indeed, that is what the *UnifySCC* court concluded when finding predominance for the Title VII claims: "[B]ecause the accommodations at issue are specified in the Policy and offered to all Class members, whether those accommodations were reasonable can be addressed on a class-wide basis."  2024 WL 333892, at *11.

In its opposition, United has not identified any reason why related questions of cost or direct-threat defenses cannot be addressed broadly. That is likely because United can easily provide testimony about what it perceived as the costs and direct threats of unvaccinated pilots and flight attendants flying with other accommodations in place. Here again, these are broad questions that can be addressed at the class level. *Mullen*, 186 F.3d at 626.

2. As to damages, United comes up short again. Here, United misunderstands Plaintiffs' position and the law. To satisfy this requirement, Plaintiffs need only identify "a mathematical or formulaic calculation" that covers each affected class member. *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307–08 (5th Cir. 2003).[18] Plaintiffs have done so. Mot. at 39–41.

On the facts, United's only response is to address a strawman, refuting a position Plaintiffs did not advance. United suggests (at 40) that Plaintiffs are proposing "the use of averages [which] would, by definition, undercompensate some putative class members[.]" While that may be true if an average of some pilots' earnings were used as the measure of damages for other pilots, Plaintiffs have instead proposed a formula where each *individual's* average earnings are used to calculate that individual's lost wages. Pls.' App.851, 853–54, 863. There is no risk of undercompensating or overcompensating here, and United's expert fails to show otherwise.[19]

On the law, United suggests (at 40–41) that Plaintiffs have not identified authority for using averages when computing backpay. That blinks reality: "It is *well-established* in the Fifth Circuit that the trier of fact may rely on a lost income stream calculation that is based on an average wage rate[.]" *Nelson v. Cooper T. Smith Stevedoring, Co.*, 2013 WL 4591362, at *1 (E.D. La. Aug. 28,

---

[18] United's suggestion (at 39) that Plaintiffs changed their position when referencing "salary" and later referencing "earnings" ignores that these words simply mean the same thing—income.

[19] So too with Plaintiffs' proposal (Pls.' App.853–54) to calculate damages by operation of governing contracts, just as United did for pilots when this Court's TRO was in place.

2013) (emphasis added).  Plaintiffs identified extensive authority (at 40) where courts have used averages to calculate damages for plaintiffs who receive variable pay.  That authority is directly applicable, and it is of no moment that those cases did not arise under Title VII or the ADA. Rather, the use of a single formula to calculate each individual's average earnings would be easily applied here, as the record already confirms.[20]  Pls.' App.851, 853–54, 863.

At each turn, United's challenge to predominance starts with the incorrect premise that there can be no individualized questions.  But courts across the country reject that argument.  *See UnifySCC*, 2024 WL 333892, at *15 (finding that common questions predominate for Title VII claims challenging unpaid leave as an accommodation to vaccine mandate); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 305–06 (3d Cir. 2005) ("courts have consistently held that the necessity of [an individual damages] inquiry does not preclude class action treatment where class issues predominate").  Plaintiffs thus satisfy the predominance requirement.

**B.    A Class Action is the Superior Method for Resolving These Questions.**

Plaintiffs have also demonstrated superiority because, as the Supreme Court requires, certification will "promot[e] ... efficiency and economy of litigation."  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983).  United's proposal to force courts to manage more than a thousand lawsuits—each addressing the same questions and evidence—confirms that a class action is superior.  Indeed, were it not for the increased liability exposure, United would undoubtedly be

---

[20] United also incorrectly states (at 41–42) that Plaintiffs' motion is "oddly silent" about non-backpay compensatory damages.  Plaintiffs explained that compensatory damages can also be calculated on a class-wide basis using mechanical formulas.  Mot. at 41.  For instance, if United's unpaid leave scheme caused employees to make early (and costly) withdrawals from their 401(k) accounts, those penalties can be easily calculated.  So too for the health insurance premiums that class members had to pay when United stripped "accommodated" employees of insurance coverage.  And, for the more detailed harms United caused, those are directly relevant to demonstrating United's punitive actions toward the class.

arguing the same thing, as resolving these claims at once is indisputably more efficient for everyone than repetitively litigating the same claims over and over for years, clogging the courts with identical lawsuits. That is why the Fifth Circuit has affirmed class certification where it "would 'promote judicial economy and avoid the wasteful, duplicative litigation which would inevitably result if these cases were tried individually.'" *Mullen*, 186 F.3d at 627.

The Supreme Court confirms that class actions are a superior method of adjudication when the case involves "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). That is especially true in a case like this one, where hundreds of employees were never placed on unpaid leave and others succumbed to United's coercion by taking the vaccine against their beliefs and health. Monetary damages may be limited for such individuals. *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769–70 (5th Cir. 2020) (discussing negative value suits). United's attempt to avoid this obvious conclusion by pointing to Title VII's statutory cap ignores that a cap is not an estimation of the value of the claims here, and it ignores that the certified classes discussed above involved Title VII claims, despite the statutory cap.

Likewise, class actions are vastly superior to individual litigation where plaintiffs "are vulnerable to reprisals by the defendant due to a continuing economic relationship, such as employment." 2 Wm. B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 4.65 (6th ed. 2023). The evidence here of reprisals is manifest. But United waves its hand at the idea that employees would be reticent to bring their own cases against the airline, citing (at 44) "dozens" of employees who have already sued the company. But the fact that only 1,685 individuals were willing to file EEOC charges against United, when 5,885 employees submitted accommodation requests and suffered from United's unlawful accommodation decisions, suggests that *many*

23

employees were likely fearful to pursue claims against their employer.  Opp'n at 8.  From the beginning, United has been vindictive toward employees unwilling to acquiesce to Kirby's mandate.  Employees know this and are understandably less willing to bring separate actions against the company.

Finally, while United complains (at 44) that Plaintiffs have not offered a detailed trial plan, this is not a difficult hurdle.  As Plaintiffs discussed above, the common claims and defenses can be addressed through testimony of Plaintiffs and several other class members from various United work groups.  And United's explanations for its actions can be easily examined through testimony from the individuals involved in creating and implementing the mandate.  In fact, Plaintiffs have already deposed nearly all of them, and the parties have already exchanged broad discovery on these topics.  Moreover, the scope of remaining issues and claims will likely be narrowed substantially through summary judgment.

Additionally, should the Court conclude that any of the individualized questions need to be addressed separately, there is ample authority in this Circuit for a special master to resolve such issues while the class proceedings continue.  Similarly, although a bifurcated class action is not necessary, a "*Lone Pine* order" may be appropriate to streamline consideration of any defenses that the Court concludes might have merit (*e.g.*, individuals submitting a counterfeit accommodation request).  *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 556 & n.3 (5th Cir. 2011) (requiring plaintiffs "to produce some evidence to support a credible claim" (cleaned up)).  This type of gatekeeping mechanism would allow United to present any individual defenses and preserve its due process rights.  But a class action does not become "inferior" to individual actions merely because there may be difficulties in managing the case.  That is especially true when the alternative is for thousands of individuals to ask courts and juries across the country to

24

address the same basic questions.

## IV.    There are no Jurisdictional Hurdles.

Finally, as Plaintiffs have previously shown (ECF No. 55 at 10–11), United's personal jurisdiction arguments conflict with the holdings of courts across the country that have considered the same issues, and United's argument would lead to the absurd result that nationwide class actions may only be brought against a company in its home state.  That has never been the rule.  Rather, Rule 23 provides its own strictures ensuring fair play and substantial justice.  *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 433 (5th Cir. 2021).  A class action is thus distinct from cases where an individual brings his own claim against a defendant in a particular forum.

United understandably does not want to face a class action that would hold it responsible for its behavior toward thousands of individuals who requested accommodations, but its jurisdictional argument is a stretch that would undermine the very purposes of Rule 23.  Additionally, this argument fails because it is premature.  This Court previously noted in ruling on personal jurisdiction that it could not exclude *putative* class members—"[i]f the class is certified, United may then re-urge its Motion as to that class."  ECF No. 103 at 14.[21]

### CONCLUSION

United devised and implemented a uniform scheme for responding to accommodation requests in a discriminatory and coercive manner.  Since United has consistently treated employees who requested accommodations as a class, the Court should do likewise.  Accordingly, the Court should certify the requested (b)(2) and (b)(3) classes.

---

[21] Plaintiffs also reiterate their contention that United should be subject to general jurisdiction in Texas for the various reasons explained previously (*e.g.*, over 14,000 United employees work in Houston alone; United's payroll operations occur in Texas where United maintains corporate offices; and CEO Kirby lives and works in Dallas).

February 23, 2024                           Respectfully submitted,

*/s/ Mark R. Paoletta*                       */s/ John C. Sullivan*
Mark R. Paoletta*                           John C. Sullivan
D.C. Bar No. 422746                         Texas Bar No. 24083920
Gene C. Schaerr*                            David Austin R. Nimocks
D.C. Bar No. 416368                         Texas Bar No. 24002695
Brian J. Field*                             S|L LAW PLLC
D.C. Bar No. 985577                         610 Uptown Boulevard, Suite 2000
Cristina Martinez Squiers                   Cedar Hill, TX 75104
Texas Bar No. 24093764                      Telephone: (469) 523-1351
SCHAERR | JAFFE LLP                         Facsimile: (469) 613-0891
1717 K Street NW, Suite 900                 john.sullivan@the-sl-lawfirm.com
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
mpaoletta@schaerr-jaffe.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs and the Proposed Class*

26

## CERTIFICATE OF SERVICE

On February 23, 2024, I filed the foregoing document with the clerk of court for the United States District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rule of Civil Procedure 5(b)(2) (ECF System).

*/s/ Brian J. Field*
Brian J. Field